# EXHIBIT 2

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the fiscal year ended December 31, 2022**

OR

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
   **For the transition period from to**

**Commission file number 001-39546**

# PROTERRA INC
**(Exact name of registrant as specified in its charter)**

| **Delaware** | **90-2099565** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1815 Rollins Road** | |
| **Burlingame, California** | **94010** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(864) 438-0000**
Registrant's telephone number, including area code

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.0001 par value per share | PTRA | The Nasdaq Stock Market LLC |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T

(§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer | ☒ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C.7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2022, the last business day of the registrant's most recently completed second fiscal quarter, based on the closing price of $4.64 for shares common stock then listed on the Nasdaq Global Select Market, was approximately $0.9 billion.

The registrant had outstanding 226.4 million shares of common stock as of March 13, 2023.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive proxy statement relating to its 2023 Annual Meeting of Stockholders (the "Proxy Statement") are incorporated herein by reference in Part III, Items 10 through 14 of this Annual Report on Form 10-K ("Annual Report"), as specified in the responses to those item numbers. Except with respect to information specifically incorporated by reference in this Annual Report, the Proxy Statement is not deemed to be filed as part hereof. The Proxy Statement will be filed with the Securities and Exchange Commission within 120 days of the registrant's fiscal year ended December 31, 2022.

Table of Contents

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Explanatory Note - Certain Defined Terms | 3 |
| Forward-Looking Statements | 4 |
| Summary of Risk Factors | 7 |
| | |
| **PART I** | |
| Item 1. Business | 10 |
| Item 1A. Risk Factors | 23 |
| Item 1B. Unresolved Staff Comments | 70 |
| Item 2. Properties | 70 |
| Item 3. Legal Proceedings | 71 |
| Item 4. Mine Safety Disclosures | 71 |
| | |
| **PART II** | |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 72 |
| Item 6. Reserved | 73 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 73 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 95 |
| Item 8. Financial Statements and Supplementary Data | 97 |
| Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosures | 143 |
| Item 9A. Controls and Procedures | 143 |
| Item 9B. Other Information | 145 |
| Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 145 |
| | |
| **PART III** | |
| Item 10. Directors, Executive Officers and Corporate Governance | 146 |
| Item 11. Executive Compensation | 146 |
| Item 12. Security Ownership of Certain Beneficial Owner and Management and Related Stockholder Matters | 146 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence | 146 |
| Item 14. Principal Accountant Fees and Services | 146 |
| | |
| **PART IV** | |
| Item 15. Exhibits and Financial Statement Schedules | 148 |
| Item 16. Form 10-K Summary | 150 |
| Signatures | 151 |

Table of Contents

**Explanatory Note - Certain Defined Terms**

Unless otherwise stated in this Annual Report on Form 10-K or the context otherwise requires, references to:

- "ArcLight" means ArcLight Clean Transition Corp., a Cayman Islands exempted company, prior to the consummation of the Domestication;

- "Business Combination" means the Domestication, the Merger and the other transactions contemplated by the Merger Agreement, collectively, including the PIPE Financing;

- "Class A ordinary shares" means the Class A ordinary shares, par value $0.0001 per share, of ArcLight, prior to the Domestication, which automatically converted, on a one-for-one basis, into shares of common stock in connection with the Domestication;

- "Class B ordinary shares" means the Class B ordinary shares, par value $0.0001 per share, of ArcLight that were initially issued to the Sponsor (a portion of which were subsequently transferred to the other initial shareholders) in a private placement prior to ArcLight's initial public offering, and, in connection with the Domestication, which automatically converted, on a one-for-one basis, into shares of common stock;

- "Closing" means the closing of the Business Combination;

- "Closing Date" means June 14, 2021;

- "common stock" means the common stock, par value $0.0001 per share, of Proterra;

- "Convertible Notes" means the Secured Convertible Promissory Notes that Legacy Proterra issued in August 2020;

- "Domestication" means the transfer by way of continuation and deregistration of ArcLight from the Cayman Islands and the continuation and domestication of ArcLight as a corporation incorporated in the State of Delaware;

- "initial public offering" means ArcLight's initial public offering that was consummated on September 25, 2020;

- "Legacy Proterra" means Proterra Inc, a Delaware corporation, prior to the consummation of the Business Combination;

- "Merger" means the merger of Phoenix Merger Sub with and into Legacy Proterra pursuant to the Merger Agreement, with Legacy Proterra as the surviving company in the Merger and, after giving effect to such Merger, Legacy Proterra becoming a wholly-owned subsidiary of Proterra;

- "Merger Agreement" means that certain Merger Agreement, dated as of January 11, 2021 (as may be amended, supplemented or otherwise modified from time to time), by and among ArcLight, Phoenix Merger Sub and Legacy Proterra;

- "Phoenix Merger Sub" refers to Phoenix Merger Sub, Inc., a Delaware corporation and a wholly-owned direct subsidiary of ArcLight;

- "PIPE Financing" means the transactions contemplated by the Subscription Agreements, pursuant to which the PIPE Investors collectively subscribed for 41,500,000 shares of common stock for an aggregate purchase price of $415,000,000 in connection with the Closing;

- "PIPE Investors" means the investors who participated in the PIPE Financing and entered into the Subscription Agreements;

3

Table of Contents

- "private placement warrants" means the 7,550,000 private placement warrants outstanding as of September 30, 2021 that were issued to the Sponsor as part of ArcLight's initial public offering, which were substantially identical to the public warrants, subject to certain limited exceptions; the Sponsor exercised the private placement warrants on a "cashless" basis in connection with our redemption of our remaining outstanding public warrants on October 26, 2021;

- "Proterra" means ArcLight upon and after Closing;

- "public warrants" means the 13,874,994 redeemable warrants to purchase common stock outstanding as of September 30, 2021 that were issued by ArcLight in its initial public offering; on October 29 2021, we redeemed the remaining outstanding public warrants that had not previously been exercised at a redemption price of $0.10 per public warrant;

- "Senior Credit Facility" means the Loan, Guaranty and Security Agreement that entered into by Legacy Proterra in May 2019;

- "Sponsor" means ArcLight CTC Holdings, L.P., a Delaware limited partnership; and

- "Subscription Agreements" means the subscription agreements, entered into by ArcLight and each of the PIPE Investors in connection with the PIPE Financing.

In addition, unless otherwise indicated or the context otherwise requires, references in this Annual Report to the "Company," "we," "us," "our" and other similar terms refer to Legacy Proterra prior to the Business Combination and to Proterra and its consolidated subsidiaries after giving effect to the Business Combination.

## Forward-Looking Statements

This Annual Report contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). This Annual Report contains forward-looking statements regarding, among other things, our plans, strategies and prospects, both business and financial. These statements are based on the beliefs and assumptions of our management. We also may provide forward-looking statements in oral statements or other written materials released to the public. Although we believe that our plans, intentions and expectations reflected in or suggested by these forward-looking statements are reasonable, we cannot assure you that we will achieve or realize these plans, intentions or expectations. Forward-looking statements are inherently subject to risks, uncertainties and assumptions. Generally, statements that are not historical facts, including statements concerning possible or assumed future actions, business strategies, events or results of operations, are forward-looking statements. These statements may be preceded by, followed by or include the words "believes", "estimates", "expects", "projects", "forecasts", "may", "will", "should", "seeks", "plans", "scheduled", "anticipates" or "intends" or similar expressions. Forward-looking statements contained in this Annual Report may include, for example, statements about:

- our financial and business performance, including business metrics and our compliance with terms governing the Convertible Notes and Senior Credit Facility;

- our ability to maintain the listing of our common stock on the Nasdaq Global Select Market ("Nasdaq"), and the potential liquidity and trading of our common stock;

- changes in our strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects and plans;

- regulations that we are subject to, the impact of unfavorable changes to such regulations, or our ability to comply with.such regulations;

- expectations regarding corporate, state, federal and international mandates/commitments;

4

Table of Contents

- our success in retaining or recruiting, or changes required in, our officers, key employees or directors, and our ability to attract and retain key personnel;

- the anticipated success of our business, including our most recent business expansion with Proterra Powered and Proterra Energy, and our ability to attract the customers and business partners we expect;

- forecasts regarding long-term end-customer adoption rates and demand for our products in markets that are new and rapidly evolving and our ability to meet demand for our products;

- our ability to compete successfully against current and future competitors in light of intense and increasing competition in the transit bus and commercial vehicle electrification market;

- the availability of government economic incentives and government funding for public transit upon which our transit business is significantly dependent;

- willingness of corporate and other public transportation providers to adopt and fund the purchase of electric vehicles for mass transit;

- availability of a limited number of suppliers for our products and services and their desire and/or ability to satisfy our supply demands;

- material losses and costs from product warranty claims, recalls, or remediation of electric transit buses or our battery systems for real or perceived deficiencies or from customer satisfaction campaigns;

- increases in costs, disruption of supply, or shortage of materials, particularly lithium-ion cells and wiring harnesses, and drivetrain components;

- our dependence on a small number of customers that fluctuate from year to year, and ability to add new customers or expand sales to our existing customers;

- our ability to improve operational efficiency, streamline supply chain and distribution logistics, reduce organizational complexity and reduce facility costs;

- our dependence on our business suppliers, particularly as we build out new facilities;

- rapid evolution of our industry and technology, and related unforeseen changes, including developments in alternative technologies and powertrains or improvements in the internal combustion engine that could adversely affect the demand for our electric transit buses;

- development, maintenance and growth of strategic relationships in the Proterra Powered or Proterra Energy business, identification of new strategic relationship opportunities, or formation strategic relationships;

- competition for the business of both small and large transit agencies, which place different demands on our business, including the need to build an organization that can serve both types of transit customers;

- accident or safety incidents involving our buses, battery systems, electric drivetrains, high-voltage systems or charging solutions;

- product liability claims, which could harm our financial condition and liquidity if we are not able to successfully defend or insure against such claims;

- changes to U.S. trade policies, including new tariffs or the renegotiation or termination of existing trade agreements or treaties;

- various environmental and safety laws and regulations that could impose substantial costs upon us and negatively impact our ability to operate our manufacturing facilities; outages and disruptions of our

5

Table of Contents

services if we fail to maintain adequate security and supporting infrastructure as we scale our information technology systems;

- availability of additional capital to support business growth;

- ability to protect our intellectual property;

- intellectual property rights claims by third parties, which could be costly to defend, related significant damages and resulting limits on our ability to use certain technologies;

- developments and projections relating to our competitors and industry;

- our anticipated growth rates and market opportunities;

- the period over which we anticipate our existing cash and cash equivalents will be sufficient to fund our operating expenses and capital expenditure requirements;

- the potential for our business development efforts to maximize the potential value of our portfolio and our related plans and strategy;

- our estimates regarding expenses, future revenue, capital requirements and needs for additional financing;

- our ability to develop and maintain effective internal controls and procedures and remediate the material weaknesses we have identified in our internal controls;

- the diversion of management's attention and consumption of resources as a result of potential strategic transactions;

- our ability to maintain adequate operational and financial resources or raise additional capital, generate sufficient cash flows, including our ability to service our debt obligations under the Senior Credit Facility and Convertible Notes;

- our ability to comply with the covenants in the Senior Credit Facility and Convertible Notes;

- our ability to continue as a going concern;

- cyber-attacks and security vulnerabilities; and

- the effect of the COVID-19 pandemic and macroeconomic conditions, such as rising inflation rates, uncertain credit and global financial markets, including the recent bank failures, and supply chain disruptions, and geopolitical events, such as the conflict between Russia and Ukraine and related sanctions, on the foregoing.

These forward-looking statements are based on information available as of the date of this Annual Report, and current expectations, forecasts and assumptions, and involve a number of judgments, risks and uncertainties. Important factors could cause actual results to differ materially from those indicated or implied by forward-looking statements such as those contained in documents we have filed with the Securities and Exchange Commission (the "SEC"). Accordingly, forward-looking statements should not be relied upon as representing our views as of any subsequent date, and we do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws. Our forward-looking statements do not reflect the potential impact of any future acquisitions, mergers, dispositions, joint ventures, investments or similar transactions.

Table of Contents

As a result of a number of known and unknown risks and uncertainties, our actual results or performance may be materially different from those expressed or implied by these forward-looking statements. For a discussion of the risks involved in our business and investing in our common stock, see Part I, Item 1A, titled "Risk Factors."

Should one or more of these risks or uncertainties materialize, or should any of the underlying assumptions prove incorrect, actual results may vary in material respects from those expressed or implied by these forward-looking statements. You should not place undue reliance on these forward-looking statements.

## Summary of Risk Factors

The below summary of risk factors provides an overview of many of the risks we are exposed to in the normal course of our business activities. As a result, the following summary of risks does not contain all of the information that may be important to you, and you should read the summary of risks together with the more detailed discussion of risks set forth in Part I, Item 1A under the heading "Risk Factors," and elsewhere in this Annual Report. Additional risks, beyond those summarized below or discussed elsewhere in this Annual Report, may apply to our activities or operations as currently conducted or as we may conduct them in the future or in the markets in which we operate or may in the future operate. Consistent with the foregoing, we are exposed to a variety of risks, including risks associated with the following:

- Our independent registered public accounting firm's audit report includes an explanatory paragraph expressing substantial doubt about our ability to continue as a going concern, indicating the possibility we may not be able to operate in the future.

- Senior Credit Facility and Convertible Notes contain covenants that have and may in the future restrict our business and financing activities. We are in covenant default under the Senior Credit Facility and we have obtained waivers of certain covenants contained in the Convertible Notes. If we are not able to obtain further waivers with respect to, or comply with our covenants under the Senior Credit Facility and Convertible Notes, we would continue to be in default of the Senior Credit Facility or may be in default under one or both of the Senior Credit Facility or Convertible Notes which may have an immediate adverse effect on our business.

- We will require additional capital to support business growth, and such capital might not be available on a timely basis or on terms acceptable to us, if at all.

- If our estimates or judgments relating to our critical accounting policies prove to be incorrect or financial reporting standards or interpretations change, our operating results could be adversely affected.

- We have identified material weaknesses in our internal control over financial reporting and may identify additional material weaknesses in the future.

- Our limited history of selling battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies makes it difficult to evaluate our business and prospects and may increase the risks associated with your investment.

- We have a history of net losses, have experienced rapid growth and anticipate increasing our operating expenses in the future, and may not achieve or sustain positive gross margin or profitability in the future.

- Our operating results may fluctuate from quarter to quarter, which makes our future results difficult to predict.

- Further increases in costs, disruption of supply, or shortage of materials, particularly lithium-ion cells, could continue to harm our business.

7

Table of Contents

- Our recent workforce reduction and planned closure of our City of Industry facility may not be as successful as anticipated and may not improve overall efficiency.

- Because many of the markets in which we compete are new and rapidly evolving, including consolidation of industry players, it is difficult to forecast long-term end-customer adoption rates and demand for our products, and our ability to meet demand for our products.

- If our battery systems, electrification and charging solutions, electric transit buses, fleet and energy management software, or other products have product defects and if our customer service is not effective in addressing customer concerns, our ability to develop, market and sell our products and services could be harmed.

- We face intense and increasing competition in the transit bus market and may not be able to compete successfully against current and future competitors, which could adversely affect our business, revenue growth, and market share.

- We have been and may continue to be impacted by macroeconomic conditions such as the COVID-19 pandemic, rising inflation rates, uncertain credit and global financial markets, including the recent bank failures, supply chain disruption and geopolitical events, such as the conflict between Russia and Ukraine and related sanctions.

- Our transit business is significantly dependent on government funding for public transit, and the unavailability, reduction, or elimination of government economic incentives would have an adverse effect on our business, prospects, financial condition, and operating results.

- The growth of our transit business is dependent upon the willingness of corporate and other public transportation providers to adopt and fund the purchase of electric vehicles for mass transit.

- Our dependence on a limited number of suppliers introduces significant risk that could have adverse effects on our financial condition and operating results.

- We have a long sales, production, and technology development cycle for new public transit customers, which may create fluctuations in whether and when revenue is recognized and may have an adverse effect on our business.

- We could incur material losses and costs from product warranty claims, recalls, or remediation of electric transit buses for real or perceived deficiencies or from customer satisfaction campaigns.

- Our annual revenue has in the past depended, and will likely continue to depend, on a small number of customers that fluctuate from year to year, and failure to add new customers or expand sales to our existing customers could have an adverse effect on our operating results for a particular period.

- Our industry and its technology are rapidly evolving and may be subject to unforeseen changes. Developments in alternative technologies and powertrains or improvements in the internal combustion engine may adversely affect the demand for our electric transit buses and our electric battery solutions for commercial vehicles.

- We may not be able to develop, maintain and grow strategic relationships in the Proterra Powered or Proterra Energy businesses, identify new strategic relationship opportunities, or form strategic relationships, in the future.

- Our business is subject to substantial regulations and compliance programs, which are evolving, and unfavorable changes or failure by us to comply with these regulations and compliance programs could have an adverse effect on our business.

- The use of lithium-ion cells may become disfavored as a result of the availability, or perceived superiority of, other types of batteries or yet undeveloped or unknown technologies.

8

Table of Contents

- Our business could be adversely affected from an accident or safety incident involving our battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses or defaults in the materials or workmanship of our composite bus bodies or other components.

9

Table of Contents

**PART I**

**Item 1. Business**

**Overview**

Proterra's mission is to advance electric vehicle technology to deliver the world's best performing commercial vehicles.

Commercial and industrial fleets are expected to adopt electric vehicles at increasingly higher rates over the next two decades, driven by factors including emissions targets and regulations, and lower operating costs. More than 200,000 new electric buses, medium-duty trucks, and heavy-duty trucks are expected to be sold in the industry by 2030 and approximately 650,000 by 2040 in our core markets of North America and Europe. Assuming average battery capacity per vehicle of 225 kWh for medium-duty trucks, 300 kWh for buses and 750 kWh for heavy-duty trucks, we estimate this could translate into demand for heavy-duty commercial and industrial-scale batteries of approximately 90 GWh in 2030 and approximately 300 GWh in 2040 in such markets. Our business strategy is to capitalize on this opportunity.

In the first quarter of 2023, we announced the appointment of Julian Soell as the Chief Operating Officer of the Company, and Christopher Bailey as Chief Business Officer of the Company, each appointment effective as of March 1, 2023. With these appointments, we consolidated all of our product lines under one Chief Business Officer and all our operations under one Chief Operating Officer, from organizing our business around business groups (called Proterra Transit and Proterra Powered & Energy, respectively) each lead by a President. In addition, we announced workforce restructuring plans designed to improve operational efficiency with the reduction of our workforce by up to twenty five percent or the elimination of approximately 300 jobs and the closure of our City of Industry manufacturing facility by December 31, 2023.

We have three commercial offerings each addressing a critical component of commercial vehicle electrification.

- **Proterra Powered & Energy.** Proterra Powered products are our proprietary battery systems and electrification solutions for global commercial vehicle original equipment manufacturer ("OEM") customers serving the Class 3 to Class 8 vehicle segments, including delivery trucks, school buses, and coach buses, as well as construction and mining equipment, and other applications. Proterra Energy products and services offer turnkey fleet-scale, high-power charging solutions and software services, ranging from fleet and energy management software-as-a-service, to fleet planning, hardware, infrastructure, installation, utility engagement, and charging optimization. These solutions are designed to optimize energy use and costs, and to provide vehicle-to-grid functionality.

- **Proterra Transit.** We design, develop, manufacture, and sell electric transit buses as an OEM for North American public transit agencies, airports, universities, and other commercial transit fleets. Proterra Transit vehicles showcase and validate our electric vehicle technology platform through rigorous daily use by a large group of sophisticated customers focused on meeting the wide-ranging needs of the communities they serve.

Our industry experience, the performance of our transit buses, and compelling total cost of ownership has helped make us the leader in the U.S. electric transit bus market. With over 1,000 electric transit buses delivered, our electric transit buses currently have delivered more than 35 million cumulative service miles spanning a wide spectrum of climates, conditions, altitudes and terrains. From this experience, we have been able to continue to iterate and improve our technology.

Our decade of experience supplying battery electric heavy duty transit buses provided us the opportunity to validate our products' performance, operational efficiency and maintenance costs with a demanding customer base and helped broaden our appeal as a key electrification solutions supplier to OEMs in other commercial vehicle segments and geographies. Proterra Powered's strategy is to leverage Proterra Transit's success in the electric transit bus market and domain expertise to showcase the performance of our technology and demonstrate a strong track record of range and reliability in order to provide our battery systems and electrification solutions to

10

Table of Contents

other commercial vehicle segments. We believe our success in the transit bus market using our battery systems and electrification solutions to power heavy-duty vehicles with better performance and operating characteristics than a diesel-powered bus, all while maintaining a rigorous regular schedule of operation with little tolerance for error, helps demonstrate the broad applicability of our technology to other commercial vehicle segments with similar requirements. We sell our battery systems and electrification solutions using a business development team as well as a channel sales team for certain end markets. These teams work closely with our engineering team to develop optimal electrification solutions for our customers, adapted to their vehicle requirements.

Proterra Powered has partnered with more than a dozen OEMs spanning from Class 3 to Class 8 trucks, several types of buses, and multiple off-highway categories. Through December 31, 2022, Proterra Powered has delivered battery systems and electrification solutions for more than 1,600 vehicles to our OEM partner customers.

In addition, Proterra Energy has established us as a leading commercial vehicle charging solution provider by helping fleet operators fulfill the high-power charging needs of commercial electric vehicles and optimize their energy usage, while meeting our customers' space constraints and continuous service requirements. As of December 31, 2022, we had installed more than 95 MW of charging infrastructure across North America.

Through December 31, 2022, we have generated the majority of our revenue from Proterra Transit's sales of electric transit buses, complemented by additional revenue from Proterra Powered's sales of battery systems and Proterra Energy's sales and installation of charging systems, as well as from the sale of spare parts and other services provided to customers. As fleet electrification continues to expand beyond buses to trucks and other commercial vehicles, we expect Proterra Powered & Proterra Energy to grow into a significantly larger portion of our overall business and generate a greater portion of revenue. Through December 31, 2022, our chief operating decision maker, the Chief Executive Officer, evaluates Proterra's results on a consolidated basis for purposes of making decision on allocating resources and assessing financial performance, resulting in a single reportable segment.

We delivered 199, 208, and 170 new transit buses in 2022, 2021, and 2020, respectively. We also delivered 14 and 9 pre-owned buses in 2022 and 2021, respectively. We delivered battery systems for 1,229 vehicles, 273 vehicles, and 107 vehicles in 2022, 2021, and 2020, respectively.

For the years ended December 31, 2022, 2021 and 2020, our total revenue was $309.4 million, $242.9 million, and $196.9 million, respectively. As of December 31, 2022, in aggregate, we have generated revenue of $749.2 million for the past three years. We generated a gross loss of $(24.0) million for the year ended December 31, 2022 and a gross profit of $2.1 million and $7.5 million for the year ended December 31, 2021 and 2020, respectively. We have also invested significant resources in research and development, operations, and sales and marketing to grow our business and, as a result, generated losses from operations of $220.9 million, $127.6 million, and $96.0 million for the years ended December 31, 2022, 2021 and 2020, respectively.

**Business Combination**

On June 14, 2021, we consummated the transactions contemplated by Merger Agreement, by and among ArcLight (and, after the Domestication, Proterra), Phoenix Merger Sub, and Legacy Proterra. As contemplated by the Merger Agreement, on June 11, 2021, ArcLight filed a notice of deregistration with the Cayman Islands Registrar of Companies, together with the necessary accompanying documents, and filed a certificate of incorporation and a certificate of corporate domestication with the Secretary of State of the State of Delaware, under which ArcLight was domesticated and continues as a Delaware corporation. Further, on June 14, 2021, as contemplated by the Merger Agreement, Proterra consummated the Merger, whereby Phoenix Merger Sub merged with and into Legacy Proterra, the separate corporate existence of Phoenix Merger Sub ceasing and Legacy Proterra being the surviving corporation and a wholly owned subsidiary of Proterra. Legacy Proterra was incorporated in Delaware on February 2, 2010, and upon the Merger on June 14, 2021 changed its name to "Proterra Operating Company, Inc." and continues as a Delaware Corporation.

11

Table of Contents

**Our products**

We design, manufacture, and sell proprietary battery systems, electrification and charging solutions and fleet and energy management systems purpose-built for commercial vehicles. Our battery systems, electrification and charging solutions and fleet and energy management systems are also used in electric transit buses that we design, sell, and manufacture. Our Proterra Energy business also provides charging infrastructure solutions to simplify the adoption of electric commercial vehicles and improve fleet operations, as well as software services relating to fleet management, remote diagnostics, smart charging and vehicle-to-grid energy management.

*Battery system*

Our highly modular battery systems meet the needs of a variety of commercial vehicle segments and sizes. We sell our battery packs in two different widths and three different heights depending upon the frame rail length constraints of the vehicle. In addition, each module is available in two different lengths, and three different voltages (25V, 35V and 50V). Modules can be strung in series up to 1,200V within a pack. Packs can be combined up to 16 strings in parallel.

We design, validate, test, and manufacture high-voltage battery packs that are used in our electric transit buses, as well as other commercial vehicle applications. We have designed our batteries based on the core principles of modularity, durability, safety, and scalability.

Our batteries have been designed around standardized form factor cylindrical cells that are produced by numerous global cell manufacturers. Our battery design is flexible to chemistry and manufacturer, allowing us to utilize the best cells commercially available in terms of energy density, cost, cycle life performance, charge rate acceptance, and safety. We have worked with LG Chem Ltd., now LG Energy Solution, to develop cells that are optimized for our applications. Each module contains a proprietary battery monitoring board, and each pack contains a proprietary battery management system, which together monitor the performance of the battery pack and communicate with the vehicle.

We engineered the battery pack with safety and durability as core principles. The battery enclosure is a rugged structure, built using aluminum extrusions and castings, and may include an aluminum base plate to protect the cells. The module and enclosure architecture are designed to be safe in extreme mechanical and environmental abuse scenarios. We internally test our battery cells, modules, and packs to ensure they meet our durability, cycle life performance, and safety and warranty requirements.

Inherent to the mechanical and electrical architecture of our battery modules and battery packs is the flexibility to rapidly reconfigure components for use in various commercial vehicle applications. Battery modules and packs can be connected electrically in a series of strings to increase system voltage up to 1,200V. Additionally, multiple strings can be connected in parallel to enable megawatt-hour-scale battery systems. While our battery system is optimized for commercial vehicle applications, we have also created an architecture with second-life use in mind. For instance, our battery packs are designed to be stackable in order to be deployed with minimal modification in stationary energy storage applications.

We operate a battery research and development laboratory at our Burlingame headquarters, co-located with battery engineering, advanced manufacturing engineering, and manufacturing operations. Capabilities of this lab include mechanical and environmental durability testing, highly accelerated life testing, electrical safety testing, cell lifecycle and safety testing, mechanical abuse testing, and prototype assembly for new applications. Prototype and production variants of our battery products are tested and certified to industry standards, including Society of Automotive Engineers ("SAE") J2929, as well as proprietary internal test requirements.

*Electric drivetrains*

A key driver of vehicle performance, and biggest consumer of battery energy, is the drivetrain, which includes the traction motor, inverter, controller, and gearbox. We have partnered with leading engineering and manufacturing companies to offer both single- and dual-motor drivetrains. These are the 275 continuous horsepower ProDrive 2.0 system and the 338 continuous horsepower DuoPower system. Both utilize three-phase, permanent-magnet, liquid-cooled motors. In contrast to internal combustion engines, electric motors provide very

12

Table of Contents

high torque for superior hill-climb ability. Proterra couples this with a multi-speed gearbox to deliver that torque across a wide range of vehicle speeds. These systems provide superior performance to a comparably sized commercial diesel vehicle, and provide a higher 'regen' efficiency when the bus is braking. Our drivetrains also have significant advantages over traditional powertrains in weight and serviceability. Our motor weighs 90 kilograms, compared to over 800 kilograms for a typical diesel engine, and may be removed in four hours, compared to 12 hours for a standard diesel engine.

The traction motor inverter is a liquid-cooled power electronics unit that converts high-voltage battery direct-current into AC power required for the desired torque and speed of the traction motor. This unit operates bi-directionally, acting as the control to turn the motor into a regenerative brake, recovering energy back into the battery packs. The drivetrain controller translates the accelerator and brake pedal commands into torque and speed commands for the inverter. The drivetrain controls a number of safety functions, including anti-lock brake system activation, hill-hold features, and programmable responsiveness for both acceleration and regeneration. We believe that multispeed gearboxes, paired with small high-performance motors, provide our customers compelling value, performance, and vehicle range.

### High-voltage systems, controls, and telemetry gateways

To integrate the battery, drivetrain, charging, and other vehicle hardware, we developed a controls architecture for optimal system function, reliability, and safety. The core components of the control system are the battery management system, the charge controller that manages the interface between the battery and the charging system during charging, the telematics unit that provides wireless connectivity and supports vehicle monitoring and analytics, the drivetrain controller that interfaces with the motor and inverter, the vehicle controller that manages all base vehicle systems, including the high voltage and thermal systems, and the body controller that manages customer configurable functions such as HVAC, doors, lighting, and vehicle ride height.

Developed expressly for heavy duty and high-occupancy vehicle applications, our battery management system ("BMS") and battery monitoring board ("BMB") hardware, software, and patented control algorithms are designed to ensure safe and reliable operation in all commercial vehicle applications. The BMS is deployed on an automotive grade controller within the battery pack responsible for actively and safely managing a lithium ion battery pack. It controls the battery pack electrical contactors, monitors all relevant parameters, determines real-time state and limits designed to ensure safe and reliable operation, and communicates with the vehicle. Moreover, the BMS performs electrical safety functions such as isolation monitoring and high voltage interlock control. These functions are critical to performance and safety. Additional functions performed include measuring cell operating parameters such as voltage, temperature, and relative humidity and performing dissipative cell balancing.

These units and other devices, such as dashboard displays and other onboard electronics, are interconnected with industry standard Controller Area Network ("CAN Bus") vehicle networking. Our controls team uses model-based control architecture to create software for each of these units and ensure proper validation through automated software testing. At the system level, we use these models in conjunction with industry-standard Hardware-In the-Loop and Software-In the-Loop test set-ups, which allow for full vehicle simulation and development.

### ZX5 electric transit bus

The Proterra electric transit bus is our flagship product and the only finished vehicle we manufacture ourselves as an OEM. In 2014, we launched our first 40-foot electric low-floor transit bus seating up to 40 people, followed one year later by a 35-foot version seating up to 29 people. We focus on 35-foot and 40-foot buses because these buses represent more than three-quarters of the market according to the Federal Transit Authority's National Transit Database. Currently offered with battery sizes up to 492 kWh on the 35-foot and base 40-foot, and up to 738 kWh on the ZX5 Max variant, our buses can provide a range of up to 340 miles on a single charge. With the batteries mounted in ballistic-grade enclosures below the floor of the vehicle between the axles, the bus has been designed to optimize mass distribution and safety. Enabled by our battery and electric drive train technology and a body made of light-weight composite materials, our purpose-built electric transit bus also offers compelling acceleration, gradeability, and energy efficiency. Along with zero tailpipe emissions and low

13

Table of Contents

maintenance costs, the Proterra Electric Transit Bus offers a compelling value proposition to transit agencies seeking to electrify their fleets.

While other manufacturers use a modified steel body and frame that was originally designed for an internal combustion engine, we have partnered with a supplier, TPI Composites, Inc, to architect a lighter weight bus body with advanced materials specifically designed for an electric powertrain. Our composite bus body houses the battery packs below the floor of the vehicle, between the axles, to achieve a low center of gravity and ride comfort and safety. Utilizing carbon fiber and fiberglass, our design approach optimizes mass, stiffness, and durability. Our bus body has been tested on a four-post shaker table to a simulated 750,000 miles and 18 years of useful life, and has also undergone 125,000 effective miles at the Bus Research and Testing Center's test track in Altoona, Pennsylvania which executes federally mandated transit vehicle durability testing.

The ZX5 bus can be charged by either a standard J1772 CCS charge port for in-depot charging, or a J3105 standard-compliant overhead pantograph charger, offering an estimated charge time of three hours. The latter can be deployed in-depot or used as an on-route charger for charge replenishment.

Our electric transit bus can also offer significant total cost of ownership savings as compared to the equivalent diesel- and natural gas-powered buses. Our electric transit bus uses approximately 75% less energy per mile than the average legacy diesel bus. In a typical transit operation, the total cost of ownership of our bus is lower than diesel, diesel-hybrid, and compressed natural gas-powered vehicles. Our electric transit bus combines a competitive upfront price with low operations and maintenance costs, which we estimate results in a lower total cost of ownership over the lifetime of the vehicle.

Proterra Transit electric buses can also be acquired with a battery lease through our battery leasing program. We offered this program in 2021 through a partnership with Mitsui, whose contract with us ended in March 2022. We are currently offering this program directly. This program enables the customer to pay for the price of the battery over time rather than upfront with the price of the bus. Given the operational savings our buses typically offer in both fuel and maintenance costs, we seek to structure the battery lease payments so they are covered by the operating cost savings.

### Fleet-scale charging solutions

Fleet charging requires a complex balance of multiple stakeholder groups, fleet logistics, battery operational requirements, variable charging times and power, and electric utility engagement, which together present more challenges than passenger vehicle charging. Successful charging infrastructure implementation is critical to scaling the deployment of commercial electric vehicles. We have designed our charging solutions with a focus on high power, scalability, bi-directional power capability, autonomous charge docking, and charge management. We believe our software algorithms and planning solutions can enable as much as 50% fewer chargers, while optimizing both charging time and energy costs.

We currently offer five charger capacities for small fleet solutions: 60 kW, 90 kW, 120 kW, 150 kW, and 180 kW. We also offer a Megawatt class of charger for large fleet solutions. Our charger architecture is designed for commercial fleet applications and allows for the larger charging hardware cabinet to be placed up to 500 feet away from the charger dispensers. This architecture provides commercial fleets with more siting flexibility in depots with limited space. The dispensers can be ground-, wall-, or overhead structure-mounted to meet a customer's specific requirements. Charging systems include a wireless data connection to our Valence software platform that allows for over-the-air software updates.

### Valence software platform

The Proterra Valence (formerly called APEX) connected vehicle intelligence system is a cloud-based data platform that can provide customers performance information about their fleets, and is designed to provide management of vehicle and charging operations to reduce operating costs.

Our hardware and software connectivity platform is designed for compatibility with each vehicle and charging system that we deliver. Each gateway on a vehicle or charging system automatically connects securely with our cloud-based platform. Applications that run on this platform are accessible to registered users through a role-

14

Table of Contents

based, access-controlled web portal. Our data exploration tools offer users current and historical metrics, insights, and reports. Metrics include odometer readings and mileages, battery state-of-charge, energy usage by subsystem, overall energy efficiency, route geolocation, and environmental impact. Charging voltages, power, energy delivered, and session start and stop times are also available. Real-time fault and status alert capabilities provide user notifications through email and text message. The telematics platform also provides charge management capability enabling optimization of power levels and energy costs based on bus arrival and departure schedules. The telematics platform can enable over-the-air updates, and over time we expect to expand its functionality to include further charge management capabilities which is expected to enable customers to minimize demand charges and further reduce energy costs. The Valence platform is designed to be flexible and can also be configured for use with other commercial electric vehicles.

## Our Technology

Our technology platform supports our broad portfolio of products and services across the electrification ecosystem designed to overcome the most significant obstacles to commercial vehicle electrification. The primary features of our electric vehicle technology platform, designed to meet the unique requirements of commercial fleet electrification and differentiate it from the competition, include:

- *Integrated technology solutions spanning the electrification ecosystem.* Our proprietary commercial electric vehicle platform is centered on our Proterra Powered battery and electric drivetrain technology, is complemented by our Proterra Energy fleet-scale, high-power charging infrastructure solutions, and enhanced by our Valence fleet and energy management software-as-a-service platform, which is designed to enable customers to manage their vehicles and charging operations in real-time, reducing the total cost of ownership. Proterra Transit offers real-world validation, testing, and a positive feedback loop for our technology platform.

- *Modular and flexible battery platform.* We offer a modular battery platform available in different form factors, which can be produced on the same manufacturing line, to satisfy the specific needs of our customers and the design constraints of their vehicles. Commercial vehicles are not homogenous and span a wide range of weight classes (from Class 3 over 10,000 pounds to Class 8 over 33,000 pounds), chassis sizes, and frame rail lengths. We believe offering compatibility with as many different vehicle segments as possible without requiring equipment retooling or manufacturing customization is key to achieving higher market penetration. Enabled by the simplicity of design and integrated architecture of our battery modules, our battery packs are available in two widths and heights to accommodate different frame rails, various lengths ranging from 3-feet to 9-feet, and four different voltages which can be strung together in up to 16 parallel strings, with voltages as high as 1,200V. The modularity and manufacturability of our batteries enable us to provide solutions for a wide variety of commercial vehicle sizes and segments, ranging from as low as 35 kWh systems for commercial vans and shuttles up to 1 megawatt-hour ("MWh") or more for long haul trucks and heavy-duty equipment.

- *Highly efficient design enabling exceptional energy density and range.* Our battery systems are structurally designed to optimize energy density, safety, and cost. We achieve this through a highly efficient design in which the cooling mechanisms, module structure, and pack structure are all the same element, reducing space, weight and cost. The high energy density of our battery systems increases vehicle efficiency, extends range and allows higher occupant or cargo capacity. Our focus on efficiency extends to our drivetrains, which we have designed to optimize torque and efficiency through the use of multi-speed transmissions to meet the demands of the most rigorous and diverse routes for commercial vehicles. As a result, relative to diesel's low fuel efficiency of less than 5 miles per gallon, our electric vehicles can exceed 20 miles per gallon equivalent, generating significant cost savings. By implementing these efficient designs, maintenance costs can also be materially reduced given fewer moving parts, no need for oil changes, and less frequent brake replacements due to regenerative braking systems.

- *Designed and certified for safety.* Safety is a top priority in our battery design. In addition to offering higher energy density than typical electric passenger vehicle batteries, our commercial-grade batteries offer a high degree of safety and durability due in large part to two core design attributes: cooling and structural rigidity. Through the use of both active cooling and passive propagation resistance in module and pack construction, we have designed our batteries to achieve a lifespan required for commercial

15

Table of Contents

vehicle use while operating under daily charge/discharge cycles and to maintain safe and reliable operation. Our battery systems incorporate hundreds of sensors that continuously monitor the active and passive safety systems with multiple layers of redundancy. In addition, we designed our battery packs to be structurally robust, providing protection against strenuous duty cycles and high impact incidents. Our battery systems have been certified by Underwriter Laboratories to be compliant to ISO 26262, which represents today's state-of-the-art for functional safety for road vehicles. We have also received ECE-R100 certification required to deliver certain product to our European customers. These certifications can provide us a competitive advantage, especially in markets where the certification is a prerequisite to sell electric vehicles and with vehicle OEMs that have their own standards for component safety.

**Competition**

Our main sources of competition fall into four categories:

- companies, including established vehicle manufacturers and component suppliers, that design and manufacture, or are reported to have plans to design and manufacture, commercial electric vehicle batteries or powertrains;

- specialized developers of electric and other zero-emission powertrain technology that are beginning to enter the market;

- incumbent transit vehicle integrators that have served our market with legacy diesel, diesel-hybrid and compressed natural gas products for many years; and

- Chinese battery manufacturers and transit bus makers that offer an array of vehicle and other products, including electric transit vehicles.

The principal competitive factors in our market include:

- cost;

- product quality and safety;

- performance;

- customer experience.

- integrated business model;

- technology innovation;

- charging expertise;

- manufacturing efficiency; and

- service capability.

Because of our singular focus on electric vehicle technology for commercial applications, we believe that we compete favorably across these factors.

**Customers**

***Proterra Powered and Energy*** As of December 31, 2022, Proterra Powered had delivered electric vehicle battery systems and electrification solutions to customers in commercial and industrial vehicle segments including school buses, coach buses, delivery trucks, and off-highway equipment. As of December 31, 2022, Proterra Energy had installed more than 95 MW of charging infrastructure across North America.

Table of Contents

***Proterra Transit*** As of December 31, 2022, Proterra Transit customers include municipal transit agencies, corporations, airports, universities, and national parks.

In the year ended December 31, 2022, we have two customers with 10% or more of total revenue.

**Distribution, Sales and Marketing**

*Distribution*

We distribute our products by truck and rail in North America and to overseas customers by boat and if necessary, by air freight.

*Sales*

We sell our battery systems and electrification solutions, fleet and energy management software and electric transit buses using a business development team as well as a channel sales team for certain markets. These teams are located in North America and focus on the customers and industries that are likely to adopt commercial vehicle electrification. The sales team for Proterra Powered, including the channel sales team, works closely with the engineering team to develop optimal electrification solutions for our customers, depending on their vehicle requirements. Proterra Transit sells buses with Proterra Powered battery/powertrain systems through a direct sales force, which is comprised of a small team of sales directors who maintain an active dialogue with the largest 400 transit agencies and commercial bus fleet operators in North America. Given the well-defined and consolidated nature of our customer base, we can cover our market with a lean and focused sales team, organized by designated geographical regions. Our transit sales organization also includes a demo team, and a proposals and contracts team. Our sales team leads product experiences with customers and has been an integral tool in our sales process. Our proposals and contracts team leads customer engagement in the procurement process, assisting with documentation related to the procurement process, as well as detailed customer-specific product configuration. Proterra Energy has a sales team that directly sells to Proterra Powered and Proterra Transit customers but also responds to solicitations from other customers. The Proterra Energy team includes a fleet modeling specialist and sales engineers to help design optimal charging and energy solutions for customers. In addition to the sales teams, we have a government relations team that helps to facilitate our sales effort by building and supporting relationships with public utilities, local governments, the federal government, and transit agencies to educate these entities about our company and facilitate the adoption of electric vehicles.

*Marketing*

We utilize strategic marketing to accelerate sales opportunities and build brand awareness. Our current marketing programs primarily target commercial vehicle OEMs and transit agencies, and include:

- conferences and industry events that we participate in, sponsor, and exhibit at, such as the American Public Transportation Association Annual Meeting and the Annual Mobility Conference;

- press releases and email campaigns;

- print and digital advertising campaigns;

- graphical wraps for our demo buses;

- cooperative marketing efforts with customers and suppliers; and

- communicating our differentiated selling points and product features through marketing collateral such as our website, print and digital brochures, presentation slides, webinars, and videos.

To date, conferences and industry events have been the primary drivers of our sales leads and have helped us achieve sales with relatively low marketing costs.

Table of Contents

**Engineering**

We have made significant investments in our development and customer engineering teams. These teams provide components, sub-systems and assemblies for our Proterra Powered, Proterra Energy, and Proterra Transit businesses. Our team members have a broad range of expertise from the commercial vehicle, automotive, aerospace, industrial, and consumer goods industries. We also use external engineering consultants in specialized development areas, including custom circuit board layouts, CAD design, and custom gear box and axle development. They support the full product lifecycle from new product innovation to sustaining engineering, including range improvement, product features, cost reduction, and mass optimization.

Our engineering team in Burlingame includes battery and charging system engineers with significant industry experience. We have launched several battery and charger families using a rigorous multi-phase process in collaboration with our design and internal manufacturing teams, as well as outside vendors. Key areas of technical focus include battery structure, thermal and battery management systems, charging systems, high voltage power distribution, and embedded electronics. The team uses the latest combined environment durability test methods and rigorous safety testing protocols that are designed to assure product reliability and safe operation.

Proterra Transit's vehicle engineering team, based primarily in Greenville includes a number of experienced sub-teams organized by vehicle technology. Those include body, interior/exterior, chassis, pneumatics, mechanical systems, low and high voltage electrical, thermal systems, controls, embedded electronics and drivetrain.

**Supply chain**

We have developed close relationships with several key suppliers, particularly for lithium-ion cells, drivetrain components, charging systems, and bus bodies. Our bus bodies are purchased from TPI Composites, Inc. While we obtain some components from multiple sources, in some cases we also purchase significant components used in our products from a single source that we have validated. For our battery cells, we have two qualified suppliers for supply chain resiliency but have only used one of these suppliers, LG Energy Solution, for our current battery system to date. We also operate a cell testing lab where we regularly empirically evaluate the performance and reliability of new cells and cell chemistries from a wide range of global cell manufacturers.

We obtain systems, components, raw materials, parts, manufacturing equipment, and other supplies from suppliers that we believe to be reputable and reliable. We have established and follow internal quality control processes to source suppliers, considering engineering validation, quality, cost, delivery, and lead-time. We have a quality management team that is responsible for managing and ensuring that supplied components meet quality standards. Our quality standards are guided by industry standards, including Automotive Industry Action Group, Advanced Product Quality Planning, and Production Part Approval Process procedures, which were developed by the U.S. auto industry.

Our electric transit buses use purchased parts that are primarily sourced from American suppliers. We developed our supply chain to comply with the Federal Transit Administration's ("FTA") Buy America requirements and the Federal Aviation Administration's ("FAA") Buy American requirements, which govern transit bus procurements that are paid for, in part, with federal funds by transit agencies and airports, respectively. For certain Canadian customers, we source select vehicle content from Canadian suppliers in order to comply with Canadian Content requirements.

**Manufacturing**

We have battery manufacturing facilities in City of Industry and Burlingame, California, and Powered 1 battery factory at Greer, South Carolina, which started production in January 2023. We manufacture electric transit buses at each of our facilities in City of Industry and Greenville. In January 2023, we announced a plan designed to improve operational efficiency, including the planned closure of our City of Industry facility. We will move manufacturing from our City of Industry facility to our existing facilities in Greenville. Transit bus production in the City of Industry facility is expected to end in the first quarter of 2023, and battery production at the City of Industry

18

Table of Contents

facility is expected to end by the end of the third quarter of 2023. We plan to vacate the City of Industry facility by the end of 2023.

We strive to instill a manufacturing culture of continuous improvement and leverage best practices in quality control and worker safety across our facilities. We are ISO 14001 certified in our Burlingame, City of Industry, and Greenville facilities.

**Quality control**

We have adopted an integrated, end-to-end approach to quality control. We have strategies to identify and correct any defects at each of the design, supplier development, production, and field performance stages for our battery systems, electrification and charging solutions, fleet and energy management software, and our electric transit buses. Our battery lines are required to undergo end-of-line testing for safety, and to assess readiness for vehicle integration. We designed our bus manufacturing line with multiple quality checkpoints, commissioning and functional validation, and road testing. Our customers typically inspect our buses at our facilities prior to shipment. In August of 2020, we passed the ISO audit and became ISO 9001 and 14001 certified. We believe these certifications are a testament to our commitment to quality control.

**Service and warranty**

*Service*

We believe customer service is a critical component of promoting adoption of our technology. Our customer service team provides various onsite services for our vehicles at our customers' locations. Our services typically include training for operators and technicians, onsite delivery support, field support, engineering escalation support, and procurement of spare parts. By performing vehicle services ourselves, we can efficiently identify problems, find solutions, and incorporate improvements into our products.

We design our charging systems and buses with the capability to connect to our telematics platform. We use this data to inform product development and assist with service calls. We are constantly evaluating our service offerings to make sure we are properly aligned with our customers' needs.

*Warranty*

We offer warranties for our battery systems, electric transit buses, including their major subsystems, and charging systems.

Our battery system warranty is dependent on the vehicle and its usage. We offer 6-year standard warranty and 12-year extended warranty on the battery for materials and workmanship, and an energy capacity warranty that depends on vehicle capacity and expected usage. We typically offer two to five-year warranties on other ancillary components of our powertrain system. Our standard warranty on battery systems reserves the right to replace components with different items of equal or better performance to keep pace with improvements in battery technology development.

Our electric transit bus warranty is comprised of a one-year complete bus warranty, a 12-year warranty on our composite bus body, and warranties on other components generally ranging from one to three years. Transit agencies will often request additional coverage as part of the initial capital purchase, in part to minimize their operational costs. We price these extended warranties into our contract bids.

Under the fleet defect provisions included in some electric transit bus purchase contracts, we are required to proactively prevent re-occurrences of a defect in the entire fleet of electric transit buses delivered under a contract if the same defect occurs in more than a specified percentage of the fleet within the base warranty period (or sometimes base warranty period plus one year) following delivery of the electric transit bus.

We offer a standard two-year warranty on our charging hardware. Warranties for installed third party hardware can extend up to five years. When we have offered extended warranty coverage beyond the suppliers' warranty, we have priced these extended warranties into our contract bid.

19

Table of Contents

**Government regulations, funding, and other programs**

*Regulations and programs*

*Battery safety and testing*

Our battery system complies with all requirements of the SAE J2929 Safety Standard for Electric and Hybrid Vehicle Propulsion Battery Systems Utilizing Lithium-based Rechargeable Cells. In addition, we test our battery systems according to industry standards, including from the SAE, the Economic Commission for Europe ("ECE"), and Underwriters Laboratories ("UL"), as well as our own internal standards, for conditions, including mechanical abuse, thermal cycling, humidity, water immersion, corrosion, and short circuit events. We have also completed applicable transportation tests for our battery packs, demonstrating our compliance with applicable regulations that govern the transport of lithium-ion batteries.

Certain materials in our battery packs contain trace amounts of hazardous chemicals, whose use, storage, and disposal are regulated under federal and state law. In addition, we are subject to international regulatory and safety requirements, including the European Union's directives related to hazardous substances such as Registration, Evaluation, Authorization and Restriction of Chemicals ("REACH") and the Restriction of Hazardous Substances ("RoHS"). Most of our battery systems are recyclable, which enables us to develop battery recycling programs with third parties to recycle our battery packs at the end of their useful life.

*Model bus testing program*

The FTA mandates that new transit bus models, and subsequent material changes to those models, be physically tested to meet certain performance standards in order to be eligible to receive federal transit funding. Altoona Testing is designed to promote production of better transit vehicles and components, and to ensure that transit customers purchase vehicles that are able to withstand the rigors of transit service. Altoona Testing, typically a required pre-condition for customer acceptances, is available to vendors on a first-come, first-served basis and subject to a waiting list. To date, our 40-foot and 35-foot buses have completed Altoona Testing, but as material changes are made to our bus platform, we must undergo new rounds of testing.

The vehicles we sell in Canada are subject to different safety testing regulations and may require redesign or additional testing.

*Zero Emission Certifications*

In addition, we are subject to the Environmental Protection Agency ("EPA") and California Air Resources Board's ("CARB") annual certification greenhouse gas emissions requirements related to our transit vehicle and powertrain. The CARB certification is required to participate in California's Hybrid and Zero-Emission Truck and Bus Voucher Incentive Project ("HVIP"), which offers vouchers to our customers to reduce the purchase price of zero-emission vehicles.

*Motor Vehicle Safety Standards*

The United States NHTSA mandates that vehicles, including transit buses, meet all the Federal Motor Vehicle Safety Standards ("FMVSS") testing requirements issued by the agency. We self-certify that our electric transit buses comply with applicable FMVSS as of the date of vehicle production. Our electric transit buses must also conform to state and local requirements which vary by jurisdiction. Transit buses sold in Canada must also meet Canada Motor Vehicle Safety Standards ("CMVSS"). Transport Canada monitors FMVSS for applicability to Canada to further align with U.S. regulations, adopting or modifying an FMVSS to address unique usage and environmental conditions in the Canadian market.

20

Table of Contents

***Government funding opportunities***

*Federal funding programs for zero-emission commercial vehicles*

On November 15, 2021, President Biden signed the Infrastructure and Investment Jobs Act, also referred to as the "Bipartisan Infrastructure Law", into law. The Bipartisan Infrastructure Law created a number of new funding opportunities for Proterra Powered & Energy customers. The EPA will receive $5 billion over 5 years for the Clean School Bus program, which provides $500 million per year for zero emission school buses, as well an additional $500 million per year for low or zero emission school buses. The EPA also continues to administer the Diesel Emission Reduction Act grant program, which provides funding for transit, school bus, drayage, refuse, and other vehicle types that are low or zero emission. Finally, the Bipartisan Infrastructure Law also provides funding through discretionary and formula programs to various departments at the US Department of Transportation and, can potentially fund opportunities to electrify commercial vehicles at airports, ports, and other locations.

In August 2022, the Inflation Reduction Act was signed into law, adding additional funding and tax credit programs for commercial vehicles, including a commercial clean vehicle credit, a number of which are expected to become available to recipients in 2023.

*Federal formula and competitive funding programs for transit customers*

Our transit customers are generally transit authorities who depend on federal government funding and programs authorized for public transportation under Title 49, Chapter 53 of the United States Code, and administered by the FTA, as well as other state funding programs. Federal and state funding has accelerated the adoption of electric vehicles in this market. Our principal customers are eligible for government funding, including, in particular, programs authorized under the Fixing America's Surface Transportation (FAST) Act, to accelerate their investments in electric transit fleets. Passed in December 2015, the FAST Act allocated over $305 billion for highway, transit, and vehicle safety programs for a five-year period ending September 30, 2020. The FAST Act was subsequently extended and then reauthorized by the Bipartisan Infrastructure Law through the federal government's fiscal year 2026.

The Bipartisan Infrastructure Law provides approximately $567 billion to discretionary and formula programs under the U.S. Department of Transportation's ("USDOT") jurisdiction, including approximately $39 billion of funding to transit, which represents an increase of 43% compared to amounts authorized under the FAST Act. Among other programs, the Bipartisan Infrastructure Law authorized a supplemental appropriation of $5.25 billion over five years for the Low or No Emission Program. Although 25% of this funding is reserved for low-emission buses only, it will provide over $850 million per year for funding zero-emission transit buses and infrastructure, a 14-fold increase over the authorized amounts in the FAST Act. The Bipartisan Infrastructure Law also funds the Buses and Bus Facilities competitive program at $376 million in 2022 to $412 million in 2026.

*State funding programs*

Certain states offer vouchers and other incentives for clean energy vehicles. California offers HVIP, which provides a point-of-sale discount to organizations that purchase fleets of hybrid and electric trucks and buses. The HVIP vouchers are targeted to offset about 80% of the incremental cost of hybrid and electric trucks and buses. In 2021, the state of California passed a historic zero-emission vehicle and infrastructure funding package for fiscal year 2021-2022, which includes $269.5 million for the HVIP program as well as $130 million set aside for HVIP for school buses, $70 million set aside for transit vehicles, and $75 million for HVIP for drayage trucks. California also offers vouchers for clean off-road equipment ("CORE"), such as cargo handling equipment. California's FY2021-2022 budget includes $194.95 million for CORE vouchers. California's zero-emission vehicle and infrastructure funding package for fiscal year 2021-2022 also provided for $873 million in funding for clean heavy-duty vehicles and off-road equipment in fiscal year 2021-2022 (to be implemented by the California Air Resources Board) and $391 million in funding for medium- and heavy-duty ZEV infrastructure in fiscal year 2021-2022 (to be implemented by the California Energy Commission).

New York offers the Truck Voucher Incentive Program, which funds low- and zero-emission transit buses and other vehicles. Other states offer similar programs that provide point-of-sale discounts to purchasers of electric vehicles, which help our customers offset the costs of purchasing our transit vehicles. To be eligible vehicles, our

21

Table of Contents

electric transit buses must meet certification requirements for electric vehicles from the EPA and, where applicable, California Air Resources Board. Additionally, there are other state programs that help fund electric bus purchases. For example, states are allocating portions of settlement funds from the approximately $15 billion Volkswagen Emissions Settlement Program to investments in zero-emission transit buses, and the state of California has allocated about 10% of its annual Cap-and-Trade funds to California's Transit and Intercity Rail Capital Program.

*State emissions credits*

Public transit agencies and other customers may be eligible for emission reduction credits through state programs.

The California Low Carbon Fuel Standard ("LCFS") enables transit agencies using electricity as a source of fuel to opt into the LCFS program and earn credits that can be monetized. While the value of these credits fluctuates, the credits may help to offset up to half of the fuel costs for our transit customers.

## Intellectual property

The protection of our technology and intellectual property is an important aspect of our business. We rely upon a combination of patents, trademarks, trade secrets, copyrights, confidentiality procedures, contractual commitments, and other legal rights to establish and protect our intellectual property. We generally enter into confidentiality agreements and invention or work product assignment agreements with our employees and consultants to control access to, and clarify ownership of, our proprietary information.

As of December 31, 2022, we held 77 issued U.S. patents and had 25 U.S. patent applications pending. We also held 31 issued patents and 30 patent applications pending in a foreign jurisdiction. Our U.S. issued patents expire between 2029 and 2040. As of December 31, 2022, we held 8 registered trademarks in the United States, including the Proterra mark, and also held 14 registered trademarks in foreign jurisdictions. We continually review our development efforts to assess the existence and patentability of new intellectual property. We intend to continue to file additional patent applications with respect to our technology.

## Human Capital Management

We believe that our talented workforce and our mission driven company culture are competitive advantages and we have taken steps to strengthen our culture and focus on workforce development and engagement as we have grown. As of December 31, 2022, we employed 1,247 full-time equivalent employees. In January 2023, we announced a reduction of approximately 25% of our workforce across multiple locations and closure of our City of Industry facility where we manufacture transit buses and battery systems. We continue to hire new employees based on business needs. Our production employees in City of Industry are represented by the United Steel Paper & Forestry, Rubber, Manufacturing, Energy, Allied & Industrial Service Workers International Union AFL-CIO, CLC and we have a collective bargaining agreement with the union that will terminate with the wind down of the City of Industry facility. We do not have collective bargaining agreements in any of our other facilities.

In 2022, we focused on our culture by engaging our employees and leadership through surveys, focus group meetings, cross functional working sessions, and establishing an employee task force to work with external consultants to refine and communicate our shared values of innovation, adaptability, continuous improvement, teamwork & collaboration, inclusion, kindness, and sustainability. We also hired our first Chief People Officer in October 2022.

*Health and Safety*

We are a manufacturer and a technology company. We are committed to providing safe and healthful working conditions for all of our employees across all of our development, testing, and manufacturing environments, and at all of our locations and customer's job sites. Safety is routinely addressed at our Board, leadership, staff and production meetings throughout the company. We strive to ensure safe, responsible and sustainable operations across all aspects of our business.

Table of Contents

*Compensation and Benefits*

Our competitive compensation and benefit programs are designed to attract and retain talented and diverse employees across our manufacturing, technology, leadership and support functions. In addition to competitive wages and salaries, we offer comprehensive medical, dental and vision plans, an employee assistance program, flexible spending programs, family and other leave programs, commuter benefits, a Company matched 401(k) Plan, and an employee stock purchase plan and opportunities to be awarded equity grants under our equity incentive plan.

*Inclusion and Diversity*

Proterra is committed to hiring inclusively, fostering an inclusive culture, and ensuring equitable pay for employees. We continue to focus on increasing diverse representation at every level of the Company. Our leadership team is measured by the Board of Directors on our progress against diversity, equity and inclusion goals.

*Workplace Policies*

We ask our employees to read and acknowledge our Code of Business Conduct and Ethics each year. Proterra has a zero tolerance policy for discrimination or harassment. We are committed to providing a workplace free of harassment or discrimination based on gender, race, color, religion, age, citizenship, sexual orientation, gender identity, gender expression, marital status, pregnancy, national origin, ancestry, physical or mental disability or condition, and other legally protected status.

**Availability of Information**

We file Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, Proxy Statements, any amendments to those reports and statements and other information with the SEC. These SEC filings are made available free of charge on our website at www.proterra.com as soon as reasonably practicable after we file or furnish the materials with the SEC. Information contained on or accessible through our website is not incorporated into this filing unless expressly noted, and the inclusion of our website address in this filing is an inactive textual reference only.

**Item 1A. Risk Factors**

*Investing in our securities involves risks. You should consider carefully the risks and uncertainties described below, together with all of the other information in this Annual Report, including the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes, before deciding whether to purchase any of our securities. Our business, results of operations, financial condition, and prospects could also be harmed by risks and uncertainties that are not presently known to us or that we currently believe are not material. If any of these risks actually occur, our business, results of operations, financial condition, and prospects could be materially and adversely affected. Unless otherwise indicated, references in these risk factors to our business being harmed will include harm to our business, reputation, brand, financial condition, results of operations, and prospects. In such event, the market price of our securities could decline, and you could lose all or part of your investment.*

**Risks Related to Our Financial Condition**

***Our independent registered public accounting firm's audit report includes an explanatory paragraph expressing substantial doubt about our ability to continue as a going concern, indicating the possibility we may not be able to operate in the future.***

Under ASC Subtopic 205-40, *Presentation of Financial Statements-Going Concern* ("ASC 205-40"), we have the responsibility to evaluate whether conditions and/or events raise substantial doubt about our ability to meet our future financial obligations as they become due within one year of the financial statements included elsewhere in this Annual Report on Form 10-K being issued.

Table of Contents

Pursuant to the terms of the purchase agreement governing the Convertible Notes, we are required to maintain Liquidity (as defined therein) as of the last day of each quarter of not less than the greater of (a) $75.0 million and (b) an amount equal to the product of multiplying (i) the amount of Cash Burn (as defined therein) from operations for the three-month period ending on the end of such month by (ii) four (the "Minimum Liquidity Covenant").

As of December 31, 2022, we did not have Liquidity in an amount equal to clause (b) above as of such date. As a result, we obtained a waiver of the Minimum Liquidity Covenant for the quarter ended December 31, 2022. Without such waiver, we would have been in default of the Convertible Notes, which would have resulted in a cross-default under the Senior Credit Facility. However, we have not obtained a waiver of the Minimum Liquidity Covenant for any future periods, and, as a result of anticipated operating cash outflows from operation, capital investment at our Powered 1 battery factory, and incremental cash payments for the workforce restructuring we announced in January 2023, we may not satisfy the Minimum Liquidity Covenant as of March 31, 2023 for the quarter ended March 31, 2023.

In addition, the audit report included elsewhere in this Annual Report on Form 10-K contains a going concern qualification, and our inability to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern is an event of default under both the Convertible Notes and the Senior Credit Facility. We have obtained a prospective limited waiver under the Convertible Notes, which will expire on March 31, 2023, with respect to our obligations under the Convertible Notes to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern in connection with this Annual Report on Form 10-K, and a cross-default under the Convertible Notes with respect to the Senior Secured Credit Facility, resulting from the substantially similar covenant thereunder. If we are unable to obtain a further waiver under the Convertible Notes beyond March 31, 2023, then there would be an event of default under the Convertible Notes for failure to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) in this Annual Report on Form 10-K, which would be a cross-default under the Senior Credit Facility, unless waived. An event of default under the Convertible Notes would permit the holders of the Convertible Notes to cause all of the outstanding indebtedness under the Convertible Notes to become immediately due and payable.

In addition, we have not obtained a waiver with respect to the corresponding covenant under the Senior Credit Facility as of the date hereof and we are therefore in default of such covenant as of the issuance of the financial statements and related audit report included elsewhere in this Annual Report on Form 10-K. Unless waived, the default under the Senior Credit Facility resulting from the issuance of these financial statements and related audit report containing a going concern qualification (and potential cross-default under the Convertible Notes if we are unable to obtain a waiver thereunder beyond March 31, 2023), permits (and would permit) the Lenders under the Senior Credit Facility to terminate all commitments to extend credit under the Senior Credit Facility and cause all of the outstanding indebtedness under the Senior Credit Facility to become immediately due and payable.

If we are unable to comply with or obtain a waiver for the Minimum Liquidity Covenant, if applicable, for the quarter ended March 31, 2023 or a future period (and/or if we are unable to obtain a waiver under the Convertible Notes beyond March 31, 2023 with respect to our obligations under the Convertible Notes to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern in connection with this Annual Report on Form 10-K and cross-default under the Convertible Notes with respect to the Senior Secured Credit Facility), there would be an unwaived event of default under the Convertible Notes and a cross-default under the Senior Credit Facility on March 31, 2023 or such future period, which would permit (i) the holders of the Convertible Notes to cause all of the outstanding indebtedness under the Convertible Notes to become immediately due and payable and (ii) the Lenders under the Senior Credit Facility to cause all of the outstanding indebtedness under the Convertible Notes to become immediately due and payable and to terminate all commitments to extend credit under the Senior Credit Facility. If such indebtedness were to become immediately due and payable in the event of such a default this would have an immediate adverse effect on our ability to meet our working capital needs and our business and operating results.

The current and potential events of default under the Convertible Notes and the Senior Credit Facility when coupled with the following conditions: our available cash resources, recurring losses and cash outflows from operations, an expectation of continuing operating losses and cash outflows from operations for the foreseeable

Table of Contents

future, and the need to raise additional capital to finance our future operations, causes substantial doubt about our ability to continue as a going concern to exist.

There is no assurance that we will be able to obtain any future waivers under the Convertible Notes or the Senior Credit Facility or other resolution with the holders of the Convertible Notes and the lenders under the Senior Credit Facility on a timely basis, on favorable terms or at all. We would need to take further action to raise additional funds in the capital markets or otherwise to fund our obligations under the Convertible Notes in addition to our other obligations over the one-year period from the issuance of the financial statements included elsewhere in this Annual Report on Form 10-K, and we would not be able to draw upon the Senior Credit Facility. If we do not have sufficient funds or we are unable to arrange for additional financing to repay outstanding debt, the lenders under the Senior Credit Facility and holders of the Convertible Notes could seek to enforce their security interests in the collateral securing the indebtedness under the Senior Credit Facility and the Convertible Notes, which are secured substantially by all our assets including intellectual property and other restricted property.

We expect to seek additional funds through potential securities financings, debt financings or other capital sources or strategic transactions. In addition, we may seek to obtain a waiver or amendment of our existing debt agreements. However, we may not be successful in securing additional financing on acceptable terms or at all, or in obtaining a waiver or amendment to our existing debt agreements. Furthermore, high volatility and uncertainty in the capital markets resulting from the COVID-19 pandemic and macroeconomic conditions, including rising inflation rates and interest rates, and recent and potential future disruptions in access to bank deposits or lending commitments due to bank failures, has had, and could continue to have, and a negative impact on the credit and financial markets and on the price of our common stock and could adversely impact our ability to raise additional funds. If we seek additional financing to fund our business activities in the future and there remains substantial doubt about our ability to continue as a going concern, investors, or other financing sources may be unwilling to provide funding to us on commercially reasonable terms, if at all. If sufficient funds are not available, we will have to delay, reduce the scope of, or eliminate some of our business activities, including related operating expenses, and our suppliers could impose more onerous terms on us, such as requiring cash payments prior to parts delivery, which would adversely affect our business prospects and our ability to continue our operations and would have a negative impact on our financial condition and ability to pursue our business strategies, and we may have to liquidate our assets and may receive less than the value at which those assets are carried on our audited financial statements, and/or seek protection under Chapters 7 or 11 of the United States Bankruptcy Code. This could potentially cause us to cease operations and result in a complete or partial loss of your investment in our common stock.

***Senior Credit Facility and Convertible Notes contain covenants that have and may in the future restrict our business and financing activities. We are in covenant default under the Senior Credit Facility and we have obtained waivers of certain covenants contained in the Convertible Notes. If we are not able to obtain further waivers with respect to, or comply with our covenants under the Senior Credit Facility and Convertible Notes, we would continue to be in default of the Senior Credit Facility or may be in default under one or both of the Senior Credit Facility or Convertible Notes which may have an immediate adverse effect on our business.***

Each of Senior Credit Facility and Convertible Notes is secured by substantially all our assets, including our intellectual property and other restricted property. Subject to certain exceptions, the Senior Credit Facility and Convertible Notes also restrict our ability to, among other things:

- dispose of or sell our assets;
- make material changes in our business or management, or accounting and reporting practices;
- acquire, consolidate, or merge with other entities;
- incur additional indebtedness;
- create liens on our assets;
- pay dividends;
- make investments;
- enter transactions with affiliates; and

Table of Contents

- pre-pay other indebtedness.

The covenants in the Senior Credit Facility, Convertible Notes, and any future financing agreements that we may enter, may restrict our ability to finance our operations, engage in, expand or otherwise pursue our business activities and strategies. See the Risk Factor entitled - *Our independent registered public accounting firm's audit report includes an explanatory paragraph expressing substantial doubt about our ability to continue as a going concern, indicating the possibility we may not be able to operate in the future* - for risks related to our events of default, cross-defaults under the debt instruments, and related waivers, as applicable, concerning maintaining Liquidity (as defined in the Convertible Notes) and our failure to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) in our Annual Report on Form 10-K for the period ending December 31, 2022 under the Senior Credit Facility and the Convertible Notes. Further, if we fail to comply with our debt covenants in the future, there is no assurance that we will be able to obtain any future waivers under the Convertible Notes or the Senior Credit Facility.

If the Convertible Notes were to become immediately due and payable because of such events of default, we may not have sufficient cash available to repay our obligations under the Convertible Notes and meet the working capital needs of our business, which would have an immediate adverse effect on our business and operating results. We would need to take further action to raise additional funds in the capital markets or otherwise to service our obligations under the Convertible Notes in addition to our other obligations over the period, and we would not be able to draw upon the Senior Credit Facility.  If we do not have sufficient funds or we are unable to arrange for additional financing to repay outstanding debt, holders of the Convertible Notes could seek to enforce their security interests in the collateral securing the Convertible Notes, which are secured substantially by all our assets including intellectual property and other restricted property, and we may have to liquidate our assets and may receive less than the value at which those assets are carried on our audited financial statements, and/or seek protection under Chapters 7 or 11 of the United States Bankruptcy Code, and it is likely that investors will lose all or a part of their investment.

***We will require additional capital to support business growth, and such capital might not be available on terms acceptable to us, if at all.***

We expect to seek additional funds through potential securities financings, debt financings or other capital sources or strategic transactions. We intend to continue to make investments to support our business growth and will require additional funds to respond to business challenges, including the need to improve our operating infrastructure or acquire complementary businesses and technologies. Accordingly, we will need to engage in the issuance of public or private equity, equity-linked, debt securities or other financing or strategic transaction to secure additional funds. We may not be able to obtain additional financing on a timely basis or on terms favorable to us, if at all. If we raise additional funds through future issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences, and privileges superior to those of holders of our common stock. Any debt financing that we secure in the future could involve restrictive covenants relating to our capital raising activities and other financial and operational matters, including the ability to pay dividends. This may make it more difficult for us to obtain additional capital and to pursue business opportunities, including potential strategic transactions.

There can be no assurance that further deterioration in credit and financial markets and confidence in economic conditions will not occur, including as a result of recent bank failures. A severe or prolonged economic downturn could result in a variety of risks to our business, including weakened demand for our products and harm our ability to raise additional capital when needed on acceptable terms, if at all. If the equity and credit markets continue to deteriorate, it may make any necessary debt or equity financing more difficult, more costly, and more dilutive. Failure to secure any necessary financing in a timely manner and on favorable terms could impair our ability to achieve our growth strategy, could harm our financial performance and stock price and could require us to delay or abandon our business plans. We cannot anticipate all of the ways in which the current economic climate and financial market conditions could adversely impact our access to capital. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to support our business growth and respond to business challenges could be significantly impaired, and our business, prospects, financial condition, and operating results could be adversely affected.See the Risk Factor entitled - *Our independent registered public accounting firm's audit report includes an explanatory paragraph expressing*

26

Table of Contents

*substantial doubt about our ability to continue as a going concern, indicating the possibility we may not be able to operate in the future,* for additional risks related to our ability to raise additional capital.

***If our estimates or judgments relating to our critical accounting policies prove to be incorrect or financial reporting standards or interpretations change, our operating results could be adversely affected.***

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates, judgments, and assumptions that affect the amounts reported in our financial statements and accompanying notes. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. The results of these estimates form the basis for making judgments about the carrying values of assets, liabilities, and equity as of the date of the financial statements, and the amount of revenue and expenses, during the periods presented, that are not readily apparent from other sources. Significant assumptions and estimates used in preparing our financial statements include those related to determination of revenue recognition, stock-based compensation, inventory, and warranties. Our operating results may be adversely affected if our assumptions change or if actual circumstances differ from those in our assumptions, which could cause our operating results to fall below the expectations of industry or financial analysts and investors, resulting in a decline in the trading price of our common stock.

Additionally, we regularly monitor our compliance with applicable financial reporting standards and review new pronouncements and drafts thereof that are relevant to us. As a result of new standards, changes to existing standards, and changes in interpretation, we might be required to change our accounting policies, alter our operational policies, or implement new or enhance existing systems so that they reflect new or amended financial reporting standards, or we may be required to restate our published financial statements. Changes to existing standards or changes in their interpretation may have an adverse effect on our reputation, business, financial position, and profit, or cause an adverse deviation from our revenue and operating profit target, which may negatively impact our financial results.

***We have identified material weaknesses in our internal control over financial reporting and may identify additional material weaknesses in the future. If we fail to remediate these material weaknesses or otherwise fail to establish and maintain effective control over financial reporting, it may adversely affect our ability to accurately and timely report our financial results in the future, and may adversely affect investor confidence, our reputation, our ability to raise additional capital, and our business operations and financial condition.***

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

Management, with the participation of the principal executive officer and principal financial officer, under the oversight of our board of directors, evaluated the effectiveness of our internal control over financial reporting as of December 31, 2022, using the framework in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was not effective as of December 31, 2022, because of the material weaknesses in internal control over financial reporting, described below.

We did not have a sufficient number of trained resources with assigned responsibility and accountability for the design, operation and documentation of internal control over financial reporting.

As a result:

- We did not have an effective risk assessment process that defined clear financial reporting objectives and evaluated risks at a sufficient level of detail to identify all relevant risks of material misstatement across the entity.

- We did not have an effective information and communication process that identified and assessed the source of and controls necessary to ensure the reliability of information used in financial reporting and

Table of Contents

that communicates relevant information about roles and responsibilities for internal control over financial reporting.

• We did not have effective monitoring activities to assess the operation of internal control over financial reporting, including the continued appropriateness of control design and level of documentation maintained to support control effectiveness.

As a consequence, we did not effectively design, implement, or operate process-level control activities for substantially all of our financial reporting processes.

Our management, with the oversight of the audit committee of our board of directors, is in the process of designing and implementing a remediation plan and is taking steps to remediate the material weaknesses. The material weaknesses will not be considered remediated until such time as management designs and implements effective controls that operate for a sufficient period of time and concludes, through testing, that these controls are effective. Furthermore, we cannot ensure that the measures we have taken to date, and actions we may take in the future, will be sufficient to remediate in a timely manner or at all the control deficiencies that led to our material weakness in our internal controls over financial reporting or that they will prevent or avoid potential future material weaknesses due to a failure to implement and maintain adequate internal control over financial reporting or circumvention of these controls. In addition, even if we are successful in strengthening our controls and procedures, in the future these controls and procedures may not be adequate to prevent or identify irregularities or errors or to facilitate the fair presentation of our financial statements.

We will need to continue to dedicate internal resources, engage outside consultants and maintain a detailed work plan to assess and document the adequacy of internal control over financial reporting, continue steps to remediate the material weakness and any future control deficiencies or material weaknesses, and improve control processes as appropriate, validate through testing that controls are functioning as documented and maintain a continuous reporting and improvement process for internal control over financial reporting. If we are not able to correct material weaknesses or deficiencies in internal controls in a timely manner or otherwise comply with the requirements of Section 404 in a timely manner, our ability to record, process, summarize and report financial information accurately and within applicable time periods may be adversely affected and we could be subject to sanctions or investigations by the SEC, the Nasdaq Stock Market or other regulatory authorities as well as shareholder litigation which would require additional financial and management resources and could adversely affect the market price of our common stock. Furthermore, if we cannot provide reliable financial reports or prevent fraud, our business and results of operations could be harmed. Inferior internal controls could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our common stock.

Any failure to remediate the material weaknesses or otherwise develop or maintain effective controls or any difficulties encountered in their implementation or improvement could limit our ability to prevent or detect a misstatement of our accounts or disclosures that could result in material misstatements of our annual or interim financial statements. In such case, we may be unable to maintain compliance with securities law requirements regarding timely filing of periodic reports in addition to the listing requirements of the Nasdaq. For example, in connection with the identification of the material weakness described above, we were unable to file this Annual Report on Form 10-K by the deadline prescribed by the SEC and, as a result, we are currently not eligible to utilize a Form S-3 registration statement. Additionally, investors may lose confidence in our financial reporting and our stock price may decline as a result. In addition, perceptions of the Company among customers, suppliers, lenders, investors, securities analysts and others could also be adversely affected.

**Risks Related to Our Business and Industry**

***Our limited history of selling battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies makes it difficult to evaluate our business and prospects and may increase the risks associated with your investment.***

Although Legacy Proterra was incorporated in 2004, we only began delivering electric vehicles in 2010, and through December 31, 2022, had delivered over 1,000 electric transit buses. In 2022, 2021 and 2020, we

28

Table of Contents

recognized $309.4 million, $242.9 million, and $196.9 million in total revenue, respectively. Since 2010, our product line has changed significantly, and our most recent transit bus model has only been in operation since 2020. Further, we started developing our battery technology in 2015 and did not begin battery pack production in any significant volume until 2017. We also have limited experience deploying our electric powertrain technology in vehicles other than electric transit buses. In 2018, we announced our software platform for connected vehicle intelligence, which we now refer to as our Valence (formerly called APEX) fleet and energy management software-as-a-service platform, which has only had beta customers until recently; we just relaunched the platform as Valence in 2022. Our energy services, which includes fleet planning, charging infrastructure and related energy management services, only began generating limited revenue in 2019. We began providing integrated charging solutions in 2019 and have only begun sourcing our new charging hardware from a new partner in 2020, with our first deliveries occurring in 2021.

As a result, we have a limited operating history upon which to evaluate our business and future prospects, which subjects us to a number of risks and uncertainties, including our ability to plan for and predict future growth. Our limited operating experience is particularly concentrated in our Proterra Transit line of business, and that limited experience may not prove to be relevant to Proterra Powered and Proterra Energy. As a result, the operating history of Proterra Transit may not prove to be predictive of the success of Proterra Powered and Proterra Energy.

Moreover, because of the limited deployment of our products and services to date and our focus on electric transit buses, defects or other problems with our products or industry-wide setbacks that impact the electric vehicle market may disproportionately impact our ability to attract additional customers or sell to existing customers, and harm our brand and reputation relative to larger, more established vehicle manufacturers that have a longer operating history and investments in more than one technology. We have encountered and expect to continue to encounter risks and difficulties experienced by growing companies in rapidly developing and changing industries, including challenges related to achieving market acceptance of our existing and future products and services, competing against companies with greater financial and technical resources, competing against entrenched incumbent competitors that have long-standing relationships with our prospective customers in the commercial vehicle market, including the public transit market and other transportation markets, recruiting and retaining qualified employees, and making use of our limited resources. We cannot ensure that we will be successful in addressing these and other challenges that we may face in the future, and our business may be adversely affected if we do not manage these risks appropriately. As a result, we may not attain sufficient revenue to achieve or maintain positive cash flow from operations or profitability in any given period, or at all.

***We have a history of net losses, have experienced rapid growth and anticipate increasing our operating expenses in the future, and may not achieve or sustain positive gross margin or profitability in the future.***

We incurred net losses of $238.0 million, $250.0 million, and $127.0 million in 2022, 2021, and 2020, respectively, and we expect to incur net losses for the foreseeable future. As of December 31, 2022, we had an accumulated deficit of $1.1 billion. We expect to make significant expenditures related to the development and expansion of our business, including: making new capital investments and continuing investments in our electric powertrain, including advancements in our battery technology and high voltage systems; hiring and retaining qualified employees; adding additional production lines or production shifts in our manufacturing facilities; building new manufacturing facilities; expanding our software offerings; expanding our business into new markets and geographies; research and development in new product and service categories; and in connection with legal, accounting, and other administrative expenses related to operating as a public company.

We have also experienced rapid growth in recent periods. For example, our number of employees has increased significantly over the last few years, from 492 full-time employees as of December 31, 2018 to 1,247 full-time employees as of December 31, 2022. On January 13, 2023, we approved a plan designed to improve operational efficiency, including reducing our workforce by approximately 25% and closing our City of Industry facility. We will move manufacturing from our City of Industry facility to our existing facilities in South Carolina. In transitioning manufacturing facilities, we may experience delays and disruptions in our manufacturing and production activities. We also expect to continue to hire new employees, particularly for our manufacturing facilities in South Carolina. Managing our growth has and will place significant demands on our management as well as on our administrative, operational, legal and financial resources. To manage our growth effectively, we must continue to improve and expand our infrastructure, including our information technology, financial, legal, compliance and administrative systems and controls. We must also continue to effectively and efficiently manage our employees, operations, finances, research and development, and capital investments.

Table of Contents

All of these efforts may prove more expensive than we currently anticipate, and we may not succeed in increasing our revenue sufficiently, or at all, to offset these higher expenses. While our revenue has grown in recent periods, our operating expenses have also increased significantly. If our revenue declines or fails to grow at a rate faster than increases in our operating expenses, or we are unable to increase gross margin, whether through reducing the cost of production or increasing sales, we would not be able to achieve and maintain profitability in future periods. As a result, we may continue to generate losses. We cannot ensure that we will achieve profitability in the future or that, if we do become profitable, that we will be able to sustain profitability.

***Our operating results have fluctuated and may fluctuate from quarter to quarter, which makes our future results difficult to predict.***

Our quarterly operating results have fluctuated in the past and may fluctuate in the future. Our revenue recognition with respect to electric transit buses and charging systems depends on the timing of delivery and customer acceptance. Large order sizes may result in a significant number of electric transit buses or charging systems being accepted or rejected at one time, which could disproportionately impact revenue recognition in a given quarter. Revenue for battery systems and electrification and charging solutions is less dependent on customer acceptance but can be unpredictable based on our customers' ability to cancel within lead times. Additionally, we have a limited operating history, which makes it difficult to forecast our future results and subjects us to several risks and uncertainties, including our ability to plan for and anticipate future growth. As a result, our past quarterly operating results may not be reliable indicators of future performance, particularly in our rapidly evolving market.

Our operating results in any given quarter can be influenced by numerous factors, many of which are unpredictable or are outside of our control, including:

- our ability to maintain and grow our customer base and to sell additional products to our existing customers;

- our ability to build a reputation as a manufacturer of quality battery systems, electrification and charging solutions, fleet and energy management software and electric transit buses and to build trust and long-term relationships with customers;

- the effects of the ongoing COVID-19 pandemic, particularly with respect to funding for state and federal transit programs and reduced operating revenue from reduced passenger levels, and the effect on our suppliers;

- the amount of funding appropriated annually for state and federal transit programs and the amount and timing of government funding programs for electric vehicles;

- our ability to deliver our products as planned to meet our revenue goals and avoid liquidated damages within certain contracts, which may depend on factors such as supply shortages of components and component quality issues, customer configuration, manufacturing, or shipping delays, our ability to manage logistics, and to accurately forecast inventory and labor requirements;

- the mix of order size for transit bus orders, and variations in profit margins for each contract, which may affect our overall gross margin in any particular period;

- fluctuations in the cost and availability of raw materials, including as a result of tariffs and other trade restrictions;

- cancellations or modifications of awards or orders by our customers;

- our ability to design and produce safe, reliable, and quality products on an ongoing basis;

- levels of warranty claims or estimated costs of warranty claims and vehicle or equipment recalls;

30

Table of Contents

- our ability to distinguish ourselves from competitors in our industry by developing and offering competitive products, effectively partner with manufacturers in adjacent markets and respond to competitive developments, including the introduction of new battery systems, electrification and charging solutions, fleet and energy management software or electric transit buses and pricing changes by our competitors;

- our ability to promote the adoption of electric vehicles over other fuel solutions such as diesel-hybrid, hybrid, or compressed natural gas vehicles or battery electric fuel cell vehicles;

- the success and timing of our strategic relationships to enter adjacent markets;

- pricing pressure as a result of competition or otherwise;

- our ability to implement cost reduction measures;

- buying patterns of customers, and the procurement schedules of our current and prospective customers in the public transit market, school bus market, and other commercial vehicle markets;

- current and evolving industry standards and government regulations that impact our business at the federal, state, and local level, particularly in the areas of product safety and rules of origin such as Buy America, Buy American, and provincial Canadian Content regulations, and competitive bidding regulations at the federal, state and local level for electric transit buses;

- the timing of testing by, and the ability of our buses to pass, the FTA's federal bus testing program;

- delays or disruptions in our supply, manufacturing, or distribution chain, including insolvency, credit, or other difficulties confronting our key suppliers;

- our ability to effectively manage the length and complexity of our sales cycles;

- the mix of financing alternatives that we offer and our customers choose to utilize;

- our ability to continuously improve our product without obsoleting inventory or production tooling;

- litigation, adverse judgments, settlements, or other litigation-related costs;

- timing of stock-based compensation expense; and

- general economic and political conditions and government regulations in the United States and Canada and the countries where we may expand in the future, macroeconomic such as the COVID-19 pandemic, rising inflation and interest rates, uncertain credit and global financial markets, recent and potential future disruptions in access to bank deposits or lending commitments due to bank failures, supply chain disruption and geopolitical conditions, including the conflict between Russia and Ukraine and related sanctions.

The impact of one or more of the foregoing and other factors may cause our operating results to vary significantly. As such, we believe that quarter-to-quarter comparisons of our operating results may not be meaningful and should not be relied upon as an indication of future performance. If we fail to meet or exceed the expectations of investors or securities analysts, then the trading price of our common stock could fall substantially, and we could face costly lawsuits, including securities class action suits.

***Further increases in costs, disruption of supply, or shortage of materials, particularly lithium-ion cells, wiring harnesses, and drivetrain components could continue to harm our business.***

We may experience, and in 2021 and 2022 have experienced and continue to experience, increases in the cost of, or a sustained interruption in the supply of or shortage of materials necessary for, the production, maintenance and service of our transit buses, battery systems, electrification and charging solutions, fleet and energy management systems, and related technologies. For example, our vehicle and equipment deliveries were

31

Table of Contents

impacted by constraints and inefficiencies in production driven by shortages in component parts, particularly resin for connectors, wiring harnesses, and certain drivetrain components, resulting in part from global supply chain disruptions stemming from the effects of the Covid 19 pandemic and in part from challenges particular to certain vendors. These delays have caused temporary shutdowns of our production lines, and have caused delays in production and incremental shipping costs for air freight. Further, if suppliers impose unfavorable credit term as a result of our current financial condition, this could restrict our ability to secure parts and limit our production. Any such increases in cost, including due to inflation, supply interruption, materials shortages, or an increase in freight and logistics costs, our unfavorable credit terms with suppliers could adversely impact our business, prospects, financial condition and operating results.

Our suppliers also use various materials, including aluminum, carbon fiber, lithium, cobalt, nickel, copper and neodymium. The prices and supply of these materials may fluctuate, depending on market conditions, geopolitical risks, such as the conflict in Ukraine and the resulting sanctions on Russia and Belarus, fluctuations in currency exchange rates, and global supply and demand for these materials, including increased production of electric transit buses and other energy storage applications by our competitors and companies in adjacent markets such as passenger cars and stationary storage. Our contracts do not all have mechanisms in place that allow us to raise prices to the end customer due to inflation or other material cost increases. If we are not able to raise our prices to our end customers, inflationary pressures and other material cost increases could, in turn, negatively impact our operating results.

Moreover, we are subject to risks and uncertainties associated with changing economic, political, and other conditions in foreign countries such as disruptions due to geopolitical turmoil, including the conflict between Russia and Ukraine and related sanctions, and due to the ongoing COVID-19 pandemic and related global supply chain disruptions, increased import duties, tariffs, and trade restrictions. Unavailability or delay of imports from our suppliers have caused and may in the future cause interruptions in our supply chain and increase our costs of procurement. Even if we do not have suppliers in Ukraine or other countries affected directly by such conflict, companies that can no longer rely on suppliers in countries affected by the conflict may look to suppliers in other parts of the world, including the suppliers from which we source materials. Consequently, we may experience increased competition for materials, which could further increase the cost to us of sourcing materials and negatively impact our ability to source parts from our current suppliers and from identifying and working with new suppliers.

Our business is dependent on reliable availability of lithium-ion cells for our battery packs. While we believe other sources of lithium-ion cells will be available for our battery packs, to date, we have only used one supplier for lithium-ion cells for the battery packs used in commercial applications for our Proterra Transit and Proterra Powered customers. As we increase battery pack production, there is no guarantee that our current cell supplier will be able to supply the volume that we will require to meet growing demand. Battery cell demand continues to increase across vehicle segments including passenger car, and new incentives and tax credits under the Inflation Reduction Act, which became law in August 2022, may further accelerate demand and competition for cell supply. Any disruption in the supply of battery cells could disrupt production of our battery systems and electric transit buses until we are able to find a different supplier that can meet our specifications and production demands. Such disruption could have an adverse effect on our business, prospects, financial condition and operating results.

We expect raw material prices to remain elevated in the foreseeable future due to inflation and continued global supply chain issues. While we believe our exposure to increased costs is no greater than the industry as a whole, our business and results of operations may be adversely affected if our efforts to mitigate their effects are unsuccessful. Substantial increases in the prices for our materials or prices charged to us, particularly those charged by lithium-ion cell suppliers or charger hardware providers, would increase our operating costs and could reduce our margins if we cannot recoup the increased costs through increased sale prices on our battery systems, vehicles or charging systems. Furthermore, fluctuations in fuel costs, or other economic conditions, may cause us to experience significant increases in freight charges and material costs. Additionally, because the negotiated price of an existing battery system, vehicle or charging system is established at the outset, we, rather than our customers, bear the economic risk of increases in the cost of materials. Moreover, any attempts to increase battery system, vehicle or charging system prices in response to increased material costs could increase the difficulty of selling our electric transit buses or battery systems at attractive prices to new and existing customers and lead to cancellations of customer orders. If we are unable to effectively manage our supply chain and respond to disruptions to our supply chain in a cost-efficient manner, we may fail to achieve the financial

32

Table of Contents

results we expect or that financial analysts and investors expect, and our business, prospects, financial condition and operating results may be adversely affected.

***Our recent workforce reduction and planned closure of our City of Industry facility may not be as successful as anticipated and may not improve overall efficiency.***

On January 20, 2023, we implemented a reduction-in-force and announced the closure of our City of Industry facility, which we expect to vacate by the end of 2023. While we believe this will improve operational efficiency and expect to realize cost reductions, we may not be able to realize the full benefits within the anticipated time frame, or at all. We may also incur other charges, costs, future cash expenditures or impairments not currently contemplated due to events that may occur as a result of, or in connection with the reduction in workforce and facility closure. Further, we may experience unintended consequences and costs, such as the loss of institutional knowledge and expertise, attrition beyond our intended reduction-in-force, a reduction in morale among our remaining employees, and the risk that we may not achieve the anticipated benefits, all of which may have an adverse effect on our results of operations or financial condition.

While we have implemented, and intend to continue to implement, cost-reduction strategies in order to meet our profitability goals, if we do not achieve expected savings or if operating costs increase as a result of investments in strategic initiatives, our total operating costs would be greater than anticipated. We may also incur substantial costs or cost overruns in utilizing and increasing our production capability, particularly if we build new battery production lines, and if we vertically integrate subsystem production into our manufacturing facilities. In addition, if we do not manage cost-reduction efforts properly, such efforts may affect the quality of our products and our ability to generate future revenue. Moreover, significant portions of our operating expenses are fixed costs that will neither increase nor decrease proportionally with revenue. In addition, we incur significant costs related to procuring the materials required to manufacture our battery systems, electrification and charging solutions, fleet and energy management systems and electric transit buses, as well as assembling electric transit buses and systems, and compensating our personnel. If we are not able to implement further cost-reduction efforts or reduce our fixed costs sufficiently in response to a decline in revenue, our business, prospects, financial condition, and operating results may be adversely affected.

***Because many of the markets in which we compete are new and rapidly evolving, including possible consolidation of industry players, it is difficult to forecast long-term end-customer adoption rates and demand for our products, and our ability to meet demand for our products.***

We are pursuing opportunities in markets that are undergoing rapid changes, including technological and regulatory changes, and it is difficult to predict the timing and size of the opportunities. There may be ongoing consolidation of industry players which could impact market demand for our products and competition for electrification solutions. For example, in October 2022 Nikola Corporation, a customer, completed an acquisition of Romeo Power, a competitor. Commercial vehicle battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies, represent complex products and services. Because these automotive systems depend on technology from many companies, commercialization of commercial vehicle electrification products could be delayed or impaired due to unavailability of technology or integration challenges inherent in the use of multiple vendors in commercial vehicle production. Although we currently have contracts with several commercial customers, these companies may not be able to implement our technology immediately, or at all. Some of our commercial customers are emerging companies that may not be able to commercialize their products on the production timelines they contemplated when entering into a contract with us, or at all. In 2022, we renegotiated production volumes and minimum order penalties for some customers, and any future inability of customers to meet contract commitments could adversely affect our business and financial results.

In addition, regulatory, safety or reliability requirements, many of which are outside of our control, could also cause delays or otherwise impair commercial adoption of these new technologies, which will adversely affect our growth. Our future financial performance will depend on our ability to make timely investments in the correct market opportunities. If one or more of these markets experience a shift in customer or prospective customer demand, our products may not compete as effectively, if at all. It is also possible that we may not be able to meet demand, and lose customer or prospective customer confidence as a result and lose business to competitors. In the evolving nature of the markets in which we operate, it is difficult to predict customer demand or adoption rates

Table of Contents

for our products or the future growth of the markets in which we operate. If demand does not develop or if we cannot accurately forecast customer demand, the size of our markets, or our future financial results, our business, prospects, financial condition, and operating results could be adversely affected.

***If our battery systems, electrification and charging solutions, electric transit buses, fleet and energy management software, or other products have product defects and if our customer service is not effective in addressing customer concerns, our ability to develop, market and sell our products and services could be harmed.***

Our battery systems, electrification and charging solutions, fleet and energy management software and electric transit buses have in the past contained, and may in the future contain, product defects. Due to the limited deployment of our battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies, there may be latent problems with our products that have not yet been discovered.

We have in the past found defects in our battery systems, electric transit buses, and charging systems. We may in the future find additional design and manufacturing defects that cause our products to require repair or not perform as expected. While we perform our own and in some cases third-party testing on the products we manufacture, we currently have a limited amount of customer operating experience with our battery systems, drivetrains, high-voltage systems, electric transit buses, software systems, and charging solutions by which to evaluate detailed long-term quality, reliability, durability, and performance characteristics of these products and solutions. There can be no assurance that we will be able to detect and fix any defects in our products prior to their sale to or operation by customers. Our efforts to remedy any issues may not be timely, may hamper production, or may not be satisfactory to our customers. Further, our business has grown rapidly in recent periods, and we may not be able to scale our service organization or partner with an existing service network quickly enough to satisfactorily provide timely customer service and address product defects, customer complaints, and warranty issues, which could result in customer dissatisfaction and negatively impact further sales.

Any product defects, delays, or legal restrictions on our products, or other failure of our products to perform as expected could harm our reputation, negatively impact our ability to market and sell our products, and result in delivery delays, product recalls, product liability claims, customer contract terminations, adverse regulatory actions, and significant warranty and other expenses, and could have an adverse effect on our business, prospects, financial condition, and operating results.

***Our battery packs use of lithium-ion cells, which have been observed to catch fire, and our charging solutions operate at high voltages which may cause concerns regarding the use of battery systems, electrification and charging solutions and fleet and energy management software in public transit and other commercial vehicles.***

The battery packs that we produce make use of lithium-ion cells. On rare occasions, it is possible for lithium-ion cells to rapidly release contained energy by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. Highly publicized incidents of laptop computers and cell phones containing lithium-ion batteries bursting into flames have focused consumer attention on the safety of these cells. Fires have also been reported in electric cars and transit buses using lithium-ion batteries, including one of our transit buses. These events have raised questions about the suitability of using lithium-ion cells for commercial vehicle applications.

Despite the safety features that we design into our battery packs, there has been, and could be a failure of the battery packs in our buses or battery packs that we may produce for third parties. In November 2022, we experienced the first known fire on a Proterra transit bus that involved our proprietary battery system. There were no injuries and no known property damage, other than to exterior parts of the bus near the thermal event and the involved battery pack. After investigation we issued a recall for a limited number of battery packs. Incidents such as the November 2022 event could subject us to lawsuits, product recalls, cancelled contracts, lost customers, and potentially slow market adoption of our electric transit buses by transit authorities and our technologies by other customers. Also, negative public perceptions regarding the suitability of lithium-ion cells for commercial vehicle applications or any future incident involving lithium-ion cells, such as a vehicle or other fires, particularly

34

Table of Contents

public transit vehicle incidents, even if unrelated to our products, could have an adverse effect on our business, prospects, financial condition, and operating results.

In addition to thermal risk related to battery packs, related accessories and ancillary products could also be subject to similar safety concerns and risks as a result of the high voltage they carry and transmit. Our charging solutions also operate at high voltages and charging equipment must be properly maintained. In the past, our legacy single blade chargers have experienced charger fires which caused damage to the chargers and the bus. In particular, we experienced four such thermal incidents related to our legacy overhead single blade chargers over 2019 and 2020, including one incident in which a charger was completely destroyed. While none of these events resulted in personal injury or significant property damage to the bus or other property, it is possible that other such or related incidents could occur in the future, or that such thermal discharge could result in personal injury or property damage.

We also store a significant number of lithium-ion cells and design, test, and produce battery modules and packs at our manufacturing facilities and other locations. While we have implemented safety procedures for handling cells, we may experience a safety issue or fire related to the cells. Once we ship our customers battery systems, those systems are out of immediate control. Any mishandling of battery systems or equipment failures in our operations or in our customers operations may cause accidents that could potentially harm our employees or third parties or result in disruptions to our business or our customers' business. While we have implemented safety procedures and require our customers to implement safety procedures, we or our customers could experience a safety issue or fire which could disrupt operations or cause injuries and could have an adverse effect on our business, prospects, financial condition, and operating results.

***Defects in the materials or workmanship of our composite bus bodies could harm our reputation, expose us to product warranty or other liability claims, decrease demand for our buses, or materially harm existing or prospective customer relationships.***

We are one of a small number of transit bus manufacturers to use a composite unibody for our electric transit buses. In the past, we have sourced composite bus bodies from three suppliers, and now use only one supplier. Defects in the composite body, including non-structural concerns, whether caused by design, engineering, materials, manufacturing errors, or deficiencies in manufacturing or quality control processes at our suppliers, are an inherent risk in manufacturing technically advanced products for new applications. We offer our customers a twelve-year warranty on the composite bus body structure and bear the risk of possible defects. We have experienced defects in some bus bodies and have had to make repairs. For example, in October 2018 we discovered cracking in the wheel wells on some of our buses which required us to repair these defects under our warranty and will increase our field and customer service costs. In addition, in 2020 and 2021, we discovered a manufacturing quality issue that required us to repair laminate cracks that occurred near door frames of certain customer buses, and we expect that we will have to make more of these types of repairs. In 2020, we filed a recall related to the attachment of a torque limiter plate to the composite bus body that did not have proper adhesive application and could compromise the steering gear box and steering of the vehicle. In 2022, we voluntarily filed a new recall on the same issue for a new population of buses. Certain customers have experienced superficial cracking in the exterior gel coat or skin coat of the composite body which has caused certain customers to remove buses from revenue service and required us to develop inspection criteria and repair protocols, when applicable. We have also had to address vehicle inspection guidelines that are designed for metal frame buses with chassis and are not necessarily applicable to composite unibody architecture. Though these defects have not materially impacted us to date, we expect to continue to address these issues, and these defects or future defects with our advanced body materials whether structural or not may harm our existing and prospective customer relationships, damage our brand, and result in a reduction of awards, customer contract terminations, adverse regulatory actions, increased warranty claims, product liability claims and other damages.

***Our most recent business expansion with Proterra Powered and Proterra Energy may not be as successful as anticipated, may not attract the customers and business partners we expect, and the assumptions underlying the growth prospects of these businesses may not prove to be accurate.***

We have recently introduced and, in the future may introduce, new services and products that our customers and prospective customers may not utilize to the extent we anticipate or at all. For example, Proterra Powered and Proterra Energy products and services are designed to simplify the complexities of electric vehicle energy

Table of Contents

delivery and the deployment of large electric vehicle fleets for our customers. Through these businesses, we offer to design, build, finance, operate, and maintain the energy ecosystem that we believe to be required to power commercial electric vehicles. We have made, and will continue to be required to make, significant investments to scale these businesses, but we cannot be certain that such investments will be successful or meet the needs of our customers. Moreover, even if our customers use these services, we may encounter new challenges related to the delivery of energy solutions and competition from companies that may be better positioned to provide energy management services. If we invest in services or products that are not adopted by our customers or fail to invest in new services and products that meet the needs of our customers, our business, prospects, financial condition, and operating results could be adversely affected. In addition, we have limited history operating these businesses and providing the products and services they offer. There can be no assurances that these products and services will be accepted by our customers, or that we will effectively be able to market and sell them to existing customers, especially our transit customers who comprise the vast majority of our current revenues. Further, the limited experience we have acquired operating Proterra Transit may not prove to be applicable to Proterra Powered and Proterra Energy.

We expect Proterra Powered and Proterra Energy product lines to account for a growing percentage of our revenue in the future, and it is possible that certain assumptions underlying the launch of these businesses are subsequently determined to be inaccurate, such as assumptions regarding the growing adoption of electrification by commercial vehicle manufacturers and their customers in general; the attractiveness of our products and services to OEMs that would use our battery systems, electric drivetrains, high-voltage systems, vehicle controls, telemetry gateways, charging solutions, software and telematics platforms and related technologies in their electric transit buses or elsewhere; government and regulatory initiatives and directives impacting the adoption of electrification technologies for commercial vehicle applications; and the overall reliance by enterprises on commercial vehicles and the demand for medium- and heavy-duty trucks in the future.

***We face intense and increasing competition in the transit bus market and may not be able to compete successfully against current and future competitors, which could adversely affect our business, revenue growth, and market share.***

The transit bus industry is relationship driven and dominated by incumbent companies that have served their respective markets longer than we have. In the transit bus industry, our main sources of competition are incumbent transit vehicle integrators that have served our market with legacy diesel, diesel-hybrid and compressed natural gas products for many years, such as NFI Group Inc., Gillig Corporation, and Nova Bus Company; BYD Company Ltd., a Chinese company that offers an array of vehicles and other products, including electric transit vehicles; and new entrants and companies in adjacent markets, including other vehicle manufacturers that have entered or are reported to have plans to enter the transit bus market.

In the transit bus industry, electric bus procurements still represent a minority of annual transit bus purchases. As the number of electric bus OEMs increases, we may not be able to maintain our leading market position in North America. We also may not be successful in competing against incumbent competitors that have longer histories of serving the transit bus market and established track records of service, or with much larger, well-funded companies that choose to invest in the electric transit bus market. As more established bus companies develop their electric vehicle or competing zero-emission solutions, their long history in the transit sector could prove to be a competitive advantage which may have a negative impact on our ability to compete with them. Moreover, our competitors that also manufacture diesel-hybrid and compressed natural gas vehicles may have an advantage with their existing and prospective customers that are interested in exploring diesel alternatives without committing to electric vehicles or to pursue a gradual electrification strategy with the same manufacturer. Additionally, these competitors have more experience with the procurement process of public transit authorities, including bid protests. Competitors, potential customers, or regulators may also make claims that our electric transit buses or competitive bid activity are not in compliance with laws, regulatory requirements, or industry standards, which may impact our ability to sell our electric transit buses and to compete successfully for current and future customers. Actions by competitors may have consequences for future business or effects that we have not anticipated on other future opportunities.

Table of Contents

***We face intense and increasing competition in the commercial vehicle electrification market and may not be able to compete successfully against current and future competitors, which could adversely affect our business, revenue growth, and market share.***

The electric powertrain, electric commercial vehicle and charging solutions industries are highly competitive. We may not be successful in competing against companies in the battery systems, electric powertrain, charging solutions and related industries who may have more resources than we do or who are able to produce products and deliver services that are perceived by the market to be superior to ours. Global battery makers in particular may be able to leverage their superior scale and access to capital to sell their products more effectively to potential customers and may be further incentivized to compete with us in the North American market to take advantage of new incentives and tax credits for commercial vehicle electrification in the Inflation Reduction Act, which became law in August 2022. We may also face competitive pressure from incumbent vehicle producers that decide to enter the battery system or electric powertrain business, or vertically integrate their supply chain, and that are able to leverage their superior resources and capital to produce products that perform or are priced competitively when compared to our own.

In the battery system and electric powertrain industry, our main sources of competition include large Chinese battery suppliers such as CATL; incumbent tier one automotive suppliers that are developing electric powertrain alternatives to internal combustion engines, such as Cummins, Allison Transmission, BorgWarner and Dana; and commercial vehicle manufacturers that are developing or may develop their own internal electric powertrain solutions for their vehicles including large automotive companies, such as Daimler Truck Group and Volvo Group. In the future, incumbents and new companies offering competing zero emission solutions such as fuel cell electric vehicles may also become significant competitors.

In the charging solutions industry, our main sources of competition are incumbent charging solutions providers that develop charging solutions for commercial vehicles such as Siemens, ABB, Heliox, ChargePoint and Rhombus; and software companies that offer charging management solutions and can partner with hardware providers to provide complete solutions to end customers.

These competitors may have greater financial, technical, manufacturing, marketing, sales, and other resources than we do, and may have more experience and ability to devote greater resources to designing, developing, testing, manufacturing, distributing, deploying, promoting, selling or supporting battery systems, electrification and charging solutions, fleet and energy management software, and related technologies. Similarly, our principal competitors that also design, test, manufacture and deploy battery systems, electrification and charging solutions, fleet and energy management systems and related technologies for passenger vehicles may have a competitive advantage, through their established distribution and service networks for legacy vehicle technology, brand recognition and market acceptance of their products and services, and perceived reliability or popularity, all of which could be attractive to prospective partners and manufacturers that are exploring commercial vehicle electrification alternatives. As a result, our current and potential competitors may be able to respond more quickly and effectively than we can to new or changing opportunities, technologies, standards, or customer requirements, or devote greater resources than we can to the development, promotion, distribution and sale of their products and services. Our competitors and potential competitors may also be able to develop products or services that are equal or superior to ours, achieve greater market acceptance of their products and services, and increase sales by utilizing different distribution channels than we do. Some of our competitors may aggressively discount their products and services in order to gain market share, which could result in pricing pressures, reduced profit margins, lost market share, or a failure to grow market share for us. As the market for commercial electric vehicles grows and battery systems, electrification and charging solutions, fleet and energy management software, and related technologies gain wider adoption, we expect that additional specialized providers of battery systems, electric powertrain technology, charging infrastructure, and related software solutions and related technologies will enter the markets that we address and that larger competitors could more effectively sell their offerings.

In addition, we developed our battery system and powertrain systems and related components to be compliant with "Buy America" regulations applicable to the transit business, which means that we may have higher costs to procure components, and design, test and manufacture such products in the United States than competitors that are not compliant with Buy America or similar regulations. Our competitors may be able to manufacture comparable or competitive products in more cost-effective jurisdictions and import them to the United

37

Table of Contents

States at prices lower than ours, which competition could cause us to lose market share or compel us to reduce prices for goods or services to remain competitive, which could result in reduced sales and revenue in industry segments that are not subject to Buy America or similar regulation. The production of battery systems, electrification and charging solutions, fleet and energy management systems, and related technologies in China, where production costs are lower and where the development of such technologies could be subsidized by the state, could negatively impact our competitive profile by presenting our customers and partners a more cost-effective alternative to our products and services, which could result in reduced sales and revenue and loss of market share or compel us to reduce prices for goods or services to remain competitive.

Moreover, current and future competitors may also make strategic acquisitions or establish cooperative relationships among themselves or with others, including our current or future suppliers or business partners. By doing so, these competitors may increase their ability to meet the needs of our customers or potential customers. These developments could limit our ability to generate revenue from existing and new customers. If we are unable to compete successfully against current and future competitors, our business, prospects, financial condition, and operating results would be adversely affected.

***Our suppliers have and may fail in the future to deliver components according to schedules, prices, quality and volumes that are acceptable to us, or we may be unable to manage these suppliers effectively.***

Some of our products contain thousands of parts that we purchase from hundreds of mostly single-source direct suppliers, generally without long-term supply agreements. This exposes us to multiple potential sources of component shortages. Unexpected changes in business conditions, materials pricing, labor issues, wars, governmental changes, tariffs, natural disasters, health epidemics such as the global COVID-19 pandemic and its related disruption of global supply chains, particularly in the industrial sector, and other factors beyond our or our suppliers' control could also affect these suppliers' ability to deliver components to us or to remain solvent and operational. Single source suppliers provide us with a number of components that are required for manufacturing of our current products, including our composite bus bodies. If a single source supplier was to go out of business, we might be unable to find a replacement for such source in a timely manner, or at all. If a single source supplier were to be acquired by a competitor, that competitor may elect not to sell to us in the future. We have experienced and continue to experience component shortages and delays, including resin for connectors and wiring harnesses. In the fourth quarter of 2022, difficulty sourcing wiring harnesses from a vendor resulted in our production delays and fewer buses delivered in that quarter. In the first quarter of 2023, we experienced a shortage in a component used to complete our battery packs, temporarily idling our manufacturing lines in City of Industry. The unavailability of any component or supplier has in the past, and could in the future result in production delays, idle manufacturing facilities, require product design changes, cause loss of access to important technology and tools for producing and supporting our products, and create delays in providing replacement parts to our customers. We have also experienced delays in sourcing replacement parts for some of our oldest transit buses in customer fleets, which has led to customer dissatisfaction and buses being out of service for lengthy periods while awaiting replacement parts.

Moreover, significant increases in our production, or product design changes made by us have required and may in the future require us to procure additional components in a short amount of time. Our suppliers may not be able to sustainably meet our timelines or our cost, quality and volume needs, or may increase prices to do so, requiring us to replace them with other sources. Our supply for battery cells and other raw materials is critical in allowing us to scale our operations and meet our growth profitability and cash flow targets, such that any supply delay or vulnerability in the battery cell supply chain could alter our growth plans. Further, we have limited manufacturing experience and we may experience issues increasing the level of localized procurement at our current or future facilities. While we have to date secured additional or alternate sources or developed our own replacements for many of our components, and we believe that we will be able to continue to do so, there is no assurance that we will be able to do so quickly or at all, particularly with highly customized components. Additionally, we may be unsuccessful in our continuous efforts to negotiate with existing suppliers to obtain cost reductions and avoid unfavorable changes to terms, source less expensive suppliers for certain parts, and redesign certain parts to make them less expensive to produce. Any of these occurrences may harm our business, prospects, financial condition and operating results.

As the scale of our production increases, we will also need to accurately forecast, purchase, warehouse and transport components at high volumes to our manufacturing facilities across the United States. If we are unable to

Table of Contents

accurately match the timing and quantities of component purchases to our actual needs or successfully implement automation, inventory management and other systems to accommodate the increased complexity in our supply chain and parts management, we may incur unexpected production disruption, storage, transportation and write-off costs, which may harm our business and operating results.

***Our dependence on a limited number of suppliers introduces significant risk that could have adverse effects on our financial condition and operating results.***

We are a relatively low-volume producer of battery systems, electrification and charging solutions, fleet and energy management software and electric transit buses, and related technologies, and do not have significant purchasing power with suppliers in the electric vehicle market for many components of our products, including batteries, drivetrains, high-voltage systems and electric transit buses. As a result, suppliers and other third parties may be less likely to invest time and resources in developing business relationships with us if they are not convinced that our business will succeed. Larger suppliers have in the past and may in the future require minimum order quantities from us, which can expose us to liquidated damages or substantial penalties. For example, in 2022, we incurred nearly $8 million in penalties owed to our bus body supplier.

To build and maintain our business and obtain favorable contract terms, we must maintain our suppliers' and other vendors' confidence in our stability, liquidity, and business prospects. Maintaining such confidence may be complicated by certain factors, such as our limited operating history, suppliers' unfamiliarity with our products, competition, and uncertainty regarding the future of commercial vehicle electrification. Some of these factors are outside of our control and any negative perception about our business prospects, even if exaggerated or unfounded, would likely harm our business and make it more difficult to contract with suppliers on favorable terms. In addition, some of our suppliers may have more established relationships with our competitors, and as a result of those relationships, some suppliers may choose to limit or terminate their relationship with us.

In addition, with respect to our battery manufacturing operations that supports Proterra Transit and Proterra Powered, our battery production volumes are relatively small and we are currently sole sourcing key components from select suppliers, such as LG Energy Solution, for the lithium-ion cells that we use to manufacture our battery packs and other sole source suppliers for key elements of the battery pack. Disruptions in production may result if we had to replace any of these sole source suppliers on short notice. As we increase battery production volumes, if our current sole source suppliers cannot meet our demand for increased supply, we may find our ability to grow our business constrained if there are not alternative sources of supply that we can secure in a timely fashion, or at all.

With respect to our transit business, we have few long-term agreements with suppliers and typically purchase supplies on an order-by-order basis depending on the material requirements to build customers' buses. In many cases, we rely on a small group of suppliers, many of which are single-source suppliers, to provide us with components for our products, such as our bus body, which we sole source from TPI Composites Inc, and components of our drivetrains. Moreover, transit bus customers have specified a certain supplier for components, such as its preferred seating or heating, ventilation, and air conditioning units, and we are then beholden to that specified supplier's terms and delivery schedule. While we obtain components from multiple sources when that is a viable alternative, certain components used in our electric transit buses, such as bus bodies sourced from TPI Composites, must be custom made for us. In 2022 and into early 2023 we sourced wiring harnesses for our transit and powertrain products largely from one vendor that has recently experienced challenges and financial instability in its business, which created disruption in our supply and slowed our production.

If these suppliers become unwilling or unable to provide components, there may be few alternatives for supply of specific components, such as wiring harnesses, which may not be available to us on acceptable terms or favorable prices, or that meet our published specifications in a timely manner or at all. We have experienced in the past, may again experience delays while we qualify new suppliers and validate their components. In addition, replacing our sole source suppliers may require us to reengineer our products, which could be time consuming and costly.

Our reliance on a small group of sole-source suppliers as well as certain suppliers specifically chosen by customers creates multiple potential sources of delivery failure or component shortages for the production of our products. As a result, we have in the past, and may be required to in the future renegotiate our existing

39

Table of Contents

agreements with our suppliers, potentially with less favorable terms, and incur additional costs associated with the production. In the past, we have experienced delays related to supply shortages, including, most recently, as a result of the global supply chain disruptions related to the COVID-19 pandemic, and untimely or unsatisfactory delivery of components, including cells, wiring harnesses and other drivetrain components, that have stalled production with respect to our electric transit buses and our battery systems. Moreover, although we continue to expend significant time and resources vetting and managing suppliers and sourcing alternatives, we may experience future interruptions in our supply chain. Failure by our suppliers to provide components for our electric transit buses, battery systems or other products has in the past, and could in the future,severely restrict our ability to manufacture our products and prevent us from fulfilling customer orders in a timely fashion, which could harm our relationships with our customers and result in contract fines, negative publicity, damage to our reputation, and adverse effects on our business, prospects, financial condition, and operating results.

***We have been and may continue to be impacted by macroeconomic conditions, rising inflation rates, uncertain credit and global financial market, including recent and potential bank failures, supply chain disruption and geopolitical events, such as the conflict between Russia and Ukraine.***

In recent years, the United States and other significant markets have experienced cyclical downturns and worldwide economic conditions remain uncertain, including downturns of economic displacement related to COVID-19 or other similar pandemics and the current conflict between Russia and Ukraine. Economic uncertainty and associated macroeconomic conditions, including high volatility and uncertainty in the capital markets including as a result of inflation and interest rate spikes and recent and potential disruptions in access to bank deposits or lending commitments due to bank failures, make it difficult for our customers and us to accurately forecast and plan future business activities, and could cause our customers to slow spending on our battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies, which could delay and lengthen sales cycles. Furthermore, during uncertain economic times our customers may face issues gaining timely access to sufficient funding, which could result in an impairment of their ability to make timely payments to us. If that were to occur, we may be required to increase our allowance for doubtful accounts and our results could be negatively impacted. A weak or declining economy could also strain our suppliers, possibly resulting in supply disruption. In addition, there is a risk that our current or future suppliers, service providers, manufacturers or other partners may not survive such difficult economic times, which would directly affect our ability to attain our operating goals on schedule and on budget.

A significant downturn in economic activity, or general spending on transit or commercial vehicle electrification technologies, may cause our current or potential customers to react by reducing their capital and operating expenditures in general or by specifically reducing their spending on electric commercial vehicles and related technologies. In addition, our customers may delay or cancel projects to upgrade or replace existing vehicles in their fleets, or other projects to electrify commercial vehicle fleets, with our products or seek to lower their costs by renegotiating contracts. Moreover, competitors may respond to challenging market conditions by lowering prices and attempting to lure away our customers.

Given the global nature of our supply chain and customer base, global political, economic, and other conditions, including geopolitical risks such as the current conflict between Russia and Ukraine and related sanctions, may adversely affect our business and results of operations in ways we cannot foresee at the outset. War and economic dislocations may spur recessions, economic downturns, slowing economic growth and social and political instability; commodity shortages, supply chain risks and price increases; instability in U.S. and global capital and credit markets which could impact us, our suppliers and customers; and currency exchange rate fluctuations among other impacts that adversely affect our business or results of operations.

We cannot predict the timing, strength, or duration of any economic slowdown or any subsequent recovery generally, or in any industry. If the conditions in the general economy and the markets in which we operate worsen from present levels, our business, financial condition, and operating results could be adversely affected.

Table of Contents

***Our transit business is significantly dependent on government funding for public transit, and the unavailability, reduction, or elimination of government economic incentives would have an adverse effect on our business, prospects, financial condition, and operating results.***

Our principal transit customers are transit authorities that depend on government funding and programs authorized for public transportation under Title 49, Chapter 53 of the U.S. Code, and administered by the FTA, including Urbanized Area Formula Grants, Formula Grants for Rural Areas, the Capital Investment Program, and the Bus and Bus Facilities Program.The Fixing America's Surface Transportation Act, or FAST Act, enacted in December 2015, allocated over $305 billion for highway, transit, and vehicle safety programs for the five-year period that ended on December 31, 2020. Among other programs, the FAST Act reinstated a competitive Bus and Bus Facilities Infrastructure Investment Program, which grew from $268 million in 2016 to $344 million in 2020, resulting in an 89% increase over the 2015 funding levels for buses and bus facilities. To date, a substantial majority of our customers have received funding through these FAST Act programs in order to purchase new electric transit buses. For example, in 2018, nearly 70% of transit agencies that ordered buses from us were recipients of grants through the Low or No Emission Vehicle Program. The Low or No Emission Vehicle Program has enabled public transit agencies to purchase electric transit buses when the upfront cost of the electric bus was significantly higher than legacy diesel buses and the technology was new to customers. On November 15, 2021, President Biden signed the Infrastructure and Investment Jobs Act (IIJA), also referred to as the "Bipartisan Infrastructure Law", into law, reauthorizing surface transportation programs through the federal government's fiscal year in 2026, increasing funding for transit focused programs and establishing additional funding opportunities for no and low emission vehicles at unprecedented levels of funding. In August 2022, the Inflation Reduction Act was signed into law, further expanding incentives for commercial zero emission vehicles including clean vehicle tax credits.

In addition to funding and incentives under the FAST Act and the Bipartisan Infrastructure Law, and the Inflation Reduction Act, certain states and cities offer vouchers for the purchase of electric buses, such as California's Hybrid & Zero Emission Truck & Voucher Incentive Project, and the New York Truck Voucher Incentive Program. These vouchers provide point-of-sale discounts to vehicle purchasers. Additionally, there are other state programs that help fund electric bus purchases, including California's Transit and Intercity Rail Capital Program, which has been allocated a portion of California's Cap-and-Trade funds annually. The California Low Carbon Fuel Standard, or LCFS, also enables transit agencies using electricity as a source of fuel to opt into the LCFS program and earn credits that can be monetized. While the value of these credits fluctuates, the credits may help to offset up to half of the fuel costs for our transit customers.

There can be no assurance that these programs will be reauthorized following expiration of their current terms, that other government funding programs will continue to be available at the current levels or at all in the future, or that new government funding programs will be adopted, including with respect to products and services that are currently or will in the future be offered by Proterra Powered and Proterra Energy. Uncertainty or delay in extending, renewing, or adopting these incentives beyond their current or future expiration dates could negatively impact our business because sales cycles for public and other transit customers are long and customers may be unwilling to adopt electric technology if supportive funding is not assured. For example, transit authorities have reduced order sizes in the past because of a decrease in available funding.

Available government funding and economic incentives are subject to change for a variety of reasons that are beyond our control, including budget and the policy initiatives and priorities of current and future administrations at the federal and state level. In addition, future government shutdowns may impact the availability and administration of government funding, which could adversely impact future bus orders and result in payment delays for existing orders. For example, we experienced payment delays from customers during the U.S. federal government shutdown in January 2019 related to the FTA's inability to administer grant funding during the shutdown. If government support for adoption of electric vehicles and clean energy initiatives wanes, as it did during the Trump Administration, this could adversely affect the growth of the North American public transit electric bus market and the commercial electric vehicle market generally, and could have an adverse effect on our business, prospects, financial condition, and operating results.

41

Table of Contents

***Our future growth prospects depend upon the interest of commercial vehicle manufacturers in adopting our products and services that are designed to facilitate the electrification of commercial vehicles.***

Our growth is highly dependent upon the adoption of our battery systems, electrification and charging solutions, fleet and energy management software and electric transit buses by commercial vehicle manufacturers and OEMs, and their willingness to partner with us on the design, development, testing, manufacturing, distribution, deployment, promotion, sale, and support of our products. The market for commercial electric vehicles and electrification technologies is relatively new, rapidly evolving, and characterized by rapidly changing technologies, price competition, additional competitors, evolving government regulation and industry standards, frequent new product and vehicle announcements, and changing demands and behaviors of customers and potential partners. For example, in August 2022, the Inflation Reduction Act passed in the United States, adding unprecedented funding opportunities and tax credits for passenger car and commercial vehicle electrification, could make the United States an attractive market for vehicle electrification and increase competition as more industry players enter our core market. As a result, we spend resources educating our potential customers and partners on the benefits of adopting electric vehicle technology and engaging in lobbying efforts to promote clean energy initiatives that benefit our business activities.

Other factors that may influence the adoption of our commercial vehicle electrification technologies by manufacturers and OEMs include:

- perceptions about commercial electric vehicle performance, total cost of ownership, design, quality, cost and reliability that may be attributed to the use of advanced technology (in particular with respect to lithium-ion battery packs), especially if adverse events or accidents occur that are linked to the quality or safety of commercial electric vehicles;

- the amount and availability of federal, state, or other government funding and, in particular, the availability of economic incentives promoting fuel efficiency and alternate forms of energy, such as the Low or No Emission Vehicle Program, the Advanced Technology Vehicle Manufacturing Loan Program and the tax credits in the Inflation Reduction Act;

- the range over which commercial electric vehicles may be driven on a single battery charge and the time it takes to recharge the batteries of these vehicles;

- the cost and feasibility of installing new charging infrastructure;

- concerns about electric grid capacity and reliability, the cost of electricity, and reliance of utilities on fossil fuels for electricity generation, which could derail our past and present efforts to promote commercial electric vehicles as a practical substitution for vehicles that require fossil fuels;

- the availability of alternative fuel vehicles, including diesel-hybrid and compressed natural gas vehicles, and battery electric fuel cell vehicles;

- improvements in the fuel economy of the internal combustion engine;

- perceptions about the impact of electric vehicles on the environment and the health and welfare of communities;

- perceptions about the use of electric batteries, sourcing of battery components, recyclability, and safe disposal of batteries;

- the availability of service for commercial electric vehicles;

- the environmental consciousness of corporations and public agencies;

- volatility in the cost of diesel fuel and oil;

- government regulations;

42

Table of Contents

- social and political support for clean energy initiatives and commercial electric vehicles;

- perceptions about and the actual cost of alternative fuel vehicles; and

- macroeconomic factors.

Moreover, the willingness of commercial vehicle manufacturers and OEMs to embrace our battery systems, electrification and charging solutions, fleet and energy management software, and related technologies depends, in part, on the real or perceived reliability of these products and services, and their ability to provide complete electrification solutions to potential customers. Any lapse in quality, reliability or performance of any of these products or services could harm the perception of our other products and negatively impact the adoption of our products or services.

Any of the factors described above may cause current or potential customers not to purchase or adopt our products or services. If the market for commercial electric vehicles does not develop as we expect or develops more slowly than we expect, our business, prospects, financial condition, and operating results could be adversely affected.

***The growth of our transit business is dependent upon the willingness of corporate and other public transportation providers to adopt and fund the purchase of electric vehicles for mass transit.***

The growth of our transit business is highly dependent upon the adoption of electric transit buses for mass transit by corporate and public transportation providers. The market for electric transit buses is relatively new, rapidly evolving, and characterized by rapidly changing technologies, price competition, additional competitors, evolving government regulation and industry standards, frequent new vehicle announcements, and changing demands and behaviors of riders. As a result, we spend resources educating our potential customers on the benefits of adopting electric vehicle technology and engaging in lobbying efforts to promote clean energy initiatives.

The same factors described above that may influence the adoption of our commercial vehicle electrification technologies by manufacturers and OEMs, also may influence the adoption of electric transit buses by corporate and public transportation providers. Moreover, the willingness of corporate and public transportation providers to embrace electric transit buses depends, in part, on the willingness of users of public transportation to continue to use buses instead of alternative modes of transportation, including private car, rail, and ridesharing services including Uber, Lyft, and electric bikes and scooter services, on-demand shuttles and, in the future, autonomous vehicles. Bus ridership has been severely impacted by the COVID-19 pandemic and has been declining in large transportation markets, which may lead to fewer investments in electric transit buses in the long term.

Any of these factors may cause current or potential corporate and other public transit customers not to purchase our electric transit buses or use our services. If the market for electric vehicles for mass transit does not develop as we expect or develops more slowly than we expect, our business, prospects, financial condition, and operating results could be adversely affected.

***If we fail to make the right investment decisions in our technologies and services, we may be at a competitive disadvantage.***

Electrification of commercial vehicles is a relatively new field. We have invested significant resources into our technologies, including our battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies. For example, we invested in a single-blade overhead charging system that we have deployed and must continue to support for transit customers, even though the industry has moved to other solutions such as overhead pantograph or plug-in charging which also have required, and may continue to require, new investments on our part. In the third quarter of 2022, we made a strategic equity investment in a privately held entity that we expect to manufacture LFP cells domestically for us in the future. However, there is no guarantee that this company will succeed in making cells to our specifications, that we will develop product using these cells, or that we will be successful introducing a product with these cells into the market. If we select and invest in technology or technology standards that are not widely adopted or invest in technologies that are not widely adopted by large customers who influence the industry in the future, we may not

43

Table of Contents

recover our investments in these technologies and may be at a competitive disadvantage, and our business, prospects, financial condition, and operating results could be adversely affected.

***We have a long sales, production, and technology development cycle for new public transit customers, which may create fluctuations in whether and when revenue is recognized, may result in unfavorably priced contracts and may have an adverse effect on our business.***

The vast majority of our current and historical sales are to transit agencies that do not procure electric transit buses every year. The complexity, expense, and nature of government procurement processes result in a lengthy customer acquisition and sales process. It can take us years to attract, obtain an award from, contract with, and recognize revenue from the sale of a vehicle to a new customer, if we are successful at all. We have in the past entered contracts with customers based on certain assumptions regarding the cost of production, but the buses were produced years after the award was made when costs were much higher and it was unprofitable to fulfil the order. In 2022, we negotiated with several customers to make adjustments in pricing to acknowledge inflation but were not always successful. With long contract cycles we may continue to face this risk in the future even with contract terms that allow for inflation adjustments.

Before awarding an order for electric transit buses, transit agencies generally conduct a comprehensive and competitive proposal process based on a variety of criteria, including technical requirements, reliability, reputation, and price. Even if we are awarded an order, the actual realization and timing of revenue is subject to various contingencies, many of which are beyond our control, including the customer's interpretation of technical or performance requirements for acceptance, timing and conditions of customer acceptance, and the customer's reduction, modification, or termination of an order. A customer is not obligated to purchase the electric transit buses and may cancel or modify an award prior to entering into a contract with us. We have in the past, and may in the future, experience customer cancellations or modifications of awards. Customers have in the past , and customers may in the future cancel or modify an award for a variety of reasons, including as a result of improvements in our technology or the technology of our competitors between the dates of award and signed contract, or as the result of a successful bid protest.

Our sales and production cycle for a transit customer can be a long and time-consuming process. The initial sales process from first engagement to award typically ranges from 6 to 18 months. The award of a proposal is typically followed by a pre-production process where the design and specifications of the customized buses are mutually agreed and we negotiate a final contract and purchase order with our customer. Procurement of parts and production typically follow this final agreement between us and the customer. Once a bus is fully manufactured, the customer typically performs a final inspection and determines whether to accept delivery of the bus, at which time we recognize revenue on the sale. In other cases, revenue is recognized upon acceptance by the customer, typically by signing an acceptance document, which can cause delay in revenue recognition. The length of time between a customer award and vehicle acceptance typically varies between 12 and 24 months, depending on product availability, production capacity, and the pre-delivery and post-delivery inspection process by the customer which has in the past resulted in additional changes to the transit bus after manufacturing completion, re-works, further product validation and acceptance periods, and additional costs to us that we may not be able to recover. Consequently, we have in the past, and we may continue to invest significant resources and incur substantial expenses before a customer accepts a bus order and these expenses may not be recovered at all if a customer does not accept the completed bus, the bus requires costly modifications, or we extend additional warranties. For instance, we create a bill of materials and obtain the appropriate parts for each customized bus for a customer, which can result in excessive inventory risk if a customer changes or cancels the order. In addition, we may devote significant management effort to develop potential relationships that do not result in bus orders, acceptance of the bus as delivered, and the corresponding recognition of revenue, and the diversion of that effort may prevent us from pursuing other opportunities. As a result, our long sales and development cycle may subject us to significant risks that could have an adverse effect our business, prospects, financial condition, and operating results.

***If we are unable to attract new customers and expand sales to existing customers, our revenue growth could be slower than we expect and our business would be adversely affected.***

Our ability to achieve significant future revenue will depend in large part upon our ability both to attract new customers and to expand our sales to existing customers, including sales of Proterra Powered and Proterra

44

Table of Contents

Energy products and services to current and future customers, including Proterra Transit customers. If we fail to attract new customers or fail to maintain and expand our customer relationships, our business would be adversely affected. For example, if our existing transit customers do not expand their orders, our revenue may grow more slowly than expected, may not grow at all, or may decline. Additionally, we have a small direct sales force for each part of our business. We plan to continue expanding our sales efforts, but we cannot be assured that our efforts will result in sales to new customers, or increased sales to existing customers, with respect to our Proterra Powered, Proterra Transit or Proterra Energy offerings. Further, given the small size of our sales team, losing a member of our team may adversely affect our sales efforts with existing or potential new customers. If our efforts to expand sales to our existing customers are not successful, our existing customers do not continue to purchase additional products and services, or we are unable to attract new customers, our business, prospects, financial condition, and operating results would be adversely affected.

***We could incur material losses and costs from product warranty claims, recalls, or remediation of electric transit buses for real or perceived deficiencies or from customer satisfaction campaigns.***

We provide warranties on our Proterra Transit, Proterra Powered and Proterra Energy hardware products and process warranty claims in the ordinary course of our business. Warranty estimates are inherently uncertain and changes to our historical or projected experience, especially with respect to new battery systems, electrification and charging solutions, fleet and energy management systems or other vehicle technologies, may cause material changes to our warranty reserves in the future. If our warranty reserves are inadequate to cover future warranty claims on our products, our business, prospects, financial condition, and operating results could be adversely affected. In addition, we may also choose to upgrade parts or systems across an entire vehicle fleet or electric drivetrain product line for our own service or customer satisfaction needs, which may result in unforeseen costs.

We provide a limited warranty to customers on battery systems, electric transit buses and charging systems. The limited warranty ranges from one to twelve years depending on the components. Specifically, under the fleet defect provisions included in some transit bus purchase contracts, we are required to establish proactive programs to prevent the re-occurrence of defects in electric transit buses delivered under the contract if the same defect occurs in more than a specified percentage of the fleet within the base warranty period following delivery of the electric transit bus. We calculate an estimate of these costs into each of our contracts based on our historical experience and technical expectations. Warranty reserves include management's best estimate of the projected costs to repair or to replace items under warranty. These estimates are based on actual claims incurred to date and an estimate of the nature, frequency, and costs of future claims.

Because of the short operating history of our current product line, we have had limited data upon which to base our warranty expense estimates. Also, although we may offer customers lengthy warranties, our ability to recover warranty claims from underlying suppliers may be limited to a shorter period by contract. We are currently aware of warranty claims on certain transit bus structures and components which may result in material warranty costs. For example, we have received warranty claims related to cracked wheel wells and rear door framing in our buses and failures with third-party charging systems installed by us that did not meet customer specifications.

We are potentially subject to recalls of our products to cure real or perceived manufacturing defects or if we fail to comply with applicable U.S. Federal Motor Vehicle Safety Standards, or FMVSS. We have filed voluntary recalls with the United States National Highway Transportation Safety Administration. We are potentially subject to recalls made by the suppliers of components or parts that we purchase and incorporate into our electric transit buses. In October 2018, for example, we initiated a recall on certain of our electric transit buses because of a defect in a brake caliper after an equipment recall by our axle supplier, even though none of our customers had experienced a problem with the part. We may also need to bring battery systems back to our facilities for warranty work and deploy staff to assist customers with battery system issues, and we may need to transport buses back to one of our facilities or retrofit transit buses in the field to address a warranty claim, a recall campaign, or to otherwise satisfy customer concerns, which may require significant staff to be deployed to customer locations.

Even if a defect or perceived defect is not subject to a warranty claim or a current recall process, we may still incur costs of a customer satisfaction campaign when we choose to upgrade our battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies without cost to the customer. For example, we are currently aware that the amount of weight on the front axle of certain of our buses in operation may exceed the manufacturer's gross axle weight rating. To address this issue

45

Table of Contents

with our customers, in 2019 we launched a customer satisfaction campaign to upgrade our electric transit buses' front axle, which will result in increased labor and parts costs, for which we have accrued a reserve. We are also aware of cracks in the gel coat finish on some of our composite bus bodies which has required and is expected to require customer service support at our cost.

A product warranty claim, product recall, or product remediation, as a result of real or perceived defects, caused by systems or components engineered or manufactured by us or our suppliers, could involve significant expense and could have an adverse effect on our business, prospects, financial condition, and operating results. In addition, adverse publicity or industry rumors and speculation that may result from a customer or customers taking our battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies out of service pending a repair or remedy, product warranty claims, or product recalls, could slow market acceptance of our products and have an adverse effect on our reputation, brand image, and our ability to successfully market and sell our products.

***If we are unable to scale production and deliver battery systems and buses on time, our business could be adversely affected.***

Our business plan calls for significant increases in both vehicle and battery system production in a short amount of time to meet expected delivery dates to customers. Our ability to achieve our production plans will depend upon many factors, including adding additional battery lines, auxiliary vehicle production lines and production shifts, recruiting and training new staff while maintaining our desired quality levels, and improving our vehicle configuration process, supply chain management, and our suppliers' ability to support our needs. Moreover, because many of our orders are with respect to products that will be delivered more than a year after the order placed, whether we are the battery system supplier or, in the case of electric transit buses, the vehicle OEM, there can be no assurance that we will be able to accurately forecast our supply chain demands or scale our manufacturing accordingly to meet the delivery deadlines for these orders. In addition, we have adopted, and may adopt in the future, new factory and supply chain management technologies and manufacturing and quality control processes, which we must successfully introduce and scale for production across our factories. We have introduced new battery system configurations for our customers and we are new to modifying our production processes to complete different configurations. Moreover, our electric transit buses are customized for our customers and certain battery systems require custom integration with our customer electric transit buses, which means that each new electric transit bus order brings its own set of challenges to vehicle configuration and supply chain. For example, each new electric transit bus configuration may introduce a multitude of parts that we have not used in previous electric transit bus builds, which in turn requires obtaining parts from new suppliers that engineering must validate and incorporate into our vehicle configuration. In the past, we have experienced changes in work instructions for electric transit buses that have not been timely communicated between factories, resulting in recalls of delivered product. We have limited experience developing, manufacturing, selling, servicing, and allocating our available resources among multiple products and multiple factories simultaneously. If we fail to effectively manage the complexity of our production process, our business, prospects, financial condition, and operating results could be adversely affected.

Our inability to deliver electric transit buses that meet customer specifications in a timely manner could significantly delay recognition of revenue and receipt of payment, because we do not recognize revenue and are not paid for electric transit buses until they are delivered to the customer. Moreover, some of our contracts with transit agencies include liquidated damages clauses that apply monetary penalties on a per vehicle per day basis if electric transit buses are not delivered to the customer by the date specified in the contract. Per day penalties can be significant depending on the contract. We have delivered battery systems, charging systems and electric transit buses late in the past, and have incurred substantial penalties with respect to certain of these late deliveries, which have reduced our revenue and margin. Although we actively manage our production schedule and our customers' expectations, we may still fail to meet delivery deadlines and may incur penalties as a result. If we are unable to realize our production plans and deliver our battery systems and buses on time, our reputation, business, prospects, financial condition, and operating results could be adversely affected.

46

Table of Contents

***Our business could be adversely affected if utilities and state utility commissions do not, or are slow to, support transportation electrification efforts.***

Fleet-wide adoption of electric vehicles will benefit from favorable electricity rate structures for transit authorities and other large fleet operators and investment in make-ready infrastructure for electric vehicle charging at scale by utilities. For example, pursuant to California Senate Bill 350: Clean Energy and Pollution Reduction Act, the California investor-owned utilities have submitted Integrated Resource Plans that detailed how each utility will meet its customers' resource needs and reduce greenhouse gas emissions, including support for transportation electrification. The California Public Utilities Commission approved the plans in May 2018, including Pacific Gas and Electric Company's proposed investment in infrastructure and rebates and Southern California Edison Corporation's proposed time-of-use rates for charging electric transit buses. In September 2018, the Public Service Enterprise Group in New Jersey outlined a number of initiatives, including providing funding for charging system installations, deploying make-ready electric infrastructure and making grants for electric school buses. The New Jersey Board of Public Utilities will now evaluate the filing. In addition, utility commissions in several states are also evaluating the needs and benefits of transportation electrification, including the transit bus sector.

Our customers expect to pay lower electricity costs and generally look to the utilities to invest in infrastructure upgrades that will support commercial vehicle electrification plans. Therefore, efforts on the part of utility companies and state utility commissions to develop an appropriate rate designed to ensure that electricity as a fuel is competitive with fossil fuels will improve the total cost of ownership benefits for our transit customers and vehicle fleet owners, and enhance the attractiveness of our other products and offerings. Similarly, investments that utilities make to upgrade the infrastructure necessary to support additional load on the electrical grid will save our customers from potentially having to make their own investments. However, if utilities and utility commissions do not make the necessary investments to support commercial vehicle electrification and develop the appropriate, cost-competitive electricity rates, or delay such efforts, the market for battery systems, electrification and charging solutions, fleet and energy management software and electric transit buses, and related technologies may not develop as we expect or may develop more slowly than we expect, and our business, prospects, financial condition, and operating results could be adversely affected.

***Our annual revenue has in the past depended, and will likely continue to depend, on a small number of customers that fluctuate from year to year, and failure to add new customers or expand sales to our existing customers could have an adverse effect on our operating results for a particular period.***

Because the majority of our historical and current customers are public transit authorities that do not procure new vehicle fleets every year, the composition of customers that account for a significant portion of our revenue is likely to vary from year to year based on which customers have accepted delivery of large fleet orders with us during the applicable period. For example, two customers accounted for approximately 33% of our total revenue for the year ended December 31, 2022. Moreover, because public transit authorities tend to procure new vehicles in large batch orders, our revenue in any given quarter may be highly dependent on a single customer. For example, in the third and fourth quarter of 2022, approximately 45% and 67%, respectively, of electric transit buses were delivered to a single customer, Miami-Dade County. In the second quarter of 2020, approximately 50% of the electric transit buses we delivered were delivered to a single customer, the Port Authority of New York and New Jersey and in the fourth quarter of 2020, approximately 40% of the buses we delivered were delivered to a single customer, the City of Edmonton. We believe that we will continue to depend upon a relatively small number of customers for a significant portion of our revenue in any given period for the foreseeable future because we have only recently begun to deliver our buses and other products at a larger scale and we have a lengthy sales cycle and on-ramp for new customers. Our failure to diversify our customer base by adding new customers or expanding sales to our existing Proterra Transit customers and our failure to add new customers and expand sales to existing customers in our Proterra Powered and Proterra Energy businesses outside of the transit industry could therefore have an adverse effect on our operating results for a particular period.

***Our industry and its technology are rapidly evolving and may be subject to unforeseen changes. Developments in alternative technologies and powertrains or improvements in the internal combustion***

47

Table of Contents

***engine may adversely affect the demand for our electric transit buses and our electric battery solutions for commercial vehicles.***

The electric vehicle industry, and the electric commercial vehicle industry in particular, is relatively new and has experienced substantial change in the last several years. As more companies invest in electric vehicle and autonomous vehicle technology and alternative modes of transportation, we may be unable to keep up with technology advancements and, as a result, our competitiveness may suffer. As technologies change, we plan to spend significant resources in ongoing research and development, and to upgrade or adapt our products and services, and introduce new products and services in order to continue to provide battery systems, electrification and charging solutions, fleet and energy management software for electric transit buses, and related technologies with the latest technology, in particular battery technology. Our research and development efforts may not be sufficient or could involve substantial costs and delays and lower our return on investment for our technologies. For example, we invested substantial resources into developing a charging system solution in 2018 and then replaced that solution by entering into a new contract for supply of charging systems a few years later. Delays or missed opportunities to adopt new technologies could adversely affect our business, prospects, financial condition, and operating results.

In addition, we may not be able to compete effectively with other alternative fuel vehicles and integrate the latest technology, which may include autonomous vehicle technology, into our battery systems, electrification and charging solutions, fleet and energy management systems, and related technologies. Even if we are able to keep pace with changes in technology and develop new products and services, we are subject to the risk that our prior models, products, services and designs will become obsolete more quickly than expected, resulting in unused inventory and potentially reducing our return on investment, or become increasingly difficult to service or provide replacement parts at competitive prices. For example, we incurred $0.8 million, $1.9 million and $3.0 million in inventory write-offs in 2022, 2021 and 2020, respectively, as the result of unused raw materials or adopting new technologies. Additionally, given the long sales cycle of each of our products and services, customers may delay purchases and modify or cancel existing orders in anticipation of the release of new models and technology. Moreover, developments in alternative technologies, such as advanced diesel, ethanol, fuel cells, or compressed natural gas, or improvements in the fuel economy of the internal combustion engine, may adversely affect our business and prospects in ways we do not currently anticipate. Any developments with respect to these technologies, in particular fuel cell technologies and related chemical research, or the perception that they may occur, may prompt us to invest heavily in additional research to compete effectively with these advances, which research and development may not be effective. Any failure by us to successfully react to changes in existing technologies could adversely affect our competitive position and growth prospects.

***If we are unable to successfully manufacture and sell our battery systems, electrification and charging solutions, fleet and energy management software and electric transit buses, and related technologies, our business could be adversely affected.***

We have limited experience with manufacturing and selling battery systems, electrification and charging solutions, fleet and energy management software and electric transit buses, and related technologies to global commercial vehicle manufacturers and other types of manufacturers. As we develop partnerships with global commercial vehicle manufacturers to provide these products and other component parts to these partners and customers, we must introduce and implement manufacturing and quality control processes across our factories that are comparable to those of other Tier 1 suppliers in the automotive industry. We have identified areas for improvement as we scale and mature, such as ISO certification for our operations, that would allow us to meet quality standards required by companies such as Daimler and its subsidiaries. Furthermore, we must compete against more established battery designers, drivetrain designers, vehicle manufacturers, charging solution designers and component suppliers with greater resources and more experience in large scale manufacturing and deployment than we have. To compete effectively against these incumbent manufacturers and suppliers, we will have to devote substantial resources and effort to efficiently and effectively scale our manufacturing capabilities, implement new manufacturing and quality control processes, and enhance our existing processes. The implementation of a Tier 1 automotive supplier manufacturing operations inherently involves risks related to infrastructure and process development, quality control, and customer acceptance. If we fail to mature our manufacturing operations to the satisfaction of our customers, then our business, prospects, financial condition, and operating results could be adversely affected.

Table of Contents

***If we are unable to design, develop, market, and sell new products and services that address adjacent market opportunities, our business, prospects, and operating results may be adversely impacted.***

We may not be able to successfully develop new products and services or develop a significantly broader customer base. For the past several years, we have focused our business on the development and sale of electric transit buses for the mass transit market. Our product line in the transit market is currently limited to the 40-foot and 35-foot ZX5 transit buses, and spare parts. We have recently expanded our offerings to include battery systems, electrification and charging solutions, and fleet and energy management software, and related technologies that are designed for broader application to other commercial vehicles.

In this regard, we have entered into development and supply agreements to develop and sell our battery systems, electrification and charging solutions and fleet and energy management software to other medium-duty and heavy-duty commercial vehicle manufacturers. Our business model offers end-to-end powertrain systems, energy system integrations when electric drivetrains are supplied by a third party, and battery system supply when integration and electric drivetrains are supplied by third parties to the end customer. Achieving success in these relatively new markets will require us to, among other things:

- enter into strategic agreements with leading manufacturers in these markets and maintain and grow these relationships;

- adapt our electric powertrain technology to meet the specifications of additional commercial vehicle categories;

- successfully compete with other manufacturers in the new markets;

- effectively and efficiently scale our manufacturing capabilities;

- effectively and efficiently grow and manage our supply chain;

- expand our sales and marketing capabilities;

- enter into service partnerships or expand our internal service and parts capabilities;

- expand our integration and engineering services to compete with other integrators and suppliers of high voltage systems, controls and drivetrains;

- expand our software and telematics platform to offer competitive solutions;

- develop technology solutions that are compatible with offerings of third-party providers;

- develop charging solutions, including software and telematics that are compatible with electric vehicle technology independent of manufacturer or supplier; and

- comply with changing regulations applicable to our products and services.

If we fail to adequately improve our products and services to compete effectively against our competitors, we may not be successful in expanding our customer base in the electric commercial vehicle market.

In addition, our failure to address additional market opportunities could harm our business, financial condition, operating results, and prospects. We may not be able to successfully design, develop, or test new products and services in order to effectively compete with our competitors in these new markets. Furthermore, there may be no demand by customers to purchase newly developed or improved products and services, there may be risks and unbudgeted costs associated with launching new products and services, and we may not be able to recoup our research and development costs, all of which could have an adverse effect on our business, prospects, financial condition, and operating results.

Table of Contents

***We may not be able to develop, maintain and grow strategic relationships in the Proterra Powered or Proterra Energy business, identify new strategic relationship opportunities, or form strategic relationships, in the future.***

We expect that our ability to establish, maintain, and manage strategic relationships, such as development and supply agreements with customers that could have a significant impact on the success of our business. While we expect to increase the amount of revenue associated with Proterra Powered and Proterra Energy, there can be no assurance that we will be able to identify or secure suitable and scalable business relationship opportunities in the future or that our competitors will not capitalize on such opportunities before we do. Moreover, identifying such opportunities could demand substantial management time and resources, and may involve significant costs and uncertainties.

Additionally, we cannot guarantee that the companies with which we have developed or will develop strategic relationships will continue to devote the resources necessary to promote mutually beneficial business relationships and grow our business. Our current arrangements are not exclusive, and some of our strategic partners offer competing products. As a result of these factors, many of the companies with which we have development and supply agreements may choose to develop alternative products in addition to or in lieu of our solutions, either on their own or in collaboration with others, including our competitors. If we are unsuccessful in establishing or maintaining our relationships with key strategic partners, our overall growth could be impaired, and our business, prospects, financial condition, and operating results could be adversely affected.

***Lack of long-term customer contracts, uncertainty regarding customer option exercises, and customer suspension or termination of contracts may have adverse effects on our business.***

Proterra Transit relies heavily on sales to public and other transit authorities, which, consistent with general industry practice, do not make long-term purchase commitments with transit vendors. Most transit authorities usually undertake significant procurement of new transit buses once every few years and typically acquire a relatively small percentage of their fleet each time. Often, the terms of our procurements allow customers, without notice or penalty, to suspend or terminate their relationship with us at any time and for any reason. For example, one of our customers previously made an award to us for buses in 2017, but due in part to improvements in electric vehicle technology and the release of new bus models, withdrew the award in 2018 in favor of considering a new request for proposal process. Some customers have also elected to purchase fuel cell vehicles for their transit fleet. Even if customers continue their relationship with us, they may not purchase the same volume of products as in the past or they may not pay the same price for those products. This may also be true with respect to Proterra Powered, where customers may have long-term contracts, but are not subject to fixed quantity order requirements such that final orders may be below our revenue expectations or estimates.

Further, many transit authority contracts include options to purchase additional electric transit buses in the future, and while a portion of future orders may be represented by options, customers may not end up exercising these options. Although options represent a significant source of potential orders for us, we do not have an extensive history of fulfilling orders based on our customer option agreements. Even if we had a history of significant option exercises by customers, customers may not continue to exercise such options at the same rate or at all in the future. Any loss of customers or decrease in the number of electric transit buses or battery systems purchased under a contract could have an adverse effect on our business, prospects, financial condition, and operating results.

***We are competing for the business of both small and large transit agencies, which place different demands on our business, and if we do not build an organization that can serve both types of transit customers, by scaling our internal resources to meet varying customer needs, our business, prospects, financial condition and operating results may be harmed.***

Proterra Transit has competed for, and may in the future compete for, the business of larger transit agencies that maintain fleets of several hundred to thousands of vehicles, including Los Angeles, Miami Dade County and Chicago. This size of customer places significant demands on our business because they have large, specialized groups of professionals focused on different requirements or systems related to transit bus procurement and rigorous inspections with multiple levels of review to assure each bus meets their specifications, which may be driven by conformity with other vehicles in the fleet, large long-term supply contracts, such as for tires and other

50

Table of Contents

wear items, and operating contracts with maintenance and operations teams. Serving these customers requires significant investment in customer relationship managers and service professionals to support the levels of design, review, change orders, inspection, and commissioning and delivery of the electric transit buses. Similarly, servicing our Proterra Powered customers requires significant investments in customer relationship managers and other professionals as each customer requires different levels of battery integration support and service.

We also compete for the business of smaller transit agencies. Although smaller transit agencies often have less complicated procurement processes than larger transit agencies, serving these smaller agencies requires processing small order sizes while still catering to the specific vehicle configurations for each customer. If we continue to serve both large and small transit agency customers, we will need to effectively and efficiently scale our internal resources to meet varying customer needs. Our failure to do so could have an adverse effect on our business, prospects, financial condition, and operating results.

***Our business is subject to substantial regulations, which are evolving, and unfavorable changes or failure by us to comply with these regulations could have an adverse effect on our business.***

The majority of our current transit customers are government entities and we are subject to many local, state, and federal laws that add significant compliance costs to our operations. In addition, local, state, and federal regulations may conflict, making it difficult to build one vehicle that satisfies all requirements in all jurisdictions. Moreover, competitive bidding rules for government contracts add additional layers of complexity and require compliance with federal and state conflict of interest rules and rules governing our choice of suppliers and components.

Our electric transit buses and component products must comply with the National Traffic and Motor Vehicle Safety Act of 1966, as amended ("NTMVSA"), and regulations promulgated thereunder, which are administered by the National Highway Traffic Safety Administration ("NHTSA"). NTMVSA requires vehicle and equipment manufacturers to provide notice of safety defects to NHTSA and initiate a recall process within five days of such a determination by a manufacturer. NHTSA also administers reporting requirements from vehicle manufacturers under the Transportation Recall Enhancement, Accountability and Documentation Act of 2000 (the "TREAD Act"). We have ongoing reporting requirements under the TREAD Act and in the past have failed to timely report under the TREAD Act. NHTSA may also require a manufacturer to recall and repair vehicles that contain safety defects or that are not compliant with FMVSS or other certification requirements for vehicles. Sales into foreign countries may be subject to similar regulations. We cannot assure you that violations of these laws and regulations will not occur in the future or have not occurred in the past as a result of human error, accidents, equipment failure, manufacturing or design defects, or other causes. It is possible that our reporting for historical periods for which we failed to timely report may reveal instances where we should have taken actions required by law but failed to do so. For example, we became subject to certain early warning reporting obligations under the TREAD Act in 2018. Our ongoing reporting obligations require us to provide certain early warning data to help identify potential safety-related defects, including certain safety data dating back ten years. While we have filed reports for current periods, we are currently not in full compliance with these early warning reporting requirements for prior periods. As we work to remediate our non-compliance, we may be subject to retrospective safety recall notices on our electric transit buses. Recalls of our electric transit buses or components, whether initiated by us, NHTSA or another authority, or penalties for regulatory compliance failures could have a material adverse effect on our reputation, business and operating results and be used by our competitors to our disadvantage.

Furthermore, if we choose to expand internationally, we would likely face additional international requirements that may not be compatible with regulations that govern our business in the United States. For example, in the United States, we developed our supply chain to ensure that we comply with Buy America regulations, which govern manufactured products and rolling stock, including transit bus, procurements that are paid for, in part, with funds administered by the FTA. Buy America regulations currently require that 70% of our vehicle components by cost be manufactured in the United States, and the Made in America Office opened under the Biden-Harris administration has proposed rules which may raise this requirement further. Buy America regulations have the effect of rendering the cost of our supply chain more expensive when compared with our competitors. As we began selling buses to airports, we had to modify our operations to comply with the Buy American requirements under the FAA rules, which differ from the Buy America requirements under the FTA rules. In June 2018, we received our first order from a Canadian transit authority, and as a result, we need to comply with Canadian Content requirements, which will require sourcing components from Canadian suppliers or assembly of

Table of Contents

components in Canada. These regulations may increase the costs of doing business and add operational challenges.

In addition, there is no assurance that the current Buy America, Buy American, or Canadian Content requirements will not change or become stricter or that we will continue to be able to meet those requirements in the future. Our competitors have lobbied extensively to alter Buy America regulations to effectively prohibit our use of cylindrical battery cells produced outside of the United States for which there currently is no source of domestic supply available to us. Lack of domestic supply of cylindrical battery cells may also make our product less competitive and less desirable to customers that demand product that meets the domestic content requirements to achieve tariff-free status under the United States-Mexico-Canada trade agreement which entered into force on July 1, 2020.

Also, our ability to meet domestic content requirements is, in part, dependent on hundreds of suppliers. If any of these suppliers change the source of the components or subcomponents comprising their products, they could potentially prevent us from meeting domestic content requirements and negatively impact our business. Conversely, if domestic content requirements become less stringent in the future, foreign competitors without significant U.S. operations may be able to enter the U.S. market more easily and gain market share. Thus, any change to domestic content regulations could have an adverse effect on our business, prospects, financial condition, and operating results.

***Delays in FTA mandated Model Bus Testing Program, or failure to successfully complete federally mandated testing, could adversely impact our business.***

The FTA mandates that new transit bus models must undergo testing at its testing facility in Altoona, Pennsylvania and meet certain performance standards set by the FTA's Model Bus Testing Program, known as "Altoona Testing," in order to be eligible to receive federal funding. There is only one facility approved for testing by the FTA and in the past, we have experienced delays of several months before receiving regulatory approval to test our buses at Altoona, as well as delays in the actual testing at Altoona. The COVID-19 pandemic resulted in a shut-down of the Altoona facility in 2020 and there can be no assurances that the facility will not be shut down again due to the COVID-19 pandemic or otherwise. We may in the future choose to undergo testing or be required to do so.

When available, Altoona Testing is designed to promote production of better transit vehicles and components and to ensure that transit customers purchase vehicles that can withstand the rigors of transit service. Our 40-foot and 35-foot electric transit buses, including the ZX5 with DuoPower drivetrain, have satisfactorily completed Altoona Testing, but for each material change that we make to our transit bus platform, we must undergo a new round of testing. We have in the past and may in the future experience failures of components of our transit bus during Altoona Testing, which may prolong the test process, and cause us to be required to redesign components on the test bus and restart the testing process. Testing is available to vendors on a first-come, first-served basis. We cannot receive payment from customers relying on federal funds unless the applicable bus platform has satisfactorily completed Altoona Testing, and thus testing delays could have an adverse effect on our business, prospects, financial condition, and operating results. We have in the past and may in the future experience delays in Altoona Testing availability, including as a result of the COVID-19 pandemic, other pandemics, or other unforeseen events. In the past, a delay in receiving a required Altoona test report resulted in late delivery of buses to a customer and caused us to incur monetary penalties, delayed acceptance and delayed revenue recognition and customer payments. Moreover, there can be no assurance that the current Altoona Testing requirements will not change or become more onerous or that our future bus models will pass Altoona Testing. For instance, in 2016, the Model Bus Testing Program regulations changed to require a pass/fail test result. If we cannot produce electric transit buses that pass Altoona Testing, we would not be able to continue to sell buses to customers in the United States that rely on federal funds for their procurements, which would have a material and adverse effect on our business, prospects, financial condition, and operating results.

***Failure to comply with the Disadvantaged Business Enterprise ("DBE") program requirements or our failure to have our DBE goals approved by the FTA could adversely impact our transit business.***

The FTA requires transit vehicle manufacturers that bid on federally-assisted rolling stock procurements to submit annual goals to support qualified DBEs (as defined in the DBE program regulations), and to certify that

52

Table of Contents

they have complied with the requirements of the DBE program established by the U.S. Department of Transportation, which aims to increase the participation of DBEs in state and local procurements. Companies are certified as DBE if they are for-profit small businesses majority-owned by socially and economically disadvantaged individuals. The FTA reviews and approves transit vehicle manufacturers' DBE goals for the upcoming year and maintains a certified list of transit vehicle manufacturers that are eligible to bid on federally funded vehicle procurements based on their goals to contract with DBEs and good faith implementation of those goals. Our failure to comply with the DBE program requirements or a delay in having our DBE goals approved by the FTA could result in our ineligibility to bid on federally funded transit vehicle procurements, which could have an adverse effect on our business, prospects, financial condition, and operating results.

***Our business and prospects depend significantly on our ability to build our brand. We may not succeed in continuing to establish, maintain, and strengthen our brand, and our brand and reputation could be harmed by negative publicity regarding our company or products.***

Our business and prospects are heavily dependent on our ability to develop, maintain, and strengthen our brand. Promoting and positioning our brand will depend significantly on our ability to provide high quality battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies, and we have limited experience in these areas, particularly with respect to products and services that are not used in electric transit buses. In addition, we expect that our ability to develop, maintain, and strengthen our brand will also depend heavily on the success of our branding efforts. To promote our brand, we need to incur increased expenses, including product demonstrations and attending trade conferences. Brand promotion activities may not yield increased revenue, and even if they do, the increased revenue may not offset the expenses we incur in building and maintaining our brand and reputation. If we fail to promote and maintain our brand successfully or to maintain loyalty among our customers, or if we incur substantial expenses in an unsuccessful attempt to promote and maintain our brand, we may fail to attract new customers and partners, or retain our existing customers and partners and our business and financial condition may be adversely affected.

Moreover, any negative publicity relating to our employees, current or future partners, original equipment manufacturers deploying our battery or powertrain technology in their electric transit buses, partners or customers who use our high-voltage systems or software and telematics platforms, or others associated with these parties may also tarnish our own reputation simply by association and may reduce the value of our brand. Additionally, if safety or other incidents or product defects occur or are perceived to have occurred, whether or not such incidents or defects are our fault, we could be subject to adverse publicity, which could be particularly harmful to our business given our limited operating history. Given the popularity of social media, any negative publicity about our products or their safety, whether true or not, could quickly proliferate and harm customer and community perceptions and confidence in our brand. For example, in 2021, we were the subject of negative publicity arising out of the appearance of cracks in the composite bus body architecture, potential early retirement of some of our first generation transit buses and negative political commentary. Public transit agencies and OEMs are particularly sensitive to concerns and perceptions of the passenger and community constituencies they serve. If the passengers in our electric transit buses or people in communities where electric transit buses using our technology are deployed form a negative opinion of our electric transit buses or battery systems or charging solutions, our current and potential customers might not choose our products, and strategic partners in other markets may not adopt our battery systems or electric powertrain technology or charging solutions. Other businesses, including our competitors, and organized labor, may also be incentivized to fund negative campaigns against our company to damage our brand and reputation to further their own purposes. Future customers of our products and services may have similar sensitivities and may be subject to similar public opinion and perception risks. Damage to our brand and reputation may result in reduced demand for our products and increased risk of losing market share to our competitors. Any efforts to restore the value of our brand and rebuild our reputation may be costly and may not be successful, and our inability to develop and maintain a strong brand could have an adverse effect on our business, prospects, financial condition, and operating results.

***The use of lithium-ion cells may become disfavored as a result of the availability, or perceived superiority of, other types of batteries or yet undeveloped or unknown technologies.***

The battery packs that we currently produce make use of lithium-ion cells, which we believe currently represent the industry standard for battery technology for electric vehicles. It is possible, however, that other types of batteries or yet undeveloped or unknown technologies may become favored in the future, such as lithium iron

53

Table of Contents

phosphate ("LFP") batteries. LFP batteries currently have a wide range of applications, including in electric vehicle applications, and are perceived by many as offering cost-effective performance as compared to lithium-ion cells. The cost-effectiveness of LFPs is due, in part, to substantial investments in this technology development and manufacturing capability in China. While we believe that our products and services based on the lithium-ion cells that we have chosen to offer our customers present advantages with respect to ease of integration with their products and services and underlying performance, it is possible that these customers and partners may deem LFP-based technology, or other technologies, as sufficient or superior for their purposes, and may demand that we shift to LFP-based technology or decide to partner with other service providers who employ such technologies. In addition, it is possible that the performance, safety features or characteristics, reliability or cost-effectiveness of LFP batteries, or another form of battery, could improve in the future such that our current lithium-ion cell based offerings would become, or be perceived as, inferior or obsolete. In addition, it is possible that new forms of batteries or electrification technologies, such as solid state batteries, could emerge as a more cost effective or safer alternative to the batteries we currently offer. In the event that LFP or a new form of battery emerges or is deemed to exhibit better performance, operate at lower cost or exhibit better safety features, we could be compelled to attempt to integrate those new types of batteries into our platform, which may not be possible or feasible at a price that would be attractive to our customers or potential partners. Any developments with respect to LFP or new battery technology, or new electrification technologies that are based on unforeseen developments in fuel cell technology, or the perception that they may occur, may prompt us to invest heavily in additional research to compete effectively with these advances, which research and development may not be effective. Any failure by us to successfully react to changes in existing technologies could adversely affect our competitive position and growth prospects.

***Our business could be adversely affected from an accident or safety incident involving our battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses or defects in the materials or workmanship of our composite bus bodies or other components.***

An accident or safety incident involving one of our battery systems, electrification and charging solutions, fleet and energy management systems or electric transit buses could expose us to significant liability and a public perception that our electric transit buses and products are unsafe or unreliable. Our agreements with customers contain broad indemnification provisions, and in the event of a major accident, we could be subject to significant personal injury and property claims that could subject us to substantial liability. While we maintain liability insurance in amounts and of the type generally consistent with industry practice, the amount of such coverage may not be adequate to cover fully all claims, and we may be forced to bear substantial losses from an accident or safety incident. In addition, any accident or safety incident involving one of our buses, even if fully insured, could harm our reputation and result in a loss of future customer demand if it creates a public perception that our electric transit buses are unsafe or unreliable as compared to those offered by other transit bus manufacturers or other means of transportation. While we have not experienced significant accident or safety incidents involving our electric transit buses, we have experienced malfunctions, such as the overhead single blade charger thermal events and a bus fire related to low voltage wiring. Moreover, the public may be more sensitive to incidents involving transit buses and school buses, thereby compounding the effects of such incidents on the public and customer perception of our electric transit buses. As a result, any accident or safety incident involving our buses, or the buses of our competitors could materially and adversely affect our business, prospects, financial condition, and operating results.

***Our work with government customers exposes us to unique risks inherent in government contracting.***

We must comply with and are affected by laws and regulations relating to the award, administration, and performance of government contracts. Government contract laws and regulations affect how we do business with our customers and impose certain risks and costs on our business. A violation of specific laws and regulations by us, our employees, or others working on our behalf could harm our reputation and result in the imposition of fines and penalties, the termination of our contracts, suspension or debarment from bidding on or being awarded contracts, and civil or criminal investigations or proceedings.

Our performance under our contracts with government entities and our compliance with the terms of those contracts and applicable laws and regulations are subject to periodic audit, review, and investigation by various agencies of the government. If such an audit, review, or investigation uncovers a violation of a law or regulation or improper or illegal activities relating to our government contracts, we may be subject to civil or criminal penalties

Table of Contents

or administrative sanctions, including the termination of contracts, forfeiture of profits, the triggering of price reduction clauses, withholding of payments, suspension of payments, fines, and suspension or debarment from contracting with government agencies. There is inherent uncertainty as to the outcome of any audit, review, or investigation. If we incur a material penalty or administrative sanction or otherwise suffer harm to our reputation, our business, prospects, financial condition, or operating results could be adversely affected.

Further, if a government regulatory authority were to initiate suspension or debarment proceedings against us as a result of a conviction or indictment for illegal activities, we may lose our ability to be awarded contracts in the future or receive renewals of existing contracts for a period of time. We could also suffer harm to our reputation if allegations of impropriety were made against us, which would impair our ability to win awards of contracts in the future or receive renewals of existing contracts. Inability to be awarded contracts in the future or receive renewal of existing contacts could have an adverse effect on our business, prospects, financial condition, and operating results.

***A portion of our business is dependent upon U.S. government contracts and grants, which are highly regulated and subject to oversight audits by U.S. government representatives and subject to cancellations. Such audits could result in adverse findings and negatively impact our business.***

Our U.S. government business is subject to specific procurement regulations with numerous compliance requirements. These requirements, although customary in government contracting in the United States, increase our performance and compliance costs. These costs may increase in the future, thereby reducing our margins, which could have an adverse effect on our financial condition. Failure to comply with these regulations or other compliance requirements could lead to suspension or debarment from U.S. government contracting or subcontracting for a period. Among the causes for debarment are violations of various laws or policies, including those related to procurement integrity, export control, U.S. government security regulations, employment practices, protection of criminal justice data, protection of the environment, accuracy of records, proper recording of costs, foreign corruption, Trade Agreements Act, Buy America Act, and the False Claims Act.

Generally, in the United States, government contracts and grants are subject to oversight audits by government representatives. For example, in December 2020, the FTA released an audit of our and other manufacturers compliance with Buy America requirements. Such audits could result in adjustments to our contracts. For contracts covered by the Cost Accounting Standards, any costs found to be improperly allocated to a specific contract may not be allowed, and such costs already reimbursed may have to be refunded. Future audits and adjustments, if required, may materially reduce our revenues or profits upon completion and final negotiation of audits. Negative audit findings could also result in investigations, termination of a contract or grant, forfeiture of profits or reimbursements, suspension of payments, fines and suspension or prohibition from doing business with the U.S. government. All contracts with the U.S. government can be terminated for convenience by the government at any time.

In addition, contacts with government officials and participation in political activities are areas that are tightly controlled by federal, state, local and international laws. Failure to comply with these laws could cost us opportunities to seek certain government sales opportunities or even result in fines, prosecution, or debarment.

***We may not be able to obtain, or comply with terms and conditions for, government grants, loans, and other incentives for which we have applied and may apply for in the future, which may limit our opportunities to expand our business.***

We have in the past applied for and received state grants and tax incentives designed to promote the manufacturing of electric vehicles and related technologies, including charging solutions. In April 2015, the California Energy Commission awarded us $3.0 million based on our investment of approximately $8.4 million in our manufacturing facilities in California through December 31, 2018. In April 2017, California's Office of Business and Economic Development entered into a California Competes Tax Credit Allocation Agreement with us for an award of a California Competes Tax Credit in the amount of $7.5 million if certain conditions in that agreement are met in the prescribed time periods. In April 2019, the California Energy Commission awarded us a $1.8 million grant based on our expected investment of approximately $4.3 million in our manufacturing facility in City of Industry, California.

Table of Contents

We anticipate that in the future there will be new opportunities for us to apply for grants, loans, and other federal and state incentives. Our ability to obtain funds or incentives from government sources is subject to the availability of funds under applicable government programs and approval of our applications to participate in such programs. The application process for these funds and other incentives is and will remain highly competitive. We may not be successful in obtaining any of these additional grants, loans, and other incentives. We have in the past failed and may also in the future fail to comply with the conditions of these incentives, which could cause us to lose funding or negotiate with governmental entities to revise such conditions. For example, we received a grant in South Carolina in 2010 that was subject to certain performance criteria, including a condition that we create no fewer than 400 new full- time jobs. We were unable to meet the original deadline but negotiated with the South Carolina Coordinating Council for Economic Development (the "Council") for an extension on the date of job creation and we have since fulfilled the revised condition to the Council's satisfaction. Our estimates of job growth under our California Competes Tax Credit have also not come to fruition for certain fiscal years. We may be unable to find alternative sources of funding to meet our planned capital needs, in which case, our business, prospects, financial condition, and operating results could be adversely affected.

***We may become subject to product liability claims, which could harm our financial condition and liquidity if we are not able to successfully defend or insure against such claims.***

We provide indemnification to our customers who may be sued for product liability related to our electric transit buses and electric powertrain solutions, and we may otherwise be subject to product liability claims, including with respect to our charging solutions. The commercial vehicle market experiences significant product liability claims and we face inherent risk of exposure to claims in the event our electric transit buses or components do not perform as expected. Commercial vehicles including public transit buses have been involved and may in the future be involved in crashes resulting in death or personal injury, and in some cases catastrophic crashes resulting in the death and injury to many passengers.

While we carry insurance for product liability, it is possible that our insurance coverage may not cover the full exposure on a product liability claim of significant magnitude. A successful product liability claim against us could require us to pay a substantial monetary award. A product liability claim could also generate substantial negative publicity about our products and business and could have an adverse effect on our brand, business, prospects, financial condition, and operating results.

***Changes to U.S. trade policies, including new tariffs or the renegotiation or termination of existing trade agreements or treaties, may adversely affect our financial performance.***

We currently manufacture our products in the United States, but may consider other international locations, including locations in Canada. Although many of our suppliers are in the United States, we rely on a number of suppliers in other countries for key components. We are subject to risks and uncertainties associated with changing economic, political, and other conditions in foreign countries where our vendors are located, such as increased import duties, tariffs, trade restrictions, and quotas or other government regulations, work stoppages, fluctuations of foreign currencies, natural disasters, political unrest, and customs delays. Unavailability or delay of imports from our foreign vendors would likely cause interruptions in our supply chain and could have an adverse effect on our business, prospects, financial condition, and operating results.

Moreover, the U.S. federal government may alter U.S. international trade policy and to renegotiate or terminate certain existing trade agreements and treaties with foreign governments. The U.S. federal government renegotiated the North American Free Trade Agreement, renamed the U.S.-Mexico-Canada Agreement, which was signed on November 30, 2018. The U.S. federal government's potential decision to re-enter, withdraw or modify other existing trade agreements or treaties could adversely impact our business, customers, and suppliers by disrupting trade and commercial transactions and adversely affecting the U.S. economy.

In addition, the U.S. federal government has imposed, tariffs on certain foreign goods. For example, in 2018, the U.S. federal government imposed additional tariffs under Section 232 of the Trade Expansion Act of 1962, as amended, on many products including certain aluminum products imported into the United States, which may impact the commercial vehicle market and our supply chain. Moreover, these tariffs, as well as country-specific or product-specific exemptions, may also lead to retaliatory actions from foreign governments that could adversely affect our business. Certain foreign governments, including China and the European Union, have instituted or may

56

Table of Contents

consider imposing additional tariffs on certain U.S. goods. Restrictions on trade with foreign countries, imposition of customs duties, or further modifications to U.S. international trade policy have the potential to disrupt our supply chain or the supply chains of our suppliers and to adversely impact our costs, customers, suppliers, and the economy, which could have an adverse effect on our business, prospects, financial condition, and operating results.

***We are subject to various environmental and safety laws and regulations that could impose substantial costs upon us and negatively impact our ability to operate our manufacturing facilities if we fail in our efforts to abide by these laws and regulations.***

As a manufacturer, producer and seller of battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies, we are subject to numerous environmental, health, and safety laws and regulations in the United States, including laws relating to exposure to, use, handling, storage, and disposal of hazardous materials, and the building, testing and use of batteries and high-voltage systems, and other components, such as HVAC systems. Moreover, we may be subject to additional regulations as we expand our operations internationally. The costs of compliance, including assessing changes to our operations and notices required in our facilities and on our electric transit buses regarding potential hazards could be substantial. In addition, we may be required to manufacture product with alternative technologies and materials that require changes to our engineering, supply and product development programs that could result in significant cost and delays in product introduction. We also may not be successful in complying with such laws and regulations which could impact our ability to sell our products in certain locations, or result in substantial fines and penalties if our products in service are found to be non-compliant with certain laws and regulations. We also expect regulation of electric powertrains will increase over time, and result in increased compliance costs. For example, beginning in 2023, we will need to receive a zero emission powertrain certification in California. In addition, we have indemnified certain of our landlords for any hazardous waste that may be found on or about property that we lease. Furthermore, delays in achieving required certifications may prevent us from selling product in certain markets, and, any violations of applicable environmental and safety laws and regulations may result in substantial fines and penalties, remediation costs, third-party damages, a suspension or cessation of our sales of product or operations, and negative publicity that could harm our business, reputation, prospects, financial condition, and operating results.

***Our future success depends on the continuing efforts of our key employees and on our ability to hire, retain, and motivate additional key employees and scale our workforce.***

Our future success depends upon the continuing services of our key employees and on our ability to attract and retain members of our management team and other highly skilled employees, including battery and high voltage systems engineers, electric powertrain designers and engineers, vehicle systems and integration engineers, supply chain and quality control employees, sales personnel, service personnel, and software engineers and manufacturing talent. In our key areas of operations, including California, there is increasing competition for individuals with skill sets needed for our business, including specialized knowledge of batteries, electric vehicles, software engineering, and manufacturing engineering and quality control. This competition affects both our ability to retain key employees and hire new ones. Moreover, none of our key employees has an employment agreement for a specific term and any of our employees may terminate his or her employment with us at any time. Our continued success depends upon our continued ability to retain current employees and hire new employees in a timely manner, especially to support our expansion plans and to continue to ramp up our suite of offerings related to commercial vehicle electrification. For example, we started production at our Powered 1 factory in Greer, South Carolina in January 2023, and have needed and will continue to need to hire many people to achieve maximum production there. We are also adding additional production shifts at existing facilities. If we cannot find sufficiently trained staff in a timely manner, our launch of production at this facility could be delayed and adversely impact our business. Additionally, we compete for talent with both large and established companies that have far greater financial resources than we do and start-ups and emerging companies that may promise more attractive growth opportunities.

Furthermore, the reduction in workforce that we implemented in the first quarter of 2023 may yield unintended consequences and costs, such as the loss of institutional knowledge and expertise, employee attrition beyond our intended reduction in force, a reduction in morale among our remaining employees, greater-than-anticipated costs incurred in connection with implementing the restructuring, and the risk that we may not achieve the benefits from

57

Table of Contents

the restructuring to the extent or as quickly as we anticipate, all of which may have a material adverse effect on our business, results of operations or financial condition. These restructuring initiatives could place substantial demands on our management and employees, which could lead to the diversion of our management's and employees' attention from other business priorities. In addition, we may discover that the workforce reduction and other restructuring efforts will make it difficult for us to pursue new opportunities and initiatives and require us to hire qualified replacement personnel, which may require us to incur additional and unanticipated costs and expenses.

In addition, new employees often require significant training and, in many cases, take significant time before they achieve full productivity. As a result, we may incur significant costs to attract and retain new employees, including significant expenditures related to salaries and benefits and compensation expenses related to equity awards, and we may lose new employees to our competitors or other companies before we realize the benefit of our investment in recruiting and training them. Moreover, new employees may not be or become as productive as we expect, as we may face challenges in adequately or appropriately integrating them into our workforce and culture. Difficulties in retaining current employees or recruiting new ones could have an adverse effect on our business, prospects, financial condition, and operating results.

***Our businesses rely heavily on our specialized sales personnel and technical sales support to market and sell our products. If we are unable to effectively hire, train, manage, and retain our sales personnel, our business may be adversely impacted.***

The success of our businesses largely depends on our ability to hire, train, and manage our sales personnel who have experience with and connections to the public and other transit agencies and commercial vehicle OEMs that are our current and potential customers. Because we employ a small and specialized sales force, the loss of any member of our sales team or technical sales support professionals could weaken our sales expertise and our customer reach, and adversely affect our business, and we may not be able to find adequate replacements on a timely basis, or at all. Moreover, there are no assurances that we will be able to maintain a sufficient level of sales personnel to effectively meet our needs as our business continues to grow, particularly with respect to Proterra Powered and Proterra Energy.

Competition for sales personnel who are familiar with and trained to sell our products and services continues to be strong. We train our sales personnel to better understand our existing and new product technologies and how they can be positioned against our competitors' products. We also train our sales personnel to be adept at working with long sales cycles characteristic of public agency customers and commercial vehicle manufacturers, as well as the special requirements attendant to each.

These initiatives are intended to improve the productivity of our sales personnel and our revenue and profitability. It takes time for the sales professionals to become productive following their hiring and training and there can be no assurance that sales representatives will reach adequate levels of productivity, or that we will not experience significant levels of attrition in the future. Measures we implement to improve the productivity may not be successful and may instead contribute to instability in our operations, departures from our sales and technical support organizations, or reduce our revenue, profitability, and harm our business.

***If we are unable to obtain bid bonds, performance bonds, or letters of credit required by public transit agencies or other customers, our ability to obtain future projects could be negatively affected.***

We have in the past been, and may in the future be, required to provide bid bonds or performance bonds to secure our performance under customer contracts or, in some cases, as a prerequisite to submitting a bid on a potential project. Our continued ability to obtain these bonds will depend primarily upon our capitalization, working capital, past performance, management expertise, reputation and certain external factors, including the overall capacity of the surety market. Surety companies consider these factors in relation to the amount of our awards and their underwriting standards, which may change from time to time. Surety companies also require that we collateralize a percentage of the bond with cash or other form of credit enhancement. With a decreasing number of insurance providers in that market, it may be difficult to find sureties who will continue to provide contract-required bonding on acceptable terms and conditions, or at all. Furthermore, events that affect surety markets generally may result in bonding becoming more difficult to obtain in the future or being available only at a significantly greater cost.

Table of Contents

In addition, some of our Proterra Transit and Proterra Energy customers also require collateral guarantees in the form of letters of credit to secure performance or to fund possible damages in the event of default under our contracts with them. If we enter agreements that require the issuance of letters of credit, our liquidity could be negatively impacted. Our inability to obtain adequate bonding or letters of credit and, as a result, to bid or enter into agreements, could have an adverse effect on our business, prospects, financial condition, and operating results.

***We may experience outages and disruptions of our services if we fail to maintain adequate security and supporting infrastructure as we scale our information technology systems.***

As we grow our business, we expect to continue to invest in our existing information technology systems, including data centers, network services, data storage, and database technologies, and cybersecurity technologies both to assist us in our business and to better provide our fleet-scale, high-power charging solutions and software services to our customers. Creating the appropriate information technology support systems for our business is time intensive, expensive, and complex. Our implementation, maintenance, and improvement of these systems may create inefficiencies, operational failures and increased vulnerability to cyber-attacks. Moreover, there are inherent risks associated with developing, improving, and implementing new information technology systems, including the disruption of our current data management, procurement, manufacturing, execution, finance, supply chain, sales, and service processes. As we continue to grow our services that rely on collecting and analyzing customer telematics and charging data, our exposure to information technology risks will increase. These risks may affect our ability to manage our data and inventory, procure parts or supplies or manufacture, sell, deliver, and service electric transit buses, or achieve and maintain compliance with applicable regulations.

We also maintain information technology measures designed to protect us against system security risks, data breaches, and cyber-attacks. Cyber-attacks could include denial-of-service attacks impacting customer service availability and reliability, the exploitation of software vulnerabilities in internet facing applications, social engineering of system administrators (for example, tricking company employees into releasing control of their systems to a hacker), or the introduction of computer viruses or malware into our systems to steal confidential or proprietary data. In 2020, we were the victim of a successful social engineering attack that resulted in the diversion of significant funds we intended to pay a supplier to a fraudulent account. In the third quarter of 2021, human error also resulted in a server for our Valence platform being accessible to the public for a short period of time, allowing unauthorized access to telematics data and, resulting in the deletion of a limited amount of data used by employees and customers for report functionality. Cyber-attacks of increasing sophistication may be difficult to detect and could result in the theft of our funds, intellectual property and data. In addition, we are vulnerable to unintentional errors or malicious actions by persons who have authorized access to our systems but exceed the scope of their access rights, or unintentionally or intentionally alter parameters or otherwise interfere with the intended operations of our technology services. The steps we take to increase the reliability, integrity, and security of our systems as they scale may be expensive and may not prevent system failures or unintended vulnerabilities resulting from the increasing number of persons with access to our systems, complex interactions within our technology platform and the increasing number of connections with third-party partners' and vendors' technology. Operational errors or failures or successful cyber-attacks could compromise our proprietary information, the quality of our services, and our ability to perform for our customers, resulting in damage to our reputation, which could have an adverse effect on our business, prospects, financial condition, and operating results.In addition, these events could increase the risk of claims alleging that we do not comply with applicable laws and regulations, subjecting us to potential liability and regulatory penalties under privacy laws protecting personal information.

***If we update our manufacturing equipment more quickly than expected, we may have to shorten the useful lives of any equipment to be retired as a result of any such update, and the resulting acceleration in our depreciation could negatively affect our financial results.***

We have invested and expect to continue to invest significantly in what we believe is state-of-the-art tooling, machinery, and other manufacturing equipment for production of our battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies. We depreciate the cost of such equipment and electric transit buses over their expected useful lives. However, manufacturing and commercial vehicle technology may evolve rapidly, and we may decide to update our manufacturing process with more advanced equipment or tooling. Moreover, as our engineering and manufacturing expertise and

Table of Contents

efficiency increase, we may be able to manufacture our products using less of our installed equipment. The useful life of any equipment that would be retired early as a result would be shortened, causing the depreciation on such equipment to be accelerated, and our operating results could be negatively impacted.

***Our business may be adversely affected by workforce disruptions.***

Our production employees in our City of Industry facility are represented by a union and we are party to a collective bargaining agreement that will expire in 2023 as we exit the City of Industry facility and no longer employ the employees that constitute the bargaining unit. Our other employees are not represented by a union, though it is common throughout the commercial vehicle industry for employees to belong to a union, and if more of our employees decide to join or form a labor union, we may become party to additional collective bargaining agreements, which could result in higher employee costs, higher administrative and legal costs, and increased risk of work stoppages. It is also possible that a union seeking to organize our facilities may mount a corporate campaign, resulting in negative publicity or other actions that require attention by our management team and our employees. Negative publicity, work stoppages, or strikes by unions could have an adverse effect on our business, prospects, financial condition, and operating results.

Moreover, some of our suppliers and vendors, including freight companies, have workforces represented by unions and are subject to collective bargaining agreements. The failure of our suppliers and vendors to successfully negotiate collective bargaining agreements could result in disruptions to our supply chain, manufacturing, and sale of our electric transit buses. Such delays could have an adverse impact on our business, prospects, financial condition, or operating results.

***We may acquire or invest in additional companies, or undertake other strategic transactions or other business relationships which may divert our management's attention, result in additional dilution to our stockholders, consume resources that are necessary to sustain our business, and which we may not be able to integrate successfully.***

In 2022, we made a strategic equity investment in a privately held entity that we expect to produce lithium iron phosphate (LFP) battery cells in the United States in the coming years to provide us with development opportunities for battery packs with another cell chemistry to address additional segments of the commercial vehicle market. We may never be able to capitalize on the opportunity that we anticipated with this investment, for a number of reasons including our own future strategic decisions or the entity's failure, which may result in no return on our investment. Although we have not made any acquisitions to date, our business strategy in the future may include acquiring other complementary products, technologies, or businesses or making further investments in companies that the management team believes are important to our supply chain or other strategic business interests. We also may enter relationships with other businesses to expand our domestic and international operations and to create services networks to support our products, such as a joint venture or other strategic partnerships. An acquisition, investment, or other strategic transaction or business relationship may result in unforeseen operating difficulties and expenditures. We may encounter difficulties assimilating or integrating the businesses, technologies, products, services, personnel, or operations of the acquired companies particularly if the key personnel of the acquired companies choose not to work for us. Acquisitions or other strategic transactions may also disrupt our business, divert our resources, and require significant management attention that would otherwise be available for the development of our business. Moreover, the anticipated benefits of any acquisition, investment, or other strategic transaction or business relationship may not be realized or we may be exposed to unknown liabilities.

Negotiating these types of transactions can be time consuming, difficult, and expensive, and our ability to close these transactions may often be subject to approvals that are beyond our control. Consequently, these transactions, even if undertaken and announced, may not close. Even if we do successfully complete transactions, we may not ultimately strengthen our competitive position or achieve our goals, and any transactions we complete could be viewed negatively by our customers, securities analysts, and investors.

Table of Contents

***Any potential future international expansion will subject us to additional costs and risks that could harm our business, including unfavorable regulatory, political, tax, and labor conditions, and our potential future efforts to expand internationally may not be successful.***

Should we choose to expand our business internationally in the future and establish business relationships with new international partners, we may be subject to legal, political, and regulatory requirements and social and economic conditions that may be very different from those affecting us domestically. For example, we have expanded our transit business into Canada. As we expanded into Canada, our electric transit buses were required to comply with Canadian Motor Vehicle Safety Standards, which differ from the FMVSS. Funding for transit bus procurement from certain provincial governments in Canada also requires compliance with Canadian Content requirements, which will require different supply chain partners than those that we rely on for our electric transit buses sold in the U.S. market and assembly of certain components or subcomponents in Canada. In addition, we are providing products and services to OEMs in Australia and Western Europe, and as we expand our Proterra Powered or Proterra Energy business internationally, or should we choose to further expand our Proterra Transit business outside the United States and Canada, we may face a number of risks associated with international business activities that may increase our costs, impact our ability to sell our electric transit buses, and require significant management attention. These risks include:

- conforming our products to various international regulatory and safety requirements as well as charging and other electric infrastructures;

- difficulty in establishing, staffing, and managing foreign operations and service networks;

- challenges in attracting international customers;

- preferences of foreign nations for domestically manufactured products;

- our ability to enforce our contractual rights;

- longer sales and collection cycles in some countries;

- weaker intellectual property protection in some countries;

- compliance with multiple, potentially conflicting and changing governmental laws, regulations and permitting processes, including environmental, product safety, banking, employment, and tax;

- compliance with U.S. and foreign anti-bribery laws including the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "FCPA"), and the UK Bribery Act of 2010;

- currency exchange rate fluctuations;

- regional economic and political instability, including as a result of acts of war or terrorism in countries where we may operate;

- restrictions on repatriations of earnings;

- trade restrictions, customs regulations, tariffs, and price or exchange controls;

- increased competition from local providers of similar products;

- increased costs to establish and maintain effective controls at foreign locations; and

- overall higher costs of doing business internationally.

As a result of these risks, any potential future international expansion efforts that we may undertake may not be successful and may incur significant operational expenses. Our failure to manage these risks and challenges successfully could have an adverse effect on our business, prospects, financial condition, and operating results.

Table of Contents

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

We may be limited in the portion of net operating loss ("NOL") carryforwards that we can use in the future to offset taxable income for U.S. federal and state income tax purposes. As of December 31, 2022, we had U.S. federal NOL carryforwards and state NOL carryforwards of approximately $729.5 million and $531.1 million, respectively, which if not utilized will begin to expire for federal and state tax purposes beginning in 2030 and 2023, respectively. Federal NOLs generated after December 31, 2017 have an indefinite carryover period, and federal NOLs generated after December 31, 2017 may be utilized to offset no more than 80% of taxable income annually. Realization of NOL carryforwards that expire beginning in 2030 and 2023, respectively, depends on future income, and there is a risk that these carryforwards could expire unused and be unavailable to offset future income tax liabilities, which could adversely affect our operating results.

In addition, under Sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three-year period, the corporation's ability to use its pre-change NOL carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income may be limited. While we have conducted a Section 382 study in the past, we may experience ownership changes in the future, including as a result of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-change NOL carry-forwards and other tax attributes to offset U.S. federal taxable income may be subject to limitations, which could potentially result in increased future tax liability to us.

***U.S. federal income tax reform could adversely affect us.***

New legislation or regulations that could affect our tax burden could be enacted by any governmental authority. United States federal legislation affecting the tax laws was enacted in December 2017 (the "Tax Cuts and Jobs Act" or "TCJA"), March 2020 (the "Families First Coronavirus Response Act"), March 2020 (the "CARES Act"), December 2020 ("Consolidated Appropriations Act, 2021") and August 2022 (the "Inflation Reduction Act" or "IRA").

We continue to examine the impact the TCJA and CARES Act may have on our business. The TCJA is a far- reaching and complex revision to the U.S. federal income tax laws with disparate and, in some cases, countervailing impacts on different categories of taxpayers and industries, and will require subsequent rulemaking and interpretation in a number of areas. The long-term impact of the TCJA on the overall economy, the industries in which we operate and our and our partners' businesses cannot be reliably predicted at this early stage of the new law's implementation. For example, beginning in 2022, the TCJA eliminates the option to deduct research and development expenditures in the year they were incurred and instead requires taxpayers to capitalize and amortize these expenditures over five or fifteen years pursuant to Section 174 of the Internal Revenue Code. Although there is proposed legislation that would defer the capitalization requirement to later years, we have no assurance that the provision will be repealed or otherwise modified. There can be no assurance that the TCJA will not negatively impact our operating results, financial condition, and future business operations. The estimated impact of the TCJA is based on our management's current knowledge and assumptions, following consultation with our tax advisors. Because of our valuation allowance in the United States, ongoing tax effects of the Act are not expected to materially change our effective tax rate in future periods.

In response to the COVID-19 pandemic, California's Legislature passed Assembly Bill 85 ("A.B. 85"), which suspends the use of net operating losses for tax years beginning in 2020, 2021, and 2022 for taxpayers with taxable income of $1.0 million or more before an application of net operating loss. A.B. 85 includes an extended carryover period for the suspended net operating losses with an additional year carryforward for each year of suspension. A.B. 85 also limits the utilization of business incentive tax credits for taxable years 2020, 2021, and 2022, requiring that taxpayers can only claim a maximum of $5.0 million in tax credit on an aggregate basis. On February 9, 2022, Governor Gavin Newsom signed Senate Bill 113 ("SB 113"). SB 113 restores the use of California net operating losses and eliminates the $5 million annual business credit limit of A.B. 85 for tax years beginning on or after January 1, 2022.

On August 16, 2022, President Biden signed the IRA, which became effective beginning in 2023. The IRA includes implementation of a new alternative minimum tax, an excise tax on stock buybacks, other significant tax incentives for energy and climate initiatives and other provisions. These new incentives may increase competition.

Table of Contents

We use our best judgment in attempting to quantify and reserve for these tax obligations. However, a challenge by a taxing authority, our ability to utilize tax benefits such as carryforwards or tax credits, or a deviation from other tax-related assumptions may cause actual financial results to deviate from previous estimates.

***Our business is subject to the risk of earthquakes, fire, power outages, floods, and other catastrophic events and to interruption by man-made problems such as terrorism.***

We maintain production facilities in Northern and Southern California and South Carolina. Any of our facilities may be harmed or rendered inoperable by disasters, including earthquakes, tornadoes, hurricanes, wildfires, floods, nuclear disasters, geopolitical events, acts of terrorism or other criminal activities, infectious disease outbreaks (such as COVID-19), and power outages. In the event of natural disaster or other catastrophic event, we may be unable to continue our operations and may endure production interruptions, reputational harm, delays in manufacturing, development and testing of our battery systems, electrification and charging solutions, fleet and energy management systems, electric transit buses, and related technologies, and loss of critical data, all of which could have an adverse effect on our business, prospects, financial condition, and operating results. Moreover, our corporate headquarters and one of our current battery production facilities are in the San Francisco Bay Area, and we have facilities in Los Angeles County, regions known for seismic activity and potentially subject to catastrophic fires. If our facilities are damaged by such natural disasters or catastrophic events, our repair or replacement would likely be costly and any such efforts would likely require substantial time that may affect our ability to produce and deliver our products. For example, in July 2015, we experienced a fire in our Greenville, South Carolina manufacturing facility and then-headquarters, in which substantially all of our computer equipment, furniture and fixtures, leasehold improvements, work in progress, raw material, and finished goods inventories were damaged or destroyed. While we were insured for our losses and resumed manufacturing shortly thereafter, the disruption temporarily impacted our business. Similarly, any future disruptions in our operations could negatively impact our business, prospects, financial condition, and operating results and harm our reputation. In addition, we may not carry enough insurance to compensate for the losses that may occur.

**Risks Related to Regulation**

***Failure to comply with anti-corruption, anti-money laundering laws, and sanctions laws,import and export controls, including the FCPA and similar laws associated with our activities outside of the United States, could subject us to penalties and other adverse consequences.***

We are subject to the FCPA, the U.S. domestic bribery statute contained in 18 U.S.C. § 201, the U.S. Travel Act, the USA PATRIOT Act, the UK Bribery Act of 2010, U.S. and foreign laws relating to import and export controls, economic sanctions, including the laws and regulations administered by the U.S. Department of the Treasury's Office of Foreign Assets Control, and may be subject to other anti-bribery, anti-money laundering, and sanctions laws in countries in which we conduct activities. We face significant risks if we fail to comply with the FCPA and other anti-corruption laws that prohibit companies and their employees and third-party intermediaries from promising, authorizing, offering, or providing, directly or indirectly, improper payments or benefits to foreign government officials, political parties, and private sector recipients for the purpose of obtaining or retaining business, directing business to any person, or securing any advantage. In many foreign countries, particularly in countries with developing economies, it may be a local custom that businesses engage in practices that are prohibited by the FCPA or other applicable laws and regulations. We may have direct or indirect interactions with officials and employees of government agencies or state- owned or affiliated entities and we can be held liable for the corrupt or other illegal activities of these third- party intermediaries, our employees, representatives, contractors, partners, and agents, even if we do not explicitly authorize such activities. We have implemented an anti-corruption compliance program but cannot assure you that all of our employees and agents, as well as those companies to which we outsource certain of our business operations, will not take actions in violation of our policies and applicable law, for which we may be ultimately held responsible.

Our products and solutions are subject to export control and import laws and regulations, including the U.S. Export Administration Regulations, U.S. Customs regulations, and the economic and trade sanctions regulations administered by the U.S. Treasury Department's Office of Foreign Assets Controls, as well as similar laws in other countries in which we conduct business. Exports of our products, services, and technology must be made in compliance with these laws and regulations. In addition, these laws may restrict or prohibit altogether the sale or

Table of Contents

supply of certain of our products, services, and technologies to certain governments, persons, entities, countries, and territories, including those that are the target of comprehensive sanctions, unless there are license exceptions that apply or specific licenses are obtained. Any future changes in export control, import, or economic sanctions laws and regulations may adversely impact our ability to sell our products, services, and technologies in certain markets or, in some cases, prevent the export or import of our products, services, and technologies to or from certain countries, governments, or persons altogether, which could adversely affect our business, results of operations, and growth prospects.

Any violation of the FCPA, other applicable anti-corruption laws, anti-money laundering, import and export controls, economic sanctions laws and other applicable laws could result in whistleblower complaints, adverse media coverage, investigations, loss of export privileges, or severe criminal or civil sanctions, which could have an adverse effect on our business, prospects, financial condition, and operating results. In addition, responding to any enforcement action may result in a significant diversion of management's attention and resources, significant defense costs, and other professional fees.

***The requirements of being a public company may strain our resources, divert management's attention and affect our ability to attract and retain additional executive management and qualified board members.***

We are subject to the reporting requirements of the Exchange Act, the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), the listing requirements of Nasdaq and other applicable securities rules and regulations. Compliance with these rules and regulations will increase our legal and financial compliance costs, make some activities more difficult, time-consuming, or costly, and increase demand on our systems and resources, particularly after we are no longer an emerging growth company. The Exchange Act requires, among other things, that we file annual, quarterly, and current reports with respect to our business and operating results. The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and internal control over financial reporting. In order to maintain and, if required, improve our disclosure controls and procedures and internal control over financial reporting to meet this standard, significant resources and management oversight may be required. As a result, management's attention may be diverted from other business concerns, which could adversely affect our business and operating results. Although we have already hired additional employees to comply with these requirements, we may need to hire more employees in the future or engage outside consultants, which would increase our costs and expenses.

In addition, changing laws, regulations, and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs, and making some activities more time consuming. These laws, regulations, and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve or otherwise change over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. We intend to invest resources to comply with evolving laws, regulations, and standards (or changing interpretations of them), and this investment may result in increased selling, general and administrative expenses and a diversion of management's time and attention from revenue-generating activities to compliance activities. If our efforts to comply with new laws, regulations, and standards differ from the activities intended by regulatory or governing bodies due to ambiguities related to their application and practice, regulatory authorities may initiate legal proceedings against us, and our business may be adversely affected. We also expect that being a public company and the associated rules and regulations will make it more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These factors could also make it more difficult for us to attract and retain qualified members of our board of directors, particularly to serve on our audit committee, compensation committee, and nominating and governance committee, and qualified executive officers.

As a result of disclosure of information in the filings required of a public company, our business and financial condition is more visible, which may result in threatened or actual litigation, including by competitors. If such claims are successful, our business and operating results could be adversely affected, and even if the claims do not result in litigation or are resolved in our favor, these claims, and the time and resources necessary to resolve them, could divert the resources of our management and adversely affect our business and operating results. In

64

Table of Contents

addition, as a result of our disclosure obligations as a public company, we have reduced flexibility and are under pressure to focus on short-term results, which may adversely affect our ability to achieve long-term profitability.

***Regulations related to "conflict minerals" may force us to incur additional expenses, may make our supply chain more complex and may result in damage to our reputation with customers.***

Pursuant to the Dodd-Frank Act, the SEC has adopted requirements for companies that use certain minerals and metals, known as conflict minerals, in their products, whether or not these products are manufactured by third parties. These requirements require companies to perform due diligence, disclose, and report whether such minerals originate from the Democratic Republic of Congo and adjoining countries, or come from recycled or scrap sources. These requirements could adversely affect the sourcing, availability, and pricing of minerals used in the manufacture of heavy-duty electric vehicles, including our products. While these requirements continue to be subject to administrative uncertainty, we will incur additional costs to comply with the disclosure requirements, including costs related to determining the source of any of the relevant minerals and metals used in our products. Since our supply chain is complex, we may not be able to sufficiently verify the origins for these minerals and metals used in our products through the due diligence procedures that we implement, which may harm our reputation. In such event, we may also face difficulties in satisfying customers who require that all of the components of our products are certified as conflict mineral free.

## Risks Related to our Intellectual Property

***Failure to protect our intellectual property could adversely affect our business.***

Our success depends in large part on our proprietary technology, software and data. We rely on various intellectual property rights, including patents, copyrights, trademarks, and trade secrets, as well as confidentiality provisions and contractual arrangements, and other forms of statutory protection to protect our proprietary rights. If we do not protect and enforce our intellectual property rights adequately and successfully, our competitive position may suffer, which could adversely affect our business, prospects, financial condition, and operating results.

Our pending patent or trademark applications may not be approved, or competitors or others may challenge the validity, enforceability, or scope of our patents, the scope of our copyrights, the registrability of our trademarks or the trade secret status of our proprietary information. There can be no assurance that additional patents will be issued or that any issued patents will provide significant protection for our intellectual property or for those portions of our proprietary technology and software that are the most key to our competitive positions in the marketplace. In addition, our patents, copyrights, trademarks, trade secrets, and other intellectual property rights may not provide us a significant competitive advantage. There is no assurance that the forms of intellectual property protection that we seek, including business decisions about when and where to file patents and when and how to maintain and protect copyrights, trade secrets, license and other contractual rights will be adequate to protect our business.

Moreover, recent amendments to developing jurisprudence regarding and current and possible future changes to intellectual property laws and regulations, including U.S. and foreign patent, copyright, trade secret and other statutory law, may affect our ability to protect and enforce our intellectual property rights and to protect our proprietary technology, software and data. In addition, the laws of some countries do not provide the same level of protection for our intellectual property as do the laws of the United States. As we expand our international activities, our exposure to unauthorized copying and use of our technology and proprietary information will likely increase. Despite our precautions, our intellectual property is vulnerable to unauthorized access and copying through employee or third-party error or actions, including malicious state or state-sponsored actors, theft, hacking, cybersecurity incidents, and other security breaches and incidents, and such incidents may be difficult to detect or unknown for a significant period of time. It is possible for third parties to infringe upon or misappropriate our intellectual property, to copy or reverse engineer our bus and battery pack designs, and to use information that we regard as proprietary to create products and services that compete with ours. Effective intellectual property protection may not be available to us in every country in which we may sell our electric transit buses and related or other products and services. In addition, many countries limit the enforceability of patents against certain third parties, including government agencies or government contractors, or make patents subject to

Table of Contents

compulsory licenses to third parties under certain circumstances. In these countries, patents may provide limited or no benefit.

Intellectual property laws, procedures, and restrictions provide only limited protection and any of our intellectual property rights may be challenged, invalidated, circumvented, infringed, or misappropriated. Further, the laws of certain countries do not protect proprietary rights to the same extent as the laws of the United States, and, therefore, in certain jurisdictions, we may be unable to protect our proprietary technology.

We enter into confidentiality and invention assignment or intellectual property ownership agreements with our employees and contractors and enter into confidentiality agreements with other third parties. We cannot ensure that these agreements, or all the terms thereof, will be enforceable or compliant with applicable law, or otherwise effective in controlling access to, use of, reverse engineering, and distribution of our proprietary information or in effectively securing exclusive ownership of intellectual property developed by our current or former employees and contractors. Further, these agreements with our employees, contractors, and other parties may not prevent other parties from independently developing technologies, products and services that are substantially equivalent or superior to our technologies, products and services.

We may need to spend significant resources securing and monitoring our intellectual property rights, and we may or may not be able to detect infringement by third parties. Our competitive position may be adversely impacted if we cannot detect infringement or enforce our intellectual property rights quickly or at all. In some circumstances, we may choose not to pursue enforcement because an infringer has a dominant intellectual property position, because of uncertainty relating to the scope of our intellectual property or the outcome of an enforcement action, or for other business reasons. In addition, competitors might avoid infringement by designing around our intellectual property rights or by developing non-infringing competing technologies. Litigation brought to protect and enforce our intellectual property rights could be costly, time-consuming, and distracting to management and our development teams and could result in the impairment or loss of portions of our intellectual property. Further, our efforts to enforce our intellectual property rights may be met with defenses, counterclaims attacking the scope, validity, and enforceability of our intellectual property rights, or with counterclaims and countersuits asserting infringement by us of third-party intellectual property rights. Our failure to secure, protect, and enforce our intellectual property rights could adversely affect our brand and our business, any of which could have an adverse effect on our business, prospects, financial condition, and operating results.

***We may be subject to intellectual property rights claims or other litigation by third parties, which could be costly to defend, could require us to pay significant damages and could limit our ability to use certain technologies.***

Third parties may assert claims of infringement of intellectual property rights or violation of other statutory, license or contractual rights in technology, software or data against us or against our customers for which we may be liable or have an indemnification obligation. Any such claim by a third party, even if without merit, could cause us to incur substantial costs defending against such claim and could distract our management and our development teams from our business.

Although third parties may offer a license to their technology, software or data, the terms of any offered license may not be acceptable and the failure to obtain a license or the costs associated with any license could cause our business, prospects, financial condition, and operating results to be adversely affected. In addition, some licenses may be non-exclusive, and therefore our competitors may have access to the same technology, software or data licensed to us. Alternatively, we may be required to develop non-infringing technology, software or data which could require significant effort and expense and ultimately may not be successful. Furthermore, a successful claimant could secure a judgment or we may agree to a settlement that prevents us from selling certain products or performing certain services or that requires us to pay substantial damages, including treble damages if we are found to have willfully infringed such claimant's patents, copyrights, trade secrets or other statutory rights, royalties or other fees. Any of these events could have an adverse effect on our business, prospects, financial condition, and operating results.

Adverse litigation judgments or settlements resulting from legal proceedings in which we may be involved could expose us to monetary damages or limit our ability to operate our business.

66

Table of Contents

We have in the past and may in the future become involved in private actions, collective actions, investigations, and various other legal proceedings by customers, employees, suppliers, competitors, government agencies, or others. The results of any such litigation, investigations, and other legal proceedings are inherently unpredictable and expensive. Any claims against us, whether meritorious or not, could be time consuming, result in costly litigation, damage our reputation, require significant management time, and divert significant resources. If any of these legal proceedings were to be determined adversely to us, or we were to enter into a settlement arrangement, we could be exposed to monetary damages or limits on our ability to operate our business, which could have an adverse effect on our business, financial condition, and operating results.

**Risks Related to our Common Stock**

***The price of our common stock has been and may continue to be volatile.***

From January 3, 2022 through December 30, 2022, our common stock price has ranged from a low of $3.51 to a high of $10.90. For the period from January 1, 2023 through March 16, 2023, our common stock price has ranged from a low of $1.165 to a high of $5.62. As a result of this volatility, investors in our common stock may not be able to sell their shares at or above the prices they paid. Further, as a result of this volatility it may be difficult for us to attract new investments, including additional offerings of our securities, on terms we consider reasonable, or at all. The price of our common stock has fluctuated and may fluctuate in the future due to a variety of factors, including:

- changes in the industries in which we and our customers operate;

- variations in our operating performance and the performance of our competitors in general;

- material and adverse impact of the COVID-19 pandemic on the markets and the broader global economy;

- actual or anticipated fluctuations in our quarterly or annual operating results;

- the public's reaction to our press releases, our other public announcements and our filings with the SEC;

- negative publicity regarding our company or products;

- our failure or the failure of our competitors to meet analysts' projections or guidance that we or our competitors may give to the market;

- additions and departures of key personnel;

- changes in laws and regulations affecting its business;

- commencement of, or involvement in, litigation involving us;

- changes in our capital structure, such as future issuances of securities or the incurrence of additional debt;

- publication of research reports by securities analysts about us or our competitors or our industry;

- sales of shares of common stock by the PIPE Investors;

- the volume of shares of our common stock available for public sale, including as a result of the conversion of the Convertible Notes into shares of common stock; and

- general economic and political conditions such as recessions, changes in interest rates, an increased rate of inflation, increased costs of goods, supply chain disruptions, fuel price fluctuations, foreign currency fluctuations, international tariffs, social, political and economic risks, geopolitical conflicts (including the current conflict in Ukraine), and acts of war or terrorism.

Table of Contents

These market and industry factors may materially reduce the market price of our common stock regardless of our operating performance.

Companies that have experienced volatility in the market price of their stock have frequently been the subject of securities class action and shareholder derivative litigation. We could be the target of such litigation in the future. Class action and derivative lawsuits, whether successful or not, could result in substantial costs, damage or settlement awards and a diversion of our management's resources and attention from running our business, which could materially harm our reputation, financial condition and results of operations.

***Conversion of the Convertible Notes will dilute the ownership interest of existing stockholders or may otherwise depress our stock price.***

In August 2020, we issued $200.0 million in original aggregate principal amount of Convertible Notes, with cash interest of 5.0% per annum payable at each quarter end and PIK interest of 4.5% per annum payable by increasing the principal balance at each quarter end. Certain holders of Convertible Notes with aggregate original principal amounts of $46.5 million elected to convert their Convertible Notes, including accrued PIK interest and cash interest, at the Closing resulting in the issuance of 7.4 million shares of common stock. As of December 31, 2022, the outstanding balance of the Convertible Notes was $170.8 million iinclusive of PIK interest of $17.3 million. To the extent the remaining outstanding Convertible Notes are converted pursuant to their mandatory conversion provisions, the balance under the Convertible Notes will grow and the number of shares that may be issued upon conversion will increase accordingly. The conversion of the Convertible Notes will dilute the ownership interests of existing stockholders. Any sales in the public market of the common stock issuable upon such conversion could adversely affect prevailing market prices of our common stock. In addition, the existence of the Convertible Notes may encourage short selling by market participants because the anticipated conversion of the Convertible Notes into shares of common stock could depress our stock price.

***Future resale of our common stock may cause the market price of our common stock to drop significantly, even if our business is doing well.***

Sales of a substantial number of shares of common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock. We have filed a registration statement related to the offer and sale from time to time by the selling securityholders named in the prospectus that forms a part of the registration statement of up to 125,389,111 shares of common stock, which registration statement has been declared effective by the SEC. In addition, as of June 17, 2022, Rule 144 became available for the resale of any shares that are restricted or control securities, subject to volume and other restrictions as applicable under Rule 144. To the extent shares are sold into the market pursuant to a registration statement that has been declared effective by the SEC, under Rule 144 or otherwise, particularly in substantial quantities, the market price of our common stock could decline.

***Our management team has limited experience managing a public company.***

Most members of our management team have limited experience managing a publicly traded company, interacting with public company investors, and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage our transition to a public company subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These obligations and constituents will require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could have an adverse effect our business, prospects, financial condition, and operating results.

***Reports published by analysts, including projections in those reports that differ from our actual results, could adversely affect the price and trading volume of our common stock.***

Securities research analysts may establish and publish their own periodic projections for us. These projections may vary widely and may not accurately predict the results we actually achieve. Our share price may decline if our actual results do not match the projections of these securities research analysts. Similarly, if one or

68

Table of Contents

more of the analysts who write reports on us downgrades our stock or publishes inaccurate or unfavorable research about our business, our share price could decline. If one or more of these analysts ceases coverage of us or fails to publish reports on us regularly, our share price or trading volume could decline. While we expect research analyst coverage, if no analysts commence coverage of us, the market price and volume for our common stock could be adversely affected.

***We are subject to changing law and regulations regarding regulatory matters, corporate governance and public disclosure that will increase our costs and the risk of non-compliance.***

We are subject to rules and regulations by various governing bodies, including, for example, the SEC, which are charged with the protection of investors and the oversight of companies whose securities are publicly traded, and to new and evolving regulatory measures under applicable law. Our efforts to comply with new and changing laws and regulations will result in increased general and administrative expenses and a diversion of management time and attention.

Moreover, because these laws, regulations and standards are subject to varying interpretations, their application in practice may evolve over time as new guidance becomes available. This evolution may result in continuing uncertainty regarding compliance matters and additional costs necessitated by ongoing revisions to our disclosure and governance practices. If we fail to address and comply with these regulations and any subsequent changes, we may be subject to penalty and our business may be harmed.

***We do not intend to pay dividends for the foreseeable future.***

We have never declared or paid any cash dividends on our common stock and do not intend to pay any cash dividends in the foreseeable future. Additionally, our ability to pay dividends on our common stock is limited by restrictions under the terms of our Loan Agreements. We anticipate that for the foreseeable future we will retain all our future earnings for use in the development of our business and for general corporate purposes. Any determination to pay dividends in the future will be at the discretion of our board of directors. Accordingly, investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investments.

***Provisions in our charter documents and under Delaware law could make an acquisition of our company more difficult, limit attempts by our stockholders to replace or remove our current management, limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, or employees, and limit the market price of our common stock.***

Provisions in our certificate of incorporation and restated bylaws that are in effect may have the effect of delaying or preventing a change of control or changes in our management. Our certificate of incorporation and restated bylaws include provisions that:

- provide that our board of directors will be classified into three classes of directors with staggered three-year terms;

- permit the board of directors to establish the number of directors and fill any vacancies and newly created directorships;

- require super-majority voting (or if two-thirds of the board of directors approves, a majority) to amend some provisions in our certificate of incorporation and restated bylaws;

- authorize the issuance of "blank check" preferred stock that our board of directors could use to implement a stockholder rights plan;

- provide that only a majority of our board of directors will be authorized to call a special meeting of stockholders;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders;

Table of Contents

- provide that the board of directors is expressly authorized to make, alter, or repeal our bylaws; and

- establish advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

In addition, our certificate of incorporation provides the Court of Chancery of the State of Delaware, to the fullest extent permitted by law, will be the exclusive forum for any derivative action or proceeding brought on our behalf, any action asserting a breach of fiduciary duty, any action asserting a claim against us arising pursuant to the Delaware General Corporation Law (the "DGCL"), our certificate of incorporation, or our restated bylaws, or any action asserting a claim against us that is governed by the internal affairs doctrine. The provision will not apply to suits brought to enforce a duty or liability created by the Exchange Act. Our restated bylaws provide that the federal district courts of the United States of America will, to the fullest extent permitted by law, be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act or the Exchange Act, which we refer to as a Federal Forum Provision. Our decision to adopt a Federal Forum Provision followed a decision by the Supreme Court of the State of Delaware holding that such provisions are facially valid under Delaware law. While there can be no assurance that federal courts or state courts will follow the holding of the Delaware Supreme Court or determine that the Federal Forum Provision should be enforced in a particular case, application of the Federal Forum Provision means that suits brought by our stockholders to enforce any duty or liability created by the Securities Act or the Exchange Act must be brought in federal court and cannot be brought in state court. These choice of forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers, and other employees.

Moreover, Section 203 of the DGCL may discourage, delay, or prevent a change of control of our company. Section 203 imposes certain restrictions on mergers, business combinations, and other transactions between us and holders of 15% or more of our common stock. See the section titled "Description of Capital Stock" for additional information.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

Our corporate headquarters are in Burlingame, California, where we occupy facilities totaling approximately 34,400 square feet under a lease that expires in May 2025. We use these facilities for administration, finance, legal, human resources, information technology, sales and marketing, engineering, technology, and development. Our Burlingame headquarters also includes one of our battery manufacturing facilities and our test lab.

We also have bus manufacturing facilities in City of Industry, California and Greenville, South Carolina. Battery manufacturing is also in City of Industry where we lease approximately 157,100 square feet of space under a lease that expires in December 2023. In January 2023, we approved a plan to improve operational efficiency that included closing our City of Industry facility. We plan to vacate the City of Industry facility by the end of 2023. In Greenville, we lease approximately 209,300 square feet under a lease that expires in June 2026, for which we have two five-year options to extend our lease to June 2036. In November 2021, we entered into a lease arrangement for a new factory with approximately 327,000 square feet at Greer, South Carolina to expand our battery system manufacturing capacity. The lease expires in January 2032, and we have two five-year options to extend our lease to 2042.

We have in the past applied for and received state grants and tax incentives designed to promote the manufacturing of electric vehicles and related technologies. In April 2015, the California Energy Commission awarded us $3.0 million based on our investment of approximately $8.4 million in our manufacturing facilities in California through December 31, 2018. In addition, in April 2019, the California Energy Commission awarded us a $1.8 million grant based on our expected investment of approximately $4.3 million in our manufacturing facility in City of Industry, California. In connection with the planned closure of City of Industry facility by December 31, 2023, some of the assets funded by the California Energy Commission will be relocated to our Burlingame facility.

Table of Contents

The California Energy Commission awards were made after a competitive grant solicitation that offered to fund development of advanced vehicle technology manufacturing facilities in California.

We intend to procure additional space as we add employees and expand geographically. We believe that our facilities are adequate to meet our needs for the immediate future, and that suitable additional space will be available to accommodate any expansion of our operations if needed in the future.

**Item 3. Legal Proceedings**

From time to time we may be involved in various disputes and litigation matters that arise in the ordinary course of business. We are currently not a party to any material legal proceedings.

**Item 4. Mine Safety Disclosures**

Not applicable.

Table of Contents

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our outstanding common stock has been listed on the Nasdaq Global Select Market under the ticker symbol "PTRA" since June 15, 2021.

**Holders**

As of March 13, 2023, there were 658 holders of record of our common stock. The actual number of holders of our common stock is greater than the number of record holders and includes stockholders who are beneficial owners, but whose shares are held in street name by brokers or other nominees. The number of holders of record presented here also does not include stockholders whose shares may be held in trust by other entities.

**Dividend Policy**

We have never declared or paid any cash dividends on our capital stock, and we do not currently intend to pay any cash dividends for the foreseeable future. We expect to retain future earnings, if any, to fund the development and growth of our business. Any future determination to pay dividends on our common stock will be at the discretion of our board of directors and will depend upon, among other factors, our financial condition, operating results, current and anticipated cash needs, plans for expansion and other factors that our board of directors may deem relevant.

**Stock Performance Graph**

*This performance graph shall not be deemed "filed" for purposes of Section 18 of the Exchange Act, or incorporated by reference into any filing of Proterra Inc under the Securities Act, or the Exchange Act, except as shall be expressly set forth by specific reference in such filing.*

The following graph shows a comparison, from September 21, 2020 (the date of the ArcLight public offering) through December 31, 2022, of the cumulative total return on our common stock, the Russell 2000 Index and Indxx US Electric and Autonomous Vehicles Index (IUEAV). Such returns are based on historical results and are not intended to suggest future performance. Data for the Russell 2000 Index and Indxx US Electric and Autonomous Vehicles Index (IUEAV) assumes an investment of $100 on September 21, 2020 and reinvestment of dividends. We have never declared or paid cash dividends on our common stock nor do we anticipate paying any such cash dividends in the foreseeable future.



COMPARISON OF 27 MONTH CUMULATIVE TOTAL RETURN*
Among Proterra Inc., the Russell 2000 Index and the Indxx US Electric and Autonomous Vehicles Index (IUEAV)

*$100 invested on 9/21/20 in stock or index, including reinvestment of dividends. Fiscal year ending December 31.

72

Table of Contents

**Securities Authorized for Issuance Under Equity Compensation Plans**

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

**Sales of Unregistered Securities**

None.

**Issuer Purchases of Securities**

None.

**Item 6. Reserved**

**Item 7. Management's Discussion and Analysis Of Financial Condition and Results of Operations**

You should read the following discussion and analysis of our financial condition and results of operations together with our audited financial statements and notes thereto included elsewhere in this Annual Report. Certain of the information contained in this discussion and analysis or set forth elsewhere in this Annual Report, including information with respect to plans and strategy for Proterra's business, includes forward-looking statements that involve risks and uncertainties. As a result of many factors, including those factors set forth in the section entitled "*Risk Factors,*" Proterra's actual results could differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis. You should carefully read the section entitled "*Risk Factors*" to gain an understanding of the important factors that could cause actual results to differ materially from Proterra's forward-looking statements.

**Overview**

Proterra's mission is to advance electric vehicle technology to deliver the world's best performing commercial vehicles.

Driven by factors including emissions targets and regulations, and lower operating costs, commercial and industrial fleets are expected to adopt electric vehicles at increasingly higher rates over the next two decades. More than 200,000 new electric buses, medium-duty trucks, and heavy-duty trucks are expected to be sold in the industry by 2030 and approximately 650,000 by 2040 in our core markets of North America and Europe. Assuming average battery capacity per vehicle of 225 kWh for medium-duty trucks, 300 kWh for buses and 750 kWh for heavy-duty trucks, we estimate this could translate into demand for heavy-duty commercial and industrial-scale batteries of approximately 90 GWh in 2030 and approximately 300 GWh in 2040 in such markets. Our business strategy is to capitalize on this opportunity.

In the first quarter of 2023, we announced the appointment of Julian Soell as the Chief Operating Officer of the Company, and Christopher Bailey as Chief Business Officer of the Company, each appointment effective as of March 1, 2023. With these appointments, we consolidated all of our product lines under one Chief Business Officer and all our operations under one Chief Operating Officer, from organizing our business around business groups (called Proterra Transit and Proterra Powered and Energy, respectively) each lead by a President. In addition, we announced workforce restructuring plans designed to improve operational efficiency with the reduction of our workforce by up to twenty five percent or the elimination of approximately 300 jobs and the closure of our City of Industry manufacturing facility by December 31, 2023.

We have three commercial offerings each addressing a critical component of commercial vehicle electrification.

- **_Proterra Powered & Energy._** Proterra Powered products are our proprietary battery systems and electrification solutions for global commercial vehicle original equipment manufacturer ("OEM") customers serving the Class 3 to Class 8 vehicle segments, including delivery trucks, school buses, and coach buses, as well as construction and mining equipment, and other applications. Proterra Energy products

Table of Contents

and services offer turnkey fleet-scale, high-power charging solutions and software services, ranging from fleet and energy management software-as-a-service, to fleet planning, hardware, infrastructure, installation, utility engagement, and charging optimization. These solutions are designed to optimize energy use and costs, and to provide vehicle-to-grid functionality.

- *Proterra Transit.* We design, develop, manufacture, and sell electric transit buses as an OEM for North American public transit agencies, airports, universities, and other commercial transit fleets. Proterra Transit vehicles showcase and validate our electric vehicle technology platform through rigorous daily use by a large group of sophisticated customers focused on meeting the wide-ranging needs of the communities they serve.

The first application of Proterra Powered commercial vehicle electrification technology was through Proterra Transit's heavy-duty electric transit bus, which we designed from the ground up for the North American market. Our industry experience, the performance of our transit buses, and compelling total cost of ownership has helped make us a leader in the U.S. electric transit bus market. With over 1,000 electric transit buses delivered, our electric transit buses currently have delivered more than 35 million cumulative service miles spanning a wide spectrum of climates, conditions, altitudes and terrains. From this experience, we have been able to continue to iterate and improve our technology.

Our decade of experience supplying battery electric heavy duty transit buses provided us the opportunity to validate our products' performance, fuel efficiency and maintenance costs with a demanding customer base and helped broaden our appeal as a supplier to OEMs in other commercial vehicle segments and geographies. Proterra Powered has partnered with more than a dozen OEMs spanning from Class 3 to Class 8 trucks, several types of buses, and multiple off-highway categories. Through December 31, 2022, Proterra Powered has delivered battery systems and electrification solutions for more than 1,600 vehicles to our OEM partner customers.

In addition, Proterra Energy has established us as a leading commercial vehicle charging solution provider by helping fleet operators fulfill the high-power charging needs of commercial electric vehicles and optimize their energy usage, while meeting our customers' space constraints and continuous service requirements. As of December 31, 2022, we had installed more than 95 MW of charging infrastructure across North America, predominantly for electric transit bus and school bus customers.

Through December 31, 2022, we have generated the majority of our revenue from Proterra Transit's sales of electric transit buses, complemented by additional revenue from Proterra Powered's sales of battery systems and Proterra Energy's sales and installation of charging systems, as well as from the sale of spare parts and other services provided to customers. As fleet electrification continues to expand beyond buses to trucks and other commercial vehicles, we expect Proterra Powered & Energy to grow into a significantly larger portion of our overall business and generate a greater portion of revenue. Through December 31, 2022, our chief operating decision maker, the Chief Executive Officer, evaluated our results on a consolidated basis for purposes of making decision on allocating resources and assessing financial performance, resulting in a single reportable segment.

Enhanced by Proterra Powered™ high performance battery systems and electrification solutions and our purpose-built transit bus vehicle designed to optimize power, weight, and efficiency, Proterra Transit has been a leader in the North American electric transit market since 2012. Our sales efforts are focused on the 400 largest public transit agencies, which range in size from approximately 50 buses to thousands of buses in their fleets. These agencies operate more than 85% of the more than 70,000 transit buses on the road in North America, according to the FTA's National Transit Database. We also focus our sales effort on airports, universities, hospitals, and corporate shuttle operators. As of December 31, 2022, there are, in aggregate, more than 25,000 buses in operation at fleets that are mandated to convert to 100% zero-emission by 2040 in North America, including fleets in the state of California and the cities of New York City, Chicago, and Seattle, among others. The fleet size of our primary public transit agency customer targets ranges between approximately 100 to more than 4,000 buses, and their electrification plans typically involve a phased approach. Our strategy is to maintain our leadership in market share of the North American electric transit bus market as electric penetration continues to rise by both acquiring new customers and expanding our share of existing customers as transit agencies' average order rates increase to meet their zero emission targets. We believe we have a competitive advantage in winning new bus sales due to our extensive track record, with more than 1,000 vehicles delivered and more than 35

74

Table of Contents

million real-world service miles spanning a wide spectrum of climates, conditions, altitudes and terrains. We believe that repeat orders of increasing scale represent a considerable growth opportunity for our electric transit buses. After initial purchase, our customers often expand their electric vehicle programs and place additional orders for electric buses and charging systems. Repeat orders lower our customer acquisition costs and increase visibility into our sales pipeline. Many of our existing customers have announced long-term goals to transition to fleets completely comprised of electric vehicles.

We have a long sales and production cycle given our customers' structured procurement processes and vehicle customization requirements, and believe that our proven ability to deliver commercial-quality battery systems, electrification and charging solutions, and electric transit buses gives us a distinct first mover advantage in end markets that are electrifying rapidly. For Proterra Powered, new vehicle development programs for commercial vehicle OEMs typically last between one and three years. As a result, volume production and revenue generation tend to trail initial contract signatures by a few years. For Proterra Transit, public transit agencies typically conduct a request for proposal process before awards are made and purchase orders are issued. Proposals are evaluated on various criteria, including but not limited to technical requirements, reliability, reputation of the manufacturer, and price. This initial sales process from first engagement to award typically ranges from 6 to 18 months. Once a proposal has been awarded, a pre-production process is completed where customer specific options are mutually agreed upon. A final purchase order follows the pre-production process. Procurement of parts and production typically follow the purchase order. Once a bus is fully manufactured, the customer performs a final inspection before accepting delivery, allowing us to recognize revenue. The length of time between a customer award and vehicle acceptance typically varies between 12 and 24 months, depending on product availability and production capacity.

We are consolidating our bus production to our largest bus manufacturing facility located in Greenville, South Carolina. We constructed our Powered 1 battery factory which has approximately 327,000 square feet at Greer, South Carolina. Our total battery system manufacturing capacity is multiple gigawatt-hours per year. We have specifically developed our battery modules using a design for manufacturability (DFM) approach that enables high-volume automated production of the module using a modular manufacturing line that can be rapidly built with low capital expenditures. Enabled by the simplicity of design and integrated architecture of our battery modules, we can manufacture our battery packs in two widths and three heights, various lengths ranging from 3-feet to 9-feet, and four different voltages. In the year ended December 31, 2021, our battery production was 189 MWh and in the year ended December 31, 2022, our battery production was 342 MWh, a 81% increase year over year. As we increase our production volumes and complete construction of our Powered 1 battery factory, and improve manufacturing efficiency across our production assets as we scale, we believe that we will be able to leverage our historical investments in capacity to reduce our labor and overhead costs as a percentage of total revenue. With the addition of our Powered 1 factory, we believe we will have sufficient capacity to fulfill our current backlog and anticipated near-term growth but further investment in capacity will be required as demand for electric vehicles continues to grow globally.

For the years ended December 31, 2022, 2021 and 2020, our total revenue was $309.4 million, $242.9 million, and $196.9 million, respectively. As of December 31, 2022, in aggregate, we have generated revenue of $749.2 million for the past three years. We generated a gross loss of $24.0 million for the year ended December 31, 2022 and a gross profit of $2.1 million and $7.5 million for the year ended December 31, 2021 and 2020, respectively. We have also invested significant resources in research and development, operations, and sales and marketing to grow our business and, as a result, generated losses from operations of $220.9 million, $127.6 million, and $96.0 million for the years ended December 31, 2022, 2021 and 2020, respectively.

We intend to continue to make investments in developing new products and enhancing existing products. In 2022, we made a strategic equity investment in a privately held entity that we expect to produce lithium iron phosphate (LFP) battery cells in the United States in the coming years to provide us with development opportunities for battery packs with another cell chemistry to address additional segments of the commercial vehicle market. We are also increasing and/or optimizing our production capacity, and also expect to make investments in our sales and marketing organizations as well as those expenses associated with operating as a public company. As a result, we expect that the cost of goods sold and operating expenses will increase with total revenue in absolute dollars in future periods but decline as a percentage of total revenue over time.

Table of Contents

**Key metrics**

*Deliveries*

We delivered 213 (199 new and 14 pre-owned), 217 (208 new and 9 pre-owned) and 170 vehicles in 2022, 2021 and 2020, respectively. We delivered battery systems for 1,229, 273 and 107 vehicles in 2022, 2021 and 2020, respectively.

Deliveries is an indicator of our ability to convert awarded orders into revenue and demonstrates the scaling of our operations. We expect volume of deliveries to vary every quarter and not be linear as product configurations vary in complexity and timing for completion is not standard. Vehicles delivered represents the number of buses that have met revenue recognition criteria during a period. Battery systems delivered represents the battery systems sold to OEMs that have met revenue recognition criteria during a period and is measured based on the number of underlying vehicles in which they are to be used. In addition to batteries, battery systems could include drivetrains and high voltage systems and controls, depending upon the customer contract.

Growth rates between deliveries and total revenue are not perfectly correlated because our total revenue is affected by other variables, such as the mix of products sold during the period or other services provided in addition to the hardware delivered.

**Key factors affecting our performance**

*Supply Chain Disruption, Materials Costs and Economic Impacts*

The outbreak of the novel coronavirus COVID-19, which was declared a pandemic by the World Health Organization on March 11, 2020, has led to adverse impacts on the U.S. and global economies and created uncertainty regarding potential impacts to our supply chain, operations, and customer demand. The recent increase in inflation, interest rates and energy costs and continued disruption in global markets (in part stemming from the conflict in Ukraine) have further impacted supply chain stability and material costs. Our vehicle and charging system deliveries were impacted, especially during the three months ended March 31, 2022 and three months ended December 31, 2022, by ongoing constraints and inefficiencies in production driven in part by shortages in component parts, particularly wiring harnesses, resulting from global supply chain disruptions stemming from the pandemic and supplier instability. Although we achieved revenue growth during the year ended December 31, 2022 compared to the year ended December 31, 2021, these disruptions decreased our production which negatively impacted our revenue and increased our overhead, led to increased costs to secure components critical to our production needs and negatively impacted our margins. Our transit bus production in particular was impacted in 2022 by availability of wiring harnesses and other parts shortages, and we have qualified additional suppliers for wiring harnesses in early 2023 to mitigate that issue going forward. However, we still expect that our results for 2023 across all of our product lines will continue to be impacted by supply chain issues, including parts shortages.

More generally, raw material and component price inflation, and increased freight and logistics costs in addition to parts shortages are currently expected to continue to have an impact on our results of operations, financial position, and liquidity. If supply chain disruptions, shipment delays, part shortages, production inefficiencies, extended customer order and acceptance processes are prolonged or worsen, or if supplier credit terms are unfavorable as a result of our current financial condition, it could lead to more significant delays in production, the signing of new customer contracts and customer acceptances of near-term deliveries.

*Ability to sell additional powertrains, vehicles, chargers and other products to new and existing customers*

Our results will be impacted by our ability to sell our battery systems, electrification solutions including charging and energy management software, and electric transit buses, to new and existing customers. We have had initial success with Proterra Powered establishing strategic partnerships and with Proterra Transit selling electric transit buses and chargers to transit agencies, universities and airports. Our growth opportunity is dependent on commercial vehicle manufacturers electrifying their product offerings and increasing production as well as transit agencies electrifying more of their fleets (both of which we believe will increase with continued improvement in battery performance and costs over time), as well as our ability to increase manufacturing

76

Table of Contents

capacity and secure supply of key components, including battery cells, to meet expected demand, and our reputation in the market. Our ability to sell additional products to existing customers is a key part of our success, as follow-on purchases indicate customer satisfaction and decrease the likelihood of competitive substitution. In order to sell additional products to new and existing customers, we will need to continue to invest significant resources in our products and services, and our manufacturing capacity and supply chain, and demonstrate our reliability as a partner both in terms of our financial condition and product quality and customer service. If we fail to make the right investment decisions in our technology and electrification solutions, including our battery systems and electrification and charging solutions, and our manufacturing facilities and supply chain initiatives, if customers do not adopt our technology or our products and services or we cannot timely deliver products to customers due to supply chain disruptions or otherwise, or if our competitors are able to develop and deliver technology or products and services that are superior to ours, our business, prospects, financial condition, and operating results could be adversely affected.

*Ability to improve profit margins and scale our business*

We intend to continue investing in initiatives to improve our operating leverage and significantly ramp production. We believe continued reduction in costs and an increase in production volumes will enable commercial vehicle manufacturers to electrify faster. Purchased materials represent the largest component of cost of goods sold in all products and we continue to explore ways to reduce these costs through improved design for cost, strategic sourcing, long-term contracts, and in some cases vertical integration. We are consolidating battery and bus manufacturing to our facilities in Greer and Greenville South Carolina. We completed construction of our first multi-gigawatt capacity battery production facility in Greer, which began production in January 2023. We believe that an increase in volume and additional experience will allow us to leverage those investments and reduce our labor and overhead costs, as well as our freight costs, as a percentage of total revenue. We expect our product cost of goods sold to increase in absolute dollars in future periods as the volume of products we sell increases. As we grow into our current capacity, execute on cost-reduction initiatives, and improve production efficiency, we expect our product cost of goods sold as a percentage of revenue to decrease in the longer term. We anticipate that by increasing facility utilization rates and improving overall economies of scale, we can positively impact gross margins of our products, bring value to our customers and help accelerate commercial electric vehicle adoption. Our ability to achieve cost-saving and production-efficiency objectives can be negatively impacted by a variety of factors including, among other things, labor cost inflation, lower-than-expected facility utilization rates, rising real estate costs, manufacturing and production cost overruns, increased purchased material costs, and unexpected supply-chain quality issues or interruptions, and delays in our ability to hire, train, and retain employees needed to scale production to meet demand.

*Continued emissions regulation and environmental stewardship*

Our business benefits from international, federal, state, and local government interest in regulating air pollution and greenhouse gas emissions that contribute to global climate change. In July 2020, 15 states, including California and New York, pledged to work jointly towards a unified goal of zero emissions for 100% of new sales of medium- and heavy-duty commercial vehicles by 2050. In August 2019, the European Union passed Regulation 2019/1242, mandating a reduction in emissions from new trucks by 2025 and 2030. In addition, a growing number of cities and transit agencies have pledged to convert their entire transit bus fleets to zero-emission vehicles by a specific target date, and many have already begun to purchase electric vehicles in order to meet this goal. For example, on December 14, 2018, the California Air Resources Board adopted a state-wide mandate, the Innovative Clean Transit Rule, mandating transit agencies to commit to purchasing zero-emission buses starting in 2029. The move away from diesel- and natural gas-powered commercial vehicles is a significant step forward to accelerate the use of advanced technologies in medium- and heavy-duty vehicles to meet air quality and public health goals, thereby boosting near-term deployment of battery-electric commercial vehicles. As legacy internal combustion engine technology becomes more heavily regulated and costly across the globe, commercial vehicle manufacturers are investing in electrification. While this investment may increase competition, we believe that it will also increase customer demand, and help build the necessary supply chain and adjacent industry investments to support powertrain electrification. However, the uncertainty related to the passage of new legislation, appropriation of government funding, and implementation of regulations could impact the timing and number of vehicle orders, and any reduction in governmental interest in emissions regulation could negatively impact our business prospects or operating results.

Table of Contents

*Government programs accelerating adoption of zero-emission vehicles*

Federal and state funding has accelerated the adoption of electric vehicles in our target markets. For instance, our U.S. transit customers have partially funded electric bus purchases through competitive grant programs, including the Low or No Emission Vehicle Program authorized by the federal Fixing America's Surface Transportation Act in 2015, and other state-specific funding. The Infrastructure Investment and Jobs Act enacted on November 15, 2021 authorizes additional funding for electric vehicles and electric vehicle charging infrastructure through the creation of new programs and grants and the expansion of existing programs, including over $4.0 billion to replace existing buses with zero emission buses and at least $2.5 billion to replace existing school buses with zero emission school buses. In August 2022, the Inflation Reduction Act added additional funding and tax credit programs for both passenger car and commercial vehicles, many of which will become available to recipients in 2023. In the United States, states are also allocating portions of settlement funds from the approximately $15 billion Volkswagen Emissions Settlement Program to investments in zero-emission transit buses and school buses. We expect that the availability of this now unprecedented level of government funding for our customers, suppliers, and competitors to help fund purchases of commercial electric vehicles and battery systems will remain an important factor in our company's growth prospects.

## Components of results of operations

*Revenue*

We derive revenue primarily from the sale of vehicles, the sale of battery and powertrain systems, the sale and installation of charging systems, as well as the sale of spare parts and other services provided to customers.

*Product revenue.* Product revenue consists of revenue earned from the sale of vehicles, sale of battery and powertrain systems as well as sales and installation of charging systems. A vehicle is considered delivered once met revenue recognition criteria. Revenue from sales of vehicles and charging systems is typically recognized upon delivery when we can objectively demonstrate that the criteria specified in the contractual acceptance provisions are achieved prior to delivery. In cases, where we cannot objectively demonstrate that the criteria specified in the contractual acceptance provisions have been achieved prior to delivery, revenue is recognized upon acceptance by the customer. Under certain contract arrangements, revenue related to the charging systems is recognized over the installation period using an input measure based on costs incurred to date relative to total estimated costs to completion. Revenue from the sale of battery and powertrain systems is typically recognized upon shipping. Product revenue also includes revenue from leasing vehicles and charging systems under operating leases. Revenue from operating lease arrangements is recognized ratably over the lease term. The amount of product revenue we recognize in a given period depends on the number of products delivered and the type of financing used by the customer.

*Parts and other service revenue.* Parts and other service revenue includes sales of spare parts, revenue earned from the development of electric vehicle powertrain components, the design and development of battery and drive systems for other vehicle manufacturers, and sales of extended warranties. The amount of parts and service revenue tends to grow with the number of vehicles delivered. However, variability can exist as customers have different methodologies for sourcing spare parts for their fleets. Revenue related to the design, development and integration of battery and drive systems is typically recognized upon shipping or delivery of services and prototypes, depending on the terms in customer contracts.

For a description of our revenue recognition policies, see the section titled "- Critical Accounting Policies and Estimates."

*Cost of goods sold*

*Product cost of goods sold.* Product cost of goods sold consists primarily of direct material and labor costs, manufacturing overhead, other personnel-related expenses, which include salaries, bonuses, benefits, and stock-based compensation expense, reserves for estimated warranty costs, freight expense, and depreciation expense. Product cost of goods sold also includes charges to write-down the carrying value of inventory when it exceeds its estimated net realizable value, including on-hand inventory that is either obsolete or in excess of forecasted demand. We expect our product cost of goods sold to increase in absolute dollars in future periods as the volume

78

Table of Contents

of products we sell increases. As we grow into our current capacity, execute on cost-reduction initiatives, and improve production efficiency, we expect our product cost of goods sold as a percentage of revenue to decrease in the longer term.

*Parts and other service cost of goods sold*. Parts and other service cost of goods sold consists primarily of material costs and the cost of services provided, including field service costs and costs related to our development team. We record costs of development services incurred in periods prior to the finalization of an agreement as research and development expense. Once a development agreement is finalized, we record these costs in parts and other service cost of goods sold. We expect our parts and other service cost of goods sold to increase in absolute dollars in future periods as more customers put additional vehicles into service and sign new development agreements.

*Gross profit (loss) and margin*

Gross profit (loss) is total revenue less total cost of goods sold. Gross margin is gross profit (loss) expressed as a percentage of total revenue. Our gross profit (loss) and margin has and may in the future fluctuate from period-to-period. Such fluctuations have been and will continue to be affected by a variety of factors, including the timing of vehicle delivery, mix of products sold, manufacturing costs, financing options, and warranty costs. We expect our gross margin to improve over time as we continue to scale our operations and execute on cost reduction initiatives in the longer term.

*Operating expenses*

*Research and development*. Research and development expense consists primarily of personnel-related expenses, consulting and contractor expenses, validation and testing expense, prototype parts and materials, depreciation expense, and allocated overhead costs. Software development costs related to our fleet and energy management platform are expensed as incurred if the capitalization criteria are not met. We intend to continue to make significant investments in developing new products and enhancing existing products. Research and development expense will be variable relative to the number of products that are in development, validation or testing. However, we expect it to decline as a percentage of total revenue over time.

*Selling, general and administrative*. Selling, general and administrative expenses consist primarily of personnel-related expenses for our sales, marketing, supply chain, finance, legal, human resources, and administrative personnel, as well as the costs of customer service, information technology, professional services, insurance, travel, allocated overhead, and other marketing, communications and administrative expenses. We will continue to actively promote our products. We also expect to invest in our corporate organization and incur additional expenses associated with operating as a public company, including increased legal and accounting costs, investor relations costs, higher insurance premiums, and compliance costs. As a result, we expect that selling, general and administrative expenses will increase in absolute dollars in future periods but decline as a percentage of total revenue over time.

*Interest expense, net*

Interest expense, net consists primarily of interest expense associated with our debt facilities and amortization of debt discount and issuance costs. Interest income consists primarily of interest income earned on our cash and cash equivalents and short-term investments balances.

*Gain on debt extinguishment*

Gain on debt extinguishment relates to the forgiveness of the PPP loan.

*(Gain) loss on valuation of derivative and warrant liabilities*

(Gain) loss on valuation of derivative and warrant liabilities relates to the changes in the fair value of derivative and warrant liabilities, which were subject to remeasurement at each balance sheet date.

Table of Contents

*Other expense (income), net*

Other expense (income), net primarily relates to sublease income and currency fluctuations that generate foreign exchange gains or losses on invoices denominated in currencies other than the U.S. dollar, amortization of short-term investment premium/discount and other non-operational financial gains or losses.

*Provision for income taxes*

We are subject to income taxes in the United States and certain states. Due to our net operating loss position, we have not recognized any material provision or benefit through December 31, 2022.

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. A valuation allowance is provided when it is more likely than not that the deferred tax assets will not be realized. We have established a full valuation allowance to offset our U.S. net deferred tax assets due to the uncertainty of realizing future tax benefits from our net operating loss carryforwards and other deferred tax assets.

As of December 31, 2022, we had U.S. federal net operating loss carryforwards of $729.5 million, and state net operating loss carryforwards of $531.1 million. The federal net operating loss carryforwards generated prior to 2018 will begin to expire in 2030, and the federal net operating loss carryforwards generated since 2018 do not expire. The state net operating loss carryforwards will begin to expire in 2023. Also, as of December 31, 2022, we had U.S. federal research and development tax credit carryforwards of $7.2 million, and state research and development tax credit carryforwards of $4.3 million. The federal research credits begin to expire in 2037, and the South Carolina research and development tax credit carryforwards begin to expire in 2027. California state research and development tax credit carryforwards have no expiration date. Our ability to use net operating loss carryforwards and other tax attributes to reduce future taxable income and liabilities may be subject to limitations based on possible ownership changes in the future. As a result, if we earn net taxable income, our ability to use our pre-change net operating loss carryforwards or other pre-change tax attributes to offset U.S. federal and state taxable income may still be subject to limitations, which could potentially result in increased future tax liability to us. Additionally, a challenge by a taxing authority, a change in our ability to utilize tax benefits such as carryforwards or tax credits, or a deviation from other tax-related assumptions may cause actual financial results to deviate from previous estimates.

## Critical accounting policies and estimates

The preparation of financial statements in conformity with U.S. GAAP requires us to make estimates, assumptions, and judgments that affect amounts of assets and liabilities reported in the financial statements, the disclosure of contingent assets and liabilities as of the date of the financial statements and reported amounts of revenues and expenses during the applicable periods. We base our estimates, assumptions, and judgments on historical experience and on various other factors that we believe to be reasonable under the circumstances. Different assumptions and judgments would change the estimates used in the preparation of our financial statements, which, in turn, could change the results from those reported. We evaluate our estimates, assumptions, and judgments on an ongoing basis. The critical accounting estimates, assumptions, and judgments that we believe have the most significant impact on our financial statements are described below.

*Revenue recognition*

We recognize revenue in accordance with ASC 606, Revenue from Contracts with Customers. We determine the amount of revenue to be recognized through the application of the following steps: (1) identify the contract; (2) identify the performance obligations; (3) determine the transaction price; (4) allocate the transaction price to the performance obligations; and (5) recognize revenue when (or as) performance obligations are satisfied.

We derive revenue primarily from the sale of vehicles and charging systems, the installation of charging equipment, and the sale of batteries and powertrain components to other vehicle manufacturers, as well as the sale of spare parts and other services provided to customers. Customer contracts typically have multiple performance obligations. Generally, our goods and services are considered separate performance obligations.

Table of Contents

Development services and products sold to other vehicle manufacturers are typically sold on a stand-alone basis and are not bundled with other goods or services.

The transaction price of the contract is allocated to each performance obligation in a manner depicting the amount of consideration to which the Company expects to be entitled in exchange for transferring the goods or services to the customer (the "allocation objective"). If the allocation objective is met at contractual prices, no further allocations are made. Otherwise, the Company allocates the transaction price to each performance obligation identified in the contract on a relative standalone selling price basis.

We recognize revenue when or as we satisfy a performance obligation by transferring control of a product or service to a customer. Amounts collected in advance of meeting all of the revenue recognition criteria are not recognized in the statement of operations and are instead recorded as deferred revenue on the balance sheets.

*Warranty*

We provide a limited warranty to customers on vehicles, charging systems, and battery and powertrain systems. The limited warranty ranges from one to twelve years depending on the components. Separately, we also periodically perform field service actions related to product service campaigns. Pursuant to these warranties and field service actions, we will repair, replace, or adjust the parts on the products that are defective in factory-supplied materials or workmanship. We record a warranty reserve for the products sold at the point of revenue recognition, which includes the best estimate of the projected costs to repair or replace items under the limited warranty and field service actions. These estimates are based on actual claims incurred to date and an estimate of the nature, frequency, and costs of future claims. These estimates are inherently uncertain given our relatively short history of sales, and changes to the historical or projected warranty experience may cause material changes to the warranty reserve in the future. The warranty reserve does not include projected warranty costs associated with the products subject to lease accounting, as the costs to repair these warranty claims are expensed as incurred. The portion of the warranty reserve expected to be incurred within the next twelve months is included within accrued liabilities while the remaining balance is included within other long-term liabilities on the balance sheets.

*Stock-based compensation expense*

We use the fair value method for recording stock-based compensation expense. Stock-based compensation expense for stock options is estimated at the grant date based on each stock option's fair value as calculated using the Black-Scholes option pricing model. We recognize stock-based compensation expense for stock option grants on a straight-line basis over the requisite service period for the entire award.

Determining the fair value of stock-based awards at the grant date requires judgment. The determination of the grant date fair value of stock options using an option pricing model is affected by our estimated common stock fair value prior to the Merger Close, as well as assumptions regarding a number of complex and subjective variables. The major subjective assumptions used in the Black-Scholes option pricing model are estimated as follows:

*Expected volatility.* Since the Company has limited trading history by which to determine the volatility of its own common stock price, the expected volatility being used is primarily derived from the historical stock volatility of a representative industry peer group of comparable publicly listed companies over a period approximately equal to the expected term of the stock options.

*Common stock valuations.* Historically, for all periods prior to our Merger Close, the fair value of our common stock was determined by our board of directors, with input from management, taking into account our most recent valuations from an independent third-party valuation firm. Our board of directors intended all stock options granted to have an exercise price per share not less than the per share fair value of our common stock on the date of grant. The valuations of our common stock were determined in accordance with the guidelines outlined in the American Institute of Certified Public Accountants Practice Aid, *Valuation of Privately-Held-Company Equity Securities Issued as Compensation*. The assumptions we use in the valuation models were based on future

81

Table of Contents

expectations combined with management judgment, and considered numerous objective and subjective factors to determine the fair value of our common stock as of the date of each option grant, including the following factors:

- the liquidation preferences, rights, and privileges of our convertible preferred stock relative to the common stock;

- our actual operating and financial performance;

- current business conditions and projections;

- our stage of development;

- the likelihood and timing of achieving a liquidity event for the shares of common stock underlying the stock options, such as an initial public offering or sale of our company, given prevailing market conditions;

- any adjustment necessary to recognize a lack of marketability of the common stock underlying the granted options;

- the market performance of comparable publicly traded companies; and

- U.S. and global capital market conditions.

In valuing our common stock, our board of directors relied in part upon independent third-party valuation reports to determine the equity value of our business using various valuation methods including combinations of income and market approaches with input from management.

In August 2020, we issued Convertible Notes that contain several conversion options. The Monte Carlo simulation was the most appropriate valuation method given the variability of distributions to different share classes depending on the conversion terms upon various potential exit events of the Company and considering that the likelihood of such exit events and potential exit values were speculative as of the valuation date.

Application of these approaches involves the use of estimates, judgment, and assumptions that are highly complex and subjective, such as those regarding our expected future revenue, expenses, and future cash flows, discount rates, market multiples, the selection of comparable companies, and the probability of possible future events. Changes in any or all of these estimates and assumptions or the relationships between those assumptions impact our valuations as of each valuation date and may have a material impact on the valuation of our common stock.

*Inventory*

Inventories are recorded at the lower of cost and net realizable value using the first-in, first-out method. Inventory costs consist primarily of the costs of materials, manufacturing support costs, including labor and factory overhead associated with such production, and shipping costs. We assess the valuation of inventory and periodically record a provision, which increases cost of goods sold, to adjust inventory to its estimated net realizable value, including when we determine inventory to be in excess of anticipated demand or obsolete. Once inventory has been written-off or written-down, it creates a new cost basis for the inventory that is not subsequently written-up.

Table of Contents

**Results of operations**

The following tables set forth our results of operations for the periods presented and as a percentage of our total revenue for those periods. Percentages presented in the following tables may not sum due to rounding.

| (in thousands) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Product revenue | $ 288,400 | $ 232,450 | $ 190,411 |
| Parts and other service revenue | 20,964 | 10,410 | 6,532 |
| Total revenue | 309,364 | 242,860 | 196,943 |
| Product cost of goods sold | 311,884 | 229,142 | 181,987 |
| Parts and other service cost of goods sold | 21,471 | 11,666 | 7,417 |
| Total cost of goods sold [1] | 333,355 | 240,808 | 189,404 |
| Gross profit (loss) | (23,991) | 2,052 | 7,539 |
| Research and development [1] | 63,650 | 43,840 | 36,233 |
| Selling, general and administrative [1] | 133,214 | 85,841 | 67,139 |
| Asset impairment charge | - | - | 121 |
| Total operating expenses | 196,864 | 129,681 | 103,493 |
| Loss from operations | (220,855) | (127,629) | (95,954) |
| Interest expense, net | 28,588 | 50,982 | 15,413 |
| Gain on debt extinguishment | (10,201) | - | - |
| Loss on valuation of derivative and warrant liabilities | - | 70,177 | 12,989 |
| Other expense (income), net | (1,292) | 1,202 | 2,629 |
| Loss before income taxes | (237,950) | (249,990) | (126,985) |
| Provision for income taxes | - | 16 | 22 |
| Net loss | $ (237,950) | $ (250,006) | $ (127,007) |

_____
(1) Includes stock-based compensation as follows:

| (in thousands) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Cost of goods sold | $ 1,749 | $ 1,385 | $ 929 |
| Research and development | 5,302 | 2,507 | 1,616 |
| Selling, general and administrative | 14,789 | 12,169 | 7,737 |
| Total stock-based compensation expense | $ 21,840 | $ 16,061 | $ 10,282 |

83

Table of Contents

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| Product revenue | 93% | 96% | 97% |
| Parts and other service revenue | 7 | 4 | 3 |
| Total revenue | 100 | 100 | 100 |
| Product cost of goods sold | 101 | 94 | 92 |
| Parts and other service cost of goods sold | 7 | 5 | 4 |
| Total cost of goods sold [1] | 108 | 99 | 96 |
| Gross profit (loss) | (8) | 1 | 4 |
| Research and development [1] | 20 | 18 | 18 |
| Selling, general and administrative [1] | 43 | 35 | 34 |
| Asset impairment charge | - | - | - |
| Total operating expenses | 63 | 53 | 52 |
| Loss from operations | (71) | (52) | (48) |
| Interest expense, net | 9 | 21 | 8 |
| Gain on debt extinguishment | (3) | - | - |
| Loss on valuation of derivative and warrant liabilities | - | 29 | 7 |
| Other (income) expense, net | - | - | 1 |
| Loss before income taxes | (77) | (102) | (64) |
| Provision for income taxes | - | - | - |
| Net loss | (77)% | (102)% | (64)% |

_____

(1)  Includes stock-based compensation expense as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | **2020** | |
| Cost of goods sold | - | % | 1 | % | - | % |
| Research and development | 2 | | 1 | | 1 | |
| Selling, general and administrative | 5 | | 5 | | 4 | |
| Total stock-based compensation expense | 7 | % | 7 | % | 5 | % |

*Revenue*

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| (dollars in thousands) | **2022** | **2021** | **2020** | **$** | **%** | **$** | **%** |
| Product revenue | $ 288,400 | $ 232,450 | $ 190,411 | $ 55,950 | 24% | $ 42,039 | 22% |
| Parts and other service revenue | 20,964 | 10,410 | 6,532 | 10,554 | 101% | 3,878 | 59% |
| Total revenue | $ 309,364 | $ 242,860 | $ 196,943 | $ 66,504 | 27% | $ 45,917 | 23% |
| Proterra Transit new buses delivered | 199 | 208 | 170 | (9) | (4)% | 38 | 22% |
| Proterra Powered battery systems delivered | 1,229 | 273 | 107 | 956 | 350% | 166 | 155% |
| MW charging infrastructure installed | 35.3 | 14.5 | 19.8 | 20.8 | 143% | (5.3) | (27)% |

Total revenue increased by $66.5 million in the year ended December 31, 2022 compared to the year ended December 31, 2021. The increase in total revenue was primarily due to increased delivery of battery systems and charging systems. The new bus delivery slightly decreased, but we also delivered 14 pre-owned buses in the year

84

Table of Contents

ended December 31, 2022, which increased from 9 pre-owned buses in the year ended December 31, 2021. For the year ended December 31, 2022, our production and deliveries were negatively impacted by parts shortages. Both production and deliveries during fiscal year 2021 were negatively impacted by the COVID-19 pandemic due to supplier constraints and delays in equipment delivery.

Total revenue increased by $45.9 million in the year ended December 31, 2021 compared to the year ended December 31, 2020. The increase of total revenue was primarily due to increase of vehicle and battery systems deliveries. In addition, we also delivered 9 pre-owned buses in the year ended December 31, 2021. The charging systems and installation revenue decreased due to delay in equipment delivery. Both production and deliveries during fiscal year 2020 were negatively impacted by the COVID-19 pandemic due to inefficiencies experienced with required safety measures and complications with inspections and regulatory testing. Both production and deliveries during fiscal year 2021 were negatively impacted by the COVID-19 pandemic due to supplier constraints and delays in equipment delivery.

*Cost of goods sold and gross profit*

| (dollars in thousands) | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| Product cost of goods sold | $ 311,884 | $ 229,142 | $ 181,987 | $ 82,742 | 36% | $ 47,155 | 26% |
| Parts and other service cost of goods sold | 21,471 | 11,666 | 7,417 | $ 9,805 | 84% | $ 4,249 | 57% |
| Total cost of goods sold | $ 333,355 | $ 240,808 | $ 189,404 | $ 92,547 | 38% | $ 51,404 | 27% |
| Gross profit (loss) | $ (23,991) | $ 2,052 | $ 7,539 | $ (26,043) | NM | $ (5,487) | (73)% |

Cost of goods sold increased by $92.5 million in the year ended December 31, 2022 compared to the year ended December 31, 2021. The increase in costs were mainly driven by the increased product volume, higher material input costs and growth in personnel related costs due to inflation and global supply chain interruption. To support the growth in demand for our products, we increased headcount since 2021. However, parts shortages in part caused delays in production, which negatively impacted our ability to absorb such increased labor and manufacturing overhead costs and also, in part, resulted in a purchase commitment shortfall penalty for volumes committed in 2022 and 2023 volume modification totaling $7.7 million to our bus body supplier incurred in the fourth quarter of 2022. In addition, the cost of goods sold for the year ended December 31, 2022 also included $6.3 million related to start-up costs for the Powered 1 battery factory, which was under construction, and $3.0 million year end inventory adjustment.

Gross profit decreased by $26.0 million for the year ended December 31, 2022 compared to the year ended December 31, 2021, which was mainly due to the unabsorbed labor and manufacturing overhead costs and supplier purchase shortfall penalty incurred in the fourth quarter of 2022 from delayed production caused in part by parts shortages, start-up costs for the Powered 1 battery factory, and our high mix of deliveries with pre-inflation pricing and higher material input costs.

Cost of goods sold increased by $51.4 million in the year ended December 31, 2021 compared to the year ended December 31, 2020. The $47.2 million increase in product cost of goods sold was mainly driven by an increase in vehicle and battery systems delivered. To support the growth, we have increased headcount, however, COVID-19 related supply chain interruptions caused delays in production, which negatively impacted our ability to absorb such increased labor and manufacturing overhead costs.

Gross profit decreased by $5.5 million for the year ended December 31, 2021 compared to the year ended December 31, 2020, which was mainly due to the unabsorbed labor and manufacturing overhead costs from delayed production caused by parts shortages stemming from the COVID-19 related supply chain interruption.

85

Table of Contents

*Operating expenses*

Research and development

| (dollars in thousands) | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| Research and development | $ 63,650 | $ 43,840 | $ 36,233 | $ 19,810 | 45% | $ 7,607 | 21% |

Research and development expense increased by $19.8 million in the year ended December 31, 2022 compared to the year ended December 31, 2021. The increase was primarily due to an increase in personnel related expenses of $8.6 million and stock-based compensation of $2.8 million, an increase in prototype parts and tools expense of $3.7 million, an increase of travel expense of $1.6 million as a result of the relaxation of COVID-19 restrictions, and an increase in professional and consulting fees of $1.4 million to support increased product development efforts.

Research and development expense increased by $7.6 million in the year ended December 31, 2021 compared to the year ended December 31, 2020. The increase was primarily due to an increase in personnel related expenses of $6.4 million and stock-based compensation of $0.9 million, and an increase in professional and consulting fees to support increased product development efforts, and an increase in IT expense. These increases were partially offset by a decrease in prototype parts and tools expense of $1.5 million following the completion of the development of the advanced composite bus body and the ZX5 bus platform.

Selling, general and administrative

| (dollars in thousands) | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| Selling, general and administrative | $ 133,214 | $ 85,841 | $ 67,139 | $ 47,373 | 55% | $ 18,702 | 28% |

Selling, general and administrative expense increased by $47.4 million in the year ended December 31, 2022 compared to the year ended December 31, 2021 primarily due to an increase in personnel related expenses of $19.5 million and stock-based compensation of $2.6 million, an increase in professional and consulting fees of $8.7 million, an increase in IT expense of $4.9 million due to increased cybersecurity measures, more users and incremental data usage costs, an increase in facilities expense of $3.6 million, an increase in insurance expense of $2.6 million, and an increase in travel expense of $1.4 million as a result of the relaxation of COVID-19 restrictions.

Selling, general and administrative expense increased by $18.7 million in the year ended December 31, 2021 compared to the year ended December 31, 2020 primarily due to an increase in personnel related expenses of $7.3 million and stock-based compensation of $4.4 million, an increase in insurance expense of $3.5 million, an increase in IT expense of $2.0 million due to increased cybersecurity measures, more users and incremental data usage costs, and an increase in travel expense of $1.2 million as a result of the relaxation of COVID-19 restrictions.

*Interest expense, net*

| (dollars in thousands) | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | $ | % | $ | % |
| Interest income | $ (1,620) | $ (1,735) | $ (240) | $ 115 | (7)% | $ (1,495) | 623% |
| Interest expense | 30,208 | 52,717 | 15,653 | (22,509) | (43) | 37,064 | 237 |
| Interest expense, net | $ 28,588 | $ 50,982 | $ 15,413 | $ (22,394) | (44) | $ 35,569 | 231 |

Interest expense, net decreased by $22.4 million in the year ended December 31, 2022 compared to the year ended December 31, 2021 primarily due to the write-off of $21.0 million of unamortized debt issuance costs associated with the Convertible Notes with an original aggregate principal of $46.5 million that were converted

Table of Contents

upon the Closing of the Business Combination in June 2021. For more information regarding the Convertible Notes, see "-Liquidity and capital resources" below.

Interest expense, net increased by $35.6 million in the year ended December 31, 2021 compared to the year ended December 31, 2020 primarily due to the write-off of $21.0 million of unamortized debt issuance costs associated with the Convertible Notes with an original aggregate principal of $46.5 million that were converted upon the Closing of the Business Combination, and additional interest expense resulting from the original aggregate principal of $200.0 million of Convertible Notes issued in August 2020. These amounts were offset by increased interest income earned on investments from cash equivalents and short-term investments.

*Gain on debt extinguishment*

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| (dollars in thousands) | 2022 | 2021 | 2020 | $ | % | $ | % |
| Gain on debt extinguishment | $ (10,201) | $ - | $ - | $ (10,201) | NM | $ - | NM |

The $10.2 million gain on debt extinguishment was related to the $10.0 million PPP loan forgiveness approved by the SBA in May 2022. The previously paid and accrued interest of $0.2 million was also forgiven.

*Loss on valuation of derivative and warrant liabilities*

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| (dollars in thousands) | 2022 | 2021 | 2020 | $ | % | $ | % |
| Loss on valuation of derivative and warrant liabilities | $ - | $ 70,177 | $ 12,989 | $ (70,177) | NM | $ 57,188 | NM |

The $70.2 million loss in the year ended December 31, 2021 was related to losses on revaluation of the derivative and warrant liabilities arising from the Convertible Notes and related warrants of $111.7 million and $47.3 million, respectively, offset by the $50.3 million and $38.6 million of gains recognized on revaluation of the liabilities arising from the public warrants and private placement warrants, respectively.

The derivative and remaining warrant liabilities arising from the Convertible Notes were reclassified to stockholder's equity upon the Closing in June 2021. The public and private placement warrants were exercised or redeemed in October 2021, and the related warrant liabilities were reclassified to stockholder's equity.

The $13.0 million loss in the year ended December 31, 2020 related to the fair value change of derivative and warrant liabilities arising from the Convertible Notes.

*Other expense (income), net*

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| (dollars in thousands) | 2022 | 2021 | 2020 | $ | % | $ | % |
| Other expense (income), net | $ (1,292) | $ 1,202 | $ 2,629 | $ (2,494) | NM | $ (1,427) | (54)% |

Other expense (income), net includes realized gain or loss from short-term investment, currency fluctuations that generate foreign exchange gains or losses on invoices denominated in currencies other than the U.S. dollar, sublease income and other non-operational financial losses. The increase of other income in the year ended December 31, 2022 compared to the year ended December 31, 2021 primarily due to higher amount of ST investment throughout 2022 compared to 2021.

The higher expense in the year ended December 31, 2020 was mainly due to foreign exchange rate fluctuations in the first quarter of 2020, and other non-operational financial gains or losses.

87

Table of Contents

*Provision for income taxes*

| | Year Ended December 31, | | | 2022 vs 2021 Change | | 2021 vs 2020 Change | |
|---|---|---|---|---|---|---|---|
| (dollars in thousands) | 2022 | 2021 | 2020 | $ | % | $ | % |
| Provision for income taxes | $          - | $          16 | $          22 | $          (16) | NM | $          (6) | NM |

We are subject to income taxes in the United States and certain states, but due to our net operating loss position, we have not recognized any material provision or benefit through December 31, 2022. In the years ended December 31, 2021 and 2020, we recorded a provision for taxes in certain states, where tax is not based solely on income before taxes.

88

Table of Contents

**Liquidity and capital resources**

As of December 31, 2022, we had cash and cash equivalents and short-term investments of $298.1 million. Our primary requirements for liquidity and capital are investment in new products and technologies, the completion and improvement of our current manufacturing and future capacity expansion, working capital, debt service, and general corporate needs. Historically, these cash requirements have been met through the net proceeds we received through private sales of equity securities, the Business Combination, the PIPE Financing, borrowings under our credit facilities, and payments received from customers.

Under ASC Subtopic 205-40, *Presentation of Financial Statements-Going Concern* ("ASC 205-40"), we have the responsibility to evaluate whether conditions and/or events raise substantial doubt about our ability to meet our future financial obligations as they become due within one year of the financial statements being issued.

Pursuant to the terms of the purchase agreement governing the Convertible Notes, we are required to maintain Liquidity (as defined therein) as of the last day of each quarter of not less than the greater of (a) $75.0 million and (b) an amount equal to the product of multiplying (i) the amount of Cash Burn (as defined therein) from operations for the three-month period ending on the end of such month by (ii) four (the "Minimum Liquidity Covenant").

As of December 31, 2022, we did not have Liquidity in an amount equal to clause (b) above as of such date. As a result, we obtained a waiver of the Minimum Liquidity Covenant for the quarter ended December 31, 2022. Without such waiver, we would have been in default of the Convertible Notes, which would have resulted in a cross-default under the Senior Credit Facility. However, we have not obtained a waiver of the Minimum Liquidity Covenant for any future periods, and, as a result of anticipated operating cash outflows from operation, capital investment at our Powered 1 battery factory, and incremental cash payments for the Workforce Restructuring (discussed in Note 15, Subsequent Events), we may not meet the Minimum Liquidity Covenant as of March 31, 2023.

In addition, our inability to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern is an event of default under the Convertible Notes and the Senior Credit Facility. We obtained a prospective limited waiver under the Convertible Notes, which will expire on March 31, 2023, with respect to our obligations under the Convertible Notes to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern in connection with this Annual Report on Form 10-K, and a cross-default under the Convertible Notes with respect to the Senior Secured Credit Facility, resulting from the substantially similar covenant thereunder. If we are unable to obtain a further waiver under the Convertible Notes beyond March 31, 2023, then there would be an event of default under the Convertible Notes for failure to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) in this Annual Report on Form 10-K, which would be a cross-default under the Senior Credit Facility, unless waived. An event of default under the Convertible Notes would permit the holders of the Convertible Notes to cause all of the outstanding indebtedness under the Convertible Notes to become immediately due and payable.

In addition, we have not obtained a waiver with respect to the corresponding covenant under the Senior Credit Facility as of the date hereof and we are therefore in default of such covenant as of the issuance of these financial statements and related audit report. Unless waived, the default under the Senior Credit Facility resulting from the issuance of these financial statements and related audit report containing a going concern qualification (and potential cross-default under the Convertible Notes if we are unable to obtain a waiver thereunder beyond March 31, 2023), permits the Lenders under the Senior Credit Facility to terminate all commitments to extend credit under the Senior Credit Facility and cause all of the outstanding indebtedness under the Senior Credit Facility to become immediately due and payable.

In addition, if we are unable to comply with or obtain a waiver for the Minimum Liquidity Covenant for the quarter ended March 31, 2023 or a future period, there would be an event of default under the Convertible Notes and a cross-default under the Senior Credit Facility for such period, which would permit (i) the holders of

Table of Contents

the Convertible Notes to cause all of the outstanding indebtedness under the Convertible Notes to become immediately due and payable and (ii) the Lenders under the Senior Credit Facility to terminate all commitments to extend credit under the Senior Credit Facility and cause all of the outstanding indebtedness under the Senior Credit Facility to become immediately due and payable.

We are working with the holders of the Convertible Notes and the lenders under the Senior Credit Facility to come to a resolution; but we cannot guarantee a resolution on a timely basis, on favorable terms or at all.

If the Convertible Notes and amounts outstanding under the Senior Credit Facility were to become immediately due and payable in the event of such a default, this would have an immediate adverse effect on our ability to meet our working capital needs and our business and operating results. There is no assurance that we will be able to obtain any future waivers under the Convertible Notes or the Senior Credit Facility. We would need to take further action to raise additional funds in the capital markets or otherwise to fund our obligations under the Convertible Notes in addition to our other obligations over the period, and we would not be able to draw upon the Senior Credit Facility. If we do not have sufficient funds or we are unable to arrange for additional financing to repay outstanding debt, the lenders under the Senior Credit Facility and holders of the Convertible Notes could seek to enforce their security interests in the collateral securing the indebtedness under the Senior Credit Facility and the Convertible Notes, which are secured substantially by all our assets including intellectual property and other restricted property.

Our potential inability to maintain the Liquidity requirement under the Convertible Notes and the current and potential events of default under the Convertible Notes and the Senior Credit Facility when coupled with the following conditions: our available cash resources, recurring losses and cash outflows from operations, an expectation of continuing operating losses and cash outflows from operations for the foreseeable future, and the need to raise additional capital to finance our future operations, causes substantial doubt about our ability to continue as a going concern to exist.

We are currently executing on various strategies to improve available cash balances, liquidity and cash generated from operations that include a workforce reduction across the Company announced in January 2023, and our plan to windup operations at the City of Industry facility by the end of the third quarter of 2023 to improve operational efficiency. We expect to seek additional funds through potential securities financings, debt financings or other capital sources or strategic transactions. In addition, we may seek to obtain a waiver or amendment of our existing debt agreements. However, we may not be successful in securing additional financing on acceptable terms or at all, or in obtaining a waiver or amendment to our existing debt agreements. Furthermore, high volatility and uncertainty in the capital markets resulting from the COVID-19 pandemic and macroeconomic conditions, including rising inflation rates and interest rates, and recent and potential future disruptions in access to bank deposits or lending commitments due to bank failures, has had, and could continue to have, a negative impact on the price of our common stock and could adversely impact our ability to raise additional funds. If sufficient funds are not available, we will have to delay, reduce the scope of, or eliminate some of our business activities, including related operating expenses, which would adversely affect our business prospects and our ability to continue our operations and would have a negative impact on our financial condition and ability to pursue our business strategies. Further, if sufficient funds are not available, we may have to liquidate our assets and may receive less than the value at which those assets are carried on our audited financial statements, and/or seek protection under Chapters 7 or 11 of the United States Bankruptcy Code, and it is likely that investors will lose all or a part of their investment. This could potentially cause us to cease operations and result in a complete loss of your investment in our common stock.

These financial statements have been prepared by management in accordance with GAAP and this basis assumes that the Company will continue as a going concern, which contemplates the realization of assets and the satisfaction of liabilities and commitments in the normal course of business. These financial statements do not include any adjustments that may result from the outcome of this uncertainty.

*Senior Credit Facility*

In May 2019, we entered into a Loan, Guaranty and Security Agreement (the "Senior Credit Facility"), which is a senior secured asset-based lending facility with borrowing capacity up to $75.0 million. The Senior

Table of Contents

Credit Facility is available on a revolving basis through the earlier of May 2024 or 91 days prior to the stated maturity of any subordinated debt in aggregate amount of $7.5 million or more. The maximum availability under the Senior Credit Facility is based on eligible accounts receivable and inventory, subject to certain reserves, determined in accordance with the Senior Credit Facility. The commitment under the Senior Credit Facility includes a $25.0 million letter of credit sub-line, which was increased in January 2023 from $20.0 million as of December 31, 2022. Subject to certain conditions, the commitment may be increased by $50.0 million upon approval by the lender, and at our option, the commitment can be reduced to $25.0 million or terminated upon at least 15 days' written notice.

The Senior Credit Facility is secured by a security interest on substantially all our assets except for intellectual property and other restricted property.

Borrowings under the Senior Credit Facility bear interest at per annum rates equal to, at our option, either (i) the base rate plus an applicable margin for base rate loan, or (ii) the London Interbank Offered Rate ("LIBOR"), plus an applicable margin for LIBOR loan. The base rate is calculated as the greater of (a) the Lender prime rate, (b) the federal funds rate plus 0.5%, and (c) one-month LIBOR plus 1.0%. The applicable margin is calculated based on a pricing grid linked to quarterly average excess availability (as a percentage of borrowing capacity). For base rate loans, the applicable margin ranges from 0.0% to 1.5%, and for LIBOR Loans, it ranges from 1.5% to 3.0%. The unused line fee is 0.375% per annum of the actual daily amount of the unutilized revolver commitment and will be reduced to 0.25% under certain conditions.

The Senior Credit Facility contains certain customary non-financial covenants. In addition, the Senior Credit Facility requires us to maintain a Fixed Charge Coverage Ratio of at least 1.00:1.00 during such times as a covenant trigger event shall exist.

As of December 31, 2022, there was no balance outstanding under the Senior Credit Facility, although we utilized $17.6 million of the facility's sub-line for letters of credit.

*Small Business Administration Loan*

In May 2020, we received Small Business Administration (the "SBA") loan proceeds of $10.0 million from Town Center Bank pursuant to the Paycheck Protection Program (the "PPP loan") under the "Coronavirus Aid, Relief and Economic Security (CARES) Act". The PPP loan was in the form of a note with an original maturity in May 2022, and which was extended to May 2025 based on the SBA's interim final rule. The interest rate was 1.0% per annum and interest is payable monthly commencing in October 2021. All or a portion of the loan was eligible for forgiveness by the SBA upon application with supporting documentation of expenditures in accordance with the SBA requirements, which include employees being kept on the payroll for eight weeks after the date of the loan and the proceeds being used for payroll, rent, mortgage interest, or utilities.

In May 2022, the SBA approved our PPP loan forgiveness application, and the PPP loan of $10.0 million was forgiven in full and the previously paid interest of approximately $0.2 million was refunded. A total of $10.2 million was recorded as gain on debt extinguishment in our consolidated statements of operations.

*Secured Convertible Promissory Notes*

In August 2020, we issued the Convertible Notes. The Convertible Notes had an aggregate principal amount of $200.0 million as of the issuance date, with a cash interest of 5.0% per annum payable at each quarter end and a paid-in-kind interest of 4.5% per annum payable by increasing the principal balance at each quarter end. The Convertible Notes will mature in August 2025, and we may not make prepayment unless approved by the required holders of the Convertible Notes.

Each of the Convertible Notes rank equally without preference or priority of any kind over one another, but senior in all rights, privileges, and preferences to all other shares of our capital stock and all other securities that are convertible into or exercisable for our capital stock directly or indirectly.

Prior to the maturity date or conversion of the entire balance of the Convertible Notes, in the event of a liquidation or sale of the Company, we shall pay to the holders of Convertible Notes the greater of (i) 150% of

91

Table of Contents

the principal balance of the Convertible Notes or (ii) the consideration that the holders would have received had the holders elected to convert the Convertible Notes into common stock immediately prior to such liquidation event.

The Convertible Notes do not entitle the holders to any voting rights or other rights as a stockholder of the Company, unless and until the Convertible Notes are actually converted into shares of our capital stock in accordance with their terms.

The Note Purchase Agreement governing the Convertible Notes contains certain customary non-financial covenants. In addition, the Note Purchase Agreement requires us to maintain liquidity at quarter end ("Minimum Liquidity Covenant") of not less than the greater of (i) $75.0 million and (ii) four times of Cash Burn (as defined therein) for the three-month period then ended.

In connection with the issuance of the Convertible Notes, we issued to the purchasers of the Convertible Notes warrants to purchase 4.6 million shares of our stock at an exercise price of $0.02 per share. These warrants are freestanding financial instruments and, prior to the Closing, were classified as liability due to the possibility that they could become exercisable into Legacy Proterra convertible preferred stock. The warrant liability was remeasured on a recurring basis at each reporting period date, with the change in fair value reported in the statement of operations. Upon any exercise of the warrants for shares of common stock, the carrying amount of the warrant liability was reclassified to stockholders' equity. Upon the consummation of the Merger, the warrants became exercisable for Proterra common stock, with no possibility to convert to Legacy Proterra convertible preferred stock. As a result, the carrying amount of the warrant liability was reclassified to stockholders' equity. The loss from change in fair value of the warrant liability was $47.3 million for the year ended December 31, 2021. An aggregate of $69.3 million in warrant liability was reclassified to additional paid-in capital upon exercise and consummation of the Merger. In the fourth quarter of 2021, all remaining outstanding warrants were exercised for shares of common stock.

Prior to the Closing, the embedded features of the Convertible Notes were composed of conversion options that had the economic characteristics of a contingent early redemption feature settled in shares of our stock rather than cash, because the total number of shares of our stock delivered to settle these embedded features would predominantly have a fixed value. These conversion options were bifurcated and accounted for separately from the host debt instrument. The derivative liability of $68.5 million was initially measured at fair value on its issuance date and recorded as a debt discount and was amortized during the term of the Convertible Notes to interest expense using effective interest method. The derivative liability was remeasured on a recurring basis at each reporting period date, with the change in fair value reported in the statement of operations. The loss from the change in fair value of the derivative liability was $111.7 million for the year ended December 31, 2021. Upon the consummation of the Merger, the embedded conversion features associated with the Convertible Notes no longer qualified for derivative accounting since the conversion price became fixed. The $182.6 million carrying amount of the embedded derivative, fair value as of the date of the Closing, was reclassified to stockholders' equity in accordance with Topic 815, Derivatives and Hedging.

At the Closing, certain Convertible Note holders with an original aggregate principal amount of $46.5 million elected to convert their Convertible Notes at the Closing of the Business Combination, resulting in the issuance of 7.4 million shares of common stock. An aggregate of $48.8 million principal and interest was reclassified to stockholders' equity, and $21.0 million of remaining related debt issuance costs were expensed to interest expense.

As of December 31, 2022, the outstanding balance of the Convertible Notes was $170.8 million inclusive of PIK interest of $17.3 million.

The remaining Convertible Notes including accrued interest will be automatically converted to common stock at $6.5712 per share pursuant to the mandatory conversion provisions, if and when the VWAP of our common stock exceeds $9.86 over 20 consecutive days.

We were not in compliance with the Minimum Liquidity Covenant in the Convertible Notes as of December 31, 2022, We received a waiver of such Liquidity (as defined therein) requirement in February 2023

Table of Contents

which provides for retroactive effect, so that there was no such event of default for the year ended December 31, 2022. Refer to Note 15, Subsequent Events for details.

Due to the uncertainty of obtaining waivers of the Liquidity requirement (as defined therein) for future periods and our inability to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern, even though the Convertible Notes have a maturity date in August 2025, they are classified as a current liability on the Company's balance sheets as of December 31, 2022.

*Performance bonds*

Public transit agencies may require their suppliers to obtain performance bonds from surety companies or letters of credit to protect against non-performance. These performance guarantees are normally valid from contract effective date to completion of the contract, which is generally upon customer acceptance of the vehicle. Surety companies limit the maximum coverage they will provide based on financial performance and do not provide committed bonding facilities. Currently, we are required to collateralize a portion of the total performance bond amount. Historically, we have primarily provided cash collateral. Our surety provider may accept letters of credit. The collateral provided is a mix of restricted cash on the balance sheet and letters of credit. As of December 31, 2022, we had $12.6 million of restricted cash and $17 million of letters of credit related to performance bonds. We believe we have sufficient capacity to meet the performance guarantee needs of our business through our arrangements with our primary surety provider.

*Cash flows*

The following table summarizes our cash flows:

| (in thousands) | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Cash flows (used in) provided by: | | | |
| Operating activities | $ (296,607) | $ (126,261) | $ (76,070) |
| Investing activities | 184,107 | (447,281) | (54,525) |
| Financing activities | 16,156 | 632,449 | 200,643 |
| Net increase (decrease) in cash and cash equivalents, and restricted cash | $ (96,344) | $ 58,907 | $ 70,048 |

*Operating activities*

Net cash used in operating activities in 2022 was $296.6 million compared to $126.3 million in 2021. In both years, the cash used in operating activities was due to net losses and increases in working capital due to the growth of our business, especially the strategic purchases in inventory due to supply chain constraints and higher costs from material and freight inflation. The decrease in net loss of $12.1 million in the year ended December 31, 2022 as compared to the year ended December 31, 2021 included decreases of non-cash items of $70.2 million of loss on change in the fair value of derivative and warrant liabilities, $21.2 million of interest expense and debt discount and issuance costs amortization expense, and partially offset by increase of $5.8 million of stock-based compensation expense. For the year ended December 31, 2022, cash used in operating activities primarily related to $54.5 million,$48.7 million, $35.7 million and $13.5 million for inventory, accounts receivable, prepaid expenses and other current assets and other assets, respectively, and was partially offset by cash provided by deferred revenue and accounts payable and accrued liabilities of $31.0 million and $14.9 million, respectively. For the year ended December 31, 2021, cash used in operating activities primarily related to $29.9 million, $20.2 million, and $8.0 million for accounts receivable, inventory, prepaid expenses and other current assets, respectively, and was partially offset by cash provided by accounts payable and accrued liabilities and deferred revenue of $27.4 million and $6.6 million, respectively.

Net cash used in operating activities in 2021 was $126.3 million compared to $76.1 million in 2020. In both years, the cash used in operating activities was due to net losses and increases in working capital. The increase in net loss of $123.0 million in the year ended December 31, 2021 as compared to the year ended December 31, 2020 included increases of non-cash items of $57.2 million of loss on change in the fair value of

93

Table of Contents

derivative and warrant liabilities, $33.5 million of interest expense and debt discount and issuance costs amortization expense, and $5.8 million of stock-based compensation expense. For the year ended December 31, 2021, cash used in operating activities primarily related to $29.9 million, $20.2 million, and $8.0 million for accounts receivable, inventory, prepaid expenses and other current assets, respectively, and was partially offset by cash provided by accounts payable and accrued liabilities and deferred revenue of $27.4 million and $6.6 million, respectively. For the year ended December 31, 2020, cash used in operating activities primarily related to $7.2 million and $4.1 million for accounts receivable and accounts payable and accrued liabilities, respectively, and was partially offset by cash provided by deferred revenue, inventory, and other non-current liabilities of $9.6 million, $2.2 million, and $2.2 million, respectively.

*Investing activities*

Net cash provided by investment activities was $184.1 million in the year ended December 31, 2022 compared to net cash used in investment activities $447.3 million in the year ended December 31, 2021. The $631.4 million change was primarily driven by a net increase of $667.4 million related to more proceeds from maturity of investments in the year ended December 31, 2022 as compared to more purchases of investments in the year ended December 31, 2021, and a $36.0 million increase in capital expenditures.

Net cash used in investment activities was $447.3 million in the year ended December 31, 2021 compared to $54.5 million in the year ended December 31, 2020. The $392.8 million change was primarily driven by a net increase of $394.9 million related to the purchase of investments in the year ended December 31, 2021 as compared to the year ended December 31, 2020, and a $2.1 million increase in capital expenditures. The increased purchase of investments was driven by our investment of the net proceeds from the Business Combination.

*Financing activities*

Net cash provided by financing activities was $16.2 million, $632.4 million, and $200.6 million for the years ended December 31, 2022, 2021 and 2020, respectively. The net cash provided by financing activities for the year ended December 31, 2022 primarily resulted from net proceeds of $9.8 million from the exercise of stock options and warrants, and $3.0 million from the ESPP. The net cash provided by financing activities for the year ended December 31, 2021 primarily resulted from net proceeds of $644.7 million from the Business Combination and the PIPE Financing and $6.8 million from the exercise of stock options and warrants, which was partially offset by a Senior Credit Facility repayment of $17.1 million. The net cash provided by financing activities for the year ended December 31, 2020 primarily resulted from proceeds from borrowings of $200.0 million through the issuance of Convertible Notes, $14.5 million under the Senior Credit Facility, $10.0 million from PPP loan, and $4.2 million from the exercise of stock options, offset by $12.8 million repayment under the Senior Credit Facility and $10.0 million repayment of a prior credit facility with Hercules Capital, Inc.

94

Table of Contents

**Off-balance sheet arrangements**

We have not created, and are not party to, any special-purpose or off-balance sheet entities for the purpose of raising capital, incurring debt, or operating our business. With the exception of letters of credit, we do not have any off-balance sheet arrangements or relationships with entities that are not disclosed in our consolidated financial statements that have, or are reasonably likely to have, a material current or future effect on our financial condition, revenue, expenses, results of operations, liquidity, capital expenditures, or capital resources. In addition, we do not engage in trading activities involving non-exchange traded contracts.

**Contractual obligations**

The purchase commitments including purchase orders or contracts for the purchase of certain goods and services was $2.2 billion as of December 31, 2022, of which approximately 20% was expected to be due within one year, 37% in 2024 and 2025, and the remainder thereafter through 2028. Most of the commitments relate to the expected purchase of cylindrical cells manufactured at a yet to be built LG Energy Solution battery cell plant in the United States, pursuant to a long-term supply agreement through 2028.

The Convertible Notes had an outstanding principal amount inclusive of PIK interest of $170.8 million as of December 31, 2022, which will mature in August 2025. The outstanding balances will be automatically converted into common stock at $6.5712 per share pursuant to the mandatory conversion provisions, if and when the VWAP of our common stock exceeds $9.86 over 20 consecutive days.

**Recent accounting pronouncements**

See Note 2 of our Notes to Consolidated Financial Statements for information regarding recent accounting pronouncements that are of significance, or potential significance to us.

**Item 7A. Quantitative and Qualitative Disclosures about Market Risk**

We are exposed to market risks in the ordinary course of our business.

*Interest rate and market risk*

As of December 31, 2022, we had cash and cash equivalents and short-term investments of $298.1 million. Our cash and cash equivalents and short-term investments are held primarily in U.S. treasury and corporate debt securities, and money market funds. Our primary objectives for investment activities are to preserve principal, provide liquidity, and maximize income without significantly increasing risk.

Our investments in fixed rate debt securities are subject to market risk due to changes in interest rates. our future investment income may fluctuate due to changes in interest rates or we may suffer losses in principal if we are forced to sell securities that decline in market value due to changes in interest rates. Our debt securities are classified as "available for sale." When the fair value of the security declines below its amortized cost basis, any portion of that decline attributable to credit losses, to the extent expected to be nonrecoverable before the sale of the security, is recognized in our consolidated statement of operations. When the fair value of the security declines below its amortized cost basis due to changes in interest rates, such amounts are recorded in other comprehensive loss, and are recognized in our consolidated statement of operations only if we sell or intend to sell the security before recovery of its cost basis.

Based on a sensitivity model that measures market value changes when changes in interest rates occur, as of December 31, 2022, an immediate increase of 100-basis points in interest rates would have no material impact to the fair value of our cash equivalents and short-term investment.

We had non-controlling equity investments in privately-held companies of $26.6 million as of December 31, 2022. The fair value of such strategic investment may fluctuate depending on the financial condition and near-term prospects of these companies, and we may be required to record an impairment loss if the carrying value of the investment exceed its fair value.

95

Table of Contents

We are exposed to interest rate risk related to our indebtedness under the Senior Credit Facility that bears interest at floating rates based on the prime rate plus a specified margin. As of December 31, 2022, we had no borrowing outstanding under the Senior Credit Facility.

*Foreign currency exchange rate risk*

We are exposed to foreign currency exchange rate risk, primarily related to certain raw material purchases denominated in Euros and certain accounts receivables from three customers denominated in Canadian dollars. Payments denominated in foreign currencies represented less than 5% of our total payments during the years ended December 31, 2022, 2021 and 2020. The revenue from the customers with accounts receivable denominated in Canadian dollars was less than 1% of our total revenue for the years ended December 31, 2022 and 2021, and was less than 10% of our total revenue for the year ended December 31, 2020. The exchange rate fluctuations were not material in the years ended December 31, 2022 and 2021, and accounted for $1.1 million of other expense in the year ended December 31, 2020. The higher expense in 2020 was mainly due to foreign exchange rate fluctuations in the first half of 2020. As a result, we believe that we currently do not have material exposure to changes in foreign currency exchange rates.

*Inflation Risk*

Volatility in the prices of commodities and third-party parts and components or the impact of inflationary increases could increase the costs of our products and services. We may not be able to pass on these costs to our customers and this could have a material adverse impact on our results of operations and cash flows. The reasons for these fluctuations include the impact by global supply and demand trends, both within and outside our industry, as well as commodity price fluctuations, conversion costs, energy costs, labor costs, and transportation costs, competition, worldwide currency fluctuations, regulatory costs, and product and process evolutions that impact demand for the same materials. We have experienced inflation in our material costs, including increased costs for freight, due to supply chain challenges as a result of COVID-19.

Table of Contents

**Item 8. Financial Statements and Supplementary Data**

**Index to Consolidated Financial Statements**

|  | Page(s) |
| --- | --- |
| Reports of KPMG LLP, Independent Registered Public Accounting Firm (PCAOB Number: 185) | 98 |
| Consolidated Balance Sheets | 102 |
| Consolidated Statements of Operations | 103 |
| Consolidated Statements of Comprehensive Loss | 104 |
| Consolidated Statements of Stockholders' Equity | 105 |
| Consolidated Statements of Cash Flows | 106 |
| Notes to Consolidated Financial Statements | 108 |

97

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and Board of Directors
Proterra Inc:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated balance sheets of Proterra Inc and subsidiary (the Company) as of December 31, 2022 and 2021, the related consolidated statements of operations, comprehensive loss, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2022, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated March 17, 2023 expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

*Going Concern*

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, the Company's projected noncompliance with liquidity requirements related to the Convertible Notes, combined with a history and expectation of continued recurring losses and cash outflows from operations for the foreseeable future raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

*Critical Audit Matter*

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of a critical audit

98

matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Product warranty reserve*

As discussed in Note 1 to the consolidated financial statements, the Company's product warranty reserve as of December 31, 2022 was $25.5 million, including a warranty reserve on vehicles sold to customers. The Company records a warranty reserve for vehicles sold at the point of revenue recognition, which includes management's best estimate of the projected costs to repair or replace items under the limited warranty and field service actions. These estimates are based on actual claims incurred to date and an estimate of the nature, frequency and costs of future claims.

We identified the evaluation of the product warranty reserve related to the sale of vehicles as a critical audit matter. Specifically, a high degree of subjective auditor judgment was required to evaluate the Company's estimate of the total warranty cost per vehicle due to the relatively short period of the Company's historical warranty claim experience and lack of relevant industry data for warranty costs. In addition, changes in the total warranty cost per vehicle could have had a significant effect on the estimate of the warranty reserve.

The following are the primary procedures we performed to address this critical audit matter. We assessed the estimated future warranty repair costs used in the development of the total warranty cost per vehicle by comparing them to the Company's historical warranty claims data. We tested a sample of the current year claims used in the determination of the estimated future warranty repair costs by comparing them to the relevant underlying documentation. We also assessed the consistency of the Company's warranty reserve with recent trends in actual warranty claims, taking into account changes in conditions affecting the Company.

/s/ KPMG LLP

We have served as the Company's auditor since 2012.

Santa Clara, California
March 17, 2023

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Stockholders and Board of Directors
Proterra Inc:

*Opinion on Internal Control Over Financial Reporting*

We have audited Proterra Inc and subsidiary's (the Company) internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, because of the effect of the material weaknesses, described below, on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2022 and 2021, the related consolidated statements of operations, comprehensive loss, stockholders' equity, and cash flows for each of the years in the three-year period ended December 31, 2022, and the related notes (collectively, the consolidated financial statements), and our report dated March 17, 2023 expressed an unqualified opinion on those consolidated financial statements.

99

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment. The Company did not have a sufficient number of trained resources with assigned responsibility and accountability for the design, operation and documentation of internal control over financial reporting. As a result:

- The Company did not have an effective risk assessment process that defined clear financial reporting objectives and evaluated risks at a sufficient level of detail to identify all relevant risks of material misstatement across the entity;

- The Company did not have an effective information and communication process that identified and assessed the source of and controls necessary to ensure the reliability of information used in financial reporting and that communicates relevant information about roles and responsibilities for internal control over financial reporting;

- The Company did not have effective monitoring activities to assess the operation of internal control over financial reporting, including the continued appropriateness of control design and level of documentation maintained to support control effectiveness.

As a consequence, the Company did not effectively design, implement, or operate process-level control activities for substantially all of the Company's financial reporting processes.

The material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2022 consolidated financial statements, and this report does not affect our report on those consolidated financial statements.

*Basis for Opinion*

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*Definition and Limitations of Internal Control Over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ KPMG LLP

Santa Clara, California
March 17, 2023

101

Table of Contents

**PROTERRA INC**
**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except per share data)**

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Assets: | | |
| Cash and cash equivalents | $ 73,695 | $ 170,039 |
| Accounts receivable, net | 130,337 | 81,644 |
| Short-term investments | 224,359 | 490,967 |
| Inventory | 169,567 | 114,556 |
| Prepaid expenses and other current assets | 50,893 | 15,300 |
| Deferred cost of goods sold | 4,304 | 1,816 |
| Restricted cash, current | 12,565 | 12,105 |
| Total current assets | 665,720 | 886,427 |
| Property, plant, and equipment, net | 107,552 | 62,246 |
| Operating lease right-of-use assets | 20,274 | 24,282 |
| Restricted cash, non-current | - | 460 |
| Long-term inventory prepayment | 10,000 | - |
| Other assets | 36,913 | 8,472 |
| Total assets | $ 840,459 | $ 981,887 |
| Liabilities and Stockholders' Equity: | | |
| Accounts payable | $ 57,822 | $ 53,404 |
| Accrued liabilities | 33,551 | 20,634 |
| Deferred revenue, current | 30,017 | 13,821 |
| Operating lease liabilities, current | 6,876 | 4,084 |
| Debt, current | 122,692 | - |
| Total current liabilities | 250,958 | 91,943 |
| Debt, non-current | - | 110,999 |
| Deferred revenue, non-current | 37,381 | 22,585 |
| Operating lease liabilities, non-current | 18,098 | 20,963 |
| Other long-term liabilities | 17,164 | 15,245 |
| Total liabilities | 323,601 | 261,735 |
| Commitments and contingencies (Note 8) | | |
| Stockholders' equity: | | |
| Common stock, $0.0001 par value; 500,000 shares authorized; and 226,265 shares and 221,960 shares issued and outstanding as of December 31, 2022 and 2021, respectively | 22 | 22 |
| Preferred stock, $0.0001 par value; 10,000 shares authorized and zero shares issued and outstanding as of December 31, 2022 and 2021 | - | - |
| Additional paid-in capital | 1,613,556 | 1,578,943 |
| Accumulated deficit | (1,096,175) | (858,225) |
| Accumulated other comprehensive loss | (545) | (588) |
| Total stockholders' equity | 516,858 | 720,152 |
| Total liabilities and stockholders' equity | $ 840,459 | $ 981,887 |

See accompanying notes to consolidated financial statements.

Table of Contents

**PROTERRA INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(in thousands, except per share data)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Product revenue | $ 288,400 | $ 232,450 | $ 190,411 |
| Parts and other service revenue | 20,964 | 10,410 | 6,532 |
| Total revenue | 309,364 | 242,860 | 196,943 |
| Product cost of goods sold | 311,884 | 229,142 | 181,987 |
| Parts and other service cost of goods sold | 21,471 | 11,666 | 7,417 |
| Total cost of goods sold | 333,355 | 240,808 | 189,404 |
| Gross profit (loss) | (23,991) | 2,052 | 7,539 |
| Research and development | 63,650 | 43,840 | 36,233 |
| Selling, general and administrative | 133,214 | 85,841 | 67,139 |
| Asset impairment charge | - | - | 121 |
| Total operating expenses | 196,864 | 129,681 | 103,493 |
| Loss from operations | (220,855) | (127,629) | (95,954) |
| Interest expense, net | 28,588 | 50,982 | 15,413 |
| Gain on debt extinguishment | (10,201) | - | - |
| Loss on valuation of derivative and warrant liabilities | - | 70,177 | 12,989 |
| Other expense (income), net | (1,292) | 1,202 | 2,629 |
| Loss before income taxes | (237,950) | (249,990) | (126,985) |
| Provision for income taxes | - | 16 | 22 |
| Net loss | $ (237,950) | $ (250,006) | $ (127,007) |
| Net loss per share of common stock: | | | |
| Basic | $ (1.06) | $ (2.07) | $ (28.96) |
| Diluted | $ (1.08) | $ (2.07) | $ (28.96) |
| Weighted average shares used in per share computation: | | | |
| Basic | 224,301 | 120,886 | 4,385 |
| Diluted | 249,156 | 120,886 | 4,385 |

See accompanying notes to consolidated financial statements.

Table of Contents

**PROTERRA INC**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**
**(in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| Net loss | $ (237,950) | $ (250,006) | $ (127,007) |
| Other comprehensive income (loss), net of taxes: | | | |
| Available-for-sale securities: | | | |
| Unrealized gain (loss) on available-for-sale securities | 43 | (588) | - |
| Other comprehensive income (loss), net of taxes | 43 | (588) | - |
| Total comprehensive loss, net of taxes | $ (237,907) | $ (250,594) | $ (127,007) |

See accompanying notes to consolidated financial statements.

104

Table of Contents

**PROTERRA INC**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**
**(in thousands)**

| | Convertible Preferred Stock | | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance, December 31, 2019 | 115,136 | $ 13 | 3,927 | $ - | $ 668,178 | $ (481,212) | $ - | $ 186,979 |
| Issuance of stock, net of costs | - | - | 1,751 | 1 | 4,211 | - | - | 4,212 |
| Stock-based compensation | - | - | - | - | 10,282 | - | - | 10,282 |
| Net loss | - | - | - | - | - | (127,007) | - | (127,007) |
| Balance, December 31, 2020 | 115,136 | 13 | 5,678 | 1 | 682,671 | (608,219) | - | 74,466 |
| Conversion of convertible preferred stock into common stock in connection with the reverse recapitalization | (115,136) | (13) | 115,576 | 11 | 2 | - | - | - |
| Conversion of Convertible Notes into common stock | - | - | 7,424 | 1 | 48,780 | - | - | 48,781 |
| Issuance of common stock upon the reverse recapitalization, net of issuance costs | - | - | 76,172 | 8 | 502,307 | - | - | 502,315 |
| Reclassification of derivative liability upon the reverse recapitalization | - | - | - | - | 182,554 | - | - | 182,554 |
| Reclassification of Legacy Proterra warrant liability upon the reverse recapitalization | - | - | - | - | 87,016 | - | - | 87,016 |
| Issuance of common stock upon exercise of options and warrants | - | - | 7,012 | 1 | 6,711 | - | - | 6,712 |
| Issuance of Earnout Shares, net of repurchase | - | - | 4,736 | - | (634) | - | - | (634) |
| Issuance of common stock upon warrant redemption | - | - | 5,362 | - | 53,475 | - | - | 53,475 |
| Stock-based compensation | - | - | - | - | 16,061 | - | - | 16,061 |
| Net loss | - | - | - | - | - | (250,006) | - | (250,006) |
| Other comprehensive loss, net of taxes | - | - | - | - | - | - | (588) | (588) |
| Balance, December 31, 2021 | - | - | 221,960 | 22 | 1,578,943 | (858,225) | (588) | 720,152 |
| Stock issuance for exercise of stock option and RSU release, net of costs | - | - | 3,655 | - | 9,779 | - | - | 9,779 |
| Stock issuance for employee stock purchase plan | - | - | 650 | - | 2,994 | - | - | 2,994 |
| Stock-based compensation | - | - | - | - | 21,840 | - | - | 21,840 |
| Net loss | - | - | - | - | - | (237,950) | - | (237,950) |
| Other comprehensive income, net of taxes | - | - | - | - | - | - | 43 | 43 |
| Balance, December 31, 2022 | - | $ - | 226,265 | $ 22 | $ 1,613,556 | $ (1,096,175) | $ (545) | $ 516,858 |

See accompanying notes to consolidated financial statements.

105

Table of Contents

**PROTERRA INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Cash flows from operating activities: | | | |
| Net loss | $ (237,950) | $ (250,006) | $ (127,007) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | |
| Depreciation and amortization | 12,606 | 15,689 | 15,536 |
| Loss on disposal of fixed assets | 205 | 645 | 143 |
| Asset impairment charge | - | - | 121 |
| Stock-based compensation | 21,840 | 16,061 | 10,282 |
| Amortization of debt discount and issuance costs | 14,297 | 34,809 | 6,045 |
| Accretion of debt end of term charge and PIK interest | 7,475 | 8,207 | 3,501 |
| Gain on debt extinguishment | (10,007) | - | - |
| Loss on valuation of derivative and warrant liabilities | - | 70,177 | 12,989 |
| Others | (1,931) | 1,281 | (153) |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (48,693) | (29,928) | (7,216) |
| Inventory | (54,495) | (20,181) | 2,182 |
| Prepaid expenses and other current assets | (35,671) | (8,021) | (1,043) |
| Deferred cost of goods sold | (2,488) | 221 | (797) |
| Operating lease right-of-use assets and liabilities | 3,936 | 30 | 87 |
| Other assets | (13,521) | (1,974) | 1,575 |
| Accounts payable and accrued liabilities | 14,850 | 27,447 | (4,090) |
| Deferred revenue, current and non-current | 30,991 | 6,586 | 9,599 |
| Other non-current liabilities | 1,949 | 2,696 | 2,176 |
| Net cash used in operating activities | (296,607) | (126,261) | (76,070) |
| Cash flows from investing activities: | | | |
| Purchase of investments | (446,418) | (587,846) | (108,960) |
| Proceeds from maturities of investments | 690,000 | 164,000 | 80,000 |
| Purchase of property and equipment | (59,475) | (23,435) | (25,565) |
| Net cash provided by (used in) investing activities | 184,107 | (447,281) | (54,525) |
| Cash flows from financing activities: | | | |
| Merger and PIPE financing | - | 644,695 | - |
| Payment of tax withholding obligations on earnout shares | - | (634) | - |
| Proceeds from debt, net of issuance costs | - | - | 219,471 |
| Repayment of debt | - | (17,083) | (22,787) |
| Repayment of finance obligation | - | (2,642) | (484) |
| Proceeds from (repayment of) government grants | (700) | 1,323 | 275 |
| Proceeds from exercise of stock options and warrants | 9,779 | 6,790 | 4,168 |
| Proceeds from employee stock purchase plan | 2,994 | - | - |
| Other financing activities | 4,083 | - | - |
| Net cash provided by financing activities | 16,156 | 632,449 | 200,643 |
| Net increase (decrease) in cash and cash equivalents, and restricted cash | (96,344) | 58,907 | 70,048 |
| Cash and cash equivalents, and restricted cash at the beginning of year | 182,604 | 123,697 | 53,649 |
| Cash and cash equivalents, and restricted cash at the end of year | $ 86,260 | $ 182,604 | $ 123,697 |
| Supplemental disclosures of cash flow information: | | | |
| Cash paid for interest | $ 8,467 | $ 9,074 | $ 5,827 |
| Cash paid for income taxes | - | 15 | 9 |

Table of Contents

**PROTERRA INC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(in thousands)**

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| Non-cash investing and financing activity: | | | |
| Assets acquired through accounts payable and accrued liabilities | $ 4,113 | $ 4,955 | $ 659 |
| Non-cash transfer of leased assets to inventory | 515 | 2,046 | 635 |
| Reclassification of Convertible Notes warrants liability upon exercise | - | 17,696 | - |
| Conversion of Convertible Notes into common stock | - | 48,607 | - |
| Reclassification of remaining Convertible Notes warrants liability upon the reverse recapitalization | - | 69,320 | - |
| Reclassification of derivative liability upon the reverse recapitalization | - | 182,554 | - |
| Conversion of preferred stock into common stock | - | 627,315 | - |
| Cashless warrant exercise | - | 53,326 | - |
| Non-cash long-term investment | - | 1,600 | - |

See accompanying notes to consolidated financial statements.

107

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1.**
**Summary of Significant Accounting Policies**

*Organization and Description of Business*

Proterra Inc ("Proterra" or the "Company"), formerly known as ArcLight Clean Transition Corp. ("ArcLight"), is a leading developer and producer of zero-emission electric vehicle and EV technology solutions for commercial application. Proterra designs, develops, manufactures, and sells electric transit buses as an original equipment manufacturer for North American public transit agencies, airports, universities, and other commercial transit fleets. It also designs, develops, manufactures, sells, and integrates proprietary battery systems and electrification solutions for global commercial vehicle manufacturers. Additionally, Proterra provides fleet-scale, high-power charging solutions for its customers.

Legacy Proterra (as defined below) was originally formed in June 2004 as a Colorado limited liability company and converted to a Delaware corporation in February 2010. Proterra is headquartered in Burlingame, California, and also has manufacturing and product development facilities in Burlingame and City of Industry, California, and Greenville and Greer, South Carolina.

On June 11, 2021, ArcLight filed a notice of deregistration with the Cayman Islands Registrar of Companies, and filed a certificate of incorporation and a certificate of corporate domestication with the Secretary of State of the State of Delaware, under which ArcLight was domesticated and continued as a Delaware corporation. On June 14, 2021 (the "Closing Date"), ArcLight consummated a merger with Phoenix Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of ArcLight ("Phoenix Merger Sub"), and Proterra Inc, a Delaware corporation ("Legacy Proterra"), with Legacy Proterra surviving as the surviving company and as a wholly-owned subsidiary of ArcLight (the "Merger" and, collectively with the other transactions described in the Agreement and Plan of Merger (the "Merger Agreement"), the "Business Combination"). In connection with the Business Combination, Legacy Proterra changed its name to "Proterra Operating Company, Inc." and ArcLight changed its name to "Proterra Inc".

The Merger was accounted for as a reverse merger and a recapitalization with Legacy Proterra being the accounting acquirer. Accordingly, all historical financial information presented in the consolidated financial statements of Proterra represents the accounts of Legacy Proterra and its wholly owned subsidiaries as if Legacy Proterra is the predecessor to Proterra. The shares and net loss per common share, prior to the Merger, have been retroactively restated as shares reflecting the exchange ratio established in the Merger ( 0.8925 shares of Legacy Proterra common stock for 1 share of Proterra common stock) (the "Exchange Ratio"). Unless otherwise specified or unless the context otherwise requires, references in these notes to the "Company," "we," "us," or "our" refer to Legacy Proterra prior to the Business Combination and to Proterra following the Business Combination.

Prior to the closing of the Business Combination (the "Closing"), ArcLight's Class A ordinary shares and public warrants were listed on the Nasdaq Capital Market under the symbols "ACTC" and "ACTCW," respectively. Proterra's common stock is currently listed on the Nasdaq Global Select Market under the symbol "PTRA". See Note 3, "Reverse Recapitalization" for further details of the Merger. The Company's public warrants were previously listed on the Nasdaq Global Select Market under the symbol "PTRAW." On October 29, 2021, the Company redeemed its remaining outstanding public warrants at a redemption price of $0.10 per public warrant. See Note 10, Warrants, for further details.

The Company has incurred net losses and negative cash flows from operations since inception. As of December 31, 2022, the Company has an accumulated deficit of $1.1 billion, and cash and cash equivalents and short-term investments of $298.1 million. The Company has funded operations primarily through a combination of equity and debt financing. There was no outstanding balance under the Senior Credit Facility as of December 31, 2022. There was an aggregate of $17.6 million of letters of credit outstanding as of December 31, 2022. As of December 31, 2022, the outstanding balance of the Convertible Notes was $170.8 million inclusive of PIK interest of $17.3 million.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

Under ASC Subtopic 205-40, *Presentation of Financial Statements-Going Concern* ("ASC 205-40"), we have the responsibility to evaluate whether conditions and/or events raise substantial doubt about our ability to meet our future financial obligations as they become due within one year of the financial statements being issued.

Pursuant to the terms of the purchase agreement governing the Convertible Notes, we are required to maintain Liquidity (as defined therein) as of the last day of each quarter of not less than the greater of (a) $75.0 million and (b) an amount equal to the product of multiplying (i) the amount of Cash Burn (as defined therein) from operations for the three-month period ending on the end of such month by (ii) four (the "Minimum Liquidity Covenant").

As of December 31, 2022, we did not have Liquidity in an amount equal to clause (b) above as of such date. As a result, we obtained a waiver of the Minimum Liquidity Covenant for the quarter ended December 31, 2022. Without such waiver, we would have been in default of the Convertible Notes, which would have resulted in a cross-default under the Senior Credit Facility. However, we have not obtained a waiver of the Minimum Liquidity Covenant for any future periods, and, as a result of anticipated operating cash outflows from operation, capital investment at our Powered 1 battery factory, and incremental cash payments for the Workforce Restructuring (discussed in Note 15, Subsequent Events), we may not meet the Minimum Liquidity Covenant as of March 31, 2023.

In addition, our inability to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern is an event of default under the Convertible Notes and the Senior Credit Facility.

We obtained a prospective limited waiver under the Convertible Notes, which will expire on March 31, 2023, with respect to our obligations under the Convertible Notes to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern, and a cross-default under the Convertible Notes with respect to the Senior Secured Credit Facility, resulting from the substantially similar covenant thereunder. If we are unable to obtain a further waiver under the Convertible Notes beyond March 31, 2023, then there would be an event of default under the Convertible Notes for failure to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation), which would be a cross-default under the Senior Credit Facility, unless waived. An event of default under the Convertible Notes would permit the holders of the Convertible Notes to cause all of the outstanding indebtedness under the Convertible Notes to become immediately due and payable.

In addition, we have not obtained a waiver with respect to the corresponding covenant under the Senior Credit Facility as of the date hereof and we are therefore in default of such covenant as of the issuance of these financial statements and related audit report. Unless waived, the default under the Senior Credit Facility resulting from the issuance of these financial statements and related audit report containing a going concern qualification (and potential cross-default under the Convertible Notes if we are unable to obtain a waiver thereunder beyond March 31, 2023), permits the Lenders under the Senior Credit Facility to terminate all commitments to extend credit under the Senior Credit Facility and cause all of the outstanding indebtedness under the Senior Credit Facility to become immediately due and payable.

In addition, if we are unable to comply with or obtain a waiver for the Minimum Liquidity Covenant for the quarter ended March 31, 2023 or a future period, there would be an event of default under the Convertible Notes and a cross-default under the Senior Credit Facility for such period, which would permit (i) the holders of the Convertible Notes to cause all of the outstanding indebtedness under the Convertible Notes to become immediately due and payable and (ii) the Lenders under the Senior Credit Facility to terminate all commitments to extend credit under the Senior Credit Facility and cause all of the outstanding indebtedness under the Senior Credit Facility to become immediately due and payable.

If the Convertible Notes and amounts outstanding under the Senior Credit Facility were to become immediately due and payable in the event of such a default, this would have an immediate adverse effect on our ability to meet our working capital needs and our business and operating results. There is no assurance that we

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

will be able to obtain any future waivers under the Convertible Notes or the Senior Credit Facility. We would need to take further action to raise additional funds in the capital markets or otherwise to fund our obligations under the Convertible Notes in addition to our other obligations over the period, and we would not be able to draw upon the Senior Credit Facility. If we do not have sufficient funds or we are unable to arrange for additional financing to repay outstanding debt, the lenders under the Senior Credit Facility and holders of the Convertible Notes could seek to enforce their security interests in the collateral securing the indebtedness under the Senior Credit Facility and the Convertible Notes, which are secured substantially by all our assets including intellectual property and other restricted property.

Our potential inability to maintain the Liquidity requirement under the Convertible Notes and the current and potential events of default under the Convertible Notes and the Senior Credit Facility when coupled with the following conditions: our available cash resources, recurring losses and cash outflows from operations, an expectation of continuing operating losses and cash outflows from operations for the foreseeable future, and the need to raise additional capital to finance our future operations, causes substantial doubt about our ability to continue as a going concern to exist.

We are currently executing on various strategies to improve available cash balances, liquidity and cash generated from operations that include a workforce reduction across the Company announced in January 2023, and our plan to windup operations at the City of Industry facility by the end of the third quarter of 2023 to improve operational efficiency. We expect to seek additional funds through potential securities financings, debt financings or other capital sources or strategic transactions. In addition, we may seek to obtain a waiver or amendment of our existing debt agreements. However, we may not be successful in securing additional financing on acceptable terms or at all, or in obtaining a waiver or amendment to our existing debt agreements. Furthermore, high volatility and uncertainty in the capital markets resulting from the COVID-19 pandemic and macroeconomic conditions, including rising inflation rates and interest rates, and recent and potential future disruptions in access to bank deposits or lending commitments due to bank failures, has had, and could continue to have, a negative impact on the price of our common stock and could adversely impact our ability to raise additional funds. If sufficient funds are not available, we will have to delay, reduce the scope of, or eliminate some of our business activities, including related operating expenses, which would adversely affect our business prospects and our ability to continue our operations and would have a negative impact on our financial condition and ability to pursue our business strategies.

These financial statements have been prepared by management in accordance with GAAP and this basis assumes that the Company will continue as a going concern, which contemplates the realization of assets and the satisfaction of liabilities and commitments in the normal course of business. These financial statements do not include any adjustments that may result from the outcome of this uncertainty.

*Basis of Presentation*

The consolidated financial statements and accompanying notes have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP") and the rules and regulations of the U.S. Securities and Exchange Commission (the "SEC"). The Company's consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All intercompany transactions and balances have been eliminated upon consolidation.

The Company has not experienced any significant impact to estimates or assumptions as a result of the COVID-19 pandemic. However, the Company's financial results have been impacted by ongoing constraints and inefficiencies in production largely driven by shortages of component parts and shipment delays, and workforce absences due to illness or quarantines during the pandemic experienced by the Company or its suppliers. While the COVID-19 pandemic has not had a material adverse impact on the Company's financial condition and results of operations to date, the related global supply chain interruption, macroeconomic and geopolitical conditions on the Company's future operational and financial performance will depend on certain developments, including the impact on the Company's customers and the effect on the Company's suppliers, all of which are uncertain and cannot be predicted.

110

Table of Contents

**PROTERRA INC
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

*Segments*

The Company operates in the United States and has sales to the European Union, Canada, United Kingdom, Australia, Japan and Türkiye.
Revenue disaggregated by geography, based on the addresses of the Company's customers, consists of the following (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| United States | $ 265,049 | $ 227,091 | $ 141,073 |
| Rest of World | 44,315 | 15,769 | 55,870 |
| Total | $ 309,364 | $ 242,860 | $ 196,943 |

The Company's chief operating decision maker is its Chief Executive Officer (CEO) who reviews financial information presented on a consolidated basis for purposes of making decision on allocating resources and assessing financial performance. Accordingly, the Company has determined that it has a single reportable segment.

*Use of Estimates*

The preparation of financial statements in conformity with U.S. GAAP requires the use of estimates and judgments that affect the reported amounts in the consolidated financial statements and accompanying notes. U.S. GAAP requires the Company to make estimates and judgments in several areas including, but not limited to, those related to revenue recognition, collectability of accounts receivable, valuation of inventories, valuation of Convertible Notes (See Note 4), warranty liability, contingent liabilities, stock-based compensation expense, useful lives of property, plant, and equipment, recoverability of assets, residual value of leased assets, and the valuation of deferred tax assets. These estimates are based on historical facts and various other assumptions that the Company believes are reasonable. Actual results could differ materially from those estimates.

*Foreign Currency Transactions*

The U.S. dollar is the Company's functional currency. Monetary assets and liabilities denominated in currencies other than the U.S. dollar are remeasured to the U.S. dollar at period end, and transaction gains and losses are recorded in other expense (income), net in the statements of operations. Net gains or losses resulting from foreign exchange transactions was not material for the years ended December 31, 2022 and 2021. The net losses resulting from foreign exchange transactions were $1.1 million for the year ended December 31, 2020.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments purchased with original maturities of three months or less to be cash equivalents.

*Accounts Receivable and Allowance for Credit Losses*

Accounts receivable are recorded at the invoiced amount and do not bear interest. The Company determines the allowance for credit losses based on historical write-off experience, an analysis of the aging of outstanding receivables, customer payment patterns and expectations of changes in macroeconomic conditions that may affect the collectability of outstanding receivables. The allowance for credit losses was not material as of December 31, 2022 and 2021.

*Short-Term Investments*

The Company's primary objectives for investment activities are to preserve principal, provide liquidity, and maximize income without significantly increasing risk. The Company's short-term investments were primarily

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

comprised of U.S. Treasury and corporate debt securities, and classified as available-for-sale at the time of purchase because it is intended that these investments are available for current operations.

Investments are reported at fair value and are subject to periodic impairment review. Unrealized gains and losses related to changes in the fair value of these securities are recognized in accumulated other comprehensive loss. The ultimate value realized on these securities is subject to market price volatility until they are sold. Realized gains or losses from short-term investments are recorded in other expense (income), net.

As of December 31, 2022 and 2021, short-term investments were $224.4 million and $491.0 million, respectively.

*Restricted Cash*

The Company maintains certain cash amounts restricted as to withdrawal or use. The restricted cash is primarily collateral for performance bonds issued to certain customers. The collateral is provided in the form of a cash deposit to either support the bond directly or to collateralize a letter of credit that supports the performance bonds. The restricted cash was $12.6 million as of December 31, 2022 and 2021.

*Credit Risk and Concentration*

The Company's financial instruments that are potentially subject to concentrations of credit risk consist primarily of cash, cash equivalents, restricted cash, short-term investments, and accounts receivable. Cash and cash equivalents and short-term investments are maintained primarily at one financial institution as of December 31, 2022, and deposits exceed federally insured limits. Risks associated with cash and cash equivalents, and short-term investments are mitigated by banking with creditworthy financial institutions. The Company has not experienced any losses on its deposits of cash and cash equivalents or its short-term investments.

Cash equivalents and short-term investments consist of short-term money market funds, corporate debt securities, and debt securities issued by the U.S. Treasury, which are deposited with reputable financial institutions. The Company's cash management and investment policy limits investment instruments to securities with short-term credit ratings at the time of purchase of P-2 and A-2 or better from Moody's Investors Service and Standard & Poor's Financial Services, LLC, respectively, with the objective to preserve capital and to maintain liquidity until the funds can be used in business operations.

Accounts receivable are typically unsecured and are generally derived from revenue earned from transit agencies, universities and airports in North America and global commercial vehicle manufacturers in North America, the European Union, the United Kingdom, Australia, Japan, and Türkiye. The Company periodically evaluates the collectability of its accounts receivable and provides an allowance for potential credit losses as necessary.

Given the large order value for customers and the relatively low number of customers, revenue and accounts receivable have typically been concentrated with a limited number of customers.

|  | Revenue | | | Accounts Receivable | |
|  | Year Ended December 31, | | | December 31, | |
|  | 2022 | 2021 | 2020 | 2022 | 2021 |
|---|---|---|---|---|---|
| Number of customers accounted for 10% or more | 2 | - | 1 | 2 | 1 |
| Total % for customers accounted for 10% or more | 32 % | - % | 21 % | 48 % | 18 % |

Single source suppliers provide the Company with a number of components that are required for manufacturing of its current products. For example, we sole source our composite bus bodies from TPI

112

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

Composites Inc. In other instances, although there may be multiple suppliers available, many of the components are purchased from one single source. If these single source suppliers fail to meet the Company's requirements on a timely basis at competitive prices or are unable to provide components for any reason, the Company could suffer manufacturing delays, a possible loss of revenue, or incur higher cost of sales, any of which could adversely impact the Company's operating results.

*Fair Value of Financial Instruments*

The carrying value of the Company's financial instruments, including cash and cash equivalents, accounts receivable, short-term investments, accounts payable, and accrued and other current liabilities, approximates fair value due to the short period of time to maturity, receipt, or payment. The carrying amount of the Company's debt, except for Convertible Notes (as defined below), approximates its fair value as the stated interest rates approximate market rates currently available to the Company.

In August 2020, the Company issued Secured Convertible Promissory Notes (the "Convertible Notes") that, prior to the Closing, contained embedded features subject to derivative accounting. These embedded features were composed of conversion options that had the economic characteristics of a contingent early redemption feature settled in a variable number of shares of the Company's stock. These conversion options were bifurcated and accounted for as a derivative liability separately from the host debt instrument. Embedded derivatives were recognized as a derivative liability on the balance sheets. The derivative liability was measured at fair value and subject to remeasurement at each balance sheet date. Upon the consummation of the Merger, the embedded conversion features associated with the Convertible Notes no longer qualify for derivative accounting after the conversion price became fixed. The carrying amount of the embedded derivative, the fair value as of the date of the Closing, was reclassified to stockholders' equity in accordance with Topic 815, Derivatives and Hedging.

The warrants issued in connection with the Convertible Notes were, prior to the Closing, classified as a liability ("legacy Proterra warrant liability") because they could become exercisable into common stock upon a Qualified Initial Public Offering ("QIPO") or into convertible preferred stock after 5 years from issuance date in the event that there is no QIPO during such period. Such warrants were measured at fair value, subject to remeasurement at each balance sheet date. Upon exercise of the warrants to common stock within 5 years from issuance date, the carrying amount of the warrant liability would be reclassified to stockholders' equity. Upon the consummation of the Merger, the stock issuable upon exercise of the warrants is common stock, with no possibility to convert to Legacy Proterra convertible preferred stock. As a result, the carrying amount of the warrant liability was reclassified to stockholders' equity.

In connection with ArcLight's initial public offering in September 2020, 21,425,000 warrants to purchase ArcLight ordinary shares were issued, including 13,875,000 public warrants and 7,550,000 private placement warrants. These warrants were classified as liabilities as they did not meet the requirements for equity classification under Topic 815, Derivatives and Hedging. These warrants were continually measured at fair value, subject to remeasurement at each balance sheet date. Most of the public warrants and private placement warrants were exercised in October 2021, and the Company redeemed the remaining outstanding public warrants at a redemption price of $ 0.10 per public warrant. See Note 10, Warrants, for further details.

*Inventories*

Inventories are recorded at the lower of cost and net realizable value using the first-in, first-out method. Inventory costs consist primarily of the cost of materials, manufacturing support costs, including labor and factory overhead associated with such production, and shipping costs. The costs of products delivered to customers that have not yet met revenue recognition criteria are also included in inventories. The Company assesses the valuation of inventory and periodically records a provision to adjust inventory to its estimated net realizable value, including when the Company determines inventory to be obsolete or in excess of anticipated demand. Once inventory has been written-off or written-down, it creates a new cost basis for the inventory that is not subsequently written-up. Accelerating the disposal process or incorrect estimates may cause actual results to differ from the estimates at the time such inventory is disposed or sold.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

*Deferred Cost of Goods Sold*

Deferred cost of goods sold primarily includes incurred costs for charging system installations that have not met revenue recognition criteria.

*Property, Plant, and Equipment*

Property, plant, and equipment, including leasehold improvements, are stated at cost. Depreciation is computed using the straight-line method over the estimated useful lives of the respective assets, as follows:

| Property, Plant, and Equipment | Estimated Useful Life |
|---|---|
| Computer hardware | 3 years |
| Computer software | 3 to 5 years |
| Internally used vehicles and charging systems | over the shorter of their estimated useful lives or 5 years |
| Machinery and equipment | 5 to 12 years |
| Office furniture and equipment | 5 years |
| Tooling | 3 to 5 years |
| Leasehold improvements | over the shorter of their estimated useful lives or the terms of the related leases |
| Leased batteries | over the shorter of the terms of the related leases or 12 years |
| Leased vehicles and charging systems | over the shorter of the terms of the related leases or 5 years |

If the estimated useful life of an asset is less than the stated number of years in our capitalization policy, the depreciation expense will be recorded over the shorter period.

Upon the retirement or sale of property, plant, and equipment, the cost and associated accumulated depreciation are removed from the balance sheets, and the resulting gain or loss is reflected on the statement of operations. Maintenance and repair expenditures are expensed as incurred while major improvements that increase the functionality, output, or expected life of an asset are capitalized and depreciated ratably over the identified useful life.

*Impairment of Long-Lived Assets*

The Company evaluates the recoverability of property, plant, and equipment and right-of-use assets for possible impairment whenever events or circumstances indicate that the carrying amount of such assets may not be recoverable. Recoverability of these assets is measured by a comparison of the carrying amounts to the future undiscounted cash flows the assets are expected to generate. If such review indicates that the carrying amount of long-lived assets is not recoverable, the carrying amount of such assets is reduced to fair value.

In addition to the recoverability assessment, the Company periodically reviews the remaining estimated useful lives of property, plant, and equipment. If the estimated useful life assumption for any asset is reduced, the remaining net book value is depreciated over the revised estimated useful life.

No impairment charge was recognized in the years ended December 31, 2022 and 2021. The Company recorded a $0.1 million impairment charge associated with a facility lease for the year ended December 31, 2020.

*Deferred Revenue*

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

Deferred revenue consists of billings or payments received in advance of revenue recognition that are recognized as revenue once the revenue recognition criteria are met. In some instances, progress billings are issued upon meeting certain milestones stated in the contracts. Accordingly, the deferred revenue balance does not represent the total contract value of non-cancelable arrangements. Invoices are typically due within 30 to 40 days.

The changes in deferred revenue consisted of the following (in thousands):

| | | |
|---|---|---:|
| Deferred revenue as of December 31, 2021 | $ | 36,406 |
| Revenue recognized from beginning balance during the year ended December 31, 2022 | | (13,071) |
| Deferred revenue added during the year ended December 31, 2022 | | 44,063 |
| Deferred revenue as of December 31, 2022 | $ | 67,398 |

The current portion of deferred revenue represents the amount that is expected to be recognized as revenue within one year from the balance sheet date.

*Revenue Recognition*

The Company derives revenue primarily from the sale of vehicles and charging systems, the installation of charging systems, the sale of battery systems and powertrain components to other vehicle manufacturers, as well as the sale of spare parts and other services provided to customers. Product revenue consists of revenue earned from vehicles and charging systems, battery systems and powertrain components, installation of charging systems, and revenue from leased vehicles, charging systems, and batteries under operating leases. Leasing revenue recognized over time was approximately $
1.1 million, $2.1 million and $2.3 million for the years ended December 31, 2022, 2021 and 2020, respectively. Parts and other service revenue includes revenue earned from spare parts, the design and development of battery systems and powertrain systems for other vehicle manufacturers, and extended warranties.

Goods and services that are promised in the Company's contracts include vehicles, charging systems, battery systems and powertrain components to other vehicle manufacturers, installation of charging systems, spare parts, and extended warranty. The Company assesses the products and services promised in contracts at contract inception, and identifies performance obligations for each promise to transfer to the customer a product or service that is distinct. If a product or service is separately identifiable from other items in the bundled arrangement and a customer can benefit from the product or service on its own or with other resources that are readily available to the customer, then such product or service is considered distinct. Customer contracts typically have multiple performance obligations. Generally, the Company's goods and services are considered separate performance obligations. Development services and products sold to other vehicle manufacturers are typically sold on a stand-alone basis and are not bundled with other goods or services.

The transaction price of the contract is allocated to each performance obligation in a manner depicting the amount of consideration to which the Company expects to be entitled in exchange for transferring the goods or services to the customer (the "allocation objective"). If the allocation objective is met at contractual prices, no further allocations are made. Otherwise, the Company allocates the transaction price to each performance obligation identified in the contract on a relative standalone selling price basis.

To determine the standalone selling price of its promised products or services, the Company conducts an analysis to determine whether its products or services have an observable standalone selling price. In determining the observable standalone selling price, the Company requires that a substantial majority of the standalone selling prices for a product or service fall within a reasonably narrow range. If there is no directly observable standalone selling price for a particular product or service, then the Company estimates a standalone selling price by using the estimated cost plus margin or by reviewing external and internal market factors including, but not limited to, pricing practices including historical discounting, major service groups, and the geographies in which we offer products and services.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

The Company recognizes revenue when or as it satisfies a performance obligation by transferring control of a product or service to a customer. Revenue from product sales is recognized when control of the underlying performance obligations is transferred to the customer. Revenue from sales of vehicles is typically recognized upon delivery when the Company can objectively demonstrate that the criteria specified in the contractual acceptance provisions are achieved prior to delivery. In cases, where the Company cannot objectively demonstrate that the criteria specified in the contractual acceptance provisions have been achieved prior delivery, revenue is recognized upon acceptance by the customer. Revenue from sales of charging systems is recognized at a point in time, generally upon delivery or commissioning when control of the underlying performance obligations are transferred to the customer. Under certain contract arrangements, the control of the performance obligations related to the charging systems is transferred over time, and the associated revenue is recognized over the installation period using an input measure based on costs incurred to date relative to total estimated costs to completion. Spare parts revenue is recognized upon shipment. Extended warranty revenue is recognized over the life of the extended warranty using the time elapsed method. Development service contracts typically include the delivery of prototype products to customers. The performance obligation associated with the development of prototype products as well as battery systems and powertrain components to other vehicle manufacturers, is satisfied at a point in time, typically upon shipping.

Revenue derived from performance obligations satisfied over time from charging systems and installation was $7.7 million, $5.8 million and $6.0 million in the years ended December 31, 2022, 2021, and 2020, respectively. Extended warranty revenue was $2.1 million, $1.7 million and $1.3 million in the years ended December 31, 2022, 2021, and 2020, respectively.

As of December 31, 2022 and 2021, the contract assets balance was $26.1 million and $1.3 million, respectively, and are recorded in the prepaid expenses and other current assets on the consolidated balance sheets. The contract assets are assessed based on contractual terms and expected to be billed within the next twelve months. The increase was mainly related to two customers, which accounts for 60% and 13% of the balance as of December 31, 2022, respectively.

As of December 31, 2022, the amount of remaining performance obligations that have not been recognized as revenue was $438.7 million, of which 77% was expected to be recognized as revenue over the next 12 months and the remainder thereafter. This amount excludes the value of remaining performance obligations for contracts with an original expected length of one year or less.

The Company has three commercial offerings each addressing a critical component of commercial vehicle electrification.

- **Proterra Transit** designs, develops, manufactures, and sells electric transit buses as an original equipment manufacturer ("OEM") for North American public transit agencies, airports, universities, and other commercial transit fleets.

- **Proterra Powered & Energy** includes Proterra Powered, which designs, develops, manufactures, sells, and integrates proprietary battery systems and electrification solutions into vehicles for global commercial vehicle OEMs, and Proterra Energy, which offers turnkey fleet-scale, high-power charging solutions and software services, ranging from fleet and energy management software-as-a-service, to fleet planning, hardware, infrastructure, installation, utility engagement, and charging optimization.

The revenue of these commercial offerings are as follows (in thousands):

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2022 | 2021 | 2020 |
| Proterra Transit | $ 191,087 | $ 195,558 | $ 156,021 |
| Proterra Powered & Energy | 118,277 | 47,302 | 40,922 |
| Total | $ 309,364 | $ 242,860 | $ 196,943 |

116

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

*Lease Arrangements*

The Company offers customers leasing alternatives outside of the standard sales contracts for vehicles, charging equipment and batteries used in the vehicles. The leasing arrangements are typically bundled together with the sales contracts. The Company assessed the nature of the bundled arrangements under the revenue accounting standard. For arrangements that contain a lease, the Company determined the classification of the lease in accordance with Topic 842, Leases. A lease arrangement that transfers substantially all of the benefits and risks incident to ownership of the products is classified as a sales-type lease based on the criteria established by the accounting standard; otherwise the lease is classified as an operating lease.

For sales-type leases, product revenue is generally recognized upon customer acceptance of the underlying leased assets. The current portion of net investment in sales-type leases is recorded in accounts receivable, and the non-current portion is recorded in other assets on the balance sheets. The discounted unguaranteed residual value of underlying leased assets is not material to the net investment in lease balance.

For operating leases, the leasing revenue is recognized on a straight-line basis over the lease term.

The Company monitors the performance of customers who leased batteries and are subject to ongoing payments. No allowance has been recorded for the receivables under the leasing arrangements.

The Company determines whether an arrangement is or contains a lease at inception. Short-term leases with a term of less than 12 months will not be recognized in the right-of-use assets or lease liabilities. The lease and non-lease components are not separated for all leases regardless of whether the Company is the lessee or a lessor to the lease. See Note 7, Leases, for additional information.

*Cost of Goods Sold*

Cost of goods sold includes direct material and labor costs, manufacturing overhead including depreciation expense, freight costs, and reserves for estimated warranty expenses. Cost of goods sold also includes charges to write-down the carrying value of inventory when it exceeds its estimated net realizable value and to provide for on-hand inventory that is either obsolete or in excess of forecasted demand. Costs of development services are expensed as incurred. Costs of development services incurred in periods prior to the finalization of a service agreement with a customer are recorded as research and development expense. Once the customer agreement is finalized, these costs are recorded in cost of goods sold.

*Sales and Other Taxes*

Taxes assessed by various government entities, such as sales, use, and value added taxes, collected at the time of sale are excluded from revenue.

*Shipping Costs*

Amounts billed to customers related to shipping and handling are classified as revenue, and the related shipping and handling costs are included in cost of goods sold.

*Research and Development Costs*

Research and development costs are expensed as incurred. Research and development expense consists primarily of payroll and benefits of those employees engaged in research, design, and development activities, costs related to prototype parts and design tools, license expenses related to intellectual property, supplies and services, depreciation, and other occupancy costs.

117

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

*Advertising Expenses*

Advertising costs are expensed as incurred. Advertising expenses were $1.2 million, $1.1 million, and $0.6 million for the years ended December 31, 2022, 2021 and 2020, respectively.

*Product Warranties*

The Company provides a limited warranty to customers on vehicles, charging systems, and battery systems. The limited warranty ranges from one to 12 years depending on the components. Separately, the Company also periodically performs field service actions related to product service campaigns. Pursuant to these warranties and field service actions, the Company will repair, replace, or adjust the parts on the products that are defective in factory-supplied materials or workmanship. The Company records a warranty reserve for the products sold at the point of revenue recognition, which includes the best estimate of the projected costs to repair or replace items under the limited warranty and field service actions. These estimates are based on actual claims incurred to date and an estimate of the nature, frequency and costs of future claims. These estimates are inherently uncertain given the relatively short history of sales. Changes to the historical or projected warranty experience may cause material changes to the warranty reserve in the future. The warranty reserve does not include projected warranty costs associated with the vehicles under operating leases, as the costs to repair these warranty claims are expensed as incurred. The portion of the warranty reserve expected to be incurred within the next 12 months is included within accrued liabilities while the remaining balance is included within other long-term liabilities on the balance sheets.

Warranty expense is recorded as a component of cost of goods sold. Accrued warranty activity consisted of the following (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Warranty reserve - beginning of period | $ 23,274 | $ 18,582 | $ 14,926 |
| Warranty costs incurred | (7,142) | (7,199) | (4,214) |
| Net changes in liability for pre-existing warranties, including expirations | (5,124) | (1,710) | (3,392) |
| Provision for warranty | 14,505 | 13,601 | 11,262 |
| Warranty reserve - end of period | $ 25,513 | $ 23,274 | $ 18,582 |

*Stock-Based Compensation*

The Company uses the fair value method for recording stock-based compensation expense. Stock-based compensation expense for stock options is estimated at the grant date based on each stock option's fair value as calculated using the Black-Scholes option pricing model. The stock-based compensation expense is recognized on a straight-line basis over the requisite service period for the entire award.

*Income Taxes*

Income taxes are computed using the asset and liability method, under which deferred tax assets and liabilities are determined based on the difference between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to affect taxable income. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized.

The Company recognizes tax benefits from uncertain tax positions only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position. The Company adjusts these reserves when facts and circumstances change, such as the closing of a tax audit or

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Summary of Significant Accounting Policies** (cont.)

the refinement of an estimate. The provision for income taxes includes the effects of any reserves that are considered appropriate.

Accrued interest and penalties related to unrecognized tax benefits are classified as income tax expense.

*Government Incentives*

The Company receives incentives from federal and state government agencies in the form of grants. Incentives are recorded in the financial statements in accordance with their purposes, either as a reduction of expense or a reduction of the cost of the capital investment. The benefit of these incentives is recorded when performance is complete and all conditions as specified in the agreement are fulfilled.

California and certain other states provide incentives to accelerate the purchase of cleaner, more efficient buses in the form of point-of-sale discounts to vehicle purchasers. These incentives are included in the customer contract value, and recognized as revenue once all revenue recognition criteria are met.

*Other Comprehensive Income (Loss)*

The components of accumulated other comprehensive income (loss) and activity, net of related taxes, for the year ended December 31, 2022 were as follows (in thousands):

|  | December 31, 2021 | | Increase/ Decrease | | December 31, 2022 | |
|---|---|---|---|---|---|---|
| Net unrealized gain (loss) on available-for-sale securities | $ | (588) | $ | 43 | $ | (545) |
| Total accumulated other comprehensive income (loss), net of taxes | $ | (588) | $ | 43 | $ | (545) |

**2.**
**Adoption of New Accounting Standards**

**ASU No. 2020-06,** *Accounting for Convertible Instruments and Contracts in an Entity's Own Equity.* This standard simplifies the accounting for convertible instruments by removing certain separation models in ASC 470-20, Debt - Debt with Conversion and Other Options. This standard updates the guidance on certain embedded conversion features that are not required to be accounted for as derivatives under Topic 815, Derivatives and Hedging, or that do not result in substantial premiums accounted for as paid-in capital, such that those features are no longer required to be separated from the host contract. The convertible debt instruments will be accounted for as a single liability measured at amortized cost. This will also result in the interest expense recognized for convertible debt instruments to be typically closer to the coupon interest rate when applying the guidance in Topic 835, Interest. Further, this standard made amendments to the EPS guidance in Topic 260 for convertible instruments, the most significant impact of which is requiring the use of the if-converted method for diluted earnings per share calculation, and no longer allowing the net share settlement method. This standard also made revisions to Topic 815-40, which provides guidance on how an entity must determine whether a contract qualifies for a scope exception from derivative accounting. The amendments to Topic 815-40 change the scope of contracts that are recognized as assets or liabilities. This standard is effective for interim and annual periods beginning after December 15, 2021, with early adoption permitted after December 15, 2020. Adoption of this standard can either be on a modified retrospective or full retrospective basis. The Company adopted this standard on January 1, 2022, and it had no material impact on the consolidated financial statements.

**3.**
**Reverse Recapitalization**

On June 14, 2021, Phoenix Merger Sub merged with Legacy Proterra, with Legacy Proterra surviving as a wholly-owned subsidiary of ArcLight. In connection with the Business Combination, Legacy Proterra changed its name to "Proterra Operating Company, Inc." and ArcLight changed its name to "Proterra Inc".

The following transactions occurred upon the Closing:

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**3. Reverse Recapitalization** (cont.)

- each share of outstanding Legacy Proterra convertible preferred stock was converted into shares of Proterra common stock in accordance with the applicable conversion ratio immediately prior to the effective time, and each share of Legacy Proterra common stock (including shares issued upon conversion of Legacy Proterra convertible preferred stock and warrants net exercised upon Closing) was converted into shares of common stock after giving effect of the Exchange Ratio of 0.8925 and resulting in the issuance of 123,752,882 shares of common stock;

- certain holders of Convertible Notes with an original aggregate principal amounts of $46.5 million elected to convert their outstanding Convertible Notes balances including accrued PIK interest and cash interest at the Closing resulting in the issuance of 7.4 million shares of common stock;

- each outstanding Legacy Proterra option was converted into an option to purchase shares of Proterra common stock by multiplying the number of underlying shares by the Exchange Ratio, rounded down to the nearest whole share, resulting in such options being exercisable to purchase for an aggregate of 22,532,619 shares of Proterra common stock; the exercise price of each converted option was determined by dividing the per share exercise price of the respective Legacy Proterra options by the Exchange Ratio of 0.8925, rounded up to the nearest whole cent;

- each outstanding Legacy Proterra warrant to purchase Legacy Proterra common stock and convertible preferred stock was converted into a warrant to purchase shares of Proterra common stock by multiplying the number of underlying shares by the Exchange Ratio, rounded down to the nearest whole share, resulting in such warrants being exercisable to purchase an aggregate of 3,504,523 shares of Proterra common stock; the exercise price of each converted warrant was determined by dividing the per share exercise price of the respective Legacy Proterra warrant by the Exchange Ratio of 0.8925, rounded up to the nearest whole cent;

- each outstanding Convertible Note that was not optionally converted in connection with the Closing remained outstanding and became convertible into shares of Proterra common stock in accordance with the terms of such Convertible Notes.

- 15,172 public shares were redeemed by ArcLight shareholders, and an aggregate of $0.2 million was paid from the trust account to these redeeming holders; and each share of ArcLight Class A and Class B ordinary shares was converted into the right to receive one share of Proterra's common stock resulting in the issuance of 34,671,900 shares of common stock;

- pursuant to the subscription agreements between ArcLight and certain investors (the "PIPE Investors"), the PIPE Investors purchased 41.5 million shares of Proterra common stock at a purchase price of $10.00 per share for aggregate gross proceeds of $415.0 million (the "PIPE Financing");

- each ArcLight warrant outstanding immediately prior to the consummation was converted into a warrant exercisable into an equivalent number of shares of Proterra common stock, resulting in such warrants being exercisable for an aggregate of 21,424,994 shares of Proterra common stock; and

- the 669,375 shares of Proterra common stock underlying certain Milestone Options (as defined below) fully vested upon the Closing.

Upon the occurrence of any of the following events during the first five years following the Closing of the Merger ("earnout period"), up to an additional 22,809,500 shares of Proterra common stock (the "Earnout Stock") may be issued to former holders of Legacy Proterra convertible preferred stock, common stock, warrants, vested options and Convertible Notes as of immediately prior to the closing of the Merger, as follows:

a. 21.0526% of the Earnout Stock if over any 20 trading days within any 30 trading day period, the volume-weighted average price ("VWAP") of the Proterra common stock is greater than or equal to $15.00 per

120

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**3. Reverse Recapitalization** (cont.)

share or there occurs any transaction resulting in a change in control with a valuation of the Proterra common stock that is greater than or equal to $15.00 per share (the "First Earnout Shares");

b.  an additional 26.3158% of the Earnout Stock if over any 20 trading days within any 30 trading day period, the VWAP of the Proterra common stock is greater than or equal to $20.00 per share or there occurs any transaction resulting in a change in control with a valuation of the Proterra common stock that is greater than or equal to $20.00 per share;

c.  an additional 26.3158% of the Earnout Stock if over any 20 trading days within any 30 trading day period, the VWAP of the Proterra common stock is greater than or equal to $25.00 per share or there occurs any transaction resulting in a change in control with a valuation of the Proterra common stock that is greater than or equal to $25.00 per share;

d.  an additional 26.3158% of the Earnout Stock if over any 20 trading days within any 30 trading day period, the VWAP of the Proterra common stock is greater than or equal to $30.00 per share or there occurs any transaction resulting in a change in control with a valuation of the Proterra common stock that is greater than or equal to $30.00 per share;

Pursuant to a letter agreement (the "Sponsor Letter Agreement") with ArcLight CTC Holdings, L.P. (the "Sponsor"), 10% of the Proterra common stock received by the Sponsor upon consummation of the Merger in exchange for its outstanding shares of ArcLight Class B ordinary shares, excluding 140,000 shares owned by the ArcLight board of directors, was subject to vesting and forfeiture (the "Sponsor Earnout Stock"). Such shares of Sponsor Earnout Stock would vest if over any 20 trading days within any 30 trading day period during the five-year earnout period, the VWAP of the Proterra common stock was greater than or equal to $15.00 per share or there occurred any transaction resulting in a change in control with a valuation of the Proterra common stock that is greater than or equal to $15.00 per share.

The Earnout Stock and Sponsor Earnout Stock met indexation and other criteria under Topic 815, Derivatives and Hedging, and are considered as equity-classified instruments.

The number of shares of Proterra common stock issued immediately following the consummation of the Merger was (in thousands):

|  | Shares |
|---|---|
| Ordinary shares Class A of ArcLight, outstanding prior to Merger | 27,750 |
| Less redemption of ArcLight shares | (15) |
| Sponsor | 6,257 |
| Sponsor Earnout Stock | 680 |
| Common stock of ArcLight | 34,672 |
| PIPE Investors | 41,500 |
| Legacy Proterra shares | 131,176 |
| Total shares of common stock immediately after Merger | 207,348 |

Immediately after the Merger, Proterra is authorized to issue 510.0 million shares, with a par value of $0.0001 per share. As of the Closing, the authorized shares consisted of 500.0 million shares of common stock and 10.0 million shares of preferred stock, and there were 207.3 million shares of common stock issued and outstanding, and no shares of preferred stock issued and outstanding. In addition, as of the Closing, there were 24.9 million warrants issued and outstanding, including 13.9 million public warrants, 7.6 million private placement warrants, and 3.5 million Legacy Proterra warrants.

As of the Closing, a total of 82.3 million shares were reserved for future issuance upon the exercise of stock options, warrants and the issuance of Earnout Stock, of which 10.4 million shares were reserved for issuance

121

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**3. Reverse Recapitalization** (cont.)

under Proterra's 2021 Equity Incentive Plan, 22.5 million shares were reserved under Legacy Proterra's 2010 Equity Incentive Plan and 1.6 million shares reserved under Proterra's 2021 Employee Stock Purchase Plan.

The Merger has been accounted for as a reverse merger and a recapitalization under U.S. GAAP with Legacy Proterra being the accounting acquirer, based on evaluation of the following facts and circumstances:

- Legacy Proterra's stockholders have a majority of the voting power of Proterra following the Merger;

- Legacy Proterra has initially designated a majority of the board of directors of Proterra;

- Legacy Proterra's management comprise the management of Proterra;

- Legacy Proterra comprises the ongoing operations of Proterra;

- Legacy Proterra is the larger entity based on historical revenues and business operations; and

- Proterra has assumed Legacy Proterra's name.

Under this method of accounting, ArcLight is treated as the "acquired" company for accounting and financial reporting purposes. Accordingly, for accounting purposes, this merger transaction is treated as the equivalent of Legacy Proterra issuing equity for the net assets of ArcLight, accompanied by a recapitalization. The net assets of ArcLight have been stated at historical cost, with no goodwill or other intangible assets recorded.

The Company received aggregate cash proceeds of $649.3 million at the Closing, net of $13.8 million of PIPE Financing fees, $18.5 million of other transaction costs paid at Closing, $9.7 million of ArcLight IPO deferred underwriting fees payable, $1.3 million of other ArcLight's accrued expenses, and $0.1 million of ArcLight's related party payable. The unbilled ArcLight expenses incurred prior to the Closing were paid from the cash proceeds received by the Company. The transaction costs including advisory, legal and other professional services directly related to the Merger were recorded in the additional paid-in capital in the balance sheet to offset against proceeds. The deferred transaction costs of approximately $2.9 million paid by the Company prior to the Closing were recorded to the additional paid-in capital and classified as financing activities in the statement of cash flow for year ended December 31, 2021.

In July 2021, the conditions for the issuance of the First Earnout Shares and the vesting of the Sponsor Earnout Stock were satisfied, resulting in an aggregate of 4,800,563 shares of common stock being issued and the 679,750 shares of Sponsor Earnout Stock fully vesting.

**4.**
**Fair Value of Financial Instruments**

The Company measures certain financial assets and liabilities at fair value. Fair value is determined based on the exit price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value is estimated by applying the following hierarchy:

*Level 1* - Quoted prices in active markets for identical assets or liabilities;

*Level 2* - Observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities; and

*Level 3* - Inputs that are generally unobservable and typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**4. Fair Value of Financial Instruments** (cont.)

Financial assets measured at fair value on a recurring basis using the above input categories were as follows (in thousands):

| | Pricing Category | Fair Value at December 31, | |
| --- | --- | --- | --- |
| | | 2022 | 2021 |
| Assets: | | | |
| Cash equivalents: | | | |
| Money market funds | Level 1 | $    14,941 | $    102,978 |
| U.S. Treasury securities | Level 1 | - | 49,996 |
| Short-term investments: | | | |
| U.S. Treasury securities | Level 1 | 224,359 | 330,053 |
| Corporate debt securities | Level 2 | - | 160,914 |
| Total | | $    239,300 | $    643,941 |

The Company's short-term investments were comprised of U.S. Treasury and corporate debt securities, and classified as available-for-sale at the time of purchase because it is intended that these investments are available for current operations. Investments are reported at fair value and are subject to periodic impairment review. Unrealized gains and losses related to changes in the fair value of these securities are recognized in accumulated other comprehensive loss. The ultimate value realized on these securities is subject to market price volatility until they are sold. Realized gains or losses from short-term investments are recorded in other expense (income), net.

As of December 31, 2022, the Company has $ 26.6 million of long-term investments recorded in other assets in the consolidated balance sheets, comprised of minority ownership of equity investments in privately held entities. The long-term investment balance includes a $25.0 million strategic equity investment made in the third quarter of 2022 in an entity that the Company expects to produce lithium iron phosphate (LFP) battery cells in the United States in the coming years which will provide the Company with development opportunities for battery packs with another cell chemistry to address additional segments of the commercial vehicle market. These investments do not have a readily determinable fair value and are accounted for under a measurement alternative at cost, less impairment, adjusted for observable price changes. No impairment charges or observable price changes were recognized in the year ended December 31, 2022. There are no unrealized gains or losses associated with these investments as of December 31, 2022.

The following is a summary of cash equivalents and marketable securities as of December 31, 2022 (in thousands):

| | Amortized Cost | Unrealized Losses | Estimated Fair Value |
| --- | --- | --- | --- |
| Cash equivalents: | | | |
| Money market funds | $    14,941 | $    - | $    14,941 |
| Short-term investments: | | | |
| U.S. Treasury securities | 224,904 | (545) | 224,359 |
| Total | $    239,845 | $    (545) | $    239,300 |

123

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**4. Fair Value of Financial Instruments** (cont.)

As of December 31, 2022, the contractual maturities of the short-term investments were less than one year.

The following is a summary of cash equivalents and marketable securities as of December 31, 2021 (in thousands):

| | Amortized Cost | Unrealized Losses | Estimated Fair Value |
|---|---|---|---|
| Cash equivalents: | | | |
| Money market funds | $ 102,978 | $ - | $ 102,978 |
| U.S. Treasury securities | 49,996 | - | 49,996 |
| Short-term investments: | | | |
| U.S. Treasury securities | 330,618 | (565) | 330,053 |
| Corporate debt securities | 160,937 | (23) | 160,914 |
| Total | $ 644,529 | $ (588) | $ 643,941 |

The unrealized losses as of December 31, 2022 and 2021 are primarily related to U.S. Treasury securities with original maturities longer than one year due to changes in interest rates and considered temporary in nature.

As of December 31, 2022, the contractual maturities of the short-term investments were less than one year.

In August 2020, the Company issued Convertible Notes. Refer to Note 6, Debt, for additional information on the Convertible Notes. The fair value of the Convertible Notes was $195.8 million as of December 31, 2022. The carrying value of the Convertible Notes of $122.7 million, net of $48.1 million unamortized debt discount and issuance costs, as of December 31, 2022, was recorded in Debt, non-current on the balance sheets.

**5.**
**Balance Sheet Components**

Cash and cash equivalents consisted of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2022 | 2021 |
| Cash | $ 58,754 | $ 17,065 |
| Cash equivalents | 14,941 | 152,974 |
| Total cash and cash equivalents | $ 73,695 | $ 170,039 |

The following table provides a reconciliation of cash, cash equivalents, and restricted cash reported within the balance sheets to the total of such amounts shown on the statements of cash flows. The restricted cash is primarily collateral for performance bonds issued to certain customers. The collateral is provided in the form of a

124

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**5. Balance Sheet Components** (cont.)

cash deposit to either support the bond directly or to collateralize a letter of credit that supports the performance bonds.

|  | December 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Cash and cash equivalents | $ 73,695 | $ 170,039 |
| Restricted cash, current portion | 12,565 | 12,105 |
| Restricted cash, net of current portion | - | 460 |
| Total restricted cash | 12,565 | 12,565 |
| Total cash and cash equivalents, and restricted cash | $ 86,260 | $ 182,604 |

Inventories consisted of the following (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Raw materials | $ 127,199 | $ 65,225 |
| Work in progress | 21,153 | 25,062 |
| Finished goods | 13,518 | 18,269 |
| Service parts | 7,697 | 6,000 |
| Total inventories | $ 169,567 | $ 114,556 |

The Company recorded a write-down of excess or obsolete inventories to cost of goods sold of $0.8 million, $1.9 million and $3.0 million in the years ended December 31, 2022, 2021 and 2020, respectively. For the year ended December 31, 2022, the Company recorded $7.7 million purchase commitment shortfall penalty to cost of goods sold associated with bus body inventory purchases.

Property, plant, and equipment, net, consisted of the following (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Computer hardware | $ 5,465 | $ 5,195 |
| Computer software | 11,012 | 9,561 |
| Internally used vehicles and charging systems | 15,177 | 16,459 |
| Leased vehicles and batteries | 5,142 | 6,863 |
| Leasehold improvements | 10,716 | 10,516 |
| Machinery and equipment | 28,942 | 28,302 |
| Office furniture and equipment | 2,523 | 1,861 |
| Tooling | 22,430 | 21,726 |
| Finance lease right-of-use assets | 179 | 179 |
| Construction in progress | 72,505 | 20,243 |
|  | 174,091 | 120,905 |
| Less: Accumulated depreciation and amortization | (66,539) | (58,659) |
| Total | $ 107,552 | $ 62,246 |

Construction in progress was comprised of various assets that are not available for their intended use as of the balance sheet date, and mainly related to the equipment and facility build out at the Powered 1 battery factory in Greer, South Carolina.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**5. Balance Sheet Components** (cont.)

Depreciation and amortization expense were $12.6 million, $15.7 million and $15.5 million for the years ended December 31, 2022, 2021 and 2020, respectively.

Accrued liabilities consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Accrued payroll and related expenses | $ 8,647 | $ 8,069 |
| Accrued sales and use tax | 1,784 | 885 |
| Warranty reserve | 8,406 | 8,116 |
| Accrued supplier liability | 7,699 | - |
| Insurance related liability | 4,445 | - |
| Other accrued expenses | 2,570 | 3,564 |
| Total | $ 33,551 | $ 20,634 |

Other long-term liabilities consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Warranty reserve | $ 17,107 | $ 15,158 |
| Finance lease liabilities, non-current | 57 | 87 |
| Total | $ 17,164 | $ 15,245 |

**6.**
**Debt**

Debt, net of debt discount and issuance costs, consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| PPP loan | $ - | $ 10,000 |
| Convertible Notes | 122,692 | 100,999 |
| Total debt | 122,692 | 110,999 |
| Less debt, current | 122,692 | - |
| Debt, non-current | $ - | $ 110,999 |

*Senior Credit Facility*

In May 2019, the Company entered into a Loan, Guaranty and Security Agreement for a senior secured asset-based lending facility (the "Senior Credit Facility") with borrowing capacity up to $75.0 million. The commitment under the Senior Credit Facility is available to the Company on a revolving basis through the earlier of May 2024 or 91 days prior to the stated maturity of any subordinated debt in aggregate amount of $7.5 million or more. The maximum availability under the Senior Credit Facility is based on certain specified percentages of eligible accounts receivable and inventory, subject to certain reserves, to be determined in accordance with the Senior Credit Facility. The commitment under the Senior Credit Facility includes a $20.0 million letter of credit sub-line as of December 31, 2022. Subject to certain conditions, the commitment may be increased by $50.0 million upon approval by the lender, and at the Company's option, the commitment can be reduced to $25.0 million or terminated upon at least 15 days written notice.

The Senior Credit Facility is secured by a security interest in substantially all of the Company's assets except for intellectual property and other restricted property.

126

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**6. Debt** (cont.)

Borrowings under the Senior Credit Facility bear interest at per annum rates equal to, at the Company's option, either (i) the base rate plus an applicable margin for base rate loan, or (ii) the London Interbank Offered Rate ("LIBOR") plus an applicable margin for LIBOR loan. The base rate is calculated as the greater of (a) the Lender prime rate, (b) the federal funds rate plus 0.5%, and (c) one-month LIBOR plus 1.0%. The applicable margin is calculated based on a pricing grid linked to quarterly average excess availability (as a percentage of borrowing capacity). For base rate loans, the applicable margin ranges from 0.0% to 1.5%, and for LIBOR Loans, it ranges from 1.5% to 3.0%. The Senior Credit Facility contains certain customary non-financial covenants. In addition, the Senior Credit Facility requires the Company to maintain a Fixed Charge Coverage Ratio of at least 1.00:1.00 during such times as a covenant trigger event shall exist.

There was no outstanding balance under the Senior Credit Facility as of December 31, 2022 and 2021. There was an aggregate of $17.6 million of letters of credit outstanding as of December 31, 2022.

*Small Business Administration Loan*

In May 2020, the Company received Small Business Administration (the "SBA") loan proceeds of $10.0 million from Town Center Bank pursuant to the Paycheck Protection Program (the "PPP loan") under the Coronavirus Aid, Relief and Economic Security (CARES) Act. The PPP loan was in the form of a note with an original maturity in May 2022, and was extended to May 2025 based on the SBA's interim final rule.

In May 2022, the SBA approved the Company's PPP loan forgiveness application, and the PPP loan of $10.0 million was forgiven in full, and the previously paid interest of approximately $0.2 million was refunded. A total of $10.2 million was recorded as gain on debt extinguishment in the Company's consolidated statements of operations.

*Convertible Notes*

In August 2020, the Company entered into a Note Purchase Agreement for Secured Convertible Promissory Notes (the "Convertible Notes"). The Convertible Notes had an aggregate principal amount of $200.0 million, with cash interest of 5.0% per annum payable at each quarter end and a paid-in-kind interest of 4.5% per annum payable by increasing the principal balance at each quarter end. The Convertible Notes will mature in August 2025, and the Company may not make prepayment unless approved by the required holders of the Convertible Notes.

Each of the Convertible Notes shall rank equally without preference or priority of any kind over one another, but senior in all rights, privileges and preferences to all other shares of the Company's capital stock and all other securities of the Company that are convertible into or exercisable for the Company's capital stock directly or indirectly.

Prior to the maturity date or prior to the payment or conversion of the entire balance of the Convertible Notes, in the event of a liquidation or sale of the Company, the Company shall pay to the holders of Convertible Notes the greater of (i) 150% of the principal balance of the Convertible Notes or (ii) the consideration that the holders would have received had the holders elected to convert the Convertible Notes into common stock immediately prior to such liquidation event.

The Convertible Notes do not entitle the holders to any voting rights or other rights as a stockholder of the Company, unless and until the Convertible Notes are actually converted into shares of the Company's capital stock in accordance with their terms.

The Note Purchase Agreement contains certain customary non-financial covenants. In addition, the Note Purchase Agreement requires the Company to maintain liquidity at quarter end ("Minimum Liquidity Covenant") of not less than the greater of (i) $75.0 million and (ii) four times of cash burn for the three-month period then ended.

127

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**6. Debt** (cont.)

In connection with the issuance of the Convertible Notes, the Company issued warrants to the holders of Convertible Notes to purchase 4.6 million shares of Company stock at an exercise price of $0.02 per share. The warrants are freestanding financial instruments and, prior to the Closing, were classified as a liability due to the possibility that they could become exercisable into Legacy Proterra convertible preferred stock. Upon the consummation of the Merger, the stock issuable upon exercise of the warrants is Proterra common stock, with no possibility to convert to Legacy Proterra convertible preferred stock. As a result, the carrying amount of the warrant liability was reclassified to stockholders' equity. The warrant liability of $29.0 million was initially measured at fair value on its issuance date and recorded as a debt discount and amortized during the term of the Convertible Notes to interest expense using the effective-interest method. The warrant liability was remeasured on a recurring basis at each reporting period date, with the change in fair value reported in the statement of operations. Upon any exercise of the warrants to common stock, the carrying amount of the warrant liability is reclassified to stockholders' equity.

Prior to the Closing, the embedded features of the Convertible Notes were composed of conversion options that had the economic characteristics of a contingent early redemption feature settled in a variable number of shares of Company stock. These conversion options were bifurcated and accounted for separately from the host debt instrument. The derivative liability of $68.5 million was initially measured at fair value on the issuance date of the Convertible Notes and recorded as a debt discount and was amortized during the term of the Convertible Notes to interest expense using the effective-interest method. The derivative liability was remeasured on a recurring basis at each reporting period date, with the change in fair value reported in the statement of operations. Upon consummation of the Merger, the embedded conversion features associated with the Convertible Notes no longer qualify for derivative accounting since the conversion price became fixed. The carrying amount of the embedded derivative, the fair value as of the Closing Date, was reclassified to stockholders' equity in accordance with Topic 815, Derivatives and Hedging. A summary of the changes of the derivative liability is as follows (in thousands):

|  | Derivative liability |
| --- | --- |
| Fair value as of December 31, 2020 | $ 70,870 |
| Change in fair value | 111,684 |
| Reclassification of liability upon the reverse recapitalization | (182,554) |
| Fair value as of December 31, 2021 | $ - |

Issuance costs of $5.1 million were also recorded as debt discount and are amortized during the term of the Convertible Notes to interest expense using the effective interest method.

On June 14, 2021, certain Convertible Note holders with an original aggregate principal amount of $46.5 million elected to convert their Convertible Notes at the Closing. An aggregate of $48.8 million principal and interest was reclassified to additional paid-in capital, and $21.0 million of remaining related debt issuance costs were expensed to interest expense.

The outstanding Convertible Notes including accrued interest will be automatically converted to common stock at $6.5712 per share pursuant to the mandatory conversion provisions, if and when the volume-weighted average price (VWAP) of the common stock exceeds $9.86 over 20 consecutive days subsequent to January 13, 2022.

The amortization expense of debt discount and issuance costs was $14.2 million, $34.7 million and $5.6 million for the years ended December 31, 2022, 2021 and 2020, respectively.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**6. Debt** (cont.)

The Convertible Notes, net of debt discount and issuance costs, consisted of the following (in thousands):

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Principal | $ 153,500 | $ 153,500 |
| PIK interest | 17,301 | 9,826 |
| Total principal | 170,801 | 163,326 |
| Less debt discount and issuance costs | (48,109) | (62,327) |
| Total Convertible Notes | $ 122,692 | $ 100,999 |

The Company was not in compliance with the the Minimum Liquidity Covenant of the Convertible Notes as of December 31, 2022. The Company received a waiver of the Liquidity (as defined therein) requirement in February 2023 which provides for retroactive effect, so that no such event of default occurred in the year ended December 31, 2022. Refer to Note 15, Subsequent Events for details.

However, the Company has not obtained a waiver of the Minimum Liquidity Covenant for any future periods, and as a result of anticipated operating cash outflows from operation, capital investment at the Powered 1 battery factory, and incremental cash payments for the Workforce Restructuring (discussed in Note 15, Subsequent Events), the Company may not meet the Minimum Liquidity Covenant as of March 31, 2023.

In addition, the audit report included elsewhere in this Annual Report on Form 10-K contains a going concern qualification. Our inability to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern is an event of default under the Convertible Notes and the Senior Credit Facility. If we are unable to obtain a waiver for the current event of default and/or for the Liquidity requirement for the quarter ended March 31, 2023, there would be an unwaived event of default under the Convertible Notes and under the Senior Credit Facility, which would permit (i) the holders of the Convertible Notes to cause all of the outstanding indebtedness under the Convertible Notes to become immediately due and payable and (ii) the Lenders under the Senior Credit Facility to terminate all commitments to extend credit under the Senior Credit Facility and cause all of the outstanding indebtedness under the Senior Credit Facility to become immediately due and payable. If the Convertible Notes were to become immediately due and payable in the event of such a default this would have an immediate adverse effect on our ability to meet our working capital needs and our business and operating results. There is no assurance that we will be able to obtain any future waivers under the Convertible Notes or the Senior Credit Facility. We would need to take further action to raise additional funds in the capital markets or otherwise to fund our obligations under the Convertible Notes in addition to our other obligations over the period, and we would not be able to draw upon the Senior Credit Facility.

Due to the uncertainty of obtaining waivers of the Liquidity requirement for future periods and our inability to deliver audited financial statements certified by our independent registered public accounting firm without qualification (or similar notation) as to going concern, even though the Convertible Notes have a maturity date in August 2025, they are classified as a current liability on the Company's balance sheets as of December 31, 2022.

**7. Leases**

*As a Lessor*

The net investment in leases were as follows:

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Net investment in leases, current | $ 985 | $ 411 |
| Net investment in leases, non-current | 9,304 | 5,179 |
| Total net investment in leases | $ 10,289 | $ 5,590 |

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**7. Leases** (cont.)

Interest income from accretion of net investment in lease is not material in the years ended December 31, 2022, 2021 and 2020.

Future minimum payments receivable from operating and sales-type leases as of December 31, 2022 for each of the next five years were as follows:

|  | Operating leases | Sales-type leases |
|---|---|---|
| 2023 | $ 384 | $ 749 |
| 2024 | - | 1,010 |
| 2025 | - | 1,528 |
| 2026 | - | 1,528 |
| 2027 | - | 1,528 |
| Thereafter | - | 4,013 |
| Total minimum lease payments | $ 384 | $ 10,356 |

*As a Lessee*

The Company leases its headquarters in Burlingame, California, and manufacturing related facilities in Burlingame and City of Industry, California, Greenville and Greer, South Carolina, and Rochester Hills, Michigan under operating lease agreements with various expiration dates from 2023 through 2033.

The Company had no material capital leases as of December 31, 2022.

Maturities of operating lease liabilities as of December 31, 2022 were as follows (in thousands):

|  |  |
|---|---|
| 2023 | $ 8,203 |
| 2024 | 4,224 |
| 2025 | 3,487 |
| 2026 | 2,615 |
| 2027 | 2,238 |
| Thereafter | 9,858 |
| Total undiscounted lease payment | 30,625 |
| Less: imputed interest | (5,651) |
| Total lease liabilities | $ 24,974 |

Operating lease expense was $7.3 million, $4.2 million, and $4.0 million for the years ended December 31, 2022, 2021 and 2020, respectively.

Short-term and variable lease expenses for the years ended December 31, 2022, 2021 and 2020 were not material.

130

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**7. Leases** (cont.)

Supplemental cash flow information related to leases were as follows (in thousands):

| | Year Ended December 31 | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Cash paid for amounts included in the measurement of lease liabilities: | | | |
| Operating cash flows from operating leases | $ (7,053) | $ (4,209) | $ (3,855) |
| Lease liabilities arising from obtaining right-of-use assets: | | | |
| Operating lease | $ 5,534 | $ 17,573 | $ 7 |

Operating lease right-of-use assets and liabilities consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| **Operating leases** | | |
| Operating lease right-of-use assets | $ 20,274 | $ 24,282 |
| Operating lease liabilities, current | $ 6,876 | $ 4,084 |
| Operating lease liabilities, non-current | 18,098 | 20,963 |
| Total operating lease liabilities | $ 24,974 | $ 25,047 |

The weighted average remaining lease term and discount rate of operating leases were 6.4 years and 6.2%, respectively, as of December 31, 2022. The weighted average remaining lease term and discount rate of operating leases were 7.6 years and 5.8%, respectively, as of December 31, 2021.

As of December 31, 2022, the Company had no significant finance leases and no significant additional leases that have not yet commenced.

**8.**
**Commitments and Contingencies**

*Purchase Commitments*

As of December 31, 2022, the Company had outstanding inventory and other purchase commitments of $ 2.2 billion. Most of the commitments relate to the expected purchase of cylindrical cells manufactured at a yet to be built LG Energy Solution battery cell plant in the United States, pursuant to a long-term supply agreement through 2028. The terms of the agreement require the Company to make certain prepayments that vary in size and that are made as milestones are met on the construction of the US facility. As of December 31, 2022, the Company has made a $10.0 million prepayment, which was recorded as the long-term inventory prepayment on the consolidated balance sheets. The Company expects the next prepayment to be made within the next six to twelve months. The prepayments will be recouped by the Company by offsetting a predetermined amount per unit on cells purchased from LG Energy Solution.

*Letters of Credit*

As of December 31, 2022, the Company had letters of credit outstanding totaling $ 17.8 million, which will expire over various dates in 2023.

*Legal Proceedings*

The Company accrues contingent liabilities when it is probable that future expenditures will be made and such expenditures can be reasonably estimated. From time to time in the normal course of business, various claims and litigation have been asserted or commenced. Due to uncertainties inherent in litigation and other claims, the Company can give no assurance that it will prevail in any such matters, which could subject the Company to

Table of Contents

**PROTERRA INC**
**NOTES TO FINANCIAL STATEMENTS**

**8. Commitments and Contingencies** (cont.)

significant liability or damages. Any claims or litigation could have an adverse effect on the Company's business, financial position, operating results, or cash flows in or following the period that claims or litigation are resolved.

As of December 31, 2022, the Company was not a party to any legal proceedings that would have a material adverse effect on its business.

**9.**
**Stockholders' Equity**

On June 14, 2021, the Merger was consummated and, following the Closing, the Company is authorized to issue 510,000,000 shares of capital stock, with a par value of $0.0001 per share. The authorized shares consisted of 500,000,000 shares of common stock and 10,000,000 shares of preferred stock. As of December 31, 2022, 226,265,161 shares of common stock were issued and outstanding, and no shares of preferred stock were issued and outstanding. The holders of each share of common stock are entitled to one vote per share.

As of December 31, 2022, the Company had reserved shares of common stock for issuance as follows (in thousands):

| | |
|---|---|
| 2010 Equity Incentive Plan | 16,643 |
| 2021 Equity Incentive Plan | 20,476 |
| 2021 Employee Stock Purchase Plan | 3,200 |
| Warrants | 1 |
| Earnout Stock | 18,009 |
| Convertible notes | 26,316 |
| Total | 84,645 |

**10.**
**Warrants**

*Public Warrants and Private Placement Warrants*

The public warrants and private placement warrants were issued in connection with ArcLight's initial public offering. Public warrants were only exercisable for a whole number of shares of common stock at a price of $11.50 per share, subject to adjustment, at any time commencing on September 25, 2021. The warrants were to expire June 14, 2026 or earlier upon redemption or liquidation. The private placement warrants had terms and provisions that were identical to those of the public warrants, but were not transferable, assignable or salable until July 14, 2021, except pursuant to limited exceptions.

The public warrants and private placement warrants were classified as liabilities as they did not meet the requirements for equity classification under Topic 815, Derivatives and Hedging. Immediately prior to the Closing, the warrant liability was $84.6 million for the public warrants and $57.6 million for the private placement warrants. Such warrants were measured at fair value, subject to remeasurement at each balance sheet date.

On September 27, 2021, the Company announced that it would be redeeming all of its outstanding public warrants and private placement warrants (collectively, the "Warrants") based on the terms in the Amended and Restated Warrant Agreement dated June 14, 2021. On October 29, 2021 (the "Redemption Date"), any Warrants that remained unexercised became void and no longer exercisable, and the holders of those Warrants were entitled to receive only the redemption price of $0.10 per Warrant. In connection with the redemption, holders of Warrants had the option to either exercise the Warrants in cash or on a "cashless" basis to receive 0.255 shares of common stock per warrant.

In October 2021, 10,599 public warrants were exercised for cash resulting in the issuance of 10,599 shares of common stock for an aggregate exercise price of $121,889, 13,436,250 public warrants and 7,550,000 private placement warrants were exercised on a cashless basis resulting in the issuance of 5,351,231 shares of common stock, and 428,145 public warrants were redeemed for cash for an aggregate redemption price of $42,815. In

132

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**10. Warrants** (cont.)

connection with the warrant exercise and redemption, $53.4 million of the carrying amount of the warrant liability was reclassified to stockholder's equity.

*Other Warrants*

As of December 31, 2022, the Company had 892 common stock warrants outstanding exchanged from Legacy Proterra warrants.

Activity of warrants in the year ended December 31, 2021 is as follows:

|  | Public warrants | Private placement warrants | Other warrants | Total warrants |
|---|---|---|---|---|
| Outstanding as of December 31, 2020 [(1)] | - | - | 5,104,030 | 5,104,030 |
| Issued as part of the Merger | 13,874,994 | 7,550,000 | - | 21,424,994 |
| Exercised [(2)] | (13,446,849) | (7,550,000) | (5,103,138) | (26,099,987) |
| Redeemed | (428,145) | - | - | (428,145) |
| Outstanding as of December 31, 2021 | - | - | 892 | 892 |

(1)   Including 4,562,533 warrants issued to the holders of Convertible Notes as described in Note 6.
(2)   An aggregate of 10,348,690 shares of common stock were issued from warrant exercise.

A summary of the changes of the warrant liabilities in the year ended December 31, 2021 is as follows (in thousands):

|  | Legacy Proterra warrant liability | Private placement warrant liability | Public warrant liability |
|---|---|---|---|
| Fair value as of December 31, 2020 | $ 39,670 | $ - | $ - |
| Warrant liability acquired as part of the reverse recapitalization | - | 57,610 | 84,640 |
| Change in fair value | 47,346 | (38,589) | (50,264) |
| Reclassification of liability upon the reverse recapitalization | (69,320) | - | - |
| Reclassification of liability upon exercise of warrants | (17,696) | (19,021) | (34,376) |
| Fair value as of December 31, 2021 | $ - | $ - | $ - |

The change in fair value of warrant liabilities was recorded in the statement of operations.

**11.**
**Equity Plans and Stock-based Compensation**

*2010 Equity Incentive Plan*

In 2010, Legacy Proterra adopted the 2010 Equity Incentive Plan (the "2010 Plan"), which provided for the grant of stock options, stock appreciation rights, restricted stock, and restricted stock units. Upon Closing, the then outstanding options under the 2010 Plan were converted into options exercisable to purchase an aggregate of 22,532,619 shares of common stock. Following the Closing, such options continue to be subject to the terms of the 2010 Plan and applicable award agreements; however, no further awards can be granted under the 2010 Plan. As of December 31, 2022, options to purchase 16,642,864 shares of common stock remained outstanding under the 2010 Plan.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**11. Equity Plans and Stock-based Compensation** (cont.)

*2021 Equity Incentive Plan*

The 2021 Plan was adopted by the ArcLight Board prior to the Closing, approved by ArcLight's shareholders on June 11, 2021, and became effective upon the Closing Date. The Equity Incentive Plan allows the Company to grant awards of stock options, restricted stock awards, stock appreciation rights ("SARs"), restricted stock units ("RSUs"), performance awards, and stock bonus awards to officers, employees, directors and consultants.

The Company initially reserved 10,000,000 shares of common stock, plus 387,531 reserved shares not issued under the 2010 Plan on the effective date of the 2021 Plan. The number of shares reserved for issuance under the 2021 Plan increases automatically on January 1 of each of 2022 through 2031 by the number of shares equal to the lesser of 4% of the total number of outstanding shares of all classes of common stock as of the immediately preceding December 31, or a number as may be determined by the Board. In the first quarter of 2022, the shares of common stock reserved for issuance were increased by 8,878,388, pursuant to the 2021 Plan.

The exercise price of stock options granted must be at least equal to the fair market value of common stock on the date of grant. Incentive stock options granted to an individual who holds, directly or by attribution, more than ten percent of the total combined voting power of all classes of capital stock must have an exercise price of at least 110% of the fair market value of common stock on the date of grant. Subject to certain adjustments, no more than 30,000,000 shares may be issued pursuant to the exercise of incentive stock options granted under the 2021 Plan.

The maximum term of options granted is ten years from the date of grant, except that the maximum permitted term of incentive stock options granted to an individual who holds, directly or by attribution, more than ten percent of the total combined voting power of all classes of capital stock is five years from the date of grant.

Stock option and RSU awards generally vest annually over a four-year period.

*2021 Employee Stock Purchase Plan*

Proterra's 2021 Employee Stock Purchase Plan (the "ESPP"), including the authorization of the initial share reserve thereunder, was adopted by the ArcLight Board prior to the Closing, approved by ArcLight's shareholders on June 11, 2021, and became effective upon the Closing Date.

An aggregate of 1,630,000 shares of common stock were reserved and available for sale under the ESPP. The aggregate number of shares reserved for sale under the ESPP increases automatically on January 1 of each of 2022 through 2031 by a number of shares equal to the lesser of 1% of the total number of outstanding shares of common stock as of the immediately preceding December 31 or a number of shares as may be determined by the Board or the compensation committee. The aggregate number of shares issued over the term of the ESPP, subject to certain adjustments, may not exceed 16,300,000 shares. In the first quarter of 2022, the shares of common stock reserved for issuance were increased by 2,219,597, pursuant to the ESPP.

The ESPP allows eligible employees to purchase shares of common stock at a discount through payroll deductions of up to 15% of their eligible compensation, at not less than 85% of the fair market value, as defined in the ESPP, subject to any plan limitations. A participant may purchase a maximum of 2,500 shares during each 6-month offering period and $25,000 in any one calendar year. The offering periods generally start on the first trading day on or after November 15th and May 15th of each year. The first offering period started in the fourth quarter of 2021. The Company calculated the fair value of the employees' purchase rights relating to the ESPP using the Black-Scholes model and recorded approximately $1.3 million and $0.2 million of stock-based compensation expense for the year ended December 31, 2022 and 2021, respectively. In the year ended December 31, 2022, 649,492 shares of common stock was purchased under the ESPP.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**11. Equity Plans and Stock-based Compensation** (cont.)

A summary of the Company's stock option activity and related information was as follows:

| | Options Outstanding | | | |
| --- | --- | --- | --- | --- |
| | Number of Stock Options Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (Years) | Aggregate Intrinsic Value (in thousands) |
| Balance as of December 31, 2019 | 18,208,313 | $ 3.42 | 7.6 | $ 34,723 |
| Granted | 5,829,698 | 4.89 | | |
| Exercised | (1,750,822) | 2.40 | | |
| Cancelled/forfeited/expired | (2,108,405) | 4.61 | | |
| Balance as of December 31, 2020 | 20,178,784 | $ 3.81 | 7.4 | $ 65,056 |
| Granted | 726,309 | 10.42 | | |
| Exercised | (1,966,532) | 3.36 | | |
| Cancelled/forfeited/expired | (836,977) | 4.65 | | |
| Balance as of December 31, 2021 [1] | 18,101,584 | $ 4.08 | 5.5 | $ 87,425 |
| Granted | 758,528 | 7.70 | | |
| Exercised | (3,213,024) | 3.02 | | |
| Cancelled/forfeited/expired | (1,390,391) | 6.04 | | |
| Balance as of December 31, 2022 [1] | 14,256,697 | $ 4.32 | 5.5 | $ 9,469 |
| Exercisable as of December 31, 2022 [2] | 11,822,253 | 3.87 | 4.9 | $ 9,469 |

[1] Excluding Equity Awards of 2,677,500 shares and Milestone Options of 669,375 shares. See below for further details.
[2] Excluding 1,840,784 shares exercisable under the Equity Awards with weighted average exercise price of $19.61 per share as of December 31, 2022.

In March 2020, in conjunction with Mr. Allen's appointment as the then President and Chief Executive Officer, the board of directors of Legacy Proterra approved a grant to Mr. Allen of stock option awards with respect to 4,685,624 shares, comprised of (1) 1,338,749 shares of a time-based award with an exercise price of $5.33 per share vesting quarterly over four years, (2) 2,677,500 shares of a time-based award consisting of four tranches with an exercise price of $11.21, $16.81, $22.41 and $28.02 per share, respectively, and vesting quarterly over four years ("Equity Awards"), and (3) 669,375 shares of milestone-based award with an exercise price of $5.33 per share vesting entirely and becoming exercisable on the first trading day following the expiration of the lockup period of the Company's initial public offering or the consummation of a change in control of the Company or upon the consummation of a merger involving a Special Purpose Acquisition Company ("Milestone Options").

The stock-based compensation expense for Milestone Options was recognized at the time the performance milestone became probable of achievement, which was at the time of Closing. Upon Closing, the 669,375 shares underlying the Milestone Options fully vested, and $2.1 million stock-based compensation expense was recognized in June 2021.

Aggregate intrinsic value represents the difference between the estimated fair value of the underlying common stock and the exercise price of outstanding, in-the-money stock options. The total intrinsic value of stock options exercised was $10.9 million, $12.1 million and $4.3 million for the year ended December 31, 2022, 2021 and 2020, respectively. The total estimated grant date fair value of stock options vested was $9.3 million, $13.8 million and $9.9 million for the year ended December 31, 2022, 2021 and 2020, respectively. As of December 31, 2022, the total unrecognized stock-based compensation expense related to outstanding stock options was $12.9 million, which is expected to be recognized over a weighted-average period of 1.8 years.

135

Table of Contents

**PROTERRA INC
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**11. Equity Plans and Stock-based Compensation** (cont.)

*Determining Fair Value of Stock Options*

The Company uses the Black-Scholes option pricing model to determine the fair value of stock options. The fair value of each stock option grant is estimated on the date of the grant. The fair value of the Legacy Proterra common stock underlying the stock options has historically been determined by the board of directors, as there was no public market for the Company's common stock prior to Merger Closing. Therefore, the board of directors has determined the fair value of the common stock at the time of the stock option grant by considering a number of objective and subjective factors including independent third-party valuation reports, valuations of comparable companies, sales of convertible preferred stock and common stock to unrelated third parties, operating and financial performance, lack of liquidity of capital stock and general and industry-specific economic outlook, among other factors.

The fair value of stock options granted is estimated on the date of grant using the following assumptions:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2022** | **2021** | **2020** |
| Expected term (in years) | 6.3 | 6.2 | 6.1 |
| Risk-free interest rate | 2.0 % | 1.0 % | 0.5 % |
| Expected volatility | 55.1 % | 54.8 % | 69.1 % |
| Expected dividend rate | - | - | - |

*Expected Term* - The Company estimates the expected term consistent with the simplified method. The Company elected to use the simplified method because of its limited history of stock option exercise activity. The simplified method calculates the expected term as the average of the vesting and contractual terms of the award.

*Volatility* - Since the Company has limited trading history by which to determine the volatility of its own common stock price, the expected volatility being used is primarily derived from the historical stock volatility of a representative industry peer group of comparable publicly listed companies over a period approximately equal to the expected term of the stock options.

*Risk-Free Interest Rate* - The risk-free interest rate is based on U.S. Treasury zero coupon issues with remaining terms similar to the expected term on the options.

*Expected Dividend* - The Company has never declared or paid any cash dividends and does not plan to pay cash dividends in the foreseeable future, and, therefore, used an expected dividend yield of zero in the valuation model.

*Forfeiture* - All stock-based payment awards are amortized on a straight-line basis over the requisite service periods of the awards, which are generally the vesting periods. The Company accounts for forfeitures when they occur.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**11. Equity Plans and Stock-based Compensation** (cont.)

*Restricted Stock Units*

A summary of the Company's RSU activity and related information is as follows:

| | Number of RSUs | Weighted Average Grant Date Fair Value |
|---|---|---|
| Balance as of December 31, 2020 | - | $ - |
| Granted | 1,480,201 | 10.72 |
| Vested | (58,731) | 11.41 |
| Forfeited | (96,510) | 10.98 |
| Balance as of December 31, 2021 | 1,324,960 | 10.67 |
| Granted | 5,541,916 | 6.60 |
| Vested | (442,934) | 9.84 |
| Forfeited | (690,715) | 8.39 |
| Balance as of December 31, 2022 | 5,733,227 | $ 7.07 |

The Company started to grant RSUs to employees in the third quarter of 2021. The compensation expense related to the service-based awards is determined using the fair market value of the Company's common stock on the date of the grant. As of December 31, 2022, the total unrecognized stock-based compensation expense related to outstanding RSUs was $33.7 million, which is expected to be recognized over a weighted-average period of 3.0 years.

*Stock-based Compensation Expense*

Stock-based compensation expense included in operating results was as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2022 | 2021 | 2020 |
| Cost of goods sold | $ 1,749 | $ 1,385 | $ 929 |
| Research and development | 5,302 | 2,507 | 1,616 |
| Selling, general and administrative | 14,789 | 12,169 | 7,737 |
| Total stock-based compensation expense | $ 21,840 | $ 16,061 | $ 10,282 |

**12.**
**Net Loss Per Share**

Basic net loss per share is computed by dividing the net loss by the weighted-average number of shares of common stock outstanding during the period, less the weighted-average unvested common stock subject to repurchase or forfeiture as they are not deemed to be issued for accounting purposes. Diluted net loss per share is computed by giving effect to all potential shares of common stock, including stock options, RSU, and warrants, to the extent they are dilutive.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**12. Net Loss Per Share** (cont.)

The computation of basic and diluted net loss per share of common stock attributable to common stockholders was as follows (in thousands, except for per share data):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Numerator: | | | |
| Net loss | $ (237,950) | $ (250,006) | $ (127,007) |
| Effect of dilutive securities: | | | |
| Interest expense to be recognized upon conversion of Convertible Notes [1] | (32,330) | - | - |
| Numerator for diluted EPS - Net loss after the effect of dilutive securities | (270,280) | (250,006) | (127,007) |
| Denominator: | | | |
| Weighted-average shares used in computing net loss per share of common stock, basic | 224,301 | 120,886 | 4,385 |
| Convertible Notes [1] | 24,855 | - | - |
| Diluted weighted average shares | 249,156 | 120,886 | 4,385 |
| Net loss per share of common stock: | | | |
| Basic | $ (1.06) | $ (2.07) | $ (28.96) |
| Diluted | $ (1.08) | $ (2.07) | $ (28.96) |

_____

[1] Adjustment is under the "if-converted" method. Adjustment for the year ended December 31, 2022 includes write-off of $62.3 million unamortized debt discount of the Convertible Notes as of December 31, 2021, offset by the $30.0 million interest expense recorded in net loss for the year ended December 31, 2022.

The outstanding Convertible Notes including accrued interest will be automatically converted to common stock at $ 6.5712 per share pursuant to the mandatory conversion provisions, if and when the VWAP exceeds $9.86 over 20 consecutive days subsequent to January 13, 2022.

Since the Company was in a loss position after the effect of diluted securities, no adjustment is required to the weighted-average shares used in computing the diluted net loss per share as the inclusion of the remaining potential common stock shares outstanding would have been anti-dilutive. The potentially dilutive securities were as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2022 | 2021 | 2020 |
| Convertible preferred stock[1] | - | - | 115,576 |
| Warrants to purchase convertible preferred stock | - | - | 508 |
| Stock options and RSUs to purchase common stock | 23,337 | 22,773 | 23,526 |
| Warrants to purchase common stock | 1 | 1 | 4,596 |
| | 23,338 | 22,774 | 144,206 |

_____

[1] Represents the shares of common stock that the convertible preferred stock is convertible into.

138

**PROTERRA INC.**
**NOTES TO FINANCIAL STATEMENTS**

**13.**
**Income Tax**

The components of the net loss before the provision for income taxes were as follows (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| Domestic | (237,950) | (249,990) | (126,985) |

The provision for income taxes consisted of the following (in thousands):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| Current: | | | |
| Federal | $ - | $ - | $ - |
| State | - | 16 | 13 |
| Foreign | - | - | 9 |
| Total current provision | - | 16 | 22 |
| Deferred: | | | |
| Federal | - | - | - |
| State | - | - | - |
| Foreign | - | - | - |
| Total deferred provision | - | - | - |
| Total provision for income taxes | $ - | $ 16 | $ 22 |

A reconciliation of the U.S. federal statutory income tax rates to the Company's effective tax rate is as follows (in percentages):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| U.S. federal statutory rate | 21.0 % | 21.0 % | 21.0 % |
| State income taxes, net of federal benefit | 2.6 | 3.9 | 1.7 |
| Change in valuation allowance | (23.2) | (17.9) | (17.5) |
| Research and development credit | 1.2 | 0.5 | 0.2 |
| Fair market value adjustment [1] | - | (5.9) | (2.1) |
| Non-deductible Convertible Notes interest expense | (1.4) | (1.5) | (2.2) |
| Other | (0.2) | (0.1) | (1.1) |
| Effective income tax rate | - % | - % | - % |

_____
(1)  The adjustments related to the loss on valuation of derivative and warrant liabilities.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**13. Income Tax** (cont.)

The Company's deferred tax assets (liabilities) are as follows (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Deferred tax assets: | | |
| Net operating loss carryforwards | $ 182,302 | $ 150,857 |
| Deferred revenue | 16,593 | 9,419 |
| Stock-based compensation | 5,276 | 4,679 |
| Accruals and reserves, not currently deductible for tax purposes | 11,355 | 10,665 |
| Research and development credit | 7,941 | 4,562 |
| Goodwill and capitalized R&D expenses | 12,936 | 888 |
| Interest expense | 1,405 | 1,808 |
| Lease liability | 6,172 | 6,511 |
| Other | 45 | 381 |
| Gross deferred tax assets | 244,025 | 189,770 |
| Less valuation allowance | (237,399) | (182,113) |
| Net deferred tax assets | $ 6,626 | $ 7,657 |
| Deferred tax liabilities: | | |
| Property, plant and equipment | (1,612) | (1,344) |
| ROU assets | (5,014) | (6,313) |
| Other | - | - |
| Gross deferred tax liabilities | (6,626) | (7,657) |
| Net deferred tax asset (liabilities) | $ - | $ - |

The net valuation allowance increased by $
55.3 million and $44.7 million for December 31, 2022 and 2021, respectively.

As of December 31, 2022 and 2021, the Company's net deferred tax assets and liabilities were zero. The deferred tax assets consist primarily of the federal and state net operating losses. Realization of deferred tax assets is dependent upon future taxable income, if any, the amount and timing of which are uncertain. In assessing the realizability of deferred tax assets, management determined that it is more likely than not that no deferred tax assets will be realized. Therefore, the Company has provided a full valuation allowance against these deferred tax assets.

The Company had net operating loss carryforwards as follows (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Federal (Prior to 2018) | $ 237,850 | $ 237,850 |
| Federal (Post December 31, 2017) | 491,620 | 361,815 |
| State | 531,138 | 437,868 |
| Total | $ 1,260,608 | $ 1,037,533 |

Net operating loss carryforwards are available to offset future federal and state taxable income. The federal net operating loss carryforwards generated prior to 2018 will begin to expire in 2030 and the net operating loss carryforwards generated after December 31, 2017 do not expire. The state net operating loss carryforwards will begin to expire in 2023.

Table of Contents

**PROTERRA INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**13. Income Tax** (cont.)

The Company had research and development credit carryforwards as follows (in thousands):

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2022 | | 2021 | |
| Federal | $ | 7,167 | $ | 3,454 |
| State |  | 4,257 |  | 2,471 |
| Total | $ | 11,424 | $ | 5,925 |

The research and development credit carryforwards are available to reduce future regular income taxes. The federal research and development credit carryforwards will begin to expire in 2037, while the South Carolina research and development credit carryforwards will begin to expire in 2027. California research and development credit carryforwards have no expiration date.

Utilization of the Company's net operating loss carryforwards and research tax credit carryforwards may be subject to substantial annual limitations due to the ownership change limitations provided by the Internal Revenue Code and similar state provisions. The annual limitation could result in the expiration of the net operating loss carryforwards and research tax credit carryforwards before utilization.

The Company's policy is to recognize interest or penalties related to income tax matters in income tax expense. As of December 31, 2022 and 2021, the Company had no accrued interest or penalties. The unrecognized tax benefits may change during the next year for items that arise in the ordinary course of business. In the event that any unrecognized tax benefits are recognized, the effective tax rate will not be affected.

A reconciliation of the beginning and ending amount of unrecognized tax benefits for 2022, 2021 and 2020 was as follows (in thousands):

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2022 | | 2021 | | 2020 | |
| Beginning balance | $ | 1,481 | $ | 813 | $ | 707 |
| Increase - tax positions in current period |  | 1,375 |  | 668 |  | 106 |
| Ending balance | $ | 2,856 | $ | 1,481 | $ | 813 |

The Company files tax returns in the United States and certain states. Due to the losses being carried forward, the tax years from 2010 forward remain open to examination.

**14.**
**401(k) Plan**

The Company sponsors a 401(k) defined contribution plan covering all eligible employees and provides matching contribution for the first
4% of their salaries. The matching costs incurred were $3.3 million, $2.4 million, and $1.9 million for the years ended December 31, 2022, 2021 and 2020, respectively.

**15.**
**Subsequent Events**

In January 2023, the letter of credit sub-line under the Senior Credit Facility was increased by $5.0 million to $25.0 million.

In January 2023, the Board of Directors approved a plan designed to improve operational efficiency that includes a planned reduction of the current workforce by approximately 25%, or the elimination of approximately 300 jobs (the "Workforce Restructuring") and the closure of the Company's City of Industry facility by December 31, 2023 (the "Facility Closure"). The severance payment resulted from the Workforce Restructuring is estimated between $3.0 million and $5.0 million, and will be largely recorded in the first quarter of 2023.

Table of Contents

**PROTERRA INC.**
**NOTES TO FINANCIAL STATEMENTS**

**14. Subsequent Events** (cont.)

The City of Industry facility currently manufactures transit buses and the current generation battery systems. The Company will move manufacturing from the City of Industry facility to its existing facilities in South Carolina. Transit bus production in the City of Industry is expected to end in the first quarter of 2023, and battery production at the end of the third quarter of 2023. The Company plans to vacate the facility by the end of 2023 when the lease expires. The Company currently expects to use equipment from the City of Industry facility in other locations and does not expect impairment charges relating to the Facility Closure.

In February 2023, the Company entered into a Waiver (the "Waiver") with CSI Prodigy Holdco LP, CSI Prodigy Co-Investment LP, CS GP I LLC and CSI PRTA Co-Investment LP (collectively, the "Cowen Parties") to that certain previously disclosed Note Purchase Agreement, dated as of August 4, 2020 (as amended), by and among Proterra Operating Company, Inc., as issuer (the "Issuer"), the Investors (as defined therein) from time to time party thereto, the Guarantors (as defined therein) from time to time party thereto and CSI GP I LLC, as collateral agent (the "Purchase Agreement"), and the senior secured convertible promissory notes issued with respect thereto (the "Notes"). Pursuant to Section 7.1(k) of the Purchase Agreement, the Company is required to maintain Liquidity (as defined therein) as of the last day of each quarter of not less than the greater of (a) $75.0 million dollars and (b) an amount equal to the product of multiplying (i) the amount of Cash Burn (as defined therein) from operations for the three-month period ending on the end of such month by (ii) four ("Minimum Liquidity Covenant"), and pursuant to Section 7.1(a) of the Purchase Agreement, the Company is required to provide Investors (as defined therein) certain financial and other information with respect to each completed fiscal period ("Reporting Covenant"). Pursuant to the Waiver, the Required Holders (as defined therein) have agreed to a limited waiver of (i) the Minimum Liquidity Covenant and the related obligations under Section 7.1(k) of the Purchase Agreement for the quarter ending December 31, 2022, and the related obligations under the Notes, requiring Liquidity of at least four times the Cash Burn defined in the Purchase Agreement and of the Reporting Covenant pursuant to Section 7.1(a) for specified fiscal period, and (ii) the Reporting Covenant under Section 7.1(a) of the Purchase Agreement and the related obligations under the Notes with respect to the fiscal periods ending March 31, 2021 through and including December 31, 2022. The Waiver provides for retroactive effect, such that, no default or event of default shall have occurred due to the Company's or any Guarantor's failure to observe or perform any covenant under the foregoing sections of the Purchase Agreement for the foregoing periods

On March 14, 2023, the Company obtained a limited advance waiver from the holders of the Convertible Notes with respect to the Going Concern Covenant until March 31, 2023.

142

Table of Contents

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosures**

Not applicable.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision of and with the participation of our principal executive officer and principal financial officer, management has evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934, as amended (the "Exchange Act") as of December 31, 2022. Disclosure controls and procedures are designed to ensure that information required to be disclosed by us in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure. Based on this evaluation, our principal executive officer and principal financial officer have concluded that our disclosure controls and procedures were not effective as of December 31, 2022, because of the material weaknesses in internal control over financial reporting described below in Management's Annual Report on Internal Control Over Financial Reporting.

Our management, including our chief executive officer and chief financial officer, does not expect that our disclosure controls and procedures or our internal control over financial reporting will be able to prevent all errors and detect all fraud due to inherent limitations of internal controls. Because of such limitations, there is a risk that material misstatements will not be prevented or detected on a timely basis by internal control over financial reporting. These inherent limitations are known features of the financial reporting process. Therefore, it is possible to design into the financial reporting process safeguards to reduce, though not eliminate, the risk of errors or fraud.

Notwithstanding the material weaknesses in internal control over financial reporting identified in Management's Annual Report on Internal Control Over Financial Reporting, our management has concluded that the consolidated financial statements included in this Annual Report on Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for each of the periods presented in conformity with U.S. generally accepted accounting principles ("US GAAP").

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act). Our internal control over financial reporting was designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of published financial statements in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

143

Table of Contents

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

Management, with the participation of the principal executive officer and principal financial officer, under the oversight of our board of directors, evaluated the effectiveness of our internal control over financial reporting as of December 31, 2022, using the framework in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was not effective as of December 31, 2022, because of the material weaknesses in internal control over financial reporting described below.

We did not have a sufficient number of trained resources with assigned responsibility and accountability for the design, operation and documentation of internal control over financial reporting. As a result:

a. We did not have an effective risk assessment process that defined clear financial reporting objectives and evaluated risks at a sufficient level of detail to identify all relevant risks of material misstatement across the entity.

b. We did not have an effective information and communication process that identified and assessed the source of and controls necessary to ensure the reliability of information used in financial reporting and that communicates relevant information about roles and responsibilities for internal control over financial reporting.

c. We did not have effective monitoring activities to assess the operation of internal control over financial reporting including the continued appropriateness of control design and level of documentation maintained to support control effectiveness.

As a consequence, we did not effectively design, implement, or operate process-level control activities for substantially all of our financial reporting processes.

The material weaknesses in internal controls over financial reporting did not result in any material misstatements or omissions in our previously reported financial statements.

Our independent registered public accounting firm, KPMG LLP, who audited the consolidated financial statements included in this Annual Report on Form 10-K, issued an adverse opinion on the effectiveness of our internal control over financial reporting. KPMG LLP's report appears on page 96.

*Management's Remediation Plan*

Our management, with the oversight of the audit committee of our board of directors, is in the process of designing and implementing a remediation plan and is taking steps to remediate the material weakness. We are committed to continuing to improve our internal controls over financial reporting and make progress remediating the material weaknesses during fiscal year 2023. Management's plan will include (1) Hiring, training, and retaining individuals with the appropriate skills and experience related to technical accounting, internal control over financial reporting, and the design and implementation of information technology solutions; (2) Enhancing risk assessment and prioritizing remediation activities that most significantly reduce the risk that a material misstatement to the consolidated financial statements would not be prevented or detected on a timely basis; (3) Implementing and monitoring our phased approach to remediation of control activities; (4) Enhancing information and communication processes through information technology solutions designed to ensure that information needed for financial reporting is accurate, complete, relevant and reliable, and communicated in a timely manner; and (5) Reporting regularly to the audit committee of the board of directors on the progress and results of our remediation plan, including the identification, status, and resolution of internal control deficiencies.

The material weaknesses will not be considered remediated until such time as management designs and implements effective controls that operate for a sufficient period of time and concludes, through testing, that these controls are effective. We will continue to monitor the effectiveness of our remediation plan and will make the changes we determine to be appropriate.

Table of Contents

**Changes in Internal Control Over Financial Reporting**

Except for the identification of the material weaknesses described above, there were no changes in our internal control over financial reporting during the quarter ended December 31, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

**Disclosure Pursuant to Item 1.01 of Form 8-K: Entry into a Material Definitive Agreement.**

On March 14, 2023, we entered into a waiver (the "Convertible Notes Waiver") with CSI Prodigy Holdco LP, CSI Prodigy Co-Investment LP, CS GP I LLC and CSI PRTA Co-Investment LP (collectively, the "Cowen Parties") to the Note Purchase Agreement and the Convertible Notes. Pursuant to Section 7.1(a)(i) of the Note Purchase Agreement, we are required to furnish to the holders of the Convertible Notes financial statements for the fiscal year ended December 31, 2022 without a qualification (or similar notation), and the audit report included elsewhere in this Annual Report on Form 10-K contains a going concern qualification in contravention of such requirement. The Convertible Notes Waiver is a limited waiver from the Cowen Parties, acting on behalf of all of the holders of the Convertible Notes, of the Going Concern Covenant under the Note Purchase Agreement and the Convertible Notes that provides for prospective effect, such that, no default or event of default shall occur due to our or any Guarantor's (as defined in the Note Purchase Agreement) failure to observe or perform the Going Concern Covenant with respect to the audit report contained in this Annual Report on Form 10-K until March 31, 2023. In addition, the Cowen Parties, acting on behalf of all of the holders of the Convertible Notes, agreed to waive a cross-default under the Convertible Notes with respect to the Senior Secured Credit Facility, resulting from the substantially similar covenant thereunder until March 31, 2023.

The description of the Convertible Notes Waiver does not purport to be complete and is qualified in its entirety by reference to the full text of the Convertible Notes Waiver, which is filed as Exhibits 10.43 to this Annual Report on Form 10-K.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections**

Not applicable.

Table of Contents

**PART III**

Certain information required by Part III is omitted from this Annual Report on Form 10-K and incorporated by reference to our definitive proxy statement for our 2023 annual general meeting of shareholders, or our 2023 Proxy Statement, to be filed pursuant to Regulation 14A of the Securities Exchange Act of 1934, as amended, or Exchange Act. If our 2023 Proxy Statement is not filed within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K, the omitted information will be included in an amendment to this Annual Report on Form 10-K filed not later than the end of such 120-day period.

### Item 10. Directors, Executive Officers and Corporate Governance

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders under sections entitled "Delinquent Section 16(a) Reports,""Proposal 1 - Election of Directors", "Director Biographies" "Board Committees," "Code of Business Conduct and Ethics" and "Board Composition"  to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

Our Board adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including our President and Chief Executive Officer, Chief Financial Officer, and other executive and senior officers. The full text of this code of business conduct and ethics is posted on the investor relations page of our website at https://ir.proterra.com. The reference to our website address in this filing does not include or incorporate by reference the information on that website into this filing. We intend to disclose future amendments to certain provisions of this code of business conduct and ethics, or waivers of these provisions, on our website or in public filings to the extent required by the applicable rules.

### Item 11. Executive Compensation

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders under the sections entitled "Executive Compensation," "Director Compensation," "Corporate Governance and Board Matters-Compensation Committee Interlocks and Insider Participation" and "Corporate Governance and Board Matters-Compensation Committee Report" to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

### Item 12. Security Ownership of Certain Beneficial Owner and Management and Related Stockholder Matters

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders under the section entitled "Equity Compensation Plan Information" and the information required by this item with respect to security ownership of certain beneficial owners and management is to be included in our 2023 Proxy Statement under the section entitled "Security Ownership of Certain Beneficial Owners and Management" and in each case is incorporated herein by reference to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

### Item 13. Certain Relationships and Related Person Transactions

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders under the sections entitled "Certain Relationships and Related Party Transactions" and "Corporate Governance and Board Matters-Independence of the Board of Directors" to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

### Item 14. Principal Accountant Fees and Services

The information required by this item is incorporated by reference to our Proxy Statement for the 2023 Annual Meeting of Stockholders under the section entitled "Proposal 2-On a Non-Binding Advisory Basis, Ratify Appointment of Independent Registered Accounting Firm and, On a Binding Basis, Authorize the Board of

Table of Contents

Directors, Acting Through the Audit Committee, to Determine the Independent Auditors' Remuneration" to be filed with the SEC within 120 days of the fiscal year ended December 31, 2022.

147

Table of Contents

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules.**

(a) The following documents are filed as part of this report:

1. Financial Statements

See Index to Financial Statements under Part II, Item 8 of this Annual Report.

2. Financial Statement Schedules

Schedules not listed above have been omitted because they are not required, not applicable, or the required information is otherwise included.

3. Exhibits

The exhibits listed below are filed as part of this Annual Report or are incorporated by reference as indicated.

| Exhibit Number | Description | Incorporated by Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date |
| 2.1† | Agreement and Plan of Merger, dated as of January 11, 2021, by and among ArcLight Clean Transition Corp., Phoenix Merger Sub, Inc., and Proterra Inc | 8-K | 2.1 | 1/12/2021 |
| 3.1 | Certificate of Incorporation of the Registrant | 8-K | 3.1 | 6/17/2021 |
| 3.1.1 | Certificate of Amendment to the Certificate of Incorporation of the Registrant | 8-K | 3.1.1 | 6/17/2021 |
| 3.2 | Restated Bylaws of the Registrant | 8-K | 3.2 | 6/17/2021 |
| 4.1 | Description of Registrant's Securities | 10-K | 4.1 | 3/14/2022 |
| 4.2 | Specimen Common Stock Certificate | S-3 | 4.2 | 12/23/2022 |
| 4.3 | Form of Indenture | S-3 | 4.3 | 12/23/2022 |
| 4.4 | Form of Warrant Agreement | S-3 | 4.5 | 12/23/2022 |
| 4.5 | Form of Preferred Stock Warrant Agreement and Warrant Certificate | S-3 | 4.6 | 12/23/2022 |
| 4.6 | Form of Debt Securities Warrant Agreement and Warrant Certificate | S-3 | 4.7 | 12/23/2022 |
| 10.1 | Form of Registrant's Indemnification Agreement. | S-4/A | 10.1 | 4/7/2021 |
| 10.2+ | 2010 Equity Incentive Plan, as amended, and forms of equity agreements thereunder | S-4/A | 10.2 | 4/7/2021 |
| 10.3+ | Form of Severance Agreement for executive officers | S-4/A | 10.3 | 4/7/2021 |
| 10.4** | AIR Commercial Real Estate Association Standard Industrial/Commercial Single-Tenant Lease - Net, dated April 23, 2015 and amended January 30, 2018, and further amended June 18, 2019 by and between G&T Properties and Proterra Inc | S-4/A | 10.4 | 4/7/2021 |
| 10.5** | Amendment No. 3, dated April 25, 2022, to Lease Agreement dated April 23, 2015 and amended January 30, 2018, and further amended June 18, 2019 by and between G&T Properties and Proterra Inc | | | |
| 10.6** | Lease Agreement, dated May 8, 2015, by and between PAC Operating Limited Partnership and Proterra Inc, as amended February 8, 2019 | S-4/A | 10.5 | 4/7/2021 |
| 10.7** | Third Amendment, dated March 22,2022, to Lease Agreement dated May 8, 2015, by and between PAC Operating Limited Partnership and Proterra Inc, as amended February 8, 2019 | | | |
| 10.8** | Fifth Amendment, dated December 24, 2022, to Lease Agreement dated May 8, 2015, by and between PAC Operating Limited Partnership and Proterra Inc, as amended February 8, 2019 | | | |
| 10.9** | Lease Agreement, dated November 13, 2021, by and between Proterra Operating Company, Inc. and Carolina CC Venture XXXVII, LLC | | | |
| 10.10 | Lease Guaranty Agreement, dated November 8, 2011, by and between Proterra, Inc. and Carolina CC Venture XXXVII, LLC | | | |
| 10.11 | Lease Agreement, dated March 21, 2018, by and between Smith Development Company, Inc. and Proterra Inc | | | |
| 10.12** | Sublease Agreement, dated February 26, 2019, by and between International Transport Innovation Center and Proterra Inc | S-4/A | 10.7 | 4/7/2021 |
| 10.13** | Amended and Restated Product Supply Agreement, dated November 3, 2017, by and between TPI Inc. and Proterra Inc as amended December 31, 2018, October 1, 2019, and May 13, 2020 | S-4/A | 10.8 | 4/7/2021 |
| 10.14** | Amendment #4, dated June 29, 2021, to Amended and Restated Product Supply Agreement, dated November 3, 2017, by and between TPI Inc. and Proterra Inc as amended December 31, 2018, October 1, 2019, and May 13, 2020 | | | |
| 10.15** | Loan, Guaranty and Security Agreement, dated May 8, 2019, by and between Bank of America, N.A. and Proterra Inc, as amended August 4, 2020 | S-4/A | 10.9 | 4/7/2021 |

148

Table of Contents

| Exhibit Number | Description | Incorporated by Reference | | |
|---|---|---|---|---|
| | | Form | Exhibit | Filing Date |
| 10.16** | The Note Purchase Agreement dated August 4, 2020, by and among CSI Prodigy HoldCo L.P. and CSI Prodigy Co-Investment L.P., and Proterra Inc as amended August 31, 2020 by and among Broadscale PT Investors LP., Generation IM Climate Solutions II, L.P., QPB Holdings Ltd., Palindrome Master Fund, L.P., and Proterra Inc | S-4/A | 10.10 | 4/7/2021 |
| 10.17 | Form of Subscription Agreement | S-4/A | 10.11 | 5/7/2021 |
| 10.18 | Amended and Restated Registration Rights Agreement, dated June 14, 2021, by and among Proterra Inc, ArcLight CTC Holdings, L.P. and the other Holders party thereto | 8-K | 10.12 | 6/17/2021 |
| 10.19+ | Proterra Inc 2021 Equity Incentive Plan | 8-K | 10.13 | 6/17/2021 |
| 10.20+ | Form of Stock Option Agreement under the Proterra Inc 2021 Equity Incentive Plan. | S-8 | 99.2 | 8/16/2021 |
| 10.21+ | Form of Restricted Stock Unit Award Agreement under the Proterra Inc 2021 Equity Incentive Plan. | S-8 | 99.3 | 8/16/2021 |
| 10.22+ | 2022 Form of Stock Option Agreement under the Proterra Inc 2021 Equity Incentive Plan | 10-Q | 10.1 | 11/03/2022 |
| 10.23+ | Form of Restricted Stock Agreement under the Proterra Inc 2021 Equity Incentive Plan. | S-8 | 99.4 | 8/16/2021 |
| 10.24+ | Form of Stock Appreciation Right Agreement under the Proterra Inc 2021 Equity Incentive Plan. | S-8 | 99.5 | 8/16/2021 |
| 10.25+ | Form of Performance Shares Award Agreement under the Proterra Inc 2021 Equity Incentive Plan. | S-8 | 99.6 | 8/16/2021 |
| 10.26+ | Form of Global Stock Option Agreement under the Proterra Inc 2021 Equity Incentive Plan. | S-8 | 99.7 | 8/16/2021 |
| 10.27+ | Form of Stock Bonus Agreement under the Proterra Inc 2021 Equity Incentive Plan. | S-8 | 99.8 | 8/16/2021 |
| 10.28+ | Proterra Inc 2021 Employee Stock Purchase Plan | 8-K | 10.14 | 6/17/2021 |
| 10.29+ | Proterra Inc Key Employee Incentive Plan | S-1 | 10.15 | 6/29/2021 |
| 10.30 | Sponsor Letter Agreement, dated as of January 11, 2021, by and among ArcLight CTC Holdings, L.P., ArcLight Clean Transition Corp. and Proterra Inc, and certain other parties thereto | S-4/A | 10.17 | 5/7/2021 |
| 10.31 | Amendment No. 1 to the Sponsor Letter Agreement, dated as of February 2, 2021, by and among ArcLight CTC Holdings, L.P., ArcLight Clean Transition Corp. and Proterra Inc | S-4/A | 10.18 | 5/7/2021 |
| 10.32+ | Executive Offer Letter of John J. Allen, dated March 29, 2021 | S-4/A | 10.19 | 4/7/2021 |
| 10.33+ | Executive Offer Letter of Gareth T. Joyce, dated March 23, 2021 | S-4/A | 10.2 | 4/7/2021 |
| 10.34+ | Executive Offer Letter of Gareth T. Joyce, dated December 7, 2021 | 10-K | 10.27 | 3/14/2022 |
| 10.35+ | Severance Agreement of Gareth T. Joyce, dated January 1, 2022 | 10-K | 10.28 | 3/14/2022 |
| 10.36+** | Executive Offer Letter of Karina F. Padilla, dated December 7, 2021 | | | |
| 10.37+** | Severance Agreement of Karina F. Padilla, dated January 3, 2022 | | | |
| 10.38 | Executive Offer Letter of Christopher L. Bailey, dated November 9, 2021 | S-1 | 10.36 | 4/18/2022 |
| 10.39 | Executive Offer Letter of JoAnn C. Covington, dated April 13, 2022 | S-1 | 10.37 | 4/18/2022 |
| 10.40+ | Retention Agreement of JoAnn C. Covington, dated September 15, 2021 | 10-K | 10.34 | 3/14/2022 |
| 10.41+ | Executive Offer Letter of Juilan R. Soell, dated August 1, 2022 | 10-Q | 10.1 | 8/3/2022 |
| 10.42 | Waiver Pursuant to the Note Purchase Agreement and Secured Convertible Promissory Notes, dated February 17, 2023, by and among Proterra Inc. and the Cowen Parties | 8-K | 10.1 | 2/24/2023 |
| 10.43* | Limited Waiver Pursuant to Note Purchase Agreement and Secured Convertible Promissory Notes, dated March 14, 2023, by and among Proterra Operating Company Inc. and the Cowen Parties | | | |
| 21.1* | List of Subsidiaries | S-1 | 21.1 | 6/29/2021 |
| 23.1* | Consent of KPMG LLP, independent registered public accounting firm for Proterra Inc | | | |
| 24.1* | Power of Attorney (included on signature page to this Annual Report) | | | |
| 31.1* | Certification of Chief Executive Officer, as required by Rule 13a-14(a) of the Securities Exchange Act of 1934 | | | |
| 31.2* | Certification of Chief Financial Officer, as required by Rule 13a-14(a) of the Securities Exchange Act of 1934 | | | |
| 32.1# | Certification of Chief Executive Officer, as required by Rule 13a-14(b) of the Securities Exchange Act of 1934 | | | |
| 32.2# | Certification of Chief Financial Officer, as required by Rule 13a-14(b) of the Securities Exchange Act of 1934 | | | |
| 101.INS* | XBRL Instance Document | | | |
| 101.SCH* | XBRL Taxonomy Extension Schema Document | | | |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document | | | |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document | | | |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document | | | |
| 101.PRES* | XBRL Taxonomy Extension Presentation Linkbase Document | | | |
| 104* | Cover Page Interactive Data File (formatted in iXBRL and contained in Exhibit 101) | | | |

_____

† Certain of the exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(a)(5). We agree to furnish a copy of all omitted exhibits and schedules to the SEC upon its request.

+ Indicates a management contract or compensatory plan, contract or arrangement.

* Filed herewith.

** Certain portions of this exhibit have been redacted pursuant to Item 601(b)(10)(iv) of Regulation S-K. The omitted information is (i) not material and (ii) would likely cause competitive harm to the Company if publicly disclosed. The Company agrees to furnish supplementally an unredacted copy of the exhibit to the SEC upon its request.

# This certification is deemed not filed for purpose of section 18 of the Exchange Act or otherwise subject to the liability of that section, nor shall it be deemed incorporated by reference into any filing under the Securities Act or the Exchange Act.

Table of Contents

**Item 16. Form 10-K Summary**

None.

150

Table of Contents

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**PROTERRA INC**
(Registrant)

| | |
|---|---|
| By: | /s/ GARETH T. JOYCE |
| Name: | Gareth T. Joyce |
| Title: | President and Chief Executive Officer |
| Date: | March 17, 2023 |

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Gareth T. Joyce and Karina F. Padilla, and each of them, as his or her true and lawful attorneys-in-fact, proxies and agents, each with full power of substitution and resubstitution and full power to act without the other, for him or her in any and all capacities, to sign any and all amendments to this Annual Report, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact, proxies and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully for all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact, proxies and agents, or their or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

| Signature | Title | Date |
|---|---|---|
| /s/ GARETH T. JOYCE<br>Gareth T. Joyce | President, Chief Executive Officer and Director<br>*(Principal Executive Officer)* | March 17, 2023 |
| /s/ KARINA F. PADILLA<br>Karina F. Padilla | Chief Financial Officer<br>*(Principal Financial and Accounting Officer)* | March 17, 2023 |
| /s/ JOHN J. ALLEN<br>John J. Allen | Chairman of the Board | March 17, 2023 |
| /s/ MARY LOUISE KRAKAUER<br>Mary Louise Krakauer | Director | March 17, 2023 |
| /s/ ROGER M. NIELSEN<br>Roger M. Nielsen | Director | March 17, 2023 |
| /s/ BROOK F. PORTER<br>Brook F. Porter | Director | March 17, 2023 |
| /s/ JOAN ROBINSON-BERRY<br>Joan Robinson-Berry | Director | March 17, 2023 |
| /s/ JEANNINE P. SARGENT<br>Jeannine P. Sargent | Director | March 17, 2023 |
| /s/ CONSTANCE E. SKIDMORE<br>Constance E. Skidmore | Director | March 17, 2023 |
| /s/ MICHAEL D. SMITH<br>Michael D. Smith | Director | March 17, 2023 |
| /s/ JAN R. HAUSER<br>Jan R. Hauser | Director | March 17, 2023 |

EX 10.10

**LEASE GUARANTY**

THIS LEASE GUARANTY ("Guaranty") is made this day of_, 2021, by PROTERRA, INC., a Delaware corporation (hereinafter referred to as "Guarantor", whether one or more) in favor of Carolina CC Venture XXXVII, LLC, a Delaware limited liability company ("Landlord").

FOR VALUE RECEIVED, Guarantor hereby unconditionally, irrevocably and absolutely guarantees to Landlord the prompt and full payment and performance, when due, of all obligations and covenants of Proterra Operating Company, Inc., a Delaware corporation ("Tenant"), fixed or contingent, arising out of the Lease Agreement dated on or about the date hereof and executed by and between Tenant and Landlord and any and all renewals, extensions, amendments, and modifications thereof (collectively, the "Lease"), or which Tenant, or its successors or assigns, may in any other manner now or at any time hereafter owe Landlord in connection with the Lease, including, but not limited to, all of Tenant's obligations to timely pay Base Rent, additional rent, and any other rent, damages and expenses resulting from an Event of Default or other breach by Tenant under the Lease, interest and all collection costs including, without limitation, attorneys' fees and expenses (collectively, the "Obligations").

1.     CONTINUING GUARANTY. This is a continuing Guaranty and shall apply to the Obligations and any renewals, extensions, amendments, modifications, waivers and transfers thereof.

2.     OTHER REMEDIES. Landlord shall not be required to pursue any other remedies before invoking the benefits of this Guaranty; specifically, Landlord shall not be required to take any action against Tenant or any other person, to exhaust its remedies against any other guarantor of the Obligations, any collateral or other security, or to resort to any balance of any deposit account or credit on the books of Landlord in favor of Tenant or any other person.

3.     OBLIGATIONS NOT IMPAIRED. Prior to performance and satisfaction in full of the Obligations, the liability of Guarantor under this Guaranty shall not be released or impaired without the prior written consent of Landlord, which consent may be withheld in Landlord's sole discretion. Without limiting the generality of the foregoing, the liability of Guarantor shall not be released or impaired on account of any of the following events or circumstances:

(a)     the voluntary or involuntary liquidation, sale or other disposition of all or substantially all of the assets of Tenant, or any receivership, insolvency, bankruptcy, reorganization or other similar proceedings affecting Tenant or any of its assets;

(b)     the addition of a new guarantor or guarantors or the release of any one or more other guarantor(s);

(c)     any bankruptcy or insolvency proceedings against or by Tenant, its property, or its estate or any modification, discharge or extension of the Obligations resulting from the operation of any present or future provision of the United States Bankruptcy Code or any other similar federal or state statute, or from the decision of any court, it being the intention hereof that Guarantor shall remain liable on the Obligations notwithstanding any act, omission, order, judgment or event which might, but for the provisions hereof, otherwise operate as a legal or equitable discharge of Guarantor;

(d)     Landlord's failure to use diligence in preserving the liability of any person on the Obligations, or in bringing suit to enforce collection of the Obligations;

(e)     the substitution or withdrawal of any security deposit or other collateral, or release of any security deposit or other collateral, or the exercise or failure to exercise by Landlord of any right conferred upon it herein or in the Lease or any collateral agreement;

(f)      the presentment or draw down of the Letter of Credit;

(g)     if Tenant is not liable for any of the Obligations because the act of creating the Obligations is *ultra vires*, or the officers or persons creating the Obligations acted in excess of their authority, or for any reason the Obligations cannot be enforced against Tenant;

(h)     any payment by Tenant to Landlord if such payment is held to constitute a preference under the bankruptcy laws, or if for any other reason Landlord is required to refund such payment to Tenant or pay the amount thereof to any other party;

(i)     the existence of, or assertion by Guarantor of, any defense or set-off, counterclaim, recoupment or right of termination under this Guaranty by reason of the invalidity, illegality or unenforceability of the Lease or otherwise or the failure of Landlord to assert any claim or demand, or to enforce the Lease or any right or remedy available to Landlord under the Lease, against Tenant under the Lease or any other agreement;

(j)    any rescission, waiver, extension, renewal, amendment, or modification of the Lease, unless Landlord, in its sole discretion, releases Tenant from further liability of the Obligations by virtue of an amendment or Lease modification agreement, in which case Guarantor shall be deemed released from further liability under this Guaranty (but not liability already incurred or accrued) as of the effective date of such Tenant release. Guarantor hereby waives notice of any such modifications, amendments, or assignment by Proterra Operating Company, Inc.; or

(k)    any assignment of the Lease or subletting of all or any portion of the Premises, unless Landlord, in its sole discretion agrees in writing to release Tenant from further liability of the Obligations by virtue of such assignment, in which case Guarantor shall be deemed released from further liability under this Guaranty (but not liability already incurred or accrued) as of the effective date of such Tenant release.

4.    BENEFIT TO GUARANTOR. Guarantor acknowledges and warrants that it derives or expects to derive financial and other advantage and benefit, directly or indirectly, from the Lease, the Obligations and the release of collateral or other relinquishment of legal rights made or granted or to be made or granted by Landlord to Tenant. Guarantor acknowledges that, in entering into the Lease, Landlord is relying on Guarantor's agreements contained in this Guaranty and on Guarantor's creditworthiness. Guarantor acknowledges that Landlord would not have entered into the Lease without Guarantor's guarantee of the Obligations pursuant to the terms hereof.

5.    JOINT AND SEVERAL LIABILITY. Unless the context clearly indicates otherwise, "Guarantor" shall mean the guarantor hereunder, or any of them, if more than one. The obligations of said guarantors hereunder if more than one, shall be joint and several. Suit may be brought against said guarantors jointly and severally, and against any one or more of them, or less than all, without impairing the rights of Landlord against the others of said guarantors; and Landlord may compromise with any one of said guarantors for such sums or sum as it may see fit and release such of said guarantors from all further liability to Landlord for such indebtedness without impairing the right of Landlord to demand and collect the balance of such indebtedness from others of said guarantors not so released; but it is agreed among said guarantors themselves, however, that such compromising and release shall not impair the rights and obligations of said guarantors as among themselves.

6.    CHANGE IN COMPOSITION. Should the status, composition, structure or name of Tenant change, including, but not limited to, by reason of a merger, dissolution, consolidation or reorganization, this Guaranty shall continue and also cover the Obligations of Tenant under the new status, composition structure or name according to the terms hereof. If Tenant is a general or limited partnership, no termination of said partnership, nor withdrawal therefrom by, or termination of any ownership interest therein owned by, any general or limited partner of such partnership shall alter, limit or modify Guarantor's obligations set forth in this Guaranty or otherwise affect this Guaranty in any manner whatsoever, all of which obligations of Guarantor shall remain in effect as herein written.

7.    WAIVER AND SUBROGATION OF GUARANTOR'S RIGHTS AGAINST TENANT.
Until all of Tenant's obligations under the Lease are fully performed, Guarantor

(i) waives any rights that Guarantor may have against Tenant by reason of any one or more payments or acts in compliance with the obligations of Guarantor under this Guaranty; and

(ii) subordinates any liability or indebtedness of Tenant held by Guarantor to the obligations of Tenant to Landlord under the Lease.

8.    DEATH OR DISSOLUTION OF GUARANTOR. Upon the death, dissolution or bankruptcy of Guarantor, the liability of Guarantor shall continue against its assets as to all Obligations which shall have been incurred by Tenant.

9.    FINANCIAL STATEMENTS. Guarantor warrants and represents to Landlord that all financial statements heretofore delivered by Guarantor to Landlord are true and correct in all material respects and there are no material adverse changes with respect thereto as of the date hereof. Guarantor further agrees to deliver to Landlord from time to time, within ten (10) days after request by Landlord, (but only in the event Guarantor is not a publicly traded company) Guarantor's most current financial statement. Such statement shall be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Guarantor, and shall be audited by an independent certified public accountant. Guarantor consents to the delivery of such financial statements by Landlord to its partners, lenders or prospective lenders or prospective purchasers of the Project subject to a confidentiality agreement between Landlord and its lender, purchaser or investor. Notwithstanding the foregoing, if Guarantor is otherwise required herein to provide its financial statement, Guarantor shall not be required to deliver such financial statement more than once in any calendar year except in connection with a bona fide financing/refinancing or sale of the Project or any portion thereof. The obligations of Tenant under the Lease to execute and deliver estoppel statements, as therein provided, shall be deemed to also require Guarantor hereunder to do and provide the same relative to Guarantor.

10.     WAIVER OF NOTICE. Guarantor waives diligence on the part of Landlord in the collection and enforcement of the Obligations, protest, and all extensions that may be granted to Tenant with respect thereto. Guarantor waives notice of acceptance of this Guaranty. Guarantor additionally waives grace, demand, presentment, notice of demand, notice of non-payment or non-performance, and any and all other notices or demands which Guarantor might otherwise be entitled to receive (to the extent allowed by applicable law).

11.     LIMITATION ON INTEREST. To the extent that any law limiting the amount of interest that may be contracted for, charged or received is applicable to the indebtedness of Guarantor under this Guaranty, no provision of this Guaranty shall require the payment or permit the collection of any sum in excess of the maximum lawful amount of interest applicable to Guarantor's indebtedness under this Guaranty. If any sum in excess of the maximum lawful amount applicable to Guarantor's indebtedness under this Guaranty is provided for herein, the provision of this paragraph shall govern, and Guarantor shall not be obligated to pay any sum in excess of the maximum lawful amount applicable to Guarantor's indebtedness under this Guaranty. The intention of Guarantor and Landlord hereunder is to comply with all laws applicable to this Guaranty and Guarantor's liability hereunder.

12.     MODIFICATION OR CONSENT. No modification, consent or waiver of any provision of this Guaranty, nor consent to any departure by Guarantor therefrom, shall be effective unless the same shall be in writing and signed by Landlord, and then shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on Guarantor, in any case shall, of itself, entitle Guarantor to any other or further notice or demand in similar or other circumstances. No delay or omission by Landlord in exercising any power or right hereunder shall impair any such right or power or be construed as a waiver thereof or any acquiescence therein, nor shall any single or partial exercise of any such power preclude other or further exercise thereof or the exercise of any other right or power hereunder. All rights and remedies of Landlord hereunder are cumulative of each other and of every other right or remedy which Landlord may otherwise have at law or in equity or under any other contract or document, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

13.     INDUCEMENT TO LANDLORD. Guarantor acknowledges that this Guaranty is given to induce Landlord to enter into the Lease and to extend credit to Tenant which would not be extended except in reliance upon this Guaranty.

14.     ATTORNEYS' FEES. If Landlord is the prevailing party in any lawsuit or other legal proceeding instituted in connection with this Guaranty, then Guarantor agrees to pay to Landlord all expenses incurred in connection with such lawsuit or proceeding (including, but not limited to, reasonable attorneys' fees actually incurred at customary hourly rates without regard as to any statutory presumption as to such fees and costs of court).

15.     SUCCESSORS AND ASSIGNS. This Guaranty is for the benefit of Landlord, and its successors or assigns. Landlord may assign its rights hereunder in whole or in part; and, upon any such assignment, all the terms and provisions of this Guaranty shall inure to the benefit of such assignee, to the extent so assigned. The liability of Guarantor hereunder shall be binding upon all heirs, estates, executors, administrators, legal representatives, successors and assigns of Guarantor.

16.     HEADINGS. The section headings hereof are inserted for convenience of reference only and shall not alter, define or be used in construing the text of this instrument.

17.     LAW GOVERNING. Suit on this Guaranty shall be brought in any state or federal court in Spartanburg County, South Carolina and each party waives the right to be sued elsewhere. This Guaranty shall be deemed to have been made under and shall be governed by the laws of the State of South Carolina in all respects..

18.     TERM. This Guaranty shall terminate only when all of the Obligations have been fully performed and satisfied.

19.     GUARANTY OF PAYMENT AND PERFORMANCE. This is a guaranty of payment and performance and not a guaranty of collection.

20.     PAST DUE AMOUNTS. All past due payments of the Obligations shall bear interest at the maximum lawful rate, or if no maximum lawful rate is established by applicable law, then at the rate per annum which shall from day to day be equal to ten percent (10%).

21.     REPRESENTATIONS. Guarantor represents and warrants to Landlord that (i) Guarantor has executed this Guaranty of its free will and accord; (ii) Guarantor has read and understands the terms of this Guaranty and the Lease; (iii) Guarantor has had the opportunity to have this Guaranty and the Lease reviewed by an attorney of Guarantor's choice; (iv) the Lease has been duly authorized, executed and delivered by Tenant and is a legal, valid and binding instrument enforceable against Tenant in accordance with its terms, and

(v) this Guaranty has been duly authorized, executed and delivered by Guarantor and is a legal, valid and binding instrument enforceable against Guarantor in accordance with its terms.

22.    ENTIRE AGREEMENT. Guarantor acknowledges and agrees that this Guaranty accurately represents and contains the entire agreement between Guarantor and Landlord with respect to the subject matter hereof, that Guarantor is not relying, in the execution of this Guaranty, on any representations (whether written or oral) made by or on behalf of Landlord except as expressly set forth in this Guaranty, and that any and all prior statements and/or representations made by or on behalf of Landlord to Guarantor (whether written or oral) in connection with the subject matter hereof are merged herein. This Guaranty shall not be waived, altered, modified or amended as to any of its terms or provisions except in writing duly signed by Landlord and Guarantor.

23.    SEVERABILITY. If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty will not be affected thereby, and each provision of this Guaranty will be valid and enforceable to the fullest extent permitted by law.

24.    **WAIVER OF RIGHT TO JURY TRIAL. GUARANTOR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING, OR COUNTERCLAIM BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS GUARANTY OR ANY CONDUCT, ACT, FAILURE TO ACT OR OMISSION OF OR BY LANDLORD OR GUARANTOR, OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LANDLORD OR GUARANTOR, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, OR IN THE ENFORCEMENT OF ANY OF THE TERMS OR PROVISIONS OF THIS GUARANTY. IT IS AGREED AND UNDERSTOOD THAT THIS WAIVER CONSTITUTES A WAIVER OF TRIAL BY JURY OF ALL CLAIMS AGAINST ALL PARTIES TO SUCH ACTIONS OR PROCEEDINGS, INCLUDING CLAIMS AGAINST PARTIES WHO ARE NOT PARTIES TO THIS GUARANTY. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY GUARANTOR, AND GUARANTOR HEREBY REPRESENTS THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. GUARANTOR FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS GUARANTY AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.** Neither this provision nor any provision in the Lease regarding waiver of jury trial or submission to jurisdiction or venue in any court is intended or shall be construed to be in derogation of any provision herein or in the Lease for arbitration of any controversy or claim.

25.    STATE SPECIFIC PROVISIONS. Guarantor hereby waives and renounces, to the fullest

extent permitted by law, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshalling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Guaranty and including, without limitation, any and all rights to which Guarantor may otherwise have been entitled under any suretyship laws or similar laws in effect from time to time.

26.    DEFINED TERMS. Capitalized but undefined terms used herein will have the same meaning as set forth in the Lease.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the day and year first written above.

GUARANTOR: PROTERRA, INC.,
a Delaware corporation


By:_

Name: _

Title: _

Attest: _

Name: _

Title: _

      [CORPORATE SEAL]

Address:
Proterra, Inc.
1815 Rollins Road
Burlingame, California 94010 Attn: General Counsel's
Office

**EX 10.14**

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE IT IS NOT MATERIAL AND WOULD LIKELY CAUSE COMPETITIVE HARM TO PROTERRA INC. IF PUBLICLY DISCLOSED.SUBJECT TO FED. R. EVID. 408**

**Amendment No. 4 to Amended and Restated Product Supply Agreement**

This Amendment No. 4 ("***Amendment No. 4***") is entered into by and between Proterra Operating Company, Inc. (fka Proterra, Inc.) ("***Proterra***") and TPI, Inc. ("***TPI***") effective June 29, 2021 (the "***Amendment No. 4 Effective Date***") and amends the Amended and Restated Product Supply Agreement entered into by and between Proterra and TPI effective November 3, 2017 (the "***PSA***"), as amended on by Amendment No. 1 to the PSA dated December 31, 2018 ("***Amendment No. 1***"), Amendment No. 2 to the PSA dated October 1, 2019 ("***Amendment No. 2***") and Amendment No. 3 to the PSA dated May 13, 2020 ("***Amendment No. 3;***" and collectively with the PSA and Amendment Nos. 1 and 2, the "***Agreement***"). Proterra and TPI may be referred to herein individually as a "***Party***" and collectively as the "***Parties***". Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Agreement.

***RECITALS***

**WHEREAS**, the Agreement governs TPI's manufacture and supply of, and Proterra's purchase of, forty-foot (40') and thirty five-foot (35') composite bus bodies in accordance with the technical specifications, pricing, purchase commitment and production schedule set forth therein (collectively, the "***Bus Program***");

**WHEREAS**, the Parties desire to amend the Agreement to extend the term (the "***Term***");

**WHEREAS**, the Parties desire to amend the Agreement's price schedule and minimum volume commitments to align with the current demand, capacity and cost of the Bus Program;

**WHEREAS**, as of June 14, 2021, Proterra Inc changed its name to Proterra Operating Company, Inc.,

**NOW, THEREFORE**, in consideration of the mutual covenants, terms and conditions set forth herein, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**ARTICLE I**

**PURCHASE ORDERS**

Except for the purchase orders set forth in the next sentence, the purchase orders that were issued prior to the Amendment No. 4 Effective Date shall be governed by the Agreement. The Parties acknowledge and agree that the following purchase orders shall be governed by this Amendment No. 4:

POs [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***], [***].

For clarity, all purchase orders issued subsequent to the Amendment No. 4 Effective Date shall be governed by this Amendment No. 4.

**AMENDMENTS TO THE AGREEMENT**

1. **Term**. Parties agree to modify the basic term of the agreement End Date to December 31, 2024, provided the Agreement may continue to be terminated as set forth in the Agreement.
2. **Minimum Purchase Commitment and Dedicated Capacity.** In Exhibit B of the Agreement, as amended by Section 5 of Amendment No. 1 and Section 2 of Amendment 3, the "Minimum Purchase Commitment and Dedicated Capacity" section is hereby amended as follows: Proterra's 2020 Minimum Commitment shall be waived. Proterra's 2021 Minimum Commitment shall be [***] bus bodies; Proterra's 2022 Minimum Commitment shall be [***] bus bodies; Proterra's 2023 Minimum Commitment shall be [***] bus bodies and Proterra's 2024 Minimum Commitment shall be [***] bus bodies. For the avoidance of doubt, Proterra's reduction of the 2020 - 2022 Minimum Commitments shall not trigger any minimum commitment penalties under Section 5 of the Agreement.

3. **Cost Adjustment to the Bus Program**. Notwithstanding anything to the contrary in Exhibit B of the Agreement, as amended by Amendment Nos. 1, 2 and 3, the individual bus body price for all production bus bodies manufactured and delivered under the Bus Program shall be as follows:

    **i.** 2021
        i. Standard Body: [***]
        ii. Standard Body + CMVSS: [***]
        iii.      FAA/RI overflow: [***]
        iv.      35' Heron #3-#15: [***]

    **ii.** 2022
        i. Standard Body: [***]
        ii. Standard Body + CMVSS: [***]
        iii.      FAA/RI overflow: [***]

    **iii.** 2023
        i. Standard Body: [***]
        ii. Standard Body + CMVSS: [***]
        iii.      FAA/RI overflow: [***]

    **iv.** 2024
        i. Standard Body: [***]
        ii. Standard Body + CMVSS: [***]
        iii.      FAA/RI overflow: [***]

4. **Revised Specifications.** The Parties acknowledge and agree that as of the Amendment No. 4 Effective Date, the specifications set forth below shall be used to manufacture the bus bodies and there are no outstanding Change Orders there are no other plans to modify the design or build of the bus bodies. Any further plans or modifications will require a Change Order as contemplated by the Agreement.

    **i.** 40' Heron:
        i. PN 118-5026: Base 40' Heron body, 6 hard point main floor, no CMVSS panel.
        ii. PN 118-5027: Base 40' Heron body,10 hard point main floor, no CMVSS panel.
        iii.      PN 121-5863: Base 40' Heron body,6 hard point main floor, and CMVSS panel.
        iv.      PN 121-5864: Base 40' Heron body,10 hard point main floor, and CMVSS panel.

    **ii.** 35' Heron:
        i. PN 126-7333: Base 35' Heron body, 6 hard point main floor, no CMVSS panel.
        ii. PN 126-7334: Base 35' Heron body, 10 hard point main floor, no CMVSS panel.
        iii.      PN 126-7336: Base 35' Heron body, 6 hard point main floor, and CMVSS panel.
        iv.      PN 126-7337: Base 35' Heron body, 10 hard point main floor, and CMVSS panel.
        v. PN 045923

5. **BOM and Labor Rates.** Within ninety (90) days of the Amendment No. 4 Effective Date, and at least once per calendar quarter thereafter, the Parties will meet in good faith to update and establish a baseline Materials BOM and Labor Hours.

<center>**ARTICLE II**</center>

<center>**GENERAL**</center>

6. **Conflicts**. To the extent that this Amendment conflicts with the terms of the Agreement, the terms of this Amendment shall control.

7. **Effect of Amendments**. Except as modified or changed herein, all terms and provisions of the Agreement remain in full force and effect and are incorporated herein by reference.

8. **Counterparts**. This Amendment may be executed in multiple counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.

<center>[Signature Page Follows]</center>

<center>2</center>

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed by their authorized representatives as of the dates set forth below, effective as of the Amendment Effective Date.

**PROTERRA OPERATING COMPANY, INC. TPI, INC.**


By: /s/ Amy Ard By: /s/ William Siwek

Name: Amy Ard Name: William Siwek

Title: Chief Financial Officer Title: President

Date: June 29, 2021 Date: June 29, 2021

3

**EX 10.36**

December 7, 2021

Ms. Karina Franco Padilla


Dear Karina:

We are pleased to extend you an offer to join Proterra Inc (collectively with its subsidiaries, the "*Company*" or "*Proterra*") as Chief Financial Officer reporting to the CEO. Your appointment as Chief Financial Officer is subject to approval by the Board of Directors (the "*Board*"), which will be requested from the Board of Directors at the upcoming meeting scheduled in December 2021. Your employment with the Company will commence as soon as practicable on a date to be determined by you and the CEO, which shall be no later than January 3, 2022 ("*Start Date*"). You will be based out of Greenville, South Carolina and will be expected to travel to the Company's other offices. We understand that you will be based in North Carolina for the first 18 months following your Start Date. We are offering you the following:

   1.  **Cash Compensation**. The Company will pay you an annual base salary of $425,000 payable in accordance with the Company's standard payroll schedule. Your pay will be periodically reviewed as a part of the Company's regular reviews of compensation. You will be eligible to participate in the Company's short term cash incentive bonus plans at a target of 75% of your annual base salary.

   2.  **Sign On Bonus**. Also, we will offer a sign on bonus of $250,000, less applicable withholding taxes and deductions, to be paid in your second paycheck. If you voluntarily terminate employment with Proterra within twelve months following your start date, you will be required to repay to Proterra 100% of the $250,000 sign-on bonus received by you.

   3.  **Employee Benefits**. You will be eligible to participate in a number of Company-sponsored benefits to the extent that you comply with the eligibility requirements of each such benefit plan. The Company, in its sole discretion, may amend, suspend or terminate its employee benefits at any time, with or without notice. In addition, you will be entitled to paid vacation in accordance with the Company's vacation policy, as in effect from time to time.

   4.  **Equity Compensation**. Following commencement of your employment and subject to approval by the Board or Compensation Committee, the Company will grant you 585,000 restricted stock units (the "*RSUs*") under the 2021 Equity Incentive Plan ("*Plan*"). The RSUs shall vest according to the following schedule: 25% of such RSUs shall vest on a date set by the Company in the quarter of the year that you start employment until all such RSUs have vested, so long as you continue to provide services to the Company on each such vesting date. The RSUs will be subject to the terms, conditions and restrictions set forth in the Plan and the Company's standard form of RSU Award Agreement. You will also be eligible to receive additional equity awards as part of the Company's long term incentive program, as may be determined by the Board or Compensation Committee, consistent with the Company's compensation practices. We will recommend to the Board or Compensation Committee that you be eligible for an equity incentive award with four-year ratable vesting valued at $800,000 at the time of grant in fiscal year 2022. Such grants are not part of your base compensation and the Board or Committee may change or discontinue the long-term incentive program at any time.

   5.  **Termination Benefits**. You will be eligible to receive certain change in control and severance payments and benefits under the Severance Agreement approved by the Board and attached to this offer letter as **Exhibit A**.

   6.  **Confidentiality Agreement**. By signing this offer letter, you confirm that you will execute and abide by the terms and conditions of the Employee Confidentiality, Arbitration, Non-Solicit, Non-Compete and Invention Assignment Agreement by and between you and the Company and attached to this offer letter at **Exhibit B**.

   7.  **No Conflicting Obligations**. You understand and agree that by signing this offer letter, you represent to the Company that your performance will not breach any other agreement to which you are a party and that you have not, and will not during the term of your employment with the Company, enter into any oral or written agreement in conflict with any of the provisions of this letter or the Company's policies. You are not to bring with you to the Company, or use or disclose to any person associated with the Company, any confidential or proprietary information belonging to any former employer or other person or entity with respect to which you owe an obligation of confidentiality under any agreement or otherwise. The Company does not need and will not use such information and we will assist you in any way possible to preserve and protect the confidentiality of proprietary information belonging to third parties. Also, we expect you to abide by any obligations to refrain from soliciting any person employed by or otherwise associated with any former employer and suggest that you refrain from having any contact with such persons until such time as any non-solicitation obligation expires.

**8.** **Outside Activities**. While you render services to the Company, you agree that you will not engage in any other employment, consulting or other business activity without the written consent of the Company. In addition, while you render services to the Company, you will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company.

**9.** **General Obligations**. As an employee, you will be expected to adhere to the Company's standards of professionalism, loyalty, integrity, honesty, reliability and respect for all. You will also be expected to comply with the Company's policies and procedures. The Company is an equal opportunity employer.

**10.** **At-Will Employment**. Your employment with the Company is for no specific period of time. Your employment with the Company will be on an "at will" basis, meaning that either you or the Company may terminate your employment at any time for any reason or no reason. The Company also reserves the right to modify or amend the terms of your employment at any time for any reason. Any contrary representations which may have been made to you are superseded by this offer letter. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and the Company's Board of Directors.

**11.** **Withholdings**. All forms of compensation paid to you as an employee of the Company shall be less all applicable withholdings.

**12**. **Section 409A**. It is intended that all of the severance benefits and other payments payable under this offer letter satisfy, to the greatest extent possible, the exemptions from the application of Section 409A of the Internal Revenue Code of 1986, as amended (the "*Code*" and "*Section 409A*") provided under Treasury Regulations 1.409A-1(b)(4), 1.409A-1(b)(5) and 1.409A-1(b)(9), and this offer letter will be construed to the greatest extent possible as consistent with those provisions, and to the extent not so exempt, this offer letter (and any definitions hereunder) will be construed in a manner that complies with Section 409A. All payments and benefits that are payable upon a termination of employment hereunder shall be paid or provided only upon your "separation from service" from the Company (within the meaning of Section 409A).

This offer letter supersedes and replaces any prior understandings or agreements, whether oral, written or implied, between you and the Company regarding the matters described in this letter. This letter will be governed by the laws of South Carolina, without regard to its conflict of laws provisions.

Very truly yours,

PROTERRA INC

By: Jack Allen
Chief Executive Officer

ACCEPTED AND AGREED:

Karina Franco Padilla

Signature

Date

[Signature Page to Offer Letter]

Exhibit A: Severance Agreement

Exhibit B: Employee Confidentiality, Arbitration, Non-Solicit, Non-Compete and Invention Assignment Agreement

EX 10.37

**SEVERANCE AGREEMENT**

This Severance Agreement (the "**Agreement**") is entered into as of  _(the "**Effective Date**") by  and between [_] (the "**Executive**") and Proterra Inc, a Delaware corporation (the "**Company**").

**1.    Term of Agreement**.

This Agreement shall terminate on the date the Executive's employment with the Company or its subsidiary, as applicable, terminates for a reason other than a Qualifying Termination or CIC Qualifying Termination (the "***Expiration Date***"); provided however, if a definitive agreement relating to a Change in Control has been signed by the Company on or before the Expiration Date, then this Agreement shall remain in effect through the earlier of:

- The date the Executive's employment with the Company terminates for a reason other than a Qualifying Termination or CIC Qualifying Termination, or

- The date the Company has met all of its obligations under this Agreement following a termination of the Executive's employment with the Company due to a Qualifying Termination or CIC Qualifying Termination.

**2.    Qualifying Termination**. If the Executive is subject to a Qualifying Termination, then, subject to Sections 4, 9, and 10 below, Executive will be entitled to the following benefits:

    (a)    **Severance Benefits**. The Company or its subsidiaries shall pay the Executive six months of Executive's monthly base salary (at the rate in effect immediately prior to the actions that resulted in the Qualifying Termination). The severance benefits shall be paid through salary continuation in equal installments in accordance with the Company's or its subsidiary's, as applicable, standard payroll procedures, with the initial payment to occur on the first payroll date following the sixtieth (60th) day following the Separation, with the first installment to include a catchup payment for amounts covering the period from the date of Separation through the first payment date, *provided that* the Release Conditions have been satisfied. However, if the period comprising the sum of the sixty (60)- day period described in the preceding sentence and the ten (10)-day period described in clause (3) of the second sentence of Section 7(e) below spans two calendar years, then the payments which constitute deferred compensation subject to Section 409A will not in any case commence in the first calendar year. The number of months of severance set forth in the first sentence of this subsection (a) shall be referred to herein as the "**Severance Period**."

    (b)    **Continued Employee Benefits**. If Executive timely elects continued coverage under the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), the Company or its subsidiary shall pay the full amount of Executive's COBRA premiums on behalf of the Executive for the Executive's continued coverage under the Company's or its subsidiary's, as applicable, health, dental and vision plans, including coverage for the Executive's eligible dependents, for the Severance Period. Notwithstanding the foregoing, if the Company, in its sole discretion, determines that it cannot provide the foregoing subsidy of COBRA coverage without potentially violating or causing the Company or its subsidiary to incur additional expense as a result of noncompliance with applicable law (including, without limitation, Section 2716 of the Public Health Service Act), the Company or its subsidiary instead shall provide to Executive a taxable monthly payment in an amount equal to the monthly COBRA premium that Executive would be required to pay to continue the group health coverage in effect on the date of the Separation (which amount shall be based on the premium for the first month of COBRA coverage), which payments shall be made regardless of whether Executive elects COBRA continuation coverage and shall commence on the later of (i) the first day of the month following the month in which Executive experiences a Separation and (ii) the effective date of the Company's determination of violation of applicable law, and shall end on the earlier of (x) the effective date on which Executive becomes covered by a health, dental or vision insurance plan of a subsequent employer, and (y) the last day of the Severance Period, *provided that*, any taxable payments under this Section 2(b) will not be paid before the first business day occurring after the sixtieth (60th) day following the Separation and, once they commence, will include any unpaid amounts accrued from the date of Executive's Separation (to the extent not otherwise satisfied with continuation coverage). However, if the period comprising the sum of the sixty (60)-day period described in the preceding sentence and the ten (10)-day period described in clause (3) of the second sentence of Section 7(e) below spans two calendar years, then the payments which constitute deferred compensation subject to Section 409A will not in any case be paid in the first calendar year. Executive shall have no right to an additional gross-up payment to account for the fact that such COBRA premium amounts are paid on an after-tax basis.

**3.    CIC Qualifying Termination**. If the Executive is subject to a CIC Qualifying Termination, then, subject to Sections 4, 9, and 10 below, Executive will be entitled to the following benefits:

(a)    **Severance Benefits**. The Company or its subsidiaries shall pay the Executive twelve months of Executive's monthly base salary and then-current target bonus opportunity (at the rates in effect immediately prior to the actions that resulted in the Separation). The severance benefits shall be paid through salary continuation in equal installments in accordance with the Company's or its subsidiary's, as applicable, standard payroll procedures, with the initial payment to occur on the first payroll date following the sixtieth (60th) day following the Separation, with the first installment to include a catchup payment for amounts covering the period from the date of Separation through the first payment date, *provided that* the Release Conditions have been satisfied. However, if the period comprising the sum of the sixty (60)-day period described in the preceding sentence and the ten (10)-day period described in clause (3) of the second sentence of Section 7(e) below spans two calendar years, then the payments which constitute deferred compensation subject to Section 409A will not in any case commence in the first calendar year.

(b)    **Continued Employee Benefits**. The Company or its subsidiary shall pay the Executive the continued employee benefits set forth in Section 2(b) above for the same period that the Executive is paid severance benefits pursuant to Section 3(a) following the Executive's Separation or, if earlier, until Executive becomes covered by a health, dental or vision insurance plan of a subsequent employer or until Executive is no longer eligible for COBRA benefits.

(c)    **Equity**. Each of Executive's then outstanding Equity Awards, including awards that would otherwise vest only upon satisfaction of performance criteria, shall accelerate and become vested and exercisable as to 100% of the then unvested shares underlying the Equity Award. For awards that would otherwise vest only upon satisfaction of performance criteria, the foregoing acceleration shall be based on achievement of performance criteria at target, except to the extent otherwise provided in the award agreement evidencing such award. "**Equity Awards**" means all options to purchase shares of Company common stock as well as any and all other stock-based awards granted to the Executive, including but not limited to stock bonus awards, restricted stock, restricted stock units or stock appreciation rights. Subject to Section 4, the accelerated vesting described above shall be effective as of the Separation.

4.    **General Release**. Any other provision of this Agreement notwithstanding, the benefits under Section 2 and 3 shall not apply unless the Executive (i) has executed a general release (in a form prescribed by the Company) of all known and unknown claims that Executive may then have against the Company or entities or persons affiliated with the Company and such release has become effective and (ii) has agreed not to prosecute any legal action or other proceeding based upon any of such claims. The release must be in the form prescribed by the Company, without alterations (this document effecting the foregoing, the "**Release**"). The Company or its subsidiary will deliver the form of Release to the Executive within thirty (30) days after the Executive's Separation. The Executive must execute and return the Release within the time period specified in the form.

5.    **Accrued Compensation and Benefits**. Notwithstanding anything to the contrary in Section 2 and 3 above, in connection with any termination of employment upon or following a Change in Control (whether or not a Qualifying Termination or CIC Qualifying Termination), the Company or its subsidiary shall pay Executive's earned but unpaid base salary and other vested but unpaid cash entitlements for the period through and including the termination of employment, including unused earned vacation pay and unreimbursed documented business expenses incurred by Executive prior to the date of termination (collectively "**Accrued Compensation and Expenses**"), as required by law and the applicable Company or its subsidiary, as applicable, plan or policy. In addition, Executive shall be entitled to any other vested benefits earned by Executive for the period through and including the termination date of Executive's employment under any other employee benefit plans and arrangements maintained by the Company or its subsidiary, as applicable, in accordance with the terms of such plans and arrangements, except as modified herein (collectively "**Accrued Benefits**"). Any Accrued Compensation and Expenses to which the Executive is entitled shall be paid to the Executive in cash as soon as administratively practicable after the termination, and, in any event, no later than two and one-half (2-1/2) months after the end of the taxable year of the Executive in which the termination occurs or at such earlier time as may be required by applicable law or Section 10 below, and to such lesser extent as may be mandated by Section 9 below. Any Accrued Benefits to which the Executive is entitled shall be paid to the Executive as provided in the relevant plans and arrangements.

6.    **Covenants**.

(a)    **Non-Competition**. The Executive agrees that, during Executive's employment with the Company, Executive shall not engage in any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest with the Company.

(b)    **Cooperation and Non-Disparagement**. The Executive agrees that, during the Severance Period, he or she shall cooperate with the Company or its subsidiary in every reasonable respect and shall use Executive's best efforts to assist the Company or its subsidiary with the transition of Executive's duties to Executive's successor. The Executive further agrees that following the date of Separation, Executive shall not

in any way or by any means disparage the Company, its subsidiaries, or the members of their Board of Directors or their officers and employees.

**7.      Definitions**.

(a)      "**Cause**" means (i) an unauthorized use or disclosure by Executive of the Company's or its subsidiaries' confidential information or trade secrets, which use or disclosure causes or is reasonably likely to cause material harm to the Company or its subsidiaries, (ii) a material breach of any agreement between Executive and the Company or its subsidiaries, (iii) a material failure to comply with the Company's or its subsidiaries' written policies or rules that has caused or is reasonably likely to cause material injury to the Company, its successor, or its affiliates, or any of their business, (iv) conviction of, or plea of "guilty" or "no contest" to, a felony under the laws of the United States or any state thereof,
(v) willful misconduct that has caused or is reasonably likely to cause material injury to the Company, its successor, or its affiliates, or any of their business, (vi) embezzlement, (vii) failure to cooperate with the Company or its subsidiaries in any investigation or formal proceeding if the Company or its subsidiary, as applicable, has requested Executive's reasonable cooperation, (viii) violation of any applicable federal, state or foreign statutes, laws or regulations or (ix) a continued failure to perform assigned duties after receiving written notification of such failure from the Company's or its subsidiaries', as applicable, Chief Executive Officer; *provided that* Executive must be provided with written notice of Executive's termination for "Cause" and Executive must be provided with a thirty (30) day period following Executive's receipt of such notice to cure the event(s) that trigger "Cause," with the Company's or its subsidiaries', as applicable, Board of Directors making the final determination whether Executive has cured any Cause.

(b)      "**Code**" means the Internal Revenue Code of 1986, as amended.

(c)      "**Change in Control**." For all purposes under this Agreement, a Change in Control shall mean a "Change in Control," as such term is defined in the Company's 2010 Equity Incentive Plan, as may be amended from time to time, *provided that* the transaction (including any series of transactions) also qualifies as a change in control under U.S. Treasury Regulation 1.409A-3(i)(5)(v) or 1.409A-3(i)(5)(vii).

(d)      "**CIC Qualifying Termination**" means a Separation (A) within twelve (12) months following a Change in Control or (B) within three (3) months preceding a Change in Control (but as to part (B), only if the Separation occurs after a Potential Change in Control) resulting, in either case (A) or (B), from (i) the Company or its subsidiary, as applicable, terminating the Executive's employment for any reason other than Cause or (ii) the Executive voluntarily resigning Executive's employment for Good Reason. A termination or resignation due to the Executive's death or disability shall not constitute a CIC Qualifying Termination. A "**Potential Change in Control**" means the date of execution of a legally binding and definitive agreement for a corporate transaction which, if consummated, would constitute the applicable Change in Control (which for the avoidance of doubt, would include a merger agreement, but not a term sheet for a merger agreement). In the case of a termination following a Potential Change in Control and before a Change in Control, solely for purposes of benefits under this Agreement, the date of Separation will be deemed the date the Change in Control is consummated.

(e)      "**Good Reason**" means, without the Executive's consent, (i) a material reduction in the Executive's level of responsibility and/or scope of authority, (ii) a reduction by more than 10% in Executive's base salary (other than a reduction generally applicable to executive officers of the Company or its subsidiary, as applicable, and in generally the same proportion as for the Executive), or (iii) relocation of the Executive's principal workplace by more than thirty-five (35) miles from Executive's then current place of employment. For the purpose of clause (i), a change in responsibility shall not be deemed to occur (A) solely because Executive is part of a larger organization or (B) solely because of a change in title. For the Executive to receive the benefits under this Agreement as a result of a voluntary resignation under this subsection (e), all of the following requirements must be satisfied: (1) the Executive must provide notice to the Company or its subsidiary, as applicable, of Executive's intent to assert Good Reason within sixty (60) days of the initial existence of one or more of the conditions set forth in subclauses (i) through (iii); (2) the Company or its subsidiary, as applicable, will have thirty (30) days (the "**Company Cure Period**") from the date of such notice to remedy the condition and, if it does so, the Executive may withdraw Executive's resignation or may resign with no benefits; and (3) any termination of employment under this provision must occur within ten (10) days of the earlier of expiration of the Company Cure Period or written notice from the Company or one of its subsidiaries, as applicable, that it will not undertake to cure the condition set forth in subclauses
(i) through (iii). Should the Company or one of its subsidiaries, as applicable, remedy the condition as set forth above and then one or more of the conditions arises again within twelve months following the occurrence of a Change in Control, the Executive may assert Good Reason again subject to all of the conditions set forth herein.

(f)      "**Release Conditions**" mean the following conditions: (i) Company has received the Executive's executed Release and (ii) any rescission period applicable to the Executive's executed Release has expired.

(g)      "**Qualifying Termination**" means a Separation that is not a CIC Qualifying Termination, but which results from (i) the Company or one of its subsidiaries, as applicable, terminating the Executive's

employment for any reason other than Cause or (ii) the Executive voluntarily resigning his or her employment for Good Reason. A termination or resignation due to the Executive's death or disability shall not constitute a Qualifying Termination.

(h)     "**Separation**" means a "separation from service," as defined in the regulations under Section 409A of the Code.

**8.     Successors**.

(a)     **Company's Successors**. The Company shall require any successor (whether direct or indirect and whether by purchase, lease, merger, consolidation, liquidation or otherwise) to all or substantially all of the Company's business and/or assets, by an agreement in substance and form satisfactory to the Executive, to assume this Agreement and to agree expressly to perform this Agreement in the same manner and to the same extent as the Company would be required to perform it in the absence of a succession. For all purposes under this Agreement, the term "Company" shall include any successor to the Company's business and/or assets or which becomes bound by this Agreement by operation of law.

(b)     **Executive's Successors**. This Agreement and all rights of the Executive hereunder shall inure to the benefit of, and be enforceable by, the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees and legatees.

**9.     Golden Parachute Taxes**.

(a)     **Best After-Tax Result**. In the event that any payment or benefit received or to be received by Executive pursuant to this Agreement or otherwise ("**Payments**") would
(i) constitute a "parachute payment" within the meaning of Section 280G of the Code and (ii) but for this subsection (a), be subject to the excise tax imposed by Section 4999 of the Code, any successor provisions, or any comparable federal, state, local or foreign excise tax ("**Excise Tax**"), then, subject to the provisions of Section 10, such Payments shall be either
(A) provided in full pursuant to the terms of this Agreement or any other applicable agreement, or (B) provided as to such lesser extent which would result in the Payments being $1.00 less than the amount at which any portion of the Payments would be subject to the Excise Tax ("**Reduced Amount**"), whichever of the foregoing amounts, taking into account the applicable federal, state, local and foreign income, employment and other taxes and the Excise Tax (including, without limitation, any interest or penalties on such taxes), results in the receipt by Executive, on an after-tax basis, of the greatest amount of payments and benefits provided for hereunder or otherwise, notwithstanding that all or some portion of such Payments may be subject to the Excise Tax. Unless the Company and Executive otherwise agree in writing, any determination required under this Section shall be made by independent tax counsel designated by the Company and reasonably acceptable to Executive ("**Independent Tax Counsel**"), whose determination shall be conclusive and binding upon Executive and the Company for all purposes. For purposes of making the calculations required under this Section, Independent Tax Counsel may make reasonable assumptions and approximations concerning applicable taxes and may rely on reasonable, good faith interpretations concerning the application of Sections 280G and 4999 of the Code; *provided that* Independent Tax Counsel shall assume that Executive pays all taxes at the highest marginal rate. The Company and Executive shall furnish to Independent Tax Counsel such information and documents as Independent Tax Counsel may reasonably request in order to make a determination under this Section. The Company shall bear all costs that Independent Tax Counsel may reasonably incur in connection with any calculations contemplated by this Section. In the event that Section 9(a)(ii)(B) above applies, then based on the information provided to Executive and the Company by Independent Tax Counsel, the cutback described hereunder will apply as to compensation not subject to Section 409A of the Code prior to compensation subject to Section 409A of the Code and will otherwise apply on a reverse chronological basis from payments latest in time. If the Internal Revenue Service (the "**IRS**") determines that any Payment is subject to the Excise Tax, then Section 9(b) hereof shall apply, and the enforcement of Section 9(b) shall be the exclusive remedy to the Company.

(b)     **Adjustments**. If, notwithstanding any reduction described in Section 9(a) hereof (or in the absence of any such reduction), the IRS determines that Executive is liable for the Excise Tax as a result of the receipt of one or more Payments, then Executive shall be obligated to surrender or pay back to the Company or its subsidiary, as applicable, within one-hundred twenty (120) days after a final IRS determination, an amount of such payments or benefits equal to the "**Repayment Amount**." The Repayment Amount with respect to such Payments shall be the smallest such amount, if any, as shall be required to be surrendered or paid to the Company or its subsidiary, as applicable, so that Executive's net proceeds with respect to such Payments (after taking into account the payment of the Excise Tax imposed on such Payments) shall be maximized. Notwithstanding the foregoing, the Repayment Amount with respect to such Payments shall be zero (0) if a Repayment Amount of more than zero (0) would not eliminate the Excise Tax imposed on such Payments or if a Repayment Amount of more than zero would not maximize the net amount received by

Executive from the Payments. If the Excise Tax is not eliminated pursuant to this Section 9(b), Executive shall pay the Excise Tax.

**10.    Miscellaneous Provisions**.

(a)    **Section 409A**. To the extent (i) any payments to which Executive becomes entitled under this Agreement, or any agreement or plan referenced herein, in connection with Executive's termination of employment with the Company or its subsidiary, as applicable, constitute deferred compensation subject to Section 409A of the Code and (ii) Executive is deemed at the time of such termination of employment to be a "specified" employee under Section 409A of the Code, then such payment or payments shall not be made or commence until the earlier of (i) the expiration of the six (6)-month period measured from

the Executive's Separation; or (ii) the date of Executive's death following such Separation; *provided, however*, that such deferral shall only be effected to the extent required to avoid adverse tax treatment to Executive, including (without limitation) the additional twenty percent (20%) tax for which Executive would otherwise be liable under Section 409A(a)(1)(B) of the Code in the absence of such deferral. Upon the expiration of the applicable deferral period, any payments which would have otherwise been made during that period (whether in a single sum or in installments) in the absence of this paragraph shall be paid to Executive or Executive's beneficiary in one lump sum (without interest). Except as otherwise expressly provided herein, to the extent any expense reimbursement or the provision of any in-kind benefit under this Agreement (or otherwise referenced herein) is determined to be subject to (and not exempt from) Section 409A of the Code, the amount of any such expenses eligible for reimbursement, or the provision of any in-kind benefit, in one calendar year shall not affect the expenses eligible for reimbursement or in kind benefits to be provided in any other calendar year, in no event shall any expenses be reimbursed after the last day of the calendar year following the calendar year in which Executive incurred such expenses, and in no event shall any right to reimbursement or the provision of any in- kind benefit be subject to liquidation or exchange for another benefit. To the extent that any provision of this Agreement is ambiguous as to its exemption or compliance with Section 409A, the provision will be read in such a manner so that all payments hereunder are exempt from Section 409A to the maximum permissible extent, and for any payments where such construction is not tenable, that those payments comply with Section 409A to the maximum permissible extent. To the extent any payment under this Agreement may be classified as a "short-term deferral" within the meaning of Section 409A, such payment shall be deemed a short-term deferral, even if it may also qualify for an exemption from Section 409A under another provision of Section 409A. Payments pursuant to this Agreement (or referenced in this Agreement) are intended to constitute separate payments for purposes of Section 1.409A-2(b)(2) of the regulations under Section 409A.

(b)    **Other Arrangements**. This Agreement also supersedes any and all cash severance arrangements and vesting acceleration arrangements on change in control under any agreement governing Equity Awards, severance and salary continuation arrangements, programs and plans which were previously offered, or may be offered on the Effective Date or thereafter, by the Company or its subsidiary, as applicable, to the Executive, including change in control severance arrangements and vesting acceleration arrangements pursuant to an agreement governing Equity Awards, employment agreement or offer letter, and Executive hereby waives Executive's rights to such other benefits. In no event shall any individual receive cash severance benefits under both this Agreement and any other severance pay or salary continuation program, plan or other arrangement with the Company or its subsidiaries. For the avoidance of doubt, in no event shall Executive receive payment under both Section 2 and Section 3 with respect to Executive's Separation.

(c)    **Dispute Resolution**. To ensure rapid and economical resolution of any and all disputes that might arise in connection with this Agreement, Executive and the Company agree that any and all disputes, claims, and causes of action, in law or equity, arising from or relating to this Agreement or its enforcement, performance, breach, or interpretation, will be resolved solely and exclusively by final, binding, and confidential arbitration, by a single arbitrator, in San Mateo County, and conducted by Judicial Arbitration & Mediation Services, Inc. ("**JAMS**") under its then-existing employment rules and procedures. Nothing in this section, however, is intended to prevent either party from obtaining injunctive relief in court to prevent irreparable harm pending the conclusion of any such arbitration. Each party to an arbitration or litigation hereunder shall be responsible for the payment of its own attorneys' fees.

(d)    **Notice**. Notices and all other communications contemplated by this Agreement shall be in writing and shall be deemed to have been duly given when personally delivered or when mailed by U.S. registered or certified mail, return receipt requested and postage prepaid or deposited with Federal Express Corporation, with shipping charges prepaid. In the case of the Executive, mailed notices shall be addressed to him or her at the home address which he or she most recently communicated to the Company in writing. In the case of the Company, mailed notices shall be addressed to its corporate headquarters, and all notices shall be directed to the attention of its Secretary.

(e)    **Waiver**. No provision of this Agreement shall be modified, waived or discharged unless the modification, waiver or discharge is agreed to in writing and signed by the Executive and by an authorized officer of the Company (other than the Executive). No waiver by either party of any breach of, or of compliance with, any condition or provision of this Agreement by the other party shall be considered a waiver of any other condition or provision or of the same condition or provision at another time.

(f)    **Withholding Taxes**. All payments made under this Agreement shall be subject to reduction to reflect taxes or other charges required to be withheld by law.

(g)    **Severability**. The invalidity or unenforceability of any provision or provisions of this Agreement shall not affect the validity or enforceability of any other provision hereof, which shall remain in full force and effect.

(h)    **No Retention Rights**. Nothing in this Agreement shall confer upon the Executive any right to continue in service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or any subsidiary of the Company or of the Executive, which rights are hereby expressly reserved by each, to terminate his or her service at any time and for any reason, with or without Cause.

(i)    **Choice of Law**. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of California (other than its choice- of-law provisions).

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, each of the parties has executed this Agreement, in the case of the Company by its duly authorized officer, as of the day and year first above written.

PROTERRA INC

_____

By:
Title: On behalf of the Board of Directors

_____

[Executive's Name]

**EX 10.43**

**Proterra Operating Company, Inc.**

March 14, 2023

**PRIVATE AND CONFIDENTIAL**

Via: Email

CSI I Prodigy Holdco LP
CSI Prodigy Co-Investment LP
CSI GP I LLC
CSI PRTA Co-Investment LP
599 Lexington Avenue, 20th Floor
New York, NY 10022

*Re: Limited Waiver Pursuant to Note Purchase Agreement and Secured Convertible Promissory Notes*

Ladies and Gentlemen:

We refer to that certain Note Purchase Agreement, dated as of August 4, 2020, by and among Proterra Operating Company, Inc., a Delaware corporation formerly known as Proterra Inc. (the "***Company***"), the Investors (as defined therein) from time to time party thereto, the Guarantors (as defined therein) from time to time party thereto and CSI GP I LLC, as collateral agent (the "***Purchase Agreement***"), and the Secured Convertible Promissory Notes in the initial aggregate principal amount of $200,000,000.00 issued pursuant thereto (the "***Notes***"). CSI Prodigy Holdco LP, CSI Prodigy Co-Investment LP, CS GP I LLC and CSI PRTA Co-Investment LP (collectively, the "***Cowen Parties***") purchased and continue to hold Notes in initial aggregate principal amount of $150,000,000.00. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

The Company has (i) informed the Cowen Parties that the financial statements to be delivered in accordance with Section 7.1(a)(i) of the Purchase Agreement for the fiscal year ended December 31, 2022 are expected to contain a qualification (or similar notation) as to going concern in contravention of the express requirement of Section 7.1(a)(i) (the "***Anticipated Default***") and (ii) requested a limited advance waiver of the Anticipated Default pursuant to Section 10.11 of the Purchase Agreement. The waiver in the foregoing sentence shall, (i) where applicable and as permitted by Section 10.11 of the Purchase Agreement, be given prospective effect notwithstanding the date of this letter and, notwithstanding any terms set forth in the Purchase Agreement and for the avoidance of doubt, no Default or Event of Default shall occur due to the Company's or any Guarantor's failure to observe or perform any covenant under Section 7.1(a) (in connection with the delivery by the Company of audited and certified financial statements for the fiscal year ending December 31, 2022 and that arises solely because such financial statements contain a qualification (or similar notation) as to going concern and (ii) expire and be of no further force and effect on March 31, 2023 (and an Event of Default shall occur if the Company or any Guarantor fails to observe or perform any covenant under Section 7.1(a) (including in connection with the delivery by the Company of audited and certified financial statements for the fiscal year ending December 31, 2022 that contain a qualification (or similar notation) as to going concern).

Section 10.11 of the Purchase Agreement provides that any term of the Financing Documents may be amended and the observance of any term of the Financing Documents may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and (a) the holders of Notes representing the majority of the aggregate Principal Balances (as defined in the Notes) of all the Notes then outstanding and (b) if the Cowen Investors, in the aggregate, hold Notes having an aggregate stated principal amount (excluding any increase thereto for PIK interest) in excess of fifty million Dollars ($50,000,000), the Cowen Investors holding a majority of the aggregate Principal Balances (as defined in the Notes) of all of the Notes held by Cowen Investors ((a) and (b) together, the "***Required Holders***"), and that any such amendment or waiver shall be binding upon each holder of the Notes then outstanding, each future holder of such securities, and the Company.

By the signatures of the Required Holders below, the Required Holders, subject to the terms and conditions described herein, grant the prospective waiver of the Anticipated Default under Section 7.1(a)(i) of the Purchase Agreement. For the avoidance of doubt, except as otherwise expressly provided herein, this waiver does not change, modify, amend or waive any other terms and conditions of the Notes, the Purchase Agreement or any other documents or instruments related to any of the foregoing.

This waiver may be executed in two or more counterparts, including delivery by electronic transmission, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

This waiver shall be governed by and construed in accordance with the internal laws of the State of Delaware, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

*[Signature Page Follows]*

If you are in agreement with the foregoing, please sign a counterpart copy of this waiver and return same to my attention.

Very truly yours,

**PROTERRA OPERATING COMPANY, INC.**

By: _/s/ Gareth Joyce_

Name: Gareth Joyce

Title: CEO

ACCEPTED AND AGREED TO:

**CSI I PRODIGY HOLDCO LP**

By: CSI GP I LLC, its general partner

By: _/s/ Vusal Najafov_

Name: Vusal Najafov

Title: Co-head of CSI

ACCEPTED AND AGREED TO:

**CSI PRODIGY CO-INVESTMENT LP**

By: CSI GP I LLC, its general partner

By: _/s/ Vusal Najafov_

Name: Vusal Najafov

Title: Co-head of CSI

**CSI PRTA CO-INVESTMENT LP**

By: CSI GP I LLC, its general partner

By: _/s/ Vusal Najafov_

Name: Vusal Najafov

Title: Co-head of CSI

**CSI GP I LLC**

By: _/s/ Vusal Najafov_

Name: Vusal Najafov

Title: Co-head of CSI

**EX 10.5**

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE IT IS NOT MATERIAL AND WOULD LIKELY CAUSE COMPETITIVE HARM TO PROTERRA INC.IF PUBLICLY DISCLOSED.SUBJECT TO FED. R. EVID. 408**

**Amendment NO. 3**
**TO LEASE AGREEMENT**

Lessor: G & T Properties, a limited partnership

Lessee: Proterra Operating Company, Inc.,, a Delaware corporation formerly known as Proterra Inc.

Premises: 1815 & 1835 Rollins Road and 23 Broderick Road, Burlingame, CA 94010

Date: April 25, 2022

---

This Amendment NO. 3 is made on April 25, 2022 by and between G & T Properties, a limited partnership ("Lessor") and Proterra Operating Company, Inc., a Delaware corporation ("Lessee").

Whereas Lessor and Lessee entered into a Lease Agreement dated April 23, 2015 for the premises described as ±34,400 square foot freestanding office/warehouse building and parking lot, but excluding Lessor's storage/garage as shown by crosshatching Exhibit A, located at 1815 Rollins Road, Burlingame, CA, and was further amended with an Amendment NO. 1 dated January 30, 2018, and later amended by an Amendment NO. 2 dated June 18, 2019 which included an expansion of another building located at 1835 Rollins Road, a ±9,000 square foot freestanding office/warehouse building (as amended, the "Lease").

Whereas, all provisions of the Lease are hereby confirmed as stated, except as specifically modified in the numbered paragraphs below which consist of both an extension of term on 1815 Rollins Road (but not 1835 Rollins Road) and an expansion of the premises to include 23 Broderick Road, a ±10,000 square foot freestanding office/warehouse building.

Now, therefore, Lessor and Lessee agree to the following provisions of this amendment:

1. **<u>New Premises & Term at 23 Broderick Road</u>**:
   Effective June 1, 2022 or upon Lessor's delivery of the premises, whichever is later, Lessee is expanding into another +/- 10,000 SF building owned by Lessor located at 23 Broderick Road for a period of three (3) years per the rent schedule below.

2. **<u>23 Broderick Road Rent Schedule</u>**:

| *Period* | *Monthly Base Rent (NNN)* |
|---|---|
| Months 1 - 12 | [***]* |
| Months 13 - 24 | [***] |
| Month 25 - 5/31/2025 | [***] |

*Base rent for the first full month shall be abated. For example, if the effective date of expansion is June 20, 2022, then Base Rent shall be abated from June 20, 2022 through July 19, 2022.

3. **<u>Fixed CAM for 23 Broderick Road</u>**:

| Period | Monthly CAM |
|--------|-------------|
| Months 1-12 | [***] |
| Months 13-24 | [***] |
| Month 25 - 5/31/2025 | [***] |

4. **Extended Term for 1815 Rollins Road**:
The term with respect to 1815 Rollins Road is hereby extended for a period of eight (8) months beyond its existing lease expiration date of September 30, 2024 and therefore a new expiration date of May 31, 2025. The base rent for this extension period shall be per the rent schedule below.

5. **1815 Rollins Road Rent for Extended Term**:

| Period | Monthly Base Rent (NNN) |
|--------|-------------------------|
| 10/01/2024 - 5/31/2025 | [***] |

6. **Fixed CAM for 1815 Rollins Road Extended Term**:

| Period | Monthly CAM |
|--------|-------------|
| 10/1/2024 - 5/31/2025 | [***] |

7. **Delivery Conditions for 23 Broderick Road**:
Lessor will deliver the premises with a target date of June 1, 2022 in a professionally clean condition with all building systems in good working order. Lessor shall so deliver the premises no later than August 1, 2022. Lessor shall provide Lessee written notice on or before May 26, 2022 if delivery will not occur on June 1, 2022 and shall specify in such notice Lessor's revised estimated delivery date.

8. **Security Deposit**:
Lessee shall provide Lessor a Security Deposit for the new premises located at 23 Broderick Road in the amount of [***].

9. **1835 Rollins Road**:
No changes to the term for this leased premises; refer to Amendment NO.2. The term for 1835 Rollins Road expires on September 30, 2024.

10. **Parking for 23 Broderick Road**:
Lessee shall have the exclusive right to all parking located on the parcel.

11. **Additional Parking**:
Lessor shall continue to lease the Additional Parking Area set forth in Section 4 of Amendment No. 1 to Lessee, and Lessee shall continue to have the exclusive use of the additional parking set forth therein, at no cost through the remaining term of the Lease and through the new amended Lease Term (i.e., through May 31, 2025). Reference to "September 30, 2024" in Section 4 of Amendment No. 1 (as amended by Section 10 of Amendment No. 2) is hereby changed to "May 31, 2025".

12. **Agency/Disclosure and Commissions**:
In this transaction JLL is representing both Lessor and Lessee and therefore a dual agent. Landlord shall pay JLL a leasing commission per a separate Listing agreement which states a 5% fee for years 1-5 on new transactions (23 Broderick Road) and 3% on Lease extensions (1815 Rollins Road); this total amount shall be split 50/50 between Procuring and Listing agents.

13. **Controlling Instrument**:

Except as set forth in this Amendment NO. 3 all terms and conditions of the original Lease, Amendment NO. 1 and Amendment NO. 2 shall remain unchanged and in full force and effect and shall govern all premises (1815 & 1835 Rollins Road and 23 Broderick Road).

[Remainder of page left intentionally blank]

IN WITNESS WHEREOF, the parties to this Amendment have executed this Amendment NO. 3 as of the dates indicated below.

| LESSOR: | LESSEE: |
|---|---|
| **G & T Properties, a limited partnership** | **Proterra Operating Company, Inc.** |

By    _/s/ Terrill Timberlake_        By    _/s/ Brian Miller_

        Terrill Timberlake                    Brian Miller

Date        5/5/2022                Date        5/3/2022

By    _/s/Gary Guittard_

        Gary Guittard

Date        5/4/2022


For purposes of Section 11 of this Amendment No. 3, Guittard Chocolate Co, the fee simple owner of a portion of the Additional Parking Area, hereby represents, warrants and confirms that Lessor has the full right and authority to lease the Additional Parking Area to Lessee pursuant to this Amendment No. 3 for the remaining term (as amended). In the event Lessor's right and authority to lease the Additional Parking Area to Lessee shall terminate for any reason, Lessee shall continue to have the right to lease the same from Guittard Chocolate Co. on a direct lease basis at no cost to Lessee through the remaining existing term of the Lease and through the new amended Lease term (i.e., through May 31, 2025). The representations and obligations of Guittard Chocolate Co. hereunder shall be binding upon its successors and assigns.

GUITTARD CHOCOLATE CO.

By: _/s/ Gary Guittard_
Print Name:_Gary Guittard_
Title:_Partner_

**EX 10.7**

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE IT IS NOT MATERIAL AND WOULD LIKELY CAUSE COMPETITIVE HARM TO PROTERRA INC. IF PUBLICLY DISCLOSED.SUBJECT TO FED. R. EVID. 408**

**THIRD AMENDMENT TO LEASE AGREEMENT**

**THIS THIRD AMENDMENT TO LEASE AGREEMENT** (this “Amendment”) is entered into as of ______________________, by and between PAC Operating Limited Partnership, a Delaware limited partnership (“Landlord”) and Proterra Operating Company, Inc., a Delaware corporation, formerly known as Proterra Inc. (“Tenant”).

W I T N E S S E T H:

WHEREAS, Landlord and Tenant have entered into a Lease dated May 8, 2015, and as amended by a First Amendment to Lease Agreement dated February 8, 2019 and as amended by that First Amendment to Lease Agreement dated July 1, 2021 (as amended, the “Lease”), pursuant to which Landlord leased to Tenant certain premises consisting of approximately 157,055 rentable square feet located at 383-393 South Cheryl Lane, City of Industry, CA 91789 (the “Premises”), such lease, as heretofore modified, being herein referred to as the “Lease”.

WHEREAS, Landlord and Tenant desire to modify the Lease on the terms and conditions set forth below.

A G R E E M E N T:

NOW THEREFORE, in consideration of the Premises and the mutual covenants hereinafter contained, the parties hereto agree as follows:

1. The Lease Term is extended for twelve (12) months, such that the Expiration Date is amended to be 08/31/2023 (the “Second Extension Term”). All of the terms and conditions of the Lease shall remain in full force and effect during the Second Extension Term except that the Monthly Base Rent shall be as follows:

| Period | Monthly Base Rent |
|---|---|
| [***] | [***] |

2. Notwithstanding anything contained herein to the contrary, following the commencement of the Second Extension Term, Landlord and Tenant shall reconcile the actual Excess Operating Expenses for the Premises through August 31, 2022, and as provided in Paragraph 6 of the Lease irrespective of the amendment to Paragraph 6 as provided below.

3. Effective on the first day of the Second Extension Term (the “Second Extension Term Commencement Date”), Landlord and Tenant acknowledge and agree that the Lease shall be amended as follows:

   a. Paragraph 6 of the Lease is deleted in its entirety and replaced with:

      “**FOE.** In addition to the Base Rent, during each month of the Lease Term, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to $25,976.88 (“Monthly FOE”), which Landlord and Tenant agree shall be reimbursement for Landlord’s obligations with respect to the maintenance, repairs, and replacements as provided in Paragraph 10 of the Lease, as well as the insurance premiums incurred by Landlord as provided in Paragraph 9 of the Lease. All references to “Operating Expenses” under the Lease are hereby replaced with “Monthly FOE and Taxes. Effective on each annual anniversary of the Second Extension Term Commencement Date during the Lease Term (or, if the first annual anniversary occurs on a date other than the first day of a calendar month, then on the first day of the immediately subsequent calendar month and on each annual anniversary date thereafter), the Monthly FOE shall be automatically increased by an amount equal to 2.40% over the Monthly FOE due and payable under this Lease immediately prior to such increase (the “Annual FOE Increase”). Landlord and Tenant agree that except for the increases in the Monthly FOE as provided above, the Monthly FOE shall not be reconciled against the actual operating expenses incurred by Landlord. Upon extension of the Lease Term, whether via an option to extend or otherwise, upon written notice to Tenant, Landlord shall have the right to amend the Monthly FOE, and the Annual FOE Increase, each as determined in Landlord’s reasonable determination based on the actual operating expenses applicable to the Project prior to such increase and Landlord’s projected annual increase of such operating expenses.”

   b. Paragraph 8 of the Lease is deleted in its entirety and replaced with:

"**Taxes.** Subject to reimbursement as provided below, Landlord shall pay all taxes, assessments, governmental charges, and fees payable to tax consultants and attorneys for consultation and contesting taxes (collectively referred to as "Taxes") that accrue against the Building or Project during the Lease Term. Landlord may contest the amount, validity, or application of any Taxes. All capital levies or other taxes assessed or imposed upon the rents payable to Landlord under this Lease and any franchise tax, excise, use, margin, transaction, sales or privilege tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents from or the value of the Premises and/or the Project or any portion thereof shall be paid by Tenant to Landlord upon demand as additional rent; provided, however, in no event shall Tenant be liable for any net income taxes imposed on Landlord unless such net income taxes are in substitution for any Taxes payable hereunder. If any tax or excise is levied or assessed directly against Tenant, or the Premises, or results from any Tenant-Made Alterations (defined below), or against any personal property or fixtures placed in the Premises then Tenant shall pay such tax or excise as required by the taxing authority even if levied or assessed against the Landlord.

During each month of the Lease Term, on the same date that Base Rent is due, Tenant shall pay Landlord an amount equal to 1/12 of the annual cost (prorated for any fractional calendar month), as estimated by Landlord from time to time, of Tenant's Proportionate Share of Taxes for the Project or Building. If Tenant's total payments of Taxes for any year are less than Tenant's Proportionate Share of actual Taxes for such year, then Tenant shall pay the difference to Landlord within 30 days after demand, and if more, then Landlord shall pay such refund to Tenant. Any payment required to be paid by Landlord shall be delivered to the most recent address Tenant has provided to Landlord and, if undeliverable, shall be deemed forfeited by Tenant.  Tenant's "Proportionate Share" shall be reasonably adjusted by Landlord in the future for changes in the physical size of the Premises, Building, or Project. The initial payment of Taxes set forth below is only an estimate, and Landlord makes no guaranty as to the accuracy of such estimate."

c.  Paragraph 10 of the Lease is deleted in its entirety and replaced with:

"**Landlord's Repairs and Maintenance.** Landlord shall maintain, repair, and replace, at Landlord's expense, the exterior elements of the Building, including the roof, walls, parking areas, driveways, alleys, landscaping, lighting, and the Building fire sprinkler system, all components of the heating, ventilation, and air conditioning (the "HVAC") units serving the office portion of the Premises, and any heating and/or evaporative cooler systems serving the warehouse portion of the Premises which may exist (the "Warehouse Units"), and the below slab water and sewer lines, in good working order, excluding reasonable wear and tear and uninsured damages caused by Tenant, its employees, agents, contractors, invitees, subtenant's and assignees.  Notwithstanding the foregoing to the contrary, Landlord's obligation with respect to the HVAC and Warehouse Units as provided above shall expressly exclude any heating, ventilation, or air conditioning systems installed by Tenant in the Premises, any specialty HVAC systems (including but not limited to IT room supplemental HVAC or which are necessary for temperature controlled product), and any air conditioning systems serving the warehouse portion of the Premises other than the evaporative cooler systems as provided above. In addition to the foregoing, Landlord, at Landlord's expense, shall provide snow removal for the Project to the extent applicable under the local conditions, and parking lot sweep at the Project in a manner consistent with owners of similar buildings and projects in the market where the Building is located. The term "walls" as used in this Paragraph 10 shall not include windows, glass or plate glass, doors or overhead doors, store fronts, dock bumpers, dock plates or levelers, or office entries. Tenant shall promptly give Landlord written notice of any repair required by Landlord pursuant to this Paragraph 10.

On or about the Second Extension Term Commencement Date, the parties shall cause the HVAC and Warehouse Units to be inspected by a qualified HVAC contractor. In the event that such inspection determines that any maintenance, repairs or replacements are required to be performed, then at Landlord's option: (a) Tenant shall perform such work, at Tenant's sole cost and expense, within thirty (30) days after the date of such inspection, (b) Landlord shall perform such work and Tenant shall reimburse Landlord for all costs incurred by Landlord within thirty (30) days after written demand; or (c) defer such work and cause Tenant to pay the costs thereof from any future maintenance, repair or replacement performed by Landlord, such payment to be made within thirty (30) days after written demand from Landlord."

d.  Paragraph 11 of the Lease is deleted in its entirety and replaced with:

"**Tenant's Repairs.** Subject to Landlord's obligation in Paragraph 10, and subject to Paragraphs 9 and 15, Tenant, at its expense, shall repair, replace and maintain in good

condition the Premises and all areas, improvements and systems exclusively serving the Premises including, without limitation, dock and loading areas, truck doors, plumbing, above slab water and sewer lines up to points of common connection, entries, doors, ceilings, windows, and interior walls, which repair and replacement obligations include capital repairs whose benefit may extend beyond the Expiration Date.  Notwithstanding Landlord's obligations with respect to the HVAC units serving the office portion of the Premises as provided in Paragraph 10, Tenant, at Tenant's expense, shall be responsible for the maintenance, repair, and replacement of any heating, ventilation, or air conditioning systems installed by Tenant in the Premises, any specialty HVAC systems (including but not limited to IT room supplemental HVAC or which are necessary for temperature controlled product), and any air conditioning systems serving the warehouse portion of the Premises, as well as the exhaust fans, ductwork, vents, and registers of such air conditioning units serving the warehouse portion of the Premises. If Tenant fails to perform any maintenance, repair, or replacement for which it is responsible, Landlord may perform such work and be reimbursed by Tenant within 10 days after demand therefor. Subject to Paragraphs 9 and 15, Tenant shall bear the full cost of any repair or replacement to any part of the Building or Project that results from damage caused by Tenant, its agents, contractors, or invitees, or Tenant's failure to maintain the Premises in accordance with this Lease, and any repair that benefits only the Premises."

4. Effective on the Second Extension Term Commencement Date, the Monthly FOE (as defined above) shall due and payable under the Lease, subject to the Annual FOE Increase. The Monthly FOE will be broken out as follows:

Operating Expenses: [***]
Capital Repairs/Replacements: [***]

 **Total Monthly FOE: [***]**

5. Effective on the Second Extension Term Commencement Date, the estimated payment of Taxes due and payable under the Lease will be [***] subject to reimbursement and adjustment as provided in Paragraph 8.

6. Except as otherwise expressly provided herein, all defined terms used in this Amendment shall have the same respective meanings as are provided for such defined terms in the Lease. Tenant shall accept the Premises in its "as is" condition and shall pay Monthly FOE, Taxes and other reimbursable costs as provided in the Lease during the Second Extension Term.

7. Notwithstanding anything provided in the Lease to the contrary, effective on the date hereof, all payments required to be made by Tenant to Landlord (or to such other party as Landlord may from time to time specify in writing) may only be made by Electronic Fund Transfer ("EFT") of immediately available federal funds before 11:00 a.m., Eastern Time at such place, within the continental United States, as Landlord may from time to time designate to Tenant in writing.

8. The notice addresses for Landlord and Tenant during the Lease Term, as extended, shall be as follows:

Landlord:                        PAC Operating Limited Partnership
                                 [***]
                                 [***]
                                 Attention: Market Officer


With a copy to: Prologis
[***]
[***]
Attention: General Counsel

Tenant:            Proterra Operating Company, Inc.
                   1815 Rollins Road
                   Burlingame, California 94010
                   Attention: Chief Legal Officer

                   With a copy to:

                   Proterra Operating Company, Inc.
                   1815 Rollins Road
                   Burlingame, California 94010
                   Attention: Chief Financial Officer

9.  Tenant represents and warrants that it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction other than JLL, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

10. Landlord makes the following statement based on Landlord's actual knowledge in order to comply with California Civil Code Section 1938: The Building and Premises have not undergone an inspection by a Certified Access Specialist (CASp). A Certified Access Specialist (CASp) can inspect the subject Premises and determine whether the subject Premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject Premises, the Landlord may not prohibit the Tenant from obtaining a CASp inspection of the subject Premises for the occupancy or potential occupancy of the Tenant, if requested by the Tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises. Landlord and Tenant hereby agree that a Tenant-requested CASp inspection shall be at Tenant's sole cost and expense and that the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the Premises shall be governed by Paragraph 3 of the Lease.

11. Insofar as the specific terms and provisions of this Amendment purport to amend or modify or are in conflict with the specific terms, provisions and exhibits of the Lease, the terms and provisions of this Amendment shall govern and control; in all other respects, the terms, provisions and exhibits of the Lease shall remain unmodified and in full force and effect.

12. Landlord and Tenant hereby agree that (i) this Amendment is incorporated into and made a part of the Lease, (ii) any and all references to the Lease hereinafter shall include this Amendment, and (iii) the Lease and all terms, conditions and provisions of the Lease are in full force and effect as of the date hereof, except as expressly modified and amended hereinabove.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the date first written above.

**TENANT:**

**PROTERRA OPERATING COMPANY, INC.**
**a Delaware corporation**

By: _____
Name: _____
Title: _____

**LANDLORD:**

**PAC OPERATING LIMITED PARTNERSHIP**
**a Delaware limited partnership**

By: Palmtree Acquisition Corporation
a Delaware corporation
its general partner

By: _____
Name: Robert B. Antrobius
Title: Senior Vice President
Market Officer - Los Angeles

**EX 10.8**

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE IT IS NOT MATERIAL AND WOULD LIKELY CAUSE COMPETITIVE HARM TO PROTERRA INC. IF PUBLICLY DISCLOSED.SUBJECT TO FED. R. EVID. 408**

**FIFTH AMENDMENT TO LEASE AGREEMENT**

**THIS FIFTH AMENDMENT TO LEASE AGREEMENT** (this "Amendment") is entered into as of 24 December 2022, by and between PAC Operating Limited Partnership, Delaware limited partnership ("Landlord") and Proterra Operating Company, Inc., a Delaware corporation ("Tenant").

W I T N E S S E T H:

WHEREAS, Landlord and Tenant's predecessor in interest have entered into a Lease dated May 8, 2015, and as amended by a First Amendment to Lease Agreement dated February 8, 2019, a Second Amendment to Lease Agreement dated July 1, 2021, a Third Amendment to Lease Agreement dated March 22, 2022 and a Fourth Amendment to Lease Agreement dated April 14, 2022, pursuant to which Landlord leased to Tenant certain premises consisting of approximately 157,055 rentable square feet located at 383-393 South Cheryl Lane, City of Industry, CA 91789 (the "Premises"), such lease, as heretofore modified, being herein referred to as the "Lease".

WHEREAS, Landlord and Tenant desire to modify the Lease on the terms and conditions set forth below.

A G R E E M E N T:

NOW THEREFORE, in consideration of the Premises and the mutual covenants hereinafter contained, the parties hereto agree as follows:

1. The Lease Term is extended for 4 months commencing on September 1, 2023 (the "Third Extension Commencement Date"), such that the Expiration Date is amended to be December 31, 2023 (the "Third Extension Term"). All of the terms and conditions of the Lease shall remain in full force and effect during the Third Extension Term except that the Monthly Base Rent, Monthly Fixed Operating Expenses, and Annual Fixed Operating Expenses Increase shall be as follows:

| **Period** | **Monthly Base Rent** |
|---|---|
| 09/01/2023 through 12/31/2023 | [***] |

Monthly Fixed Operating Expenses:

| | |
|---|---|
| Operating Expenses: | [***] |
| Capital Repairs/Replacements: | [***] |
| **Total Monthly FOE:** | [***] |

Initial Estimated Monthly Property Taxes Payment: [***]

Annual Fixed Operating Expenses Increase: 3.80%

2. Except as otherwise expressly provided herein, all defined terms used in this Amendment shall have the same respective meanings as are provided for such defined terms in the Lease. Tenant shall accept the Premises in its "as is" condition and shall pay other reimbursable costs as provided in the Lease during the Third Extension Term.

3. Notwithstanding anything provided in the Lease to the contrary, effective on the date hereof, all payments required to be made by Tenant to Landlord (or to such other party as Landlord may from time to time specify in writing) may only be made by Electronic Fund Transfer ("EFT") of immediately available federal funds before 11:00 a.m., Eastern Time at such place, within the continental United States, as Landlord may from time to time designate to Tenant in writing.

4. The notice addresses for Landlord and Tenant during the Lease Term, as extended, shall be as follows:

Landlord:            PAC Operating Limited Partnership

                     17777 Center Court Dr. N., Suite 100,

                     Cerritos, California 90703

                     Attention: Market Officer


With a copy to: Prologis
1800 Wazee Street, Suite 500
Denver, Colorado 80202
Attention: General Counsel


Tenant:              Proterra Operating Company, Inc.

                     1815 Rollins Road

                     Burlingame, California 94010

                     Attention: Chief Legal Officer


With a copy to:      Proterra Operating Company, Inc.

                     1815 Rollins Road

                     Burlingame, California 94010

                     Attention: Chief Financial Officer

5.  Tenant represents and warrants that, it has dealt with no broker, agent or other person in connection with this transaction and that no broker, agent or other person brought about this transaction, other than Paul Sablock and Greg Matter with Jones Lang LaSalle, and Tenant agrees to indemnify and hold Landlord harmless from and against any claims by any other broker, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Tenant with regard to this leasing transaction.

6.  Within fifteen (15) days of Landlord's written request, Tenant agrees to deliver to Landlord such information and/or documents as Landlord requires for Landlord to comply with California Public Resources Code Section 25402.10, or successor statute(s), and California Energy Commission adopted regulations set forth in California Code of Regulations, Title 20, Division 2, Chapter 4, Article 9, Sections 1680-1685, and successor and related California Code of Regulations, relating to commercial building energy ratings.  Landlord makes the following statement based on Landlord's actual knowledge in order to comply with California Civil Code Section 1938: The Building and Premises have not undergone an inspection by a Certified Access Specialist (CASp).  A Certified Access Specialist (CASp) can inspect the subject Premises and determine whether the subject Premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject Premises, the Landlord may not prohibit the Tenant from obtaining a CASp inspection of the subject Premises for the occupancy or potential occupancy of the Tenant, if requested by the Tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises. Landlord and Tenant hereby agree that a Tenant-requested CASp inspection shall be at Tenant's sole cost and expense and that the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the Premises shall be governed by Paragraph 3 of the Lease.

7.  All Tenant options to extend the Lease Term, terminate the Lease, or expand or contract the Premises, if any, which exist under the Lease are hereby null and void.

8.  Intentionally Omitted.

9.  Insofar as the specific terms and provisions of this Amendment purport to amend or modify or are in conflict with the specific terms, provisions and exhibits of the Lease, the terms and provisions of this Amendment shall govern and control; in all other respects, the terms, provisions and exhibits of the Lease shall remain unmodified and in full force and effect.

10. Landlord and Tenant hereby agree that (i) this Amendment is incorporated into and made a part of the Lease, (ii) any and all references to the Lease hereinafter shall include this Amendment, and (iii) the Lease and all terms, conditions and provisions of the Lease are in full force and effect as of the date hereof, except as expressly modified and amended hereinabove.

[Remainder of page is intentionally blank; signature page to follow]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the Effective Date.

**TENANT:**

  PROTERRA OPERATING COMPANY, INC.
  a Delaware corporation

By:*/s/ Gareth Joyce*_____
Name: Gareth Joyce_____
Title: CEO_____

**LANDLORD:**

PAC OPERATING LIMITED PARTNERSHIP
a Delaware limited partnership

By: Palmtree Acquisition Corporation
a Delaware corporation
its general partner

By:  */s/ Robert B. Antrobius*_____
Name: Robert B, Antrobius_____
Title: Senior VP-Market officer LA_____

EX 10.9

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE IT IS NOT MATERIAL AND WOULD LIKELY CAUSE COMPETITIVE HARM TO PROTERRA INC. IF PUBLICLY DISCLOSED.SUBJECT TO FED. R. EVID. 408**

LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease"), made and entered into as of November 13, 2021 (the "date of this Lease") by and between Proterra Operating Company, Inc., a Delaware corporation (hereinafter referred to as "Tenant"), and Carolina CC Venture XXXVII, LLC, a Delaware limited liability company (hereinafter referred to as "Landlord");

W I T N E S S E T H

1. PREMISES. For and in consideration of the obligation of Tenant to pay rent as herein provided, and in consideration of the other terms, provisions and covenants hereof, Landlord hereby demises and leases to Tenant, and Tenant hereby leases from Landlord certain premises (Suite 100) (the "Premises") containing approximately 327,139 square feet and known as Building One (the "Building") as more particularly set forth on the Leasing Plan attached hereto as Exhibit "A" and incorporated herein by reference, and located on that certain 25.58 acre tract of land more particularly described on Exhibit "B" (the "Land"). The Premises, together with all rights, privileges, easements, and appurtenances belonging to or in any way pertaining to said Premises, and the Land are hereinafter collectively referred to as the "Property".

TO HAVE AND TO HOLD the Premises for the Demised Term, as hereinafter defined.

2. TERM.

A. The Term of this Lease (hereinafter referred to as the "Demised Term") shall be for a period commencing on the Commencement Date, as hereinafter defined, and ending one hundred twenty-two (122) full calendar months thereafter, unless sooner terminated as provided in this Lease or unless further extended pursuant to the Renewal Term(s) described in Paragraph 32 below; provided, however, that, in the event the Commencement Date is not the first day of a calendar month, the Demised Term shall extend for the remainder of the calendar month in which the Commencement Date occurs plus said number of months.

The "Commencement Date" shall be November 13, 2021.

B. Landlord shall have no obligation to perform or cause the performance of construction of any improvements to the Premises other than (i) Landlord represents and warrants that the HVAC, plumbing, electrical and life safety systems serving the Premises and installed by Landlord shall be in good working order for one (1) year following the Commencement Date (excluding any repairs, non-routine maintenance, or replacements required due to the acts, omissions, negligence or intentional misconduct of Tenant or its agents, employees, contractors, licensees, vendors or other parties acting on behalf of Tenant), and (ii) Landlord represents and warrants that all loading doors on the Premises shall be free from latent defects for the first one (1) year following the Commencement Date. Landlord shall use reasonable efforts to deliver the Premises to Tenant on the Commencement Date, in an "as is" condition except for the work and warranties set forth in this grammatical paragraph, subject to delays caused by any Force Majeure Event (see Paragraph 30.O. below). Tenant acknowledges that no representations as to the condition of the Premises have been made by Landlord, unless such are expressly set forth in this Lease. After the Commencement Date, Tenant shall, upon demand, execute and deliver to Landlord a letter of acceptance of delivery of the Premises in the form attached hereto as Exhibit "E".

3. BASE RENT.

A. Tenant agrees to pay Landlord rent for the Premises ("Base Rent"), in advance, without demand, deduction or set off, for the Demised Term in an amount equal to [***] per month ([***] per rentable square foot); provided, however, that Base Rent shall be abated in full through January 7, 2022 and Tenant shall have no obligation to pay Base Rent from October 13, 2021 to and through January 7, 2022. The first monthly installment of Base Rent shall be due and payable on January 1, 2022 and a like monthly installment of Base Rent shall be due and payable on or before the first day of each calendar month

thereafter during the Demised Term, except that the rent payment for any fractional calendar month at the commencement or end of the Demised Term shall be prorated on the

basis of a thirty-day month and provided, moreover, that the first installment of Base Rent due on January 1, 2022 shall be reduced on a prorata basis (using thirty-day month basis) to reflect a rent start date of January 8, 2022 to ensure that Tenant receives the full benefit of the of Base Rent abatement described above in this Paragraph 3.A.

B.     Landlord and Tenant agree that the Base Rent set forth in Paragraph 3.A. above shall increase by three percent (3%) at the beginning of the thirteenth (13th) full calendar month of the Demised Term, which adjusted rent amount shall remain in effect for the next twelve (12) consecutive months and shall increase by three percent (3%) each twelve (12) months thereafter for the balance of the Demised Term; it being the express intention of the parties that in the event the Commencement Date is not the first day of a calendar month, the anniversary date of the rent adjustment hereunder shall be the first day of the first full calendar month. Whenever Base Rent is escalated under this Lease based on a percentage increase, the resulting escalated Base Rent amount shall be rounded up or down to the nearest whole dollar.

4.     LETTER OF CREDIT.

A.     Simultaneously with the execution of this Lease, Tenant shall deliver to Landlord an irrevocable standby letter of credit (the "Letter of Credit") in the face amount of [***], naming Landlord as beneficiary and Tenant as applicant, issued by a federally insured banking or lending institution (i.e., insured by the FDIC) with a retail banking branch located within the continental United States reasonably acceptable to Landlord (the "Issuer") and otherwise in form and substance reasonably acceptable to Landlord. Landlord approves Bank of America, N.A. as a potential Issuer of the Letter of Credit. The Letter of Credit shall (i) provide for partial draws, (ii) allow for presentation requested via facsimile (confirmed by telephone notice) or by presentation at Issuer's counters), (iii) be extended automatically and without amendment, for additional one-year periods unless at least sixty (60) days prior to the expiration date or any future expiration date, the Issuer has provided written notice to Landlord that Issuer is electing not to extend the expiration date of the Letter of Credit, and
(iv) be transferrable by the beneficiary thereunder. Tenant shall be solely responsible for all costs of transferring the Letter of Credit. The Letter of Credit (or a replacement thereof otherwise complying with the requirements of this Paragraph 4) must be maintained at all times during the Demised Term and for a period of sixty (60) days after the expiration of the Demised Term.

The Letter of Credit will secure the Tenant's obligations under this Lease. Upon the occurrence of an Event of Default by Tenant as set forth in Paragraphs 21.A., 21.B., 21.C. and/or 21. D. of this Lease (as used in this Paragraph 4, a "Material Event of Default"), Landlord, in Landlord's sole discretion, may present a full or partial drawing of the Letter of Credit for the amounts then due and owing to Landlord under this Lease (including, without limitation, if an Event of Default has occurred pursuant to Paragraphs 21.B., 21.C., and/or 21.D. hereof, a full or partial drawing for the unamortized balance of Landlord's Costs, as more particularly set forth in Paragraph 22 below). The Letter of Credit will be reduced by any partial draws.

In the event Landlord draws upon the Letter of Credit, Tenant shall present to Landlord a replacement Letter of Credit in the full amount of Letter of Credit, as the same may have been reduced pursuant to the Reduction Amount set forth below, as applicable, satisfying all of the terms and conditions of this Paragraph 4.A. within twenty-one (21) days after receipt of notice from Landlord of such draw. Tenant's failure to do so within such 21- day period will constitute an Event of Default hereunder (Tenant hereby waiving any additional notice and grace or cure period), and upon such Event of Default Landlord shall be entitled to immediately exercise all rights and remedies available to it hereunder, at law or in equity.

In the event a replacement Letter of Credit is not provided within thirty (30) days after the date of Issuer's notice of nonrenewal as set forth above, Landlord, shall have the right to draw the full amount of the Letter of Credit. Provided that no Material Event of Default shall have occurred hereunder at the time of such drawing, any such amount paid to Landlord by the Issuer of the Letter of Credit shall be held in a segregated account by Landlord as security for the performance of Tenant's obligations hereunder. Any interest earned on such amounts shall be the property of Landlord. Landlord's election to draw the Letter of Credit and to hold the proceeds of the drawing under the Letter of Credit in a

segregated account shall not be deemed a cure of any default by Tenant hereunder, other than Tenant's failure to maintain the Letter of Credit as required hereunder; provided, however, as and when Landlord applies such proceeds to the outstanding amounts due from Tenant to Landlord in connection with such monetary Event(s) of Default, such specific monetary Event(s) of Default shall be deemed cured. Tenant acknowledges that any proceeds of a draw made under the Letter of Credit and thereafter held in a segregated account by Landlord may be used by Landlord to cure or satisfy any obligation of Tenant hereunder as if such proceeds were instead proceeds of a draw made under a Letter of Credit that remained outstanding and in full force and effect at the time such amounts are applied by Landlord to cure or satisfy any such obligation of Tenant. Tenant hereby affirmatively disclaims any interest Tenant has, may have, claims to have, or may claim to have in any proceeds drawn by Landlord under the Letter of Credit and held in accordance with the terms hereof.

Upon the expiration of the Letter of Credit that occurs sixty (60) days following the end of the Demised Term of this Lease (whether by expiration or earlier termination hereof), provided that Tenant is not then in default under this Lease, Landlord shall either (1) return the Letter of Credit to the Issuer or its successor (or as such issuer may direct in writing) or, (2) if the Letter of Credit has been drawn and the proceeds deposited into a segregated account as provided above, any remaining and unapplied proceeds shall be released to Tenant.

B.    In addition to the foregoing, Landlord will have the right to require Tenant to have a new Letter of Credit issued in accordance with the above requirements from a different issuer if either the original Issuer is placed on an FDIC "watch list", if the FDIC or similar state or federal banking regulatory agency is appointed as receiver or conservator for such Issuer or if Landlord analyzes such Issuer's capitalization, asset quality, earnings, and/or liquidity and in Landlord's sole and absolute discretion, disapproves of such Issuer's financial wherewithal and ability to remain as the issuer of the Letter of Credit. Such new Letter of Credit must comply with the foregoing requirements and must be issued within thirty (30) days of Landlord's demand therefore.

C.    [Intentionally Deleted]

D.    Landlord and Tenant acknowledge and agree that in no event or circumstance shall the Letter of Credit or any renewal thereof or substitute therefor or any cash held by Landlord after a draw upon the Letter of Credit be deemed to be or treated as a "security deposit" within the meaning of South Carolina law. The parties hereto: (A) recite that the Letter of Credit and/or any cash held by Landlord after a draw upon the Letter of Credit, as the case may be, is not intended to serve as a security deposit and any and all laws, rules and regulations applicable to security deposits in the commercial context ("Security Deposit Laws") shall have no applicability or relevance thereto; and (B) waive any and all rights, duties and obligations either party may now or, in the future, will have under, relating to or arising from the Security Deposit Laws.

E.    Tenant acknowledges and agrees that Tenant has no property interest whatsoever in the Letter of Credit or the proceeds thereof and that, in the event Tenant becomes a debtor under any chapter of the Bankruptcy Code, neither Tenant, any trustee, nor Tenant's bankruptcy estate shall have any right to restrict or limit Landlord's claim and/or rights to the Letter of Credit and/or the proceeds thereof by application of Section 502(b)(6) of the Bankruptcy Code, and that the Landlord may apply the Letter of Credit to its state law damages without limiting or reducing in any way, its claim for damages resulting from the rejection of the Lease under Section 502(b)(6) of the Bankruptcy Code.

F.    Provided that no Material Event of Default shall have occurred by the Tenant under this Lease, for the twelve (12) month period preceding the applicable LOC Reduction Dates (as set forth below), Landlord will submit a reduction certificate to the Issuer on the applicable LOC Reduction Date advising that the balance of the Letter of Credit shall be reduced by the following amounts, or the Tenant may provide a substitute Letter of Credit in the amount(s) specified below (which such replacement Letter of Credit shall otherwise comply with all requirements set forth herein):

| LOC Reduction Date | Reduction Amount | Substitute Letter of Credit Amounts |
|---|---|---|
| First (1st) day of the twenty-fifth (25th) full calendar month following the Commencement Date | [***] | [***] |
| First (1st) day of the thirty-seventh (37th) full calendar month following the Commencement Date | [***] | [***] |
| First (1st) day of the forty-ninth (49th) full calendar month following the Commencement Date | [***] | [***] |
| First (1st) day of the sixty-first (61st) full calendar month following the Commencement Date | [***] | [***] |
| First (1st) day of the seventy-third (73rd) full calendar month following the Commencement Date | [***] | [***] |
| First (1st) day of the eighty-fifth (85th) full calendar month following the Commencement Date | [***] | [***] |
| First (1st) day of the ninety-seventh (97th) full calendar month following the Commencement Date | [***] | [***] |
| First (1st) day of the one hundred ninth (109th) full calendar month following the Commencement Date | [***] | [***] |
| First (1st) day of the one hundred twenty-first (121st) full calendar month following the Commencement Date | [***] | [***] |

G.      Notwithstanding the foregoing, should a Material Event of Default be then occurring as of any LOC Reduction Date specified above, or if a Material Event of Default has occurred during the period preceding the applicable LOC Reduction Date as specified above, Landlord shall be under no obligation to submit any reduction certificate at any time thereafter in order to reduce the Letter of Credit.

5.      USE. The Premises shall be used only for general office purposes, and for the purpose of warehousing, distribution, receiving, storing, shipping, assembly and light manufacturing and selling (other than retail) non-hazardous products, materials and merchandise made and/or distributed by Tenant and for such other lawful purposes as may be incidental thereto; provided, however in no event shall the Premises or the Property be used for heavy manufacturing, which for purposes of this Lease shall include by way of example the following uses: steel or metal production, battery cell production, concrete production, mining, refining, manufacturing of pharmaceutical products and chemicals, manufacturing or compounding process of large volumes of raw materials into refined products. In furtherance of the foregoing, the Premises may be used for the following uses (collectively, the "Intended Use"): (1) the storage and assembly of battery pack modules and enclosures, which such processes may include, but not be limited to, light manufacturing, spot welding, testing and connecting modules, (2) vertical integration and assembly processes related to the foregoing, (3) research and development operations for electric bus fabrication and development, (4) ancillary and related office use, and (5) the interior storage of the various component parts of the battery pack modules and enclosures and various bus

components, including, but not limited to lithium ion battery cells, base plates, top covers, vent rails, manifolds, electrical components, metal fabrication parts, seats, wall panels and other miscellaneous bus components. Outside storage, including without limitation, trucks and other vehicles, is prohibited without Landlord's prior written consent, which shall not be unreasonably withheld, conditioned, or delayed; provided, however, notwithstanding the foregoing, Tenant shall be permitted to store bus bodies (i.e., complete shells of buses), trucks, trailers and fully assembled, working buses [all of the foregoing in good repair] outside the Premises in that certain location shown as "Outdoor Storage" on Exhibit "A". Tenant shall at its own cost and expense, obtain any and all other licenses and permits necessary for any such use. Tenant shall comply with all governmental laws, ordinances and regulations applicable to the use of the Premises, and shall promptly comply with all governmental orders and directives for the correction, prevention and abatement of nuisances in or upon, or connected with, the Premises, all at Tenant's sole expense. Tenant shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise or vibrations to emanate from the Premises, nor take any other action which would constitute a nuisance or would disturb or endanger any other tenants of the Building or unreasonably interfere with their use of their respective premises. Without Landlord's prior written consent, Tenant shall not receive, store or otherwise handle any product, material or merchandise which is explosive or highly inflammable. Tenant will not permit the Premises to be used for any purpose or in any manner (including without limitation, any method of storage) which would render the insurance thereon void or the insurance risk more hazardous or cause the State Board of Insurance or other insurance authority to disallow any sprinkler credits, and Tenant shall not use the Premises for the generation, storage, transportation, or disposal of dangerous, toxic or hazardous materials, chemicals, wastes or similar substances. Notwithstanding the foregoing or anything to the contrary herein, Landlord hereby specifically approves and allows the Premises to be used for the Intended Use subject to compliance with all applicable laws and the terms and conditions of this Lease.

6.    TAXES.

A.    Landlord agrees to pay before delinquency, all taxes, assessments and governmental charges of any kind and nature whatsoever, including any fee in lieu of taxes (hereinafter collectively referred to as "taxes") lawfully levied or assessed against the Property. For purposes of this Lease, the term "taxes" shall mean the actual amounts paid by Landlord after taking into account the benefits of any applicable tax abatements or rebates; provided, however, that taxes shall not include any (i) betterment taxes or fees (including public user fees), or any special assessments imposed in connection with the park, the Property or construction of the Premises, (ii) utility connection charges, (iii) income, franchise, transfer, excise, gift, inheritance, capital gains, mortgage or gross receipts taxes imposed on Landlord or the Property, (iv) impact fees, development fees, or taxes or assessments imposed to defray development costs, and (v) taxes or assessments on the fixtures, furniture or equipment of any other tenant of the Property. Tenant acknowledges and agrees that the Property is subject to that certain Fee In Lieu of Tax Agreement dated November 18, 2019 by and between Spartanburg County, South Carolina and Landlord (the "FILOT Agreement").

Tenant agrees to pay to Landlord monthly, as additional rent, the amount of Tenant's projected "proportionate share" of the taxes assessed against the Property for any given calendar year. On or before thirty (30) days before the 2023 calendar year and thereafter on or before thirty (30) days before the start of a new calendar year during the Demised Term, Landlord shall endeavor to provide to Tenant in writing Landlord's good faith estimate of the Tenant's proportionate share of the taxes for such calendar year, together with a detailed calculation of the same; provided, however, no failure of Landlord to give the statement(s) or estimates hereinabove shall be construed as, or deemed to constitute, a waiver by Landlord of the right to require payment of the taxes as required herein and, until delivery of such statement(s) or estimates, Tenant shall continue to make payments for Tenant's proportionate share of taxes in the amount in effect for the previous calendar year.

Tenant's monthly tax payments shall be paid to Landlord on the first day of each month (in the same manner as the payment of Base Rent), in equal monthly installments equal to $1/12^{th}$ of said good faith estimate of Tenant's projected "proportionate share" of the taxes assessed against the Property for the given calendar year. Subject to the reconciliation and adjustment described herein, the taxes payable by Tenant to Landlord for the period from the Commencement Date through December 31, 2022 shall be approximately $0.91 per square foot per annum ($297,696.00 per year; $24,808.00 per month).

Tenant's "proportionate share", as used in this Lease, shall mean 100% of the Building.

Commencing with the calendar year 2023, on or before April 15th of each such applicable calendar year during the Demised Term, or as soon as reasonably practical thereafter, Landlord shall provide Tenant with a

reasonably detailed statement of the actual taxes assessed against the Property, Tenant's proportionate share thereof, and the total of the estimated taxes paid by Tenant during the previous calendar year. If the actual amount of Tenant's proportionate share of the taxes assessed against the Property is more than the total of the estimated taxes paid by Tenant during the previous calendar year, Tenant shall pay the difference to Landlord within thirty (30) days after receipt of such statement. If the actual amount of Tenant's proportionate share of the taxes assessed against the Property is less than the total of the estimated taxes paid by Tenant during the previous calendar year, then within thirty (30) days following the delivery of the annual taxes statement Landlord shall either reimburse the difference to Tenant or, at Landlord's election, apply the difference to Tenant's next monthly payment(s) of Tenant's proportionate share of taxes.

B.    If at any time during the Term of this Lease, the present method of taxation shall be changed so that in lieu of the whole or any part of any taxes, assessments or governmental charges, levied, assessed or imposed on real estate and the improvements thereon, there shall be charged, levied, assessed or imposed on Landlord a capital levy or other tax directly on the rents received therefrom and/or a franchise tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents for the present or any future building or buildings on the Property, then all such taxes, assessments, levies or charges, or the part thereof so measured or based, shall be deemed to be included within the term "taxes" for the purposes hereof.

C.    The Landlord shall have the right (but no obligation) to employ a tax-consulting firm to attempt to assure a fair tax burden on the Building or buildings on the Property within the applicable tax jurisdiction. Tenant shall pay to Landlord upon demand from time to time, as additional rent, the amount of Tenant's "proportionate share" (as defined in Paragraph 6.A. herein) of the cost of such service, which is normally a contingency fee based on a percentage of tax savings generated by the tax firm.

D.    Any payment to be made pursuant to this Paragraph 6 shall be prorated in the event any portion of the Demised Term is not within a full real estate tax year.

E.    Landlord acknowledges that, in connection with Tenant's operation of the Property, Tenant has obtained, and may from time to time in the future pursue, certain tax and other incentives from the State of South Carolina or any political subdivision thereof, including, without limitation, any incentives provided pursuant to any agreement entered into with a governmental authority providing for a fee in lieu of tax arrangement (collectively, the "Tenant Incentives"). Landlord hereby agrees to reasonably cooperate with Tenant to further Tenant's pursuit and realization of the Tenant Incentives, and to execute, acknowledge, and deliver such further documents, and perform such further acts (in each case, at no cost to Landlord and provided the same are not binding upon Landlord or the Property after the expiration or earlier termination of this Lease), as may be reasonably necessary to obtain or to comply with the terms of such Tenant Incentives; provided, however, that such Tenant Incentives or pursuit of such Tenant Incentives (i) shall not adversely impact any Landlord Incentives existing as of the date hereof and (ii) are not a condition to this Lease or obligation to pay rent. Subject to the terms and conditions of this Lease, Landlord shall not take any action which, to the knowledge of Landlord, will result in any material delay or reduction in the Tenant Incentives available to Tenant. In furtherance (and not in limitation) of the foregoing, during the term of this Lease, Landlord shall not terminate the FILOT Agreement as it relates to the Property or take any other action (or fail to take any action) which, to the knowledge of Landlord, will result in any material delay or reduction of the incentives provided pursuant to the FILOT Agreement, in each case without the written consent of Tenant.

F.    Landlord shall file or cause to be filed, on a timely basis, all property tax returns required in connection with the Property, including but not limited to Form SCDOR PT-300 or such comparable form as the South Carolina Department of Revenue may provide. Landlord shall provide drafts of such returns for Tenant's review no less than thirty (30) days prior to their filing, and Tenant's written consent shall be required to file any

such returns (such consent not to be unreasonably withheld). Tenant hereby agrees to reasonably cooperate with Landlord with respect to any such filings and hereby agrees to execute, acknowledge and deliver such further documents or information, and to perform such further acts, as may be reasonably necessary for any such filings or as may be required pursuant to the FILOT Agreement in the event that Tenant is benefitting therefrom. Promptly upon making or causing to be made any filings pursuant to this section, Landlord shall provide to Tenant a copy of any such filings.

G.    Tenant hereby covenants and agrees that it will at all times indemnify, defend and hold harmless Landlord from any loss, liability, claims, suits, costs, expenses, including without limitation, attorneys' fees and damages, both real and alleged, arising out of (i) any document(s) which Landlord has executed at Tenant's request in connection with the Tenant Incentives, (ii) Tenant's failure to timely review and approve any and all filings referenced in this Paragraph 6 of which Tenant has review and approval rights, and/or (iii) any and all obligations assumed by Landlord which would not have otherwise been assumed but for Landlord's agreement to reasonably cooperate with Tenant obtaining the Tenant Incentives; provided, however, that Tenant shall have no obligations under this Paragraph 6.G. to the extent that such loss, liability, claims, suits, or expenses arise from Landlord's gross negligence, willful misconduct or breach of any agreement to which Landlord is a party.

7.    LANDLORD'S REPAIRS. Landlord, at its expense, shall maintain only the structural soundness and integrity of the roof and the exterior walls of the Premises in good repair, reasonable wear and tear excepted, and repair and pay for any damage caused by the negligence or willful misconduct of Landlord, Landlord's employees or agents, and shall maintain the Common Areas of the Building and the Property in which the Premises is located pursuant to the terms of Paragraph 9 below. Tenant shall repair and pay for any damage caused by the negligence and/or willful misconduct of Tenant, or Tenant's employees, agents or invitees, or caused by Tenant's default hereunder. The term "walls" as used herein shall not include windows, glass or plate glass, doors, special storefronts or office entries. Except as expressly set forth in this Paragraph 7 and in Paragraph 9 below, Landlord shall have no obligation to perform any repairs or maintenance to the Premises or the Property. Tenant shall immediately give Landlord written notice of defects or need for repairs, after which Landlord shall have reasonable opportunity to repair same or cure such defects.

8.    TENANT'S REPAIRS.

A.    Tenant shall at its own cost and expense keep and maintain all parts of the Premises (except those for which Landlord is expressly responsible under the terms of this Lease) in good condition, promptly making all necessary repairs and replacements, including but not limited to, windows, glass and plate glass, doors, any special office entry, interior walls and finish work, floors and floor covering, heating and air condition systems, dock boards, truck doors, dock bumpers, plumbing work and fixtures, termite and pest extermination, and regular removal of trash and debris.

Tenant shall provide Landlord with prior notice of any repair to be undertaken by Tenant costing in excess of $50,000 (in Tenant's reasonable estimation) and such other information as Landlord may reasonably request with respect to such repair, except such notice shall not be required if immediate repair is necessary for security or safety reasons.

B.    Tenant shall not damage any wall or disturb the integrity and support provided by any wall and shall, at its sole cost and expense, promptly repair any damage or injury to any wall caused by Tenant or its employees, agents or invitees.

C.    On or before thirty (30) days after all heating and air conditioning systems and equipment are initially installed and commissioned and the office component of the Leasehold Improvements (see below in Paragraph 10) is completed, Tenant shall, at its own cost and expense, enter into a quarterly preventative maintenance/service contract with one of Landlord's preferred licensed HVAC contractors for servicing all heating and air conditioning systems and equipment, within the Premises over the term of the Lease. In the event Landlord has not received a copy of Tenant's service contract described herein within aforementioned 30 day timeframe or Tenant fails to maintain the contract during the Demised Term, Landlord may, at its option, enter into a service contract on behalf of Tenant, and Tenant shall reimburse Landlord, within twenty (20) days' notice from Landlord, for the cost of such service contract. Tenant shall keep accurate and complete records of the

performance of all scheduled maintenance under such contract and shall provide copies thereof to Landlord from time to time upon request by Landlord. The service contract must i) include all services suggested by the licensed contractor to keep the units in good repair, and ii) comply with any warranties (if applicable).

9.    COMMON AREA MAINTENANCE.

A.    Tenant shall pay to Landlord, as additional rent a common area operating and maintenance charge ("CAM") that is equal to Tenant's "proportionate share" (as defined in Paragraph 6.A. herein [but for with respect to costs under the Declaration to maintain the Joint Access Area, as defined in the Declaration, in which case "proportionate share" shall be defined pursuant to the Declaration]) of the cost and expense for the Common Area Maintenance (defined below in Paragraph 9.D.) of the common areas, sidewalks, common driveways (including, but not limited to driveways on Harvey Drive and Poplar Drive Extension [if and while such drives are not publicly dedicated]), parking facilities of the Building and park and Property in which the Premises are located (collectively, the "Common Areas"). Tenant's monthly CAM payments shall be paid to Landlord on the first day of each month (in the same manner as the payment of Base Rent), in equal monthly installments equal to 1/12th of Landlord's good faith estimate of CAM for the given calendar year as described immediately below and in Paragraph 9.C. below. Notwithstanding anything to the contrary herein and subject to the reconciliation and adjustment described at the end of this Paragraph 9.A., the CAM payable by Tenant to Landlord for the period from the Commencement Date through December 31, 2022 shall be approximately $0.18 per square foot per annum ($58,884.00 per year) (the "Initial CAM") that Tenant shall pay as additional rent on the first day of each month (in the same manner as the payment of Base Rent) in equal monthly installments equal to $4,907.00. If Tenant or any other particular tenant of the Building can be clearly identified as being responsible for obstructions or stoppage of the common sanitary sewage line, then Tenant, if Tenant is responsible, or such other responsible tenant, shall pay the entire cost thereof, upon demand, as additional rent. Commencing with the calendar year 2023, on or before April 15th of each such applicable calendar year during the Demised Term, or as soon as reasonably practical thereafter, Landlord shall provide Tenant with a reasonably detailed statement of the total common area expenses actually incurred performing the Common Area Maintenance for the given timeframe, the actual amount of CAM related thereto, and the total amount of CAM previously paid by Tenant during the given timeframe (the "Annual CAM Statement"). If the actual amount of CAM is more than the total of the CAM paid by Tenant during the given timeframe, Tenant shall pay the difference to Landlord within thirty (30) days after receipt of such statement. If the actual amount of CAM is less than the total amount of CAM paid by Tenant during the given timeframe, then within thirty (30) days following the delivery of the Annual CAM Statement Landlord shall either reimburse the difference to Tenant or, at Landlord's election, apply the difference to Tenant's next monthly payments of CAM.

B.    In addition to the CAM costs above, Tenant shall pay to Landlord a management fee equal to three percent (3%) of all rents paid (or payable) in accordance with the Lease on a monthly basis, which payment shall be made on the first day of each month in the same manner as the payment of Base Rent and shall be capped at three percent (3%) of all rents during the Demised Term.

C.    On or before thirty (30) days before the 2023 calendar year and thereafter on or before thirty (30) days before start of each new calendar year during the Demised Term, Landlord shall endeavor to provide to Tenant in writing Landlord's good faith estimate of the Tenant's projected CAM for such calendar year, together with a detailed calculation of the same; provided, however, no failure of Landlord to give the statement(s) or estimates hereinabove shall be construed as, or deemed to constitute, a waiver by Landlord of the right to require payment of CAM as required herein and, until delivery of such statement(s) or estimates, Tenant shall continue to make CAM payments in the amount in effect for the previous calendar year. If at any time during a calendar year after Landlord provides such estimate, Landlord reasonably anticipates an increase in Common Area Maintenance, then Landlord may increase the estimated amount of Tenant's CAM during such year by giving Tenant written notice to that effect, and thereafter Tenant shall pay to Landlord, in each of the remaining months of such year, an amount equal to the amount of such increase in Tenant's CAM divided by the number of months remaining in such year; provided, however, that any such reset in the estimated amount of Tenant's CAM during a calendar year shall only occur a maximum of one (1) time per calendar year and shall be subject in all respects to the cap on Tenant's Controllable CAM for the calendar year as described as follows. Commencing with the 2023 calendar year, increases in Tenant's

Controllable CAM (as hereinafter defined) shall be capped at 104% (calculated on a cumulative and compounding basis annually) of the amount of the prior twelve (12) month period's Controllable CAM charged to Tenant. "Controllable CAM" shall mean all CAM other than taxes, insurance, utilities, snow and ice removal costs, and Non- Recurring Expenses. "Non-Recurring Expenses" are defined as all CAM charges that are expenses incurred on an infrequent or non-recurring basis, such as, but not limited to, exterior painting and caulking of the Building, and resurfacing/restriping of the parking lots and driveways within the Common Areas. Landlord agrees that Non-Recurring Expenses shall be amortized at 6.5% over the reasonably expected life (as reasonably determined by Landlord) of the improvement, repair or replacement to which any Non-Recurring Expenses are attributable and each year's amortization shall be included in Tenant's CAM and, as noted above, will not be considered to be Controllable CAM.

D.      Landlord shall maintain, operate, repair and replace or cause to be maintained, operated, repaired and replaced, all of the Common Areas in a good, orderly and safe condition and manner consistent with a first class industrial park in Greer, South Carolina (the "Common Area Maintenance"). The Common Area Maintenance shall include, but not be limited to, the following, all of which shall be consistent with the standards of a first-class industrial park: (i) maintenance, repair and replacement of all of the storm water drainage, sanitary sewer facilities, water service, sprinkler system, irrigation systems, common electrical systems, common gas distribution systems, common lighting systems (including, poles, bulbs, and fixtures), and other utility systems serving the Common Areas, (ii) operation of all utility services for the Common Areas, including providing electricity, water, sewer service, storm water drainage and other utility services to the Common Areas, (iii) snow and ice removal, Common Area pest control, painting, cleaning, and sweeping in the Common Areas, (iv) operation, maintenance, repair and replacement of fencing and similar items located within the Common Areas (excluding fencing and/or screening installed by or on behalf of Tenant), (v) landscaping within the Common Areas, (vi) re-paving, re-striping and cleaning of the paved parking areas, (vii) repairing and cleaning of sidewalks, (viii) prevention and removal of graffiti, (ix) operation, maintenance, repair and replacement of the lighting systems for the Common Areas, and (x) maintenance and repair of the Property as a first-class industrial park in Greer, South Carolina.

E.      Subject to the terms and conditions of this Lease, Tenant and Tenant's employees, customers, clients, guests, patrons, and permitted invitees are authorized, empowered and privileged during the Demised Term to use on a non-exclusive basis all of the Common Areas throughout the Demised Term and shall have continuous, uninterrupted access by, through, and over the Common Areas to access the Premises. The rights of Tenant in and to the Common Areas as provided in this Lease shall at all times be deemed a material aspect of this Lease to Tenant.

F.      Notwithstanding anything to the contrary, the costs and the expenses of the Common Area Maintenance applicable to Tenant and Tenant's payment of CAM shall not include the following: (i) leasing commissions, finders' fees, brokerage fees and similar fees, and costs incurred with the negotiation or enforcement of leases; (ii) rent under any ground leases; (iii) to the extent the Property is leased to more than one tenant, costs of furnishing services to other tenants or occupants to the extent that such services are in excess of services Landlord offers to all tenants at Landlord's expense; (iv) lease takeover costs incurred by Landlord in connection with new leases; (v) costs and expenses of any sale of the park or any portion thereof; (vi) costs incurred by Landlord with respect to repairs, goods and services (including utilities sold and supplied to tenants or other occupants) to the extent that Landlord is entitled to reimbursement for such costs other than through CAM; (vii) costs that are considered capital improvements under generally accepted accounting principles consistently applied except that (a) the annual amortization of these costs shall be included to the extent they reduce (or are intended to reduce) CAM, or (b) the cost of capital improvements made to comply with any law, rule, or regulation promulgated or reinterpreted after the Effective Date by any governmental authority, which costs shall be amortized over the useful economic life of such improvements as reasonably determined by Landlord, in accordance with generally accepted accounting principles consistently applied and shall be included in CAM; (viii) costs incurred by Landlord solely as a result of a violation by Landlord of the terms and conditions of any lease; (ix) interest, points and fees on debt or amortization or for any mortgage or mortgages, and all principal, escrow deposits and other sums paid on or in respect to any indebtedness (whether or not secured) and on any equity participations of any lender or lessor, and all costs incurred in connection with any financing, refinancing or syndication; (x) depreciation and amortization; (xi) the costs of the original construction of the park, Building, Premises, or any portion thereof; (xii) taxes, including special assessments, impact fees, income, franchise, transfer, inheritance, capital stock, estate, profit, gift, gross receipts or succession taxes; (xiii) salaries, fringe benefits and other compensation for personnel to the extent not directly involved in the operation or

management of the Property or any portion thereof; (xiv) management fees (except those specifically described in Paragraph 9.B. above which are in addition to CAM); (xv) costs of repairs or replacements incurred by reason of fire or other casualty or condemnation to the extent Landlord actually receives reimbursement for such costs from insurance proceeds/condemnation awards;

(xvi) costs for performing tenant installations for any individual tenant or, to the extent the Building is a multi-tenant building, for performing work or furnishing services to or for individual tenants; (xvii) Landlord's general corporate overhead and general administrative expenses; (xviii) rentals and other related expenses incurred in leasing air- conditioning systems, elevators or other equipment ordinarily considered to be of a capital nature except equipment used in providing janitorial services that is not affixed to the Building; and (xix) any add on fees such as management fees, administrative fees, and the like.

        G.    Tenant shall have the right within ninety (90) days from receipt of the Annual CAM Statement, at Tenant's cost and expense, to audit Landlord's books and records pertaining to the calculation of CAM. Such audit shall occur at a mutually convenient time at Landlord's offices. Tenant may utilize the services of an auditing firm reasonably acceptable to Landlord and which firm shall not be compensated on a contingent fee basis. Any audit by Tenant shall be for the sole purpose of verifying the Annual CAM Statement. Tenant shall hold any information obtained during any such inspection in confidence, except that Tenant shall be permitted to disclose such information to its attorneys and advisors, provided Tenant informs such parties of the confidential nature of such information and uses good faith and diligent efforts to cause such parties to maintain such information as confidential. In the event of such audit, Landlord shall reasonably cooperate with Tenant's representatives and provide all relevant or reasonably requested data and documents pertaining to the subject of said audit. Tenant shall deliver to Landlord the conclusions of its audit within ten (10) days after the completion of the audit (but in no event more than one hundred fifty (150) days after Tenant receives the Annual CAM Statement). Upon conclusion of any such audit, the parties shall act promptly and in good faith to resolve and adjust any discrepancies, overpayments, or underpayments, with Tenant responsible for payment of any amounts due Landlord and Landlord responsible for refunding any amount due Tenant.

        10.    <u>TENANT IMPROVEMENTS TO PREMISES</u>.

        A.    Tenant, at Tenant's cost, subject to the Leasehold Improvements Allowance (as defined in Exhibit "C"), shall construct certain improvements to the Premises ("Leasehold Improvements") in compliance with and in accordance with Exhibit "C" attached hereto and incorporated by reference herein.

        B.    Following the completion of the Leasehold Improvements, Tenant shall not make any alterations, additions or improvements to the Premises, exterior or interior (the "Tenant Alterations"), without the prior written consent of Landlord, except for (1) unattached movable furniture and equipment which may be installed without drilling, cutting or otherwise defacing, damaging or overloading the Premises, (2) non-structural alterations that (i) do not exceed (A) $25,000 in any one instance and (B) $50,000 in the aggregate during any calendar year, (ii) are not visible from the exterior of the Premises, (iii) do not affect any building system or the structural strength of the Premises, (iv) do not require penetrations into the floor, roof, ceiling or walls, and (v) do not require work on the roof within the walls, below the floor or above the ceiling, and (3) striping of the floors with adhesive backed vinyl tape, and (4) applying epoxy to the flooring. Subject to the foregoing, but otherwise without limiting the generality of the foregoing, Tenant acknowledges that any additional floor striping of any kind constitutes a Tenant Alteration requiring the prior written approval of Landlord. The Tenant Alterations shall be deemed for all purposes a part of the real property of the Building immediately upon the installation thereof and shall remain on the Premises as Landlord's property at the expiration or earlier termination of the term hereof without compensation to Tenant, unless Landlord elects by notice to Tenant delivered not less than one hundred twenty (120) days prior to the expiration of the Demised Term, to have Tenant remove such Tenant Alterations, in which event, Tenant, at its sole cost and expense, shall promptly remove such Tenant Alterations and restore the Premises to its condition prior to the installation of such Tenant Alterations (including, but not limited to, removal of all adhesive backed vinyl tape and any epoxy flooring and remediating/repairing such surfaces), normal wear and tear excepted (it being agreed that any damages resulting from the removal of any Tenant Alterations shall not constitute normal wear and tear). Notwithstanding anything to the contrary contained in this Lease, on or before the expiration of the Demised Term Tenant shall remove any and all of Tenant's Property (as defined in Exhibit C) from the Premises and the Property and repair any and all damage to the Premises and the Property caused by such removal. Tenant may not use or penetrate the

roof of the Premises for any purpose whatsoever without Landlord's prior written consent. To the extent Tenant does not install solar panels and related infrastructure on the Property as part of the Leasehold Improvements, Tenant shall retain the right to install solar panels and related infrastructure at its sole cost and expense (but provided Tenant shall not be charged by Landlord any additional fees or costs to enjoy and utilize this right) on the Property in locations other than the roof (it being agreed that solar panels shall not be located on the roof of the Building and the same may be used solely for the benefit of the Property and may not be used by or for the benefit of third parties) after going through the same approval processes and procedures described in Exhibit "C". All construction work done by Tenant in the Premises shall be performed in a good and workmanlike manner, in compliance with all governmental requirements, and at such times and in such manner as will cause a minimum of interference with other construction in progress and with the transaction of business in the Building.

11.  SIGNAGE. Landlord shall install, at its expense, Tenant's name and suite number on the Building directory sign and on Tenant's main entrance door. Tenant shall not install any signs visible from outside the Premises except with the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned or delayed provided that such signage complies with applicable law and with Landlord's signage criteria for the Property. Any permitted signs shall be maintained in compliance with applicable governmental rules and regulations governing such signs. Tenant shall be responsible to Landlord for any damage caused by the installation, use or maintenance of said signs Tenant installs. Tenant agrees, upon removal of said signs, to repair all damage (including discoloration) incident thereto.

Notwithstanding anything to the contrary contained in in this Lease, Tenant, at Tenant's cost, may place its logo upon the roof of the Building subject to Landlord's prior written approval (not to be unreasonably withheld, conditioned, or delayed provided the method of attachment shall not adversely affect the roof and/or invalidate any applicable roof warranty), and all applicable laws. Tenant, at Tenant's sole cost, shall be solely responsible for obtaining any necessary permits to have and install such roof signage.

12.  RIGHT OF ENTRY INSPECTION. Landlord and Landlord's agents and representatives shall have the right to enter and inspect the Premises at any reasonable time during business hours, upon reasonable advance notice (except in cases of emergency), to ascertain the condition of the Premises, to make such repairs as may be required or permitted to be made by Landlord under the terms of this Lease, or to show the Premises to prospective purchasers or tenants. Landlord shall have the right to place or erect on the Premises a suitable sign indicating the Premises are available for rent during the last six (6) months of the Demised Term.

Tenant shall give written notice to Landlord at least thirty (30) days prior to vacating the Premises and shall arrange to meet with Landlord for a joint inspection of the Premises prior to vacating. In the event of Tenant's failure to give such notice or arrange a joint inspection, Landlord's inspection at or after Tenant's vacating the Premises shall be conclusively deemed correct for purposes of determining Tenant's responsibility for repairs and restoration.

13. UTILITIES. Landlord agrees to provide at its cost water, sewer, natural gas, electricity, and telephone, data, fiber service connections into the Premises; but Tenant shall pay for all water, gas, heat, light, power, telephone, sewer, sprinkler system water and other utilities and services used in or from the Premises, together with any taxes, penalties, surcharges or the like pertaining thereto and any maintenance charges for utilities and shall furnish all electric light bulbs and tubes. If any such services are not separately metered to Tenant, Tenant shall pay a reasonable proportion as determined by Landlord of all charges jointly metered with other premises.

Landlord shall have no liability or responsibility for any interruption or cessation of any utility services to the Premises or the Property, and no such interruption or cessation of service shall be deemed an eviction or disturbance of Tenant's use and possession of the Premises or any part thereof, or render Landlord liable to Tenant for damages, or relieve Tenant from performance of Tenant's obligations under this Lease including the obligation to pay rent. Notwithstanding the foregoing, (i) if any interruption or cessation of any Essential Utilities continue for five
(5)   business days after Landlord receives written notice from Tenant of the interruption or cessation; (ii) such interruption or cessation actually renders any portion of the Premises unusable for the normal conduct of Tenant's business and Tenant, in fact, ceases to use and occupy such portion of the Premises for the normal conduct of its business; and (iii) such

interruption or cessation is due to the gross negligence or willful misconduct of Landlord, its agents, employees or contractors; then all Base Rent payable hereunder with respect to such portion of the Premises rendered unusable for the normal conduct of Tenant's business and in which Tenant, in fact, ceases to use and occupy, shall be abated beginning with the sixth (6th) business day after Landlord received Tenant's notice of the interruption, and such abatement shall continue until such time that the subject Essential Utilities is/are restored; *provided, however,* Landlord may prevent or stop any such rental abatement by providing substantially the same service by temporary or alternative means until the cause of loss of service can be corrected. As used herein, "Essential Utilities" means only electricity, water, sewer and natural gas service. Subject to the terms of Paragraph 16 below, which will supersede this Paragraph 13 with respect to any interruption caused by a casualty event, and Tenant's rights under Paragraph 35 hereof, the abatement of Base Rent shall be Tenant's sole and exclusive remedy, at law or in equity, for any interruption of utilities to the Premises or Property.

14.   ASSIGNMENT AND SUBLETTING.

A.   Except as otherwise expressly set forth in Paragraph 14.B. below, Tenant shall not, directly or indirectly, have the right to assign this Lease or to sublet the whole or any part of the Premises without the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed, provided that

(i)   Tenant shall not be in default under any of the terms and conditions of this Lease at the time of the proposed subletting or assignment; (ii) the use of the Premises in connection with such assignment or sublet use complies with zoning and the Permitted Use under this Lease; and (iii) the net worth of the proposed assignee or sublessee as of the date of such assignment shall be equal to or greater than the net worth of Tenant as the date of this Lease. Further, Landlord and Tenant agree that the consent of Landlord may be reasonably withheld for any of the following reasons:

(a)   the financial strength of the proposed assignee or subtenant, both in terms of net worth and in terms of reasonably anticipated cash flow over the term, is materially less than Tenant's financial strength at the time this Lease was executed or at the time of such assignment or sublease, whichever is greater, or is insufficient, based on generally accepted industry standards, to capitalize the business to be conducted in the Premises; (b) the proposed assignee or subtenant intends or desires to make alterations which would, in Landlord's reasonable judgment, result in a material net decrease in the value of the Premises as improved; (c) the proposed assignee or subtenant is currently a tenant of Landlord or is someone with whom Landlord, its affiliates and/or its agents have negotiated at some time during the prior two years regarding a lease or sublease in Greer, South Carolina; (d) the failure of the proposed assignee or subtenant to meet any of the reasonable criteria of Landlord that Tenant was required to meet prior to the execution of this Lease; or (e) the proposed subtenant (or an affiliate of the proposed subtenant) is, or has been, a tenant of Landlord (or an affiliate of Landlord) in another project and subtenant (or an affiliate of the proposed subtenant) failed to perform its lease obligations in a manner reasonably satisfactory to Landlord (or Landlord's affiliate). Consent to any assignment or sublease shall not be deemed a waiver of the right of Landlord to approve or disapprove a further assignment or subletting. Notwithstanding any permitted assignment or subletting, Tenant shall at all times remain directly, primarily and fully responsible and liable for the payment of the rent herein specified and for compliance with all of its other obligations under the terms, provisions and covenants of this Lease. Upon the occurrence of an Event of Default, as hereinafter defined, if the Premises or any part thereof are then assigned or sublet, Landlord, in addition to any other remedies herein provided, or provided by law, may at its option collect directly from such assignee or subtenant all rents becoming due to Tenant under such assignment or sublease and apply such rent against any sums due to Landlord from Tenant hereunder, and no such collection shall be construed to constitute a novation or a release of Tenant from the further performance of Tenant's obligations hereunder. For purposes of this Paragraph 14, each of the following events shall be deemed an assignment:

(i)   if Tenant is a partnership, a dissolution of the partnership or a change in ownership, legal or beneficial, of 50% or more of the partnership interests, whether by withdrawal or admission, voluntary or by operation of law;

(ii)   if Tenant is a corporation, the dissolution, consolidation or merger of Tenant or the sale or transfer of more than 50% of the voting shares of Tenant;

(iii)   distribution or sale of over 50% of the value of Tenant's assets (net of undistributed consideration received); or

(iv)    any other change of effective control of Tenant.

B.    Notwithstanding anything to the contrary herein and provided Landlord is given at least five (5) days prior written notice of any such assignment or sublease, then Tenant may assign this Lease or sublease the Premises, without Landlord's consent and without being subject to Paragraph 14.A. above and Paragraph 14.C. below, to (i) any corporation or limited partnership or limited liability company or other entity which controls, is controlled by or is under common control with Tenant, (ii) to any corporation or limited partnership or limited liability company or other entity resulting from the purchase of, merger of, or consolidation with Tenant provided the surviving entity has a tangible net worth, financial condition, and operating performance (determined in accordance with generally accepted accounting principles consistently applied) immediately following such merger or consolidation that is equal to or greater than the tangible net worth, financial condition, and operating performance of Tenant as of the time the Tenant signed this Lease, or (iii) to any other affiliates or subsidiaries of Tenant using the Premises for the Permitted Use and/or Intended Use (each a "Permitted Transfer" and the assignee or sublessee is a "Permitted Transferee"). In such case, any such Permitted Transferee shall assume in writing all of Tenant's obligations under this Lease.

C.    In the event that Tenant assigns this Lease or sublets the Premises or any part thereof, as permitted herein, and at any time receives rent and/or other consideration which exceeds that which Tenant would at that time be obligated to pay Landlord, Tenant shall pay to Landlord 50% of the gross excess in such rent as such rent is received by Tenant and 50% of any other consideration received by Tenant from such assignee or subtenant. In addition, should Landlord agree to an assignment or sublease agreement, Tenant will pay to Landlord on demand a sum equal to all Landlord's costs, including reasonable attorney's fees, incurred in connection with such assignment or transfer up to a maximum of $2,500.00 per request. If an assignment or subletting is approved, Tenant shall be entitled to deduct from any excess proceeds described in this Paragraph 14.C. its reasonable expenses incurred in connection with such assignment or subletting.

15.    INSURANCE.

A.    Landlord agrees to maintain special form perils insurance covering the Building in an amount not less than 100% (or such greater percentage as may be necessary to comply with the provisions of any co- insurance clauses of the policy) of the "replacement cost" thereof as such term is defined in the Replacement Cost Endorsement to be attached thereto, insuring against the perils of Fire, Lightning and Special Form Coverage, such coverage and endorsements to be as defined, provided and limited in the standard bureau forms prescribed by the insurance regulatory authority for the State in which the Premises are situated for use by insurance companies admitted in such state for the writing of such insurance on risks located within such state. Subject to the provisions of this Paragraph 15, such insurance shall be for the sole benefit of Landlord and under its sole control. Landlord may, but is not obligated to, maintain such other insurance and additional coverage as it may deem necessary, including but not limited to, loss of rental income, flood and earthquake insurance.

Tenant agrees to pay to Landlord monthly, as additional rent, the amount of Tenant's "proportionate share" of the cost of Landlord's insurance coverage on the Building, all costs and premiums of all insurance, including but not limited to property, casualty, business interruption, boiler and machinery, flood, earthquake and commercial general liability insurance applicable to the Building, the Common Areas and the operation thereof, and Landlord's personal property used in connection therewith (collectively, "Landlord's Insurance"). Tenant's payment of Landlord's Insurance (the "Insurance Charge") shall be paid to Landlord on the first day of each month (in the same manner as the payment of Base Rent), in equal monthly installments equal to $1/12^{th}$ of Landlord's good faith estimate of Landlord's Insurance. Notwithstanding anything to the contrary herein and subject to the reconciliation and adjustment described at the end of this Paragraph 15.A., the Insurance Charge payable by Tenant to Landlord for the period from the Commencement Date through December 31, 2022 shall be approximately $0.07 per square foot per annum ($22,896.00 per year) (the "Initial Insurance Charge") which Tenant shall pay as additional rent on the first day of each month (in the same manner as the payment of Base Rent) in equal monthly installments equal to $1,908.00. Commencing with the calendar year 2023, on or before April 15th of each such applicable calendar year during the Demised Term, or as soon as reasonably practical thereafter, Landlord shall provide Tenant with a reasonably detailed statement of the total cost of all of Landlord's Insurance, the actual amount of Insurance

Charges related thereto, and the total amount of Insurance Charges previously paid by Tenant during the given timeframe (the "Annual Insurance Statement"). If the actual amount of Tenant's proportionate share of Landlord's Insurance is more than the total of the Insurance Charges paid by Tenant during the given timeframe, Tenant shall pay the difference to Landlord within thirty (30) days after receipt of such statement. If the actual amount of Tenant's proportionate share of Landlord's Insurance is less than the total amount of Insurance Charges paid by Tenant during the given timeframe, then within thirty (30) days following the delivery of the Annual Insurance Statement Landlord shall either reimburse the difference to Tenant or, at Landlord's election, apply the difference to Tenant's next monthly payments of Insurance Charges. Tenant shall also reimburse Landlord for any increased premiums or additional insurance which Landlord reasonably deems as necessary as a result of Tenant's use of the Premises.

B.     Tenant shall, throughout the Term of this Lease, at its cost and expense, provide and keep in force: (1) a commercial general liability insurance policy for bodily injury, property damage, and personal injury to a third party in the amount of not less than $1,000,000 per occurrence and $2,000,000 on an aggregate basis; (2) property insurance on its own personal property located on the Premises to the extent Tenant elects; (3) workers' compensation insurance as required by the state in which the Premises is located and in amounts as may be required by applicable statute and shall include a waiver of subrogation in favor of Landlord; (4) employers liability insurance of at least $500,000; (5) business automobile liability insurance having a combined single limit of not less than $1,000,000 per occurrence insuring Tenant against liability arising out of the ownership, maintenance or use of any owned, hired or non-owned automobiles; and (6) business interruption insurance with a limit of liability representing at least six months of lost income. All such insurances shall provide that the Tenant's coverage shall be primary and noncontributing with other coverage maintained by any additional insured affiliates and subsidiaries, including, without limitation, McDonald Development Company, and all coverages shall include a waiver of subrogation in favor of Landlord.

All insurance, except Workers Compensation, provided by Tenant as required by this Paragraph 15.B. shall name, as additional insured, Landlord, Landlord's manager and any mortgagees or deed to secure debt holders of the Premises, and be carried by such responsible companies and in such form satisfactory to Landlord. The acceptable Additional Insured endorsement for the Commercial General Liability policy is ISO form CG 20 11- Additional Insured-Managers or Lessors of Premises or its equivalent. Tenant shall provide Landlord with a copy of the Additional Insured endorsement.

All insurance required by the terms of this Paragraph 15 must be issued by and binding upon an insurance company licensed or authorized to do business in the State of South Carolina, rated at least Rating A-, Financial Size VII by A.M. Best Company (or an equivalent rating by another rating agency if the Best's ratings are discontinued).

Tenant agrees to deliver to Landlord on or before the Commencement Date the original policy of insurance required by this Paragraph 15.B. or certificate thereof and evidence of payment of premium. At least ten (10)  days prior to the expiration of each such policy, Tenant shall deliver to Landlord the new original policy or certificate for renewal insurance and evidence of payment of premium. In the event Landlord has not received (on or before the Commencement Date and on or before the tenth (10th) day prior to the expiration of each such policy) evidence of Tenant's compliance with the insurance coverages required by this Paragraph 15.B., Landlord may, but shall not be required to, secure coverage on behalf of Tenant in the amounts required by this Paragraph 15.B. with companies satisfactory to Landlord. Tenant shall pay the costs of such coverage directly, or, if paid by Landlord, reimburse Landlord as additional rent, within ten (10) days of notice, for all costs incurred by Landlord in securing such coverage.

Tenant shall not violate or knowingly permit to be violated any of the conditions or provisions of any policy required by this Paragraph 15.B.

Each insurance policy (including renewal insurance) or certificates thereof issued by the insurer shall contain an agreement by the insurer that such policy shall not be canceled without at least thirty (30) days prior written notice to Landlord and any mortgagee or deed to secure debt holder of the Premises (with the exception of non-payment of premium by Tenant, in which case the notice requirement is ten (10) days), and in no event shall such policies be canceled by Tenant without Landlord's prior written consent.

C.     Tenant and Landlord shall cooperate in connection with the collection of any insurance monies that may be due in the event of loss. Tenant and Landlord shall

execute and deliver such proofs of loss and other instruments that may be required for the purpose of obtaining the recovery of any such insurance monies. Tenant shall throughout the term of the Lease, at its cost and expense, provide and keep in force: property insurance on its own personal property as well as property of others in its care, custody and control located on the Premises, to the extent Tenant elects.

D.    Any insurance provided for in this Paragraph 15 may be effected by a policy or policies of blanket insurance; provided, however, that the amount of the total insurance allocated to the Premises shall be such as to furnish in protection the equivalent of separate policies in the amount herein required, and provided further that in all other respects, any such policy or policies shall comply with the other provisions of this Lease. In any such case, it shall not be necessary to deliver the original of any such blanket policy, but rather a certified duplicate of such policy or certificate thereof.

16.    DAMAGE OR DESTRUCTION; SUBROGATION.

A.    If the Premises or the Common Areas should be damaged or destroyed by fire, tornado or other casualty, Tenant shall give immediate written notice thereof to Landlord.

B.    If the Premises should be totally destroyed by fire, tornado or other casualty, or if they should be so damaged thereby that rebuilding or repairs cannot, in Landlord's estimation to be given to Tenant within sixty (60) days after the notice of the casualty, be completed within two hundred forty (240) days after the date upon which Landlord provides such estimation to Tenant (such two hundred forty (240) day period subject to extension due to a Force Majeure Event), then this Lease shall terminate and the rent shall be abated during the unexpired portion of this Lease, effective upon the date of the occurrence of such damage.

C.    If more than 80% of the gross square footage of the Building is damaged or destroyed by any peril or casualty (but less than the entire Building), Landlord or Tenant shall have the right to terminate this Lease. Subject to the foregoing, if the Premises should be damaged or destroyed by any peril covered by the insurance to be provided by Landlord under Paragraph 15.A., but only to the extent that rebuilding or repairs can in Landlord's estimation, which shall be given within sixty (60) days after the notice of the casualty, be completed within two hundred forty (240) days after the date Landlord provides such estimation to Tenant, this Lease shall not terminate, and Landlord shall at its sole cost and expense thereupon proceed with reasonable diligence to rebuild and repair the Building to substantially the condition in which it existed prior to such damage, except that Landlord shall not be required to rebuild, repair or replace any part of the partitions, fixtures, addition and other improvements which may have been placed in, on or about the Premises by Tenant. If the Premises are untenantable or unusable by Tenant in whole or in part (as determined by Landlord and Tenant acting in good faith), following such damage, the rent payable hereunder during the period in which they are untenantable shall be reduced to such extent as may be fair and reasonable under all circumstances (provided, that in any event rent will not be reduced for the portions of the Premises Tenant is actually occupying and using) until the date Landlord completes the repairs or rebuilding. In the event that Landlord should fail to complete such repairs and rebuilding within two hundred forty (240) days after the date upon which Landlord provides its estimation to Tenant, subject to extension for delays caused by Tenant and/or a Force Majeure Event, Tenant may at its option terminate this Lease by delivering written notice of termination to Landlord as Tenant's exclusive remedy, whereupon all rights and obligations hereunder shall cease and terminate. If a casualty occurs during the last twenty-four (24) months of the Demised Term (other than a minor casualty which will not require more than thirty (30) days to repair), either Landlord or Tenant may terminate this Lease upon written notice to the other party, provided that Landlord may not terminate this Lease pursuant to this sentence if Tenant has an unexercised option to extend the Demised Term for a Renewal Term under Paragraph 32 below and Tenant exercises such option within thirty (30) days after the date of the casualty.

D.    Notwithstanding anything herein to the contrary, in the event the holder of any indebtedness secured by a mortgage or deed to secure debt covering the Premises requires that the insurance proceeds be applied to such indebtedness, then Landlord shall have the right to terminate this Lease by delivering written notice of termination to Tenant within fifteen (15) days after such requirement is made by any such holder, whereupon all rights and obligations hereunder shall cease and terminate.

E.    Each of Landlord and Tenant hereby releases the other from any loss or damage to person or property caused by fire or any other perils insured through or under

them by way of subrogation or otherwise for any loss or damage to person or property caused by fire or any other perils insured in policies of insurance covering such person or property, even if such loss or damage shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible; provided, however, that this release shall be applicable and in force and effect only with respect to loss or damage occurring during such times as the releasor's policies shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder and then only to the extent of the insurance proceeds payable under such policies. Each of the Landlord and Tenant agrees that it will request its insurance carriers to include in its policies such a clause or endorsement. If extra cost shall be charged therefore, each party shall advise the other thereof and of the amount of the extra cost, and the other party, at its election, may pay the same, but shall not be obligated to do so.

17.    <u>LIABILITY</u>. Landlord shall not be liable to Tenant or Tenant's employees, agents, invitees, patrons or visitors, or to any other person whomsoever, for any injury to person or damage to property on or about the Premises, resulting from and/or caused in part or whole by, (i) the negligence or misconduct of Tenant, its employees, agents, invitees, patrons or visitors, or of any other person entering upon the Premises, (ii) the buildings and improvements located on the Property becoming out of repair, (iii) use, generation, storage or disposal of toxic or hazardous materials or substances on or about the Premises, (iv) leakage of gas, oil, water or steam or by electricity emanating from the Premises, or (v) due to any cause whatsoever; provided, however that the foregoing exculpation of liability of Landlord shall not apply to any injury to person or damage to property on or about the Premises to the extent caused by Landlord's gross negligence or willful misconduct. Tenant hereby covenants and agrees that it will at all times indemnify and hold safe and harmless the property, the Landlord (including without limitation, the trustee and beneficiaries if Landlord is a trust), Landlord's agents and employees from any loss, liability, claims, suits, costs, expenses, including without limitation, attorney's fees and damages, both real and alleged, arising out of any such damage or injury, except injury to persons or damage to property the sole cause of which is the negligence or willful misconduct of Landlord or the failure of Landlord to repair any part of the Premises which Landlord is obligated to repair and maintain hereunder within a reasonable time after the receipt of written notice from Tenant of needed repairs.

18.    <u>CONDEMNATION</u>.

A.    If 80% or more of the gross square footage of the Building should be taken for public or quasi-public use under governmental law, ordinance or regulation by right of eminent domain, or by private purchase in lieu thereof, Landlord or Tenant shall have the right to terminate this Lease by providing written notice to the other not more than sixty (60) days after the taking and the rent shall be abated effective on the effective date of such termination. Additionally, if the whole or any substantial part of the Premises should be taken for any public or quasi- public use under governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof and the taking would prevent or materially interfere with the use of the Premises for the purpose for which that are being used in the reasonable discretion of Tenant and Landlord acting in good faith, this Lease shall terminate and the rent shall be abated during the unexpired portion of this Lease, effective on the date of the physical taking of the Premises.

B.    If part of the Premises shall be taken for any public or quasi-public use under any governmental law, ordinance or regulation, or by right of eminent domain, or by private purchase in lieu thereof, and this Lease is not terminated as provided in Paragraph 18.A., this Lease shall not terminate but the rent payable hereunder during the unexpired portion of this Lease shall be reduced to such extent as may be fair and reasonable under all of the circumstances (including a reduction of Base Rent) and following receipt of the condemnation award Landlord shall restore the Premises to a condition as near as reasonably possible to the condition prior to the taking (subject to the amount of the award).

C.    As between the parties, upon the occurrence of a taking of the Premises, all of the damages, award or compensation for the Premises shall belong to Landlord. Tenant shall have the right to claim and recover from the taking authority such compensation as may be awarded or recoverable by Tenant in Tenant's own right for or on account of damages to, or of cost or expense which Tenant would incur in removing any of Tenant's property, as compensation for any of Tenant's property which is taken, the cost of relocation of Tenant's business, and the value of this Lease provided that in no event shall Tenant's award diminish, reduce, decrease or otherwise affect Landlord's award.

19. <u>HOLDING OVER</u>. Tenant shall, at the termination of this Lease by lapse of time or otherwise, deliver immediate possession of the Premises to Landlord. If Landlord agrees in writing that Tenant may hold over after the expiration or termination of this Lease, unless the parties hereto otherwise agree in writing on the terms of such holding over, the hold over tenancy shall be subject to termination by Landlord at any time upon not less than five (5) days advance written notice, or by Tenant at any time upon not less than thirty (30) days advance written notice, and all of the other terms and provisions of this Lease shall be applicable during that period, except that Tenant shall pay Landlord from time to time, upon demand, as rent for the period of any such hold over, an amount equal to one hundred fifty percent (150%) of the Base Rent in effect on the termination date, computed on a daily basis for each day of the hold over period. No holding over by Tenant, whether with or without consent of Landlord, shall operate to extend this Lease except as otherwise expressly provided. The preceding provisions of this Paragraph 19 shall not be construed as Landlord's consent for Tenant to hold over.

20. <u>QUIET ENJOYMENT</u>. Landlord represents and warrants that it has full right and authority to enter into this Lease and that Tenant, upon paying the rent herein set forth and performing its other covenants agreements herein set forth, shall peaceably and quietly have, hold and enjoy the Premises for the Demised Term without any hindrance from Landlord or any person or persons lawfully claiming the Premises by, through or under Landlord, subject to the terms and provisions of this Lease.

21. <u>EVENTS OF DEFAULT</u>. The following events shall each be deemed an "Event of Default" by Tenant under this Lease:

A. Tenant shall fail to pay any installment of the rent herein required when due, or any payment with respect to taxes hereunder when due, or any other payment or reimbursement to Landlord required herein when due, and such failure shall continue for a period of ten (10) days from the date Landlord provides Tenant with written notice of the same; provided, however that Landlord shall only be required to provide written notice and such ten (10) day cure period twice in any twelve (12) month period, and the third and any subsequent failure to pay rent or other sums due hereunder as and when due shall be deemed an immediate Event of Default.

B. Tenant shall become insolvent, or shall make a transfer to defraud creditors, or shall make an assignment for the benefit of creditors.

C. Tenant shall file a petition under any section or chapter of the National Bankruptcy Act, as amended, or under any similar law or statute of the United States or any State thereof, or Tenant shall be adjudged bankrupt or insolvent in proceedings filed against Tenant thereunder; provided that any proceeding brought by anyone other than Landlord or Tenant under any bankruptcy, insolvency, receivership or similar law shall not constitute an Event of Default until such proceeding has continued unstayed for more than sixty (60) consecutive days.

D. A receiver or trustee shall be appointed for all or substantially all of the assets of Tenant.

E. Tenant shall desert, abandon or vacate any substantial portion of the Premises provided, however, if Tenant delivers written notice to Landlord in advance of Tenant ceasing operations in the Premises then if Tenant ceases to operate its business in the Premises but continues to fulfill its obligations under this Lease, including without limitation, maintaining the Premises in good condition and repair and continuing utility services to the Premises, then Tenant shall not be deemed to have deserted, abandoned or vacated the Premises for purposes of Paragraph 21.

F. Tenant shall fail to deliver an estoppel certificate to Landlord within the time frame set forth in Paragraph 24.C., and such failure shall continue for an additional five (5) business days following written notice to Tenant regarding Tenant's failure to timely deliver such estoppel certificate.

G. Tenant shall fail to comply with any term, provision or covenant of this Lease (other than as set forth in clauses A through F in this Paragraph 21), and shall not cure such failure within thirty (30) days after Landlord gives Tenant written notice of such default; provided, however, if the default cannot reasonably be cured within thirty (30) days following Landlord's giving of written notice, then Tenant shall be afforded additional

reasonable time (not to exceed ninety (90) days following Landlord's initial notice) to cure the default if Tenant begins to cure the default within ten (10) days following Landlord's written notice and continues diligently in good faith to completely cure the default.

22.   REMEDIES.  In addition to Landlord's right to present the Letter of Credit for payment upon the occurrence of a Material Event of Default as set forth in Paragraph 4 hereof, upon the occurrence of any of the Events of Default described in Paragraph 21 hereof, Landlord shall have the option to pursue any one or more of the following remedies without further notice or demand whatsoever:

A.    Immediately or at any time thereafter terminate this Lease, and this Lease shall be deemed to have been terminated upon giving of notice of such termination pursuant to Paragraph 26 hereof. Upon such termination, Landlord shall have the right to recover from Tenant, as liquidated damages, the following:

(1)    the unpaid rent that has been earned at the time of termination of this Lease: and

(2)    the amount by which the unpaid rent that would have been earned after the date of termination of this Lease until the time of the award exceeds the fair market value of rents over net amount of rent that could have been reasonably obtained by Landlord using reasonable diligence to relet the Premises; and

(3)    the worth, at the time of the award, of the amount by which the unpaid rent for the balance of the Lease term (as extended), if applicable) after the time of the award exceeds the fair market value of the rents over the balance of the Lease term; and

(4)    any other amount and court costs necessary to compensate Landlord for all detriment directly caused by Tenant's failure to perform its obligations under this Lease.

Any such payment shall constitute liquidated damages to Landlord, Landlord and Tenant acknowledging and agreeing that it is difficult to determine the actual damages Landlord would suffer by virtue of an Event of Default and that the agreed-upon liquidated damages are not punitive or a penalty and are just, fair, and reasonable.

The following words and phrases as used above in this Paragraph 22.A. shall have the following meanings:

(i)    Intentionally Omitted.
(ii)    the "worth at the time of the award" as used in Paragraph 22.A. (3) shall be computed by discounting the amount at the discount rate of six percent (6%) per annum;
(iii)    the term "time of the award" shall mean either the date upon which Tenant pays to Landlord the amount recoverable by Landlord as set forth above or the date of entry of any determination, order, or judgment of any court, whichever first occurs; and

(iv)    the term "fair market value of rent" means the aggregate reasonable fair market rent payable under a lease reletting the Premises on market terms for the remaining Term of this Lease from and after the time of the award, less the amortized portion (such amortization being on a straight-line basis over the term of the subject lease) attributable to the remaining Term of this Lease from and after the time of the award of brokerage commissions and fees, design fees, reasonable attorney's fees, improvement allowances, rent concessions, improvement costs, and other economic concessions and costs made or incurred in connection with a reletting of the Premises to a third party on market terms.

B.    Enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, by force if necessary (to the extent permitted by law), without being liable for prosecution or any claim for damages thereof, and relet the Premises and receive the rent therefore; and Tenant agrees to pay to the Landlord on demand any deficiency that may arise by reason of such reletting. In the event Landlord is successful in reletting the Premises at a rent in excess of that agreed to be paid by Tenant pursuant to the terms of this Lease, Landlord and Tenant each mutually agree that Tenant shall not be entitled, under any circumstances, to such excess rent, and Tenant does hereby specifically waive any claim to such excess rent.

C. Enter upon the Premises, by force if necessary (to the extent permitted by law), without being liable for prosecution or any claim for damages therefore, and do whatever Tenant is obligated to do under the terms of this Lease; and Tenant agrees to reimburse Landlord on demand for any expenses which Landlord may incur in thus effecting compliance with Tenant's obligations under this Lease, and Tenant further agrees that Landlord shall not be liable for any damages resulting to the Tenant from such action, whether caused by the negligence of Landlord or otherwise.

D. In addition to all other costs and expenses Landlord shall be entitled to recover under this Lease, Landlord shall also be entitled to recover the amount of any rental abatement, tenant construction allowance and/or other rental concession provided by Landlord to Tenant (collectively, the "Landlord's Costs"), to the extent set forth in this paragraph. The entire amount of the Landlord's Costs shall be amortized evenly over the Demised Term, and so long as an Event of Default does not occur, then Tenant shall have no liability to Landlord for the repayment of any portion of the Landlord's Costs. However, in the event that an Event of Default does occur (including without limitation, an Event of Default pursuant to Paragraphs 21.B., 21.C., and 21.D.), then in addition to all of Landlord's other remedies available under this Lease, Tenant shall also be liable to Landlord for the portion of the Landlord's Costs that remains amortized but unpaid between the date the Event of Default first occurs and the expiration of the Demised Term.

E. Landlord shall have all other rights and remedies provided by law or in equity.

In the event Tenant fails to pay any installment of rent hereunder within five (5) days after such installment is due, to help defray the additional cost to Landlord for processing such late payments, Tenant shall pay to Landlord a late charge in an amount equal to five percent (5%) of such installment. The provision for such late charge shall be in addition to all Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law, nor shall pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Landlord hereunder or any damages accruing to Landlord by reason of the violation of any of the terms, provisions and covenants herein contained. Notwithstanding the foregoing, if Landlord elects to terminate this Lease pursuant to Paragraph 22.A. hereof, Landlord's remedies thereunder constituting liquidated damages shall be Landlord's exclusive remedies hereunder respecting Landlord's breach of contract damages resulting from the termination of this Lease. No act or thing done by the Landlord or its agents during the Demised Term shall be deemed a termination of this Lease or an acceptance of the surrender of the Premises, and no agreement to terminate this Lease or accept a surrender of the Premises shall be valid unless in writing signed by Landlord. No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Landlord's acceptance of the payment of rent or other payments hereunder after the occurrence of an Event of Default shall not be construed as a waiver of such default, unless Landlord so notifies Tenant in writing. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an Event of Default shall not be deemed or construed to constitute a waiver of such default or of Landlord's right to enforce any such remedies with respect to such default or any subsequent default. If, on account of any breach or default by Tenant in Tenant's obligations under the terms and conditions of this Lease, it shall become necessary or appropriate for Landlord to employ or consult with an attorney concerning or to enforce or defend any of Landlord's rights or remedies hereunder, Tenant agrees to pay any reasonable attorney's fees so incurred.

F. Notwithstanding anything to the contrary in this Lease, (i) if an Event of Default and/or default of either party occurs, the other party shall be required to act in a commercially reasonable manner to mitigate its damages, and (ii) neither party shall be liable to the other for consequential damages, lost profits, indirect damages, speculative damages, or punitive damages.

23. <u>INTENTIONALLY DELETED</u>

24. <u>MORTGAGES, GROUND LEASES, AND ESTOPPEL CERTIFICATES.</u>

A.    Tenant hereby agrees and accepts that this Lease is and shall be subject and subordinate to any mortgage(s) and/or deeds to secure debt (collectively referred to as the "Mortgage") now or any time hereafter constituting a lien or charge upon the Premises or the improvements situated thereon; provided, however, that if the holder of any such Mortgage elects to have Tenant's interest in this Lease superior to any such instrument, then by notice to Tenant from such holder, this Lease shall be deemed superior to such lien, whether this Lease was executed before or after said Mortgage; provided, further, that any subordination is expressly contingent upon the holder of the Mortgage agreeing in writing that so long as no Event of Default is continuing, neither Tenant's right to quiet enjoyment under this Lease, nor the right of Tenant to continue to occupy the Premises and all portions thereof, and to conduct its business thereon in accordance with the covenants, conditions, provisions, terms and agreements of this Lease, shall be interfered with or disturbed by Landlord or anyone claiming by, through or under Landlord, including holder of the Mortgage. If the holder of the Mortgage or any successor in interest shall succeed to the rights of Landlord under this Lease through a foreclosure sale or a sale in lieu of foreclosure, Tenant will attorn to and recognize such successor-landlord as Tenant's landlord and such successor-landlord shall accept such attornment and recognize Tenant's rights of possession and use of the Premises in accordance with the provisions of this Lease. At the request of any holder of a Mortgage, Tenant, Landlord and such holder shall enter into a subordination, non-disturbance and attornment agreement reasonably acceptable to Landlord, Tenant and such holder, but in any event substantially consistent with the terms of this Lease. Tenant shall at any time hereafter on demand execute any instruments, releases or other documents which may be required by the holder of the Mortgage for the purpose of subjecting and subordinating this Lease to the lien of any such Mortgage.

Notwithstanding anything to the contrary contained in this Lease, Landlord agrees to use commercially reasonable efforts to obtain and deliver to Tenant a subordination, non-disturbance and attornment agreement ("SNDA") in substantially the form of Exhibit "D" attached hereto and made a part hereof, or other form reasonably acceptable to Landlord and Tenant, executed by any current Mortgagee with respect to the Building within thirty (30) days following the date hereof.

If, in connection with obtaining financing or refinancing for the Premises, or a sale of the Premises, any lender or purchaser shall request reasonable modifications in this Lease as a condition to such financing or purchase, Tenant will not unreasonably withhold or delay or defer its consent thereto, provided that such modifications do not increase the obligations of Tenant hereunder or materially and adversely affect Tenant's rights hereunder.

B.    Tenant hereby further agrees and accepts that this Lease is and shall be subject and subordinate to any ground lease now or at any time hereafter affecting the Premises; provided, that any subordination is expressly contingent upon the lessor of the ground lease agreeing in writing that so long as no Event of Default is continuing, neither Tenant's right to quiet enjoyment under this Lease, nor the right of Tenant to continue to occupy the Premises and all portions thereof, and to conduct its business thereon in accordance with the covenants, conditions, provisions, terms and agreements of this Lease, shall be interfered with or disturbed by Landlord or anyone claiming by, through or under Landlord, including lessor of the ground lease. Tenant shall at any time hereafter on demand execute any instruments, releases or other documents which may be required by the ground lessor of any ground lease affecting the Premises for the purpose of subjecting and subordinating this Lease to any such ground lease.

In the event any ground lessor of a ground lease affecting the Premises requests reasonable modifications in this Lease, Tenant will not unreasonably withhold or delay or defer its consent thereto, provided that such modifications do not increase the obligations of Tenant hereunder or materially and adversely affect Tenant's rights hereunder.

C.    At any time and from time to time designated by Landlord, Tenant will execute, acknowledge and deliver to Landlord, within ten (10) business days after receipt of a request from Landlord, a certificate certifying (a) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect, as modified, and stating the date and nature of each modification), (b) the date, if any, to which rent and other sums payable hereunder have been paid, (c) that no notice has been received by Tenant of any default which has not been cured, except as to defaults specified in said certificate, (d) the unexpired Term of this Lease; and (e) such other matters as may be reasonably requested by Landlord. Any such certificate may be relied upon by any existing or prospective purchaser, investor, ground lessor, mortgagee or holder of any

deed to secure debt on the Building or any part thereof. It is understood and agreed that Tenant's obligation to furnish such estoppel certificates in a timely fashion is a material inducement for Landlord's execution of this Lease.

      25.   <u>MECHANIC'S LIENS.</u> Tenant shall have no authority, express or implied, to create or place any lien or encumbrance of any kind or nature whatever upon or in any matter to bind, the interest of Landlord in the Premises or to charge the rent payable hereunder for any claim in favor of any person dealing with Tenant, including those who may furnish materials or perform labor for any construction or repairs and each such claim shall affect and each such lien shall attach to, if at all, only the leasehold interest granted to Tenant by this instrument. If any such mechanic's lien or other lien at any time shall be filed against the Property or any portion thereof, Tenant, within thirty
(30) days after the date Tenant first becomes aware of the filing of the same, at Tenant's election, shall cause said lien either to be discharged of record or to be bonded over in a manner which is reasonably acceptable to Landlord, and in any event in accordance with applicable law. Tenant covenants and agrees that it will pay or cause to be paid all sums legally due and payable by it on account of any labor performed or materials furnished in connection with any work performed on the Premises on which any lien is or can be validly and legally asserted against its leasehold interest in the Premises or the improvements thereon and that it will save and hold Landlord harmless from any and all loss, cost or expense based on or arising out of asserted claims or liens against the leasehold estate or against the right, title and interest of the Landlord in the Premises or under the terms of the Lease.

      26.   <u>NOTICES.</u> Any notice, demands, payments or other communications required or permitted to be delivered under this Lease shall be given by personal delivery, by deposit with a courier service that provides next-business-day service, or by deposit in the United States Mail, postage prepaid, Certified or Registered Mail, addressed to the parties hereto at the respective addresses set out below, or at such other address as they have theretofore specified by written notice delivered in accordance herewith; provided however, that the Premises shall remain as an acceptable address where notices to Tenant may be delivered throughout the Demised Term of the Lease so long as notices are also delivered simultaneously to the below address:

<table>
<tr><td align="center">LANDLORD:</td><td align="center">TENANT:</td></tr>
<tr><td align="center"><u>Carolina CC Venture XXXVII, LLC</u></td><td align="center"><u>Proterra Operating Company, Inc.</u></td></tr>
<tr><td align="center"><u>c/o McDonald Development Company</u></td><td align="center"><u>1815 Rollins Road</u></td></tr>
<tr><td align="center"><u>3715 Northside Parkway, Bldg 200, Suite 700</u></td><td align="center"><u>Burlingame, California 94010</u></td></tr>
<tr><td align="center"><u>Atlanta, Georgia 30327</u></td><td align="center"><u> </u></td></tr>
<tr><td align="center"><u>Attn: J. Austin McDonald</u></td><td align="center"><u>Attn: General Counsel's Office</u></td></tr>
</table>

      All notices shall be deemed delivered and effective upon actual receipt or refusal of delivery, except as otherwise specifically provided in this Lease and except as to the payments of rent to Landlord which shall be effective upon receipt by Landlord.

      If and when included within the term "Landlord", as used in this instrument, there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address for the receipt of notices and payments to Landlord; if and when included within the term "Tenant", as used in this instrument, there are more than one person, firm or corporation, all shall jointly arrange among themselves for their joint execution of such a notice specifying some individual at some specific address within the continental United States for the receipt of notices and payments to Tenant. All parties within the terms "Landlord" and "Tenant", respectively, shall be bound by notices given in accordance with the provisions of this Paragraph 26 to the same effect as if each had received such notice.

      27.   <u>RESTRICTIVE COVENANTS.</u> Tenant acknowledges that this Lease shall be subject and subordinate at all times to the Declaration of Covenants, Conditions and Restrictions, recorded, or to be recorded, in Spartanburg County, South Carolina Register of Deeds, as the same may be amended from time to time (hereinafter referred to as the "Declaration"), which affects the Premises. Tenant agrees to comply with all of the terms

and provisions of the Declaration, and not suffer or cause any act by Tenant or any of its employees, agents or invitees, which would violate the Declaration.

Landlord hereby represents and warrants to Tenant that: (a) Landlord has furnished to Tenant, prior to the execution of this Lease, a true and complete copy of the Declaration and any amendments and modifications in effect as of the Effective Date; (b) as of the Effective Date the Declaration is in full force and effect; (c) as of the Effective Date, Landlord has not received any written notice that any party to the Declaration is in default thereunder; and (d) the Declaration shall not be amended, without Tenant's prior written consent, to materially (i) decrease the rights granted to Tenant under this Lease, or (ii) increase Tenant's obligations under this Lease.

Landlord hereby agrees to enforce any cross-easement rights and other rights contained in the Declaration on Tenant's behalf, and if Landlord fails to enforce such rights on Tenant's behalf within thirty (30) days after written notice thereof from Tenant (or such longer period as may be reasonably required provided Landlord diligently and in good faith is attempting to enforce such rights), then Landlord agrees that if Tenant cannot otherwise reasonably operate its business in the Premises as a result of Landlord not enforcing such cross-easement or other rights contained in the Declaration, then Tenant shall have the right to enforce such rights under the Declaration pursuant to and in accordance with applicable law in the name of and on behalf of Landlord if required.

28.    REAL ESTATE BROKER. Tenant represents and warrants that the Tenant has dealt with no broker, agent or finder in connection with this Lease other than Jones Lang LaSalle ("Tenant's Broker"), which broker is acting on behalf of Tenant. Landlord represents and warrants to Tenant that Landlord has dealt with no broker, agent, or finder in connection with this Lease other than Thalhimer Greenville, LLC ("Landlord's Broker"), which is acting on behalf of Landlord (Tenant's Broker and Landlord's Broker are sometimes collectively referred to as "Broker"). The parties acknowledge and agree that Tenant's Broker and Landlord's Broker each shall be paid a commission by Landlord pursuant to separate agreement(s), and insofar as the Tenant and Landlord know, no other brokers, agent or finder negotiated this Lease or is entitled to any commission or fee in connection herewith. The parties hereby agree to indemnify, defend and hold the other free and harmless from and against all claims for broker's or agent's commissions or finder's fees by any person claiming to have been retained by the other party in connection with this transaction other than Tenant's Broker and Landlord's Broker, as applicable, or any other losses, costs, expenses (including, without limitation, attorney's fees), liabilities, damages, causes of actions or suits arising out of the alleged employment or use of a broker, agent or finder by Tenant other than Tenant's Broker and by Landlord other than Landlord's Broker.

29.    LIMITATIONS ON LANDLORD'S LIABILITY LANDLORD'S LIABILITY FOR DAMAGES OR BREACH OR NONPERFORMANCE BY LANDLORD, OR ARISING OUT OF THE SUBJECT MATTER OF THIS LEASE OR THE RELATIONSHIP CREATED HEREBY, SHALL BE LIMITED TO, AND COLLECTIBLE ONLY OUT OF, LANDLORD'S INTEREST IN THE PREMISES AND NO PERSONAL LIABILITY IS ASSUMED BY, OR SHALL AT ANY TIME BE ASSERTED AGAINST, LANDLORD OR ITS AFFILIATED CORPORATIONS, ITS AND THEIR PARTNERS, VENTURERS, DIRECTORS, SHAREHOLDERS, OFFICERS, AGENTS, SERVANTS AND EMPLOYEES, OR ANY OF ITS OR THEIR SUCCESSORS OR ASSIGNS; ALL SUCH LIABILITY, IF ANY, BEING EXPRESSLY WAIVED AND RELEASED BY TENANT. IF LANDLORD, IN VIOLATION OF THE TERMS OF THIS LEASE OR THE PROVISIONS OF LAW, WITHHOLDS, DENIES OR DELAYS ANY CONSENT WHICH TENANT IS REQUIRED TO OBTAIN HEREUNDER, TENANT MAY SEEK SPECIFIC PERFORMANCE BUT SHALL NOT BE ENTITLED TO DAMAGES THEREFORE. LANDLORD'S REVIEW, SUPERVISION, COMMENTING ON OR APPROVAL OF ANY ASPECT OF WORK TO BE DONE BY OR FOR TENANT IS SOLELY FOR LANDLORD'S PROTECTION AND, EXCEPT AS EXPRESSLY PROVIDED, CREATES NO WARRANTIES OR DUTIES TO TENANT OR TO THIRD PARTIES. LANDLORD SHALL NOT BE LIABLE IN ANY EVENT FOR INDIRECT, CONSEQUENTIAL, OR SPECULATIVE DAMAGES SUCH AS BUSINESS LOSS.

30.    MISCELLANEOUS.

A.    Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires.

B.    The terms, provisions and covenants and conditions contained in this Lease shall apply to, inure to the benefit of, and be binding upon, the parties hereto and upon their respective heirs, legal representatives, successors and permitted assigns, except as otherwise herein expressly provided. Landlord shall have the right to assign any of its rights and obligations under this Lease.

C.    Tenant agrees to furnish to the Landlord promptly upon demand, a corporate resolution, proof of due authorization by partners, or other appropriate documentation evidencing the due authorization of such Tenant to enter into this Lease.

D.    The captions inserted in this Lease are for convenience only and in no way define, limit or otherwise describe the scope or intent of this Lease, or any provision hereof, or in any way affect the interpretation of this Lease.

E.    Time is of the essence of this Lease. If the deadline for any obligation or other requirement herein (other than the payment of rent) falls on a Saturday, Sunday, or federal holiday, then the time period for timely performance of such obligation or other requirement shall be automatically extended to the next business day; provided, however in no event shall such extension apply to the payment of rent due hereunder.

F.    This Lease may not be altered, changed, or amended except by an instrument in writing signed by both parties hereto.

G.    All obligations of Tenant hereunder not fully performed as of the expiration or earlier termination of the Demised Term shall survive the expiration or earlier termination of the Demised Term, including without limitation, all payment obligations with respect to taxes and insurance and all obligations concerning the condition of the Premises. Tenant shall also, prior to vacating the Premises, pay to Landlord the amount, as estimated by Landlord, of Tenant's obligation hereunder for real estate taxes and insurance premiums for the year in which the lease expires or terminates. All such amounts shall be used and held by Landlord for payment of such obligations of Tenant hereunder, with Tenant being liable for any additional costs therefore upon demand by Landlord, or being liable for any additional costs therefore upon demand by Landlord, or with any excess to be returned to Tenant after all such obligations have been determined and satisfied, as the case may be. Any security deposit held by Landlord shall be credited against the amount payable by Tenant under this Paragraph 30.G.

H.    If any clause, sentence, paragraph or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the Term of this Lease, then and in that event it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause, sentence, paragraph or provision of this Lease that is illegal, invalid or unenforceable, there be added as a part of this Lease contract a clause, sentence, paragraph or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

I.    Provided Landlord is the prevailing party, Tenant agrees to pay any and all attorneys' fees and expenses Landlord incurs in enforcing any of the obligations of Tenant under this Lease, or in any litigation or negotiation in which Landlord shall, by virtue of this Lease or Landlord's ownership of the Premises, become involved in, through or on account of this Lease. Provided Tenant is the prevailing party, Landlord agrees to pay any and all attorneys' fees and expenses Tenant incurs in enforcing any of the obligations of Landlord under this Lease.

J.    This Lease shall create the relationship of landlord and tenant between Landlord and Tenant; no estate shall pass out of Landlord; Tenant has only a usufruct, not subject to levy and sale.

K.    This Lease shall not be recorded. At the same time as the parties execute and deliver this Lease, the parties shall execute and deliver a memorandum of lease in a form mutually satisfactory; provided, however that neither party shall record such memorandum of lease until any and all Tenant Incentives are publicly announced (including, but not limited to, any revisions to the FILOT Agreement). The party requesting the recording of the memorandum of lease shall coordinate and pay for the recording of the memorandum of lease. If and to the extent a memorandum of lease is recorded, then within ten (10) business days following the expiration or earlier termination of this Lease, Tenant shall execute, acknowledge and deliver to Landlord a memorandum of lease termination in a form reasonably acceptable to Landlord.

L.    This Lease shall not be valid or binding unless and until accepted by Landlord in writing and a fully executed copy delivered to both parties hereto.

M.    All references in this Lease to "the date hereof" or similar references shall be deemed to refer to the last date, in point of time, on which all parties hereto have executed this Lease.

N.    This Lease may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same lease agreement. Electronic PDFs of signatures and secure electronic signatures are acceptable.

O.    "Force Majeure Event" means any matter beyond the reasonable control and not the fault of Landlord or Tenant, as the case may be, including interference by governmental authorities, governmental permitting, unusual delay in deliveries or unavailability of materials, civil disturbance, strikes, lockouts, labor disputes, inability to procure labor or materials, failure of electric power, restrictive governmental laws or regulations, governmental preemption in connection with a national emergency, governmental intervention taking by eminent domain, pandemics, epidemics, riots, insurrection, war, fire, flood, casualty, severe weather, acts of terrorism, and acts of God; provided that such party's lack of funds or the unavailability of a particular contractor or personnel shall not be deemed a Force Majeure Event. If either party shall be delayed or hindered in or prevented from the performance of any act required hereunder (except for the payment when due of any money which shall in no event be excused) by

reason of a Force Majeure Event, then performance of such act shall be excused for the period of the delay and the period for the performance of any such act shall be extended for a period equivalent to the period of such delay.

P.    Upon request of Landlord and provided Tenant is not a publicly traded company, Tenant agrees to furnish to Landlord copies of Tenant's financial statements, audited if available, consisting of a most recent year end and current month end balance sheet, statement of cash flows, income statement and all relevant notes or summaries, reasonably acceptable to Landlord. Landlord shall not release copies of the financial statements or otherwise disclose or communicate the contents thereof to any other party or entity; provided, however, Landlord may disclose the financial statements to any prospective or existing mortgagee or purchaser of or investor in the Building and Landlord's attorneys, agents and accountants and as otherwise required by law.

Q.    Landlord and Tenant each hereby covenant and agree that this Lease, including the exhibits hereto, sets forth all of the promises, covenants, agreements, conditions and understandings between them with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings relating to such subject matter except as otherwise set forth herein. In entering into this Lease, neither party has relied upon any representation, warranty, covenant or other inducement not expressly set forth in this Lease.

R.    The laws of the state in which the Premises are located shall govern the validity, performance and enforcement of this Lease. If either party institutes legal suit or action for enforcement of any obligation contained herein, venue for such suit or action may be in the county, parish or other like political entity of the state in which the Premises are located.

S.    The term "attorneys' fees", "reasonable attorneys' fees", and other similar phrases used in this Lease shall mean reasonable attorneys' fees actually incurred at customary hourly costs without regard as to any statutory presumption as to such fees.

31.    <u>OFAC</u>.  Each party represents and warrants to the other party that, to the representing party's actual knowledge, it (a) is not acting, directly or indirectly, for or on behalf of, any person, group, entity, or nation named by any Executive Order or the U.S. Treasury Department as a terrorist, "Specially Designated National and Blocked Person", or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control, and (b) is not engaged in this lease transaction, directly or indirectly, on behalf of any such person, group, entity or nation. Landlord and Tenant acknowledge, however, that if Tenant or Tenant's parent company is a publicly traded corporation, then, notwithstanding the foregoing, Tenant is not responsible for the identity of each of its shareholders. The breaching party shall defend, indemnify and hold harmless the other party from and against

all claims, damages, losses, risk, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing representation.

32.    RENEWAL OPTION.

A.    Provided that no Event of Default has occurred and is continuing, and not more than fifty percent (50%) of the Premises is being sublet to third parties (in the aggregate) at the time of each such election, Tenant may renew this Lease for two (2) additional periods of five (5) years each (each, a "Renewal Term") on the same terms and conditions as provided in this Lease (except as set forth below), by delivering written notice of the exercise thereof to Landlord not later than nine (9) months before the expiration of the then Demised Term. If Tenant fails to provide such notice, Tenant shall have no further or additional right to extend or renew the Demised Term. On or before six (6) months prior to the commencement date of the Renewal Term in question, Landlord and Tenant shall execute an amendment to this Lease extending the Demised Term on the same terms and conditions as provided in this Lease, except as follows:

(i)    The Base Rent payable during each such Renewal Term shall be the prevailing rental rate, at the commencement of such Renewal Term, for space of equivalent quality, size, utility and location as the Premises, taking into account all relevant factors including, but not limited to, the length of such Renewal Term, the then existing credit standing of the Tenant, the leasehold improvements and any tenant allowance that would be paid in connection with a renewal and the amount of any commission payable by Landlord to Broker ("Market Rate"), determined in accordance with Paragraph 32.B. below;

(ii)    The 104% cap on Controllable CAM shall not apply to the first twelve (12) months of each Renewal Term, but will be applied to the Controllable CAM for the remaining lease years of such Renewal Term resulting in a "reset" of the cap on the Controllable CAM for each Renewal Term.

(iii)    The number of renewal options shall be reduced by one (1) with each exercise of a renewal option by Tenant in accordance with the provisions of this Paragraph 32;

(iv)    Landlord shall lease to Tenant the Premises in their then-current condition; and

(v)    This option is not transferable except to Permitted Transferees; the parties hereto acknowledge and agree that they intend that the aforesaid option to renew this Lease shall be "personal" to Tenant and its Permitted Transferees as set forth above and that in no event will any assignee (other than a Permitted Transferee) or sublessee have any rights to exercise the aforesaid option to renew.

Tenant's rights under this Paragraph 32 shall terminate if (x) this Lease or Tenant's right to possession of the Premises is terminated, or (y) Tenant fails to timely exercise its option and/or fails to timely execute an amendment extending the Term of this Lease under this Paragraph 32, time being of the essence with respect to Tenant's exercise thereof. If this Lease is renewed or extended, the word "Term" shall include the additional period covered by the renewal or extension, and this Lease shall apply to such additional period except as otherwise provided for herein.

B.    Upon notification from Tenant of the exercise of a renewal option, Landlord shall within 15 business days thereafter notify Tenant in writing of the proposed Market Rate applicable to the Renewal Term in question; Tenant shall, within 15 business days following receipt of such notice from Landlord, notify Landlord in writing of the acceptance or rejection of the proposed Market Rate. If Tenant fails to respond to Landlord's designation of Market Rate within said 15-business day period, Tenant shall be deemed to have accepted Landlord's designation of Market Rate for all purposes. In event of rejection by Tenant, the Market Rate for the Renewal Term in question shall be determined as follows:

(i)    Within 10 business days following notification of Tenant's rejection, Landlord and Tenant shall each appoint an appraiser. Any appraiser appointed hereunder (whether by a party hereto or by an appraiser so appointed, as hereinafter provided) shall be impartial, have an office in the county in which the Premises are located, shall have at least fifteen (15) years' experience as a real estate appraiser of warehouse/industrial buildings, and shall be a member of the

American Institute of Real Estate Appraisers or a successor or similar organization of recognized national standing, some of whose members are frequently employed for appraisal purposes by federal or state governments. The two appraisers appointed shall promptly attempt to agree on a determination of the Market Rate for the Renewal Term in question. The determination of Market Rate by the two appraisers, if they agree, shall be binding on Landlord and Tenant. If the Market Rate determinations of the two appraisers differ by an amount equal to or less than five percent (5%) of the higher of the two determinations of Market Rate, then the Market Rate shall be equal to the arithmetic mean of the two determinations.

(ii)    If the two appraisers cannot agree upon the Market Rate for the Renewal Term in question within 10 business days following their appointment, or if their determinations of Market Rate differ by more than five percent (5%) of the higher of the two determinations of Market Rate, then the two appointees shall select a third appraiser, but if they are unable to agree on a third appraiser within 5 days, then each appraiser shall select the names of two willing persons qualified to be appraisers hereunder and from the four persons so named, one name shall be drawn by lot by a representative of Tenant in the presence of a representative of Landlord, and the person whose name is so drawn shall be the third appraiser. If either of the first two appraisers fails to select the names of two willing, qualified appraisers, as aforesaid, the third appraiser shall be selected by lot from the two appraisers which were selected by the other appraiser for the drawing. The three appraisers so selected shall confer and immediately proceed to determine the Market Rate for the Renewal Term in question. If the three appraisers fail to agree on such Market Rate within 10 business days after the appointment of the third appraiser, the average of the two determinations of Market Rate which are closer to each other than the third determination of Market Rate shall be the Market Rate for the Renewal Term in question.

(iii)    The appraisers selected hereunder shall deliver a signed written report of their appraisal, or the average of the two closer appraisals, as the case may be, to Tenant and Landlord. The fee of the appraiser initially selected by Tenant shall be paid by Tenant, the fee of the appraiser initially selected by Landlord shall be paid by Landlord, and the fee of any third appraiser and any expenses reasonably incident to the appraisal (except attorneys' fees, which shall be borne by the party incurring the same) shall be shared equally by Tenant and Landlord. Any vacancy in the office of the appraiser appointed by Tenant shall be filled by Tenant, any vacancy in the office of the appraiser appointed by Landlord shall be filled by Landlord, and any vacancy in the office of the third appraiser shall be filled by the first two appraisers in the manner specified above for the selection of a third appraiser.

(iv)    If appraisal proceedings are initiated as provided above in order to determine the Market Rate which is applicable to the Renewal Term in question, the decision and award of the appraisers as to such Market Rate shall be final, conclusive, and binding on the parties, absent settlement by agreement of the parties prior to the rendering by the appraisers of any such decision and award. If the Market Rate is not finally determined prior to the commencement of the Renewal Term in question, Tenant shall pay Base Rent based upon Base Rent theretofore in effect under this Lease until the final determination of the Market Rate for the Renewal Term in question occurs as provided above. If the final determination of such Market Rate is different from the amount paid by Tenant, Tenant shall promptly pay to Landlord any deficiency in Base Rent or Landlord shall promptly pay to Tenant any overpayment of Base Rent from the commencement of the Renewal Term in question until such final determination.

33.    GENERATOR. Tenant shall be permitted by Landlord to operate a backup generator on site in a location reasonably acceptable to Landlord and shall be permitted to install and/or place a "Storage Tank" (as defined herein) near the Premises for the purpose of storing and supplying fuel for the backup generator. Notwithstanding anything to the contrary contained in this Lease, Tenant may not install or place any other "Storage Tanks" on the Property except with the prior written consent of Landlord, which shall not be unreasonably withheld, conditioned, or delayed. Tenant shall provide to Landlord plans and specifications for the back-up generator and Storage Tank prior to the installation of the same. If Tenant installs any "Storage Tanks" on the Property, Tenant shall, at its sole cost and expense, remove any such Storage Tanks, in accordance with all applicable laws, immediately upon earlier of: (a) the expiration or sooner termination of this Lease; or (b) the order of any governmental authority. In any event, any such Storage Tanks shall at all times be and remain the property and responsibility of Tenant. As used herein, the term "Storage Tank"

means any one or combination of tanks, including all pipes, sumps, valves and other equipment connected thereto, which are used for the storage of petroleum products, hydrocarbon substances or fractions thereof, or other hazardous materials, and which are located above ground. In no event shall any Storage Tank be located partially or wholly below ground. Tenant's installation, repair, maintenance, operation and removal of the back-up generator and the Storage Tank shall be subject to and performed in accordance with the terms and conditions of this Lease and all applicable laws, including without limitation providing a clearance letter upon removal (as applicable). If Tenant installs a backup generator pursuant to this Paragraph 33, then Tenant shall have the option, at its sole cost and expense, to remove the same upon the earlier of the expiration or sooner termination of this Lease.

34.    ADDITIONAL REPRESENTATIONS AND WARRANTIES.

A.    In addition to the other representations and warranties made herein, Landlord hereby represents and warrants to Tenant that as of the Effective Date:

(i)    the execution and delivery of this Lease by the signatory hereto on behalf of Landlord and the performance of this Lease by Landlord have been duly authorized by Landlord and this Lease is binding upon Landlord and enforceable against Landlord in accordance with its terms.

(ii)    Landlord is the owner of fee simple title to the Land free of all liens, encumbrances, easements, restrictions, rights and conditions of record, except those (i) as shown on that certain ALTA Owner's Policy of Title Insurance issued by Fidelity National Title Insurance Company dated July 31, 2019, Policy Number SC251906020R, (ii) Date Down Endorsement to Loan Policy issued by Fidelity National Title Insurance Company dated April 4, 2020, attached to Policy Number SC251906020R, (iii) the Declaration, (iv) the FILOT Agreement, and (v) other additional title exceptions, if any, which do not have a material adverse effect on Tenant's operation of business in the Premises for the Intended Use and do not diminish any of the rights nor increase the obligations of Tenant under this Lease.

(iii)    to Landlord's actual knowledge, without investigation or inquiry, there are no condemnation or judicial proceedings, administrative actions or examinations, claims or demands of any type which have been instituted or which are pending against Landlord with respect to the Premises or any part thereof, and as of the Effective Date Landlord has received no written notice of any threatened condemnation or judicial proceedings, administrative actions or examinations regarding same.

(iv)    to Landlord's actual knowledge, without investigation or inquiry, there are no actions or proceedings pending against Landlord with respect to the Premises before any court or administrative agency which would result in any material adverse change in the condition of the Premises, and as of the Effective Date Landlord has received no written notice of any threatened action or proceeding against Landlord regarding same.

(v)    Landlord is duly organized and validly existing under the laws of the State of Delaware and is duly authorized to transact business in the State of South Carolina.

(vi)    the Premises will be delivered to Tenant free of any occupants, parties in possession, tenants, rights of first refusal, or other rights to occupy all or any portion of the Premises (other than those referenced in this Lease), and free of any service contracts or management agreements that would be binding on the Tenant after the Commencement Date.

(vii)    Landlord has not filed any proceeding or petition in, nor received written notice that any proceeding or petition has been filed against Landlord in bankruptcy or insolvency, or for reorganization or for the appointment of a receiver, custodian or trustee, or for the arrangement of debts under any state or federal statute relating to debtor protection or insolvency, and further that Landlord is not insolvent and will not be rendered insolvent by the consummation of the transaction contemplated by this Lease.

(viii)  Landlord has received no written notice of and has no actual knowledge of (a) any violations of any laws, including without limitation environmental laws, or (b) any suits or judgments threatened or pending relating to violations at the Premises or any portion of the Premises of any such laws.

(ix)   except with respect to the FILOT Agreement, that there are no special taxes or assessments pending and/or unpaid with respect to any improvements not yet completed on the Premises.

As used in this Paragraph 34.A., any and all references to "Landlord's knowledge," "Landlord's actual knowledge" or phrases of similar import shall mean the conscious awareness of facts or other relevant information, without investigation or inquiry, by Tracy White as Senior Vice President - Development of McDonald Development Company.

B.    In addition to the other representations and warranties made herein, Tenant hereby represents and warrants to Landlord that as of the Effective Date:

(i)    the execution and delivery of this Lease by the signatory hereto on behalf of Tenant and the performance of this Lease by Tenant have been duly authorized by Tenant and this Lease is binding upon Tenant and enforceable against Tenant in accordance with its terms.

(ii)    Tenant is duly incorporated and validly existing under the laws of the State of Delaware, and is duly authorized to transact business in the State of South Carolina.

35.   SELF HELP. If Landlord fails to perform any maintenance or repair to the Premises or the Common Areas that is Landlord's obligation under this Lease, which failure materially, adversely affects Tenant's operation of its business in the Premises, then Tenant shall have the right to perform such maintenance or repair in accordance with the following procedure:

As a condition to exercising any right of self-help expressly provided to Tenant by this Paragraph 35:

(i)   Tenant must first give Landlord (and any mortgagee whose address has been provided to Tenant) written notice ("Notice of Self-Help") of (a) Landlord's failure, after any applicable notice and cure period, to provide such repair or maintenance to the Premises or the Common Areas, as required under the Lease; and (b) Tenant's intent to take self-help action pursuant to this Paragraph 35. If Landlord fails or refuses to commence such repair or maintenance within ten (10) business days after Landlord's receipt of the Notice of Self-Help, subject to extension for reasons beyond Landlord's reasonable control including, without limitation any delays caused by Tenant, then Tenant shall have the option to exercise its self-help right subject to the following terms and conditions;

(ii)  any contractor performing work upon any component of the Premises still under warranty, including without limitation the roof of the Premises, must be approved by the applicable manufacturer as an authorized servicer of such component;

(iii)  Tenant shall take only such action as is reasonably necessary to correct the defective condition;

(iv)  all work done in accordance with this Paragraph 35 must be performed at a reasonable and competitive cost and expense;

(v)  any work done by Tenant under this Paragraph 35 is otherwise subject to all applicable laws, ordinances, rules, regulations and orders and the terms and conditions of the Lease.

In the event Tenant exercises its self-help right as hereinabove provided and provided Landlord, acting in good faith, does not dispute Tenant's right to exercise its self help remedy set forth herein, such dispute to be evidenced by Landlord's written notice to Tenant delivered within ten (10) business days from Landlord's receipt of the Notice of Self-Help, Landlord shall reimburse Tenant the actual, reasonable cost of such repair within thirty (30) business days of Landlord's receipt from Tenant of (i) copies of invoices and paid checks evidencing the cost of the repair, and
(ii) original lien waivers from all applicable contractors and/or subcontractors providing labor and/or materials.

36.   <u>LANDLORD DEFAULT</u>. In the event Landlord fails to comply with any of the terms and conditions of this Lease applicable to Landlord, then unless Landlord corrects or remedies any such failure within thirty (30) days following receipt of written notice from Tenant (or such longer period of time as reasonably necessary to complete such cure or remedy provided Landlord commences to cure within such thirty (30) day period and diligently pursues such cure to completion), then Tenant may elect to declare Landlord in default of this Lease with respect to such failure to comply. In the event Landlord is in default of this Lease, Tenant may pursue its rights and remedies at law or in equity provided however in no event shall Tenant have the right to terminate this Lease, abate or otherwise offset rent, and/or exercise self-help except as otherwise expressly set forth in Paragraph 35 above.

37.   <u>LEASE GUARANTY</u>. A condition to the effectiveness of this Lease shall be Landlord's receipt from Proterra, Inc., as Guarantor, of an executed Lease Guaranty (herein so called) in a form acceptable to Landlord in its sole discretion, such being a material inducement to Landlord's decision to enter into this Lease.

*Signatures are on the following page*

IN WITNESS WHEREOF, the parties have executed this Lease with intent to be bound hereby as of the day and year indicated above each signature block, respectively, but effective as of the day and year first above written.

EXECUTED BY LANDLORD, this 13th day of November, 2021.

LANDLORD:

CAROLINA CC VENTURE XXXVII, LLC,
a Delaware limited liability company

By:  McDonald Ventures XXXVII, LLC, its
          Managing Member

          By:  McDonald Industrial XXXVII, LLC, its Sole
                  Member


                  By: John R. McDonald, Manager



EXECUTED BY TENANT, this 13th day of November, 2021.


TENANT:

PROTERRA OPERATING COMPANY, INC., a Delaware corporation


By: Name: Title:

EXHIBIT A - LEASING PLAN

[***]

Exhibit A

EXHIBIT "B"

LEGAL DESCRIPTION OF LAND

ALL THAT LOT, TRACT OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE STATE OF SC, COUNTY OF SPARTANBURG, THE METES AND BOUNDS OF WHICH ARE MORE PARTICULARLY STATED AS FOLLOWS:

COMMENCING AT AN POINT IN THE INTERSECTION OF POPLAR DRIVE EXT. (66' RIGHT-OF-WAY) & HARVEY ROAD (DITCH-DITCH RIGHT-OF-WAY), BEING THE POC (POINT OF COMMENCEMENT); THENCE CONTINUING ALONG HARVEY ROAD S87°34'15"E A DISTANCE OF 855.65 FEET TO AN IPF 1/2" REBAR; THENCE LEAVING SAID HARVEY ROAD S03°18'54"W A DISTANCE OF 200.01 FEET TO AN IPF 3/4" CT; THENCE S88°30'55"E A DISTANCE OF 63.47 FEET TO AN IPS 1/2" REBAR BEING THE POB (POINT OF BEGINNING) FOR PARCEL 2; THENCE RUNNING S88°30'55"E A DISTANCE OF 125.79 FEET TO AN IPF 1/2" REBAR, THENCE N04°42'27"E A DISTANCE OF 59.81 FEET TO AN IPF 1" SOLID ROD; THENCE S85°47'34"E A DISTANCE OF 213.94 FEET TO AN IPF BENT 1-1/4" SOLID ROD; THENCE S87°12'08"E A DISTANCE OF 387.08 FEET TO A POINT LOCATED IN THE ASPHALT OF HARVEY ROAD (DITCH-DITCH RIGHT-OF-WAY); THENCE LEAVING HARVEY ROAD S08°36'16"W A DISTANCE OF 18.20 FEET TO AN IPS 5/8" REBAR; THENCE S 08°36'16"W A DISTANCE OF 215.51 FEET TO AN IPS 1/2" REBAR; THENCE S08°36'16"W A DISTANCE OF 241.54 FEET TO AN IPS 5/8" REBAR; THENCE S14°42'48"W A DISTANCE OF 187.94 FEET TO AN IPS 5/8" REBAR; THENCE S03°29'14"E A DISTANCE OF 54.12 FEET TO A POINT LOCATED IN THE CENTERLINE OF DITCH; THENCE ALONG SAID CENTERLINE OF DITCH THE FOLLOWING BEARING AND DISTANCES; THENCE S29°05'39"W A DISTANCE OF 42.72 FEET TO A POINT; THENCE S48°53'09"W A DISTANCE OF 37.72 FEET TO A POINT; THENCE S47°43'39"W A DISTANCE OF 94.89 FEET TO A POINT; THENCE S39°45'29"W A DISTANCE OF 41.38 FEET TO A POINT; THENCE S31°52'22"W A DISTANCE OF 62.03 FEET TO A POINT; THENCE S18°38'31"W A DISTANCE OF 72.80 FEET TO A POINT; THENCE S31°23'59"W A DISTANCE OF 21.49 FEET TO A POINT; THENCE S51°22'16"W A DISTANCE OF 30.13 FEET TO A POINT; THENCE S27°22'59"W A DISTANCE OF 76.63 FEET TO A POINT; THENCE S17°04'24"W A DISTANCE OF 88.66 FEET TO A POINT; THENCE S22°48'54"W A DISTANCE OF 61.06 FEET TO A POINT; THENCE S29°27'40"W A DISTANCE OF 43.19 FEET TO A POINT; THENCE S26°34'44"W A DISTANCE OF 29.98 FEET TO A POINT LOCATED ON THE NORTHERN RIGHT-OF-WAY OF SOUTH CAROLINA HWY. 80 (250' RIGHT-OF-WAY); THENCE ALONG SAID RIGHT-OF-WAY THE FOLLOWING BEARING AND DISTANCES; S41°18'51"W A DISTANCE OF 15.86 FEET TO AN IPS 5/8" REBAR; THENCE S32°42'00"W A DISTANCE OF 120.55 FEET TO AN IPF 5/8" REBAR ON NORTHERN RIGHT-OF-WAY OF SOUTH CAROLINA HWY. 80 (250' RIGHT-OF-WAY); THENCE LEAVING SAID RIGHT-OF-WAY N69°40'04"W A DISTANCE OF 210.19 FEET TO AN IPF 1" SOLID ROD; THENCE N 05°58'22"E A DISTANCE OF 335.18 FEET TO AN IPS 1/2" REBAR, THENCE S 54°14'54" W A DISTANCE OF 254.90 FEET TO AN IPS 1/2" REBAR; THENCE N 35°45'06" W A DISTANCE OF 33.70 FEET TO AN IPS 1/2" REBAR; THENCE S 54°14'54" W A DISTANCE OF 26.63 FEET TO AN IPF 1/2" REBAR BENT; THENCE S66°01'29"W A DISTANCE OF 661.51 FEET TO AN IPF 1" CT; THENCE LEAVING C/L OF SAID 68' DUKE POWER EASEMENT N80°05'50"W A DISTANCE OF 55.81 FEET TO AN IPF 1" CT ON THE EASTERN RIGHT-OF-WAY OF SAID POPLAR DRIVE EXT.; THENCE ALONG SAID RIGHT-OF-WAY THE FOLLOWING BEARINGS AND DISTANCES: N10°07'40"E A DISTANCE OF 233.02 FEET TO AN IPF 1" CT; THENCE ALONG A CURVE TO THE LEFT HAVING A CHORD BEARING OF N12°09'37"E, A DISTANCE OF 231.49 FEET , A RADIUS OF 2,864.79 FEET AND AN ARC LENGTH OF 231.55 FEET TO AN IPF 1/2" REBAR BENT; THENCE N13°12'58"E, A DISTANCE OF 167.55 FEET TO AN IPF 1/2" REBAR; THENCE ALONG A CURVE TO THE LEFT HAVING A CHORD BEARING OF N06°58'24"E, A DISTANCE OF 149.21FEET, A RADIUS OF 572.95 FEET AND AN ARC LENGTH OF 149.64 FEET TO AN IPF 1/2" REBAR; THENCE TURNING AND RUNNING S 90°00'00" E A DISTANCE OF 184.80 FEET TO AN IPS 1/2" REBAR; THENCE N 82°09'32" E A DISTANCE OF 99.65 FEET TO AN IPS 1/2" REBAR; THENCE N 54°28'08" E A DISTANCE OF 40.22 FEET TO AN IPS 1/2" REBAR; THENCE S 35°31'52"E A DISTANCE OF 21.29 FEET TO AN IPS 1/2" REBAR; THENCE N 54°28'08" E A DISTANCE OF 505.94 FEET TO AN IPS 1/2" REBAR; THENCE N 0°00'00" W 296.74 FEET TO THE (POB) POINT OF BEGINNING OF PARCEL 2. SAID TRACT CONTAINS 29.58 ACRES OR 1,288,540 SQUARE FEET MORE OR LESS, BEING THAT SAME PARCEL IDENTIFIED AS PARCEL 2 ON THAT CERTAIN PLAT ENTITLED "SURVEY FOR CAROLINA CC VENTURE XXXVII, LLC TRUIST BANK AND FIDELITY NATIONAL TITLE INSURANCE

COMPANY, SPARTANBURG COUNTY, SOUTH CAROLINA" BY DANIEL J. STILES OF EAS PROFESSIONALS DATED SEPTEMBER 5, 2020, RECORDED SEPTEMBER 9, 2020 IN THE OFFICE OF THE SPARTANBURG COUNTY REGISTER OF DEEDS IN PLAT BOOK 178, PAGE 36, AND BEING KNOWN AS 1605 POPLAR DRIVE EXT., TMS # 9-05-02-100.00.

Less and Except:
THAT PORTION OF PARCEL 2, BEING APPROXIMATELY 4.0 ACRES, THAT LIES SOUTH AND WEST OF THE CENTER LINE OF THE CREEK LOCATED ON THE PARCEL, AS SHOWN ON THE SURVEY.

EXHIBIT "C"

The "WORK LETTER"

1.     Construction Documents.

(a)     Preliminary and Final CDs. Tenant shall, at its sole expense (but subject to the Leasehold Improvements Allowance), deliver to Landlord for its approval preliminary construction documents prepared by an architect ("Architect") chosen by Tenant and reasonably approved by Landlord (Landlord approves Harper General Contractors as the Architect) depicting and detailing all improvements and/or alterations that Tenant proposes to install and/or make in or to the Premises (the "Preliminary CDs"). The Preliminary CDs must reasonably conform to the Outline of Standard Tenant Finish Specifications attached hereto as Exhibit "C-1". The Preliminary CDs must be delivered in Autocad format together with a hard copy thereof and must include, without limitation, the partition layout, ceiling plan, electrical outlets and switches, telephone outlets, drawings for any modifications to the base Building and reasonably detailed plans and specifications for the construction of all improvements and alterations Tenant desires to be made to the Premises. Landlord shall notify Tenant whether it approves of the submitted Preliminary CDs within five (5) business days after Tenant's submission thereof. If Landlord disapproves of such Preliminary CDs based on factors as further described in Section 1(b) below, then Landlord shall notify Tenant thereof specifying in reasonable detail the reasons for such disapproval, in which case Tenant shall revise the Preliminary CDs in accordance with Landlord's objections and submit the revised Preliminary CDs to Landlord for review and approval. Landlord shall notify Tenant in writing whether it approves of the resubmitted Preliminary CDs within five (5) business days after its receipt thereof. This process shall be repeated until the Preliminary CDs have been finally approved by Landlord; provided that Landlord shall only be entitled to disapprove any resubmitted Preliminary CDs to the extent the same fail to comply in all material respects with Landlord's prior reasons for disapproval. As used herein, (i) "Final CDs" shall mean the Preliminary CDs as finally approved by Landlord, as amended from time to time by any Change Orders (hereinafter defined), and (ii) "Leasehold Improvements" shall mean, collectively, all improvements and alterations or work to be installed or performed in or made to the Premises pursuant to the Final CDs; provided, however, that Leasehold Improvements shall specifically exclude any and all of Tenant's Property, and (iii) "Tenant's Property" shall mean collectively, all personal property (including but not limited to IT equipment and office furniture), business fixtures of Tenant, all compressors, all free-standing cranes, forklift chargers, battery assembly equipment, vehicle car chargers, solar panels and invertors, and any dyno chamber(s). Upon determination of the Final CDs, this Work Letter will automatically be amended to incorporate the Final CDs by reference.

(b)     Approval Standard. Notwithstanding anything to the contrary herein, Landlord's approval of the Preliminary CDs, Final CDs, Change Order, and other changes related to the plans for the Leasehold Improvements under this Work Letter will not be unreasonably withheld, conditioned or delayed unless and then to the extent such would, if implemented and in Landlord's good faith opinion, (i) result in non-compliance of the Leasehold Improvements or the Property with any applicable governing laws, rules, ordinances, codes and/or regulations ("Legal Requirements"); (ii) overload the capacity of or have a material adverse effect on any of the Buildings fire-safety, plumbing, electrical or mechanical systems, (iii) affect the exterior appearance of the Building or Common Areas; (iv) affect the Building's exterior walls, roof, footings, foundations, structural portions of load-bearing walls, structural floors and subfloors, and structural columns and beams or exterior glass and mullions, or (v) would locate any equipment, wiring, cabling or conduit on the roof of the Building or in any Common Areas (other than chases within interior walls designated for such purposes), then, in any of such circumstances, Landlord may withhold consent in its sole discretion; provided, however, that Landlord shall allow Tenant to install solar panels and related infrastructure on the Property in locations other than the roof (it being agreed that solar panels shall not be located on the roof of the Building and further the same may be used solely for the benefit of the Property

and may not be used by or for the benefit of third parties). Landlord's approval of the Preliminary CDs shall not be a representation or warranty of Landlord that such are adequate for any use or comply with any Legal Requirements, but shall merely be the consent of Landlord thereto.

2.    Change Orders. No changes may be made to the Final CDs without Landlord's written approval. If Tenant desires to make any changes to the Final CDs, Tenant shall submit to Landlord a change order request prepared by Architect and otherwise in a form reasonably required by Landlord but which shall include, in any event, changes to the Final CDs reflecting the requested change (a "Change Order Request"). Each such Change Order Request must receive the prior written approval of Landlord, such approval or disapproval to be made within the time periods and governed by the standards for approval of the Preliminary CDs as described above and, as so approved, is herein referred to as a "Change Order").

3.    Tenant's Contractors/Construction Contracts.

(a)    Tenant's General Contractor. Tenant shall be responsible for bidding the Leasehold Improvements and selecting the General Contractor (herein so called) from the list of Landlord preferred contractors, or such other contractor as is reasonably acceptable to Landlord. Landlord approves Harper General Contractors as the General Contractor. Landlord shall have the right to approve all subcontractors, such approval to not be unreasonably delayed, conditioned or withheld.

(b)    Construction Manager. Tenant shall retain, at its sole cost (subject to the Leasehold Improvements Allowance) its own construction manager for the performance of the Leasehold Improvements.

(c)    Tenant's Construction Contracts. The construction contract for the Leasehold Improvements shall provide for, without limitation, (i) a one-year warranty for all of the Leasehold Improvements; and (ii) a requirement that the General Contractor perform the Leasehold Improvements in accordance with the Final CDs and in a good and workmanlike manner and in compliance with all Legal Requirements.

4.    Construction/Contractor Requirements.

(a)    Tenant and Tenant's General Contractor shall not commence any of the Leasehold Improvements until the later to occur of (i) determination of the Final CDs, (ii) Tenant obtaining and delivering to Landlord all necessary demolition and building permits therefor, and (iii) Tenant's General Contractor and all subcontractors have provided to Landlord certificates of insurance evidencing compliance with the following: contractors to maintain (1) commercial general liability insurance coverage of no less than Two Million and No/100 Dollars ($2,000,000.00) per occurrence and in the aggregate for personal injury, bodily injury, death or property damage, (2) builder's risk insurance for full replacement (with only Tenant's General Contractor being required to carry this insurance), and (3) workers' compensation insurance as required by applicable law. Tenant, upon written request by Landlord, shall provide to Landlord certificates of insurance from the applicable parties evidencing the insurance coverage required by this Section. Tenant's policy and the policies of Tenant's contractors (including Tenant's General Contractor) shall name Landlord as an additional covered party. Any occupancy prior to the Commencement Date shall be subject to all of the terms and conditions of the Lease (including, but not limited to, Tenant's indemnification obligations and Tenant's obligations to carry insurance) other than the payment of Rent, the payment of which shall commence on the Commencement Date as provided in the Lease. During the early-occupancy period, if any, Tenant will be responsible for providing electric power and other necessary utilities for its activities and for providing security for any of its property located on the Property or in the Premises**. DURING TENANT'S EARLY OCCUPANCY OF THE PREMISES, IF ANY, TENANT HEREBY ASSUMES ALL RISK OF DAMAGE TO AND THEFT OF PROPERTY AND INJURY TO PERSONS, IN, ON, OR ABOUT THE PREMISES FROM ANY  CAUSE WHATSOEVER AND AGREES THAT LANDLORD AND LANDLORD'S EMPLOYEES, AGENTS, CONTRACTORS, INVITEES AND OTHER TENANTS SHALL NOT BE LIABLE  FOR, AND ARE HEREBY RELEASED FROM ANY RESPONSIBILITY FOR, ANY DAMAGE  TO OR THEFT OF PROPERTY OR INJURY TO PERSONS, WHICH DAMAGE, THEFT OR INJURY IS SUFFERED BY TENANT OR BY OTHER PERSONS CLAIMING THROUGH TENANT.**

(b)    Upon commencement of the construction of the Leasehold Improvements, Tenant shall proceed with due diligence to complete same in an expeditious

manner in accordance with the Final CDs. The Leasehold Improvements must be performed in a good and workmanlike manner, in compliance with all Legal Requirements.

(c)    Tenant will take commercially reasonable steps to protect its facilities and to secure the same. Construction equipment and materials are to be located in confined areas and delivery and loading of equipment and materials shall be done at such locations and at such time as Landlord shall reasonably direct.

(d)    Tenant shall at all times keep the Common Areas free from accumulations of waste materials or rubbish caused by its suppliers, contractors or workers. Landlord may require daily clean-up if required for fire prevention and life safety reasons or applicable laws and reserves the right, following notice to Tenant and a reasonable opportunity to cure, to do clean-up at the expense of Tenant if Tenant fails to comply with Landlord's cleanup requirements. Upon Substantial Completion (hereinafter defined) of the Leasehold Improvements, Tenant's contractors shall forthwith remove all rubbish and all tools, equipment and surplus materials from and about the Premises, the Building, and the Common Areas. Any damage caused by Tenant's contractors to any portion of the Building or to any property of Landlord shall be repaired by Tenant at Tenant's expense forthwith after written notice from Landlord as to its condition prior to such damage.

5.    Substantial Completion.

(a)    As used herein "Substantial Completion," "Substantially Completed," and any derivations thereof mean that (i) the Leasehold Improvements have been substantially completed in accordance with the Final CDs as determined by Architect, and (ii) Tenant can lawfully occupy the Premises for business purposes. Substantial Completion shall have occurred even though minor details of construction, decoration, landscaping and mechanical adjustments and other "punch-list" items remain to be completed. Tenant shall have the sole responsibility for obtaining any certificate of occupancy (or equivalent). When the Architect considers the Leasehold Improvements to be Substantially Completed, Tenant will notify Landlord and within five (5) business days thereafter, Landlord's Representative and Tenant's Representative shall conduct a walk-through of the Premises and identify any necessary touch-up work, repairs and minor completion items that are necessary for final completion of the Leasehold Improvements. Tenant shall use commercially reasonable efforts to cause the General Contractor performing the Leasehold Improvements to complete all punch-list items within thirty (30) days after agreement thereon. The date upon which Substantial Completion is achieved will be the "Substantial Completion Date" as that term is used in the Lease. **NOTWITHSTANDING THE ABOVE, SUBSTANTIAL COMPLETION OF THE LEASEHOLD IMPROVEMENTS IS NOT A CONDITION TO THE COMMENCEMENT DATE OR TENANT'S OBLIGATION TO PAY RENT (OR TO PERFORM ANY OTHER OBLIGATIONS) UNDER THE LEASE).**

(b)    All of the Leasehold Improvements will be owned by Landlord and will remain in the Premises at the expiration or early termination of this Lease unless otherwise agreed in writing by

Landlord. All of the Tenant's Property will be owned by Tenant and Tenant shall remove all of Tenant's Property upon the expiration or earlier termination of the Demised Term, and repair any damage to the Premises in connection with such removal. Tenant's removal and restoration obligations under Paragraph 10.B of the Lease will include the removal of all Leasehold Improvements that Landlord designates as "Non-Building Standard Improvements" as part of the approval process for the Preliminary CDs (and otherwise in connection with the Leasehold Improvement Plans). Without limitation, and whether or not so designated by Landlord, Non-Building Standard Improvements will include the following which Tenant shall remove at the end of the Demised Term:_. Notwithstanding anything to the contrary, all electrical conduit and all process piping shall not be deemed Non-Building Standard Improvements and Tenant shall not be required to remove those items. Except as otherwise set forth herein, Tenant otherwise will not be required to remove any Leasehold Improvements upon the expiration of the Demised Term.

(c)    Within sixty (60) days after the Substantial Completion Date, Tenant shall deliver to Landlord (i) an accurate record drawing of the Leasehold Improvements as constructed in Autocad format together with a hard copy thereof, and (ii) final lien waivers from the General Contractor, fully executed, acknowledged and in recordable form.

6.    Payment for Construction Costs /Leasehold Improvements Allowance.

(a)    Construction Costs Defined. As used in this Work Letter, "Construction Costs" shall include only (i) the cost of all labor and materials and supplies for the construction of the Leasehold Improvements (including any demolition per the Final CDs); (ii) the cost of all contractor, architectural, engineering and design and project consultant/manager fees (including but not limited to costs incurred in connection with the preparation of the Final CDs and any other construction documents) and general conditions and permitting costs/fees; and (iii) the cost of utilities and debris removal. Construction Costs shall not include the cost of acquisition, installation, set up or testing of any of Tenant's Property including, Tenant's furniture, fixtures, equipment or inventory.

Prior to commencement of construction of the Leasehold Improvements, Tenant shall deliver or cause to be delivered to Landlord a construction budget setting forth in reasonable detail the estimated Construction Costs (the "Construction Budget").

(b)    Allowance/Disbursement. Landlord shall provide to Tenant a construction allowance in an amount not to exceed $11.50 per square foot of space within the Premises ($3,762.098.50; $11.50 x 327,139sf) ("Leasehold Improvements Allowance") to be applied toward Construction Costs. Tenant shall be responsible for the Construction Costs in excess of the Leasehold Improvements Allowance (the positive difference between the Construction Costs and the Leasehold Improvements Allowance being "Tenant's Contribution"). The Leasehold Improvements Allowance will be paid by Landlord in periodic payments as construction progresses on a pari passu basis, less a retainage of ten percent (10%), within thirty (30) days of receipt by Landlord of applications for payment from Tenant consistent with the provisions set forth below. In the event Landlord has disbursed to Tenant (or to the General Contractor) the total Leasehold Improvements Allowance, less a retainage equal to ten percent (10%) of the Leasehold Improvements Allowance, Tenant will be responsible for additional payments to the General Contractor sufficient to satisfy the General Contract and any obligations to the General Contractor due thereunder. Notwithstanding anything to the contrary herein, Landlord shall install, at its sole cost and expense, a 3,000A switchgear (the "Switchgear") in the Building within a reasonable time after the Commencement Date and shall work together with Tenant's electrical consultant in good faith. Further, if Tenant subsequently replaces the Switchgear with a larger capacity switchgear, as part of the Leasehold Improvements or otherwise as allowed under the Lease, then the larger capacity switchgear shall become part of the Building and part of the Leasehold Improvements and Tenant shall be deemed the owner of the

Switchgear.

Landlord is currently storing metal studs and other interior building materials (the "Stored Materials") for construction of interior improvements in the Building, which Stored Materials Landlord is willing to either (at Tenant's option): (i) apply toward the Leasehold Improvements Allowance, or (ii) remove from the Building after execution of this Lease. Landlord agrees to coordinate with Tenant and the General Contractor on the suitability of the Stored Materials to be used by Tenant in the construction of the Leasehold Improvements, and to establish the value of the credit against the Leasehold Improvement Allowance, or, in the alternative if the parties are unable to agree on such credit value, Landlord shall have the Stored Materials removed from the Building within fifteen (15) days of such decision.

(c)     Application for Disbursement. In connection with each application for payment Tenant shall provide Landlord: (A) a request for payment of the General Contractor approved by Tenant, in the appropriate AIA form or other form approved by Landlord showing the schedule, by trade, of percentage of completion of the Leasehold Improvements, detailing the portion of the Leasehold Improvements completed and the portion not completed, (B) copies of invoices from Tenant's contractors for labor rendered and materials delivered to the Premises and for which payment is sought through the subject disbursement; (C) an executed mechanic's lien release from the General Contractor with respect to the work for which payment is sought and in a form approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed, and (D) executed mechanic's lien releases from all subcontractors with respect to all previous draws paid by Landlord and in a form approved by Landlord, such approval not to be unreasonably withheld, conditioned or delayed (the foregoing being collectively referred to herein as an "Interim Application for Payment"). As between Landlord and Tenant, Tenant's submission of an Interim Application for Payment shall be deemed Tenant's acceptance and approval of the portion of the Leasehold Improvements furnished and/or the materials supplied as set forth in Tenant's payment request. Subject to the terms of this Work Letter, and provided an Interim Application for Payment is delivered on or before the 10th day of a calendar month then on or before the 30th day of such calendar month in which the Application was received (if the Interim Application for Payment is made after the 10th day of a calendar month then Landlord's contribution shall be made on the 30th day of the following calendar month), Landlord shall deliver a check to Tenant (or directly to General Contractor if requested by Tenant) in payment of the amounts so requested by Tenant, less a ten percent (10%) retention (the aggregate amount of such retentions to be known as the "Retainage"), provided that Landlord does not in good faith dispute any request for payment based on non-compliance of any Leasehold Improvements with the Finals CDs, or due to any substandard work, or for any other reasonable reason. Landlord's payment of any Application for Payment shall not be deemed Landlord's approval or acceptance of the work furnished or materials supplied as set forth in Tenant's Application for Payment.

(d)     Final Payment. Landlord shall pay the Retainage to Tenant (or directly to General Contractor if requested by Tenant) following the receipt by Landlord of an executed application for payment on the appropriate AIA form or another form as is reasonably approved by Landlord, such approval not to be unreasonably withheld, conditioned, or delayed, and the following items: (i) with respect to payment to any persons performing work or supplying or fabricating materials for the Leasehold Improvements, final lien waivers from such persons, fully executed, acknowledged and in recordable form, (ii) the Tenant's and Architect's certification that the Leasehold Improvements have been finally completed, including all punch- list items, on the appropriate AIA form or such other form as is approved by Landlord, (iii) evidence that Tenant can lawfully occupy the Premises, (iv) Landlord has determined that no substandard work exists which adversely affects the Building or the base Building or exterior appearance of the Building, (iv) evidence that Tenant has paid for the entire Construction Costs that is in excess of the Leasehold Improvements Allowance, (vi) commissioning documents for any equipment installed as part of the Leasehold Improvements that are tied into any building/mechanical systems, (vii) Tenant's "close-out" package including information regarding all materials incorporated into the Leasehold Improvements, and

(viii) Tenant has furnished Landlord with an accurate record drawing of the Leasehold Improvements as constructed in Autocad format together with a hard copy thereof (collectively, a "Final Application for  Payment" and together with an Interim Application for Payment, an "Application for Payment"). Subject to the terms of this Work Letter, Landlord shall pay to Tenant the Retainage amount within thirty (30) days following Tenant's submission of the Final Application for Payment. Tenant's submission of a Final Application for Payment shall constitute Tenant's warranty to Landlord that Tenant has inspected all of the Leasehold Improvements and accepts same subject only to latent defects, and provided that such representation does not constitute a waiver by Tenant of any claims against its contractors. Landlord's payment of such amounts shall not be deemed Landlord's approval or acceptance of the work furnished or materials supplied as set forth in Tenant's Application for Payment.

(e)     Intentionally omitted

(f)     Additional Disbursement Conditions. Except as expressly provided elsewhere in this Work Letter, Landlord shall only be obligated to make the disbursement of the Leasehold Improvements Allowance to the extent costs are incurred and paid by Tenant for the Construction Costs. If an Application for Payment is incomplete or incorrect in any respect, Landlord will notify Tenant of same and the amount of the subject disbursement of the Leasehold Improvements Allowance applicable to the portion of such incomplete or incorrect Application for Payment only shall be deferred until twenty (20) days following Landlord's receipt of the corrected Application for Payment. Notwithstanding anything to the contrary contained in this Work Letter, Landlord shall not be obligated to make any disbursement during the pendency of any of the following: (1) Landlord has received written notice of any unpaid and delinquent claims relating to any portion of the Leasehold Improvements or any materials in connection therewith, other than claims which will be paid in full from such disbursement, (2) there is an unbonded lien outstanding against the Building or any of the Premises or Tenant's interest therein by reason of work done, or claimed to have been done, or materials supplied or specifically fabricated, claimed to have been supplied or specifically fabricated, to or for Tenant or any of the Premises, (3) the conditions to the advance of the Leasehold Improvements Allowance are not satisfied, (4) an Event of Default (as defined in the Lease) under the Lease then exists, or (5) Landlord has determined, in its reasonable discretion, that substandard work exists which adversely affects the Building. Nothing herein shall be construed to grant Tenant the power to lien any interest of Landlord in the Building or the Property.

(g)     Excess Leasehold Improvements Allowance. Subject to a Force Majeure Event (as defined in the Lease), if on the 500th day after the Commencement Date there remains any balance of the Leasehold Improvements Allowance that is not then the subject of a pending or disputed Application for Payment, then in such instance such balance of the Leasehold Improvements Allowance then remaining on such 500th day after the Commencement Date will be the sole property of Landlord and Tenant will have no further right thereto.

7.     Tenant Charges. Tenant shall be solely responsible for all hard and soft costs incurred by Landlord for changes to the base Building required by Tenant (and approved by Landlord) or Legal Requirements in connection with the Leasehold Improvements or Tenant's contemplated use of the Premises; provided that the amount of such costs are approved by Tenant in advance. Upon request, Landlord will advise Tenant of the estimated costs of any changes to the base Building desired by Tenant and the actual costs thereof once implemented. Landlord may charge such costs to the Leasehold Improvements Allowance but Tenant's obligation to pay or reimburse Landlord for all such costs will not be limited thereby.

8.     Landlord's Oversight Role/Review and Inspection.

(a)     The parties acknowledge that Landlord is not an architect or engineer, and that the Leasehold Improvements will be designed and performed by independent architects, engineers and contractors engaged by Tenant. Landlord will have no responsibility for construction means, methods or techniques or safety precautions in connection with the Leasehold Improvements, and do not guarantee that the Final CDs (as such may be changed by Change Orders) will be free from errors, omissions or defects or will comply with Legal Requirements, and shall have no liability therefore notwithstanding any approval thereof. Landlord's approval of the Final CDs, Change Orders and construction contracts, and Landlord's designations, lists, recommendations or approvals concerning Tenant's architects and contractors shall not be deemed a warranty as to the

quality or adequacy thereof or of the Final CDs (as such may be changed by Change Orders), any other construction documents or the Leasehold Improvements, or the design thereof, or of its compliance with Legal Requirements.

(b)   Tenant shall cause Tenant's Representative to hold construction meetings at least bi-weekly with Landlord's representative to review the status of the construction of the Leasehold Improvements. Such meetings must be during normal business hours and may be telephonic. Tenant's Representative must give Landlord's representative not less than 24-hours advance notice of such meetings. Tenant, through Tenant's Representative, must provide to Landlord's Representative, not less frequently than monthly, with status reports on the status and progress of the construction of the Leasehold Improvements, which report shall include a then current critical path construction schedule for the Leasehold Improvements and the then current estimate for Substantial Completion of the Leasehold Improvements.

(c)   Tenant must permit access to the Premises, and inspection of the Leasehold Improvements, by Landlord and Landlord's Representative, at all times during the period in which the Leasehold Improvements are being planned and constructed to allow Landlord and Landlord's Representative to ensure compliance with this Work Letter; provided, however, Landlord and Landlord's Representative shall not impede or otherwise interfere with the construction of the Leasehold Improvements.

(d)   If Tenant fails to perform the Leasehold Improvements as required herein or the materials supplied fail to comply herewith or with the Final CDs (as such may be changed by Change Orders) and such failure shall continue for ten (10) business days after receipt of written notice thereof delivered by Landlord to Tenant's Representative, Landlord shall have the right to temporarily stop the applicable portions of the Leasehold Improvements pending Tenant's cure of such failure. Landlord shall have the right, but not the obligation, to perform, on behalf of and for the account of Tenant, subject to reimbursement by Tenant, any work required to cure or complete any Leasehold Improvements which has violated this Work Letter, or which pertains to patching of the Leasehold Improvements and other work in the Building, or involves Leasehold Improvements outside the Premises, or which affects the base Building, provided that Tenant shall not have done so within ten (10) business days after receipt of written notice thereof delivered by Landlord to Tenant or, if the same cannot be corrected within ten (10) business days, Tenant fails to commence correcting the same and diligently proceeds to correct the same. No such action by Landlord shall serve to abate any Rent due under the Lease or any other obligations of Tenant therein.

9.   <u>Construction Representatives</u>. Tenant and Landlord shall each designate in writing one or more representatives to act on its behalf in dealing with the other party in matters relating to the Improvements. Each of the representatives shall: (a) attend each project meeting as scheduled by Tenant's Representative as provided above and fully participate and cooperate with each other to ensure the orderly progression of the Leasehold Improvements; (b) be qualified to render decisions that are within their delegation of authority or, if outside their delegation of authority, to obtain such decisions in an expedited manner to ensure scope, cost and schedule are maintained; and (c) be authorized to approve Change Orders. Each party shall be bound by any consents or approvals given by such designated representatives. Except

as hereinafter provided, either party may, at any time, change its designated representative by giving a minimum of three (3) business days' notice of a change of designation. The designated representatives shall exert their best efforts to render decisions and take actions in a timely manner so as to avoid unreasonable delay in the other party's work and actions with respect to the Landlord's Work. Tenant hereby designates Jeff Hurtig (email:jhurtig@proterra.com; telephone 562-280-5155 as its designated representative. Landlord hereby designates Tracy White (email: TWhite@mcdco.com; telephone (404) 923.5069) as its designated representative. Notices required or permitted under this Work Letter given by email by one designated representative to the other will be deemed to be effective notice given by Landlord to Tenant, or Tenant to Landlord, as applicable, and will be effective notice for all purposes under this Work Letter.

10.   <u>Misc</u>. Capitalized terms used herein have the same meanings set forth for such terms in the Lease of which this Work Letter is a part. It is intended that this Work Letter (Exhibit C) and the body of the Lease be complimentary and in addition to one

another, but if there is a conflict between this Work Letter (Exhibit C) and the Lease, this Work Letter (Exhibit C) shall control with respect to any particular item and provision described herein.

EXHIBIT C-1
McDONALD DEVELOPMENT COMPANY
OUTLINE OF
STANDARD TENANT FINISH SPECIFICATIONS

Exhibit C-1

1. CARPENTRY & MILLWORK
    A. Single fixture toilet rooms to have a wall-hung lavatory. Multiple fixture toilet rooms shall have plastic laminate lavatory counter-tops without base cabinet for handicap access.
    B. One coat rod and shelf in each coat closet.
    C. Two levels of adjustable shelves in storage room.
    D. Toilet partitions to be metal, in standard colors.

2. DOORS & HARDWARE
    A. Glass entrance door is existing.
    B. Interior Doors

       3' - 0" x 6' - 8" x 1 - 3/4" flush solid core, stain grade, birch veneer door or to match existing (New doors to have Minwax Dark Walnut #2716).

       Door frames shall be KD hollow metal.

       (3) 4 x 4 hinges with 26 D finish (Brushed finish).

       Hardware shall be lever action Cal-Royal SL Series with 26D finish (Grade 2 or better).

       Function to be compatible with room types indicated on drawings
       Wall mounted door stops with interior wall blocking.

       Provide closers on all bathroom doors (excluding single fixture bathrooms) and doors leading to warehouse.
    C. Labeled Doors (where required)

       Provide labeled doors and frames with rated hinges.

       Lever action Cal-Royal SL Series locksets.
       Surface mounted closers.

3. PARTITIONS
    A. Demising Walls

       Demising wall partitions shall be 1-hour rated extending from finished slab to deck (height varies) and shall be constructed with 5/8" type C gypsum wallboard screwed to both sides of 6" wide metal studs. Provide R-11 fiberglass blankets in wall cavity floor to roof deck (UL Des. U-465), painted white with black cove base.
    B. Interior Partitions

       Typical 9' - 0" interior partitions shall extend from finished slab to finished ceiling. Construction to be of 3-5/8" wide metal studs (25 Ga.) spaced 24" o.c. with 1/2" gypsum wallboard screwed to both sides. Toilet room walls shall extend to 10'.

       Insulation - sound attenuation blanket is to be installed in all toilet room, break room, and conference room walls.

       All exterior tilt-up walls in office areas to receive 1/2" gypsum board on 3-5/8" wide metal studs (25 Ga.) spaced 24" o.c. with R-11 insulation.

Exhibit C-1

C. Office/Warehouse Separation Wall

If not 1-hour rated: Construction to be of 6" wide metal studs with 1/2" gypsum wallboard screwed to both sides (one side to the deck, one side to 10') and R-11 insulation to deck. Warehouse side to be painted white with black cove base.

4. ACOUSTICAL CEILINGS

A. 2' - 0" x 2' - 0" standard grid system with 5/8" non-directional fissured mineral board ceiling panels installed at 9' a.f.f. with no insulation above ceiling grid.

B. Ceiling to be continuous over all interior partitions, except at toilet rooms.

5. FLOORING

A. One color of vinyl composition tile (VCT) is to be installed in bathrooms and kitchen/break room. Patterns and/or multi-tiles are subject to upcharge.

B. All other finished areas are to be carpeted using building standard carpet ($16 per square yard installed allowance).

C. 4" rubber cove base is to be installed in all finished office areas and the warehouse side of the warehouse/office separation wall. Pre-molded tab corners to be used on all outside corners.

D. The warehouse floor shall be sealed with Lapidolith.

6. PAINTING

A. All walls in finished office area are to be painted with a minimum of two coats of eggshell paint.

B. Warehouse side of office warehouse separation wall to be painted white with a minimum of two coats of eggshell paint.

C. All door frames to be painted with oil-based enamel, semi-gloss.

D. Toilet room walls to be painted with eggshell latex paint.

E. Color Selections: One base color and one trim color to be selected for restrooms; one base color and one trim color to be selected for break room; one base color and one trim color to be selected for all other office areas.

7. HVAC

A. Heating and air conditioning in office area to be furnished by either split systems or roof top/package units to maintain a maximum 75°F with 94°F outside air temperature. Higher cooling loads imposed by equipment or heavier than normal occupancy would be an additional cost. Roof mounted equipment shall not be installed within thirty feet (30') of building perimeter unless a parapet provides adequate screening.

B. Provide exhaust fans in toilet rooms.

C. Heating in the warehouse is to be furnished by gas-fired unit heaters in order to maintain 50°F with 32°F outside air temperature. All vent stacks shall be provided with appropriate roof flashing that has fully soldered joints.

D. Provide additional structural reinforcement as required for all roof mounted equipment.

E. Warehouse ventilation provided by roof-mounted up blast fans.

8. <u>PLUMBING</u>
    A.  Water closet and urinals in toilet rooms in quantities as indicated on drawings.
    B.  Lavatory in each toilet room per drawings.
    C.  48" grab bar and 36" grab bar in handicapped toilet.
    D.  Single roll toilet paper holder.
    E.  Surface mounted towel dispenser.

    F.   One mirror extending the full width of the lavatory counter top.

    G.   Provide water heater (above ceiling in office area) sized as required to serve fixtures indicated.

    H.   All drinking fountains to be non-electric.

9. <u>FIRE PROTECTION</u>

    A.   Provide sprinkler drops to accommodate the office lay-out.

    B.   Provide fire extinguishers per local fire marshal's requirements.

10. <u>ELECTRICAL</u>

    A.   Provide service as recommended by electrical contractor.

    B.   Provide 3-phase, 277/480 volt electric service.

    C.   Provide warehouse lighting of 20 f.c. (unracked at 36" a.f.f.) using metal halide fixtures. Switching at panel with one fixture on continuous circuit for night-light.

    D.   Office lighting by 2' - 0" x 4' - 0" lay-in fluorescent fixtures with acrylic lens to maintain 50 foot candles at desk top.

    E.   Provide duplex receptacles and telephone boxes as shown on the drawings (Phone and data wiring to be provided by tenant.).

    F.   Exit signs and battery-pack emergency lighting as required by code.

    G.   Fire alarm and security system to be provided by tenant.

    H.   Provide electrical room lay-out drawing for owner's approval prior to beginning work.

11. <u>MISCELLANEOUS</u>

    A. Bali customizer mini blinds, 6 gauge aluminum, Snow Cap White (#386) to be placed at all storefront glass in first generation build-out. Repair and replace as necessary to match existing in renovated spaces.

12. <u>ADDITIONAL TENANT RESPONSIBILITIES</u>

    A.   Low-voltage (new and existing), phone, data systems and associated cabling is the sole responsibility of Tenant.

    B.   Keys. Tenant shall be responsible for all keys to the Premises, including re-keying any existing locks. Landlord shall provide Tenant with one (1) key to the main building electrical room.

    C.   Fire alarm and security system to be provided and maintained by tenant, inclusive of cabling and electrical requirements.

    D.   Movers. Coordinating and scheduling of movers is the responsibility of Tenant.

    E.   Furniture and Cubicles. Tenant is responsible for all costs associated with moving, set-up, installation and removal of all furniture and cubicles, including electrical costs.

    F.   Trade Fixtures. Tenant is responsible for all costs associated with installation, operation and removal of trade fixtures and equipment.

EXHIBIT "D"

FORM SNDA

**After Recording Please Return To:**

**SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT**

      This SUBORDINATION, NONDISTURBANCE, AND ATTORNMENT AGREEMENT (this "**Agreement**") is entered into as of _,_ (the "**Effective Date**"), between TRUIST BANK, a North Carolina banking corporation, whose address is

Exhibit D

_[insert address of CRE loan administration office where loan will be serviced, Attn: Loan Servicing] ("**Lender**"), and_, a_, whose address is_ ("**Tenant**"), with reference to the following facts:

A.   _, a _, whose address is _ ("**Landlord**"), owns, or is the contract purchaser of, the real property located at_(such real property, including all buildings, improvements, structures and fixtures located thereon, "**Landlord's Premises**"), as more particularly described in **SCHEDULE A**.

B.   Lender and Landlord have entered into that certain [**Construction**] Loan Agreement dated_, 20_(as amended, increased, renewed, extended, spread, consolidated, restated or otherwise modified from time to time, the "**Loan Agreement**"), for a loan to Landlord in the [**original**] principal amount of [**up to**] $_(the "**Loan**").

C.   To secure the Loan, Landlord has encumbered Landlord's Premises by entering into that certain [**Deed to Secure Debt/Deed of Trust/Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing**] dated _,_, in favor of Lender [*for NC and other Deed of Trust states, replace with " in favor of_, as Trustee for the benefit of Lender as beneficiary"*] (as amended, increased, renewed, extended, spread, consolidated, severed, restated, or otherwise changed from time to time, the "**Security Instrument**") [to be] recorded [on_, at Book_, Page _,] in the_of_,_(the "**Records**").

D.   Pursuant to a Lease, dated as of_,_, as amended on_,_and _,_(together with all rights, remedies and options of Tenant thereunder and all right, title and interest of Tenant in and to the Landlord's Premises, the "**Lease**"); Landlord demises to Tenant [**a portion of**] Landlord's Premises ("**Tenant's Premises**"). Tenant's Premises are commonly known as_.

[E. A memorandum or short form of the Lease [is to be recorded in the Records prior to the recording of this Agreement.] [was recorded in the Records on_, at Book_, Page_.]

F. Tenant and Lender desire to agree upon the relative priorities of their interests in Landlord's Premises and their rights and obligations if certain events occur.

**NOW, THEREFORE,** for good and sufficient consideration, Tenant and Lender agree:

*Definitions.*

The following terms shall have the following meanings for purposes of this Agreement.

*Construction-Related Obligation.* A "**Construction-Related Obligation**" means any obligation of Landlord under the Lease to make, pay for, or reimburse Tenant for any alterations, demolition, or other improvements or work at Landlord's Premises, including Tenant's Premises. "Construction-Related Obligations" shall not include: (a) reconstruction or repair following fire, casualty or condemnation except to the extent such reconstruction or repair requires funds in excess of the insurance or condemnation proceeds specifically allocable to the Landlord's Premises and arising out of such fire, casualty or condemnation that have actually been received by Lender or Successor Landlord, as applicable; or (b) day-to-day maintenance and repairs.

*Foreclosure Event.* A "**Foreclosure Event**" means: (a) foreclosure under the Security Instrument; (b) any other exercise by Lender of rights and remedies (whether under the Security Instrument or under applicable law, including bankruptcy law) as holder of the Loan and/or the Security Instrument, as a result of which Successor Landlord becomes owner of Landlord's Premises; or (c) delivery by Landlord to Lender (or its designee or nominee) of a deed or other conveyance of Landlord's interest in Landlord's Premises in lieu of any of the foregoing.

*Former Landlord.* A "**Former Landlord**" means Landlord and any other party that was landlord under the Lease at any time before the occurrence of any attornment under this Agreement.

*Offset Right.* An "**Offset Right**" means any right or alleged right of Tenant to any offset, defense (other than one arising from actual payment and performance, which payment and performance would bind a Successor Landlord pursuant to this

Exhibit D

Agreement), claim, counterclaim, reduction, deduction, or abatement against Tenant's payment of Rent or performance of Tenant's other obligations under the Lease, arising (whether under the Lease or other applicable law) from Landlord's breach or default under the Lease.

*Rent.* The "**Rent**" means any fixed rent, base rent or additional rent under the Lease.

*Successor Landlord.* A "**Successor Landlord**" means any party that becomes owner of Landlord's Premises as the result of a Foreclosure Event.

*Termination Right.* A "**Termination Right**" means any right of Tenant to cancel or terminate the Lease or to claim a partial or total eviction arising (whether under the Lease or under applicable law) from Landlord's breach or default under the Lease.

*Subordination*.

The Lease shall be, and shall at all times remain, subject and subordinate to the Security Instrument, the lien imposed by the Security Instrument, and all advances made under or secured by the Security Instrument.

*Nondisturbance, Recognition and Attornment*.

*No Exercise of Security Instrument Remedies Against Tenant.* So long as the Lease has not been terminated on account of Tenant's default that has continued beyond applicable cure periods (an "**Event of Default**"), Lender shall not name or join Tenant as a defendant in any exercise of Lender's rights and remedies arising upon a default under the Security Instrument unless applicable law requires Tenant to be made a party thereto as a condition to proceeding against Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease or otherwise
adversely affect Tenant's rights under the Lease or this Agreement in such action.

*Nondisturbance and Attornment.* If the Lease has not been terminated on account of an Event of Default by Tenant, then, when Successor Landlord takes title to Landlord's Premises: (a) Successor Landlord shall not terminate or disturb Tenant's possession of Tenant's Premises under the Lease, except in accordance with the terms of the Lease and this Agreement; (b) Successor Landlord shall be bound to Tenant under all the terms and conditions of the Lease (except as provided in this Agreement); (c) Tenant shall recognize and attorn to Successor Landlord as Tenant's direct landlord under the Lease as affected by this Agreement; and (d) the Lease shall continue in full force and effect as a direct lease, in accordance with its terms (except as provided in this Agreement), between Successor Landlord and Tenant.

*Further Documentation.* The provisions of this Article shall be effective and self-operative without any need for Successor Landlord or Tenant to execute any further documents. Tenant and Successor Landlord shall, however, confirm the provisions of this Article in writing upon request by either of them.

*Protection of Successor Landlord*.

Notwithstanding anything to the contrary in the Lease or the Security Instrument, Successor Landlord shall not be liable for or bound by any of the following matters:

*Claims Against Former Landlord.* Any Offset Right that Tenant may have against any Former Landlord relating to any event or occurrence before the date of attornment, and any claim for damages of any kind whatsoever as the result of any breach by Former Landlord that occurred before the date of attornment, or any act, omission, default, misrepresentation, or breach of warranty, of Former Landlord or obligations accruing prior to the date of attornment. (The foregoing shall not limit either (a) Tenant's right to exercise against Successor Landlord any Offset Right otherwise available to Tenant because of events occurring after the date of
attornment or (b) Successor Landlord's obligation to correct any conditions that existed as of the date of attornment and violate Successor Landlord's obligations as landlord under the Lease.)

*Prepayments.* Any payment of Rent that Tenant may have made to Former Landlord more than thirty (30) days before the date such Rent was first due and payable under the Lease with respect to any period after the date of attornment other than, and only to the extent that, the Lease expressly required such a prepayment.

*Payment; Security Deposit.* Any obligation: (a) to pay Tenant any sum(s) that any Former Landlord owed to Tenant or

Exhibit D

(b)    with respect to any security deposited with Former Landlord, unless such security was actually delivered to Lender. This paragraph is not intended to apply to Landlord's obligation to make any payment that constitutes a "Construction-Related Obligation."

*Modification, Amendment, or Waiver.* Any modification or amendment of the Lease, or any waiver of any terms of the Lease, made without Lender's written consent.

*Surrender, Etc.* Any consensual or negotiated surrender, cancellation, or termination of the Lease, in whole or in part, agreed upon between Landlord and Tenant, unless effected unilaterally by Tenant pursuant to the express terms of the Lease.

*Construction-Related Obligations.* Any Construction-Related Obligation of Former Landlord.

*Exculpation of Successor Landlord.*

A. Notwithstanding anything to the contrary in this Agreement or the Lease, upon any attornment pursuant to this Agreement the Lease shall be deemed to have been automatically amended to provide that Successor Landlord's obligations and liability under the Lease shall never extend beyond Successor Landlord's (or its successors' or assigns') interest, if any, in Landlord's Premises from time to time, including insurance and condemnation proceeds, Successor Landlord's interest in the Lease, and the proceeds from any sale or other disposition of Landlord's Premises by Successor Landlord (collectively, "**Successor Landlord's Interest**"). Tenant shall look exclusively to Successor Landlord's Interest (or that of its successors and assigns) for payment or discharge of any obligations of Successor Landlord under the Lease as affected by this Agreement. If Tenant obtains any money judgment against Successor Landlord with respect to the Lease or the relationship between Successor Landlord and Tenant, then Tenant shall look solely to Successor Landlord's Interest (or that of its successors and assigns) to collect such judgment. Tenant shall not collect or attempt to collect any such judgment out of any other assets of Successor Landlord. Further, neither Lender nor Successor Landlord shall have any liability or responsibility under or pursuant to the terms of the Lease and/or this Agreement after it ceases to own a fee interest in or to the Landlord's Premises.

*Lender's Right to Cure.*

*Notice to Lender.* Notwithstanding anything to the contrary in the Lease or this Agreement, before exercising any Termination Right or Offset Right, Tenant shall provide Lender with notice of the breach or default by Landlord giving rise to same (the "**Default Notice**") and, thereafter, the opportunity to cure such breach or default as provided for below.

*Lender's Cure Period.* After Lender receives a Default Notice, Lender shall have a period of thirty (30) days beyond the time available to Landlord under the Lease in which to cure the breach or default by Landlord. Lender shall have no obligation to cure (and shall have no liability or obligation for not curing) any breach or default by Landlord, except to the extent that Lender agrees or undertakes otherwise in writing.

*Extended Cure Period.* In addition, as to any breach or default by Landlord the cure of which requires possession and control of Landlord's Premises, provided only that Lender undertakes to Tenant by written notice to Tenant within thirty (30) days after receipt of the Default Notice to exercise reasonable efforts to cure or cause to be cured by a receiver such breach or default within the period permitted by this paragraph, Lender's cure period shall continue for such additional time (the "**Extended Cure Period**") as Lender may reasonably require to either (a) obtain possession and control of Landlord's Premises and thereafter cure the breach or default with reasonable diligence and continuity or (b) obtain the appointment of a receiver and give such receiver a reasonable period of time in which to cure the default.

*Confirmation of Facts.*

Tenant represents to Lender and to any Successor Landlord, in each case as of the Effective Date:

*Effectiveness of Lease.* The Lease is in full force and effect, has not been modified, and constitutes the entire agreement between Landlord and Tenant relating to Tenant's Premises. Tenant has no interest in Landlord's Premises except pursuant to the Lease. No unfulfilled conditions exist to Tenant's obligations under the Lease.

*Rent.* Tenant has not paid any Rent that is first due and payable under the Lease after the Effective Date.

Exhibit D

*No Landlord Default.* To the best of Tenant's knowledge, no breach or default of or under the Lease by Landlord exists and no event has occurred that, with the giving of notice, the passage of time or both, would constitute such a breach or default.

*No Tenant Default.* Tenant is not in default under the Lease and has not received any uncured notice of any default by Tenant under the Lease.

*No Termination.* Tenant has not commenced any action nor sent or received any notice to terminate the Lease. Tenant has no presently exercisable Termination Right(s) or Offset Right(s).

*Commencement Date.* The "**Commencement Date**" of the Lease was_.

*Acceptance.* Except as set forth in **SCHEDULE B** (if any) attached to this Agreement: (a) Tenant has accepted possession of Tenant's Premises; and (b) Landlord has performed all Construction-Related Obligations related to Tenant's initial occupancy of Tenant's Premises and Tenant has accepted such performance by Landlord.

*No Transfer.* Tenant has not transferred, encumbered, mortgaged, assigned, conveyed or otherwise disposed of the Lease or any interest therein.

*Satisfaction of Construction-Related Obligations.* Landlord has satisfied in full all Construction-Related Obligations required of Landlord under the Lease.

*Miscellaneous*.

*Notices.* All notices or other communications required or permitted under this Agreement shall be in writing and given by certified mail (return receipt requested) or by nationally recognized overnight courier service that regularly maintains records of items delivered. Each party's address is as set forth in the opening paragraph of this Agreement, subject to change by notice under this paragraph. Notices shall be effective the next business day after being sent by overnight courier service, and five (5) business days after being sent by certified mail (return receipt requested).

*Successors and Assigns.* This Agreement shall bind and benefit the parties, their successors and assigns, any Successor Landlord, and its successors and assigns. If Lender assigns the Security Instrument, then upon delivery to Tenant of written notice
thereof accompanied by the assignee's written assumption of all obligations under this Agreement, all liability of the assignor shall terminate.

*Entire Agreement.* This Agreement constitutes the entire agreement between Lender and Tenant regarding the subordination of the Lease to the Security Instrument and the rights and obligations of Tenant and Lender as to the subject matter of this Agreement.

*Interaction with Lease and with Security Instrument.* If this Agreement conflicts with the Lease, then this Agreement shall govern as between the parties and any Successor Landlord, including upon any attornment pursuant to this Agreement. This Agreement supersedes, and constitutes full compliance with, any provisions in the Lease that provide for subordination of the Lease to, or for delivery of nondisturbance agreements by the holder of, the Security Instrument. Lender confirms that Lender has consented to Landlord's entering into the Lease.

*Lender's Rights and Obligations.* Except as expressly provided for in this Agreement, Lender shall have no obligations to Tenant with respect to the Lease. If an attornment occurs pursuant to this Agreement, then all rights and obligations of Lender under this Agreement shall terminate, without thereby affecting in any way the rights and obligations of Successor Landlord provided for in this Agreement.

*Interpretation; Governing Law.* The interpretation, validity and enforcement of this Agreement shall be governed by and construed under the internal laws of the **[Commonwealth/District/State of ]**, excluding its conflict of laws principles.

*Amendments.* This Agreement may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the party to be charged.

*Execution.* This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

Exhibit D

*Due Authorization*. Each of the parties hereto represents that it has full authority to enter into this Agreement and that its entry into this Agreement has been duly authorized by all necessary actions.

*Consequential Damages*. In no event shall either party hereto and/or its successors and assigns be liable for any incidental, consequential, punitive, or exemplary damages in connection with this Agreement, the Lease and the Security Instrument.

*Payments to Lender after Default under Security Instrument*. Landlord's interest under the Lease and the rent and all other sums due thereunder have been assigned to Lender as part of the security for the Loan, and In the event that Lender notifies Tenant of a default under the Security Instrument and demands that Tenant pay its rent and all other sums due under the Lease directly to Lender, Tenant shall honor such demand and pay the full amount of its rent and all other sums due under the Lease directly to Lender, without any obligation on the part of Tenant to provide notice to or obtain the consent of Landlord or to determine whether a default actually exists under the Security Instrument and notwithstanding any contrary instructions of or demands from Landlord. Until Tenant receives any such request from Lender, Tenant will pay all of said rent to Landlord in accordance with the terms of the Lease.

[Signatures Commence on Following Page]

Exhibit D

IN WITNESS WHEREOF, this Agreement has been duly executed and sealed by Lender and Tenant as of the Effective Date.

**LENDER TRUIST BANK**,

a North Carolina banking corporation

By: _(SEAL)
Name:_ Title:_

[insert applicable state notary/acknowledgement]

**TENANT**

_, a _

By: _(SEAL)
Name:_ Title:_

[insert applicable state notary/acknowledgement]

Exhibit D

**LANDLORD'S CONSENT**

Landlord consents and agrees to the foregoing Agreement, which was entered into at Landlord's request. The foregoing Agreement shall not alter, waive or diminish any of Landlord's obligations under the Security Instrument or the Lease. The above Agreement discharges any obligations of Lender under the Security Instrument and related loan documents to enter into a nondisturbance agreement with Tenant. Landlord is not a party to the above Agreement. Landlord hereby authorizes and directs Tenant to abide by any written notice from Lender or Successor Landlord to pay the rents and all other sums due under the Lease directly to Lender or Successor Landlord. Landlord waives all claims against Tenant for any sums so paid at Lender or Successor Landlord's direction. Tenant may conclusively rely upon any written notice Tenant receives from Lender or Successor Landlord notwithstanding any claims by Landlord contesting the validity of any term or condition of such notice, including any default claimed by Lender or Successor Landlord, and Tenant shall have no duty to inquire into the validity or appropriateness of any such notice.

**LANDLORD**

_, a _

By: _(SEAL)
Name:_ Title:_

[insert applicable state notary/acknowledgement]

Exhibit D

EXHIBIT "E"

FORM TENANT ACCEPTANCE OF PREMISES

Re: Lease Agreement dated_, 2021 (the "Lease") by and between **Carolina CC Venture XXXVII, LLC,** a Delaware limited liability company ("Landlord"), and **Proterra Operating Company, Inc.**, a Delaware corporation ("Tenant"), pertaining to the premises described therein ("Premises")

This will confirm that, as of the date of this letter:

1.    Tenant has accepted the Premises in accordance with the Lease.

2.    The Commencement Date of the Demised Term is_.

3.    The expiration date of the Demised Term is_.

4.    Defined terms used herein shall have the meanings ascribed to them in the Lease.


**LANDLORD:**                                                    **TENANT**:

**CAROLINA CC VENTURE XXXVII, LLC, a**          **PROTERRA OPERATING COMPANY, INC., a**
**Delaware limited liability company**                  **Delaware corporation**

By: McDonald Ventures XXXVII, LLC**,**  a
     Georgia limited liability company,
     Its Manager

     By: McDonald Industrial XXXVII, LLC, a          By:_ Name:_ Title:_
          Georgia limited liability company, Its
          Manager                                                    Date:_


          By:_ John R. McDonald, Manager

Date:_

**EXHIBIT 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the registration statements Nos. 333-258827 and 333-263549 on Form S-8 and registration statements Nos. 333-268987 and 333-264346 on Form S-3 of our reports dated March 16, 2023, with respect to the consolidated financial statements of Proterra Inc and the effectiveness of internal control over financial reporting.

/s/ KPMG LLP

Santa Clara, California
March 17, 2023

**EXHIBIT 31.1**

**CERTIFICATION**

I, Gareth T. Joyce, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Proterra Inc;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:         March 17, 2023

By:  /s/ *Gareth T. Joyce*
Gareth T. Joyce
Chief Executive Officer

**EXHIBIT 31.2**

**CERTIFICATION**

I, Karina F. Padilla, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Proterra Inc;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:        March 17, 2023

By:  */s/ Karina F. Padilla*
Karina F. Padilla
Chief Financial Officer

**EXHIBIT 32.1**

**CERTIFICATION PURSUANT TO**
**RULE 13a-14(b) OF THE SECURITIES EXCHANGE ACT OF 1934**
**AND 18 U.S.C. SECTION 1350**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. § 1350), Gareth T. Joyce, the Chief Executive Officer of Proterra Inc (the "Company"), hereby certifies that, to the best of his knowledge:

(1)  The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022, to which this Certification is attached as Exhibit 32.1 (the "Annual Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act; and;

(2)  the information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the end of the period covered by the Annual Report and results of operations of the Company for the period covered by the Annual Report.

Date:        March 17, 2023

By:  /s/ *Gareth T. Joyce*

Gareth T. Joyce
Chief Executive Officer

A signed original of this written statement required by Section 906 of 18 U.S.C. § 1350 has been provided to Proterra Inc and will be retained by Proterra Inc and furnished to the Securities and Exchange Commission or its staff upon request.

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.

**EXHIBIT 32.2**

**CERTIFICATION PURSUANT TO
RULE 13a-14(b) OF THE SECURITIES EXCHANGE ACT OF 1934
AND 18 U.S.C. SECTION 1350**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. § 1350), Karina F. Padilla, the Chief Financial Officer of Proterra Inc (the "Company"), hereby certifies that, to the best of her knowledge:

(1)  The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022, to which this Certification is attached as Exhibit 32.1 (the "Annual Report"), fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act; and

(2)  the information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company at the end of the period covered by the Annual Report and results of operations of the Company for the period covered by the Annual Report.

Date:        March 17, 2023

                                                                By:   */s/ Karina F. Padilla*
                                                                Karina F. Padilla
                                                                Chief Financial Officer

A signed original of this written statement required by Section 906 of 18 U.S.C. § 1350 has been provided to Proterra Inc  and will be retained by Proterra Inc  and furnished to the Securities and Exchange Commission or its staff upon request.

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of the Company under the Securities Act of 1933, as amended, or the Exchange Act (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.