| Statement No. | The Speaker(s), Date(s), and Medium | False and Misleading Statements | Reasons Statements were False and Misleading When Made | Facts Giving Rise to Strong Inference of Scienter |
|---|---|---|---|---|
| 1 | **When**: May 14, 2021 **Where**: Proterra's Registration Statement **Speakers**: Jack Allen, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. Revers, Marco F. Gatti, Arno Harris, Dr. Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld (Compl. ¶189) | *While other manufacturers use a modified steel body and frame that was originally designed for an internal combustion engine, we have partnered with a supplier to architect a lighter weight bus body with advanced materials specifically designed for an electric powertrain.* Our design houses the battery packs below the floor of the vehicle, between the axles, to achieve a low center of gravity and ride comfort and safety. *Utilizing carbon fiber and fiberglass, our design approach optimizes mass, stiffness, and durability.* Our bus body has been tested on a four-post shaker table to a simulated 750,000 miles and 18 years of useful life, and has also undergone 125,000 effective miles at the Bus Research and Testing Center's test track in Altoona, Pennsylvania which executes federally mandated transit vehicle durability testing. | The statements identified in ¶189 were materially false and misleading when made because, the use of a solid, composite body rather than a steel body, supportive of modular manufacturing, was not a competitive strength. In addition, they failed to disclose and misrepresented the following material adverse facts, material adverse trends, or significant risks that existed at the time of the Registration Statement, including: (i) Proterra's solid, composite bus design, as opposed to a more modular design utilized by its competitors, prohibited building the Company's transit buses in pieces—a cost disadvantage that translated into much higher production costs; (ii) Proterra's composite unibody bus design demanded significantly more labor hours for manufacturing relative to traditional materials; (iii) Proterra's composite unibody bus design put the Company at significant risk of production delays and/or manufacturing shutdowns when the Company experienced component delays, shortages, or failed to properly manage inventory; (iv) Proterra's single source bus body supplier, TPI, frequently failed to provide the Company with a solid, composite bus body that met the unique design specifications set out in its contracts, requiring significantly more labor hours for manufacturing to comply with the customers' demands; (v) Proterra's fiberglass composite bus body was flawed, resulting in spider cracks and materially compromising the frame of its buses; and (vi) as a result, Proterra's flawed fiberglass composite bus body design put the Company at significant risk of increased costs under Proterra's warranties and higher labor costs, if and when, customers' made a claim for repair. | Not applicable, as this is a Section 11 claim without a scienter requirement. |
| 2 | | | | |

| | | | | |
|---|---|---|---|---|
| | When: May 14, 2021<br>Where: Proterra's Registration Statement<br>Speakers: Jack Allen, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. Revers, Marco F. Gatti, Arno Harris, Dr. Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld<br>(Compl. ¶191) | *[m]anufacturing efficiencies and scale benefits*" and inaccurately described Proterra's transit buses as "*designed to optimize for mass distribution*. | These statements were materially false and misleading when made because Proterra was unable to manufacture efficiently or scale its products and its buses were not optimized for mass distribution. In addition, they omitted material information regarding Proterra Transit, the Company's flagship business and primary source of revenue, including that it: (i) relied on non-scalable custom unibody design for its bus configuration; (ii) demanded large amounts of working capital for high labor and inventory costs associated with the build of its highly customizable bus configuration; (iii) strained the Company's supply chain in order to meet each customers' unique specifications for its bus configuration; (iv) suffered from manufacturing inefficiencies as a result of the Company's unique solid, composite bus design, resulting in delayed production, idle manufacturing, increased labor costs, and increased warranty costs; (v) was plagued by long-term contracts with unfavorable terms including production and delivery penalties, and prohibitions on inflation pass-throughs; and (vi) as a result, was experiencing slowed revenue growth and had dwindling or negative margins. | Not applicable, as this is a Section 11 claim without a scienter requirement. |
| 3 | When: May 14, 2021<br>Where: Proterra's Registration Statement<br>Speakers: Jack Allen, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. Revers, Marco F. Gatti, Arno Harris, Dr. Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld<br>(Compl. ¶192) | We have developed close relationships with several key suppliers, particularly for lithium-ion cells, drivetrain components, charging systems, and bus bodies. While we obtain some components from multiple sources, in some cases we also purchase significant components used in our products from a single source that we have validated. For our battery cells, we have two qualified suppliers for supply chain resiliency but have only used one of these suppliers for our current battery system to date. We also operate a cell testing lab where we regularly test new cells from a wide range of global cell manufacturers. | The statements identified in ¶192 were materially false and misleading when made because Proterra did not utilize "reputable and reliable" suppliers, and therefore, failed to properly "establish[] and follow[] internal quality control processes." In addition, they omitted material information regarding the reputation and reliability of its suppliers, including that: (i) Proterra's single source bus body supplier, TPI, supplied the Company with a flawed product design which caused the frames of its buses to crack and resulted in significant costs under Proterra's warranties and higher labor costs; (ii) the highly customizable bus configuration used by Proterra, and sourced from TPI, had a | Not applicable, as this is a Section 11 claim without a scienter requirement. |

| | | *We obtain systems, components, raw materials, parts, manufacturing equipment, and other supplies from suppliers that we believe to be reputable and reliable. We have established and follow internal quality control processes to source suppliers, considering engineering validation, quality, cost, delivery, and lead-time.* We have a quality management team that is responsible for managing and ensuring that supplied components meet quality standards. Our quality standards are guided by industry standards, including Automotive Industry Action Group, Advanced Product Quality Planning, and Production Part Approval Process procedures, which were developed by the U.S. auto industry. | considerable adverse impact on the Company's engineering validation, quality, cost, delivery, and lead-time; (iii) Proterra was already experiencing significant supply chain constraints, especially with regard to its microchips and wiring harnesses used in its Transit buses; and (iv) these supply chain constraints caused material production delay and idle manufacturing, and as a result, Proterra's production costs, delivery, and lead-time were adversely impacted. | |
|---|---|---|---|---|
| 4 | When: May 14, 2021<br>Where: Proterra's Registration Statement<br>Speakers: Jack Allen, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. Revers, Marco F. Gatti, Arno Harris, Dr. Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld<br>(Compl. ¶194) | *We also have bus manufacturing facilities in City of Industry and* Greenville. Battery manufacturing is also in City of Industry where we lease approximately 157,100 square feet of space under a lease that expires in August 2022, for which we have one three-year option to extend our lease to August 2025. In Greenville, we lease approximately 209,300 square feet under a lease that expires in June 2026, for which we have two five-year options to extend our lease to June 2036.<br><br>*We have in the past applied for and received state grants and tax incentives designed to promote the manufacturing of electric vehicles and related technologies. In April 2015, the California Energy Commission awarded us $3.0 million based on our investment of approximately $8.4 million in our manufacturing facilities in California through December 31, 2018. In addition, in April 2019, the California Energy* | The statements identified in ¶194 were materially false and misleading when made because they failed to disclose material adverse facts, including that: (i) it was significantly more expensive for the Company to operate out of its City of Industry facility – the rent at this facility was double that of its Greenville, South Carolina facility, but was half the size, and its labor costs per bus built at City of Industry were also nearly double that at Greenville – adversely impacting its profitability; and (ii) the Company experienced significant production inefficiencies at its City of Industry facility – taking 2x to 3x as long to build a bus as Greenville, in part, due to production delays caused by missing components or component shortages, Proterra's unique and highly customizable bus configurations causing idle manufacturing due to space limitations at the City of Industry facility, and difficult manufacturing hours set at the City of Industry facility causing constant turnover and resulting in an inexperienced and inefficient workforce – adversely impacting its productivity. | Not applicable, as this is a Section 11 claim without a scienter requirement. |

3

| | | | |
|---|---|---|---|
| | | *Commission awarded us a $1.8 million grant based on our expected investment of approximately $4.3 million in our manufacturing facility in City of Industry, California.* The California Energy Commission awards were made after a competitive grant solicitation that offered to fund development of advanced vehicle technology manufacturing facilities in California. | |
| 5 | When: May 14, 2021<br>Where: Proterra's Registration Statement<br>Speakers: Jack Allen, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. Revers, Marco F. Gatti, Arno Harris, Dr. Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld<br>(Compl. ¶196) | The outbreak of the novel coronavirus COVID-19, which was declared a pandemic by the World Health Organization on March 11, 2020, has led to adverse impacts on the U.S. and global economies and created uncertainty regarding potential impacts to our supply chain, operations, and customer demand. *Our manufacturing operations, and our transit agency customers, have been designated as an "Essential Business", and have continued to operate with limited interruptions since March 2020 with no material adverse impact to our operations, financial position, or liquidity through December 31, 2020. While the COVID-19 pandemic is currently expected to continue to have a limited impact to our results of operations, financial position, and liquidity*, if the outbreak, and related shutdowns, production inefficiencies or extended customer order and acceptance processes, are prolonged or worsen, it could lead to delays in production, the signing of new customer contracts, and customer acceptances of near-term deliveries. | The statements identified in ¶196 above were materially false and misleading when made because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties that Proterra had already been facing at the time of the Registration, including: (i) Proterra experienced material component shortages, including shortages of the microchips and wiring harnesses used in the manufacturing of each of its Transit buses, because of the COVID-19 pandemic; (ii) the Company's supply chain constraints, induced by the COVID-19 pandemic, were severe enough to cause significant production delay, idle manufacturing, and delivery delay, adversely impacting its productivity and revenue growth; (iii) Proterra's production inefficiencies resulting from supply chain constraints, induced by the COVID-19 pandemic, coupled with its unique highly customizable unibody bus configuration, adversely impacted Proterra's already high labor and inventory costs; (iv) Proterra's production inefficiencies resulting from supply chain constraints, induced by the COVID-19 pandemic, put the Company at significant risk of incurring penalties under its Transit contracts, adversely impacting its profit margins; (v) Proterra experienced material inflationary pressures associated with the cost of raw materials, particularly the cost of metal used to manufacturer interior components of its | Not applicable, as this is a Section 11 claim without a scienter requirement. |

4

|  |  |  | Transit buses, because of the COVID-19 pandemic; (vi) inflationary pressures, induced by the COVID-19 pandemic, were significant and had a material adverse impact on the Company's ability to avoid unfavorable terms under its contracts; (vii) Proterra's inability to pass rising material costs, induced by the COVID-19 pandemic, onto its customers adversely impacted the Company's gross margins; and (viii) as a result, the Company's operations, financial position, and liquidity had already been and would continue to be materially and adversely impacted by the COVID-19 pandemic. |  |
| --- | --- | --- | --- | --- |
| 6 | **When**: May 14, 2021 **Where**: Proterra's Registration Statement **Speakers**: Jack Allen, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. Revers, Marco F. Gatti, Arno Harris, Dr. Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld (Compl. ¶199) | *Our suppliers may fail to deliver components according to schedules, prices, quality and volumes that are acceptable to us, or we may be unable to manage these components effectively.*<br><br>Some of our products contain thousands of parts that we purchase from hundreds of mostly single-source direct suppliers, generally without long-term supply agreements. This exposes us to multiple potential sources of component shortages. Unexpected changes in business conditions, materials pricing, labor issues, wars, governmental changes, tariffs, natural disasters, health epidemics such as the global COVID-19 pandemic, and other factors beyond our or our suppliers' control could also affect these suppliers' ability to deliver components to us or to remain solvent and operational. *The unavailability of any component or supplier could result in production delays, idle manufacturing facilities, product design changes, and loss of access to important technology and tools for producing and supporting our products.* Moreover, significant increases in our production, or product design | The statements identified in ¶199 above were materially false and misleading when made because they presented Proterra's supply chain risks as potential future problems, when, in fact, these risks were actual and had already come to fruition. At the time of the Registration Statement: (i) Proterra was already experiencing component shortages, including shortages of the microchips and wiring harnesses used in its Transit buses; (ii) the supply chain constraints experienced by the Company were severe enough and had already caused delayed production and idle manufacturing, and limited its ability to optimize productivity; (iii) Proterra was already experiencing rising costs for raw materials, including for the metal used in its Transit buses; (iv) these inflationary pressures were severe and had already limited its ability to avoid unfavorable terms under its contracts and adversely impacted the Company's profit margins; and (v) as a result, harm to the Company's business, prospects, financial condition, and operating results had already materialized. In addition, at the time of the Registration Statement: (i) Proterra was already experiencing difficulty accurately matching the timing and quantities of component purchases to its actual needs for the build of its highly | Not applicable, as this is a Section 11 claim without a scienter requirement. |

changes made by us have required and may in the future require us to procure additional components in a short amount of time. Our suppliers may not be able to sustainably meet our timelines or our cost, quality and volume needs, or may increase prices to do so, requiring us to replace them with other sources. Our supply for battery cells and other raw materials is critical in allowing us to scale our operations and meet our growth targets, such that any supply delay or vulnerability in the battery cell supply chain could alter our growth plans. Further, we have limited manufacturing experience and we may experience issues increasing the level of localized procurement at our current or future facilities. While we believe that we will be able to secure additional or alternate sources or develop our own replacements for many of our components, there is no assurance that we will be able to do so quickly or at all, particularly with highly customized components. Additionally, *we may be unsuccessful in our continuous efforts to negotiate with existing suppliers to obtain cost reductions and avoid unfavorable changes to terms, source less expensive suppliers for certain parts, and redesign certain parts to make them less expensive to produce. Any of these occurrences may harm our business, prospects, financial condition and operating results.*

As the scale of our production increases, we will also need to accurately forecast, purchase, warehouse and transport components at high volumes to our manufacturing facilities across the United States. *If we are unable to accurately match the timing and quantities of component purchases to our actual needs or successfully implement automation, inventory management and other systems*

customizable bus configurations; (ii) the existing complexity of Proterra's supply chain required to build its highly customizable bus configurations was severe enough and had already caused the Company to incur production disruptions, storage, transportation and/or write-off costs; and (iii) as a result, harm to the Company's business and operating results had already materialized.

6

| | | | |
|---|---|---|---|
| | | *to accommodate the increased complexity in our supply chain and parts management, we may incur unexpected production disruption, storage, transportation and write-off costs, which may harm our business and operating results*. | | |
| 7 | **When**: May 14, 2021 <br> **Where**: Proterra's Registration Statement <br> **Speakers**: Jack Allen, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. Revers, Marco F. Gatti, Arno Harris, Dr. Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld <br> (Compl. ¶201) | ***Defects in the materials or workmanship of our composite bus bodies could harm our reputation, expose us to product warranty or other liability claims, decrease demand for our buses, or materially harm existing or prospective customer relationships.*** <br><br> ***We are the only transit bus manufacturer in the United States to use a composite unibody for our electric transit buses.*** In the past, we have sourced composite bus bodies from three suppliers, and ***now use only one supplier***. ***Defects in the composite body, including non-structural concerns, whether caused by design, engineering, materials, manufacturing errors, or deficiencies in manufacturing or quality control processes at our suppliers, are an inherent risk in manufacturing technically advanced products for new applications. We offer our customers a twelve-year warranty on the composite bus body structure and bear the risk of possible defects.*** We have experienced defects in some bus bodies and have had to make repairs. For example, in October 2018 we discovered cracking in the wheel wells on some of our buses which required us to repair these defects under our warranty and will increase our field and customer service costs. In addition, in 2020 and 2021, we repaired cracking near a door frame of a customer bus, and learned that customers removed buses with surface cracks in the | The statements identified in ¶201 above were materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, or materialized risks that existed at the time of the Registration Statement, including: (i) Proterra's solid, composite bus design, as opposed to a more modular design utilized by its competitors, prohibited building the Company's transit buses in pieces, demanding significantly more labor hours for manufacturing relative to traditional materials—a cost disadvantage that translated into much higher production costs; (ii) this design caused significant production delays and manufacturing shutdowns when Proterra experienced component delays, shortages, or failed to properly manage inventory, adversely impacting the Company's productivity and resulting in production penalties and a reduction of its initially awarded contract price; (iii) Proterra's single source bus body supplier, TPI, frequently failed to provide the Company with a solid, composite bus body that met the unique design specifications set out in its contracts, requiring significantly more labor hours for manufacturing to comply with the customers' demands; (iv) Proterra's fiberglass composite bus body was fundamentally flawed, materially compromising the frame of its buses; and (v) as a result, the risk of increased costs under Proterra's warranties, and higher labor costs associated with repair claims, had already materialized. | Not applicable, as this is a Section 11 claim without a scienter requirement. |

| | | | | |
|---|---|---|---|---|
| | | bus bodies from revenue service. ***Though these defects have not materially impacted Proterra to date, these defects or future defects with our advanced body materials whether structural or not may harm our existing and prospective customer relationships, damage our brand, and result in a reduction of awards, increased warranty claims, product liability claims and other damages.*** | | |
| 8 | **When:** May 14, 2021 <u>Where:</u> Proterra's Registration Statement <u>Speakers:</u> Jack Allen, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. Revers, Marco F. Gatti, Arno Harris, Dr. Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld (Compl. ¶203, 205) | Proterra's Registration Statement failed to describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations. | The failure of the Registration Statement to disclose omitted material facts—including the fact that Proterra had been and was continuing to experience significant, material production inefficiencies and operational challenges adversely impacting Transit's revenue growth and gross margins; as Proterra grew but failed to address these issues—including supply chain constraints, design challenges, and inflationary pressures—the number of manufacturing delays and burdensome contracts affecting Transit grew; and Proterra's ongoing losses were increasing greatly and revenue growth was slowing driven by Proterra's production inefficiencies and lengthy contracts and would slow more as the Company executed on its planned growth of Powered—violated Item 303, because these undisclosed facts were known and were likely to (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. | Not applicable, as this is a Section 11 claim without a scienter requirement. |
| 9 | **When:** May 14, 2021 <u>Where:</u> Proterra's Registration Statement <u>Speakers:</u> Jack Allen, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. | Proterra's Registration Statement failed to discuss the most significant factors that make the offering speculative or risky, and did not adequately describe the risk. | The failure of the Registration Statement to disclose omitted material facts—including the fact that Proterra had been and was continuing to experience significant, material production inefficiencies and operational challenges adversely impacting Transit's revenue growth and gross margins; as Proterra grew but failed to address these issues—including supply chain | Not applicable, as this is a Section 11 claim without a scienter requirement. |

| | | | | |
|---|---|---|---|---|
| | Revers, Marco F. Gatti, Arno Harris, Dr. Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld (Compl. ¶¶204, 206)) | | constraints, design challenges, and inflationary pressures—the number of manufacturing delays and burdensome contracts affecting Transit grew; and Proterra's ongoing losses were increasing greatly and revenue growth was slowing driven by Proterra's production inefficiencies and lengthy contracts and would slow more as the Company executed on its planned growth of Powered—violated Item 105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Proterra's stock speculative or risky. The purported Risk Factors that were provided in the Registration Statement were themselves materially false and misleading when made. | |
| 10 | When: August 11, 2021<br>Where: Q2 2021 Earnings Call<br>Speakers: Jack Allen<br>(Compl. ¶230) | *[t]his is an important step to address one of the most prominent supply chain risks to our growth prospects over the next couple of years.* | The statements identified in ¶ 230 are false and misleading because the referenced inventory agreement would not address or resolve the most prominent supply chain risks to the Company's growth prospects. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties that Proterra already faced with regards to its supply chain and growth prospects, including that: (i) the success of the Company's growth prospects primarily depended on the growth and financial success of Proterra Transit; (ii) Proterra was already experiencing material component shortages, including shortages of the microchips and wiring harnesses used in its Transit buses; (iii) the supply chain constraints adversely impacting Transit production had already caused significant delays to production and idle manufacturing, adversely impacting its ability to optimize productivity; and (iv) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, would not resolve the most prominent supply chain risks to the Company's growth prospects. | • Confidential Witnesses confirmed that problems within the Company, including those with the Company's supply chain, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Confidential Witnesses also confirmed that Proterra executives had access to, and in certain cases directly provided with, information that undercut their statements, including<br>• Defendant Allen held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶433-34.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures, including Defendant Ard's resignation shortly after this statement, bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Allen's signing of SOX certifications bolster scienter. ¶¶504-06, |

| | | | | |
|---|---|---|---|---|
| | | | | 508; |
| | | | | • That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 11 | <u>When</u>: August 11, 2021<br><u>Where</u>: Q2 2021 Earnings Call<br><u>Speakers</u>: Amy Ard<br>(Compl. ¶232) | Two notable impacts in Q2 on cash. The first was [Accounts Receivable]. It was a use of cash of $14 million in the second quarter, but this was largely related to a delay in 1 customer's payment that was subsequently made in July. ***Also, to mitigate the aforementioned COVID impacts, raw material inventory increased by $10 million as we secured battery supplies well in advance of production.***<br><br>As our production is scaling, and we are adding new customers to our pipeline, ***we are trying to ensure that no unforeseen supply chain constraints will impact our customers.*** So while free cash flow was negative $38 million in Q2, $35 million in Q -- I apologize. It was negative $52 million through the first 6 months of the year, which is a more normalized run rate. ***All in, we ended the quarter with over $750 million in cash, and we continue to believe we have more than sufficient capital to fund our business until we achieve positive free cash flow within our 5-year planning period.*** | The statements identified in ¶ 232 above were materially false and misleading when made because Proterra's exiting capital, revenue growth and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties that Proterra had already been facing, including that: (i) the adverse impacts of the COVID-19 pandemic from the increased price of raw materials used in the build of Proterra's Transit buses—a cost disadvantage that translated into unfavorable contract terms and negative margins—had not been mitigated; (ii) the adverse impacts of the COVID-19 pandemic on the Company's supply chain including material component shortages, such as microchips and wiring harnesses used in the build of its Transit buses—a cost disadvantage that translated into significant production delay, idle manufacturing, and delivery delay, adversely impacting its productivity and revenue growth—had not been mitigated; (iii) these inflationary pressures and supply chain constraints, induced by the COVID-19 pandemic, coupled with Proterra's unique highly customizable unibody bus configuration, adversely impacted Proterra Transit's already high labor and inventory costs; (iv) Proterra's existing book of business, primarily comprised of long-term Transit contracts was exposed and vulnerable to further adverse impacted from the supply chain constraints and inflationary pressures based on the Company's policy of working through one contract before moving to the next; (v) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, | • Confidential Witnesses confirmed that problems within the Company, including those at Transit, with the Company's supply chain, and related to COVID-19, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Confidential Witnesses confirmed that Defendant Ard was specifically concerned about Proterra's spending. ¶¶242-48.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures, including Defendant Ard's resignation shortly after this statement, bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Ard's signing of SOX certifications bolster scienter. ¶¶504-07;<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | | |
|---|---|---|---|---|
| | | | would not resolve the most prominent supply chain risks impacting Proterra; (vi) as a result of existing operational challenges and production inefficiencies adversely impacting Transit's revenue growth and gross margins, the Company did *not* have sufficient capital to fund its business until achieving positive free cash flow; and (vii) as a result, the Company faced a heightened risk of violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 12 | When: August 11, 2021<br>Where: Q2 2021 Earnings Call<br>Speakers: Jack Allen<br>(Compl. ¶234) | [w]e put up a solid Q2, and we're executing on our plan for 2021 so far despite really an onslaught of challenges. ***Transit is putting up strong results already.*** And as power starts to recognize material revenue for more than 1 customer, revenue growth should improve. ***And obviously***, as Amy said, ***we have sufficient cash to execute our growth plans***. | The statements identified in ¶ 234 are false and misleading because Transit's revenue growth was slowing and its margins were slim to negative, and therefore, Proterra's exiting capital, was insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties that Proterra already faced, including that: (i) Proterra Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (ii) Proterra had made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (iii) as a result, Proterra's existing book of business, primarily comprised of long-term Transit contracts, was and would continue to be adversely impacted by Transit's operational challenges and production inefficiencies based on the Company's policy of working through one contract before moving to the next; and (iv) as a result, the Company did *not* then have sufficient cash to execute its growth plans, which depended on Transit. | • Confidential Witnesses confirmed that problems within the Company, including those at Transit, with the Company's supply chain, and related to COVID-19, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Defendant Allen held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶433-34.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures, including Defendant Ard's resignation shortly after this statement, bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Allen's signing of SOX certifications bolster scienter. ¶¶504-06, 508;<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 13 | When: August 11, 2021<br>Where: Q2 2021 Letter<br>Speakers: Jack Allen | Our discussions with dozens of commercial vehicle manufacturers exploring electrification have given us | The statements identified in ¶ 237 are false and misleading because Proterra's exiting capital, revenue growth and gross margins were | • Confidential Witnesses confirmed that problems within the Company, including |

| | (Compl. ¶237) | confidence in the pace and magnitude of commercial vehicle electrification and insight into the unmet needs of the marketplace and our own capabilities in addressing them. *We are investing in our Proterra Powered and Proterra Energy business units by creating a separate business segment and dedicating resources to build out the infrastructure to support their growth and operation. We expect all of our businesses to benefit from our investing* in technology development to refine our capabilities in drivetrain and software, strengthening our vehicle integration services, *expanding our business development activities and geographies, building a deeper service and support team,* and investing in our regulatory compliance, product validation and quality functions. As a result, we expect our quarterly operating expenses to grow to approximately $35 million by Q4 2021, from $31 million in Q2 2021. We will begin reporting on Proterra Transit and Proterra Powered and Proterra Energy as independent business segments in Q3 2021, and are announcing that Josh Ensign, our Chief Operating Officer, will be appointed to a new role as President of Proterra Transit, effective September 1, 2021.<br><br>*As a result of the additional capital raised* in our [ArcLight Merger], *we do not expect these investments to have a material impact on our cash needs in the years ahead. With an unrestricted cash and short-term investment balance of $762 million* as of June 30, 2021, *we believe we are amply capitalized to fund our growth opportunities until we achieve our goal of positive free cash flow in a few years*. | insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following material adverse information, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) rather than committing cash to stabilize Transit, Proterra had made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vi) as a result, Proterra's existing book of business, primarily comprised of long-term Transit contracts, was and would continue to be adversely impacted by Transit's operational challenges and production inefficiencies based on the Company's policy of working through one contract before moving to the next; (vii) as a result of existing operational challenges and production inefficiencies adversely impacting Transit's revenue growth and gross margins, the Company was *not* then "amply capitalized to fund [its] growth opportunities" until [it] achieved [its] goal of positive free cash flow;" and (viii) as a result, there was a significant risk that the investments in the growth of Powered, including the LG Agreement, would have a material impact on the Company's cash needs in the years ahead. | those at Transit, with the Company's supply chain, and related to COVID-19, and with Powered, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Defendant Allen held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶433-34.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures, including Defendant Ard's resignation shortly after this statement, bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Allen's signing of SOX certifications bolster scienter. ¶¶504-06, 508;<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| 14 | When: August 13, 2021<br>Where: Q2 2021 10-Q<br>Speakers: Proterra<br>(Compl. ¶239) | The Company has incurred net losses and negative cash flows from operations since inception. As of June 30, 2021, the Company has an accumulated deficit of $849.4 million. ***The Company has $761.5 million of cash and cash equivalents and short-term investments as of June 30, 2021.*** The Company has funded operations primarily through a combination of equity and debt financing. ***Management believes that the Company's currently available resources will be sufficient to fund its cash requirements for at least the next twelve months.*** | The statements identified in ¶ 239 are false and misleading because Proterra's exiting capital, revenue growth and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties that Proterra already faced, including that: (i) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (ii) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iii) rather than committing cash to stabilize its existing operations, and improve Transit's revenue growth and gross margins, Proterra had made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (iv) as a result, Proterra's existing book of business, primarily comprised of long-term Transit contracts, was and would continue to be adversely impacted by Transit's operational challenges and production inefficiencies based on the Company's policy of working through one contract before moving to the next; (v) as a result, the Company's revenue growth and gross margins were insufficient to support its growth plans, funded in cash; and (vi) as a result, the Company faced heightened risks of violating the liquidity clause of its Note Purchase Agreement and insolvency. | • Confidential Witnesses confirmed that problems within the Company, including those at Transit, with the Company's supply chain, and related to COVID-19, as well as the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures, including Defendant Ard's resignation shortly after this statement, bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11;<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 15 | When: August 13, 2021<br>Where: Q2 2021 10-Q<br>Speakers: Proterra<br>(Compl. ¶240) | As of June 30, 2021, we had cash and cash equivalents and short-term investments of $761.5 million. Our primary requirements for liquidity and capital are investment in new products and technologies, the improvement and expansion of existing | The statements identified in ¶ 240 are false and misleading because Proterra's exiting capital, revenue growth and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and | • Confidential Witnesses confirmed that problems within the Company, including those at Transit, with the Company's supply chain, and related to COVID-19, as well as the Company spending too much money, were not only well known |

manufacturing facilities, working capital, debt service, and general corporate needs. Prior to the Business Combination, these cash requirements have been met through the net proceeds we received through private sales of equity securities, borrowings under our credit facilities, and payments received from customers.

*We believe that our sources of existing cash and cash equivalents and short-term investments, funds raised in connection with the Business Combination and the PIPE Financing, funds available under our Senior Credit Facility described in more detail below, and payments from customers and any proceeds that may be received from the exercise of the outstanding warrants will be sufficient to meet our working capital and capital expenditure needs for at least the next twelve months.* However, if we are unable to generate sufficient cash flows from operations in the future, or fund availability under our Senior Credit Facility is not sufficient, we may have to obtain additional equity or debt financing. The issuance and sale of additional equity (including issuances of common stock upon exercise of our warrants) would result in further dilution to our stockholders. The incurrence of indebtedness would result in increased fixed obligations and could result in significant financial and operating covenants that would restrict our operations. We cannot assure you that we will be able to obtain refinancing or additional financing on favorable terms or at all.

misrepresented the following significant, then-existing material events and adverse trends or uncertainties that Proterra already faced, including that: (i) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (ii) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iii) rather than committing cash to stabilize its existing operations, and improve Transit's revenue growth and gross margins, Proterra had made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (iv) as a result, Proterra's existing book of business, primarily comprised of long-term Transit contracts, was and would continue to be adversely impacted by Transit's operational challenges and production inefficiencies based on the Company's policy of working through one contract before moving to the next; (v) as a result, the Company's revenue growth and gross margins were insufficient to support its growth plans, funded in cash; and (vi) as a result, the Company faced heightened risks of violating the liquidity clause of its Note Purchase Agreement and insolvency.

throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.
- Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures, including Defendant Ard's resignation shortly after this statement, bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- Defendants' signing of SOX certifications bolster scienter. ¶¶504-11;
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

| 16 | When: November 10, 2021<br>Where: Q3 2021 Letter<br>Speakers: Jack Allen | *Our backlog remains strong, bolstered by Miami Transit's $37 million order for 42 of our 40-foot 450-kWh ZX5 electric* | The statements identified in ¶ 249 are false and misleading because Transit's revenue growth was slowing and its margins were slim to | • Confidential Witnesses confirmed that problems within the Company, including those at Transit, with the Company's |

| | | | |
|---|---|---|---|
| | (Compl. ¶249) | *transit buses (following its first order for 33 in 2019),* as well as a $24 million order from Austin's Cap Metro for 26 of our 40-foot 675-kWh ZX5 Max electric transit buses, part of the first stage of Cap Metro's approved $250 million-plus plan to procure almost 200 electric buses and charging infrastructure over 5 years. | negative, therefore, its backlog did *not* "remain[] strong." In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Transit suffered from significant supply chain constraints further impacting manufacturing inefficiencies and higher production costs caused by its unique and highly customizable unibody bus configuration; (ii) Transit's production inefficiencies put the Company at significant risk of incurring penalties under its contracts, adversely impacting its profit margins; (iii) Transit experienced material inflationary pressures associated with the cost of raw materials, particularly on the cost of metal used to manufacturer interior components of its buses; (iv) Proterra's inability to pass rising material costs onto its customers adversely impacted the Company's gross margins; (v) Proterra incentivized its salespeople to take deals that were bad for Transit because their compensation was tied to revenue; (vi) rather than commit cash to improve operational challenges and production inefficiencies adversely impacting Transit, Proterra had made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vii) as a result, Proterra's existing book of business, primarily comprised of long-term Transit contracts, was and would continue to be adversely impacted by these production inefficiencies and inflationary pressures based on the Company's policy of working through one contract before moving to the next; and (viii) as a result, the Company's backlog did *not* "remain[] strong," rather it was producing negative margins. Indeed, CW4 stated the Company's contract with Miami was one of Proterra's largest customers and that had a negative margin. | supply chain, and related to COVID-19, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Defendant Allen held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶433-34.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Allen's signing of SOX certifications bolster scienter. ¶¶504-06, 508;<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| | | | • Confidential Witnesses confirmed that |

15

| | When: November 10, 2021<br>Where: Q3 2021 Letter<br>Speakers: Jack Allen<br>(Compl. ¶251) | *With Proterra Powered's production poised to ramp* along with the anticipated start of serial production for an additional two vehicle programs over the next few months, three more in 2022 and the rest of our partnerships in 2023—*and Proterra Transit's outlook supported by a growing backlog—we have begun to lay the groundwork for continued growth in production. A key step was the agreement we announced in August with LG Energy Solution to secure multi-GWh per year of cell supply through 2028*, which we expect will be approved by both companies by the end of Q4. Another is growth in our battery manufacturing capacity. In operation for approximately one year now, our City of Industry battery facility has steadily increased its operational efficiency and in August 2021 began operating at two shifts per day. In parallel, our Burlingame, CA facility completed the conversion process to be able to produce our new 2170-based H-series battery platform. Fully dedicated to our Proterra Powered vehicle programs, Burlingame is ramping production of this new capacity throughout Q4, and we plan to add a second shift in early 2022 to accommodate growing demand. | The statements identified in ¶ 251 are false and misleading because Proterra had not established the "groundwork for continued growth in production" as Powered's business did not then have the performance or growth trajectory to support the Company's growth plans, Transit's backlog growth was slowing and producing slim to negative margins, and the LG Agreement would not address or resolve the most prominent supply chain risks to the Company's growth prospects. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra Transit suffered from significant supply chain constraints further impacting manufacturing inefficiencies and higher production costs caused by its unique and highly customizable unibody bus configuration; (ii) Proterra Transit's production inefficiencies put the Company at significant risk of incurring penalties under its contracts, adversely impacting profit margins; (iii) Proterra Transit also experienced material inflationary pressures associated with the cost of raw materials, particularly the cost of metal used to manufacturer interior components of its buses; (iv) Proterra's inability to pass rising material costs onto its customers adversely impacted the Company's gross margins; (v) Proterra incentivized its salespeople to take deals that were bad for Transit because their compensation was tied to revenue; (vi) rather than commit cash to improve operational challenges and production inefficiencies adversely impacting Transit, Proterra had made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vii) as a result, Proterra's existing book of business, primarily comprised of long-term Transit contracts, was and would continue to be adversely impacted by these production inefficiencies and inflationary pressures based on the Company's policy of working through one contract before moving to the next; (viii) as | problems within the Company, including those at Transit, with the Company's supply chain, and related to COVID-19, and the flaws of Powered were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Confidential Witnesses confirmed that Proterra's decision to pivot from Transit to Powered would have required the signoff of Defendants. ¶426.<br>• Defendant Allen held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶433-34.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Allen's signing of SOX certifications bolster scienter. ¶¶504-06, 508;<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | a result, Transit's "growing backlog," made up of unfavorable contracts with slim to negative margins, did *not* then support Proterra's growth plans; (ix) as a result, the Company's battery cell inventory investments, pursuant to the LG Agreement, would not resolve the most prominent supply chain risks to the Company; and (x) as a result, the Company's "groundwork" did not support "continued growth in production," rather it compounded ongoing production inefficiencies. | |
|---|---|---|---|---|
| 18 | **When**: November 10, 2021 <br> **Where**: Q3 2021 Earnings Call <br> **Speakers**: Andrew J. Cederoth (Compl. ¶253) | ***Our cash balance remains strong with $727 million of cash and securities at the end of the quarter.*** Operating cash flow was negative $13 million for the quarter as we continue to invest in our facilities and expand our product offering to grow our business. ***Our business is structured to grow. So we've invested in people and products to facilitate this growth***, leading to increased R&D as well as operating expenses. <br><br> Working capital was a source of cash of about $1 million in the quarter. On the positive side, we collected the increased receivables that were discussed last quarter, and we continue to prudently manage accounts payable. This was offset by increased inventory as we continue to use inventory as a buffer against supplier issues. ***Our strong cash balance allows the company to continue to invest in its business.*** Revenue growth will be the key to improve cash flow for the business going forward. | The statements identified in ¶ 253 are false and misleading because Proterra was not structured to grow, it had not invested in the people and products necessary to facilitate its growth plans, and its existing capital was insufficient to support the Company's growth plans and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit relied on non-scalable custom unibody design for its bus configuration; (vi) rather than committing cash to stabilize Transit, Proterra had made the "strategic" decision to starve Transit of resources to fund its Powered business; (vii) the Company's investment in battery cell inventory, pursuant to the LG | <ul><li>Confidential Witnesses confirmed that problems within the Company, including those at Transit, with the Company's supply chain, and related to COVID-19, as well as the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.</li><li>Confidential Witnesses confirmed that Proterra's decision to pivot from Transit to Powered would have required the signoff of Defendants. ¶426.</li><li>Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.</li><li>Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.</li><li>Suspicious executive departures bolster scienter. ¶¶449-84.</li><li>Defendants' insider sales bolster scienter. ¶¶485-503.</li><li>Defendant Cederoth's signing of SOX certifications bolster scienter. ¶¶504-06, 509;</li><li>That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.</li></ul> |

17

| | | | | |
|---|---|---|---|---|
| | | | Agreement, would *not* resolve the most prominent supply chain risks to Proterra; (viii) Powered was also experiencing manufacturing inefficiencies on the Company's battery production line at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (ix) as a result, Proterra's business was *not* then "structured to grow;" (x) as a result, the Company had not made the investments "in people and products to facilitate that grow;" (xi) as a result, the Company's cash balance was incapable of meeting Proterra's ongoing cash needs; and (xii) as a result, the Company's cash balance was not then "strong" but rather was getting perilously close to triggering the liquidity clause of its Note Purchase Agreement. | |
| 19 | <u>When</u>: March 1, 2022 <u>Where</u>: Q4 2021 Earnings Call <u>Speakers</u>: Gareth T. Joyce (Compl. ¶261) | *[w]hile production is facing constraints, demand is most certainly not. We have booked a healthy book of business, supporting strong growth across all of our businesses for the next few years.* Our contracted orders at Powered, combined with our Transit and Energy backlog was approximately $1.3 billion at the end of 2021. | The statements identified in ¶ 261 are false and misleading because Proterra's existing book of business was not "healthy" as it was resulting in losses for the Company and therefore did not support growth across all of Proterra's business. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) the Company's "book of business" was, in fact, *not* "healthy" as it was experiencing negative margins across both segments of Proterra's business due to burdensome contracts, resulting from inflationary pressures and capital-intensive product designs, high production costs, and manufacturing delays; (ii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; and (iii) as result, the Company's "book of business" it did *not* "support[] strong growth across all of [Proterra's] businesses for the next few years" as the Company's expenses far outpaced its revenue. | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510; |

| | | | |
|---|---|---|---|
| | | | • That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 20 | When: March 1, 2022<br>Where: Q4 2021 Earnings Call<br>Speakers: Gareth T. Joyce (Compl. ¶263) | *Proterra has demonstrated our capability in all 3 dimensions already. First on execution. Designing a product is not the same thing is producing it, and producing it is not the same thing as high-volume manufacturing. We have not only produced 500 megawatt hours of batteries as well as 800-electric transit buses through the end of 2021, but are poised to be producing batteries in multi-gigawatt hour scale in 2023.*<br><br>*Proterra has already built a mature manufacturing supply chain operation. We have the capacity in place at 3 facilities already up and running for years and have demonstrated the ability to rapidly scale.* We built our City of Industry bus factory in less than a year for under $20 million and our second 635 megawatt hour battery factory also in less than a year for under $20 million. And now we are on track to build in less than a year our third battery factory with 327,000 square feet of manufacturing space to produce multiple gigawatt hours of batteries per year as well as drivetrain and ancillary electrification components. And currently, *we had the wherewithal to establish a long-term contract with LG Energy Solutions to supply our most critical raw material, battery cells, through 2028,* including from a U.S. facility. | The statements identified in ¶ 263 are false and misleading because Proterra failing under all three categories necessary to "capture the most opportunity" in the EV space. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Transit, the Company's flagship business and primary source of revenue, relied on non-scalable custom unibody design for its bus configuration; (ii) Transit's unique and highly customizable bus configuration strained the Company's supply chain, labor costs, and production efficiency; (iii) Transit's productivity and production costs were further impacted by operational challenges and overhead costs at the Company's City of Industry facility, including limited manufacturing space, inexperienced workforce, and high cost of rent; (iv) Transit's production inefficiencies put the Company at significant risk of incurring penalties under its contracts, adversely impacting its profit margins; (v) Proterra's inability to pass rising material costs onto its customers adversely impacted the Company's gross margins; (vi) Proterra incentivized its salespeople to take deals that were bad for Transit because their compensation was tied to revenue; (vii) the referenced battery investments neither addressed nor resolved the most prominent supply chain risks constraining revenue growth and scalability; (viii) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (ix) as a result, the Company's "execution" of "500 megawatt hours of batteries as well as 800-electric transit buses through the end of 2021" was done so on slim | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510;<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | or negative margins; (x) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (xi) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its "mature manufacturing supply chain operations;" and (xii) as a result, the Company had, in fact, *failed* to demonstrate its ability to rapidly scale. | |
| 21 | **When:** March 1, 2022 **Where:** Q4 2021 Earnings Call **Speakers:** Karina Franco Padilla (Compl. ¶265) | Our balance sheet remains healthy, ending the year $661 million in cash and short-term investments. ***Proterra has a balance sheet strength to enable us to scale and give us room to write out any short-term turbulence, while providing flexibility to invest in both manufacturing capacity expansion and R&D.*** Our free cash flow burn for the year with $150 million. This was inflated by higher than normal working capital consumption in Q4, mainly from an increase in accounts receivable due to a large number of buses that were delivered in the quarter and an increase in inventory stemming from the strategic decision to stock up on battery cells, normalizing for these 2 items, free cash flow burn would have been close to $120 million. ***Our cash position gives us ample flexibility to fund our operations, while continuing to invest for future growth***. | The statements identified in ¶ 265 are false and misleading because Proterra's exiting capital, revenue growth and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vii) the Company's investment in battery cell | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31. • Defendant Padilla held herself out as knowledgeable about the Company and its different aspects of the business. ¶¶435-36. • Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448. • Suspicious executive departures bolster scienter. ¶¶449-84. • Defendants' insider sales bolster scienter. ¶¶485-503. • Defendant Padilla's signing of SOX certifications bolster scienter. ¶¶504-06, 511. • That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | | |
|---|---|---|---|---|
| | | | inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company; (viii) as a result, the construction of the Greer facility, would not improve the most prominent production efficiency risks to the Company's gross margins; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as a result, the "*turbulence*" cause by the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would *not* be "short-term" and would continue to adversely impact its revenue growth and gross margins; (xi) as a result, the Company's "cash position" did not provide the Company with "ample flexibility" to fund its operations while continuing to invest in its growth plans; (xii) as a result, the Company was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 22 | When: March 1, 2022<br>Where: Q4 2021 Earnings Call<br>Speakers: Karina Franco Padilla (Compl. ¶267) | As a result, the current environment will challenge gross margin improvement in 2022. However, *we have a 3-point incentive in place to improve gross margin as supply chain normalizes.* First, *we raised pricing of our electric transit buses in December, not only for new bus orders, but we are also evaluating existing contract with inflation pass through.* Second, *we should see production efficiencies as supply chain improves, which should lead to lower freight pricing and the need for fewer expedites, lower material costs as we will depend less on alternative suppliers, and gained efficiencies across both areas of the production floor.*<br><br>Third, as supply chain and logistics normalize, we will execute on our capacity | The statements identified in ¶ 267 are false and misleading because most of Proterra's contracts did not allow for inflation pass through, improvements in the supply chain would not resolve the Company's production inefficiencies, and increased capacity through the construction of Greer would not address or resolve the prominent risks to the Company's revenue growth and gross margins. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Transit's solid, composite bus body design prohibited building its buses in pieces, demanding significantly more labor hours for manufacturing relative to traditional materials—a cost disadvantage that translated into much higher production costs; (ii) absent supply chain constraints, this design strained the Company's supply chain, cost of | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, Greer's inability to solve the Company's problems, and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Defendant Padilla held herself out as knowledgeable about the Company and its different aspects of the business. ¶¶435-36.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. |

| | | expansion, currently limited by parts shortages. ***Over time, the increased capacity through the addition of shifts and the expansion of our new battery facility in Greer, South Carolina will enable revenue growth, scale and better asset utilization. As a result, we expect gross margin to continue to steadily improve in subsequent years.*** With that said, as of today, we have not seen evidence of the supply chain normalization and the effect of the war in Eastern Europe are unknown at this stage. | production, and production efficiency, adversely impacting productivity and resulting in contract penalties; (iii) absent supply chain constraints, Proterra was already experiencing difficulty accurately matching the timing and quantities of component purchases to its actual needs for the build of its highly customizable bus configurations; (iv) Proterra's single source bus body supplier, TPI, frequently failed to meet the unique design specifications set out in the Company's contracts, requiring significantly more labor hours for manufacturing to comply with the customers' demands; (v) Proterra's fiberglass composite bus body was fundamentally flawed, materially compromising the frame of its buses, resulting in increased costs under Proterra's warranties, and higher labor costs associated with repair claims; (vi) most of Transit's contracts did not allow for an increase in pricing and/or prohibited inflation pass-through; (vii) the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company; (viii) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (ix) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; and (x) as a result, the unmitigated operational challenges and production inefficiencies plaguing both Transit and Powered would continue to adversely impact Proterra's revenue growth and gross margins, regardless of supply chain improvements and the construction of Greer. | ¶¶485-503.<br>• Defendant Padilla's signing of SOX certifications bolster scienter. ¶¶504-06, 511.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 23 | When: May 4, 2022<br>Where: Q1 2022 Letter<br>Speakers: Gareth T. Joyce (Compl. ¶269) | Our outlook for 2022 remains consistent with our last quarterly letter published in March 2022. We continue to expect total revenue to grow between 24% and 34% | The statements identified in ¶ 269 are false and misleading because Proterra's growth did not hinge on the addition of a second production shift for Transit or increased capacity with the | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, Greer's inability to solve the Company's problems, |

year-over-year to a range of $300 million to $325 million in FY2022. ***Our next leg of growth continues to hinge upon: (1) adding a second shift of production for Proterra Transit when parts shortages ease, and (2) the launch of our new battery facility in Greer, South Carolina.***

\*\*\*\*

While the industry remains hamstrung by supply chain and logistics constraints in the near-term, the electric commercial truck and bus market in North America and Europe alone is expected to grow to close to 200,000 vehicles by 2030, according to Morgan Stanley's April 2022 forecast. This implies commercial vehicle battery demand could approach approximately 90 gigawatt-hours (GWh), up from only 1-2 GWh last year. ***With our new multi-GWh battery facility in Greer, South Carolina planned to start production in late 2022, Proterra Powered partnerships to develop or supply battery systems with more than a dozen OEMs across 19 vehicle programs***, approximately $1.3 billion in federal grant programs available for zero emission transit buses and chargers in fiscal year 2022, and ***Proterra Transit's strong backlog supporting significant growth once we add a second production shift,*** we believe we have positioned ourselves as a key supplier for this multi-billion dollar revenue opportunity.

construction of Greer, and Transit's backlog was not "strong" as it was producing losses for the Company. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Transit, the Company's flagship business and primary source of revenue, relied on non-scalable custom unibody design for its bus configuration; (ii) absent supply chain constraints, this design strained the Company's supply chain, cost of production, and production efficiency; (iii) absent supply chain constraints, Proterra was already experiencing difficulty accurately matching the timing and quantities of component purchases to its actual needs for the build of its highly customizable bus configurations; (iv) absent supply chain constraints, Proterra's solid, composite bus body design caused significant production delays and manufacturing shutdowns when it failed to properly manage inventory, adversely impacting the Company's productivity and resulting in production penalties; (v) Transit's productivity and production costs were further impacted by operational challenges and overhead costs at the Company's City of Industry facility, including limited manufacturing space, inexperienced workforce, and high cost of rent; (vi) Proterra's single source bus body supplier, TPI, frequently failed to meet the unique design specifications set out in the Company's contracts, requiring significantly more labor hours for manufacturing to comply with the customers' demands; (vii) Proterra's fiberglass composite bus body was fundamentally flawed, materially compromising the frame of its buses, resulting in increased costs under Proterra's warranties, and higher labor costs associated with repair claims; (viii) the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company; (ix) Transit's revenue growth was also strained

and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.

- CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.
- Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

23

| | | | | |
|---|---|---|---|---|
| | | | by Proterra's revenue smoothing tactics; (x) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (xi) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (xii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both Transit and Powered would continue to adversely impact Proterra's revenue growth and gross margins; (xiii) as a result, the construction of the Greer facility, would not improve the most prominent production efficiency risks to the Company's gross margins; (xiv) as a result, Transit's backlog was *not* "strong" as it was producing negative margins; (xv) as a result, Proterra's "ability to capture all of [demand] in 2022" for Powered was *not* "limited by production capacity" but rather by its failure to maximize existing capacity; and (xvi) as a result, the addition of a second production shift for Transit and the start of production at Greer would be insufficient to improve the Company's revenue growth. | |
| 24 | <u>When</u>: May 4, 2022<br><u>Where</u>: Q1 2022 Earnings Call<br><u>Speakers</u>: Gareth T. Joyce (Compl. ¶270) | In summary, Q1 was a microcosm of the key dynamics we see playing out in 2022. Powered & Energy more than doubling revenue to above $100 million for the full year and ***Transit growth curtailed by continued parts shortages and other supply chain related delays. Demand continues to gather strong momentum, but our ability to capture all of it in 2022 is being limited by production capacity and supply chain constraints.*** With Q1 somewhat in line with our expectations, we continue to expect revenue growth to accelerate to at least 24% to 34% this year to $300 million to $325 million. ***We look forward to our next leg of growth beyond*** | The statements identified in ¶ 270 are false and misleading because Proterra's growth did not hinge on the addition of a second production shift for Transit or increased capacity with the construction of Greer, and Transit's backlog was not "strong" as it was producing losses for the Company. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Transit, the Company's flagship business and primary source of revenue, relied on non-scalable custom unibody design for its bus configuration; (ii) absent supply chain constraints, this design strained the Company's supply chain, cost of production, and | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, Greer's inability to solve the Company's problems, and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• Defendant Joyce held himself out as |

| | *that, which remains a larger function of one, new battery capacity coming online at Greer, South Carolina;* and *two, Transit adding a second production shift once supply chain fluidity and predictability improves*. | production efficiency; (iii) absent supply chain constraints, Proterra was already experiencing difficulty accurately matching the timing and quantities of component purchases to its actual needs for the build of its highly customizable bus configurations; (iv) absent supply chain constraints, Proterra's solid, composite bus body design caused significant production delays and manufacturing shutdowns when it failed to properly manage inventory, adversely impacting the Company's productivity and resulting in production penalties; (v) Transit's productivity and production costs were further impacted by operational challenges and overhead costs at the Company's City of Industry facility, including limited manufacturing space, inexperienced workforce, and high cost of rent; (vi) Proterra's single source bus body supplier, TPI, frequently failed to meet the unique design specifications set out in the Company's contracts, requiring significantly more labor hours for manufacturing to comply with the customers' demands; (vii) Proterra's fiberglass composite bus body was fundamentally flawed, materially compromising the frame of its buses, resulting in increased costs under Proterra's warranties, and higher labor costs associated with repair claims; (viii) the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company; (ix) Transit's revenue growth was also strained by Proterra's revenue smoothing tactics; (x) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (xi) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (xii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both Transit and Powered would continue to adversely | knowledgeable about the Company and its different aspects of the business. ¶¶437-38. <br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448. <br>• Suspicious executive departures bolster scienter. ¶¶449-84. <br>• Defendants' insider sales bolster scienter. ¶¶485-503. <br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510. <br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | impact Proterra's revenue growth and gross margins; (xiii) as a result, the construction of the Greer facility, would not improve the most prominent production efficiency risks to the Company's gross margins; (xiv) as a result, Transit's backlog was *not* "strong" as it was producing negative margins; (xv) as a result, Proterra's "ability to capture all of [demand] in 2022" for Powered was *not* "limited by production capacity" but rather by its failure to maximize existing capacity; and (xvi) as a result, the addition of a second production shift for Transit and the start of production at Greer would be insufficient to improve the Company's revenue growth. | |
|---|---|---|---|---|
| 25 | When: May 4, 2022<br>Where: Q1 2022 Earnings Call<br>Speakers: Karina Franco Padilla<br>(Compl. ¶272) | ***Our balance sheet remains strong with $599 million in cash, cash equivalents and short-term investments as of March 31, 2022.*** Our cash flow burn in the quarter was $61 million and was in line with our expectations for the first quarter. In addition to our operational cash usage, we had approximately $10 million in capital expenditures largely related to the build-out of our new battery factory in Greer, South Carolina. We increased inventory by $14 million in part from our continued efforts to secure early delivery of key components, including battery cells.<br><br>Lastly, we ended the quarter with higher receivables due to timing of which we expect to normalize by the end of the quarter. Our adjusted EBITDA loss of $35 million in Q1 was driven by gross loss of $3 million and operating expenses of approximately $37 million excluding stock compensation offset by depreciation and amortization of $3.4 million. ***All-in with close to $600 million in cash, we have the balance sheet strength that sets us apart from others. Liquidity is a priority and we will be prudent with our*** | The statements identified in ¶ 272 are false and misleading because liquidity was not a priority for the Company and its existing capital, revenue growth, and gross margins were insufficient to support Proterra's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) the Company was not then positioned to meet its growth plans | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, Greer's inability to solve the Company's problems, and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Defendant Padilla held herself out as knowledgeable about the Company and its different aspects of the business. ¶¶435-36.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Padilla's signing of SOX certifications bolster scienter. ¶¶504-06, 511.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | | |
|---|---|---|---|---|
| | | *cash usage to give us the durability to endure these near-term supply chain disruptions while still being able to invest comfortably in battery capacity expansion, R&D and our operations to support our growth strategy for many years from now.* | without a turnaround in Transit, from which it was secretly diverting resources; (vi) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xi) as a result, Proterra's balance sheet was *not* "strong" and did not provide the Company "the durability to endure these near-term supply chain disruptions while still being able to invest comfortably…for many years from now;" (xii) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; and (ix) as a result, the Company was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 26 | When: May 6, 2022<br>Where: Q1 2022 10-Q<br>Speakers: Proterra<br>(Compl. ¶273) | The Company has incurred net losses and negative cash flows from operations since inception. As of March 31, 2022, the Company has an accumulated deficit of $908.3 million*. The Company has $598.7 million of cash and cash equivalents and short-term investments as of March 31, 2022.* The Company has funded operations primarily through a combination of equity and debt financing. *Management believes that the* | The statements identified in ¶ 273 are false and misleading because liquidity was not a priority for the Company and its existing capital, revenue growth, and gross margins were insufficient to support Proterra's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, Greer's inability to solve the Company's problems, and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31. |

| | | | |
|---|---|---|---|
| | | ***Company's currently available resources will be sufficient to fund its cash requirements for at least the next twelve months.*** However, there can be no assurance that future financings will be successfully completed or completed on terms acceptable to the Company. These financial statements do not include any adjustments that may result from the outcome of this uncertainty. | performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins— was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vi) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xi) as a result, Proterra's balance sheet was *not* "strong" and did not provide the Company "the durability to endure these near-term supply chain disruptions while still being able to invest comfortably…for many years from now;" (xii) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital | • Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | | |
|---|---|---|---|---|
| | | | expenses; and (ix) as a result, the Company was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 27 | **When**: May 6, 2022<br>**Where**: Q1 2022 10-Q<br>**Speakers**: Proterra (Compl. ¶274) | As of March 31, 2022, we had cash and cash equivalents and short-term investments of $598.7 million. ***Our primary requirements for liquidity and capital are investment in new products and technologies, the improvement and expansion of existing manufacturing facilities, working capital, debt service, and general corporate needs.*** Historically, these cash requirements have been met through the net proceeds we received through private sales of equity securities, borrowings under our credit facilities, and payments received from customers.<br><br>***We believe that our sources of existing cash and cash equivalents and short-term investments, funds available under our Senior Credit Facility described in more detail below, and payments from customers will be sufficient to meet our working capital and capital expenditure needs for at least the next twelve months.*** However, if we are unable to generate sufficient cash flows from operations in the future, or fund availability under our Senior Credit Facility is not sufficient, we may have to obtain additional equity or debt financing. The issuance and sale of additional equity would result in further dilution to our stockholders. The incurrence of indebtedness would result in increased fixed obligations and could result in significant financial and operating covenants that would restrict our operations. We cannot assure you that we will be able to obtain refinancing or additional financing on favorable terms or at all. | The statements identified in ¶ 274 are false and misleading because liquidity was not a priority for the Company and its existing capital, revenue growth, and gross margins were insufficient to support Proterra's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vi) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | | |
|---|---|---|---|---|
| | | With our existing funds, we expect no additional capital will be needed to execute our business plan over the next 12 months. *We will continue to invest in increasing and optimizing production and expanding the portfolio of products and services. These investments will be approached with a view to improving profitability in the long-term.* | chain risks to the Company; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xi) as a result, Proterra's balance sheet was *not* "strong" and did not provide the Company "the durability to endure these near-term supply chain disruptions while still being able to invest comfortably…for many years from now;" (xii) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; and (ix) as a result, the Company was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 28 | When: August 2, 2022<br>Where: Q2 2022 Letter<br>Speakers: Gareth T. Joyce (Compl. ¶292) | *With $523 million of cash, cash equivalents, and short-term investments as of the end of Q2 2022,* our new Greer factory adding multiple GWh of new battery manufacturing capacity, Proterra Powered partnerships to develop or supply battery systems with more than a dozen OEMs across 20 vehicle programs, and approximately $1.3 billion in federal grant programs available to the industry for zero emission transit buses and chargers in fiscal year 2022 *we believe we have the technology, the product, the competitive positioning and the balance sheet to not only ride out potential economic turbulence over the next year but to emerge as a central player of this developing market.* We are grateful to our team, our customers, our suppliers, and partners for putting us in this position. Our journey has only just begun. | The statements identified in ¶ 292 are false and misleading because liquidity was not a priority for the Company, its "strategic" investments did not address or resolve the most prominent risks posed to Proterra's growth prospects, and its existing capital, revenue growth, and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, Greer's inability to solve the Company's problems, and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its |

<table>
<tr><td></td><td></td><td></td><td>transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as a result, the "*economic turbulence*" or "*economic downturn*" caused by the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xi) as a result, Transit was *not* "in a strong position to take advantage" of any prospective demand; (xii) as a result, the Company's "strategic" investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiii) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xiv) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; and (xv) as a result, the Company</td><td>different aspects of the business. ¶¶437-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.</td></tr>
</table>

31

| | | | | |
|---|---|---|---|---|
| | | | was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 29 | When: August 2, 2022<br>Where: Q2 2022 Earnings Call<br>Speakers: Karina Franco Padilla (Compl. ¶293) | ***Our balance sheet remains strong with $523 million in cash, cash equivalents and short-term investments as of June 30.*** Our cash usage in the quarter was $75 million versus $61 million in the first quarter, a sequential increase of cash usage of $14 million.<br><br>This includes $40 million of cash usage in the second quarter related to securing our long-term cell supply and inventory and capital expenditures primarily tied to our new battery facility. We made a $10 million prepayment to LG Energy Solutions for the extension of our battery cell supply contract announced last August for multiple gigawatt hours of supply through 2028. We had $10 million incremental capital expenditures related to our new battery manufacturing facility as compared to Q1 2022. In addition, we grew our inventory by approximately $20 million versus the prior quarter. ***The growth in inventory is strategic. We have purchased key materials in advance of production to be go-live ready over the next several months and we'll continue to invest in supply chain security.*** Our Greer facility will multiply our existing battery production capacity once ramped and ***we are strategically acquiring the inventory in advance to help protect us from potential supply chain and logistics challenges.***<br><br>We recognize that our balance sheet strength of $523 million in cash and equivalents as of June 30 sets us apart from others. The health of our balance sheet is not coincidental. ***Liquidity is a*** | The statements identified in ¶ 293 are false and misleading because liquidity was not a priority for the Company, its "strategic" investments did not address or resolve the most prominent risks posed to Proterra's growth prospects, and its existing capital, revenue growth, and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, Greer's inability to solve the Company's problems, and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce, who Defendant Padilla worked directly under, was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Padilla held herself out as knowledgeable about the Company and its different aspects of the business. ¶¶435-36.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Padilla's signing of SOX certifications bolster scienter. ¶¶504-06, 511.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | | |
|---|---|---|---|---|
| | | *priority, it always has been and will continue to be.* But *we will continue to invest responsibly in battery capacity expansion, product research and development and across our operations to support our growth strategy for the years to come.* At face value, the result will appear as elevated cash flow when compared to normalized rates without the go-live of a new facility. Together, inventory and capital investment accounted for 2/3 of this quarter's cash flow. *I cannot emphasize enough that we understand the importance of prudent cash management especially in such volatile times. Despite the challenging environment we are all currently facing, I believe we are in an excellent position to ride out any potential economic downturn on the horizon and have ample room to improve our gross margins over time as supply chain and inflation headwinds normalize and as we ramp up our new capacity to full production*. | improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as a result, the "*economic turbulence*" or "*economic downturn*" caused by the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xi) as a result, Transit was *not* "in a strong position to take advantage" of any prospective demand; (xii) as a result, the Company's "strategic" investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiii) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xiv) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; and (xv) as a result, the Company was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 30 | <u>When</u>: August 2, 2022<br><u>Where</u>: Q2 2022 Earnings Call<br><u>Speakers</u>: Gareth T. Joyce<br>(Compl. ¶294) | On top of the lasting effects of COVID-19 in our society; we have the Russia Ukraine conflict, we're experiencing the biggest jump in inflation and interest rates in almost a generation, a slowdown in the economy and capital markets that have become much more discerning. Fortunately, *we believe we are prepared to meet these challenges as we transition from startup to scale up as I have often discussed. Early on this year, we began a assessing a strategy of operational and capital disciplines throughout the* | The statements identified in ¶ 294 are false and misleading because liquidity was not a priority for the Company, its "strategic" investments did not address or resolve the most prominent risks posed to Proterra's growth prospects, and its existing capital, revenue growth, and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, Greer's inability to solve the Company's problems, and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, |

*organization focused on enduring growth that prioritizes margin improvement over revenue growth, cash preservation without sacrificing our growth investments and focusing on core growth opportunities that can provide the highest return on capital as well as the fastest return of capital.*

*We continue to be supported by a healthy balance sheet with more than $520 million in cash and equivalents as of June 30 and I reassure you it's not one we take for granted in any way, shape or form.* We continue to make investments in our core growth opportunities and are fortunate that we have grown our staff responsibly and are not in a position where we need to reduce head count at this stage and in fact are recruiting for many roles primarily to launch our Greer manufacturing facility later this year. But we are [not] blind to the current economic and capital market environment. *We're continuing to consume cash this year because of the investments, but much of it is discrete, targeted, non-recurring investment design to increase our production volumes and improve margins and cash flow*, including strategic inventory purchases, prepayments for securing long-term battery cell supply domestically and of course CapEx particularly for the new Greer battery factory.

****

…[W]e believe our investments are putting us in a strong position to enter 2023 with a new factory multiplying our battery capacity, secure supply of our key battery modules and pack raw materials, supplier development agreements to provide battery systems for more than 20

the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins— was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as a result, the "*economic turbulence*" or "*economic downturn*" caused by the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xi) as a result, Transit was *not* "in a strong position to take advantage" of any prospective demand; (xii) as a result, the Company's "strategic" investment in battery cell inventory, pursuant to the LG Agreement,

which strained the Company's finances even further. ¶260.

- Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.

- Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.

- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.

- Suspicious executive departures bolster scienter. ¶¶449-84.

- Defendants' insider sales bolster scienter. ¶¶485-503.

- Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.

- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

| | | | | |
|---|---|---|---|---|
| | | vehicle programs, *Transit in a strong position to take advantage of more than $800 million of new annual federal funding of electric transit buses for the next few years and a well-capitalized balance sheet*. | would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiii) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xiv) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; and (xv) as a result, the Company was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 31 | When: August 2, 2022<br>Where: Q2 2022 Earnings Call<br>Speakers: Gareth T. Joyce<br>(Compl. ¶296) | *I don't think I have anything significant to add there.* The only comment I would make is obviously the Transit side of the business, there is a mix of sort of business that comes out of the low-no process as 1 example and then RFPs on the other side where you've got bids and then in some cases it's direct sourcing. So there's a mix of the kinds of business that you have and obviously how those prices are put into the market is different in each case. So *it's very difficult to sort of uniquely answer that question because*, as you know, *in the Transit business many of them have very specific requirements on the configuration of the product and so there are nuances across every customer*. | The statements identified in ¶ 296 are false and misleading because the Company had in fact identified other cost-saving measures that would have improved the average selling price of its Transit buses. In addition: (i) the Company had identified cost-saving projects, like Architecture 2.0 and Body 2.0, that would have significantly improved Proterra's bus configurations and helped its average selling price; (ii) as the Company's financial condition worsened, these cost-saving projects designed to improve Transit's revenue growth and gross margins were terminated or never implemented to continue funding the growth of Powered; (iii) most of Transit's contracts did not allow for an increase in pricing and/or prohibited inflation pass-through; (iv) as a result, Proterra's renegotiation of existing Transit contracts was insufficient to improve margins. | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510. |

| | | | |
|---|---|---|---|
| | | | • That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 32 | When: August 2, 2022<br>Where: Q2 2022 Earnings Call<br>Speakers: Gareth T. Joyce<br>(Compl. ¶299) | *For now we have a very well-constructed product portfolio. Our Transit business was at the genesis of our sort of innovation track and has proven to be a valuable asset as we can use it to essentially demonstrate the capabilities of our own product in the powertrain business and so for us, it's something that gives us that added level of confidence that what we're building in the Powered side of the business really is ready for market.* I mean we have transit buses running from East Coast to West Coast, north to south on flat terrain, mountainous terrain, hot and cold, you name it. We have 30 million miles of real world testing under the vehicle.<br><br>*So it's added tremendous value for us* and so it's helped us build out the Powered business successfully. And of course the energy business where the charging systems that we went into fleet scale charging for the transit bus business because the fleet operators really didn't have solutions for that and so that's also helped us grow and scale the Energy product portfolio. So *we like the product mix we have today and we're going to continue to develop all of them as we see the economic opportunity in the market and if that plan changes, we will update the market. But for now we're very comfortable with the product portfolio we have.* | The statements identified in ¶ 299 are false and misleading because Proterra was no longer "develop[ing]" Transit, and the only "value" Proterra saw in Transit was a means to fund its Powered business. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Proterra's solid, composite bus body design prohibited building its transit buses in pieces, demanding significantly more labor hours for manufacturing relative to traditional materials; (vi) this design strained the Company's supply chain, cost of production, and production efficiency; (vii) Proterra's fiberglass composite bus body was fundamentally flawed, materially compromising the frame of its buses, resulting in increased costs under Proterra's warranties, and higher labor costs associated with repair claims; (viii) Transit's revenue growth was also strained by Proterra's revenue smoothing tactics; (ix) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | (x) as Proterra's financial condition worsened, cost-saving projects designed to improve Transit's "value" to the Company were terminated or never implemented to continue funding Powered; (xi) as a result, Proterra had already made the decision to no longer "develop" Transit without updating the market; and (xii) as a result, Proterra did not have a "well-constructed product portfolio" as the unmitigated operational challenges and production inefficiencies plaguing Transit would continue to adversely impact its revenue growth and gross margins. | |
|---|---|---|---|---|
| 33 | **When:** August 3, 2022 <br> **Where:** Q2 2022 10-Q <br> **Speakers:** Proterra <br> (Compl. ¶301) | The Company has incurred net losses and negative cash flows from operations since inception. As of June 30, 2022, the Company has an accumulated deficit of $950.1 million. ***The Company has $523.2 million of cash and cash equivalents and short-term investments as of June 30, 2022***. The Company has funded operations primarily through a combination of equity and debt financing. ***Management believes that the Company's currently available resources will be sufficient to fund its cash requirements for at least the next twelve months.*** However, there can be no assurance that future financings will be successfully completed or completed on terms acceptable to the Company. These financial statements do not include any adjustments that may result from the outcome of this uncertainty. | The statements identified in ¶ 301 are false and misleading because Proterra's exiting capital, revenue growth and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins— was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31. <br> • CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260. <br> • Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426. <br> • Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38. <br> • Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448. <br> • Suspicious executive departures bolster scienter. ¶¶449-84. <br> • Defendants' insider sales bolster scienter. ¶¶485-503. <br> • Defendants' signing of SOX certifications bolster scienter. ¶¶504-11. |

| | | | | |
|---|---|---|---|---|
| | | | which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xi) as a result, the Company's cash and cash equivalents were *not* sufficient to meet its then working capital needs while Proterra continued investing in its growth plans; (xii) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; and (xiii) as a result, the Company was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | • That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 34 | Underline: When: August 3, 2022 Underline: Where: Q2 2022 10-Q Underline: Speakers: Proterra (Compl. ¶302) | As of June 30, 2022, we had cash and cash equivalents and short-term investments of $523.2 million. ***Our primary requirements for liquidity and capital are investment in new products and technologies, the improvement and expansion of existing manufacturing facilities, working capital, debt service, and general corporate needs***. Historically, these cash requirements have been met through the net proceeds we received through private sales of equity securities, the Business Combination, the PIPE Financing, borrowings under our credit | The statements identified in ¶ 302 are false and misleading because Proterra's exiting capital, revenue growth and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but that the information was available and discussed internally at executive meetings. ¶¶146-72, 423-31. • CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260. • Confidential Witnesses confirmed that |

facilities, and payments received from customers.

*We believe that our sources of existing cash and cash equivalents and short-term investments, borrowing capacity under our Senior Credit Facility described in more detail below, and payments from customers will be sufficient to meet our working capital and capital expenditure needs for at least the next twelve months.* However, if we are unable to generate sufficient cash flows from operations in the future, or fund availability under our Senior Credit Facility is not sufficient, we may have to obtain additional equity or debt financing. The issuance and sale of additional equity would result in further dilution to our stockholders. The incurrence of indebtedness would result in increased fixed obligations and could result in significant financial and operating covenants that would restrict our operations. We cannot assure you that we will be able to obtain refinancing or additional financing on favorable terms or at all. Our failure to raise capital as and when needed could have significant negative consequences for our business, financial condition and results of consolidated operations. *These estimates are based on our current business plan and on assumptions that may prove to be wrong, and we could use our available capital resources sooner than we currently expect.* Our future capital requirements and the adequacy of available funds will depend on many factors, including those set forth in the section titled "Risk Factors".

true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xi) as a result, the Company's cash and cash equivalents were *not* sufficient to meet its then working capital needs while Proterra continued investing in its growth plans; (xii) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; and (xiii) as a result, the Company was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency.

cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.

- Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

| 35 | When: August 3, 2022<br>Where: Q2 2022 10-Q<br>Speakers: Proterra<br>(Compl. ¶304) | *We intend to continue investing in initiatives to improve our operating leverage and significantly ramp production.* We believe continued reduction in costs and an increase in production volumes will enable commercial vehicle manufacturers to electrify faster. *Purchased materials represent the largest component of cost of goods sold in all products and we continue to explore ways to reduce these costs through improved design for cost, strategic sourcing, long-term contracts, and in some cases vertical integration.* We launched two new manufacturing facilities in 2017 and a new battery manufacturing facility in 2020. *We are currently under construction of our third battery manufacturing facility. We believe that an increase in volume and additional experience will allow us to leverage those investments and reduce our labor and overhead costs, as well as our freight costs, as a percentage of total revenue.* We expect our product cost of goods sold to increase in absolute dollars in future periods as the volume of products we sell increases. *As we grow into our current capacity, execute on cost-reduction initiatives, and improve production efficiency, we expect our product cost of goods sold as a percentage of revenue to decrease in the longer term.* We anticipate that by increasing facility utilization rates and improving overall economies of scale, we can positively impact gross margins of our products, bring value to our customers and help accelerate commercial electric vehicle adoption. *Our ability to achieve cost-saving and production-efficiency objectives can be negatively impacted by a variety of factors including, among* | The statements identified in ¶ 304 are false and misleading because Proterra was not investing in initiatives to improve its operating leverage or production efficiency, and increased capacity through the construction of Greer would not address or resolve the most prominent risks to the Company's productivity and costs of production. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (iv) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (v) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (vi) Powered was also experiencing manufacturing | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | | |
|---|---|---|---|---|
| | | *other things, labor cost inflation, lower-than-expected facility utilization rates, manufacturing and production cost overruns, increased purchased material costs, and unexpected supply-chain quality issues or interruptions, and delays in our ability to hire, train, and retain employees needed to scale production to meet demand.* | inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (vii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (viii) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (ix) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; and (x) as a result, the Company's "strategic" decision to prioritize the unsubstantiated growth of Powered over its existing operations negatively impacted its ability to achieve cost-saving and production-efficiency objectives. | |
| 36 | When: November 2, 2022<br>Where: Q3 2022 Earnings Call<br>Speakers: Gareth T. Joyce<br>(Compl. ¶313) | Proterra Powered also signed a supply contract with a new customer in Q3, Rev Group's ENC, formerly known as ElDorado National California. We will be supplying our S-Series batteries for ENCs 32, 35- and 40-foot Axess EVO battery electric transit buses in North America. *This one is significant, as it is our first Proterra Powered partnership that serves the same end market as Proterra Transit and underscores the high confidence we have in what our transit product offers beyond the battery and also supports our aspirations to capture as much value as possible from the rapid adoption of electric transit buses across North America.* So we believe our Proterra Powered business is starting to gain meaningful momentum. | The statements identified in ¶ 313 are false and misleading because Proterra did not have "high confidence" in its Transit business and was merely using Transit as a means to fund its Powered business, and the referenced contract did not demonstrate the Company's ability to "capture as much value as possible" as the deal was intentionally priced at loss. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (ii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iii) Transit was a capital-intensive business, suffering from burdensome | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of |

| | | | | |
|---|---|---|---|---|
| | | | contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iv) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (v) as Proterra's financial condition worsened, cost-saving projects designed to improve Transit's "value" to the Company were terminated or never implemented to continue funding Powered; (vi) Defendants Joyce and Padilla intentionally priced the units sold less than the cost of goods resulting in negative gross margins; (vii) as a result, the referenced partnership that served the same end market as Transit did *not* underscore the Company's "high confidence" in its Transit, rather it demonstrated a further betrayal and abandonment of Proterra's Transit business; and (viii) as a result, Proterra was not "captur[ing]" as much value as possible" as the referenced partnership resulted in a loss. | Proterra executives. ¶¶276-91, 426. <br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38. <br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510. <br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448. <br>• Suspicious executive departures bolster scienter. ¶¶449-84. <br>• Defendants' insider sales bolster scienter. ¶¶485-503. <br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 37 | **When**: November 2, 2022 <br>**Where**: Q3 2022 Earnings Call <br>**Speakers**: Gareth T. Joyce (Compl. ¶315) | [R]evenue grew 12% year-over-year to a new high of $56 million, as we achieved a new record in deliveries of 60 new electric transit buses along with 5 pre-owned buses in the quarter. ***Improvements in our production processes that have recently been implemented and the hard work and focus of our team enabled us to grow bus production and delivery to a new record, even without adding a full second shift.*** To be clear, despite our execution in Q3, though, and the record production and deliveries achieved by Proterra Transit, the coast is no way clear when it comes to the supply chain, and we continue to confront challenges, particularly with regard to wiring harness shortages. But overall, ***we're feeling more confident about our ability to grow transit production over the next couple of years***. | The statements identified in ¶ 315 are false and misleading because Transit's revenue grow was not the result of recently implemented improvements to its production processes. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (ii) Proterra's solid, composite bus body design prohibited building its transit buses in pieces, demanding significantly more labor hours for manufacturing relative to traditional materials; (iii) this design strained the Company's supply chain, cost of production, and production efficiency; (iv) Proterra's fiberglass composite bus body was fundamentally flawed, materially | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 423-31. <br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260. <br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12. <br>• Confidential Witnesses confirmed that cost-saving projects existed but were |

42

| | | | |
|---|---|---|---|
| | | compromising the frame of its buses, resulting in increased costs under Proterra's warranties, and higher labor costs associated with repair claims; (v) Transit's revenue growth was also strained by Proterra's revenue smoothing tactics; (vi) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vii) as Proterra's financial condition worsened, cost-saving projects designed to improve Transit's product design, production efficiency, and productivity were terminated or never implemented to continue funding Powered; (viii) as a result, Transit's revenue grow was *not* the result of recently implemented improvements to its production processes; and (ix) as a result, the unmitigated operational challenges and production inefficiencies plaguing Transit would continue to adversely impact its revenue growth and gross margins. | eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 38 | <u>When</u>: November 2, 2022<br><u>Where</u>: Q3 2022 Earnings Call<br><u>Speakers</u>: Karina Franco Padilla (Compl. ¶317) | ***We continue to be supported by strong balance sheet, ending the quarter with $408 million in cash, cash equivalents and short-term investments.*** As we've been mentioning since the beginning of the year, we are expecting a higher than normal cash burn in 2022 as a result of our investment in our [Greer] factory. Consistent with Q2 of 2022, there were a number of discrete investments and timing factors that led to higher than normal cash usage in the quarter.<br><br>Total cash usage in the quarter was $115 million. This included: $14 million in CapEx, almost all of which was related to the construction of [Greer]; $25 million related to a strategic equity investment in a privately-held entity that we expect to diversify our domestic cell supply into other chemistries, which Gareth [Joyce] will discuss in greater detail in a few | The statements identified in ¶ 317 are false and misleading because liquidity was not a priority to the Company, its capital investments, including in battery cell inventory and the construction of Greer, did not address nor would they resolve the most prominent risks to the Company's growth prospects, and Proterra's exiting capital, revenue growth and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs, and therefore, its balance sheet was not "strong." In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of |

minutes; a $20 million increase in accounts receivable due to a significant portion of our bus deliveries landing late in the quarter; as well as a $16 million increase in inventory.

The growth in inventory is strategic and deliberate with most of the increase in raw materials, 90% of which was to support the Powered and Energy business. The growth in inventory, as I mentioned, is intentional to prepare us for the startup production at [Greer] by the end of the year, while ensuring smooth production to support on-time delivery to our customers across both business units.

Excluding these items, cash usage was closer to $40 million in the quarter. ***Cash and liquidity is a top priority for us, and it will continue to be. We are allocating our cash to the areas we believe are most critical to reinforcing our market leadership and position us for growth in the years ahead. Ending the quarter with a cash and cash equivalents balance of more than $400 million, we believe we have the flexibility to navigate these times of economic uncertainty and capital market volatility in an advantageous competitive position just as electric commercial vehicle adoption begins to accelerate.***

I couldn't be more excited about what lies ahead for Proterra. On top of our leadership in battery technology, the strength of our balance sheet and the breadth of our established commercial vehicle partnerships, we now expect to have additional tailwinds from multiple government programs. So it may not be a smooth ride, given the volatility we're seeing in the global markets and continued challenges with supply chain disruption,

of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins— was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under significant Powered supply contract in order to obtain board approval for additional growth expenditures; (xi) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xii) as a result, the Company's "strategic" investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiii) as a result, the construction of the Greer facility, would *not* improve the most prominent

Proterra executives. ¶¶276-91, 426.
- Defendant Padilla held herself out as knowledgeable about the Company and its different aspects of the business. ¶¶435-36.
- Defendant Padilla's signing of SOX certifications bolster scienter. ¶¶504-06, 511.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

| | | | | |
|---|---|---|---|---|
| | | geopolitical instability and inflation, but I believe **we have the fundamental ingredients to deliver on our financial commitments and generate strong growth and shareholder returns over the long-term.** | production efficiency risks to the Company's gross margins; (xiv) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; (xv) as a result, the Company's cash balance was incapable of meeting Proterra's ongoing cash needs; and (xvi) as a result, the Company's cash balance was not then "strong" but rather was getting perilously close to triggering the liquidity clause of its Note Purchase Agreement. | |
| 39 | When: November 2, 2022 Where: Q3 2022 Earnings Call Speakers: Gareth T. Joyce (Compl. ¶319) | On the manufacturing front, we are taking our biggest step forward so far with our new [Greer] factory in Greer, South Carolina. This will not only be our first purpose-built high-volume battery manufacturing facility that will multiply our capacity, but we believe it will be the largest battery facility in the United States dedicated exclusively to heavy-duty commercial vehicles to date. And **we remain on track for start of production by end of 2022 and have made significant progress completing the facility over the last few months. We've completed installation of the first module line at the factory last month, and we've begun building the first e-samples of our new S-Series battery on the production line over the last few weeks. We are also working on the installation of the second module line at [Greer].** | The statements identified in ¶ 319 are false and misleading when made because the Company was not then capable of starting production by the end of 2022, and it was not then close to completing the planned construction for the Greer facility. Indeed, the identified statements failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) while the Company completed the installation of its first production line at Greer, it was already experiencing issues with the automation equipment on the line, significantly impacting productivity; (ii) as a result, the Company was least a quarter behind schedule for the start-up of the Greer facility, and therefore was, in fact, *not* "on track for start of production by end of 2022;" and (iii) when Proterra committed to the construction of the Greer facility, the plan included four to six production lines, therefore, the Company had *not* "made significant progress completing the facility over the last few months." | • Confidential Witnesses confirmed that problems within the Company, including those at Greer, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 40 | When: November 2, 2022 Where: Q3 2022 Earnings Call Speakers: Gareth T. Joyce (Compl. ¶323) | So bringing it all together, I will conclude the call with 3 key points. One, we reported record results in Q3 with triple-digit delivery growth at both Proterra Powered and Proterra Energy complementing record transit production and deliveries to drive record revenue of | The statements identified in ¶ 323 are false and misleading because Proterra's balance sheet was not "strong," as it was insufficient to support the Company's capital investments and its then cash needs; its production capacity was not "healthy" as all of Proterra's facilities were operating below capacity; and its product | • Confidential Witnesses confirmed that problems within the Company, including those at Transit, Powered, and the delay in Greer's production, as well as the Company spending too much money, were not only well known throughout the Company, but |

$96 million in the quarter. Two, we believe commercial vehicle electrification demand in the United States has entered a new era with billions of dollars of funding from multiple government programs, all starting to become available. And three, through our innovative battery technology, *we believe that we have positioned ourselves to be a central player in this industry with a strong balance sheet, healthy production capacity going into 2023, and a leading product platform with a well-positioned product strategy for the future*.

strategy was not "well-positioned" as Powered's business did not then have the performance or growth trajectory to support the Company's "strategic" decision to prioritize Powered over Transit. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the

also discussed internally at executive meetings. ¶¶146-72, 423-31.
- CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.
- CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.
- Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.
- Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.
- Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

46

| | | | "strategic" decision to manipulate the cost of goods sold under significant Powered supply contract in order to obtain board approval for additional growth expenditures; (xi) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xii) as a result, Proterra's production capacity going into 2023 was *not* "healthy" as all of its existing facilities were operating below capacity and the construction of Greer was behind schedule; (xiii) as a result, Proterra's "product strategy for the future" was *not* "well-positioned;" and (xiv) as a result, the Company's "balance sheet" was *not* then "strong" but rather was getting perilously close to triggering the liquidity clause of its Note Purchase Agreement. | |
|---|---|---|---|---|
| 41 | <u>When</u>: November 3, 2022 <u>Where</u>: Q3 2022 10-Q <u>Speakers</u>: Proterra (Compl. ¶325) | The Company has incurred net losses and negative cash flows from operations since inception. As of September 30, 2022, the Company has an accumulated deficit of $1.0 billion. ***The Company has $408.5 million of cash and cash equivalents and short-term investments as of September 30, 2022.*** The Company has funded operations primarily through a combination of equity and debt financing. ***Management believes that the Company's currently available resources will be sufficient to fund its cash requirements for at least the next twelve months.*** However, there can be no assurance that future financings will be successfully completed or completed on terms acceptable to the Company. Global economic conditions have been worsening, with disruptions to, and volatility in, the credit and financial markets in the U.S. and worldwide. If these conditions persist, the Company's ability to access additional capital or our | The statements identified in ¶ 325 are false and misleading because Proterra's exiting capital, revenue growth and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins— was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 423-31. • CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260. • CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12. • Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426. • Defendants held themselves out as |

| | | liquidity could be impacted. If the Company is unable to raise capital when needed or on attractive terms, the Company would be forced to delay, reduce or eliminate our research and development programs and/or other efforts. These financial statements do not include any adjustments that may result from the outcome of this uncertainty. | delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures; (xi) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xii) as a result, the Company's "strategic" investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiii) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xiv) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; (xv) as a result, the Company's cash balance was incapable of meeting Proterra's ongoing cash needs; and (xvi) as a result, the Company's cash balance was not then "strong" | knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br><br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br><br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br><br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br><br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.<br><br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | | |
|---|---|---|---|---|
| | | | but rather Proterra was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 42 | When: November 3, 2022<br>Where: Q3 2022 10-Q<br>Speakers: Proterra<br>(Compl. ¶326) | As of September 30, 2022, we had cash and cash equivalents and short-term investments of $408.5 million. Our primary requirements for liquidity and capital are investment in new products and technologies, the completion and improvement of our current manufacturing and future capacity expansion, working capital, debt service, and general corporate needs. Historically, these cash requirements have been met through the net proceeds we received through private sales of equity securities, the Business Combination, the PIPE Financing, borrowings under our credit facilities, and payments received from customers.<br><br>***We believe that our sources of existing cash and cash equivalents and short-term investments, borrowing capacity under our Senior Credit Facility described in more detail below, and payments from customers will be sufficient to meet our working capital and capital expenditure needs for at least the next twelve months.*** These estimates are based on our current business plan and on assumptions that may prove to be wrong, and we could use our available capital resources sooner than we currently expect. If we are unable to generate sufficient cash flows from operations in the future, or fund availability under our Senior Credit Facility is not sufficient, we will have to obtain additional equity or debt financing. The issuance and sale of additional equity would result in further dilution to our stockholders. The incurrence of indebtedness would result in increased | The statements identified in ¶ 326 are false and misleading because Proterra's exiting capital, revenue growth and gross margins were insufficient to support the Company's growth strategies and meet its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | | |
|---|---|---|---|---|
| | | fixed obligations and could result in significant financial and operating covenants that would restrict our operations. We cannot assure you that we will be able to obtain refinancing or additional financing on favorable terms or at all. Uncertainty in global economic conditions create volatility in the credit and financial markets in the U.S. and worldwide and could impact our ability to access additional capital when needed or our liquidity could otherwise be impacted. A recession or additional market corrections resulting from the impact of the evolving effects of the COVID-19 pandemic could materially affect our business and the value of our securities. Our failure to raise capital as and when needed could have significant negative consequences for our business, financial condition and results of consolidated operations. Our future capital requirements and the adequacy of available funds will depend on many factors, including those set forth in the section titled "Risk Factors". | business; (ix) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures; (xi) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xii) as a result, the Company's "strategic" investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiii) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xiv) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; (xv) as a result, the Company's cash balance was incapable of meeting Proterra's ongoing cash needs; and (xvi) as a result, the Company's cash balance was not then "strong" but rather Proterra was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 43 | When: November 3, 2022 Where: Q3 2022 10-Q Speakers: Proterra (Compl. ¶328) | *We intend to continue investing in initiatives to improve our operating leverage and significantly ramp production.* We believe continued reduction in costs and an increase in production volumes will enable commercial vehicle manufacturers to electrify faster. *Purchased materials represent the largest component of cost of goods sold in all products and we continue to explore ways to reduce these* | The statements identified in ¶ 328 are false and misleading because Proterra was not investing in initiatives to improve its operating leverage or production efficiency, the Company's battery cell inventory investment did not address nor would it resolve the most prominent supply chain risks posed to its growth prospects, and increased capacity through the construction of Greer would not address or resolve the most prominent risks to the Company's productivity and costs of | • Confidential Witnesses confirmed that problems within the Company, including those at Transit and Powered, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 423-31. <br> • CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances |

| | | | | |
|---|---|---|---|---|
| | | *costs through improved design for cost, strategic sourcing, long-term contracts, and in some cases vertical integration.* We launched two new manufacturing facilities in 2017 and a new battery manufacturing facility in 2020. We are currently under construction of our third battery production facility. We believe that an increase in volume and additional experience will allow us to leverage those investments and reduce our labor and overhead costs, as well as our freight costs, as a percentage of total revenue. We expect our product cost of goods sold to increase in absolute dollars in future periods as the volume of products we sell increases. *As we grow into our current capacity, execute on cost-reduction initiatives, and improve production efficiency, we expect our product cost of goods sold as a percentage of revenue to decrease in the longer term.* We anticipate that by increasing facility utilization rates and improving overall economies of scale, we can positively impact gross margins of our products, bring value to our customers and help accelerate commercial electric vehicle adoption. *Our ability to achieve cost-saving and production-efficiency objectives can be negatively impacted by a variety of factors including, among other things, labor cost inflation, lower-than-expected facility utilization rates, rising real estate costs, manufacturing and production cost overruns, increased purchased material costs, and unexpected supply-chain quality issues or interruptions, and delays in our ability to hire, train, and retain employees needed to scale production to meet demand.* | production. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (iv) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (v) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (vi) Powered was also experiencing manufacturing inefficiencies at its City of Industry facility resulting in operations at less than capacity and restricting revenue growth; (vii) the construction of Greer was behind schedule delaying the Company's production start-up and restricting revenue growth; (viii) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of | even further. ¶260.<br><br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br><br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br><br>• Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br><br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br><br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br><br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br><br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.<br><br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

51

| | | | | |
|---|---|---|---|---|
| | | | goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures; (ix) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (x) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xi) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; and (xii) as a result, the Company's "strategic" decision to prioritize the unsubstantiated growth of Powered over its existing operations negatively impacted its ability to achieve cost-saving and production-efficiency objectives. | |
| 44 | When: January 19, 2023<br>Where: January Press Release<br>Speakers: Gareth T. Joyce (Compl. ¶335) | With rising adoption of zero-emission transportation, ***we remain focused on operating with financial discipline towards sustainable growth***…While we have appreciated being a part of the Los Angeles business community and value the hard work and dedication of our teammates, ***streamlining our manufacturing operations will allow us to improve our production efficiency over the course of the next year as we work to deliver on our mission***. | The statements identified in ¶ 335 are false and misleading because Proterra was not operating with financial discipline and the closure of its City of Industry facility would resolve the most prominent risks to the Company's production efficiency. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production | • Confidential Witnesses confirmed that problems within the Company, including those at Transit, Powered, and the delay in Greer's production, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like |

| | | | inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Proterra's solid, composite bus body design strained the Company's supply chain, cost of production, and production efficiency; (vi) Proterra's fiberglass composite bus body was fundamentally flawed, materially compromising the frame of its buses, resulting in increased costs under Proterra's warranties, and higher labor costs associated with repair claims; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as Proterra's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (ix) as a result, Proterra's existing Transit manufacturing facilities would continue to operate below capacity; (x) the construction of Greer was behind schedule delaying the Company's production start-up and restricting revenue growth; (xi) measures taken to reduce capital expenditures were insufficient and in some instances resulted in higher costs to the Company; (xii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xiii) as a result, the Company's "strategic" investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiv) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xv) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; (xvi) as a result, the Company's cash balance was incapable of meeting Proterra's | that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br><br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br><br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br><br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br><br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br><br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br><br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br><br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

53

| | | | | |
|---|---|---|---|---|
| | | | ongoing cash needs; and (xvii) as a result, the Company was *not* "operating with financial discipline towards sustainable growth" but rather Proterra was then growing closer to violating the liquidity clause of its Note Purchase Agreement and insolvency. | |
| 45 | When: March 15, 2023<br>Where: Q4 2022 Letter<br>Speakers: Gareth T. Joyce<br>(Compl. ¶365) | All in, we believe *we made tremendous progress on our long-term business plan in 2022. After years of investment in our technology, product portfolio, and manufacturing capabilities, we believe we have successfully leveraged our early leadership in electric transit buses* to become a premier provider of battery and electrification technology to the broader commercial and industrial vehicle market in the United States and Europe.<br><br>Exiting 2022 with (a) Proterra Powered & Energy's backlog at almost $1 billion (or $1.6 billion in total including Proterra Transit), (b) *multiple GWh of U.S. battery manufacturing capacity with production started and ramping at our new [Greer] factory,* and (c) battery cell supply under contract through 2028, we believe Proterra Powered & Energy is likely to generate the majority of our revenue for the first time this year.<br><br>In 2021, we expanded our backlog significantly from buses and stepvans to trucks, delivery vans, and construction and port equipment. In 2022, we constructed the first and largest purpose-built multi-GWh battery manufacturing facility in Proterra's history. *In 2023, we expect to focus on fulfilling this backlog and efficiently ramping battery production while also working to improve gross margins, narrow our losses, and reduce cash consumption*. | The statements identified in ¶ 365 are false and misleading because Proterra's capital investments and growth strategies executed in 2022 had obliterated the Company's ability to operate under any "long-term business plan" as its existing capital, revenue growth, and gross margins were insufficient to its then cash needs. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; | • Confidential Witnesses confirmed that problems within the Company, including those at Transit, Powered, and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426. |

| | | | | |
|---|---|---|---|---|
| | | We establish full-year 2023 guidance for revenue in a range of $450 million to $500 million, representing anticipated growth of between 45% and 61% year-over-year. Though we expect initial production inefficiencies and underutilization at [Greer] to translate into gross losses in the first half of the year, *we expect positive gross margin in the second half of 2023.* In addition, following our workforce restructuring announced in January 2023, we expect operating expenses to decline approximately $15 million in 2023. We also expect capital expenditures of approximately $25 million for the full year 2023.<br><br>As the commercial vehicle market converts to zero emission power trains, *we believe the combination of our Proterra Powered battery technology, our Proterra Energy charging solutions, our Valance SaaS product and our Proterra Transit buses establish Proterra as a unique brand that is well positioned to provide commercial vehicle manufacturers and fleet operators with solutions to their future needs.* We couldn't be more thrilled about the central role we have established in this new era of commercial vehicle electrification. We express eternal gratitude to all our employees —past and present— who helped us on our journey. | (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (ix) Powered was also experiencing operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under significant Powered supply contract in order to obtain board approval for additional growth expenditures, further straining Powered's gross margins; (xi) measures taken to reduce capital expenditures, including the closure of City of Industry, were insufficient and in some instances resulted in higher costs to the Company; (xii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xiii) as a result, the Company's "strategic" investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiv) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xv) as a result, the Company's revenue growth and gross margins were insufficient to support its exorbitant capital expenses; (xvi) as a result, the Company's cash balance was incapable of meeting Proterra's ongoing cash needs; and (xvii) as a result, the Company was then growing closer to insolvency. | • Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 46 | <u>When</u>: March 15, 2023<br><u>Where</u>: Q4 2022 Earnings Call | *We have completed construction of [Greer] what we call Powered 1, our new* | The statements identified in ¶ 367 are false and misleading because Proterra had not made | • Confidential Witnesses confirmed that problems within the Company, including |

| | | | |
|---|---|---|---|
| | Speakers: Gareth T. Joyce (Compl. ¶367) | *battery factory design to manufacture multiple gigawatt hours of batteries per year once fully ramped*. We produced the first complete modules and pack assemblies at the facility at the start of the year. And *while the first stages of the ramp have been slow in January and February, we have made significant progress over the last few weeks.*<br><br>We've also produced a little more than 100 battery packs at [Greer] since the start of production and more than half of them produced in the last 4 weeks. *Last year, we also announced multiple new battery supply agreements with OEMs* including the ship groups and the rail groups ENC, amongst others, *growing the Proterra Powered & Energy goal to approximately $1 [b]illion and total company backlog to approximately $1.6 billion, including transit.* | "significant progress" in the ramp up of its Greer facility and its Powered and Energy backlog would not improve the Company's financial condition. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) Powered relied on a non-scalable battery system design; (iv) Powered was experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (v) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (vi) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, were insufficient and in some instances resulted in higher costs to the Company; (vii) as a result, the unmitigated operational challenges and production inefficiencies plaguing Proterra's Powered business would continue to adversely impact its revenue growth and gross margins; and (viii) as a result, Proterra's growing backlog would not improve its liquidity or financial stability. | those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84. |

| | | | |
|---|---|---|---|
| | | | • Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 47 | When: March 15, 2023<br>Where: Q4 2022 Earnings Call<br>Speakers: Karina Franco Padilla (Compl. ¶369) | We ended the quarter with $298 million in cash equivalents and short-term investments. Total cash usage in Q4 was approximately $110 million, a slight improvement from Q3 2022, on top of our adjusted EBITDA loss of $60 million. Cash usage was impacted by an increase in accounts receivable of almost $30 million, the bulk of which we have collected in Q1 of 2023, a $5 million increase in inventory largely related to battery cell purchases and $18 million in CapEx, most of which was related to [Greer].<br><br>All in, cash consumed in 2022 was $363 million. However, *we expect an improvement in cash consumption in 2023 from the following: we have a workforce restructuring plan in place; consolidation of the bus production facility in Greenville; material reduction in capital expenditures with the completion of [Greer]; and efficiency and working capital usage.*<br><br>It's important to note that beyond our cash and cash equivalents of almost $300 million. We have more than $100 million utilized in working capital at the end of 2022. The cost reduction, combined with working capital efficiency, we expect to reduce our cash consumption in 2023 by up to 30%, driven by lower construction costs and restructuring savings. | The statements identified in ¶ 369 are false and misleading because the Company's then cash needs did not support any expectations of improvement in cash consumption in 2023 as the referenced cost-saving measures did not address nor would they resolve the most prominent risks to the Company's capital management. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iv) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (v) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vi) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (vii) Powered relied on a non-scalable battery system design; (viii) Powered was experiencing significant operational challenges and manufacturing inefficiencies at its Greer | • Confidential Witnesses confirmed that problems within the Company, including those at Transit, Powered, and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce, who Defendant Padilla reported to, was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Padilla held herself out as knowledgeable about the Company and its different aspects of the business. ¶¶435-36.<br>• Defendant Padilla's signing of SOX certifications bolster scienter. ¶¶504-06, 511.<br>• Proterra's bankruptcy filing confirmed that |

| | | | | |
|---|---|---|---|---|
| | | | facility resulting in operations at less than capacity and restricting revenue growth; (ix) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (x) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, were insufficient and in some instances resulted in higher costs to the Company; (xi) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xii) as a result, the Company's cash balance was incapable of meeting Proterra's ongoing cash needs; and (xiii) as a result, the Company was then growing closer to insolvency. | Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 48 | When: March 15, 2023<br>Where: Q4 2022 Earnings Call<br>Speakers: Gareth T. Joyce<br>(Compl. ¶372) | So let me start off with, yes, the answer to how we see the market. The demand in transit remains healthy. We've continued to see federal funding promote the adoption of battery electric transit buses amongst transit authorities across the country. And that's evidenced by our backlog and our continued active participation in that market. So *we remain bullish about the opportunity that exists for transit as segments in the U.S. and North America broadly.*<br><br>To the second part of your question, at this point, *we continue to enjoy the benefits of transit being part of our ecosystem,* as I mentioned, between Powered, Energy and our Valance products and Transit being the proving ground for us, *it does continue to add value to our portfolio.* And as I say, *we remain bullish about the market.* | The statements identified in ¶ 372 are false and misleading because Proterra was not "bullish" about Transit and was exploring options to sell or divest it from the Company's other business lines. In addition: (i) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (ii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (iii) as Proterra's financial condition worsened, it made the "strategic" decision to terminate or never implement cost-saving projects designed to improve Transit's product design and support production efficiency in order to continue funding Powered; (iv) Proterra had already engaged two financial institutions to explore options of selling off or divesting | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was |

| | | | | |
|---|---|---|---|---|
| | | Your comments about how do we think about strategic scenarios, we, of course, continue to always think about strategic scenarios for our business for Transit Powered & Energy, and that's a continuous process. | Transit from Powered and Energy; (v) as a result, Proterra was not "bullish" about Transit; and (vi) as a result, Transit was no longer "add[ing] value to [Proterra's] portfolio" – because unmitigated operational challenges and production inefficiencies continued to have an adverse impact on Transit's revenue growth and gross margins. | cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390. <br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426. <br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426. <br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38. <br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510. <br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448. <br>• Suspicious executive departures bolster scienter. ¶¶449-84. <br>• Defendants' insider sales bolster scienter. ¶¶485-503. <br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 49 | When: March 15, 2023 <br>Where: Q4 2022 Earnings Call <br>Speakers: Gareth T. Joyce (Compl. ¶375) | Steven, the backlog has orders in it that can be as far out as 12 to 18 months ago. So yes, we could be producing units for example, in the middle of this year for contracts where we received the order 12 months ago. <br><br>Yes. So they were done at – I'm going to say, we're still sort of legacy pricing -- we work through our entire order book and exercise all the opportunity we could to | The statements identified in ¶ 375 are false and misleading because the referenced cost-saving measures did not address nor would they resolve the most prominent risks to the Company's capital management and Proterra's order book had and would continue to have negative gross margins. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31. <br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances |

| | | gain your price position based on contract language. But that was not something you could achieve for every single transaction.<br><br>In addition to that, as is widely known, we're still seeing inflationary pressure coming through in our raw material and supply chain environments. ***So making the decisions like we have to consolidate our production in Greenville for transit buses and moving the LA battery production to grow towards the end of the year, these are critical steps for us to continue to take cost out of the system as we look to optimize gross margin. And that applies to logistics, consolidation of operations, fixed cost absorption, et cetera.*** So yes, it might seem like it's something where we should simply be able to just price for it. But when you have long-term contracts that are negotiated 12 to 18 months back, it still has to work its way through the system in some of these agreements.<br><br>Having said that, I will also tell you that ***middle of last year, we effected a very focused strategy to ensure that the future opportunities that are brought into our order books are done at better gross margins. And we certainly believe that the order book as time passes, does have improving quality gross margins, both in Powered and on the Transit side of the business.*** | have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iv) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (v) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vi) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (vii) Powered relied on a non-scalable battery system design; (viii) Powered was experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (ix) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (x) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, were insufficient and in some instances resulted in higher costs to the Company; and (xi) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins. | even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| 50 | When: March 15, 2023<br>Where: Q4 2022 Earnings Call<br>Speakers: Gareth T. Joyce<br>(Compl. ¶378) | Yes. Thanks, Greg. *We have a very healthy products architecture and product road map for our Powered business, for all of them.* In fact, but clearly, for Powered as the electrification of the commercial vehicle market accelerates, we anticipate that new vehicles are starting to come to market now and are -- many are in engineering as we speak, which means they hit the market somewhere between now and 24 months from now. That really tells you that the second half of the decade is where we see acceleration of this market. And so we've set ourselves up to be prepared to capitalize on an expanding market where more diverse technologies might be needed to address wider product segments.<br><br>So it's on our product architecture road map, and we continue to invest, as you see in our R&D environment. We have a position of leadership with our technology, and we intend to keep that position of technology leadership because that is critical for our future growth plans.<br><br>Having said that, *we're obviously also navigating cash consumption and our balance sheet. And so we're sensitive to keeping the right balance in growth aspirations, setting ourselves up for the future and also managing a healthy balance sheet and income statement to continue to feed a path towards profitable growth*. | The statements identified in ¶ 378 are false and misleading because Proterra did not have a "healthy" products architecture as the majority of its products relied on non-scalable designs and cost more to produce than sold for; it was not "keeping the right balance" between growth aspirations and managing a healthy balance sheet and income statement as its capital investments in growth plans had triggered the liquidity clause of its Note Purchase Agreement and put Proterra on a trajectory to insolvency. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iv) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (v) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vi) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (vii) Powered relied on a non-scalable battery system design; (viii) Powered was experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (ix) as | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the |

61

| | | | | |
|---|---|---|---|---|
| | | | Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (x) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, were insufficient and in some instances resulted in higher costs to the Company; (xi) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xii) as a result, Proterra's income statement was insufficient to support its exorbitant capital expenditures towards profitable growth; and (xiii) as a result, the Company's "balance sheet" was *not* then healthy but rather periling closer to insolvency. | - misleading statement. ¶¶439-448.<br>- Suspicious executive departures bolster scienter. ¶¶449-84.<br>- Defendants' insider sales bolster scienter. ¶¶485-503.<br>- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 51 | **When:** March 17, 2023<br>**Where:** FY 2022 10-K<br>**Speakers:** Proterra (Compl. ¶380) | ***We intend to continue investing in initiatives to improve our operating leverage and significantly ramp production.*** We believe continued reduction in costs and an increase in production volumes will enable commercial vehicle manufacturers to electrify faster. ***Purchased materials represent the largest component of cost of goods sold in all products and we continue to explore ways to reduce these costs through improved design for cost, strategic sourcing, long-term contracts, and in some cases vertical integration.*** We are consolidating battery and bus manufacturing to our facilities in Greer and Greenville South Carolina. We completed construction of our first multi-gigawatt capacity battery production facility in Greer, which began production in January 2023. We believe that an increase in volume and additional | The statements identified in ¶ 380 are false and misleading because Proterra was not investing in initiatives to improve its operating leverage or production efficiency, the Company's battery cell inventory investment did not address nor would it resolve the most prominent supply chain risks posed to its growth prospects, and increased capacity through the construction of Greer would not address or resolve the most prominent risks to the Company's productivity and costs of production. In addition, they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth | - Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>- CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>- CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>- CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have |

experience will allow us to leverage those investments and reduce our labor and overhead costs, as well as our freight costs, as a percentage of total revenue. We expect our product cost of goods sold to increase in absolute dollars in future periods as the volume of products we sell increases. *As we grow into our current capacity, execute on cost-reduction initiatives, and improve production efficiency, we expect our product cost of goods sold as a percentage of revenue to decrease in the longer term.* We anticipate that by increasing facility utilization rates and improving overall economies of scale, we can positively impact gross margins of our products, bring value to our customers and help accelerate commercial electric vehicle adoption. *Our ability to achieve cost-saving and production-efficiency objectives can be negatively impacted by a variety of factors including, among other things, labor cost inflation, lower-than-expected facility utilization rates, rising real estate costs, manufacturing and production cost overruns, increased purchased material costs, and unexpected supply-chain quality issues or interruptions, and delays in our ability to hire, train, and retain employees needed to scale production to meet demand.*

of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins— was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (ix) Powered was experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xi) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, were insufficient and in some instances resulted in higher costs to the Company; (xii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xiii) as a result, the Company's

the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.

- Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.
- Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.
- Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.
- Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

<table>
<tr><td colspan="5">

investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiv) as a result, Powered's growth trajectory and production efficiency did not support the Company's "strategic" investment of battery cells further straining its cost of production; (xv) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xvi) as a result, the Company's "strategic" decision to prioritize the unsubstantiated growth of Powered over its existing operations negatively impacted its ability to achieve cost-saving and production-efficiency objectives; and (xvii) as a result, the Company was moving closer towards insolvency.

</td></tr>
</table>

| | | | | |
|---|---|---|---|---|
| 52 | **When:** March 17, 2023 <u>Where:</u> FY 2022 10-K <u>Speakers:</u> Proterra (Compl. ¶383) | *We have a history of net losses, have experienced rapid growth and anticipate increasing our operating expenses in the future, and may not achieve or sustain positive gross margin or profitability in the future.*<br><br>We incurred net losses of $238.0 million, $250.0 million, and $127.0 million in 2022, 2021, and 2020, respectively, and we expect to incur net losses for the foreseeable future. As of December 31, 2022, we had an accumulated deficit of $1.1 billion. *We expect to make significant expenditures related to the development and expansion of our business*, including: making new capital investments and continuing investments in our electric powertrain, including advancements in our battery technology and high voltage systems; hiring and retaining qualified employees; adding additional production lines or production shifts in our manufacturing facilities; | The statements identified in ¶ 383 are false and misleading because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, or materialized risks that existed at the time of the FY 2022 10-K, including: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit relied on a unique, non-scalable highly customizable unibody bus design that | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the |

| | | |
|---|---|---|
| building new manufacturing facilities; expanding our software offerings; expanding our business into new markets and geographies; research and development in new product and service categories; and in connection with legal, accounting, and other administrative expenses related to operating as a public company.<br><br>We have also experienced rapid growth in recent periods. For example, our number of employees has increased significantly over the last few years, from 492 full-time employees as of December 31, 2018 to 1,247 full-time employees as of December 31, 2022. On January 13, 2023, we approved a plan designed to improve operational efficiency, including reducing our workforce by approximately 25% and closing our City of Industry facility. We will move manufacturing from our City of Industry facility to our existing facilities in South Carolina. In transitioning manufacturing facilities, we may experience delays and disruptions in our manufacturing and production activities. We also expect to continue to hire new employees, particularly for our manufacturing facilities in South Carolina. Managing our growth has and will place significant demands on our management as well as on our administrative, operational, legal and financial resources. To manage our growth effectively, we must continue to improve and expand our infrastructure, including our information technology, financial, legal, compliance and administrative systems and controls. We must also continue to effectively and efficiently manage our employees, operations, finances, research and development, and capital investments. | strained the Company's supply chain, cost of production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (vi) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (viii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (ix) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (x) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (xi) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (xii) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xiii) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, were insufficient and in some instances resulted in higher costs to the Company; (xiv) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xv) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xvi) as a result, Powered's | Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | *All of these efforts may prove more expensive than we currently anticipate, and we may not succeed in increasing our revenue sufficiently, or at all, to offset these higher expenses.* While our revenue has grown in recent periods, our operating expenses have also increased significantly. *If our revenue declines or fails to grow at a rate faster than increases in our operating expenses, or we are unable to increase gross margin, whether through reducing the cost of production or increasing sales, we would not be able to achieve and maintain profitability in future periods.* As a result, we may continue to generate losses. We cannot ensure that we will achieve profitability in the future or that, if we do become profitable, that we will be able to sustain profitability. | growth trajectory and production efficiency did not support the Company's "strategic" investment of battery cells further straining its cost of production; (xvii) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xviii) as a result, the risk of Proterra's growth strategies and operating expenses harming its ability to achieve positive gross margin or profitability had already materialized; (xix) as a result, the risk of Proterra's inability to effectively implement cost-reduction efforts or reduce costs sufficiently in response to its declining revenue, harming its business, prospects, financial condition, and operating results had already materialized; and (xx) as a result, the risk of Proterra's inability to realize its production plans and deliver battery systems and buses on time, adversely affecting its reputation, business, prospects, financial condition, and operating results had already materialized. | |
| 53 | **When:** March 17, 2023 <br> **Where:** FY 2022 10-K <br> **Speakers:** Proterra <br> (Compl. ¶384) | ***Our recent workforce reduction and planned closure of our City of Industry facility may not be as successful as anticipated and may not improve overall efficiency.*** <br><br> On January 20, 2023, we implemented a reduction-in-force and announced the closure of our City of Industry facility, which we expect to vacate by the end of 2023. While we believe this will improve operational efficiency and expect to realize cost reductions, we may not be able to realize the full benefits within the anticipated time frame, or at all. We may also incur other charges, costs, future cash expenditures or impairments not currently contemplated due to events that may occur as a result of, or in connection with the reduction in workforce and facility | The statements identified in ¶¶ 384 are false and misleading because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, or materialized risks that existed at the time of the FY 2022 10-K, including: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins— was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31. <br> • CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260. <br> • CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12. <br> • CW8 confirmed that Defendant Joyce held |

closure. Further, we may experience unintended consequences and costs, such as the loss of institutional knowledge and expertise, attrition beyond our intended reduction-in-force, a reduction in morale among our remaining employees, and the risk that we may not achieve the anticipated benefits, all of which may have an adverse effect on our results of operations or financial condition.

*While we have implemented, and intend to continue to implement, cost-reduction strategies in order to meet our profitability goals, if we do not achieve expected savings or if operating costs increase as a result of investments in strategic initiatives, our total operating costs would be greater than anticipated.* We may also incur substantial costs or cost overruns in utilizing and increasing our production capability, particularly if we build new battery production lines, and if we vertically integrate subsystem production into our manufacturing facilities. In addition, if we do not manage cost-reduction efforts properly, such efforts may affect the quality of our products and our ability to generate future revenue. Moreover, significant portions of our operating expenses are fixed costs that will neither increase nor decrease proportionately with revenue. In addition, we incur significant costs related to procuring the materials required to manufacture our battery systems, electrification and charging solutions, fleet and energy management systems and electric transit buses, as well as assembling electric transit buses and systems, and compensating our personnel. *If we are not able to implement further cost-reduction efforts or reduce our fixed costs sufficiently in response to a decline in revenue, our business, prospects,*

by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit relied on a unique, non-scalable highly customizable unibody bus design that strained the Company's supply chain, cost of production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (vi) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (viii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (ix) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (x) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (xi) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (xii) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xiii) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, were insufficient and in some instances resulted in higher costs to the Company; (xiv) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross

a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.

- Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.
- Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.
- Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.
- Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

67

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | *financial condition, and operating results may be adversely affected.* | margins; (xv) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xvi) as a result, Powered's growth trajectory and production efficiency did not support the Company's "strategic" investment of battery cells further straining its cost of production; (xvii) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xviii) as a result, the risk of Proterra's growth strategies and operating expenses harming its ability to achieve positive gross margin or profitability had already materialized; (xix) as a result, the risk of Proterra's inability to effectively implement cost-reduction efforts or reduce costs sufficiently in response to its declining revenue, harming its business, prospects, financial condition, and operating results had already materialized; and (xx) as a result, the risk of Proterra's inability to realize its production plans and deliver battery systems and buses on time, adversely affecting its reputation, business, prospects, financial condition, and operating results had already materialized. |  |
| 54 | When: March 17, 2023<br>Where: FY 2022 10-K<br>Speakers: Proterra<br>(Compl. ¶385) | *If we are unable to scale production and deliver battery systems and buses on time, our business could be adversely affected.*<br><br>Our business plan calls for significant increases in both vehicle and battery system production in a short amount of time to meet expected delivery dates to customers. *Our ability to achieve our production plans will depend upon many factors, including* adding additional battery lines, auxiliary vehicle production lines and production shifts, recruiting and training new staff while maintaining our desired quality levels, and *improving our* | The statements identified in ¶ 385 are false and misleading because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, or materialized risks that existed at the time of the FY 2022 10-K, including: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to |

| | | *vehicle configuration process*, supply chain management, and our suppliers' ability to support our needs. Moreover, because many of our orders are with respect to products that will be delivered more than a year after the order placed, whether we are the battery system supplier or, in the case of electric transit buses, the vehicle OEM, there can be no assurance that we will be able to accurately forecast our supply chain demands or scale our manufacturing accordingly to meet the delivery deadlines for these orders. In addition, we have adopted, and may adopt in the future, new factory and supply chain management technologies and manufacturing and quality control processes, which we must successfully introduce and scale for production across our factories. We have introduced new battery system configurations for our customers and we are new to modifying our production processes to complete different configurations. Moreover, our electric transit buses are customized for our customers and certain battery systems require custom integration with our customer electric transit buses, which means that each new electric transit bus order brings its own set of challenges to vehicle configuration and supply chain. For example, each new electric transit bus configuration may introduce a multitude of parts that we have not used in previous electric transit bus builds, which in turn requires obtaining parts from new suppliers that engineering must validate and incorporate into our vehicle configuration. In the past, we have experienced changes in work instructions for electric transit buses that have not been timely communicated between factories, resulting in recalls of delivered product. We have limited experience developing, manufacturing, selling, servicing, and | maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit relied on a unique, non-scalable highly customizable unibody bus design that strained the Company's supply chain, cost of production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (vi) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (viii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (ix) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (x) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (xi) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (xii) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xiii) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, were insufficient and in some instances resulted in higher costs to the Company; (xiv) as a result, the unmitigated | change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br><br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br><br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br><br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br><br>• Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br><br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.<br><br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br><br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br><br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br><br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | allocating our available resources among multiple products and multiple factories simultaneously. ***If we fail to effectively manage the complexity of our production process, our business, prospects, financial condition, and operating results could be adversely affected.***<br><br>***Our inability to deliver electric transit buses that meet customer specifications in a timely manner could significantly delay recognition of revenue and receipt of payment***, because we do not recognize revenue and are not paid for electric transit buses until they are delivered to the customer. Moreover, some of our contracts with transit agencies include liquidated damages clauses that apply monetary penalties on a per vehicle per day basis if electric transit buses are not delivered to the customer by the date specified in the contract. Per day penalties can be significant depending on the contract. We have delivered battery systems, charging systems and electric transit buses late in the past, and have incurred substantial penalties with respect to certain of these late deliveries, which have reduced our revenue and margin. Although we actively manage our production schedule and our customers' expectations, we may still fail to meet delivery deadlines and may incur penalties as a result. ***If we are unable to realize our production plans and deliver our battery systems and buses on time, our reputation, business, prospects, financial condition, and operating results could be adversely affected.*** | operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xv) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xvi) as a result, Powered's growth trajectory and production efficiency did not support the Company's "strategic" investment of battery cells further straining its cost of production; (xvii) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xviii) as a result, the risk of Proterra's growth strategies and operating expenses harming its ability to achieve positive gross margin or profitability had already materialized; (xix) as a result, the risk of Proterra's inability to effectively implement cost-reduction efforts or reduce costs sufficiently in response to its declining revenue, harming its business, prospects, financial condition, and operating results had already materialized; and (xx) as a result, the risk of Proterra's inability to realize its production plans and deliver battery systems and buses on time, adversely affecting its reputation, business, prospects, financial condition, and operating results had already materialized. | |
| 55 | <u>When</u>: May 9, 2023<br><u>Where</u>: Q1 2023 Letter<br><u>Speakers</u>: Gareth T. Joyce<br>(Compl. ¶394) | For the full-year 2023, we maintain our guidance for revenue in a range of $450 million to $500 million, representing anticipated growth of between 45% and 61% year-over-year. We continue to | The statements identified in ¶ 394 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only |

expect a gross loss in the first half of 2023 and *target positive gross margins in the second half of 2023, enabled by our expectations for continued growth and higher operating efficiencies at [Greer], as well as the initial benefits from the consolidation of bus manufacturing in Greenville that is expected to be completed in Q2 2023*.

We now expect operating expenses to decline year-over-year in 2023, albeit by less than the $15 million we originally projected due to higher R&D, legal, and professional fees. We also continue to expect capital expenditures of approximately $25 million for the full year 2023. Cash usage in Q2 2023 is expected to grow substantially from Q1 2023 levels, as further investments in battery cell and other inventory will be required to prepare for our planned battery production growth into the second half of the year.

All in, *with the ramp of [Greer] steadily progressing, the anticipated benefit of greater manufacturing efficiencies from consolidating bus production in Greenville, and the recent workforce restructuring, we look forward to continuing growth in our battery business while also targeting gross margin improvement* in our pursuit to accelerate the adoption of electric commercial vehicles in the years ahead.

Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iv) Transit relied on a unique, non-scalable highly customizable unibody bus design that strained the Company's supply chain, cost of production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (viii) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (ix) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xi) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, ceasing payments to

well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.

- CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.
- CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.
- CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.
- Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.
- Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.
- Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.
- Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned

| | | | | |
|---|---|---|---|---|
| | | | material suppliers, and demanding early payment on supply contracts, were insufficient and unsustainable as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; and (xiii) as a result, the Company was moving closer towards insolvency | Proterra's core operations bolsters scienter. ¶¶512-13. |
| 56 | When: May 9, 2023<br>Where: Q1 2023 Letter<br>Speakers: Gareth T. Joyce<br>(Compl. ¶396) | *Our working capital management actions helped produce $7.1 million of net cash provided by operating activities in Q1 2023.* In Q1 2023, a $31.6 million net collection of accounts receivable, an $18.0 million increase in deferred revenue largely related to customer prepayments, and a $29.5 million increase in accounts payable and other current liabilities more than offset a $35.9 million increase in inventory, driven largely by strategic battery cell purchases to support growth in [Greer] production. Capital expenditures totaled $8.5 million in Q1 2023, down $9.2 million compared to Q4 2022 (and down $0.7 million compared to Q1 2022), with the construction and installation of the first two production lines at [Greer] largely complete by the end of 2022. | The statements identified in ¶ 396 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to sufficiently manage its capital expenses without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such |

| | | the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (ix) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) Proterra had already engaged two financial institutions to explore options of selling off or divesting Transit from Powered and Energy; (xi) as Proterra's financial condition worsened, rather than committing cash to improve existing operations, the Company took drastic measures to reduce its capital expenses – invoking hiring and travel freezes, denying employee raises and bonuses, laying off 20% of its workforce, demanding early payments on supply contracts, and ceasing payments on material contracts; (xii) these measures were insufficient to stabilize Proterra's cash consumption as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiii) as a result, any improvement in the Company's cash consumption was temporary; (xiv) as a result, operational challenges and production inefficiencies plaguing both segments of Proterra's business continued to adversely impact its revenue growth and gross margins; (xv) as a result, Powered's growth trajectory and production efficiency did not support the Company's "strategic" investment of battery cells further straining its cost of production; (xvi) as a result, the Company was *not* "looking forward to the benefits" of consolidating of its Transit manufacturing in Greenville; (xvii) as a result, the Company was *not* managing its cash consumption "well" and its "capital management" efforts were unsustainable; and | actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

73

| | | | |
|---|---|---|---|
| | | (xviii) as a result, the Company was moving closer towards insolvency. | |
| 57 | When: May 9, 2023<br>Where: Q1 2023 Earnings Call<br>Speakers: Gareth T. Joyce<br>(Compl. ¶397) | *[W]e managed cash and working capital well in Q1 2023*, with cash, cash equivalents and short-term investments down by less than $2 million from the end of Q4 2022, driven by $7.1 million in net cash provided by operating activities in Q1 2023.<br><br>Though our Q1 2023 adjusted EBITDA loss of $50 million was approximately flat sequentially, *the $7 million in net cash provided by operating activities in Q1 was achieved through improved collections on receivables, higher customer prepayments and management of accounts payable* to support growth in our inventory of battery cells, which we view as a key strategic asset for us that is expected to help feed the planned production ramp of [Greer] in 2023 and 2024. | The statements identified in ¶ 397 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to sufficiently manage its capital expenses without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (ix) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) Proterra had already | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, |

74

| | | | engaged two financial institutions to explore options of selling off or divesting Transit from Powered and Energy; (xi) as Proterra's financial condition worsened, rather than committing cash to improve existing operations, the Company took drastic measures to reduce its capital expenses – invoking hiring and travel freezes, denying employee raises and bonuses, laying off 20% of its workforce, demanding early payments on supply contracts, and ceasing payments on material contracts; (xii) these measures were insufficient to stabilize Proterra's cash consumption as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiii) as a result, any improvement in the Company's cash consumption was temporary; (xiv) as a result, operational challenges and production inefficiencies plaguing both segments of Proterra's business continued to adversely impact its revenue growth and gross margins; (xv) as a result, Powered's growth trajectory and production efficiency did not support the Company's "strategic" investment of battery cells further straining its cost of production; (xvi) as a result, the Company was *not* "looking forward to the benefits" of consolidating of its Transit manufacturing in Greenville; (xvii) as a result, the Company was *not* managing its cash consumption "well" and its "capital management" efforts were unsustainable; and (xviii) as a result, the Company was moving closer towards insolvency. | 510. <br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448. <br>• Suspicious executive departures bolster scienter. ¶¶449-84. <br>• Defendants' insider sales bolster scienter. ¶¶485-503. <br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
|---|---|---|---|---|
| 58 | When: May 9, 2023 <br>Where: Q1 2023 Earnings Call <br>Speakers: Karina Franco Padilla (Compl. ¶398) | *[O]ur cash performance in Q1 was our best on record, with positive net cash provided by operating activities of $7 million, and our cash, cash equivalents and short-term investments down by less than $2 million compared to the end of 2022.* Primary drivers were deferred revenue of $18 million, driven largely by | The statements identified in ¶ 398 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31. |

| | | | |
|---|---|---|---|
| | | prepayments from certain Powered customers, a net collection in our receivables in Q1 2023 of more than $30 million, an increase in our payables and accrued liabilities of approximately $30 million that helped offset a $36 million increase in inventory.<br><br>****<br><br>As a result, we ended the quarter with $296 million in cash, cash equivalents and short-term investments, down only $2 million compared to $298 million at the end of 2022. To be clear, *our cash performance was driven by working capital management, not EBITDA, but still underscores the assets we have in our working capital and our capability in managing our cash*. | Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to sufficiently manage its capital expenses without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (ix) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) Proterra had already engaged two financial institutions to explore options of selling off or divesting Transit from Powered and Energy; (xi) as Proterra's financial condition worsened, rather than committing cash to improve existing operations, the Company took drastic measures to reduce its capital expenses – invoking hiring and travel freezes, denying employee raises and bonuses, laying off 20% of its workforce, demanding early payments on supply contracts, and ceasing payments on material contracts; (xii) these measures were insufficient to | • CW4 confirmed that Defendant Joyce, who Defendant Padilla reported to, was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce, who Defendant Padilla reported to, held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Padilla held herself out as knowledgeable about the Company and its different aspects of the business. ¶435-36.<br>• Defendant Padilla's signing of SOX certifications bolster scienter. ¶¶504-06, 511.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. |

76

| | | | stabilize Proterra's cash consumption as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiii) as a result, any improvement in the Company's cash consumption was temporary; (xiv) as a result, operational challenges and production inefficiencies plaguing both segments of Proterra's business continued to adversely impact its revenue growth and gross margins; (xv) as a result, Powered's growth trajectory and production efficiency did not support the Company's "strategic" investment of battery cells further straining its cost of production; (xvi) as a result, the Company was *not* "looking forward to the benefits" of consolidating of its Transit manufacturing in Greenville; (xvii) as a result, the Company was *not* managing its cash consumption "well" and its "capital management" efforts were unsustainable; and (xviii) as a result, the Company was moving closer towards insolvency. | ¶¶512-13. |
|---|---|---|---|---|
| 59 | When: May 9, 2023<br>Where: Q1 2023 Earnings Call<br>Speakers: Gareth T. Joyce (Compl. ¶400) | Yes, [ ] we have executed on the workforce restructuring program that we discussed on our last call. And I'm very pleased that the team was able to execute that on time. It's always a very difficult thing to do, and I don't say that without sensitivity. Nevertheless, we did see, as you mentioned, some offsets given continued investments in our R&D programs and also some pressure on professional fees.<br><br>*We will continue to work at offsetting those cost pressures as we continue to navigate the rest of this year. We are focusing on other kinds of levers that might be in place, tight cost controls on discretionary spend, for example. We continue to look forward to the benefits of consolidating our transit footprint in* | The statements identified in ¶ 400 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held |

*our Greenville production facility, which is going on as we speak.*

We have now completed production of buses in our City of Industry facility, also on time and on plan. And then we expect to complete our battery production there at the end of the third quarter and then consolidate those operations in Greer by the end of the year. So we continue to work at the levels that we have in play and recognize that it's a very important piece of the equation to control expenditure and help us expand the overall improvement in the P&L.

delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to sufficiently manage its capital expenses without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (ix) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) Proterra had already engaged two financial institutions to explore options of selling off or divesting Transit from Powered and Energy; (xi) as Proterra's financial condition worsened, rather than committing cash to improve existing operations, the Company took drastic measures to reduce its capital expenses – invoking hiring and travel freezes, denying employee raises and bonuses, laying off 20% of its workforce, demanding early payments on supply contracts, and ceasing payments on material contracts; (xii) these measures were insufficient to stabilize Proterra's cash consumption as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiii) as a result, any improvement in the Company's cash consumption was temporary; (xiv) as a result, operational challenges and production inefficiencies plaguing both segments of Proterra's business continued to adversely impact its revenue growth and gross margins; (xv) as a result, Powered's growth trajectory

a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.

- Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.
- Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.
- Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.
- Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

78

| | | | | |
|---|---|---|---|---|
| | | | and production efficiency did not support the Company's "strategic" investment of battery cells further straining its cost of production; (xvi) as a result, the Company was *not* "looking forward to the benefits" of consolidating of its Transit manufacturing in Greenville; (xvii) as a result, the Company was *not* managing its cash consumption "well" and its "capital management" efforts were unsustainable; and (xviii) as a result, the Company was moving closer towards insolvency. | |
| 60 | When: May 9, 2023<br>Where: Q1 2023 Earnings Call<br>Speakers: Gareth T. Joyce<br>(Compl. ¶402) | Yes, the first quarter cash management was a very good effort by the team. We did mention in our previous call that Q4 was a challenging quarter for us for a number of reasons that we laid out there. In Q1, obviously, *we continued to work hard at our cash management. We saw days sales outstanding improve by more than 30%. Our payables increased by more than 80%,* and our inventory increased. *So there were a number of factors that contributed to the cash management in Q1, and we're going to continue to focus on it.*<br><br>But I would just point out to answer your question more specifically that in high-growth environments like we're in, your cash consumption is a nonlinear item. We noted in our prepared remarks that we expect Q2 to be an increase in cash burn, again, *due to the investment in cell purchases that we're continuing to make ahead of the second half production ramp that we're expecting, given the ramp-up at [Greer]. But we consider that as strategic investment.* For us, cells are a critically important raw material to be able to access and have an inventory because that gives us the ability to meet the demand. And we've worked very hard to put ourselves in a position to have access | The statements identified in ¶ 402 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to sufficiently manage its capital expenses without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that |

| | | to such a critical raw material. So, that's a nonlinear product. | worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (ix) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) Proterra had already engaged two financial institutions to explore options of selling off or divesting Transit from Powered and Energy; (xi) as Proterra's financial condition worsened, rather than committing cash to improve existing operations, the Company took drastic measures to reduce its capital expenses – invoking hiring and travel freezes, denying employee raises and bonuses, laying off 20% of its workforce, demanding early payments on supply contracts, and ceasing payments on material contracts; (xii) these measures were insufficient to stabilize Proterra's cash consumption as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiii) as a result, any improvement in the Company's cash consumption was temporary; (xiv) as a result, operational challenges and production inefficiencies plaguing both segments of Proterra's business continued to adversely impact its revenue growth and gross margins; (xv) as a result, Powered's growth trajectory and production efficiency did not support the Company's "strategic" investment of battery cells further straining its cost of production; (xvi) as a result, the Company was *not* "looking forward to the benefits" of consolidating of its Transit manufacturing in Greenville; (xvii) as a result, the Company was *not* managing its cash consumption "well" and its "capital management" efforts were unsustainable; and (xviii) as a result, the Company was moving closer towards insolvency. | cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

80

| 61 | When: May 9, 2023<br>Where: Q1 2023 Earnings Call<br>Speakers: Gareth T. Joyce<br>(Compl. ¶404) | In line with our projections last quarter, we reported a gross loss in Q1. But we're encouraged by a few **key developments** to start the year that we believe are ***supportive of our gross margin improvement goals going forward. First is the expected impact of [Greer] now that it has moved from construction phase to production phase***. Q1 2023 gross margin was adversely impacted by low fixed cost absorption with [Greer] operating well below capacity, leading to inflated labor and overhead costs per pack until we achieve higher utilization rates.<br><br>Start of production at [Greer] began in early January. And in this initial phase of the ramp, we experienced some growing pains as may be expected with any new manufacturing facility. ***We've been making progress with each successive month.*** Battery pack output at the facility in March was more than double that in January. And in April, it was up another 15% from March. Module production at the facility is doing even better, with total megawatt-hours of modules produced in April more than double that in March.<br><br>***As output grows and we achieve higher operating efficiency, we not only expect higher revenue recognition but less margin pressure as well as the overarching benefits of non-cell cost reductions that we expect from [Greer]*** compared to our California facility where all of our batteries have historically been produced. We expect those to gradually benefit gross margins going forward. | The statements identified in ¶ 404 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iv) Transit relied on a unique, non-scalable highly customizable unibody bus design that strained the Company's supply chain, cost of production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (viii) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (ix) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, 510.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the |

| | | | | |
|---|---|---|---|---|
| | | | significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xi) Proterra had already engaged two financial institutions to explore options of selling off or divesting Transit from Powered and Energy; (xii) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, ceasing payments to material suppliers, and demanding early payment on supply contracts, were insufficient and unsustainable as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; and (xiv) as a result, the Company was moving closer towards insolvency. | misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |
| 62 | <u>When</u>: May 9, 2023<br><u>Where</u>: Q1 2023 Earnings Call<br><u>Speakers</u>: Karina Franco Padilla (Compl. ¶405) | We reported a gross loss in Q1 2023 of $6.6 million compared to a gross loss of $3 million in Q1 2022 and a gross loss of $20 million in Q4 2022. The sequential improvement from Q4 levels was enabled by approximately $13 million in Q4 2022 period charges related to supplier penalty, inventory and other true-ups, which were not repeated in Q1. In addition, while we had higher fixed cost absorption from early stages of the [Greer] ramp, we benefited from improved efficiency in labor and manufacturing overhead costs in Q1 compared to Q4.<br><br>For example, in Transit, direct labor hours per bus improved 10% versus Q4 and was essentially flat year-over-year, even as we were implementing the closure of the City of Industry facility during the quarter. *We* | The statements identified in ¶ 405 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iv) Transit relied on a unique, non-scalable highly customizable unibody bus design that strained the Company's supply chain, cost of | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce, who Defendant Padilla reported to, was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12. |

| | | *expect the consolidation of bus production in Greenville to continue to drive greater labor and overhead efficiencies while maintaining the equivalent volume of output.*<br><br>And as the [Greer] ramp is expected to continue to accelerate throughout the year, we expect further labor and overhead efficiencies at our Powered and Energy businesses as well. In addition, the start of production at [Greer] also weighed on our margins in Q1 of 2023. With capacity utilization at the facility below 10% in Q1, we incurred the additional burden of higher fixed cost absorption. *As [Greer] operating efficiency increases and production ramps, we expect [Greer]'s contribution to gross margin to improve.* | production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (viii) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (ix) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xi) Proterra had already engaged two financial institutions to explore options of selling off or divesting Transit from Powered and Energy; (xii) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, ceasing payments to material suppliers, and demanding early payment on supply contracts, were insufficient and unsustainable as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; and (xiv) as a result, the | • CW8 confirmed that Defendant Joyce, who Defendant Padilla reported to, held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Padilla held herself out as knowledgeable about the Company and its different aspects of the business. ¶¶435-36.<br>• Defendant Padilla's signing of SOX certifications bolster scienter. ¶¶504-06, 511.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

| | | | Company was moving closer towards insolvency. | |
|---|---|---|---|---|
| 63 | <u>When</u>: May 9, 2023<br><u>Where</u>: Q1 2023 Earnings Call<br><u>Speakers</u>: Gareth T. Joyce<br>(Compl. ¶406) | On gross margins, we continue to expect gross margins to remain negative through the first half of 2023 and are targeting positive gross margins in the second half of the year. Of course, a lot of the improvement depends upon the pace of [Greer]'s production ramp. ***We believe we have set ourselves up for improvement in gross margins in the future***, taking into account expected higher operating efficiency at [Greer] and the anticipated benefit of the planned closure of the City of Industry facility and consolidation of bus production in Greenville.<br><br>On OpEx, we continue to expect operating expenses to decline year-over-year in 2023, although now by less than our original projections for a $15 million year-over-year decline due to higher-than-expected R&D, legal and professional fees.<br><br>In cash, following our Q1 performance, our cash, cash equivalents and short-term investments are tracking better than we expected. ***We continue to expect capital expenditures of approximately $25 million for the full year 2023, and we also aim to continue to prudently manage our working capital.***<br><br>However, as we build our strategic inventory of cells and other battery components to feed our planned production growth at [Greer] this year, we expect cash usage in Q2 to be substantially higher than in Q1, but ***we plan to continue to manage our cash through the rest of this year and into 2024***. Meanwhile, demand continues to grow for our battery | The statements identified in ¶¶ 404 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (iv) Transit relied on a unique, non-scalable highly customizable unibody bus design that strained the Company's supply chain, cost of production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (vii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding its Powered business; (viii) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (ix) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendant Joyce held himself out as knowledgeable about the Company and its different aspects of the business. ¶¶437-38.<br>• Defendant Joyce's signing of SOX certifications bolster scienter. ¶¶504-06, |

electric technology offerings. First and foremost, electric school bus is really starting to pick up.

****

In closing, with our cash, cash equivalents and short-term investments of $296 million and available capacity on our ABL of $43 million as of March 31, 2023, we are in compliance with our debt covenants as of March 31, 2023, and we are exploring potential options to raise new capital. *We believe we have put the pieces in place that provide a path to a higher gross margin profile in the future*, helping support our efforts to secure a central role as a battery and electrification technology provider to the North American and European commercial vehicle sector just as it begins to blossom.

condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xi) Proterra had already engaged two financial institutions to explore options of selling off or divesting Transit from Powered and Energy; (xii) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, ceasing payments to material suppliers, and demanding early payment on supply contracts, were insufficient and unsustainable as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; and (xiv) as a result, the Company was moving closer towards insolvency.

510.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

| 64 | When: May 10, 2023<br>Where: Q1 2023<br>Speakers: Proterra<br>(Compl. ¶408) | *We intend to continue investing in initiatives to improve our operating leverage and significantly ramp production.* We believe continued reduction in costs and an increase in production volumes will enable commercial vehicle manufacturers to electrify faster. *Purchased materials represent the largest component of cost of goods sold in all products and we continue to explore ways to reduce these costs through improved design for cost, strategic sourcing, long-term contracts, and in some cases vertical integration.* We are consolidating battery and bus manufacturing to our facilities in Greer and Greenville South Carolina. We | The statements identified in ¶ 408 are false and misleading because they failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties, including that: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins— was essential to its financial success; (iv) | - Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>- CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>- CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual |

| | | | |
|---|---|---|---|
| | | completed construction of our first multi-gigawatt capacity battery production facility in Greer, which began production in January 2023. We expect the consolidation of bus production in Greenville to continue to drive greater labor and overhead efficiencies while maintaining the equivalent volume of output. We believe that an increase in volume and additional experience will allow us to leverage those investments and reduce our labor and overhead costs, as well as our freight costs, as a percentage of total revenue. We expect our product cost of goods sold to increase in absolute dollars in future periods as the volume of products we sell increases. *As we grow into our current capacity, execute on cost-reduction initiatives, and improve production efficiency, we expect our product cost of goods sold as a percentage of revenue to decrease in the longer term.* We anticipate that by increasing facility utilization rates and improving overall economies of scale, we can positively impact gross margins of our products, bring value to our customers and help accelerate commercial electric vehicle adoption. Our ability to achieve cost-saving and production-efficiency objectives can be negatively impacted by a variety of factors including, among other things, labor cost inflation, lower-than-expected facility utilization rates, rising real estate costs, manufacturing and production cost overruns, increased purchased material costs, and unexpected supply-chain quality issues or interruptions, and delays in our ability to hire, train, and retain employees needed to scale production to meet demand. | Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vi) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (vii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (viii) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (ix) Powered was experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (x) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xi) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, ceasing payments to material suppliers, and demanding early payment on supply contracts, were insufficient and unsustainable as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xii) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xiii) as a result, the Company's | cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.<br>• Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.<br>• Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.<br>• Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.<br>• Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.<br>• Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.<br>• Suspicious executive departures bolster scienter. ¶¶449-84.<br>• Defendants' insider sales bolster scienter. ¶¶485-503.<br>• That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13. |

<table>
<tr><td colspan="5">

investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xiv) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xv) as a result, the Company's "strategic" decision to prioritize the unsubstantiated growth of Powered over its existing operations negatively impacted its ability to achieve cost-saving and production-efficiency objectives; and (xvi) as a result, the Company was moving closer towards insolvency.

</td></tr>
</table>

| | | | | |
|---|---|---|---|---|
| 65 | <u>When</u>: May 10, 2023 <br> <u>Where</u>: Q1 2023 <br> <u>Speakers</u>: Proterra <br> (Compl. ¶411) | ***We have a history of net losses, have experienced rapid growth and anticipate increasing our operating expenses in the future, and may not achieve or sustain positive gross margin or profitability in the future.*** <br><br> We have a history of net losses, have experienced rapid growth and anticipate increasing our operating expenses in the future, and may not achieve or sustain positive gross margin or profitability in the future. We incurred net losses of $244.0 million in the three months ended March 31, 2023, $238.0 million, $250.0 million, and $127.0 million in 2022, 2021, and 2020, respectively, and we expect to incur net losses for the foreseeable future. As of March 31, 2023, we had an accumulated deficit of $1.3 billion***. We expect to make significant expenditures related to the development and expansion of our business***, including: making new capital investments and continuing investments in our electric powertrain, including advancements in our battery technology and high voltage systems; hiring and retaining qualified employees; adding | The statements identified in ¶411 are false and misleading because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, or materialized risks that existed at the time of the Q1 2023 10-Q, including: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit relied on a unique, non-scalable highly customizable unibody bus design that strained the Company's supply chain, cost of production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (vi) Transit's revenue growth was | <ul><li>Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.</li><li>CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.</li><li>CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.</li><li>CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.</li><li>Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place</li></ul> |

additional production lines or production shifts in our manufacturing facilities; building new manufacturing facilities; expanding our software offerings; expanding our business into new markets and geographies; research and development in new product and service categories; and in connection with legal, accounting, and other administrative expenses related to operating as a public company.

We have also experienced rapid growth in recent periods. For example, our number of employees has increased significantly over the last few years, from 492 full-time employees as of December 31, 2018 to 1,057 full-time employees as of March 31, 2023 (reflecting the workforce reduction implemented in the first quarter of 2023). On January 13, 2023, we approved a plan designed to improve operational efficiency, including reducing our workforce by approximately 25% and closing our City of Industry facility. We will move manufacturing from our City of Industry facility to our existing facilities in South Carolina. In transitioning manufacturing facilities, we may experience delays and disruptions in our manufacturing and production activities. We also expect to continue to hire new employees, particularly for our manufacturing facilities in South Carolina. Managing our growth has and will place significant demands on our management as well as on our administrative, operational, legal and financial resources. To manage our growth effectively, we must continue to improve and expand our infrastructure, including our information technology, financial, legal, compliance and administrative systems and controls. We must also continue to effectively and efficiently manage our employees,

further strained by Proterra's revenue smoothing tactics; (vii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (viii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (ix) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (x) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (xi) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (xii) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xiii) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, ceasing payments to material suppliers, and demanding early payment on supply contracts, were insufficient and unsustainable as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiv) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xv) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's

in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.

- Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.
- Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.
- Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

operations, finances, research and development, and capital investments.

*All of these efforts may prove more expensive than we currently anticipate, and we may not succeed in increasing our revenue sufficiently, or at all, to offset these higher expenses.* While our revenue has grown in recent periods, our operating expenses have also increased significantly. *If our revenue declines or fails to grow at a rate faster than increases in our operating expenses, or we are unable to increase gross margin, whether through reducing the cost of production or increasing sales, we would not be able to achieve and maintain profitability in future periods.* As a result, we may continue to generate losses. We cannot ensure that we will achieve profitability in the future or that, if we do become profitable, that we will be able to sustain profitability.

growth prospects; (xvi) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xvii) as a result, the risk of Proterra's growth strategies and operating expenses harming its ability to achieve positive gross margin or profitability had already materialized; (xviii) as a result, the risk of Proterra's inability to effectively implement cost-reduction efforts or reduce costs sufficiently in response to its declining revenue, harming its business, prospects, financial condition, and operating results had already materialized; and (xix) as a result, the risk of Proterra's inability to realize its production plans and deliver battery systems and buses on time, adversely affecting its reputation, business, prospects, financial condition, and operating results had already materialized.

| 66 | When: May 10, 2023<br>Where: Q1 2023<br>Speakers: Proterra<br>(Compl. ¶412) | *Our recent workforce reduction and planned closure of our City of Industry facility may not be as successful as anticipated and may not improve overall efficiency.*<br><br>On January 20, 2023, we implemented a reduction-in-force and announced the planned closure of our City of Industry facility by December 31, 2023. While we believe this will improve operational efficiency and expect to realize cost reductions, we may not be able to realize the full benefits within the anticipated time frame, or at all. We may also incur other charges, costs, future cash expenditures or impairments not currently contemplated due to events that may occur as a result of, or in connection with the reduction in workforce and facility closure. Further, we | The statements identified in ¶ 412 are false and misleading because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, or materialized risks that existed at the time of the Q1 2023 10-Q, including: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to maintain and grow its transit customer base— on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.<br>• CW8 confirmed that Defendant Joyce held |

may experience unintended consequences and costs, such as the loss of institutional knowledge and expertise, attrition beyond our intended reduction-in-force, a reduction in morale among our remaining employees, and the risk that we may not achieve the anticipated benefits, all of which may have an adverse effect on our results of operations or financial condition.

*While we have implemented, and intend to continue to implement, cost-reduction strategies in order to meet our goals, if we do not achieve expected savings or if operating costs increase as a result of investments in strategic initiatives, our total operating costs would be greater than anticipated.* We may also incur substantial costs or cost overruns in utilizing and increasing our production capability, particularly if we build new battery production lines, and if we vertically integrate subsystem production into our manufacturing facilities. In addition, if we do not manage cost-reduction efforts properly, such efforts may affect the quality of our products and our ability to generate future revenue. Moreover, significant portions of our operating expenses are fixed costs that will neither increase nor decrease proportionately with revenue. In addition, we incur significant costs related to procuring the materials required to manufacture our battery systems, electrification and charging solutions, fleet and energy management systems and electric transit buses, as well as assembling electric transit buses and systems, and compensating our personnel. *If we are not able to implement further cost-reduction efforts or reduce our fixed costs sufficiently in response to a decline in revenue, our business, prospects,*

inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit relied on a unique, non-scalable highly customizable unibody bus design that strained the Company's supply chain, cost of production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (vi) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (viii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (ix) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (x) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (xi) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (xii) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xiii) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, ceasing payments to material suppliers, and demanding early payment on supply contracts, were insufficient and unsustainable as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiv) as a result, the

a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.

- Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.
- Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.
- Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.
- Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

90

|  |  |  | unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xv) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xvi) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xvii) as a result, the risk of Proterra's growth strategies and operating expenses harming its ability to achieve positive gross margin or profitability had already materialized; (xviii) as a result, the risk of Proterra's inability to effectively implement cost-reduction efforts or reduce costs sufficiently in response to its declining revenue, harming its business, prospects, financial condition, and operating results had already materialized; and (xix) as a result, the risk of Proterra's inability to realize its production plans and deliver battery systems and buses on time, adversely affecting its reputation, business, prospects, financial condition, and operating results had already materialized. |  |
| 67 | When: May 10, 2023<br>Where: Q1 2023<br>Speakers: Proterra<br>(Compl. ¶413) | ***If we are unable to scale production and deliver battery systems and buses on time, our business could be adversely affected.***<br><br>Our business plan calls for significant increases in both vehicle and battery system production in a short amount of time to meet expected delivery dates to customers. ***Our ability to achieve our production plans will depend upon many factors, including*** adding additional battery lines, auxiliary vehicle production lines and production shifts, recruiting and training new staff while maintaining our desired quality levels, and ***improving our*** | The statements identified in ¶ 413 are false and misleading because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, or materialized risks that existed at the time of the Q1 2023 10-Q, including: (i) Proterra's Powered business did not then have the performance or growth trajectory to support the Company's significant capital investments; (ii) Proterra's "strategic" division of the Company's business segments concealed the true nature of its operations and wrongly attributed the profitability and financial growth of Energy to Powered; (iii) given the outsized contribution of revenue generated by Transit, the Company's ability to | • Confidential Witnesses confirmed that problems within the Company, including those at Powered and Greer's production inefficiencies, as well as the Company spending too much money, were not only well known throughout the Company, but also discussed internally at executive meetings. ¶¶146-72, 338-56, 423-31.<br>• CW4 confirmed that Defendant Joyce was personally involved in revenue smoothing, which strained the Company's finances even further. ¶260.<br>• CW3 confirmed that in August 2022, Defendants Joyce and Padilla pressured to |

*vehicle configuration process*, supply chain management, and our suppliers' ability to support our needs. Moreover, because many of our orders are with respect to products that will be delivered more than a year after the order placed, whether we are the battery system supplier or, in the case of electric transit buses, the vehicle OEM, there can be no assurance that we will be able to accurately forecast our supply chain demands or scale our manufacturing accordingly to meet the delivery deadlines for these orders. In addition, we have adopted, and may adopt in the future, new factory and supply chain management technologies and manufacturing and quality control processes, which we must successfully introduce and scale for production across our factories. We have introduced new battery system configurations for our customers and we are new to modifying our production processes to complete different configurations. Moreover, our electric transit buses are customized for our customers and certain battery systems require custom integration with our customer electric transit buses, which means that each new electric transit bus order brings its own set of challenges to vehicle configuration and supply chain. For example, each new electric transit bus configuration may introduce a multitude of parts that we have not used in previous electric transit bus builds, which in turn requires obtaining parts from new suppliers that engineering must validate and incorporate into our vehicle configuration. In the past, we have experienced changes in work instructions for electric transit buses that have not been timely communicated between factories, resulting in recalls of delivered product. We have limited experience developing, manufacturing, selling, servicing, and

maintain and grow its transit customer base—on profitable margins—was essential to its financial success; (iv) Transit was a capital-intensive business, suffering from burdensome contracts impacted by production inefficiencies, manufacturing delays, supply chain constraints, and inflationary pressures; (v) Transit relied on a unique, non-scalable highly customizable unibody bus design that strained the Company's supply chain, cost of production, and production efficiency resulting in contractual penalties and delayed revenue recognition; (vi) Transit's revenue growth was further strained by Proterra's revenue smoothing tactics; (vii) the Company was not then positioned to meet its growth plans without a turnaround in Transit, from which it was secretly diverting resources; (viii) rather than committing cash to stabilize its existing operations, Proterra made the "strategic" decision to starve Transit of resources in order to fund its Powered business; (ix) as the Company's financial condition worsened, cost-saving projects designed to improve Transit's product design and productivity were terminated or never implemented to continue funding Powered; (x) Powered relied on a non-scalable battery system design that strained manufacturing efficiency and productivity; (xi) Powered was also experiencing significant operational challenges and manufacturing inefficiencies at its Greer facility resulting in operations at less than capacity and restricting revenue growth; (xii) as Proterra's financial condition worsened, Defendants Joyce and Padilla made the "strategic" decision to manipulate the cost of goods sold under a significant Powered supply contract in order to obtain board approval for additional growth expenditures, adversely impacting its gross margins; (xiii) measures taken to reduce capital expenditures, including the closure of its City of Industry facility, ceasing payments to material suppliers, and demanding early payment on supply contracts, were insufficient

change the pricing model of Powered's batteries, despite knowing that the actual cost of goods would result in Proterra bleeding cash. ¶¶306-12.

- CW8 confirmed that Defendant Joyce held a town hall announcing that Proterra was cutting projects, that Proterra did not have the money to pay vendors, and the necessity for belt tightening or else the Company would run out of money. ¶390.
- Confidential Witnesses confirmed that cost saving measures, like invoking travel and hiring freezes, as well as layoffs, took place in late 2022 and early 2023, and such actions necessitated the sign off of Proterra executives. ¶¶332-34, 426.
- Confidential Witnesses confirmed that cost-saving projects existed but were eliminated by Proterra, and that actions like that would have required the sign-off of Proterra executives. ¶¶276-91, 426.
- Defendants held themselves out as knowledgeable about the Company and its different aspects of the business. ¶¶432-38.
- Defendants' signing of SOX certifications bolster scienter. ¶¶504-11.
- Proterra's bankruptcy filing confirmed that Proterra's issues existed at the time of the misleading statement. ¶¶439-448.
- Suspicious executive departures bolster scienter. ¶¶449-84.
- Defendants' insider sales bolster scienter. ¶¶485-503.
- That the misrepresentations concerned Proterra's core operations bolsters scienter. ¶¶512-13.

allocating our available resources among multiple products and multiple factories simultaneously. *If we fail to effectively manage the complexity of our production process, our business, prospects, financial condition, and operating results could be adversely affected.*

*Our inability to deliver electric transit buses that meet customer specifications in a timely manner could significantly delay recognition of revenue and receipt of payment,* because we do not recognize revenue and are not paid for electric transit buses until they are delivered to the customer. Moreover, some of our contracts with transit agencies include liquidated damages clauses that apply monetary penalties on a per vehicle per day basis if electric transit buses are not delivered to the customer by the date specified in the contract. Per day penalties can be significant depending on the contract. We have delivered battery systems, charging systems and electric transit buses late in the past, and have incurred substantial penalties with respect to certain of these late deliveries, which have reduced our revenue and margin. Although we actively manage our production schedule and our customers' expectations, we may still fail to meet delivery deadlines and may incur penalties as a result. *If we are unable to realize our production plans and deliver our battery systems and buses on time, our reputation, business, prospects, financial condition, and operating results could be adversely affected*.

and unsustainable as some resulted in higher costs to the Company and others were adversely impacting Proterra's access to material supplies, further straining its revenue growth and gross margins; (xiv) as a result, the unmitigated operational challenges and production inefficiencies plaguing both segments of Proterra's business would continue to adversely impact its revenue growth and gross margins; (xv) as a result, the Company's investment in battery cell inventory, pursuant to the LG Agreement, would *not* resolve the most prominent supply chain risks to the Company's growth prospects; (xvi) as a result, the construction of the Greer facility, would *not* improve the most prominent production efficiency risks to the Company's gross margins; (xvii) as a result, the risk of Proterra's growth strategies and operating expenses harming its ability to achieve positive gross margin or profitability had already materialized; (xviii) as a result, the risk of Proterra's inability to effectively implement cost-reduction efforts or reduce costs sufficiently in response to its declining revenue, harming its business, prospects, financial condition, and operating results had already materialized; and (xix) as a result, the risk of Proterra's inability to realize its production plans and deliver battery systems and buses on time, adversely affecting its reputation, business, prospects, financial condition, and operating results had already materialized.

93