Adam M. Apton (SBN 316506)
LEVI & KORSINSKY, LLP
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
aapton@zlk.com

*Lead Counsel Plaintiffs and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| JEREMY VILLANUEVA, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> GARETH T. JOYCE, KARINA FRANCO PADILLA, JOHN J. ALLEN, AMY E. ARD, JOHN F. ERHARD, BROOK F. PORTER, JOAN ROBINSON-BERRY, JEANNINE P. SARGENT, CONSTANCE E. SKIDMORE, MICHAEL D. SMITH, DANIEL R. REVERS, MARCO F. GATTI, ARNO HARRIS, JA-CHIN AUDREY LEE, BRIAN GONCHER, and STEVEN BERKENFELD, <br><br> Defendants. | No. 5:23-cv-03519-EKL <br><br> **DECLARATION OF ADAM M. APTON IN SUPPORT OF: (1) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (2) CLASS COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES** <br><br> Date: August 20, 2025 <br> Time: 10:00 a.m. <br> Courtroom 7 <br> Judge: Hon. Eumi K. Lee |

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF
SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

I, Adam M. Apton, hereby declare as follows:

1.    I am licensed to practice law in this Court. I am a partner at Levi & Korsinsky, LLP, Lead Counsel for Court-appointed Lead Plaintiff Cyress Jam and additional Plaintiffs Jeremy Villanueva, Tanya Tirado, Luong Du, William E. Zinn, and Raymond H. Quick (collectively, "Plaintiffs") in the Action.[1] I submit this declaration in support of: (i) final approval of the Settlement that Plaintiffs reached on behalf of themselves and the Class (defined below) with Defendants Gareth T. Joyce, Karina Franco Padilla, John J. Allen, Amy E. Ard, John F. Erhard, Brook F. Porter, Joan Robinson-Berry, Jeannine P. Sargent, Constance E. Skidmore, Michael D. Smith, Daniel R. Revers, Marco F. Gatti, Arno Harris, Ja-Chin Audrey Lee, Brian Goncher, and Steven Berkenfeld (collectively, "Defendants"); (ii) approval of the Plan of Allocation; and (iii) approval of an award of attorneys' fees and litigation expenses ("Fee and Expense Application"). Unless otherwise indicated, I have personal knowledge of the matters set forth herein based both on my extensive participation in the prosecution and settlement of the claims asserted in the Action and my supervision of those working at my direction, and if called upon to testify as a witness thereto, I could and would competently do so under oath.

2.    The Settlement will resolve all claims asserted in the Action against all Defendants on behalf of the Class which consists of: (1) all persons or entities who purchased or otherwise acquired public shares in Proterra, Inc. ("Proterra") (including by exchange of publicly-listed ArcLight Clean Transition Corp. shares) pursuant and/or traceable to the proxy/registration statement filed with the SEC on Form S-4 on February 2, 2021, and thereafter amended on Form S-4/A and filed on April 7, 2021, and May 7, 2021, and the body of which was incorporated into the final prospectus on Form 424(b)(3) filed on May 14, 2021, as amended; and (2) all persons who purchased or otherwise acquired Proterra common stock between August 11, 2021 and August 7, 2023, inclusive. Excluded from the Class are: (a) Defendants and their immediate families; (b) current and former directors or officers of Proterra or ArcLight Clean Transition Corp. and their

---

[1] All capitalized terms not defined herein shall have the same meaning set forth in the Stipulation of Settlement dated January 7, 2025 (ECF No. 113) (the "Stipulation").

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

immediate families; (c) any entity that has entered into a stockholder agreement or co-venture agreement with Proterra, or was a Private Investment in Public Equities ("PIPE") investor in Proterra; and (d) and each of the foregoing persons' legal representatives, heirs, successors or assigns, and any entity controlled, majority-owned or wholly owned, or affiliated with any of the above all persons who purchased or otherwise acquired Proterra common stock during the 10(b) Class Period. Also excluded from the Class are any persons or entities who exclude themselves by submitting a request for exclusion in connection with the Notice that is accepted by the Court.

## I.    THE SIGNIFICANT RECOVERY ACHIEVED FOR THE CLASS

3.    As detailed below, through intensive efforts and after lengthy settlement negotiations, Lead Counsel and additional counsel for Plaintiffs, Pomerantz LLP (collectively, "Class Counsel"), achieved a $29,000,000.00 all-cash settlement on behalf of the Class. As set forth in the Stipulation, in exchange for this payment, the Settlement resolves all claims asserted in this Action by Plaintiffs and the Class against Defendants.

4.    The Settlement is the product of extended arm's length negotiations between experienced and well-informed counsel, including a full-day mediation session and several subsequent negotiations before an experienced mediator, David M. Murphy, Esq., which ultimately resulted in a "mediator's proposal," accepted by the parties. Plaintiffs agreed to the Settlement only after they gained a thorough understanding and appreciation of the strengths and weaknesses of the Action by, among other things, (i) conducting an extensive investigation; (ii) reviewing and analyzing thousands of pages of documents from the record in Proterra's bankruptcy; (iii) incorporating facts from those documents and other facts into detailed amended complaints; (iv) opposing Defendants' motions to dismiss; (v) preparing a detailed mediation statement; and (vi) participating in a mediation session with Mr. Murphy, followed by months of settlement discussions.

5.    The $29 million Settlement represents a recovery of approximately 19.3% of the estimated aggregate likely recoverable damages (*i.e.*, approximately $150 million), as calculated by Plaintiffs' damages expert. As set forth in the accompanying Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of

2

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

Allocation (the "Final Approval Memorandum"), at 16-17), this is well within the range of reasonableness under the circumstances and warrants final approval of the Settlement.

6. Plaintiffs and Class Counsel obtained this substantial recovery despite the significant risks Plaintiffs faced in prosecuting the Action. As discussed below, Defendants strenuously maintained, and continue to maintain, that no liability or damages in this Action could be proven at trial. When viewed in the context of these risks and uncertainties, the Settlement is an exceptional result for the Class.

## II. RELEVANT FACTUAL AND PROCEDURAL HISTORY AND NEGOTIATION OF THE SETTLEMENT

7. Levi & Korsinsky is nationally recognized for its expertise in securities litigation. The firm actively follows corporate disclosures and initiates investigations under circumstances that, in their attorneys' opinions, suggest potential wrongdoing or violations of the federal securities laws. That is precisely what happened here. On March 15, 2023, Proterra disclosed that it was in violation of a liquidity clause in its secured convertible notes and its upcoming quarterly report would most likely contain a "going concern" qualification. Although analysts at the time discounted Proterra's warnings, they were mistaken in light of the fact that on August 7, 2023, Proterra announced it had filed for bankruptcy.

8. The stream of negative news from Proterra contradicted positive statements made by its executives at or around the same time. Consequently, Levi & Korsinsky commenced an investigation into potential violations of the federal securities laws. This investigation was preliminary in nature and spanned several weeks but still included a thorough review of Proterra's public statements, filings with the U.S. Securities and Exchange Commission, and analyst reports relating to the company's financing and operations. The investigation also included analysis of Proterra's stock price at various points during relevant times both before and after public statements concerning its financial instability.

9. On July 14, 2023, Plaintiff Jeremy Villaneuva and his attorneys at Levi & Korsinsky filed the initial lawsuit in the above-captioned matter against Proterra. ECF No. 1. The Complaint

3

asserted violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5 occurring between August 2, 2022 and March 15, 2023, inclusive. As such, the lawsuit was subject to the provisions of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), including the procedures regarding the appointment of a lead plaintiff and the various pleading requirements andstandards.

10.    On September 1, 2023, Plaintiff Tanya Tirado filed a subsequent class-action complaint with her attorneys at Pomerantz LLP. Ms. Tirado's complaint concerned the same subject matter and allegations, but asserted violations under the federal securities laws ranging from August 11, 2021 to August 7, 2023, inclusive, to include Proterra's then-recent bankruptcy announcement.

11.    On September 12, 2023, in accordance with the PSLRA, Levi & Korsinsky and Pomerantz filed timely motions for lead plaintiff on behalf of their respective proposed lead plaintiff clients, Cyress Jam and Luong Do. ECF. Nos. 21, 36.

12.    On October 23, 2024, following reassignment and consolidation of the two related actions, the Court appointed Mr. Jam as the Lead Plaintiff. ECF No. 57.

13.    Mr. Jam's attorneys at Levi & Korsinsky along with the aid of Mr. Do's attorneys at Pomerantz continued their investigations following the appointment of lead plaintiff. The purpose of this further investigation was to obtain additional factual support for the alleged securities fraud violations that would then be used to amend the initial complaint. Given the pleading standards for securities fraud violations, additional factual support for the allegations was critical in order to defeat a motion to dismiss.

14.    Levi & Korsinsky and Pomerantz spent the next three months researching the alleged claims. As explained below, this entailed further review of Proterra's public statements, relevant analyst reports, and bankruptcy filings. It also included consultations with expert on issues pertaining to market efficiency, loss causation, and damages as well as extensive interviews with nearly two dozen former Proterra employees with information relevant to the allegations.

15.    While their investigation was unfolding, Levi & Korsinsky and Pomerantz also engaged bankruptcy counsel to represent the interests of the Class in Proterra's bankruptcy proceedings. This entailed reviewing and objecting to Proterra's proposed third-party releases that,

4

if allowed, would have effectively precluded any recovery for the Class. These efforts proved successful and, on January 23, 2024, Plaintiffs successfully secured a ruling from the U.S. Bankruptcy Court for the District of Delaware requiring Proterra to modify its third-party releases by changing them from "opt-out" to "opt-in," meaning that Class members would no longer automatically be bound by Proterra's confirmation plan and consequently would not inadvertently lose their claims against the company and its former officers and directors.

16.     This ruling in the bankruptcy proceedings was vital in terms of the viability of the Action. Had Plaintiffs not secured the ruling, Class members (as equity holders in Proterra) would have automatically been subject to and bound by third-party releases that would have extinguished their claims unless they affirmatively opted out using an intentionally cumbersome process proposed by Proterra's bankruptcy counsel. The vast majority of the Class here would not have received notice of the confirmation plan let alone the third-party releases contained therein. Thus, had the confirmation plan been approved as initially proposed, Class members would have inadvertently released their claims and rights to pursue Defendants for their losses thereby eviscerating the Class. By securing the ruling they ultimately obtained, Plaintiffs forced Proterra to automatically exclude equity holders from the third-party releases, thereby eliminating the prejudice that would have ensued and protecting their rights to proceed in this Action.

17.     On January 30, 2024, Plaintiffs filed their Amended Complaint for Violations of the Federal Securities Laws (the "Amended Complaint"). ECF No. 73. The Amended Complaint asserted the same Exchange Act and Rule 10b-5 violations that were asserted in the Complaint but included a significant amount of additional factual support. This additional factual support was the result of an intensive investigation that had spanned the course of several months. It included the review and analysis of:

    a.   public statements made by or on behalf of Proterra prior to, during and after the Class Period, *i.e.*, a period spanning from mid-2021 to late-2023;

    b.   Proterra's quarterly reports, annual reports and press release filings with the SEC, which comprised thousands of pages of corporate financial and operational

5

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

information;

c.  investment bank analyst reports providing discussions about Proterra's operations and liquidity;

d.  interviews with former Proterra employees spanning various levels of seniority throughout the company; and

e.  various public communications by and between investors and Proterra including but not limited to those made within the context of the company's bankruptcy proceedings.

18.  Plaintiffs' Amended Complaint also asserted claims under the Securities Act of 1933 and included additional defendants who were affiliated with the special purpose acquisition company that facilitated Proterra's initial public offering.

19.  The material obtained by Levi & Korsinsky and Pomerantz in the course of their investigation was expansive. It required many hours to digest, evaluate, and incorporate into the Amended Complaint. The product was a comprehensive complaint that provided a complete factual analysisof all public information available at the time that supported claims of securities fraud. For thebenefit of context, Levi & Korsinsky and Pomerantz's investigation yielded an Amended Complaint that was nearly 200 pages long, almost ten times longer than the Complaint initially filed.

20.  In pertinent part, the Amended Complaint alleged that Proterra's former officers and directors misrepresented the operational and financial health of its core "Transit" segment while at the same time concealing management's plans to prioritize the "Powered" and "Energy" segments instead. Plaintiffs relied on sixteen confidential witnesses (*i.e.*, former employees) to support their allegations and included firsthand accounts of named defendants receiving reports of material adverse nonpublic information that contradicted the public statements they were making at that time.

21.  Following the filing of the Amended Complaint, Plaintiffs and Defendants met and conferred concerning a response, *i.e.*, a motion to dismiss. Through these conversations Plaintiffs decided to amend the pleadings once again to add an additional named plaintiff. This additional named plaintiff allowed Plaintiffs to avoid certain arguments Defendants intended to raise in their

6

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

motion to dismiss, primarily relating to standing to assert the Securities Act claims. On March 1, 2024, Plaintiffs filed the Second Amended Complaint for Violations of the Federal Securities Laws (the "Second Amended Complaint"). ECF No. 83.

22.     On April 5, 2024, Defendants moved to dismiss the Second Amended Complaint. ECF Nos. 93, 94. Defendants' motions consisted of extensive legal arguments and factual support and required similarly complex and lengthy responses. In total, the briefing on the motions to dismiss exceeded well over 500 pages.

23.     On July 17, 2024, with Defendants' motions fully briefed and scheduled for oral argument on July 30, 2024, the Parties submitted a stipulation requesting that the hearing be vacated and the motions held in abeyance pending an attempt at private mediation.

24.     The Parties selected Mr. David Murphy, Esq., as their mediator. Mr. Murphy is a well-respected mediator with substantial experience in the field of securities litigation. Plaintiffs' counsel and defense counsel alike routinely use his services to mediate difficult cases. Mr. Murphy requires detailed briefing in advance of any mediation and this case was no exception.

25.     The Parties scheduled a full day session with Mr. Murphy for September 26, 2024. In advance of the mediation, the Parties submitted detailed briefing in support of their respective positions. Although the mediation session did not result in a settlement on September 26, 2024, Mr. Murphy continued negotiations over the following days and weeks.

26.     On October 31, 2024, following further extensive settlement negotiations, Mr. Murphy issued a "mediator's recommendation" on a double-blind basis to settle the matter for $29,000,000. On November 4, 2024, Mr. Murphy confirmed that all Parties agreed to his recommendation.

27.     On November 15, 2024, Plaintiffs and Defendants signed a confidential Settlement Term Sheet specifying the key terms of the proposed settlement. Shortly afterwards, on November 19, 2024, Plaintiffs notified the Court that the parties had reached a tentative settlement and advised that they would be able to file a motion for preliminary approval no later than December 30, 2024. ECF No. 110. The Parties' ability to meet that deadline was slightly delayed due to the holidays and,

7

on December 30, 2024, Plaintiffs asked for an additional week to file the necessary settlement paperwork. ECF No. 112.

28. On January 7, 2025, Plaintiffs filed their Notice of Unopposed Motion and Motion for Preliminary Approval of Proposed Settlement and Memorandum of Points and Authorities in Support Thereof, together with the Stipulation, the proposed Plan of Allocation, the Postcard Notice, the Notice of Pendency and Proposed Settlement of Class Action (the "Notice"), the Proof of Claim and Release Form (the "Proof of Claim" and, collectively, the Notice and Proof of Claim are referred to as the "Notice Package"), the Summary Notice, and a request that the Court preliminarily certify the Class. ECF No. 114.

29. On March 18, 2025, the Court entered an order regarding the proposed settlement vacating the April 2, 2025 preliminary approval hearing and instructing the parties to file a joint supplemental response by March 28, 2025. ECF No. 118.

30. On March 28, 2025, Plaintiffs, together with the consent of the Defendants, filed a Joint Response to the Court's Order Regarding Proposed Settlement together with a revised version of the Postcard Notice and the Notice. ECF No. 119.

31. On April 3, 2025, the Court entered an order preliminarily approving the Settlement, approving the form and manner of notice to the Class, and provisionally certifying the Class for settlement purposes (the "Preliminary Approval Order"). ECF No. 120.

32. Pursuant to the Preliminary Approval Order, a Settlement Hearing is scheduled for August 20, 2025. *Id.*

III.   **PLAINTIFFS' DAMAGES CONSULTANT**

33. As part of their comprehensive investigation of the relevant facts and legal issues, Class Counsel retained the services of an expert consultant from a reputable financial economics firm. The consultant assisted with analyzing the losses associated with declines in the prices of Proterra securities as a result of the alleged partial disclosures and statutory damages under Section 11 of the Securities Act. The consultant further assisted with preparing for negotiations of the Settlement and developing the Plan of Allocation.

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

## IV.    RISKS FACED BY PLAINTIFFS IN THE LITIGATION

34.    Class Counsel are confident that Plaintiffs would be able to prove their securities claims, based on their investigation of the relevant facts and legal issues, their review of the documentary evidence produced by Defendants to date, and their expectation that additional discovery would provide further support. Class Counsel also realize, however, that Plaintiffs would face considerable risks and defenses in continuing to litigate their claims.

35.    Specifically, Plaintiffs would face substantial risks and uncertainties in proving, *inter alia*, that: (i) Defendants' alleged misstatements and omissions were materially false and misleading; (ii) Defendants' alleged misstatements and omissions during the 10(b) Class Period were made with scienter; and (iii) Defendants' alleged misconduct caused the alleged damages suffered by the Class, as required by the federal securities laws. Plaintiffs and Class Counsel carefully considered these risks and uncertainties during the months leading up to the Settlement and throughout the Settlement discussions with Defendants and Mr. Murphy.

36.    But for this Settlement, there existed the distinct possibility that the Court would rule against Plaintiffs on Defendants' fully briefed motions to dismiss. Notably, according to NERA Economic Consulting, from 2014 through 2023, 60% of motions to dismiss filed in securities cases were granted in full (some without prejudice) while 20% were granted in part and only 20% were denied in full. *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review*, at 15-16, Figure 14 (NERA Economic Consulting Jan. 23, 2024), attached hereto as Exhibit B. And, even if Plaintiffs survived the motions to dismiss that were pending at the time the parties agreed to settle, there is a distinct possibility that Defendants would ultimately prevail on summary judgment or at trial.

37.    To prove fraud instead of mismanagement, Plaintiffs would have needed to effectively disprove the legitimacy of certain strategies and management actions. This would have been extremely difficult and expensive to do because it would have necessitated second-guessing management's actions with the benefit of hindsight and the support of industry experts. Defendants could have easily rebutted these arguments by explaining the deadlines they faced and testifying

9

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

that they always intended to produce positive results for their customers, creditors, and shareholders. Moreover, whether characterized as fraud or mismanagement, Plaintiffs recognized that it would be difficult to prove that each of the conditions revealed towards the end of the Class Period existed at the time that Defendants issued the Proxy/Registration Statement that formed the basis of Section 11 claims two years earlier. Indeed, Defendants have maintained that Plaintiffs cannot demonstrate that any of the alleged misstatements or omissions were materially false or misleading when made. They further argued that other alleged misstatements should be dismissed because they were puffery, opinions, or forward-looking statements accompanied by meaningful cautionary language. Plaintiffs believe that additional discovery would have provided further support for their falsity allegations, but such discovery may have provided support for Defendants' arguments as well.

38. Defendants also did not engage in any significant insider trading. In securities fraud cases, defendants often rely on this point to demonstrate an absence of fraudulent intent and/or lack of motive to engage in fraudulent conduct. The absence of any individualized pecuniary benefit might have been accepted by the jury as a sign of Defendants' supposed good intent. Plaintiffs would have had to somehow counter or undermine this testimony by explaining why Defendants engaged in fraud even though they did not stand to benefit from it. A jury could have accepted either side's testimony, thereby creating a significant trial risk. Moreover, as discussed above, there is a significant risk that Plaintiffs' arguments would never even reach the jury.

39. Plaintiffs also recognize the risks of ultimately proving the elements of loss causation and damages. Specifically, the federal securities laws allow shareholders to recover only those damages that are caused by the alleged misconduct. Those damages are often measured by the decline in a stock price following the announcement of materially adverse nonpublic information. Thus, in this case, Plaintiffs needed to demonstrate that the decline in Proterra's stock price following the corrective disclosures in March and August of 2023 were causally related to the alleged fraud. Defendants have maintained and likely would have argued at trial that the declines that followed the alleged corrective disclosures were either not related to the alleged fraud or only partially related, thereby decreasing the amount of recoverable damages. For example, although

10

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

Proterra's stock price declined significantly following Proterra's bankruptcy announcement, Defendants would have argued that the bankruptcy was caused by a business condition unrelated to the alleged misrepresentations concerning the "Transit" division or its strategy to prioritize the "Powered" and "Energy" segments. If this argument would have been successful, then Plaintiffs would not have been able to recovery any damages associated with the August 2023 decline in Proterra's stock price.

40.     The damages assessments of experts retained by the parties would involve complex analyses and surely vary substantially as to the existence and amount of damages. Moreover, when, as here, Plaintiffs' loss causation and damage theories rest primarily on the testimony and opinions of experts, Plaintiffs face a serious risk of having their theories rejected by the Court on a *Daubert* motion. Even were Plaintiffs to overcome this hurdle, no assurances can be made as to the outcome of a jury when it must balance the credibility of competing experts. The opinions of the parties' opposing experts would be hotly contested at trial where the jury's reaction to such a "battle of the experts" would be uncertain and unpredictable, including the possibility that the jury rejects Plaintiffs' expert, leaving Plaintiffs unable establish loss causation or damages.

41.     In addition to the risks discussed above, Plaintiffs faced a litany of routine obstacles if they continued with the litigation. If not for this Settlement, the Action would have continued to be highly contested by the parties at each significant stage, if the case even proceeded from its current posture. Assuming for argument's sake that the Action survived Defendants' motions to dismiss, continued litigation would be complex, costly, and lengthy. Among other things, document discovery would need to be completed; depositions taken; experts designated; and expert reports and discovery completed. Motions for class certification and summary judgment also would likely have to be briefed and argued. Defendants could have appealed Plaintiffs' class certification at any time (assuming the Court would have granted it). A trial could take weeks to complete, even without taking into account pre- and post-trial motions, and any favorable ruling to one party would almost certainly be appealed.

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

42.    Moreover, the insurance proceeds available to cover the claims asserted in the Action are limited, and therefore diminishing as litigation proceeds. The longer the Action continued, the more the available insurance proceeds would have been reduced by defense costs, reducing the amount available to the Class and resulting in the possibility that most, if not all, available insurance policies would have been exhausted before any verdict or later settlement. These uncertainties, as well as others, support approving the Settlement.

## V.    PLAN OF ALLOCATION

43.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Settlement proceeds must submit a valid Proof of Claim, including all required information, postmarked (if mailed) or received (if submitted online) on or before August 29, 2025. As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, notice and administration costs, and all applicable taxes, the balance of the Settlement Fund (the "Net Settlement Fund") will be distributed according to the Plan of Allocation. To date, no Class Member has objected to the Plan of Allocation.

44.    The Plan of Allocation, which was set forth and explained in full in the Notice, is designed to achieve an equitable and rational distribution of the Net Settlement Fund, but it is not a formal damages analysis that would be submitted at trial. Class Counsel developed the Plan of Allocation in close consultation with Plaintiffs' damages consultant and compensates all Class Members in a uniform manner. Depending on the number of Proterra shares held at particular points during the Class Period, Class Members will receive certain amounts of compensation. The compensation received corresponds to the claims asserted in the Second Amended Complaint.

45.    Specifically, the Plan of Allocation accounts for the declines in the price of Proterra stock that occurred on March 15, 2023 and August 7, 2023. As explained in the Second Amended Complaint, on each of these days the market reacted to negative news about Proterra. The first date, March 15, 2023, relates to the announcement that Proterra had violated certain covenants in its financing agreements and would need to include a "going concern" qualification in its quarterly filings. The second date, August 7, 2023, relates to Proterra's bankruptcy announcement, *i.e.*, the

12

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

materialization of the risks created by Defendants' fraudulent conduct.

46.     The Plan of Allocation provides class members with a recognized loss equal to the difference between their purchase prices and the market trading prices following each of these days, assuming they held shares on the days in question. Each class member will then receive a distribution from the Settlement Fund equal to his or her *pro rata* share of the total recognized losses from all class members. Class Counsel, therefore, believe that the Plan of Allocation provides a fair and reasonable method to equitably distribute the Net Settlement Fund among authorized claimants.

47.     The Court-appointed claims administrator, A.B. Data, Ltd., under Class Counsel's direction, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each authorized claimant's total recognized loss compared to the aggregate recognized losses of all authorized claimants. Calculation of recognized loss will depend upon several factors, including when the claimants purchased or acquired Proterra securities, and whether the claimants sold Proterra securities during or after the Class Period, and if so, when.

48.     In sum, the Plan of Allocation, developed in consultation with Plaintiffs' damages consultant, was designed to allocate the Net Settlement Fund fairly and rationally among authorized claimants. Accordingly, Class Counsel respectfully submit that the Plan of Allocation is fair, reasonable, and adequate, and should be approved.

## VI.     CLASS COUNSEL'S FEE AND EXPENSES APPLICATION

49.     Based on the exceptional results obtained for the Class, and the extensive efforts of Class Counsel required to achieve this result, Class Counsel are requesting an award of attorneys' fees in the amount of 25% of the Settlement Amount, plus interest. The percentage-of-the-fund method is the appropriate method of compensating counsel in PSLRA class actions because, among other things, it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time under the circumstances. As set forth in the accompanying Memorandum of Points and Authorities in Support of Attorneys' Fees and Expenses (the "Fee Memorandum"), numerous courts have applied the percentage-of-the-fund method in awarding fees and doing so is consistent with the PSLRA. *See* 15 U.S.C. §78u-4(a)(6).

The percentage sought here is the "benchmark" for attorneys' fee awards in this Circuit, *see In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011), and is merited in light of the results obtained and the efforts exerted in connection therewith.

### A.    The Requested Fee is Reasonable and Supported by Plaintiffs

50.    Class Counsel believe that the requested fee of 25% of the Settlement Amount, plus interest, is fair and reasonable in light of Class Counsel's diligent prosecution of the Action, the excellent result achieved in securing a significant and certain recovery for the Class, the complexity of the factual and legal issues presented in the Action, and the substantial risks and uncertainties of these and the other factors described in this Declaration and the Fee Memorandum, as well as the fact that the 25% fee request is consistent with fee awards in complex class actions within this District and the Ninth Circuit, the requested fee is well-supported.

51.    In addition, Lead Plaintiff Jam and each of the additional named Plaintiffs are sophisticated individual investors, each having invested in the stock market for multiple decades, and many having prior experience overseeing and hiring counsel for general litigation matters as business owners and/or through their professional careers. Plaintiffs have evaluated and fully support Class Counsel's fee and expense application. *See* Jam Decl., ¶4; Villanueva Decl., ¶5; Tirado Decl., ¶5; Du Decl., ¶6; Zinn Decl., ¶6; Quick Decl., ¶6.

### B.    The Risks and Unique Complexities of the Action Support Requested Fee

52.    The Action presented substantial challenges from the outset. The specific risks that were faced in proving Defendants' liability and damages are detailed herein.

53.    Class Counsel respectfully submit that any assessment of the requested fee should appropriately account for those significant risks. And given the exceptional result was achieved for the Class in the face of these risks, Class Counsel should be rewarded accordingly. Indeed, without the efforts and skill of Class Counsel, this Settlement would not have been consummated. Further, these risks are in addition to the more typical risks accompanying securities class actions, including that the Action was undertaken on a contingent basis.

54.    In that regard, Class Counsel understood from the outset of the Action that they were

14

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

embarking on complex, expensive, and lengthy litigation with no guarantee of being compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Class Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable expenses that cases such as this require. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Class Counsel have received no compensation during the course of the Action, but has incurred nearly 4,850 hours of time, for a total lodestar of $3,226,944.25, and has incurred $150,230.15 in expenses and charges in prosecuting the Action for the benefit of the Class (including an estimated $3,000 in travel expenses allocated for the final approval hearing). *See* Declaration of Adam M. Apton Filed on Behalf of Levi & Korsinsky, LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Levi & Korsinsky Declaration" or "L&K Decl."); Declaration of Joshua B. Silverman Filed on Behalf of Pomerantz LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Pomerantz Declaration" or "Pomerantz Decl.").

55.    Class Counsel also bore the risk that no recovery would be achieved (or that a judgement could not be collected, in whole or in part). Even with the most vigorous and competent efforts, success in contingent-fee litigation, such as this, is never assured.

56.    Class Counsel know from experience that the commencement of a class action does not guarantee a recovery. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

57.    Class Counsel are aware of many hard-fought lawsuits where because of the discovery of facts unknown when the case commenced, changes in the law during the pendency of the litigation, or a decision of the court or a jury verdict following a trial on the merits, exceptional professional efforts of members of the plaintiffs' bar produced no fee for counsel.

58.    Accordingly, even if Plaintiffs had survived Defendants' motions to dismiss the

15

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

Action, successfully opposed a motion for summary judgment, and sustained class certification, there is no guarantee that Plaintiffs would have prevailed at trial. Indeed, while only a modest number of securities class actions have been tried before a jury, some have been lost in their entirety. Additionally, a plaintiff who succeeds at trial still may find its verdict overturned on appeal. And, even when a plaintiff wins a jury verdict, it still may face substantial challenges in securing a recovery.

59.    When Class Counsel undertook to act on behalf of the Class in this matter, they were aware that the only way it would be compensated for its efforts was to achieve a successful result. The benefits conferred on the members of the Class by the Settlement are noteworthy in that a common fund worth $29 million was obtained for the Class despite the existence of substantial risks and Defendants' zealous and vigorous defense.

60.    Here, diligent efforts by Class Counsel in the face of substantial risks and uncertainties have resulted in a significant and immediate recovery for the benefit of the Class. In circumstances such as these, and in consideration of the substantial effort expended, the requested fee of 25% of the Settlement Amount and the request payment of $150,230.15 in expenses are reasonable and should be approved.

### C.    A Lodestar Cross-Check Supports the Requested Fee

61.    A lodestar cross-check supports the requested attorneys' fees. A lodestar cross-check is performed by multiplying the number of hours expended in the litigation by the hourly rates of the attorneys. While a lodestar cross-check is often a useful tool in determining the reasonability of a fee request, whether or not to perform one is within the Court's discretion.

62.    The Settlement occurred only after Class Counsel spent significant time and effort prosecuting the Action, including thoroughly investigating the claims asserted; researching and preparing the detailed Second Amended Complaint and earlier iterations of complaints filed in the Action; fully briefing Defendants' motions to dismiss; negotiating with Defendants to obtain documents pursuant to Plaintiffs' requests for production; reviewing and analyzing thousands pages of documents produced by Defendants; reviewing and analyzing thousands of pages filed

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

by Proterra, Inc. in connection with the company's bankruptcy proceedings; consulting with loss causation, market efficiency, and damages experts; and engaging in an arm's-length mediation process, including the preparation of a detailed mediation statement and the engagement in months of settlement discussions. At all times throughout the pendency of the Action, Class Counsel's efforts were driven and focused on advancing the Action to bring about the most successful outcome for the Class, whether through settlement or trial, by the most efficient means possible.

63.    Here, Class Counsel have expended nearly 4,850 hours in the prosecution and investigation of the Action. *See* L&K Decl.; Pomerantz Decl.. The resulting lodestar is $3,226,944.25, collectively. Pursuant to a lodestar "cross-check," the requested fee of 25% of the Settlement Amount (which equates to $7.25 million, plus interest) results in a "multiplier" of 2.25 on the lodestar, which does not include any time that will necessarily be spent obtaining approval of and thereafter administering the Settlement. Indeed, additional work will be required by Class Counsel on an ongoing basis, including: preparation for, and participation in, the final approval hearing; responding to any objections; supervising the claims administration process being conducted by the Claims Administrator (including responding to inquiries from Class Members); and supervising the distribution of the Net Settlement Fund to Class Members who have submitted valid Proofs of Claim. Class Counsel will not seek payment for this work. Moreover, as further detailed in the Fee Memorandum, this level of multiplier is well within the range of multipliers approved in this Circuit and elsewhere.

**D.    The Standing and Expertise of Class Counsel Supports the Requested Fee**

64.    Levi & Korsinsky, LLP, Court-appointed Lead Counsel for Plaintiffs and the Class and Class Counsel for the Settlement Class, is highly experienced in complex securities class actions and has successfully prosecuted numerous securities class action lawsuits in this Circuit and throughout the country. *See* L&K Decl. Levi & Korsinsky has often been appointed as lead or co-lead counsel in scores of securities class actions in this Circuit and across the country. *See id.* Moreover, Levi & Korsinsky has obtained numerous favorable judgments in these actions on behalf of investors. *See id.*

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

65. Similarly, Pomerantz, LLP, additional counsel for Plaintiffs and the Class and Court-appointed Class Counsel for the Settlement Class, is highly experienced in complex securities class actions and has successfully prosecuted numerous securities class action lawsuits in this Circuit and throughout the country. *See* Pomerantz Decl. Pomerantz has often been appointed as lead or co-lead counsel in scores of securities class actions in this Circuit and across the country. *See id*. Moreover, Pomerantz has obtained numerous favorable judgments in these actions on behalf of investors. *See id*.

**E.    The Standing and Caliber of Defendants' Counsel Supports the Requested Fee**

66. Defendants were represented throughout the Action by Cleary, Gottlieb, Steen & Hamilton LLP and Ropes & Gray LLP, both well-respected law firms with substantial resources and expertise in the defense of complex securities litigation. These prominent law firms and their attorneys zealously provided their clients with a vigorous and aggressive defense of the Action. In the face of this formidable opposition, Class Counsel developed the Action and successfully negotiated the Settlement for the Class.

**F.    The Financial Burden Carried by Class Counsel Supports the Requested Fee**

67. From the beginning of the Action, Class Counsel were aware that they might not recovery any of their expenses and, at the very least, would not recovery anything under the Action was successfully resolved. Thus, they were motivated to, and did, take steps to minimize expenses whenever possible and practicable without jeopardizing the vigorous and efficient prosecution and ultimately resolution of the Action.

68. The expenses for which Class Counsel seek repayment of in the amount of $150,230.15 from the Settlement Fund are the types of expenses that are necessarily incurred in litigation and routinely charged to litigants who are billed by the hour. These expenses include, among other things, travel costs, computer-based research expenses, and mediator and expert fees.

69. The Levi & Korsinsky Declaration and Pomerantz Declaration summarize by category the expenses incurred by Class Counsel in connection with the prosecution of the Action. These expenses and charges are reflected on the books and records maintained by Class Counsel.

18

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

These books and records are prepared from expense vouchers, check records, and other source materials, and are an accurate record of the expenses and charged incurred by Class Counsel.

70. All of the litigation expenses and charges incurred by Class Counsel, which total $150,230.15, were necessary for the successful prosecution and resolution of the claims against Defendants in this Action (including the estimated $3,000 travel costs associated with attending the final approval hearing).

## G. The Reaction of the Class Supports the Fee and Expense Application

71. Consistent with the Preliminary Approval Order, as of May 26, 2025, a total of 20,147 Postcard Notices have been emailed or mailed to potential Class Members and nominees. *See* Declaration of Adam D. Walter Regarding Notice Dissemination, Publication, and Requests for Exclusion Received to Date, ¶11. The Postcard Notice and the Notice stated that Class Counsel would seek an award of attorneys' fees of no more than 25% of the Settlement Amount, plus interest, and repayment of litigation expenses in an amount not greater than $275,000, plus interest. Additionally, the Summary Notice was transmitted over *PR Newswire*. *Id*., ¶12. In addition, the Notice is available on the Settlement website maintained by A.B. Data, www.ProterraSecuritiesSettlement.com. *Id*., ¶14..

72. While the July 1, 2025 deadline set by the Court for Class Members to object to the requested fees, expenses, and charges has not yet passed, to date, no objections have been received. Plaintiffs will respond to any objections received by the July 15, 2025 deadline for reply papers.

## VII. PLAINTIFFS' AWARD PURSUANT TO THE PSLRA

73. Pursuant to the PSLRA, 15 U.S.C. §§ 77z-1(a)(4) and 78u-4(a)(4), Plaintiffs seek an award to recover unreimbursed costs incurred in connection with their representation of the Class (including the cost of time spent). Class Counsel believe that Plaintiffs involvement in the Action conferred considerable benefit upon the Class, and that their efforts, if directed elsewhere, would be worth far more than the collective $35,000 award requested.

74. Among the tasks Plaintiffs have performed in executing their duties and responsibilities as representatives in this Action include: (i) reviewing the original complaint, the

19

first amended complaint, and the second amended complaint, and providing feedback regarding the drafting of these documents, and investigating the allegations set forth therein; (ii) interfacing with Class Counsel regarding litigation and mediation strategies, including regular communications via phone and email; (iii) gathering trading activity in ArcLight and/or Proterra stock; (iv) reviewing the briefing of Defendants' motions to dismiss; (v) gathering case-related documents as requested by Class Counsel; (vi) discussing settlement authority, settlement negotiations, and the stipulation of settlement with Class Counsel; and (vii) reviewing the motion for preliminary approval and supporting papers. *See* Jam Decl., ¶2; Villanueva Decl., ¶¶2-3; Tirado Decl., ¶¶2-3; Du Decl., ¶4; Zinn Decl., ¶4; Quick Decl., ¶4.

75.    Courts in this District, and elsewhere, have consistently approved as reasonable incentive or service awards for class representatives that are in line with and/or higher than those requested here. Further, the Notice informed Class Members that Class Counsel would seek an award of $10,000 for Lead Plaintiff Jam and an award of $5,000 for each of the additional named Plaintiffs in connection with the representation of the Class in the Action. As of May 26, 2025, there have been no objections to these requested awards to Plaintiffs. *See* Walter Decl., ¶16.

## VIII.    EXHIBITS

76.    Attached hereto as Exhibit A is a true and correct copy of Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements – 2023 Review and Analysis* (Cornerstone Research 2024).

77.    Attached hereto as Exhibit B is a true and correct copy of Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA 2024).

78.    Attached hereto as Exhibit C is a true and correct copy of William B. Rubenstein, *On Plaintiff "Incentive" Payments*, Class Action Attorney Fee Digest (Vol. 1, Apr. 2007).

## IX.    CONCLUSION

79.    In view of the certain, timely, and meaningful recovery to the Class and the substantial risks, costs, and delay of continued litigation, as described above and in the

20

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

accompanying Final Approval Memorandum, Class Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate, and that the Plan of Allocation should likewise be approved as fair and reasonable. Further, in view of the significant recovery achieved in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Class Counsel, Class Counsel respectfully request that the Court award attorneys' fees in the amount of 25% of the Settlement Amount, plus expenses and charges in the amount of $150,230.15, plus the interest accrued on both amounts, and award Lead Plaintiff Jam $10,000 and each additional Plaintiff $5,000, in the aggregate amount of $35,000, for their time and resources expended for the benefit of the Class, pursuant to the PSLRA.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 27th day of May 2025.

ADAM M. APTON

21

DECLARATION OF ADAM M. APTON IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION – Case No. 5:23-cv-03519-EKL

# EXHIBIT "A"



# CORNERSTONE RESEARCH

Economic and Financial Consulting and Expert Testimony

# Securities Class Action Settlements

2023 Review and Analysis

# Table of Contents

| | |
|---|---|
| 2023 Highlights | 1 |
| Author Commentary | 2 |
| Total Settlement Dollars | 3 |
| Settlement Size | 4 |
| Type of Claim | 5 |
|     Rule 10b-5 Claims and "Simplified Tiered Damages" | 5 |
|     Plaintiff-Estimated Damages | 7 |
|     '33 Act Claims and "Simplified Statutory Damages" | 8 |
| Analysis of Settlement Characteristics | 10 |
|     GAAP Violations | 10 |
|     Derivative Actions | 11 |
|     Corresponding SEC Actions | 12 |
|     Institutional Investors | 13 |
| Time to Settlement and Case Complexity | 14 |
| Case Stage at the Time of Settlement | 15 |
| Cornerstone Research's Settlement Analysis | 16 |
| Research Sample | 17 |
| Data Sources | 17 |
| Endnotes | 18 |
| Appendices | 19 |
| About the Authors | 24 |

# Figures and Appendices

| | |
|---|---|
| Figure 1: Settlement Statistics | 1 |
| Figure 2: Total Settlement Dollars | 3 |
| Figure 3: Distribution of Settlements | 4 |
| Figure 4: Median and Average "Simplified Tiered Damages" in Rule 10b-5 Cases | 5 |
| Figure 5: Median Settlement as a Percentage of "Simplified Tiered Damages" by Damages Ranges in Rule 10b-5 Cases | 6 |
| Figure 6: Settlements by Nature of Claims | 8 |
| Figure 7: Median Settlement as a Percentage of "Simplified Statutory Damages" by Damages Ranges in '33 Act Claim Cases | 9 |
| Figure 8: Median Settlement as a Percentage of "Simplified Tiered Damages" and Allegations of GAAP Violations | 10 |
| Figure 9: Frequency of Derivative Actions | 11 |
| Figure 10: Frequency of SEC Actions | 12 |
| Figure 11: Median Settlement Amounts and Institutional Investors | 13 |
| Figure 12: Median Settlement by Duration from Filing Date to Settlement Hearing Date | 14 |
| Figure 13: Median Settlement Dollars and Resolution Stage at Time of Settlement | 15 |
| Appendix 1: Settlement Percentiles | 19 |
| Appendix 2: Settlements by Select Industry Sectors | 19 |
| Appendix 3: Settlements by Federal Circuit Court | 20 |
| Appendix 4: Mega Settlements | 20 |
| Appendix 5: Median and Average Settlements as a Percentage of "Simplified Tiered Damages" | 21 |
| Appendix 6: Median and Average Settlements as a Percentage of "Simplified Statutory Damages" | 21 |
| Appendix 7: Median and Average Maximum Dollar Loss (MDL) | 22 |
| Appendix 8: Median and Average Disclosure Dollar Loss (DDL) | 22 |
| Appendix 9: Median Docket Entries by "Simplified Tiered Damages" Range | 23 |

Analyses in this report are based on nearly 2,200 securities class actions filed after passage of the Private Securities Litigation Reform Act of 1995 (Reform Act) and settled from 1996 through year-end 2023. See page 17 for a detailed description of the research sample. For purposes of this report and related research, a settlement refers to a negotiated agreement between the parties to a securities class action that is publicly announced to potential class members by means of a settlement notice.

# 2023 Highlights

In 2023, while the number of settled securities class actions declined 21% relative to the 15-year high in 2022, the median settlement amount, median "simplified tiered damages," and median total assets of issuer defendants all remained at historically elevated levels.[1]

- There were 83 securities class action settlements in 2023 with a total settlement value of approximately $3.9 billion, compared to 105 settlements in 2022 with a total settlement value of approximately $4.0 billion. (page 3)

- The median settlement amount of $15 million is the highest level since 2010 and represents an increase of 11% from 2022, while the average settlement amount ($47.3 million) increased by 25% over 2022. (page 4)

- There were nine mega settlements (equal to or greater than $100 million), with a total settlement value of $2.5 billion. (page 3)

- In 2023, 34% of cases settled for more than $25 million, the highest percentage since 2012. (page 4)

- Median "simplified tiered damages" declined 16% from the record high in 2022, but remained at elevated levels compared to the prior nine years.[2] (page 5)

- Issuer defendant firms involved in cases that settled in 2023 were 19% larger than defendant firms in 2022 settlements as measured by median total assets, which reached its highest level since 1996. (page 5)

- The median duration from the case filing to the settlement hearing date of 3.7 years in 2023 was unusually high. Since the Reform Act's passage, the time to settle reached this level in only one other year (2006). (page 14)

---

Figure 1: Settlement Statistics

(Dollars in millions)

| | 2018–2022 | 2022 | 2023 |
|---|---|---|---|
| Number of Settlements | 420 | 105 | 83 |
| Total Amount | $19,545.7 | $3,974.7 | $3,927.3 |
| Minimum | $0.4 | $0.7 | $0.8 |
| Median | $11.7 | $13.5 | $15.0 |
| Average | $46.5 | $37.9 | $47.3 |
| Maximum | $3,640.9 | $842.9 | $1,000.0 |

Note: Settlement dollars are adjusted for inflation; 2023 dollar equivalent figures are presented.

# Author Commentary

## Insights and Findings

Continuing an increase observed in 2022, the size of settled cases in 2023 (measured by the median settlement amount) reached the highest level in over a decade. This occurred despite a decline in median "simplified tiered damages," a measure of potential shareholder losses that our research finds to be the single most important factor in explaining individual settlement amounts.

The size of the issuer defendant firms involved in cases settled in 2023 (measured by median total assets) also increased. Indeed, median total assets for defendants in 2023 settlements reached an all-time high among post–Reform Act settlements and was 19% higher than in 2022. Issuer defendant assets serve, in part, as a proxy for resources available to fund a settlement and are highly correlated with settlement amounts. Thus, the increase in defendant assets likely contributed to the growth in settlement amounts in 2023.

One factor causing the increase in asset size of defendant firms in cases settled in 2023 may be that, overall, these firms were more mature than in prior years. Specifically, the median age as a publicly traded firm was 16 years, compared to the median age of 11 years for cases settled from 2014 to 2022. In addition, the percentage of cases settled in 2023 that involved firms in the financial sector (over 15%) was higher than the prior nine-year average. Firms in the financial sector involved in securities class action settlements have consistently reported higher total assets than other issuer firm defendants.

In 2023, cases took longer to settle. They also reached more advanced stages prior to resolution, including a smaller proportion of cases settled before a ruling on class certification compared to prior years. Since longer periods to reach settlement are also correlated with higher settlement amounts, this increase is consistent with the higher overall median settlement value.

*Securities class actions settled in 2023 continued to take longer to resolve—disruptions associated with the COVID-19 pandemic may have contributed to this increase.*

*Dr. Laarni T. Bulan*
*Principal, Cornerstone Research*

Longer times to reach a settlement and more advanced litigation stages are also typically correlated with greater case activity, as measured by the number of entries on the court dockets. Surprisingly, the median number of docket entries increased only slightly compared to 2022. This, and the fact that over 80% of cases settled in 2023 had been filed by the end of 2020, suggests that the lengthened time to settlement can potentially be explained by delays related to the COVID-19 pandemic.

*The size of issuer defendants in 2023 settlements surpassed even the previous record in 2022, in part due to an increase in the number of financial sector defendants to the highest level in the last decade.*

*Dr. Laura E. Simmons*
*Senior Advisor, Cornerstone Research*

## Looking Ahead

While we do not necessarily expect new record highs in settlement dollars in the upcoming years, it is possible that settlement amounts will remain at relatively high levels, based on recent trends in securities class action filings, including elevated levels of Disclosure Dollar Loss and Maximum Dollar Loss. (See Cornerstone Research's *Securities Class Action Filings—2023 Year in Review*.)

Further, the most recent emergence of case filings related to the 2023 bank failures, combined with a relatively high proportion in the last few years of settled cases involving financial firms, may result in a continued rise in the asset size of issuer defendants involved in settlements. This may also contribute to high settlement amounts.

Additionally, considering the levels of filing activity in recent years, we do not anticipate dramatic increases in the number of cases settled in the upcoming years.

*—Laarni T. Bulan and Laura E. Simmons*

# Total Settlement Dollars

- While the number of settlements in 2023 declined by more than 20% from 2022, 2023 total settlement dollars were roughly the same as in 2022.

- The nine mega settlements in 2023—the highest number since 2016—ranged from $102.5 million to $1 billion. *(See Appendix 4 for an analysis of mega settlements.)*

- Cases involving institutional investors as lead plaintiffs represented 86% of total settlement dollars in 2023, in line with the percentage in 2022.

*Mega settlements accounted for nearly two-thirds of 2023 total settlement dollars, up from 52% in 2022.*

Figure 2: Total Settlement Dollars
2014–2023

(Dollars in billions)



Note: Settlement dollars are adjusted for inflation; 2023 dollar equivalent figures are presented. "N" refers to the number of cases.

# Settlement Size

- The median settlement amount in 2023 was $15 million, an 11% increase from 2022 and 44% higher than the 2014–2022 median ($10.4 million). Median values provide the midpoint in a series of observations and are less affected than averages by outlier data.

- The average settlement amount in 2023 was $47.3 million, a 25% increase from 2022. (*See Appendix 1 for an analysis of settlements by percentiles*.)

- In 2023, 6% of cases settled for less than $2 million, the lowest percentage since 2013.

*The median settlement amount in 2023 reached the highest level since 2010.*

- The percentage of settlement amounts greater than $25 million (34%) was the highest since 2012, driven in part by the continued increase in settlement amounts in the $25 million to $50 million range.

- Issuers that have been delisted from a major exchange and/or declared bankruptcy prior to settlement are generally associated with lower settlement amounts. The number of such issuers declined from 10% in 2022 to a new all-time low of 7% in 2023, contributing to the higher overall median settlement amount in 2023.[3]

Figure 3: Distribution of Settlements
2014–2023

(Dollars in millions)



Note: Settlement dollars are adjusted for inflation; 2023 dollar equivalent figures are presented. Percentages may not sum to 100% due to rounding.

# Type of Claim

## Rule 10b-5 Claims and "Simplified Tiered Damages"

"Simplified tiered damages" uses simplifying assumptions to estimate per-share damages and trading behavior for cases involving Rule 10b-5 claims. It provides a measure of potential shareholder losses that allows for consistency across a large volume of cases, thus enabling the identification and analysis of potential trends.[4]

Cornerstone Research's analysis finds this measure to be the most important factor in estimating settlement amounts.[5] However, this measure is not intended to represent actual economic losses borne by shareholders. Determining any such losses for a given case requires more in-depth economic analysis.

*Median "simplified tiered damages" remained at elevated levels in 2023.*

- In 2023, the average "simplified tiered damages" was nearly six times as large as the median, the largest difference since 2016. This difference was primarily driven by seven cases with "simplified tiered damages" exceeding $5 billion.

- Higher "simplified tiered damages" are typically associated with larger issuer defendants. Consistent with the elevated levels of "simplified tiered damages," the median total assets of issuer defendants among settled cases in 2023 was $3.1 billion—154% higher than the prior nine-year median and higher than any other post–Reform Act year.

- Higher "simplified tiered damages" are also generally associated with larger Maximum Dollar Loss (MDL).[6] In 2023, the median MDL fell only slightly from the historical high in 2022. *(See Appendix 7 for additional information on median and average MDL.)*

Figure 4: Median and Average "Simplified Tiered Damages" in Rule 10b-5 Cases 2014–2023

(Dollars in millions)



Note: "Simplified tiered damages" are adjusted for inflation based on class period end dates and are estimated for common stock only; 2023 dollar equivalent figures are presented. Damages are estimated for cases alleging a claim under Rule 10b-5 (whether alone or in addition to other claims).

- Larger cases, as measured by "simplified tiered damages," typically settle for a smaller percentage of damages.

- In 2023, the overall median settlement as a percentage of "simplified tiered damages" of 4.5% increased 27% from 2022, but was in-line with the prior nine-year average percentage. *(See Appendix 5 for additional information on median and average settlement as a percentage of "simplified tiered damages.")*

- The median settlement as a percentage of "simplified tiered damages" of 4.6% for cases with "simplified tiered damages" from $500 million to $1 billion reached a five-year high in 2023.

Figure 5: Median Settlement as a Percentage of "Simplified Tiered Damages" by Damages Ranges in Rule 10b-5 Cases 2014–2023

(Dollars in millions)



Note: Damages are estimated for cases alleging a claim under Rule 10b-5 (whether alone or in addition to other claims).

## Plaintiff-Estimated Damages

In their motions for settlement approval, plaintiffs typically report an estimate of aggregate damages ("plaintiff-estimated damages").[7]

As explained in Cornerstone Research's *Approved Claims Rates in Securities Class Actions* (2020), "plaintiff-estimated damages" are often represented as plaintiffs' "best-case scenario" or the "maximum potential recovery" calculated by plaintiffs. However, the authors highlight a "selection bias" present in these data due to potential plaintiff counsel incentives to report "the lower end of the range of estimated total aggregate damages" to be able "to demonstrate to the court a high settlement amount relative to potential recovery." To the extent such incentives exist, their impact may vary across cases. Detailed information on plaintiffs' methodology to determine the reported amount is not disclosed. Hence, it is not possible to determine from the settlement documents the degree to which the methodologies employed are consistent across cases.

With the significant caveats above, "plaintiff-estimated damages" represent an additional measure of potential shareholder losses that may be used alongside "simplified tiered damages" in conjunction with settlement analyses.

# '33 Act Claims and "Simplified Statutory Damages"

For Securities Act of 1933 ('33 Act) claim cases—those involving only Section 11 and/or Section 12(a)(2) claims—potential shareholder losses are estimated using a model in which the statutory loss is the difference between the statutory purchase price and the statutory sales price, referred to here as "simplified statutory damages."[8]

- There were 10 settlements for cases with only '33 Act claims in 2023, with the majority of those cases filed in federal court (7) as opposed to state court (3).[9]

- In 2023, the percentage of cases with an underwriter defendant was 70%, down from the prior nine-year average of 88%.

- The median length of time from case filing to settlement hearing date for '33 Act claim cases was greater than four years—the longest observed duration in any post–Reform Act year for this type of case.

*In 2023, the median settlement amount for cases with only '33 Act claims was $13.5 million, an 85% increase from 2022.*

Figure 6: Settlements by Nature of Claims
2014–2023
(Dollars in millions)

|  | Number of Settlements | Median Settlement | Median "Simplified Statutory Damages" | Median Settlement as a Percentage of "Simplified Statutory Damages" |
|---|---|---|---|---|
| Section 11 and/or Section 12(a)(2) Only | 84 | $9.9 | $158.1 | 7.5% |

|  | Number of Settlements | Median Settlement | Median "Simplified Tiered Damages" | Median Settlement as a Percentage of "Simplified Tiered Damages" |
|---|---|---|---|---|
| Both Rule 10b-5 and Section 11 and/or Section 12(a)(2) | 123 | $14.7 | $307.4 | 6.6% |
| Rule 10b-5 Only | 596 | $10.3 | $291.7 | 4.5% |

Note: Settlement dollars and damages are adjusted for inflation; 2023 dollar equivalent figures are presented.

- Over 2014–2023, the median size of issuer defendants (measured by total assets) was 40% smaller for cases with only '33 Act claims relative to those that also included Rule 10b-5 claims.

- The smaller size of issuer defendants in cases with only '33 Act claims is consistent with most of these cases involving initial public offerings (IPOs). From 2014 through 2023, 80% of all cases with only '33 Act claims have involved IPOs.

- In 2023, however, the median total assets for settled cases with only '33 Act claims ($2.5 billion) was over four times as large as the median total assets for such cases in 2014–2022 ($580 million).

*The median "simplified statutory damages" in 2023 increased by 115% from the 2022 median and represents the third highest since 1996.*

Figure 7: Median Settlement as a Percentage of "Simplified Statutory Damages" by Damages Ranges in '33 Act Claim Cases 2014–2023

(Dollars in millions)



| | < $50 <br> N=12 | $50–$149 <br> N=28 | >= $150 <br> N=44 | Total Sample <br> N=84 |
|---|---|---|---|---|
| | 23.2% | 11.0% | 4.5% | 7.5% |

Jurisdictions of Settlements of '33 Act Claim Cases

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| State Court | 0 | 2 | 4 | 5 | 4 | 4 | 7 | 6 | 6 | 3 |
| Federal Court | 2 | 2 | 6 | 3 | 4 | 5 | 1 | 10 | 3 | 7 |

Note: "N" refers to the number of cases. This analysis excludes cases alleging Rule 10b-5 claims.

# Analysis of Settlement Characteristics

## GAAP Violations

This analysis examines allegations of GAAP violations in settlements of securities class actions involving Rule 10b-5 claims, including two sub-categories of GAAP violations—financial statement restatements and accounting irregularities.[10] For further details regarding settlements of accounting cases, see Cornerstone Research's annual report on *Accounting Class Action Filings and Settlements*.[11]

- The percentage of settled cases in 2023 alleging GAAP violations (37%) remained well below the prior nine-year average (49%).

- Contributing to the low number of GAAP cases settled in 2023 were continued low levels of cases involving financial statement restatements and accounting irregularities. In particular, 14% of settled cases in 2023 involved a restatement of financial statements, compared to 22% for the prior nine years. Only 1% of settled cases in 2023 involved accounting irregularities.

- Auditor codefendants were involved in only 2% of settled cases, consistent with the past few years but substantially lower than the average from 2014 to 2022.

*In 2023, the median settlement as a percentage of "simplified tiered damages" for cases with alleged GAAP violations increased nearly 25% from 2022.*

Figure 8: Median Settlement as a Percentage of "Simplified Tiered Damages" and Allegations of GAAP Violations 2014–2023



| N=341 | N=378 | N=151 | N=568 | N=21 | N=698 |

Note: "N" refers to the number of cases. This analysis is limited to cases alleging Rule 10b-5 claims (whether alone or in addition to other claims).

# Derivative Actions

- Securities class actions often involve accompanying (or parallel) derivative actions with similar claims, and such cases have historically settled for higher amounts than securities class actions without accompanying derivative matters. [12]

- The percentage of cases involving accompanying derivative actions in 2023 (40%) was the lowest since 2011, in part driven by a reduction in the number of cases filed in Delaware (13) compared to the prior four-year average (17).

- For cases settled during 2019–2023, 40% of parallel derivative suits were filed in Delaware. California and New York were the next most common venues, representing 19% and 17% of such settlements, respectively.

*In 2023, the median settlement amount for cases with an accompanying derivative action was $21 million, over 40% higher than in 2022.*

- It is commonly understood that most parallel derivative actions do not settle for monetary amounts (other than plaintiffs' attorney fees). However, the likelihood of a monetary settlement among parallel derivative actions is higher when the securities class action settlement is large, as shown in Cornerstone Research's *Parallel Derivative Action Settlement Outcomes*. [13]

Figure 9: Frequency of Derivative Actions
2014–2023



- Settlements without an Accompanying Derivative Action
- Settlements with an Accompanying Derivative Action

## Corresponding SEC Actions

- The percentage of settled cases in 2023 involving a corresponding SEC action was 12%. This represents a slight rebound from 2021 and 2022, when this percentage was less than 10%, but is still well below the prior nine-year average of 19%.

*Over the past 10 years, nearly 75% of settled cases involving SEC actions also involved a restatement of financial statements or alleged GAAP violations.*

- Historically, cases with a corresponding SEC action have typically been associated with substantially higher settlement amounts.[14] However, this pattern did not hold in 2023 when, for the third time in the past 10 years, the median settlement amount for cases with a corresponding SEC action was less than that for cases without such an action.

- Among 2023 settled cases that involved a corresponding SEC action, 70% also had an institutional investor as a lead plaintiff, up from 33% in 2022.

Figure 10: Frequency of SEC Actions
2014–2023



■ Settlements without a Corresponding SEC Action
■ Settlements with a Corresponding SEC Action

# Institutional Investors

As discussed in prior reports, increasing institutional investor participation as lead plaintiff in securities litigation was a focus of the Reform Act.[15] Indeed, in years following passage of the Reform Act, institutional investor involvement as lead plaintiffs did increase, particularly in cases with higher "simplified tiered damages."

- In 2023, for cases involving an institutional investor as lead plaintiff, median "simplified tiered damages" and median total assets were two times and nine times higher, respectively, than the median values for cases without an institutional investor as a lead plaintiff.

*All nine mega settlements in 2023 included an institutional investor as lead plaintiff.*

- In 2023, a public pension plan served as lead plaintiff in nearly two-thirds of cases with an institutional lead plaintiff.

- Institutional investor participation as lead plaintiff continues to be associated with particular plaintiff counsel. For example, in 2023 an institutional investor served as a lead plaintiff in over 88% of settled cases in which Robbins Geller Rudman & Dowd LLP ("Robbins Geller") and/or Bernstein Litowitz Berger & Grossmann LLP ("Bernstein Litowitz") served as lead or co-lead plaintiff counsel. In contrast, institutional investors served as lead plaintiff in 21% of cases in which The Rosen Law Firm, Pomerantz LLP, or Glancy Prongay & Murray LLP served as lead or co-lead plaintiff counsel.

Figure 11: Median Settlement Amounts and Institutional Investors
2014–2023

(Dollars in millions)



Note: Settlement dollars are adjusted for inflation; 2023 dollar equivalent figures are presented.

# Time to Settlement and Case Complexity

- Overall, less than one-third of cases settled in 2023 settled within three years of filing.

- Cases involving an institutional lead plaintiff continued to take longer to settle. In particular, cases settled in 2023 with an institutional lead plaintiff had a median time to settle of over 4.2 years compared to 3.4 years for cases without an institutional lead plaintiff.

- In 2023, the median time to settle for cases with GAAP allegations was almost a year longer than the median for cases without GAAP allegations.

*The median time from filing to settlement hearing date in 2023 (3.7 years) was up nearly 17% from 2022.*

- Historically, cases with The Rosen Law Firm, Pomerantz LLP, or Glancy Prongay & Murray LLP as lead or co-lead plaintiff counsel settled within three years of case filing. However, cases settled in 2023 with these firms acting as plaintiff counsel collectively took 3.9 years to settlement, a level reached in only one other year (2009). These three law firms were lead or co-lead plaintiff counsel in approximately 30% of cases in 2023.

- The presence of Robbins Geller as lead or co-lead plaintiff counsel is associated with a longer duration between filing and settlement. Cases settled in 2023 with Robbins Geller acting as lead or co-lead plaintiff counsel (28% of settled cases) had a median time to settle of 4.1 years compared to 3.5 years for cases in which the law firm was not involved.[16]

- The number of docket entries can be viewed as a proxy for the time and effort expended by plaintiff counsel and/or case complexity. Median docket entries in 2023 (142) increased only slightly from 2022 (138).

Figure 12: Median Settlement by Duration from Filing Date to Settlement Hearing Date
2014–2023

(Dollars in millions)



Note: Settlement dollars are adjusted for inflation; 2023 dollar equivalent figures are presented. "N" refers to the number of cases.

# Case Stage at the Time of Settlement

Using data obtained through collaboration with Stanford Securities Litigation Analytics (SSLA), this report analyzes settlements in relation to the stage in the litigation process at the time of settlement.

- Cases settling at later stages continue to be larger in terms of total assets and "simplified tiered damages."

- For example, both median total assets and median "simplified tiered damages" for cases that settled in 2023 after the ruling on a motion for class certification were over two times the respective medians for cases that settled in 2023 prior to such a motion being ruled on.

- In the five-year period from 2019 through 2023, over 90% of cases settled prior to the filing of a motion for summary judgment.

- In 2023, cases settling at later stages continued to include an institutional lead plaintiff at a higher percentage. Specifically, 68% of cases that settled after the filing of a motion for class certification involved an institutional lead plaintiff compared to 41% of cases that settled prior to the filing of such a motion.

*In 2023, the percentage of cases settling prior to the filing of a motion to dismiss continued to decline—from 14% of cases in 2019 to 7% of cases in 2023.*

Figure 13: Median Settlement Dollars and Resolution Stage at Time of Settlement
2019–2023

(Dollars in millions)



Note: Settlement dollars are adjusted for inflation; 2023 dollar equivalent figures are presented. "N" refers to the number of cases. MTD refers to "motion to dismiss," MCC refers to "motion for class certification," and MSJ refers to "motion for summary judgment." This analysis is limited to cases alleging Rule 10b-5 claims (whether alone or in addition to other claims).

# Cornerstone Research's Settlement Analysis

This research applies regression analysis to examine the relations between settlement outcomes and certain securities case characteristics. Regression analysis is employed to better understand the factors that are important for estimating what cases might settle for, given the characteristics of a particular securities class action.

## Determinants of Settlement Outcomes

Based on the research sample of cases that settled from January 2006 through December 2023, important determinants of settlement amounts include the following:

- "Simplified tiered damages"

- Maximum Dollar Loss (MDL)—the dollar-value change in the defendant issuer's market capitalization from its class period peak to the first trading day without inflation

- The most recently reported total assets prior to the settlement hearing date for the defendant issuer

- Number of entries on the lead case docket

- Whether there were accounting allegations

- Whether there was an SEC action with allegations similar to those included in the underlying class action complaint, as evidenced by a litigation release or an administrative proceeding against the issuer, officers, directors, or other defendants

- Whether there were criminal charges against the issuer, officers, directors, or other defendants with allegations similar to those included in the underlying class action complaint

- Whether there was a derivative action with allegations similar to those included in the underlying class action complaint

- Whether, in addition to Rule 10b-5 claims, Section 11 claims were alleged and were still active prior to settlement

- Whether the issuer has been delisted from a major exchange and/or has declared bankruptcy (i.e., whether the issuer was "distressed")

- Whether an institutional investor acted as lead plaintiff

- Whether securities other than common stock/ADR/ADS were included in the alleged class

Cornerstone Research analyses show that settlements were higher when "simplified tiered damages," MDL, issuer defendant asset size, or the number of docket entries was larger, or when Section 11 claims were alleged in addition to Rule 10b-5 claims.

Settlements were also higher in cases involving accounting allegations, a corresponding SEC action, criminal charges, an accompanying derivative action, an institutional investor lead plaintiff, or securities in addition to common stock included in the alleged class.

Settlements were lower if the issuer was distressed.

More than 75% of the variation in settlement amounts can be explained by the factors discussed above.

# Research Sample

# Data Sources

- The database compiled for this report is limited to cases alleging Rule 10b-5, Section 11, and/or Section 12(a)(2) claims brought by purchasers of a corporation's common stock. The sample contains only cases alleging fraudulent inflation in the price of a corporation's common stock.

- Cases with alleged classes of only bondholders, preferred stockholders, etc., cases alleging fraudulent depression in price, and mergers and acquisitions cases are excluded. These criteria are imposed to ensure data availability and to provide a relatively homogeneous set of cases in terms of the nature of the allegations.

- The current sample includes 2,199 securities class actions filed after passage of the Reform Act (1995) and settled from 1996 through 2023. These securities class actions correspond to approximately $141.2 billion in total settlement dollars, adjusted for inflation and expressed in 2023 dollars. These settlements are identified based on a review of case activity collected by Securities Class Action Services LLC (SCAS).[17]

- The designated settlement year, for purposes of this report, corresponds to the year in which the hearing to approve the settlement was held.[18] Cases involving multiple settlements are reflected in the year of the most recent partial settlement, provided certain conditions are met.[19]

In addition to SCAS, data sources include Dow Jones Factiva, Bloomberg, the Center for Research in Security Prices (CRSP) at University of Chicago Booth School of Business, Standard & Poor's Compustat, Refinitiv Eikon, court filings and dockets, SEC registrant filings, SEC litigation releases and administrative proceedings, LexisNexis, Stanford Securities Litigation Analytics (SSLA), Securities Class Action Clearinghouse (SCAC), and public press.

# Endnotes

1. Reported dollar figures and corresponding comparisons are adjusted for inflation; 2023 dollar equivalent figures are presented in this report.

2. "Simplified tiered damages" are calculated for cases that settled in 2006 or later, following the U.S. Supreme Court's 2005 landmark decision in *Dura Pharmaceuticals Inc. v. Broudo*, 544 U.S. 336. "Simplified tiered damages" is based on the stock-price declines associated with the alleged corrective disclosure dates that are described in the settlement plan of allocation.

3. Comparison to "all-time" refers to the inception of Cornerstone Research's database of post–Reform Act settlements beginning in 1996.

4. The "simplified tiered damages" approach used for purposes of this settlement research does not examine the mix of information associated with the specific dates listed in the plan of allocation, but simply applies the stock price movements on those dates to an estimate of the "true value" of the stock during the alleged class period (or "value line"). This proxy for damages utilizes an estimate of the number of shares damaged based on reported trading volume and the number of shares outstanding. Specifically, reported trading volume is adjusted using volume reduction assumptions based on the exchange on which the issuer defendant's common stock is listed. No adjustments are made to the underlying float for institutional holdings, insider trades, or short-selling activity during the alleged class period. Because of these and other simplifying assumptions, the damages measures used in settlement benchmarking may differ substantially from damages estimates developed in conjunction with case-specific economic analysis.

5. Laarni T. Bulan, Ellen M. Ryan, and Laura E. Simmons, *Estimating Damages in Settlement Outcome Modeling*, Cornerstone Research (2017).

6. MDL is the dollar-value change in the defendant issuer's market capitalization from its class period peak to the first trading day without inflation.

7. Catherine J. Galley, Nicholas D. Yavorsky, Filipe Lacerda, and Chady Gemayel, *Approved Claims Rates in Securities Class Actions: Evidence from 2015–2018 Rule 10b-5 Settlements*, Cornerstone Research (2020). Data on "plaintiff-estimated damages" is made available to Cornerstone Research through collaboration with Stanford Securities Litigation Analytics (SSLA). SSLA tracks and collects data on private shareholder securities litigation and public enforcements brought by the SEC and the U.S. Department of Justice (DOJ). The SSLA dataset includes all traditional class actions, SEC actions, and DOJ criminal actions filed since 2000. Available on a subscription basis at https://sla.law.stanford.edu/.

8. The statutory purchase price is the lesser of the security offering price or the security purchase price. Prior to the first complaint filing date, the statutory sales price is the price at which the security was sold. After the first complaint filing date, the statutory sales price is the greater of the security sales price or the "value" of the security on the first complaint filing date. For purposes of "simplified statutory damages," the "value" of the security on the first complaint filing date is assumed to be the security's closing price on this date. Similar to "simplified tiered damages," the estimation of "simplified statutory damages" makes no adjustments to the underlying float for institutional holdings, insider trades, or short-selling activity.

9. As noted in prior reports, the March 2018 U.S. Supreme Court decision in *Cyan Inc. v. Beaver County Employees Retirement Fund* (*Cyan*) held that '33 Act claim securities class actions could be brought in state court. While '33 Act claim cases had often been brought in state courts before *Cyan*, filing rates in state courts increased substantially following this ruling. This trend reversed, however, following the March 2020 Delaware Supreme Court decision in *Salzberg v. Sciabacucchi* upholding the validity of federal forum-selection provisions in corporate charters. See, for example, *Securities Class Action Filings—2021 Year in Review*, Cornerstone Research (2022).

10. The two sub-categories of accounting issues analyzed in Figure 8 of this report are (1) restatements—cases involving a restatement (or announcement of a restatement) of financial statements, and (2) accounting irregularities.

11. *Accounting Class Action Filings and Settlements—2023 Review and Analysis*, Cornerstone Research, forthcoming in spring 2024.

12. To be considered an accompanying (or parallel) derivative action, the derivative action must have underlying allegations that are similar or related to the underlying allegations of the securities class action and either be active or settling at the same time as the securities class action.

13. *Parallel Derivative Action Settlement Outcomes*, Cornerstone Research (2022).

14. As noted in prior reports, it could be that the merits in such cases are stronger, or simply that the presence of a corresponding SEC action provides plaintiffs with increased leverage when negotiating a settlement. For purposes of this research, an SEC action is evidenced by the presence of a litigation release or an administrative proceeding posted on www.sec.gov involving the issuer defendant or other named defendants with allegations similar to those in the underlying class action complaint.

15. See, for example, *Securities Class Action Settlements—2006 Review and Analysis*, Cornerstone Research (2007); Michael A. Perino, "Have Institutional Fiduciaries Improved Securities Class Actions? A Review of the Empirical Literature on the PSLRA's Lead Plaintiff Provision," St. John's Legal Studies Research Paper No. 12-0021 (2013).

16. Although Robbins Geller is associated with a longer duration to settlement, its presence as lead or co-lead plaintiff counsel is not associated with significantly higher settlements as a percentage of "simplified tiered damages."

17. Available on a subscription basis. For further details see https://www.issgovernance.com/securities-class-action-services/. Bullet updated in July 2024 to include additional detail.

18. Movements of partial settlements between years can cause differences in amounts reported for prior years from those presented in earlier reports.

19. This categorization is based on the timing of the settlement hearing date. If a new partial settlement equals or exceeds 50% of the then-current settlement fund amount, the entirety of the settlement amount is re-categorized to reflect the settlement hearing date of the most recent partial settlement. If a subsequent partial settlement is less than 50% of the then-current total, the partial settlement is added to the total settlement amount and the settlement hearing date is left unchanged.

# Appendices

Appendix 1: Settlement Percentiles

(Dollars in millions)

| Year | Average | 10th | 25th | Median | 75th | 90th |
|---|---|---|---|---|---|---|
| 2014 | $23.5 | $2.2 | $3.7 | $7.7 | $17.0 | $64.4 |
| 2015 | $50.6 | $1.7 | $2.8 | $8.4 | $20.9 | $120.9 |
| 2016 | $89.6 | $2.4 | $5.3 | $10.9 | $41.9 | $185.4 |
| 2017 | $22.9 | $1.9 | $3.2 | $6.5 | $19.0 | $44.0 |
| 2018 | $78.7 | $1.8 | $4.4 | $13.7 | $30.0 | $59.6 |
| 2019 | $33.6 | $1.7 | $6.7 | $13.1 | $23.8 | $59.6 |
| 2020 | $64.9 | $1.6 | $3.8 | $11.5 | $23.8 | $62.8 |
| 2021 | $23.1 | $1.9 | $3.5 | $9.3 | $20.1 | $65.9 |
| 2022 | $37.9 | $2.1 | $5.2 | $13.5 | $36.4 | $74.8 |
| 2023 | $47.3 | $3.0 | $5.0 | $15.0 | $33.3 | $101.0 |

Note: Settlement dollars are adjusted for inflation; 2023 dollar equivalent figures are presented.

Appendix 2: Settlements by Select Industry Sectors
2014–2023

(Dollars in millions)

| Industry | Number of Settlements | Median Settlement | Median "Simplified Tiered Damages" | Median Settlement as a Percentage of "Simplified Tiered Damages" |
|---|---|---|---|---|
| Financial | 91 | $17.8 | $313.3 | 5.3% |
| Technology | 106 | $9.4 | $318.2 | 4.3% |
| Pharmaceuticals | 122 | $8.5 | $242.5 | 3.9% |
| Telecommunication | 28 | $11.4 | $381.0 | 4.4% |
| Retail | 51 | $15.2 | $350.4 | 4.6% |
| Healthcare | 21 | $10.1 | $240.4 | 6.0% |

Note: Settlement dollars and "simplified tiered damages" are adjusted for inflation; 2023 dollar equivalent figures are presented. "Simplified tiered damages" are calculated only for cases involving Rule 10b-5 claims (whether alone or in addition to other claims).

## Appendix 3: Settlements by Federal Circuit Court
### 2014–2023
(Dollars in millions)

| Circuit | Number of Settlements | Median Settlement | Median Settlement as a Percentage of "Simplified Tiered Damages" |
|---|---|---|---|
| First | 20 | $14.1 | 2.8% |
| Second | 212 | $8.9 | 4.9% |
| Third | 85 | $7.3 | 4.9% |
| Fourth | 23 | $24.5 | 3.9% |
| Fifth | 38 | $11.7 | 4.7% |
| Sixth | 35 | $15.8 | 6.7% |
| Seventh | 40 | $18.0 | 3.7% |
| Eighth | 14 | $48.3 | 4.6% |
| Ninth | 190 | $9.0 | 4.4% |
| Tenth | 19 | $12.4 | 5.3% |
| Eleventh | 36 | $13.7 | 4.7% |
| DC | 4 | $27.9 | 2.2% |

Note: Settlement dollars are adjusted for inflation; 2023 dollar equivalent figures are presented. Settlements as a percentage of "simplified tiered damages" are calculated only for cases alleging Rule 10b-5 claims (whether alone or in addition to other claims).

## Appendix 4: Mega Settlements
### 2014–2023

■ Total Mega Settlement Dollars as a Percentage of All Settlement Dollars

■ Number of Mega Settlements as a Percentage of All Settlements



Note: Mega settlements are defined as total settlement funds equal to or greater than $100 million.

Appendix 5: Median and Average Settlements as a Percentage of "Simplified Tiered Damages" 2014–2023



Note: "Simplified tiered damages" are calculated only for cases alleging Rule 10b-5 claims (whether alone or in addition to other claims).

Appendix 6: Median and Average Settlements as a Percentage of "Simplified Statutory Damages" 2014–2023



Note: "Simplified statutory damages" are calculated only for cases alleging Section 11 ('33 Act) claims and no Rule 10b-5 claims.

## Appendix 7: Median and Average Maximum Dollar Loss (MDL)
## 2014–2023

(Dollars in millions)



Note: MDL is adjusted for inflation based on class period end dates; 2023 dollar equivalents are presented. MDL is the dollar-value change in the defendant issuer's market capitalization from its class period peak to the first trading day without inflation. This analysis excludes cases alleging '33 Act claims only.

## Appendix 8: Median and Average Disclosure Dollar Loss (DDL)
## 2014–2023

(Dollars in millions)



Note: DDL is adjusted for inflation based on class period end dates; 2023 dollar equivalents are presented. DDL is the dollar-value change in the defendant firm's market capitalization between the end of the class period to the first trading day without inflation. This analysis excludes cases alleging '33 Act claims only.

Appendix 9: Median Docket Entries by "Simplified Tiered Damages" Range
2014–2023

(Dollars in millions)



Note: "Simplified tiered damages" are calculated only for cases alleging Rule 10b-5 claims (whether alone or in addition to other claims).

# About the Authors

**Laarni T. Bulan**

Ph.D., Columbia University; M.Phil., Columbia University; B.S., University of the Philippines

Laarni Bulan is a principal in Cornerstone Research's Boston office, where she specializes in finance. Her work has focused on securities and other complex litigation addressing class certification, damages, and loss causation issues; mergers and acquisitions (M&A) and firm valuation; and corporate governance, executive compensation, and risk management issues. She has also consulted on cases related to insider trading, market manipulation and trading behavior, financial institutions and the credit crisis, derivatives, foreign exchange, and securities clearing and settlement.

Dr. Bulan has published notable academic articles in peer-reviewed journals. Her research covers topics in dividend policy, capital structure, executive compensation, corporate governance, and real options. Prior to joining Cornerstone Research, Dr. Bulan had a joint appointment at Brandeis University as an assistant professor of finance in its International Business School and in the economics department.


**Laura E. Simmons**

Ph.D., University of North Carolina at Chapel Hill; M.B.A., University of Houston; B.B.A., University of Texas at Austin

Laura Simmons is a senior advisor with Cornerstone Research. She has more than 25 years of experience in economic consulting. Dr. Simmons has focused on damages and liability issues in securities class actions, as well as litigation involving the Employee Retirement Income Security Act (ERISA). She has also managed cases involving financial accounting, valuation, and corporate governance issues. She has served as a testifying expert in litigation involving accounting analyses, securities case damages, ERISA matters, and research on securities lawsuits.

Dr. Simmons's research on pre– and post–Reform Act securities litigation settlements has been published in a number of reports and is frequently cited in the public press and legal journals. She has spoken at various conferences and appeared as a guest on CNBC addressing the topic of securities case settlements. She has also published in academic journals, including research focusing on the intersection of accounting and litigation. Dr. Simmons was previously an accounting faculty member at the Mason School of Business at the College of William & Mary. From 1986 to 1991, she was an accountant with Price Waterhouse.

The authors gratefully acknowledge the research efforts and significant contributions of their colleagues at Cornerstone Research in the writing and preparation of this annual update. The views expressed herein do not necessarily represent the views of Cornerstone Research.

The authors request that you reference Cornerstone Research in any reprint of the information or figures included in this report.

Please direct any questions and requests for additional information to the settlement database administrator at settlementdatabase@cornerstone.com.

## Cornerstone Research

Cornerstone Research provides economic and financial consulting and expert testimony in all phases of complex disputes and regulatory investigations. The firm works with an extensive network of prominent academics and industry practitioners to identify the best-qualified expert for each assignment. Cornerstone Research has earned a reputation for consistently high quality and effectiveness by delivering rigorous, state-of-the-art analysis since 1989. The firm has over 900 staff in nine offices across the United States and Europe.

www.cornerstone.com

© 2024 by Cornerstone Research.
All rights reserved. Cornerstone Research is a registered service mark of Cornerstone Research, Inc.
C and design is a registered trademark of Cornerstone Research, Inc.

# EXHIBIT "B"

# NERA

# RECENT TRENDS IN SECURITIES CLASS ACTION LITIGATION:
# 2023 FULL-YEAR REVIEW

By Edward Flores and Svetlana Starykh[1]

23 January 2024

# FOREWORD

I am excited to share NERA's "Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review" with you. This year's edition builds on work carried out over more than three decades by many of NERA's securities and finance experts. Although space does not permit us to present all the analyses the authors have undertaken while working on this year's edition or to provide details on the statistical analysis of settlement amounts, we hope you will contact us if you want to learn more about our research or our work in securities litigations. On behalf of NERA's securities and finance experts, I thank you for taking the time to review this year's report and hope you find it informative.

**DAVID TABAK, PhD**
Senior Managing Director



# INTRODUCTION

There were 228 new federal securities class action suits filed in 2023, ending a four-year decline in filings seen from 2019 to 2022. The increase in filings was mainly driven by an increase in the number of suits alleging Rule 10b-5 violations. Fueled by turmoil in the banking industry, filings in the finance sector more than doubled in 2023, comprising 18% of new filings. The number of filings related to the environment quadrupled in 2023 compared to 2022.

For the sixth consecutive year, there was a decline in the number of resolutions. There were 190 cases resolved in 2023, consisting of 90 settlements and 100 dismissals, marking the lowest recorded level of resolutions in the last 10 years. More than half of the decline in resolutions was driven by a decrease in the number of settled cases with Rule 10b-5, Section 11, and/or Section 12 claims.

Aggregate settlements totaled $3.9 billion in 2023, with the top 10 settlements of the year accounting for over 66% of this amount. Aggregate plaintiffs' attorneys' fees and expenses totaled $972 million, accounting for 24.9% of the 2023 aggregate settlement value. The average settlement value increased by 17% in 2023 to $46 million, though this was largely driven by the presence of a $1 billion settlement. The median settlement value for 2023 was $14 million, a nominal 7% increase from the inflation-adjusted median settlement value in 2022.



# TRENDS IN FILINGS

From 2019 to 2022, there was a decline in the number of federal filings. In 2023, there were 228 new cases filed, an increase from the 206 cases filed in 2022 (see Figure 1).[2] Standard cases, which contain alleged violations of Rule 10b-5, Section 11, and/or Section 12, accounted for most new filings with 206.[3] In particular, filings involving only Rule 10-5 claims increased by 34% from 137 in 2022 to 184 in 2023. On the other hand, there were only seven merger-objection suits filed in 2023, marking a 10-year low. There was also a decline in filings involving crypto unregistered securities, dropping to 11 in 2023 from the 16 observed in 2022.[4] See Figure 2.

Figure 1.    Federal Filings and Number of Companies Listed in the United States
January 1996–December 2023



Note: Listed companies include those listed on the NYSE and Nasdaq. Listings data obtained from World Federation of Exchanges (WFE). The 2023 listings data are as of October 2023.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

Figure 2.  **Federal Filings by Type**
January 2014–December 2023



Excluding merger-objection and crypto unregistered securities cases, the electronic technology and technology services sector accounted for 22% of new filings, the largest proportion of any sector. After hitting a five-year low in 2022, there was a resurgence in filings in the finance sector in 2023, accounting for 18% of new filings. This is more than double the percentage in 2022 and was partly due to the banking crisis in early 2023. On the other hand, the percentage of suits in the health technology and services sector declined from 27% in 2022 to 19% in 2023, partially driven by a decline in COVID-19-related suits. See Figure 3.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

Figure 3.  **Percentage of Federal Filings by Sector and Year**
Excludes Merger Objections and Crypto Unregistered Securities
January 2019–December 2023



Note: This analysis is based on the FactSet Research Systems, Inc. economic sector classification. Some of the FactSet economic sectors are combined for presentation.

The Second, Third, and Ninth Circuits continue to be the jurisdictions with the most cases filed, together accounting for 155 of the 210 non-merger-objections, non-crypto unregistered securities filings. The Ninth Circuit witnessed 66 new filings, marking a 22% increase from 2022. The number of filings in the Second Circuit declined by 24% to 54, marking a five-year low. The Third Circuit accounted for 35 filings, more than double the number of cases in 2022. Elsewhere, there were 14 cases filed in the Eleventh Circuit, marking a five-year high. See Figure 4.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

Figure 4.  **Federal Filings by Circuit and Year**
Excludes Merger Objections and Crypto Unregistered Securities
January 2019–December 2023



Among filings of standard cases, 31% included an allegation related to missed earnings guidance and 29% included an allegation related to misled future performance.[5] Meanwhile, the percentage of standard cases containing an allegation related to merger-integration issues declined by one-third to 11%, partially driven by a decline in SPAC-related filings. See Figure 5.

Figure 5.  **Allegations**
Shareholder Class Actions with Alleged Violations of Rule 10b-5, Section 11, and/or Section 12
January 2019–December 2023



# FILINGS AGAINST FOREIGN COMPANIES

Historically, foreign companies with securities listed on US exchanges have been targeted with securities class action suits at a higher rate than their proportion of US listings, though this trend has reversed over the past two years.[6] In 2023, 18.9% of filings of standard cases were against foreign companies, compared to 24.1% of US listings represented by foreign companies. See Figure 6.

In 2023, there were 39 standard suits filed against foreign companies, a slight increase from 2022 (see Figure 7). Suits against companies in Asia accounted for 19 filings, while another 14 filings were against European companies. Nearly 36% of cases involving foreign companies had an allegation related to regulatory issues, compared to 23% for US companies. See Figure 8.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

Figure 6.   **Foreign Companies: Share of Filings and Share of Companies Listed on US Exchanges**
Shareholder Class Actions with Alleged Violations of Rule 10b-5, Section 11, and/or Section 12
January 2014–December 2023



ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

Figure 7.  Filings Against Foreign Companies
Shareholder Class Actions with Alleged Violations of Rule 10b-5, Section 11, or Section 12 by Region
January 2014–December 2023



Note: Foreign issuer status determined based on location of principal executive offices.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

Figure 8.  Allegations by US and Foreign Companies
Shareholder Class Actions with Alleged Violations of Rule 10b-5, Section 11, and/or Section 12
January 2023–December 2023



# EVENT-DRIVEN AND OTHER SPECIAL CASES

In this section, we summarize trends in filings in potential development areas that we have identified for securities class actions over the past five years (see Figures 9 and 10). Due to the small number of cases in some categories, the findings summarized here may be driven by one or two cases.

## Crypto Cases

Since 2020, there have been at least 10 crypto-related federal filings each year, comprised of cases involving unregistered securities and shareholder suits involving companies operating in or adjacent to the cryptocurrency sector. In 2023, there were 16 crypto-related federal filings, a 28% decline from the 26 filings observed in 2022.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

Figure 9.  **Number of Crypto Federal Filings**
January 2016–December 2023



## 2023 Banking Turmoil

The first securities class action suit alleging problems in the banking industry was filed on 7 December 2022 against bank holding company Silvergate Capital Corporation, which provided a banking platform through its subsidiary, Silvergate Bank.[7] Silvergate Bank's voluntary liquidation on 8 March 2023 started a rapid chain of bank failures that intensified during the spring, which saw the collapse of Silicon Valley Bank, Signature Bank, and First Republic Bank,[8] and continued through 3 November 2023, when Citizens Bank of Sac City was closed by the Iowa Division of Banking.[9] Between December 2022 and October 2023, there were 12 securities class action suits filed against banking institutions. Of those, 11 cases were filed in 2023, representing nearly 30% of all filings in the finance sector. Four of the 11 cases were filed against Credit Suisse Group AG, after Credit Suisse, the second-largest bank in Switzerland, collapsed in March 2023 and was bought by rival UBS Group AG.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

## Environment

In recent years, there has been an increased focus by governments and regulators on issues related to the environment, fossil fuel emissions, quality of drinking water, and climate change. During the past five years, there have been 20 environment-related securities class action suits filed. Eight of these cases were filed in 2023, quadruple the number from the two cases filed in 2022. Among the cases filed in 2023 include a suit against Hawaiian Electric Industries, Inc. in connection with wildfires in Hawaii, two cases related to train derailments with severe environmental consequences against Norfolk Southern Corporation, and three cases involving telecommunication companies AT&T, Verizon Communications, and Lumen Technologies for ownership of thousands of miles of lead-covered cables.

## Cannabis

In 2019, there were 13 securities class action suits filed against defendants in the cannabis industry. The number of filings has declined in subsequent years, with only one suit filed per year in each of 2022 and 2023.

## Money Laundering

In each of 2019 and 2020, three cases were filed with claims related to money laundering. In 2021, there were no such cases filed, while in 2022 and 2023, only one such suit was filed in each year.

## Cybersecurity and Customer Privacy Breach

Since 2019, there have been at least three securities class action suits filed each year related to a cybersecurity and/or customer privacy breach. While there were seven such filings in 2021, there were only three filings in 2023.

## COVID-19

Since March 2020, there have been 85 securities class actions filed with claims related to the COVID-19 pandemic. Of these, 33 cases were filed in 2020. In 2021 and 2022, the number of suits declined to 20 each year, while in 2023, there were only 12 such filings.

## SPAC

Filings related to special purpose acquisition companies (SPACs) peaked in 2021 with 31 securities class action suits filed that year. Since then, new federal filings related to SPACs have declined each year to 24 in 2022 and 14 in 2023.

Figure 10.   Event-Driven and Other Special Cases by Filing Year
January 2019–December 2023



## TRENDS IN RESOLUTIONS

In 2023, the number of resolved cases declined by 15% to 190 from 223 in 2022, continuing a six-year decline in resolutions seen since 2018 and marking the lowest recorded level of resolutions in the last 10 years. Of these resolved cases, 90 were settlements and 100 were dismissals.[10] While resolutions declined across all categories of cases, more than half of this decline was due to

a reduction in the number of settled standard cases, which had a record-setting year in 2022. The number of merger-objection cases resolved declined to nine in 2023, consistent with the reduced number of filings of such cases in recent years. See Figure 11.

Since 2015, more cases filed have been dismissed than settled. This is consistent with historical trends, which indicate that dismissals tend to occur earlier in the litigation cycle and settlements occur later (see Figure 12). For cases filed in 2023, 5% of cases have been dismissed while 95% remain pending as of December 2023.

For cases filed and resolved over the past 20 years, over two-thirds were resolved within three years of the filing of the first complaint, while 16% of cases take longer than four years to resolve (see Figure 13). The median time to resolution is 2.1 years.

Figure 11.  **Number of Resolved Cases: Dismissed or Settled**
January 2014–December 2023



Figure 12.   Status of Cases as Percentage of Federal Filings by Filing Year
Excludes Merger Objections, Crypto Unregistered Securities, and Verdicts
January 2014–December 2023



Note: Dismissals may include dismissals without prejudice and dismissals under appeal. Component values may not add to 100% due to rounding.

The number of resolved cases decreased by 15% to 190 from 223 in 2022, continuing a six-year decline in resolutions seen since 2018 and marking the lowest recorded level of resolutions in the last 10 years.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

Figure 13. **Time from First Complaint Filing to Resolution**
Excluding Merger Objections and Crypto Unregistered Securities
Cases Filed January 2004–December 2019 and Resolved January 2004–December 2023



# ANALYSIS OF MOTIONS

NERA's federal securities class action database tracks filing and resolution activity as well as decisions on motions to dismiss, motions for class certification, and the status of any motion as of the resolution date. For this analysis, we include securities class actions that were filed and resolved over the 2014–2023 period in which purchasers of common stock are part of the class and in which a violation of Rule 10b-5, Section 11, and/or Section 12 is alleged.

## Motion to Dismiss

A motion to dismiss was filed in 96% of the securities class action suits filed and resolved. A decision was reached in 74% of these cases, while 17% were voluntarily dismissed by plaintiffs, 8% settled before a court decision was reached, and 1% of motions were withdrawn by defendants. Among the cases in which a decision was reached, 60% of motions were granted (with or without prejudice) while 40% were denied either in part or in full. See Figure 14.

ECONOMICS. EXPERTS. EXPERIENCE. | www.nera.com

Figure 14.  Filing and Resolutions of Motions to Dismiss
Cases Filed and Resolved January 2014–December 2023



## Motion for Class Certification

A motion for class certification was filed in only 18% of the securities class action suits filed and resolved, as most cases are either dismissed or settled before the class certification stage is reached. A decision was reached in 60% of the cases in which a motion for class certification was filed, while nearly all remaining 40% of cases were resolved with a settlement. Among the cases in which a decision was reached, the motion for class certification was granted (with or without prejudice) in 86% of cases. See Figure 15.

Approximately 64% of decisions on motions for class certification occur within three years of the filing of the first complaint, with nearly all decisions occurring within five years (see Figure 16). The median time is about 2.7 years.

Figure 15.  Filing and Resolutions of Motions for Class Certification
Cases Filed and Resolved January 2014–December 2023



Figure 16.  Time from First Complaint Filing to Class Certification Decision
Cases Filed and Resolved January 2014–December 2023



ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

# TRENDS IN SETTLEMENT VALUES[11]

Aggregate settlements for 2023 totaled $3.9 billion, which marks a slight decline from the inflation-adjusted total of $4.2 billion from 2022.[12]  In 2023, the average settlement value was approximately $46 million, a 17% increase over the 2022 inflation-adjusted average settlement value of $39 million and the second consecutive year that this value has increased (see Figure 17). The increase in the average settlement value is largely driven by a $1 billion settlement by Wells Fargo & Company.[13]

Figure 17.  **Average Settlement Value**
Excludes Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class
January 2014–December 2023



When excluding settlements of $1 billion or higher, the average settlement value was $34 million, a decrease of 12% from the $39 million inflation-adjusted amount in 2022 (see Figure 18). The median settlement value was $14.4 million, which is a slight increase from the $13.5 million inflation-adjusted value seen in 2022 (see Figure 19). Aside from a decrease in the percentage of settlements between $10 and $19.9 million and a roughly similar increase in the percentage of settlements between $20 to $49.9 million in 2023, the distribution of settlement values in 2023 looks similar to that of 2022 (see Figure 20).

Figure 18.    Average Settlement Value
Excludes Settlements of $1 Billion or Higher, Merger Objections, Crypto Unregistered Securities,
and Settlements for $0 to the Class
January 2014–December 2023



> When excluding settlements of $1 billion or higher, the average settlement value was $34 million in 2023, a decrease of 12% from the $39 million inflation-adjusted amount in 2022.

Figure 19.  **Median Settlement Value**
Excludes Settlements of $1 Billion or Higher, Merger Objections, Crypto Unregistered Securities,
and Settlements for $0 to the Class
January 2014–December 2023



Figure 20.  **Distribution of Settlement Values**
Excludes Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class
January 2019–December 2023



Aggregate settlements for 2023 totaled $3.9 billion, which marks a slight drop relative to the inflation-adjusted total of $4.2 billion from 2022.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

# TOP SETTLEMENTS

The 10 largest settlements in 2023 ranged from $90 million to $1 billion and together accounted for over 66% of the $3.9 billion aggregate settlement amount reached in 2023. Wells Fargo & Company appears twice on this list, taking the top spot in a $1 billion settlement in a case involving misrepresentations regarding its progress in overhauling its internal controls[14] as well as the third-highest spot in a $300 million settlement in a matter involving allegations of misconduct in its auto insurance practices.[15] The Second, Seventh, and Ninth circuits accounted for nine of the top 10 settlements.

Table 1. **Top 10 2023 Securities Class Action Settlements**

| Rank | Defendant | Filing Date | Settlement Date | Total Settlement Value ($Million) | Plaintiffs' Attorneys' Fees and Expenses Value ($Million) | Circuit | Economic Sector |
|---|---|---|---|---|---|---|---|
| 1 | Wells Fargo & Company (2020) (S.D.N.Y.) | 11 Jun 2020 | 8 Sep 2023 | $1,000.0 | $181.1 | 2nd | Finance |
| 2 | The Kraft Heinz Company (N.D. Ill.) | 24 Feb 2019 | 12 Sep 2023 | $450.0 | $92.7 | 7th | Consumer Non-Durables |
| 3 | Wells Fargo & Company (2018) | 14 Feb 2019 | 17 Aug 2023 | $300.0 | $77.0 | 9th | Finance |
| 4 | Exelon Corporation (2019) | 16 Dec 2019 | 7 Sep 2023 | $173.0 | $45.3 | 7th | Utilities |
| 5 | McKesson Corporation | 25 Oct 2018 | 2 Jun 2023 | $141.0 | $36.3 | 9th | Distribution Services |
| 6 | Alexion Pharmaceuticals, Inc. (D. Conn.) | 17 Nov 2016 | 20 Dec 2023 | $125.0 | $32.8 | 2nd | Health Technology |
| 7 | Cardinal Health, Inc. (2019) | 1 Aug 2019 | 11 Sep 2023 | $109.0 | $33.4 | 6th | Distribution Services |
| 8 | Micro Focus International plc (S.D.N.Y.) (SEC 11) | 28 Mar 2018 | 27 Jul 2023 | $107.5 | $36.7 | 2nd | Technology Services |
| 9 | Grupo Televisa S.A.B. | 5 Mar 2018 | 8 Aug 2023 | $95.0 | $29.6 | 2nd | Communications |
| 10 | The Allstate Corporation | 10 Nov 2016 | 19 Dec 2023 | $90.0 | $27.1 | 7th | Finance |
| | Total | | | $2,590.0 | $591.9 | | |

Table 2 lists the 10 largest federal securities class action settlements through 31 December 2023. Since the Valeant Pharmaceuticals partial settlement of $1.2 billion in 2020, this list has remained unchanged, with settlements ranging from $1.1 to $7.2 billion.

ECONOMICS. EXPERTS. EXPERIENCE.  |  www.nera.com

Table 2.  **Top 10 Federal Securities Class Action Settlements (As of 31 December 2023)**

| Rank | Defendant | Filing Date | Settlement Year(s) | Total Settlement Value ($Million) | Financial Institutions Value ($Million) | Accounting Firms Value ($Million) | Plaintiffs' Attorney's Fees and Expenses Value ($Million) | Circuit | Economic Sector |
|---|---|---|---|---|---|---|---|---|---|
| 1 | ENRON Corp. | 22 Oct 2001 | 2003–2010 | $7,242 | $6,903 | $73 | $798 | 5th | Industrial Services |
| 2 | WorldCom, Inc. | 30 Apr 2002 | 2004–2005 | $6,196 | $6,004 | $103 | $530 | 2nd | Communications |
| 3 | Cendant Corp. | 16 Apr 1998 | 2000 | $3,692 | $342 | $467 | $324 | 3rd | Finance |
| 4 | Tyco International, Ltd. | 23 Aug 2002 | 2007 | $3,200 | No codefendant | $225 | $493 | 1st | Producer Manufacturing |
| 5 | Petroleo Brasileiro S.A.-Petrobras | 8 Dec 2014 | 2018 | $3,000 | $0 | $50 | $205 | 2nd | Energy Minerals |
| 6 | AOL Time Warner Inc. | 18 July 2002 | 2006 | $2,650 | No codefendant | $100 | $151 | 2nd | Consumer Services |
| 7 | Bank of America Corp. | 21 Jan 2009 | 2013 | $2,425 | No codefendant | No codefendant | $177 | 2nd | Finance |
| 8 | Household International, Inc. | 19 Aug 2002 | 2006–2016 | $1,577 | Dismissed | Dismissed | $427 | 7th | Finance |
| 9 | Valeant Pharmaceuticals International, Inc.* | 22 Oct 2015 | 2020 | $1,210 | $0 | $0 | $160 | 3rd | Health Technology |
| 10 | Nortel Networks | 2 Mar 2001 | 2006 | $1,143 | No codefendant | $0 | $94 | 2nd | Electronic Technology |
| | Total | | | $32,334 | $13,249 | $1,017 | $3,358 | | |

* Denotes a partial settlement, which is included here due to its sizeable amount. Note that this case is not included in any of our resolution or settlement statistics.

# NERA-DEFINED INVESTOR LOSSES

To estimate the potential aggregate loss to investors as a result of investing in the defendant's stock during the alleged class period, NERA has developed a proprietary variable, NERA-Defined Investor Losses, using publicly available data. The NERA-Defined Investor Loss measure is constructed assuming investors had invested in stocks during the class period whose performance was comparable to that of the S&P 500 Index. Over the years, NERA has reviewed and examined more than 2,000 settlements and found, of the variables analyzed, this proprietary variable to be the most powerful predictor of settlement amount.[16]

A statistical review reveals that while settlement values and NERA-Defined Investor Losses are highly correlated, the relationship is not linear. The ratio is higher for cases with lower NERA-Defined Investor Losses than for cases with higher Investor Losses. For instance, in cases with less than $20 million in Investor Losses, the median settlement value comprises 23% of Investor Losses, while in cases with more than $50 million in Investor Losses, the median settlement value is less than 4% of Investor Losses. See Figure 21.

Since 2014, annual median Investor Losses have ranged from a low of $358 million to a high of $984 million. For cases settled in 2023, the median Investor Losses were $923 million, a 6% decline from 2022 and the second highest recorded value during the 2014–2023 period. Since 2021, the median ratio of settlement amount to Investor Losses has remained stable at 1.8%. See Figure 22.

Figure 21. Median Settlement Value as a Percentage of NERA-Defined Investor Losses
By Level of Investor Losses
Cases Settled January 2014–December 2023



The median Investor Losses were $923 million, a 6% decline relative to 2022 and the second highest recorded value during the 2014–2023 period.

ECONOMICS. EXPERTS. EXPERIENCE. | www.nera.com

Figure 22.  Median NERA-Defined Investor Losses and Median Ratio of Settlement to Investor Losses
by Settlement Year
January 2014–December 2023



NERA has identified the following key factors as driving settlement amounts:

- NERA-Defined Investor Losses;

- The market capitalization of the issuer immediately after the end of the class period;

- The types of securities (in addition to common stock) alleged to have been affected by the fraud;

- Variables that serve as a proxy for the merit of plaintiffs' allegations (e.g., whether the company has already been sanctioned by a government or regulatory agency or paid a fine in connection with the allegations);

- The stage of litigation at the time of settlement; and

- Whether an institution or public pension fund is named lead plaintiff (see Figure 23).

Among cases settled between January 2012 and December 2023, these factors in NERA's statistical model can explain over 70% of the variation observed in actual settlements.

Figure 23.  **Predicted vs. Actual Settlements**
Investor Losses Using S&P 500 Index
Cases Settled January 2012–December 2023



# TRENDS IN PLAINTIFFS' ATTORNEYS' FEES AND EXPENSES

Over the past 10 years, annual aggregate plaintiffs' attorneys' fees and expenses have ranged from a low of $489 million in 2017 to a high of $1.6 billion in 2016. In 2023, aggregate plaintiffs' attorneys' fees and expenses totaled $972 million, a slight decline from the $1.0 billion seen in 2022 (see Figure 24). Plaintiffs' attorneys' fees and expenses comprised roughly 24.9% of the $3.9 billion aggregate settlement value in 2023.

A historical analysis of plaintiffs' attorneys' fees and expenses for cases that have settled since the passage of the PSLRA in 1996 reveals that fees and expenses as a percentage of the settlement amount decline as the settlement size increases. For instance, for cases settled during the 2014–2023 period, median percent fees and expenses ranged from 36.1% in settlements of $5 million or lower to 18.6% in settlements of $1 billion or higher.

In the past 10 years, median percent attorneys' fees have increased for settlements under $5 million and for settlements over $500 million relative to the 1996–2013 period. This increase is more pronounced for settlements of $1 billion or higher, although this is partly due to this category having only five cases in the post-2013 period (see Figure 25).

Figure 24.  Aggregate Plaintiffs' Attorneys' Fees and Expenses by Settlement Size
January 2014–December 2023



Plaintiffs' attorneys' fees and expenses
comprised roughly 24.9% of the $3.9 billion
aggregate settlement value in 2023.

Figure 25.  Median of Plaintiffs' Attorneys' Fees and Expenses by Size of Settlement
Excludes Merger Objections, Crypto Unregistered Securities, and Settlements for $0 to the Class



Note: Component values may not add to total value due to rounding.

# CONCLUSION

In 2023, federal filings increased by 11% from 206 in 2022 to 228 in 2023, ending a four-year period of annual declines in filings from 2019 to 2022. Of the 228 cases filed in 2023, 206 were standard cases with alleged violations of Rule 10b-5, Section 11, and/or Section 12, and 18.9% of standard cases were against foreign companies. Filings against companies in the information technology and technology services, health technology and services, and the finance sectors accounted for 59% of non-merger objections, non-crypto unregistered securities filings.

The number of resolved cases declined by 15% from 223 in 2022 to 190 in 2023. There were 90 settlements and 100 dismissals, marking the lowest level of both settlements and dismissals in the last 10 years. Excluding the presence of settlements of $1 billion or higher, the average settlement value for 2023 was $34 million and the median settlement value was $14 million. Aggregate settlements totaled $3.9 billion in 2023, with aggregate plaintiffs' attorneys' fees and expenses accounting for $972 million, or 24.9%, of the 2023 aggregate settlement value. Over the last 10 years, the median plaintiffs' attorneys' fees and expenses as a percentage of settlement value has ranged from 18.6% for settlements of $1 billion or higher to 36.1% for settlements of $5 million or lower.

# NOTES

1   This edition of NERA's report on "Recent Trends in Securities Class Action Litigation" expands on previous work by our colleagues Lucy P. Allen, Dr. Vinita Juneja, Dr. Denise Neumann Martin, Dr. Jordan Milev, Robert Patton, Dr. Stephanie Plancich, Janeen McIntosh, and others. The authors thank Dr. David Tabak and Benjamin Seggerson for helpful comments on this edition. We thank Vlad Lee, Daniel Klotz, and other of NERA's securities and finance researchers for their valuable assistance. These individuals receive credit for improving this report; any errors and omissions are those of the authors. NERA's proprietary securities class action database and all analyses reflected in this report are limited to federal case filings and resolutions.

2   NERA tracks securities class actions that have been filed in federal courts. Most of these cases allege violations of federal securities laws; others allege violations of common law, including breach of fiduciary duty, as with some merger-objection cases; still others are filed in federal court under foreign or state law. If multiple actions are filed against the same defendant, are related to the same allegations, and are in the same circuit, we treat them as a single filing. The first two actions filed in different circuits are treated as separate filings. If cases filed in different circuits are consolidated, we revise our count to reflect the consolidation. Therefore, case counts for a particular year may change over time. Different assumptions for consolidating filings would probably lead to counts that are similar but may, in certain circumstances, lead observers to draw a different conclusion about short-term trends in filings. Data for this report were collected from multiple sources, including Institutional Shareholder Services, Dow Jones Factiva, Bloomberg Finance, FactSet Research Systems, Nasdaq, Intercontinental Exchange, US Securities and Exchange Commission (SEC) filings, complaints, case dockets, and public press reports. IPO laddering cases are presented only in Figure 1.

3   Federal securities class actions that allege violations of Rule 10b-5, Section 11, and/or Section 12 have historically dominated federal securities class action dockets and have often been referred to as "standard" cases. In the analyses of this report, standard cases involve registered securities and do not include cases involving crypto unregistered securities, which will be considered as a separate category.

4   In this study, crypto cases consist of two mutually exclusive subgroups: (1) crypto shareholder class actions, which include a class of investors in common stock, American depositary receipts/American depositary shares (ADR/ADS), and/or other registered securities, along with crypto- or digital-currency-related allegations; and (2) crypto unregistered securities class actions, which do not have class investors in any registered securities that are traded on major exchanges (New York Stock Exchange, Nasdaq). We include crypto shareholder class actions in all our analyses that include standard cases. Crypto unregistered securities class actions are excluded from some analyses, which is noted in the titles of our figures.

5   Most securities class action complaints include multiple allegations. For this analysis, all allegations from the complaint are included and thus the total number of allegations exceeds the total number of filings.

6   In our analysis, a company is defined as a foreign company based on the location of its principal executive office.

7   Class Action Complaint for Violations of the Federal Securities Laws, *In re Silvergate Capital Corporation Securities Litigation*, 7 December 2023.

8   Madeleine Ngo, "A Timeline of How the Banking Crisis Has Unfolded," *The New York Times*, 1 May 2023, available at https://www.nytimes.com/2023/05/01/business/banking-crisis-failure-timeline.html.

9   "Iowa Trust & Savings Bank, Emmetsburg, Iowa, Assumes All of the Deposits of Citizens Bank, Sac City, Iowa," FDIC Press Release, 3 November 2023, available at https://www.fdic.gov/news/press-releases/2023/pr23091.html.

10  "Dismissed" is used here as shorthand for all class actions resolved without settlement; it includes cases in which a motion to dismiss was granted (and not appealed or appealed unsuccessfully), voluntary dismissals, cases terminated by a successful motion for summary judgment, or an ultimately unsuccessful motion for class certification.

11  Unless otherwise noted, the analyses in this section exclude the 2020 partial settlement involving Valeant Pharmaceuticals.

12  For our analysis, NERA includes settlements that have had the first settlement-approval hearing. We do not include partial settlements or tentative settlements that have been announced by plaintiffs and/or defendants. As a result, although we include the 2020 Valeant Pharmaceuticals partial settlement in Table 2 due to its settlement size, this case is not included in any of our resolution, settlement, or attorney fee statistics.

13  While annual average settlement values can be a helpful statistic, these values may be affected by one or a few very high settlement amounts. Unlike averages, the median settlement value is unaffected by these very high outlier settlement amounts. To understand what more typical cases look like, we analyze the average and median settlement values for cases with a settlement amount under $1 billion, thus excluding these outlier settlement amounts. For the analysis of settlement values, we limit our data to non-merger-objection and non–crypto unregistered securities cases with settlements of more than $0 to the class.

14  Jon Hill and Jessica Corso, "Wells Fargo Inks $1B Deal to End Investors' Compliance Suit," *Law360.com*, 16 May 2023, available at https://www.law360.com/articles/1677976/.

15  Lauren Berg, "Wells Fargo Investors Ink $300M Deal in Auto Insurance Suit," *Law360.com*, 7 February 2023, available at https://www.law360.com/articles/1573911/.

16  NERA-Defined Investor Losses is only calculable for cases involving allegations of damages to common stock based on one or more corrective disclosures moving the stock price to its alleged true value. As a result, we have not calculated this metric for cases such as merger objections.

## RELATED EXPERTS



**Edward Flores**
Senior Consultant
New York City: +1 212 345 2955
edward.flores@nera.com



**Svetlana Starykh**
Associate Director, Securities Class Actions Database
New York City: +1 914 448 4123
svetlana.starykh@nera.com



SUBSCRIBE

To receive publications, news, and insights from NERA, please visit **www.nera.com/subscribe**.

*The opinions expressed herein do not necessarily represent the views of NERA or any other NERA consultant.*

## ABOUT NERA

Since 1961, NERA has provided unparalleled guidance on the most important market, legal, and regulatory questions of the day. Our work has shaped industries and policy around the world. Our field-leading experts and deep experience allows us to provide rigorous analysis, reliable expert testimony, and data-powered policy recommendations for the world's leading law firms and corporations as well as regulators and governments. Our experience, integrity, and economic ingenuity mean you can depend on us in the face of your biggest economic and financial challenges.



www.nera.com

© Copyright 2024
National Economic Research Associates, Inc.
All rights reserved. Printed in the USA.

# EXHIBIT "C"

# The Expert's Corner

## ON PLAINTIFF "INCENTIVE" PAYMENTS
William B. Rubenstein*

In the January 2007 issue, *Class Action Attorney Fee Digest* reported an antitrust case in which the class representative received an incentive award of $1,250,000 for 415 hours of its staff's work, or about $3,000/hour. *Spartanburg Regional Health Services Dist., Inc. v. Hillenbrand Indus., Inc.*, No. 03-2141 (D.S.C. 2006) (1 CAAFD 5 (January 2007)). Good work if you can get it. But don't try too hard: in the March issue, the *Digest* reported a securities case in which the lead plaintiff was denied an $8,000 reimbursement for the 16 hours she spent on the case, billing these hours at her regular professional rate (as a CEO) of $500/hour. *See In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation*, 2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. 2007) (1 CAAFD 84 (March 2007)).

What's going on here?

Well, for starters, I concede that I picked a rather extreme example, as the *Spartanburg* case is by far the largest incentive payment that I have ever seen a court award. Incentive payments[1] are neither automatic nor large. They are awarded in about 25% of class action cases, though that varies by field: a recent study documented incentive payments in about 50% of consumer and employment cases, roughly 25% of securities cases, and only about 10% of derivative and mass tort suits. *See* Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. REV. 1303 (2006). The average incentive award per class representative is about $16,000, while the median award per class representative is much lower (about $4,000), *id.* at 1308, so the *Spartanburg* award is truly an outlier.

The disparity I set up above is also attributable to the distinct statutory regimes governing the two cases. Congress' 1995 Private Securities Litigation Reform Act (PSLRA) contains a specific provision limiting payments to plaintiffs, beyond

> *Incentive payments are neither automatic nor large. They are awarded in about 25% of class action cases, though that varies by field [citing the Eisenberg & Miller study].*

their *pro rata* share of the settlement, to "reasonable costs and expenses (including lost wages) directly relating to the representation of the class." 15 U.S.C. § 77z-1(a)(4).[2] In the *Merrill Lynch* case, the court ruled that it was not enough for the plaintiff "to assert that she took time out of her workday;" rather, she had to demonstrate that she incurred actual expenses or gave up specific business opportunities as a consequence of serving as lead plaintiff. This ruling conceptualizes plaintiff payments under the PSLRA purely in terms of "reimbursement." By contrast, the plaintiff payment in the *Spartanburg* antitrust case was issued under the more general and lax approach of Rule 23, one that permits "incentive" payments that exceed simple reimbursement costs.[3]

That said, Rule 23 itself says nothing about incentive awards and the common law that has developed concerning these payments provides few guiding principles. How should courts think about them? Four issues present themselves: (1) Why provide incentive awards? (2) To whom? (3) In what circumstances? and (4) How much?

*Why Incentive Awards?* Courts award payments to class action plaintiffs for three functions that they perform. First, class representatives have *oversight and monitoring* responsibilities. They must watch class counsel so as to ensure these attorneys do not sell out the class for their own recovery. Class counsel must consult with the representatives, who must approve any important aspects of the litigation (including the settlement terms). Second, class representatives *serve as*

---

[1] I use the terms "incentive awards" or "incentive payments" generically, meaning it to encompass payments that simply reimburse the plaintiffs' costs (reimbursement payments) and those that actually provide plaintiffs money in recognition of the risks that they took and intangible services they provided (incentive awards).

*William B. Rubenstein, a law professor at UCLA School of Law, specializes in class action law; he has litigated, and regularly writes about, consults, and serves as an expert witness in class action cases, particularly on fee-related issues. Professor Rubenstein provides regular reporting on class action issues, including fees, at www.classactionprofessor. com. The opinions expressed in this article are solely those of the author.*

---

[2] The PSLRA further requires that the lead plaintiff file a sworn certification stating that it "will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's *pro rata* share of any recovery, except as ordered or approved by the court in accordance with [the paragraph in the text above]." 15 U.S.C. § 78u-4(a)(2)(A)(vi).

[3] Courts are split on whether incentive payments, beyond pure compensation, are permissible in PSLRA cases. *Compare. e.g, Swack v. Credit Suisse First Boston, LLC*, 2006 U.S. Dist. LEXIS 75470 (D. Mass. Oct. 4, 2006) (incentive payments not permitted) (collecting cases) *with, e.g., In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005) (notwithstanding PSLRA, incentive payments permissible).

(continued on page 96)

---

COPYRIGHT © 2007 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.

(continued from **Expert's Corner,** page 95)

*exemplary litigants*, subjecting themselves to depositions and other discovery, perhaps even having to testify in court. Thus, in the *Spartanburg* case, the named plaintiff "was called upon to provide documents and witnesses for various discovery issues . . . [and] spent significant amounts of time monitoring the litigation, discussing issues with counsel, and deciding what it thought was best for the class as a whole." Third, class representatives play a *gate-keeping function* in that their presence is a necessary predicate for the class suit and often determines issues such as what forum the case will be filed in. *See* Richard A. Nagareda, *Restitution, Rent Extraction, and Class Representatives: Implications of Incentive Awards*, 53 UCLA L. REV. 1483 (2006).[4]

The general theory behind incentive awards is that the monitoring, litigating, and gate-keeping functions serve important public goals. Incentive awards encourage plaintiffs to step forward and provide these public goods. The common arguments against incentive awards are those of intra-class equity and conflicts of interest. If representatives get awards, they will get more than their *pro rata* share of the settlement; the disparity may seem particularly egregious in cases in which class members gets coupons but the representatives get a cash incentive award. Indeed, one might worry that provided a high enough cash award, the class representative would agree to a settlement embodying a meaningless class-wide recovery, such as a negligible coupon. While courts must monitor such conflicts, the intra-class inequity – assuming it is not too extreme (see below) – can be justified by the fact that the representative is not similarly situated to other class members: she did something they did not and is rightly paid for stepping forward and working to safeguard the class's interests.

*Who Can Get An Award?* Generally, it is the named plaintiffs and/or class representatives who perform the functions that trigger an award. However, not all named plaintiffs do such

> The general theory behind incentive awards is that the monitoring, litigating, and gate-keeping functions serve important public goals. Incentive awards encourage plaintiffs to step forward and provide these public goods. The common arguments against incentive awards are those of intra-class equity and conflicts of interest.

work and, in particular cases, other class members who are not the class representatives might do work justifying an award. *See* Jocelyn D. Larkin, *Incentive Awards to Class Representatives in Class Action Settlements* 12-13 (available at http://www.impactfund.org/pdfs/Class%20Incentives%20 UPDATED.pdf). The best practice is that the named representatives should not automatically garner an award unless they did something to deserve it, and that other class members should not automatically be precluded from such an award if they did something to warrant one. The award should reward work done, not titles.

*When Provide An Award?* As noted, awards are not automatic. There is no statutory basis for them in general class actions, though in common fund cases, they are legitimated on the same restitutionary basis as the attorney's fee – the class representative's actions helped produce the common fund and hence the class would be unjustly enriched were the representative not compensated for this effort. *See In re Cont. Ill. Sec. Litig.*, 962 F.2d 566, 571 (7th Cir. 1992) (Posner, J.). In non-common fund cases, parties will often agree to incentive awards as part of a settlement and hence a court will be asked to accept or reject them in its normal fairness hearing inquiry. In the absence of a common fund or agreement, some courts have held that an incentive award is "plainly inappropriate." *Hadix v. Johnson*, 322 F.3d 895, 898 (6th Cir. 2003).

Where a common fund or agreement provides the context for an award, the award must still be justified. The Seventh Circuit once suggested that an "incentive award is appropriate if it is *necessary* to induce an individual to participate in the suit," *Cook v. Neidart*, 142 F.3d 1004, 1016 (7th Cir. 1988) (emphasis added), but courts generally do not require the parties to prove that the class representatives would not have participated *but for* the incentive award. Rather, courts ascertain the appropriateness of an award according to multi-factor tests examining such issues as: "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Id. See also Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995) (articulating 5-factor test).

*How Much?* Perhaps the most peculiar feature of incentive awards is that there is no real method for quantifying them.

---

4    In *qui tam* cases, plaintiffs play a fourth function. The *qui tam* plaintiff is a government whistle blower who exposes corruption within the government and, through litigation, recoups the government's losses. She performs an invaluable *detection* function: because she works on the inside, she is particularly well-situated to see fraud when it occurs. At the same time, job security may make her loathe to step forward and report the fraud. The *qui tam* statute permits the plaintiff to retain a percentage of what she recovers for the government, thereby creating a significant incentive for her to play this detection function notwithstanding the risks involved.

(continued on page 97)

COPYRIGHT © 2007 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.

(continued from **Expert's Corner,** page 96)

> *Given these principles,*
> *it seems clear that both Spartanburg and*
> *Merrill Lynch were wrongly decided.*

While attorney's fees are famously calculated according to either a lodestar or percentage method, neither of these is entirely relevant to incentive awards. Lodestar doesn't quite work because class representatives generally do not keep hours as attorneys do, nor are there readily ascertainable hourly billing rates for the functions they perform. The percentage method also is inapposite – except in *qui tam* cases where statutes permit the named plaintiff to retain a percentage of the recovery – because courts have no measuring stick (like the contingent fee percentage provides for attorney's fee) by which to set a proper percentage.

Absent these familiar measuring sticks, courts are generally guided by the actual amount of time or effort that can be shown to have been spent, with some acknowledgment of the risk that was taken, as well. Whatever award is thereby selected is then tested against the other class members' recoveries to ensure that it is not so out of line that it creates a conflict between the representatives and the class. Astute readers will note that this formulation feels familiar from attorney's fees law: incentive awards are calculated according to a rough lodestar analysis, with a risk multiplier, and then cross-checked by intra-class equity.

Given these principles, it seems clear that both *Spartanburg* and *Merrill Lynch* were wrongly decided. The class representative in *Spartanburg* should have received something – perhaps even something large, given that the case constituted a huge, nearly $500 million settlement – but nowhere near $1 million or $3,000/hour. I know of but a few services that might warrant an hourly wage of that magnitude and none are, to my knowledge, provided by a class representative. On the other hand, the class representative in *Merrill Lynch* should have been compensated for her time, even under the PSLRA's tough standard. It permits awards for reasonable costs and expenses, including lost wages; while the CEO might not literally have lost wages by working on the case, she spent professional time doing so and should be compensated for that. Attorneys are permitted to recover fees without demonstrating that they actually gave up other work to undertake the present case. Class representatives should not be put to a more stringent test. Congress did intend to reign in loose payments to professional class representatives via the PSLRA; however, seeking compensation for 16 hours of actually-expended time hardly falls into that category. Moreover, the PSLRA has encouraged institutional plaintiffs to come forward and direct securities cases. It would be perverse to simultaneously engender professional monitoring but then deny the super-monitors any money for their time.

Before 1990, court-approved payments to class action plaintiffs were rare. They now occur regularly, though not in a majority of cases. Despite the PSLRA's apparent limitations, plaintiff payments are more likely to continue to increase – in frequency and size – than they are to disappear. Ω

COPYRIGHT © 2007 OCTAGON PUBLISHING, INC. REPRODUCTION STRICTLY PROHIBITED.